No. 25-1248

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

STATE OF MARYLAND, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Maryland

_____

## EMERGENCY MOTION FOR A STAY PENDING APPEAL
## AND FOR AN IMMEDIATE ADMINISTRATIVE STAY PENDING
## DISPOSITION OF THE STAY MOTION

_____

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT ....................................................................................3

    A.    Statutory And Regulatory Background....................................3

    B.    Factual Background .............................................................5

ARGUMENT ....................................................................................9

I.    This Court Has Appellate Jurisdiction. .................................. 10

II.    The Government Is Likely To Prevail On The Merits......................... 11

    A.    The District Court Lacked Jurisdiction .........................................11

        1.    Article III Standing .........................................................11

        2.    CSRA Channeling .........................................................14

    B.    The Government Did Not Conduct A Reduction In Force Requiring Notice To States. ...............................................17

III.    The Equitable Factors Favor A Stay ...................................... 18

CONCLUSION .............................................................................. 21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# INTRODUCTION

The district court—long after the close of business on Thursday, March 13—ordered eighteen federal agencies to reinstate, by 1:00 p.m. today, thousands of probationary employees across the country whom they had terminated weeks earlier. In any lawsuit, brought by any plaintiffs, such an order would be extraordinary. This order is all the more extraordinary because it issued in a lawsuit brought by nineteen states and the District of Columbia—but not even one affected employee—to redress the purported violation of a *notice* requirement.

This Court should stay the district court's order and enter an immediate administrative stay. The district court lacked jurisdiction to superintend the federal government's employment relationships at the behest of states that are strangers to those relationships. The states lack Article III standing to represent their citizens as parens patriae against the federal government or to complain of downstream economic effects caused by the government's employment actions, and the district court's attempt to repackage plaintiffs' injuries as "informational" is a dead end. Moreover, Congress has channeled all federal employment disputes into an administrative process with judicial review in the Federal Circuit. Allowing states to circumvent that process would upend a reticulated statutory scheme and contravene Supreme Court precedent recognizing that where an exclusive remedial scheme permits claims by only a particular class of plaintiffs, it shuts the door to claims by anyone else.

The district court's merits analysis was no sounder. Under federal law, a probationary employee may be terminated upon an agency's determination that the employee has "fail[ed] to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). The district court believed that the government had not identified sufficient cause for terminating any probationary employees—itself a remarkable conclusion to reach in litigation to which the employees are not parties—but it did not stop there. Instead, the district court concluded that since the government did not have sufficient cause for firing these employees, it must have *actually* conducted a reduction in force (RIF), a specific type of personnel procedure that may require advance notice to states, *see* 5 U.S.C. § 3502(d). But even if the court were correct that the government lacked sufficient cause to fire probationary employees, that would not somehow mean the government had conducted RIFs—it would just mean that the probationary employees could challenge their terminations through the mechanisms created by Congress.

The remaining stay factors overwhelmingly favor the government. The court's order has caused and will continue to cause significant burdens for almost two dozen agencies, representing an extraordinary incursion on the executive branch's authority to manage its workforce. The states, by contrast, do not suffer any cognizable harm (let alone irreparable harm) from the federal government's determination that it no longer wishes to employ certain of their citizens. At an absolute minimum, the district court's nationwide order—premised on its conclusion that just *one* plaintiff

2

state has standing because it did not receive *notice*—vastly exceeded what was necessary to redress plaintiffs' "particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

To correct these errors and stem the chaos they will cause, this Court should grant an immediate administrative stay and stay pending appeal.[1]

## STATEMENT

### A.    Statutory And Regulatory Background

**1.**    "The President may … provide … for a period of probation" for federal employees "before an appointment in the competitive service becomes final." 5 U.S.C. § 3321(a)(1); *see id.* § 7511(a)(1). Exercising this authority, OPM has issued rules defining the probationary term for the competitive service and specifying that agencies "shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. §§ 315.801, 315.802, 315.803(a). Employees in the excepted service are subject to a trial period of two years. 5 U.S.C. § 7511(a)(1)(C)(ii).

---

[1] In compliance with Federal Rule of Appellate Procedure 8(a)(1), the government's opposition to the states' motion for injunctive relief requested that any injunctive order be stayed pending appeal. *See* Dkt. No. 20, at 26. The district court denied that request. *See* Dkt. No. 43, at 53 (Op.). In addition, in compliance with Local Rule 27(a), undersigned counsel contacted counsel for plaintiffs on March 17; counsel indicated that plaintiffs intend to oppose this motion.

The government may also conduct a RIF, a distinct "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002); *see* 5 U.S.C. § 3502. When conducting a RIF, agencies must generally provide 60 days' advance written notice to the employee, 5 U.S.C. § 3502(d)(1)(A)—and if the RIF would affect a "significant number of employees" in a jurisdiction, such notice must also be provided to "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998," *id.* § 3502(d)(1)(B), (d)(3)(A)(i).

**2.**     The Civil Service Reform Act (CSRA) "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action—including a removal, suspension for more than 14 days, or furlough of 30 days or less—to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. Employees subject to a RIF may also pursue a challenge before the MSPB. *See* 5 C.F.R. § 351.901. The CSRA empowers the MSPB to order relief, including reinstatement. 5 U.S.C. §§ 1204(a)(2), 7701(g). An employee aggrieved by a final decision of the MSPB may obtain judicial review. *Id.* § 7703(a)(1).

Probationary employees generally do not have a right to appeal to the MSPB. 5 U.S.C. § 7511(a)(1); *see also* 5 C.F.R. § 315.806(c) (permitting probationary employees

4

to appeal to the MSPB only on specific issues).  But probationary employees may in appropriate circumstances pursue relief by filing complaints alleging certain prohibited personnel practices with the Office of Special Counsel, which may in turn pursue administrative relief before the MSPB.  *See* 5 U.S.C. §§ 1212, 1214.

In addition, the Federal Service Labor–Management Relations Statute (FSLMRS) governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *American Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019).  The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes.  5 U.S.C. § 7105(a)(2).  Direct review of the FLRA's decisions is available in the courts of appeals.  5 U.S.C. § 7123(a).

### B.  Factual Background

**1.**      On January 20, 2025, the Office of Personnel Management (OPM) transmitted a guidance memo to Executive Branch agencies identifying probationary periods as "an essential tool for agencies to assess employee performance." Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, Guidance on Probationary Periods, Administrative Leave and Details, at 1 (Jan. 20, 2025).  The memo directed agencies to "identify all employees on probationary periods" and "promptly determine whether those employees should be retained at the agency."  *Id.* On March 4, OPM issued revised guidance emphasizing that agencies "have ultimate decision-making authority over, and responsibility for, such personnel actions."

Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel

Management, to Heads and Acting Heads of Departments, Guidance on Probationary

Periods, Administrative Leave and Details, at 2 (rev. Mar. 4, 2025),

https://perma.cc/E8P5-74WZ.

Invoking their legal authorities to manage their workforces, certain federal

agencies have terminated certain probationary employees. According to the plaintiffs,

between February 13 and March 3, the government terminated "at least 24,000

probationary employees." *See* Op. 7. The states allege that they "were not provided

any notice of such terminations." *Id.*

**2.** Plaintiffs—19 states and the District of Columbia—commenced this

action on March 6, 2025, and they sought a temporary restraining order the following

day. *See* Dkt. Nos. 1, 4. Plaintiffs sought an order "restraining Defendants from

terminating federal probationary employees without making specific, individualized

determinations regarding the inadequacy of the employee's conduct or performance"

and "[c]ompelling Defendants to reinstate federal probationary employees fired on or

after January 20, 2025, as part of mass terminations that did not comply with RIF

procedures and were not based on individual determinations of conduct or

performance." Dkt. No. 4, at 2.

On March 13, following briefing and a hearing, the district court substantially

granted plaintiffs' motion. With respect to standing, the district court indicated that

"[i]informational injury has long been recognized as a valid injury in fact," Op. 14, and

6

that the states had suffered such an injury by not being provided advance notice of terminations. As a result, the court concluded, the states had "incurred substantial follow-on harms," including "increased burdens" in providing resources to their citizens in response to the terminations and in paying unemployment benefits. *Id.* at 14-15; *see also id.* at 15 ("States have had to divert money and human resources from existing purposes to new ones" and have "done so less efficiently than they would otherwise have."). The court found that these injuries were caused by defendants' failure to provide notice, *id.* at 19-20, and were redressable because reinstatements would relieve pressure on the states' unemployment programs, *id.* at 20-21. Because it "would order nationwide relief even if just a single State had standing," the court declined to determine which states other than Maryland had standing. *See id.* at 18 n.3.

The court rejected the government's contention that claims concerning termination of federal employment may only be pursued under the CSRA and the FSLMRS, reasoning that the statutory scheme "forecloses any possibility of the States bringing their claims before an administrative agency" because only unions, employees, and applicants for employment have rights under those statutes. Op. 26.

On the merits, the court found that the government's termination of probationary employees constituted a RIF because the "terminated probationary employees were plainly not terminated for cause." Op. 33; *see also, e.g.*, *id.* at 38 ("The wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization, even if the Government does not refer to

7

it as such.").[2]  The district court then held that the government had failed to comply with the requirements governing RIFs, including advance notice to states.  *See id.* at 37-38.

The court found that the remaining preliminary injunction factors were satisfied.  It acknowledged that any harms faced by the states were "largely economic," but it found that they were irreparable "because money damages are likely not available" from the federal government.  Op. 41.  The court further concluded that a "diversion of resources as a result of the lack of notice also constitutes an irreparable harm."  *Id.* at 42.  The court found that the balance of the equities and the public interest favored the states.  *Id.* at 42-44.

The court ordered that the government must reinstate "all Affected Probationary Employees throughout the United States FORTHWITH, and in any event before March 17, 2025, at 1:00 p.m. EDT."  Dkt. No. 44, at 1.[3]  It further issued a sweeping follow-the-law injunction directing that the government shall not "conduct any future … [RIFs]—whether formally labeled as such or not—except in compliance

---

[2] The district court found that plaintiffs were unlikely to succeed on their claims as to the Department of Defense, the National Archives and Records Administration, and OPM, as the states failed to present sufficient evidence concerning terminations at those agencies.  *See* Op. 39.  It therefore did not order relief against those agencies.  *See* Dkt. No. 44, at 3-4.

[3] The Order defines "[r]einstatement" as "restoration to employment, whether actually on duty or on leave, including administrative leave."  Dkt. No. 44, at 3.

8

with" statutory and regulatory requirements. *Id.* at 1-2. The court ordered this relief nationwide—including in the 31 states that did not join this suit—reasoning that because the "Government's policy is violative of the law across the board, it is appropriate for injunctive relief to be nationwide in scope." Op. 48.[4]

## ARGUMENT

A stay pending appeal turns on "(1) whether the stay applicant … is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties … ; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted). These factors overwhelmingly favor a stay because the district court's sweeping injunction is flawed on numerous levels and threatens chaos if not stayed.

---

[4] On March 13, 2025, in a separate lawsuit brought by unions and nonprofits, a district court granted a preliminary injunction ordering the Departments of Veterans Affairs, Agriculture, Defense, Energy, Interior, and Treasury to "immediately" "offer reinstatement to any and all probationary employees terminated on or about February 13th and 14th 2025," on the theory that OPM unlawfully ordered the terminations without statutory authority. *See American Fed'n of Gov't Emps. v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 13, 2025), Dkt. No. 115. The government appealed and moved for an administrative stay and stay pending appeal. On March 17, a divided Ninth Circuit panel denied the motion for an administrative stay and set expedited briefing on the motion for a stay pending appeal.

## I.     This Court Has Appellate Jurisdiction.

At the outset, this Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

While courts of appeals typically lack jurisdiction to review temporary restraining

orders, "the label attached to an order is not dispositive." *Abbott v. Perez*, 585 U.S.

579, 594 (2018).  Thus, "where an order has the 'practical effect' of granting or

denying an injunction, it should be treated as such for purposes of appellate

jurisdiction." *Id.*; *see also, e.g., Sampson v. Murray*, 415 U.S. 61, 86-87 (1974) (district

court cannot "shield its orders from appellate review merely by designating them as

temporary restraining orders").

Courts have explained that it may be appropriate to treat a temporary

restraining order as a preliminary injunction when "an adversary hearing has been

held, and the court's basis for issuing the order strongly challenged."  *Sampson*, 415

U.S. at 87; *see also, e.g., Free State Realty Co. v. United States*, No. 73-1475, 1973 WL

21479, at *1 (4th Cir. Dec. 19, 1973) (per curiam) (unpublished) ("In distinguishing

between a preliminary injunction and a temporary restraining order, we must consider

the subject matter of the order, its expected duration, and whether or not both parties

were heard prior to its issuance.").  And an order that "threaten[s] serious and perhaps

irreparable harm if not immediately reviewed" is likely an appealable injunction, even

if denominated in other terms.  *Abbott*, 585 U.S. at 595.

Here, the court received briefing and heard argument from the parties at a

motions hearing, *see* Dkt. Nos. 4, 20, before issuing a 56-page opinion that delved

deeply into the merits. And although the court described its order as simply preserving the status quo until March 27, Dkt. No. 44, at 2, it directed the federal government to reinstate thousands of terminated employees, some of whom were terminated weeks prior to its order. Indeed, the court itself recognized the "practical reality that the relief [it ordered] will have far-reaching impacts on the federal workforce and will require the Government to expend considerable resources." Op. 51. That is not limited, status quo relief; it is the ultimate relief plaintiffs seek in this lawsuit. *See* Dkt. No. 1, at 50-51; *see also Sampson*, 415 U.S. at 74 ("extensive relief" of the "mandatory retention of [an employee] in the position from which she was dismissed" constitutes an injunction rather than a stay). And if the government is obligated to continue paying employees who have been reinstated, it will have no effective mechanism to recoup those funds (not least because the district court required the states to each post only a nominal $100 bond, Op. 53). In these circumstances, the district court's order is immediately appealable.

## II. The Government Is Likely To Prevail On The Merits

### A. The District Court Lacked Jurisdiction

#### 1. Article III Standing

The district court went off-track from the start, because the states lack standing to superintend the federal government's employment practices, even if those practices cause downstream effects upon state budgets and operations. States cannot sue the federal government on behalf of their citizens as parens patriae. *See Haaland v.*

*Brackeen*, 599 U.S. 255, 295 (2023). Instead, like any other litigant, a state must demonstrate that it has suffered an injury-in-fact that is "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 338 (2016). The states cannot make that showing.

The states allege that they are injured because they will have to provide resources to their citizens who were terminated. *See, e.g.*, Dkt. No. 1, ¶¶ 169-207. That theory is irreconcilable with *United States v. Texas*, 599 U.S. 670, 674 (2023)— binding, recent precedent that the district court failed to even acknowledge.

In *Texas*, states challenged a federal immigration policy that would "impose[] costs on the States." 599 U.S. at 674. The states claimed the federal government's immigration-enforcement decisions would force them to "supply social services such as healthcare and education" to additional persons. *Id.* The Supreme Court held the states lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* And a theory of standing based on those indirect effects is "more attenuated" and less likely to succeed. *Id.*; *accord, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury").

Similarly, here, the states assert that the federal government's employment decisions have inflicted downstream harms. They allege, for example, that the terminations have imposed burdens on state "administrative process[es] for handling [unemployment insurance] claims," Dkt. No. 1, ¶¶ 171, 179; threatened increased enrollment in social services such as Medicaid, *e.g.*, *id.* ¶¶ 205-206; and caused the states to expend funds to establish informational resources for their citizens, *e.g.*, *id.* ¶¶ 168, 202, 205. Such harms are not cognizable injuries-in-fact. *See Texas*, 599 U.S. at 674, 680 n.3. Were the rule otherwise, states could claim standing to second-guess nearly any federal personnel decision—hirings, firings, relocations, etc.—on the theory that the decision has a downstream effect on state resources.

The district court's attempt to repackage the states' alleged injuries as "informational," Op. 13, does not make them any more cognizable. The district court reasoned that the states are, in effect, asserting "just *one* injury": an "informational injury" from the alleged lack of "legally entitled" notice that the federal government was initiating a RIF. *See* Op. 13-15. But informational injury, standing alone, does not create Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 442 (2021). Instead, the asserted informational injury must cause "real" harms that "are of the type that have traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quotation marks omitted). Here, the only harms the district court identified are the purported harms to state resources discussed above, which cannot

13

suffice. *See, e.g.*, Op. 14-15 (citing "increased" unemployment claims and need to "divert money and human resources" to provide services and benefit programs).

Nor would any such "informational" injury support the extraordinary relief ordered by the district court in any event. A plaintiff seeking injunctive relief on a theory of informational injury must assert that a judicial order would lead him to obtain information he lacks—"[a]s when an agency denies requests for information under the Freedom of Information Act." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989); *see also, e.g.*, *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). Here, at least as to terminations that have already occurred, the states do not allege that any information is presently being withheld from them. Any informational injury no longer exists and could not possibly be grounds for the district court's sweeping reinstatement order.

### 2.    CSRA Channeling

Even if the states had Article III standing, the government would remain likely to succeed on appeal because the district court lacks jurisdiction to adjudicate their challenges to the employment decisions of federal agencies. Instead, Congress has "established a comprehensive system" that provides the "exclusive means" for reviewing such matters. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted).

The CSRA, together with the FSLMRS, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and

intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *American Fed'n of Gov't Emps. v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2023) (alterations, citation, and quotations marks omitted).  Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, albeit limited to the claims and remedies provided by Congress.  *See Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019).

The district court never disputed that if this lawsuit were brought by the real parties in interest—terminated probationary employees—it could only proceed through the scheme enacted by Congress.  *See, e.g.*, Op. 24 ("Congress has provided for the exclusive administrative review of most employment claims brought by federal employees … ."); *see also, e.g.*, *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) ("[W]hat you get under the CSRA is what you get.").  Yet it concluded that those statutory limitations are irrelevant because Congress failed to include states among the parties who may bring claims under that scheme.  *See* Op. 26, 30.  That has it backwards.  "[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail."  *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009).

Supreme Court precedent makes clear that when a comprehensive scheme permits review at the behest of some types of plaintiffs but not others, it implicitly

precludes review by plaintiffs who are not authorized to bring claims.  In *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), the Supreme Court considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else.  *See id.* at 346 (citing 7 U.S.C. § 608c).  When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process."  *Id.* at 347.  Accordingly, the Court explained, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized."  *Id.*  And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders."  *Id.*  Any other holding would facilitate circumvention of the comprehensive statutory scheme.  *See id.* at 348.

The principles described in *Block* apply with full force to the CSRA.  *See United States v. Fausto*, 484 U.S. 439, 448 (1988) (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter").  Just as Congress "intentionally foreclosed judicial review to employees who … are subjected to disciplinary actions which are modest in nature," *Pinar v. Dole*, 747 F.2d 899, 912 (4th

16

Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. Any other result would encourage litigants to "bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established." *Id.* at 913 (quotation marks omitted).

In short, Congress did not leave a gaping hole in the CSRA by permitting states to challenge federal employees' terminations on their behalf. Indeed, such an interpretation would be utterly at odds with Congress's intent in enacting the CSRA, which was to replace a "patchwork system with an integrated scheme of administrative and judicial review." *Fausto*, 484 U.S. at 445. Rather, Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum.

**B.    The Government Did Not Conduct A Reduction In Force Requiring Notice To States.**

On the merits, the fundamental premise of the court's order—that agencies' terminations of probationary employees amounted to an unannounced RIF—is wrong. Even if the district court were correct that the government had unlawfully terminated certain probationary employees without sufficient cause, that would be a claim that affected employees may pursue—and in many cases are pursuing—through the procedures created by the CSRA. *See* Dkt. No. 20, at 8 (describing how some

17

probationers have pursued relief before the Office of Special Counsel and the MSPB). It would not mean the government has accidentally conducted unlawful RIFs.

In stark contrast to a termination of a probationary employee, a RIF is a mechanism that permits agencies to terminate employees "because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position d[u]e to erosion of duties." 5 C.F.R. § 351.201(a)(2). The district court believed that "[t]he wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization," Op. 38, but under the regulations a reorganization is "the planned elimination, addition, or redistribution of functions or duties in an organization," 5 C.F.R. § 351.203. The district court identified no record evidence that any agency had engaged in a reorganization; it simply speculated that because the terminations were unlawful, they must have actually been RIFs. The government is highly likely to succeed in demonstrating that this speculation was erroneous.

## III. The Equitable Factors Favor A Stay

The equitable factors all strongly favor a stay pending appeal. Every day that the injunction is in effect causes irreparable injuries to the government and the public, whose interests "merge" here. *Nken*, 556 U.S. at 435. And even assuming that plaintiffs established irreparable injury, any such injury is "plainly outweigh[ed]" by the public interest and the Executive Branch's interest in the effective and efficient

18

management of the federal workforce. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008).

The harms to the government are apparent. Across the government, agencies have determined that the continued employment of certain employees is unnecessary and inconsistent with those agencies' missions. Beyond that, the district court's exercise of jurisdiction has a "disruptive effect on the administrative processes established by the government to handle cases such as these." *Garcia v. United States*, 680 F.2d 29, 32 (5th Cir. 1982); *see supra* pp.14-17.

Implementing the court's order also has been and will continue to be extraordinarily burdensome for the affected agencies, current agency employees, and the probationary employees themselves. At the outset, the injunction requires the impacted agencies to contact thousands of terminated employees and reinstate their employment—itself a substantial administrative burden. The agencies have endeavored to reinstate the terminated employees in compliance with the court's order, but they still must complete necessary administrative tasks. These burdens continue every day the order remains in effect and would be addressed by immediate relief. The court's order also causes tremendous uncertainty for probationary employees, who may accept reinstatement and go through the onboarding process only to potentially lose their jobs again if the district court's order is reversed.

And, of course, it disserves both the government and the taxpayers to require the government to continue employing individuals whose services the government has

19

determined it no longer requires. The government will not be able to recover that money if it later wins this case. That harm, at least, could theoretically have been addressed by a bond under Federal Rule of Civil Procedure 65(c), but the district court further abused its discretion by setting the amount of the bond at a nominal $100 per plaintiff state—which, on its face, is not "proper" to protect the interests of the government.

On the other side of the ledger, the states have not established irreparable injury warranting the district court's extraordinary relief. In the ordinary course, federal employment disputes brought by proper plaintiffs—employees—rarely justify preliminary relief because there are procedures by which a terminated employee may obtain back pay from the federal government. *See, e.g., Sampson*, 415 U.S. at 92 & n.68. And as discussed above, the states' allegations of downstream economic effects do not establish an injury-in-fact, let alone irreparable harm. *See supra* pp 11-14.

At a minimum, there was no basis for the district court to enter nationwide relief in a lawsuit brought by significantly less than half the states in the nation, only *one* of which the district court concluded had standing. The legal infirmities of nationwide injunctions are well-documented; they "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump. v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g., DHS v. New York*, 140 S. Ct. 599, 600 (2020)

(Gorsuch, J., joined by Thomas, J., concurring). The district court's suggestion that nationwide relief is warranted whenever government policy is "violative of the law across the board," Op. 50, is a recipe for a nationwide injunction in every case given that the federal government sets and enforces policy on a national basis. As current circumstances well illustrate, that is not tenable.

## CONCLUSION

The Court should stay the preliminary injunction pending appeal and enter an immediate administrative stay pending consideration of this motion.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON

*s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*
  *Steven.A.Myers@usdoj.gov*

March 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Rule 27(d)(2)(A) because it contains 5089 words. This motion was prepared using Microsoft Word in Garamond, 14-point font, a proportionally spaced typeface.

*s/ Steven A. Myers*
STEVEN A. MYERS

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Steven A. Myers
Steven A. Myers

**ADDENDUM**

# TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P. 8(a)(2)(B)(iii) and Local Rule 8**

Temporary Restraining Order
    (Mar. 13, 2025) (Dkt. No. 44) ........................................................... ADD.1

Memorandum (granting TRO and denying stay pending appeal)
    (Mar. 13, 2025) (Dkt. No. 43) ........................................................... ADD.5

Complaint
    (Mar. 6, 2025) (Dkt. No. 1) ........................................................... ADD.61

**Previous Application for Relief, pursuant to Local Rule 8**

Defendants' Opposition to Motion for TRO (and incorporated request for stay pending appeal)
    (Mar. 10, 2025) (Dkt. No. 20) ................................................... ADD.116

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF MARYLAND, *et al.*,                    *

    Plaintiffs,                              *

    v.                                       *          CIVIL NO. JKB-25-0748

UNITED STATES DEPARTMENT OF              *
AGRICULTURE, *et al.*,
                                             *

    Defendants.                              *

    *    *    *    *    *    *    *    *    *    *    *    *

<u>**TEMPORARY RESTRAINING ORDER**</u>

For the reasons stated in the foregoing Memorandum, it is ORDERED as follows:

1. Plaintiffs' Motion for Temporary Restraining Order (ECF No. 4) is GRANTED with respect to the Restrained Defendants (as defined below). The Restrained Defendants are RESTRAINED pursuant to the terms of this Order throughout the United States.

2. All purported terminations of Affected Probationary Employees (as defined below) on or after January 20, 2025, by the Restrained Defendants and/or any parties working, directly or indirectly, in concert with the Restrained Defendants, are STAYED throughout the United States.

3. To alleviate the burdens on the States conducting their mandated rapid-response activities, the Restrained Defendants SHALL REINSTATE all Affected Probationary Employees throughout the United States FORTHWITH, and in any event before March 17, 2025, at 1:00 p.m. EDT.

4. The Restrained Defendants SHALL NOT, throughout the United States, conduct any future Reductions in Force ("RIFs")—whether formally labeled as such or not—except in

ADD.1

compliance with the notice requirements set forth in 5 U.S.C. § 3502, relevant regulations set forth in Title 5, Chapter I of the Code of Federal Regulations, and all other applicable law, in order to ensure that Plaintiff States receive adequate notice, as required by law, in order to conduct their mandated rapid-response activities.[1]

5. On or before Monday, March 17, 2025, at 1:00 p.m. EDT, the Restrained Defendants SHALL FILE on the Court's electronic docket a Status Report documenting the actions that they have taken to comply with this Order. Such Status Report shall set forth the number of Affected Probationary Employees reinstated at each Defendant agency, broken down by subagency, department, and/or other subdivision, to the greatest degree of granularity practicable.

6. The Court anticipates requiring further Status Reports, which may require the Restrained Defendants to provide further detail as to their compliance activities. The Court may also enter further orders as necessary to ensure compliance with this Order.

7. Any motion for extension of this Order is due on or before Friday, March 21, 2025, at 4:00 p.m. EDT, and any hearing on a motion for a Preliminary Injunction will occur on Wednesday, March 26, 2025, at 9:30 a.m. EDT in Courtroom 5A, United States Courthouse, 101 W. Lombard St., Baltimore, Maryland.

8. Pursuant to Rule 65(c), each individual Plaintiff State and the District of Columbia SHALL POST A BOND of $100, for a total of $2,000, with the Clerk of the Court FORTHWITH.

9. Unless the Court orders otherwise, this Order SHALL EXPIRE on Thursday, March 27, 2025, at 8:00 p.m. EDT.

---

[1] Nothing in this Order prohibits the Government from conducting lawful terminations of probationary federal employees—whether pursuant to a proper RIF or else for cause, on the basis of good-faith, individualized determinations, under the standards for making such determinations set forth in the foregoing Memorandum, and not as part of a mass termination.

2

10. For the purposes of this Order, the following definitions apply:

  a. Reinstatement means restoration to employment, whether actually on duty or on leave, including administrative leave.

  b. Restrained Defendants means the following agencies, and the respective agency heads sued in their official capacities:[2]

      i. United States Department of Agriculture;

      ii. United States Department of Commerce;

      iii. United States Department of Education;

      iv. United States Department of Energy;

      v. United States Department of Health and Human Services;

      vi. United States Department of Homeland Security;

      vii. United States Department of Housing and Urban Development;

      viii. United States Department of Interior;

      ix. United States Department of Labor;

      x. United States Department of Transportation;

      xi. United States Department of Treasury;

      xii. United States Department of Veterans Affairs;

      xiii. Consumer Financial Protection Bureau;

      xiv. Environmental Protection Agency;

      xv. Federal Deposit Insurance Corporation;

      xvi. General Services Administration;

---

[2] This definition includes all Defendants named in the Complaint, with the exception of: (1) the National Archives and Records Administration and Marco Rubio in his official capacity as Archivist; (2) the Office of Personnel Management and Charles Ezell in his official capacity as its Acting Director; and (3) the Department of Defense and Pete Hegseth in his official capacity as Secretary of the Department of Defense.

3

ADD.3

xvii.   Small Business Administration; and

xviii.  United States Agency for International Development.

c.  Affected Probationary Employees means all federal probationary employees who were previously employed by any of the Restrained Defendant agencies, or any department or other subdivision therein, and who were purportedly terminated on or after January 20, 2025.  The definition excludes any such employees who (1) were actually terminated on the basis of a good-faith, individualized determination of cause, under the standards for making such a determination set forth in the foregoing Memorandum, and who (2) were not otherwise terminated as part of a mass termination.

DATED this *13* day of March, 2025, at ___*8:15 P.M*___.

BY THE COURT:

*James K. Bredar*

James K. Bredar
United States District Judge

4

ADD.4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STATE OF MARYLAND, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-25-0748 |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM**

## TABLE OF CONTENTS

I.　SUMMARY ...................................................................................................... 1

II.　INTRODUCTION ............................................................................................. 2

III.　BACKGROUND ................................................................................................ 2

　A.　Requirements for Terminating Probationary Employees ............................... 2

　B.　The Government's Alleged Actions ................................................................ 6

　C.　The States' Alleged Harms ............................................................................. 7

IV.　REVIEWABILITY ......................................................................................... 12

　A.　Justiciability ................................................................................................. 12

　　1.　Injury in Fact ........................................................................................... 13

　　2.　Causation .................................................................................................. 19

　　3.　Redressability ........................................................................................... 20

　B.　Jurisdiction ................................................................................................... 21

　　1.　Final Agency Action ................................................................................ 21

　　2.　Claim Channeling ..................................................................................... 23

V.　TEMPORARY RESTRAINING ORDER ..................................................... 30

　A.　Likelihood of Success on the Merits ............................................................ 30

　　1.　Zone of Interests ...................................................................................... 31

　　2.　The Agencies Conducted RIFs ................................................................ 32

　　3.　The Agencies' Actions Were Contrary to Statutory RIF Requirements ........ 39

　B.　Irreparable Harm .......................................................................................... 41

　C.　Balance of the Equities & the Public Interest .............................................. 42

VI.　SCOPE OF RELIEF ....................................................................................... 44

　A.　TRO Purpose & Limitations ......................................................................... 44

　B.　Geographic Scope ......................................................................................... 47

　C.　Content of the Injunction .............................................................................. 49

　D.　Agencies Restrained ..................................................................................... 52

VII.　SECURITY/BOND REQUIREMENT ........................................................... 52

VIII.　STAY PENDING APPEAL ............................................................................ 53

IX.　CONCLUSION ................................................................................................ 54

ii

## I.    SUMMARY

When the federal government terminates large numbers of its employees, including those still on probation because they were recently hired or promoted, it must follow certain rules. Some of those rules are intended to help states manage the consequences of sudden, mass layoffs. Workers who unexpectedly lose their jobs often need immediate assistance—in applying for unemployment, in searching for new jobs, and in obtaining essential social services—and Congress and the government itself recognized as much when they crafted rules meant to give states advance notice of big layoffs. Without advance notice and the opportunity to plan, organize, and reprogram necessary resources, states are harmed.

In this case, the government conducted massive layoffs, but it gave no advance notice. It claims it wasn't required to because, it says, it dismissed each one of these thousands of probationary employees for "performance" or other individualized reasons. On the record before the Court, this isn't true. There were no individualized assessments of employees. They were all just fired. Collectively. Accordingly, in the language of relevant laws, these big government layoffs were actually "Reductions in Force," or "RIFs." And, because these were "RIFs," they had to be preceded by notice to the states that would be impacted.

Lacking the notice to which they were entitled, the States weren't ready for the impact of so many unemployed people. They are still scrambling to catch up. They remain impaired in their capacities to meet their legal obligations to their citizens.

Because the federal government's recent discharge of thousands of probationary employees was not executed in compliance with rules intended to ensure that states are ready to bear the load cast upon them when mass layoffs occur, and because the Plaintiff States are not yet

1

in fact so prepared, and this because of the violations, the recent directives of various federal agencies terminating probationary employees must be stayed.

In the accompanying Temporary Restraining Order, the illegal RIFs *are* stayed for fourteen days, during which the Court will likely consider an application for a preliminary or longer-term injunction. The Temporary Restraining Order restores the status quo. Employees purportedly terminated under the RIFs are returned to the Government's employ, *i.e.*, they resume the status they enjoyed before the Government acted.

*  *  *

## II. INTRODUCTION

Plaintiffs, which include nineteen states and the District of Columbia ("the States"), have filed suit against forty-one Defendants, which include cabinet agencies and their secretaries, and other federal agencies and their heads ("the Government"). (*See generally* ECF No. 1.) The States challenge the Government's termination of probationary federal employees. Plaintiffs have filed a Motion for Temporary Restraining Order ("TRO"). (ECF No. 4.) The parties have filed briefing and evidence in relation to the Motion. (ECF Nos. 4, 5, 19, 20, 33.) The Court held a Hearing on the Motion on March 12, 2025. The Motion will be granted, and a TRO will issue.

## III. BACKGROUND

### A. Requirements for Terminating Probationary Employees

In the federal civil service, most employees are considered to be under probationary status in the first year or two of their employment. *See* 5 U.S.C. §§ 3321(a), 7511(a)(1)(A)(ii), 7511(a)(1)(C)(ii); 5 C.F.R. § 315.801. A probationary employee may be terminated "because his

2

work performance or conduct during this period fails to demonstrate his fitness or his qualifications

for continued employment," 5 C.F.R. § 315.804, or "for reasons based in whole or in part on

conditions arising before his appointment," 5 C.F.R. § 315.805. If a probationary employee is

terminated because his performance or conduct fails to demonstrate that he is fit for continued

employment, the agency "shall terminate his services by notifying him in writing as to why he is

being separated and the effective date of the action. The information in the notice as to why the

employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the

inadequacies of his performance or conduct." 5 C.F.R. § 315.804. Otherwise, a probationary

employee may be terminated as part of a reduction in force ("RIF"). The parties have not identified

any other method by which a probationary employee may be terminated.

With respect to a RIF, federal statutes and regulations set forth detailed procedures that

federal agencies must follow. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351. The relevant regulations

provide that "[e]ach agency shall follow this part when it releases a competing employee from his

or her competitive level by . . . separation . . . , when the release is required because of lack of

work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of

reemployment rights or restoration rights; or reclassification of an employee's position die [*sic*] to

erosion of duties when such action will take effect after an agency has formally announced a

reduction in force in the employee's competitive area and when the reduction in force will take

effect within 180 days." 5 C.F.R. § 351.201(a)(2).

When conducting a RIF, an agency must follow certain retention preferences, as laid out

in the statute and regulations. *See* 5 U.S.C. § 3502(a) (directing the Office of Personnel

Management ("OPM") to "prescribe regulations for the release of competing employees in a

reduction in force which give due effect to (1) tenure of employment; (2) military preference . . . ;

3

(3) length of service; and (4) efficiency or performance ratings."); 5 C.F.R. § 351.501 (providing

that "[c]ompeting employees shall be classified on a retention register on the basis of their tenure

of employment, veteran preference, length of service, and performance" based upon group

designations). Probationary employees are included in "group II" and may only be released after

the release of "group III" employees, which includes certain temporary and term employees. 5

C.F.R. § 351.501(a), (b).

> In addition, when conducting a RIF, a federal agency must:

> establish "competitive areas[1] in which employees compete for retention"; designate
> the "competitive areas" of which employees are to compete for retention at least 90
> days before the effective date of the RIF; designate any "competitive levels" of
> positions included in the RIFs that would permit the agency to reassign retained
> employees without causing undue interruption; and rank employees for retention
> based on factors including their tenure group, time in service (including military
> service), veteran preference, length of service, and performance.

(ECF No. 1 ¶ 92 (citing 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.402–351.404, 351.504).)

Further, federal agencies are required to provide at least 60 days written notice before they

may release a federal employee. If the RIF is caused by unforeseeable circumstances, "the Director

of OPM, at the request of an agency head or designee, may approve a notice period of less than 60

days." 5 C.F.R. § 351.801(b). "The shortened notice period must cover at least 30 full days before

the effective date of release." *Id.*

That notice must be provided to (1) the employee; (2) the employee's collective bargaining

representative; and—if the RIF involves at least 50 employees within a "competitive area"—(3)

the state in which the employee's duty station was located. 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803.

---

[1] "A competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location and . . . it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency. The minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R. § 351.402(b).

4

The notice must be provided to "[t]he State or the entity designated by the State to carry out rapid response activities under Title I of the Workforce Investment Act of 1998." 5 C.F.R. § 351.803. That notice must include: "(1) The number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM); (2) The effective date of the separations; and (3) Any other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services." *Id.*

When an agency fails to provide the requisite notice to the State, the "employee may not be released, due to a reduction in force[.]" 5 U.S.C. § 3502(d)(1).

The States, in turn, are required to carry out "rapid response activities" pursuant to the Workforce Innovation and Opportunity Act of 2014.[2] *See* 20 C.F.R. § 682.302 ("Rapid response must be delivered when" there is, *inter alia*, "[a]nnouncement or notification of a mass layoff as defined in § 682.305."); *see also* 20 C.F.R. § 682.305 (defining "mass layoff" as one that "meets the State's definition of mass layoff, as long as the definition does not exceed a minimum threshold of 50 affected workers" or, "[w]here a State has not defined a minimum threshold for mass layoff meeting the requirements of paragraph (a) of this section, layoffs affecting 50 or more workers").

"Rapid response activity" is defined as the activities provided by the state in response to a mass layoff "in order to assist dislocated workers in obtaining reemployment as soon as possible, with services including" "the establishment of onsite contact with employers and employee representatives"; "the provision of information on and access to available employment and training activities"; "the provision of emergency assistance"; and "assistance to the local community in

_____

[2] The Workforce Innovation and Opportunity Act of 2014 succeeded the Workforce Investment Act of 1998. *See* 29 U.S.C. § 3361(a) ("Except as otherwise specified, a reference in a Federal law to a provision of the Workforce Investment Act of 1998 (29 U.S.C. 2801 et seq.) shall be deemed to refer to the corresponding provision of [the Workforce Innovation and Opportunity Act of 2014].").

5

ADD.11

developing a coordinated response and in obtaining access to State economic development." 29

U.S.C. § 3102(51). These rapid-response services are designed to cushion the blow of sudden

mass unemployment. *See, e.g.*, 20 C.F.R. § 682.100 (providing that the Workplace Innovation and

Opportunity Act ("WIOA") designates "both required and allowable activities"); *id.* § 682.200

(identifying "[r]equired statewide . . . activities," including "rapid response activities"); *id.*

§ 682.300(a) (defining "rapid response" as "encompass[ing] the strategies and activities necessary

to," among other things, "[d]eliver services to enable dislocated workers to transition to new

employment as quickly as possible"). These federal duties stand alongside the States' own,

jurisdiction-specific requirements related to mass unemployment events. *See, e.g.*, Md. Code

Ann., Lab. & Empl. §§ 11–303 to –04 (setting out Maryland's "quick response program," whose

duties include "monitor[ing] layoff and employment patterns and payments of unemployment

compensation contributions to identify employers that are likely to experience large losses in

employment or a reduction in operations"); N.J. Stat. Ann. § 34:21-5 (setting out New Jersey's

"response team," whose duties include, among others, "[s]eek[ing] to facilitate cooperation

between [management and employees] to most effectively utilize available public programs which

may make it possible to delay or prevent the transfer or termination of operations"); (*see generally*

ECF No. 4-1 at 16–17). Finally, the States also hold background obligations to provide

unemployment and similar benefits. *See generally, e.g.*, Md. Code Ann., Lab. & Empl. §§ 8–101

to –1608; N.J. Stat. Ann. §§ 43:21–1 to –71.

### B.     The Government's Alleged Actions

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the

President's 'Department of Government Efficiency' Workforce Optimization Initiative." It set out

as its purpose, "[b]y eliminating waste, bloat, and insularity, my Administration will empower

6

ADD.12

American families, workers, taxpayers, and our system of Government itself." It provides, *inter alia*, that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."

On February 11 and 12, various agencies terminated large numbers of probationary employees. (ECF No. 1 ¶¶ 107–109.)

The States allege that, on February 13, "OPM officials met with agency officials throughout the federal government and ordered agencies to lay off nearly all of the federal government's approximately 220,000 probationary employees." (*Id.* ¶ 110.) And, in a February 14 email, Plaintiffs allege that OPM explained to agencies that "[w]e have asked that you separate probationary employees that you have not identified as mission critical no later than the end of the day Monday, 2/27. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs)." (*Id.* ¶ 112.)

This was followed by several more agencies terminating large numbers of probationary employees on February 13 through March 3. (*Id.* ¶¶ 115–137.)

All told, the States allege that the Government has terminated at least 24,000 probationary employees. (*Id.* ¶ 139.) The States were not provided any notice of such terminations from the relevant agencies. (*Id.* ¶ 148.)

### C.    The States' Alleged Harms

The States allege several injuries resulting from the Government's failure to follow the RIF procedures. They situate these injuries within five distinct categories of harm: (1) harms to the States' rapid-response protocols, which both federal and state law require the States to develop, (*see* ECF No. 4-1 at 21–22, 33–34; ECF No. 19 at 2–3); (2) harms to the States' administration of

7

unemployment benefits, (*see* ECF No. 4-1 at 21–22, 34–35; ECF No. 19 at 2–3); (3) harms to State programs that rely on embedded federal workers, (*see* ECF No. 4-1 at 36–37; ECF No. 19 at 3); (4) harms to the States' finances, namely, the States' tax bases and various social-services programs, including public health insurance, (*see* ECF No. 4-1 at 23, 37–38; ECF No. 19 at 4–5); and (5) an informational harm that attends the fact of not having received the statutorily required notice, (*see* ECF No. 4-1 at 23, 24; ECF No. 19 at 5–6).

First, the States allege harms to their rapid-response efforts by virtue of having to "divert[] or . . . prepar[e] to divert staff from critical state-funded matters." (ECF No. 19 at 2.) They also allege harms in the form of "administrative burdens [flowing from] the need to affirmatively contact federal agencies, monitor public reporting, and conduct mass outreach to identify impacted workers," (*id.* at 2–3 (citations omitted)), as well as to "determine if additional firings will occur" and "attempt to provide services to those employees," (ECF No. 4-1 at 22 (collecting affidavits from State labor officials)). For example, the State of Maryland "created a new website, requiring significant time and expense," in order to provide resources to recently terminated federal employees. (ECF No. 4-5 ¶ 29.) In the States' telling, these recent costs exceed those they would have incurred with proper notice under the RIF statute. (*See, e.g.*, ECF No. 4-5 ¶¶ 21–22 (Maryland Secretary of Labor asserting that "[r]eacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law," and that "[b]ecause the [State] has received no notice of federal RIFs, despite extensive outreach, [it is] dedicating significantly more staff, resources, and expenditures to fulfill [its] statutory obligation").)

Second, the States allege harms to their unemployment-benefits systems as a direct result of a surge in the number of claims brought by former federal employees. (*See* ECF No. 4-1 at 21–22; 32–38.) The States offer the following numbers, among others:

8

- Between January 21 and March 3, 2025, Maryland received claims from 813 former federal employees, up 330 percent from the 189 such claims it received during the same period the prior year. (*See* ECF No. 4-5 ¶¶ 50, 52.) In "the last few weeks," the State has received 30 to 60 new claims per day. (*Id.* ¶ 18.)
- Between February 1 and March 4, 2025, California received claims from 1,621 former federal employees, up 149 percent from the 650 such claims it received during the same period the prior year. (*See* ECF No. 4-7 ¶ 30.)
- Between January 19 and March 1, 2025, Illinois received claims from 446 former federal employees, just seven fewer than the 453 such claims it received during the entire 2024 calendar year. (*See* ECF 4-8 ¶¶ 15–16.)
- Between January 21 and February 26, 2025, New Jersey received claims from 388 former federal employees, up 273 percent from the 104 such claims it received during the same period the prior year. (*See* ECF No. 4-11 ¶¶ 14–15.)
- Between January 21 and February 27, 2025, New York received claims from 550 former federal employees, a "significant increase" from prior numbers. (*See* ECF No. 4-13 ¶ 4.)
- In February 2025, Massachusetts received claims from 251 former federal employees, with a "significant uptick" in the latter weeks of that period, including 32 claims on February 24 alone. (ECF No. 4-9 ¶¶ 16–17.)

Because of these increases in claims, the States say they "are experiencing administrative burdens and costs," including costs related to the processing of numerous additional claims. (ECF No. 19 at 3 (citing ECF No. 4-5 ¶¶ 37–38, 73–74 (describing how, in Maryland, state money makes up for any federal shortfalls in unemployment-related funding)); *see also* ECF No. 4-5 ¶¶ 59, 70 (identifying Maryland's added costs not only in processing claims, but in *verifying* them, especially given scant information about the firings).) And the States fear "[t]his surge is only beginning," given that "the effective dates for some terminations have not yet passed" and "there will [also] be a delay between when individuals are fired and when they likely apply for benefits." (*See* ECF No. 4-1 at 21.)

Beyond the increased burdens on unemployment-benefits services and the ability to fulfill their rapid-response duties, the States separately "anticipate increased costs to the agencies that enroll new participants in Medicaid and other health-benefits programs." (ECF No. 4-1 at 36.) In that context, the expected harms stem from circumstances substantially similar to those described

9

above: a bevy of new and otherwise avoidable administrative tasks, including "[f]ielding questions from terminated employees, processing an unexpected influx of applications, and providing other health-benefits services." (*See id.*)

Third, "[s]ome Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare." (ECF No. 1 ¶ 6.) In New Jersey and Rhode Island, for example, federal employees working in the Centers for Disease Control and Prevention ("CDC")'s Public Health Associate Program ("PHAP") are embedded in state health agencies. (*See* ECF No. 4-12 ¶ 5; ECF No. 4-15 ¶ 7.) In New Jersey, three PHAP associates, all of whom working on infectious disease tracing, were terminated. (ECF No. 4-12 ¶ 11.) CDC later reinstated the associates, but one of the three elected not to return. (*Id.*) New Jersey was "unable to prepare for the sudden loss of labor it was relying on to perform crucial public health services," and, because the associates' caseloads had to be transferred without any notice to staffers who already had full caseloads, there were "administrative inefficiencies, duplicative work, and most importantly, delayed notifications to persons exposed to syphilis, HIV, and TB, which in turn increased the risk of spreading disease in New Jersey." (*Id.* ¶ 13.) Plaintiffs provide similar evidence for Rhode Island, where two PHAP associates were terminated but then reinstated. (*See generally* ECF No. 4-15.)

Fourth, the States allege that the Government's actions "will continue to cause irreparable harm to Plaintiff States' tax base." (ECF No. 4-1 at 37.) According to the Comptroller of Maryland, for example, "[a]lthough unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment." (ECF No. 4-38 ¶ 5.) She further attests that

10

"hundreds" of Maryland federal employees have been recently terminated and applied for unemployment benefits, which will ultimately result in "significant decreases in Maryland's income tax revenues." (*Id.* ¶¶ 7–8.) Plaintiffs also rely on the analysis of Terry Clower, a public policy professor at George Mason University. (ECF No. 4-35.) Dr. Clower estimates that "the termination of 1,000 federal workers in the District [of Columbia] would, over a period of 60 days, reduce the District's income tax revenues by $320,914 and sales tax revenues by $57,942." (*Id.* ¶ 9.) If the number of terminated employees was 50,000, then the reductions in income and sales tax revenues would be approximately $16 million and just under $3 million, respectively. (*Id.*) Moreover, Dr. Clower estimates that, if fired workers are given the opportunity to find alternative employment, the tax losses to the District would be significantly lower, (*id.* ¶ 12); the States contend that this analysis shows that "[h]ad the District received the notice required by law, these losses would likely have been mitigated, including because some employees would have been able to obtain alternative employment prior to their termination." (ECF No. 4-1 at 37–38.)

Fifth, the States allege a "textbook informational injury" because of the Government's failure to provide information about RIFs as required by law. (ECF No. 19 at 5.) The States assert—and the Government does not deny—that the Government did not provide any advance notice that it was conducting RIFs, nor did it provide "information as to the location and circumstances of future RIFs" as required under federal law. (*Id.* (citing 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803(b)(1).)

11

## IV.    REVIEWABILITY

The Court first examines whether it may review the actions at issue. It concludes that the States—or at least some subset of them—have standing, that there were reviewable final agency actions, and that *Thunder Basin* does not preclude review.

### A.    Justiciability

Article III of the Constitution limits the judicial power of the federal courts to the resolution of "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1. The law has long understood this language to limit the judiciary to settling "genuine, live dispute[s] between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)). When a dispute does not fit that description, it is considered nonjusticiable, *see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979), and the federal courts lack subject-matter jurisdiction to decide it. *See Hamilton v. Pallozzi*, 848 F.3d 614, 620–21 (4th Cir. 2017) (citation omitted).

An "essential and unchanging part" of the case-or-controversy limitation is the requirement of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry is often cast as asking "whether the plaintiff is the proper party to bring th[e] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). By ensuring, among other things, that plaintiffs seek relief from only those acts that affect them in a definite and distinct way, the standing doctrine "ensures that federal courts decide only 'the rights of individuals,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Marbury v. Madison*, 5 U.S. 137, 170 (1803)), and therefore exercise only "their proper function in a limited and separated government," *id.* (citation omitted). "Such scrutiny is necessary to filter the truly afflicted from the abstractly distressed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000).

12

To establish standing, a plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury in fact; (2) that the injury "was likely caused by the defendant"; and (3) that the injury "would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560–61). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (internal quotation marks omitted) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

Here, the States have demonstrated each of the fundamental elements of standing, such that they are entitled to invoke federal jurisdiction over their claims. The Court addresses each element in turn.

### 1.    Injury in Fact

The States assert five categories of injury: (1) increased administrative costs associated with the hasty rollout of rapid-response protocols, (2) increased administrative costs related to the burden the dismissals have placed on their unemployment-benefits programs, (3) the loss of the services of embedded federal employees, (4) financial harms by way of decreased tax revenue and increased public health insurance payouts, and (5) informational harms in the form of not receiving notice they had a strong interest in receiving (an argument supported by the foregoing, allegedly avoidable harms). *See supra* Section I.C.

As an initial matter, for analytical purposes, the Court views these injuries differently than the States do. As the States themselves observed at the TRO hearing, the "central injury" in this case is fundamentally informational: the States were not given statutorily required notice of the Government's RIFs. For that reason, the other four categories of harm are most naturally understood not as standalone injuries, but as harms flowing from the lack of notice. After all, had

13

notice been provided, those other injuries—at least as the States describe them—would not have materialized. Accordingly, the Court considers the States to assert just *one* injury, not five.

That does not mean, however, that the other categories of injury are irrelevant—far from it. This is because of what is required to establish an informational injury under Article III.

Informational injury has long been recognized as a valid injury in fact. *See, e.g.*, *Laufer, LLC*, 60 F.4th at 163 (collecting cases). And while courts have, from time to time, enforced limits on the justiciability of claims arising from informational harms—often in the context of whether such harms were sufficiently "concrete," *see, e.g.*, *TransUnion*, 594 U.S. at 441–42; *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 300 (4th Cir. 2024)—they have always been open to plaintiffs who (1) did not receive information they were legally entitled to receive and, as a result, (2) experienced "a 'real' harm with an adverse effect." *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also TransUnion*, 594 U.S. at 442 (observing that there must be "'downstream consequences' from failing to receive . . . required information" (citation omitted)).

The States' asserted informational injury satisfies these requirements. First, the plain text of the relevant statutes and regulations makes clear that the States were legally entitled to notice of an imminent RIF. *See* 5 U.S.C. § 3502(d)(3)(A); 5 C.F.R. § 351.803(b). Not only that, but the notice had to contain certain information. *See* 5 U.S.C. § 3502(d)(3)(B); 5 C.F.R. § 351.803(c). Nowhere does the Government dispute the States' interest on this score—not in its briefing, nor during the TRO hearing.

Second, the States have incurred substantial follow-on harms as a result of the Government's failure to provide the required RIF notice. Chief among these are the increased burdens associated with the States' flat-footed rollout of rapid-response and unemployment-

14

benefits programs. (*See, e.g.*, ECF No. 4-5 ¶¶ 27, 58 (describing costs and delays associated with diverting Maryland personnel); ECF No. 4-8 ¶ 24 (similar, but for Illinois).) To fulfill their legal obligation to provide these services, the States have had to divert money and human resources from existing purposes to new ones—and, because of the lack of notice, have done so less efficiently than they would otherwise have. That is enough for standing. After all, even on their own, monetary losses are "obvious" concrete harms, *see, e.g.*, *TransUnion*, 594 U.S. 413 at 425, such that they are also undeniably "real" for purposes of informational injury. The same must be true of the diversion and/or loss of various employees' services, whether this stems from internal employees being reassigned or embedded ones disappearing; the Court presumes employees are hired for and placed according to the value they provide—and, accordingly, that departure or placement into another role, even temporarily, constitutes (at least) a financial loss.

The Court reaches the same conclusion, albeit on somewhat shakier ground, with respect to the increased costs associated with a surge in payouts of unemployment claims and other various public benefits. The question for *these* harms is not, of course, whether they are "concrete"; they are, for the same reasons as the financial and labor harms inflicted upon the States' capacity to run their rapid-response and unemployment-benefits programs. The question, rather, is whether they are sufficiently "actual or imminent."

On balance, the Court believes they are. Future harm is enough for standing when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). And here, the analysis is straightforward: mass layoffs lead to large numbers of unemployed people, and large numbers of unemployed people lead to an increase in the number of unemployment claims. At this early stage, that is enough, even in view of the fact

15

that not *every* terminated employee will file for unemployment, and that not every employee who does so will be successful. After all, the States have already shown an increase in the number of benefits claims coming from former federal employees. And the courts have repeatedly endorsed similar theories of future injury. *See, e.g.*, *Dep't of Com.*, 588 U.S. at 766–67 (approving standing theory based on "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" due to expected nonresponses to modified census); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (holding a State to have standing to challenge a federal immigration law based on the costs of issuing a greater number of driver's licenses), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *State v. Biden*, 10 F.4th 538, 547 (5th Cir. 2021) (holding a State to have standing because it "incurs a cost every time it *inquires* into whether [someone] satisfies the requirements for a license" (emphasis in original)). Even so, the Court notes the infirmity inherent in all theories of future injury, particularly those that rely on the anticipated behavior of third parties. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

The only injury the States assert that does *not* readily present an "actual or imminent" downstream harm is the loss of tax revenue. The question of when a state or municipality has standing to sue on the grounds that a challenged federal action will reduce its tax revenue is a somewhat unsettled one. On the one hand, it has long been held that a State cannot establish standing by positing a chain of events flowing from the Government's actions that could eventually lead to decreased tax revenue flowing into the general treasury. *See Florida v. Mellon*, 273 U.S. 12, 17–18 (1927) (rejecting as "purely speculative, and, at most, only remote and indirect" the claim that a challenged act "will have the result of inducing potential taxpayers to withdraw

16

property from the state, thereby diminishing the subjects upon which the state power of taxation may operate"). On the other, a State may be able to establish standing when a challenged action will cause a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). The Courts of Appeals are split as to how broadly *Wyoming* should be read, *compare Sierra Club v. Trump*, 977 F.3d 853, 870–71 (9th Cir. 2020), *judgment vacated on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 56 (2021), *with El Paso County v. Trump*, 982 F.3d 332, 339–41 (5th Cir. 2020), and it does not appear that the Fourth Circuit has opined on the matter.

Here, reasonable minds could differ as to whether the States' position places it closer to the plaintiff in *Florida* or in *Wyoming*. The States' fears of a general "significant decline in tax receipts" as a result of economic pressures engendered by the terminations is likely too diffuse of an injury to be cognizable. (ECF No. 19 at 4–5.) The States come closer to the mark, however, in presenting evidence that the State of Maryland will likely suffer significant lost income tax revenue as a result of the Government's terminations, because individuals receiving unemployment benefits pay lower income taxes than those who are fully employed. (ECF No. 4-38 (Declaration of the Comptroller of Maryland).) But whether this loss is sufficiently directly tied to the RIFs is unclear.

Weaknesses in certain theories aside, the Court is satisfied that the States have shown an injury in fact based on informational harm. The States have already incurred appreciable financial and labor costs as a direct result of not receiving notice they were owed, and they will certainly incur additional costs in the future related to the increased payout of public benefits. And the Court is unpersuaded by the Government's argument, reiterated throughout the TRO hearing, that each of these costs is "downstream" and therefore not cognizable under Article III. As the Supreme

17

Court has made clear, a "real," downstream harm is a critical *component* of an informational injury—hardly a circumstance that destroys one. *See, e.g.*, *TransUnion*, 594 U.S. at 442; *see also Dreher*, 856 F.3d at 345 (citing *Spokeo*, 578 U.S. at 340). For that reason, particularly in this expedited posture, the Court need not say definitively which theories of injury ought not survive for the duration of the litigation; at least one valid theory is enough.[3]

The Court is also unmoved by the Government's appeal to what it calls "the extraordinary breadth of the States' suit," an argument the Government appears to raise in support of its view that the States have not identified a particularized injury. (*See* ECF No. 20 at 13–14.)

To buttress this argument, the Government likens this action to *Murthy v. Missouri*, in which several plaintiff states—all of which had sought a preliminary injunction barring federal officials from pressuring social media platforms to suppress free speech—were held to lack standing. 603 U.S. 43 (2024). True, this case, like *Murthy*, is a "sprawling" suit in which "dozens of Executive Branch officials and agencies" have been sued. *Id.* at 49, 61. But while massive and unusual suits may legitimately invite closer judicial scrutiny than more run-of-the-mill ones, there is of course no *per se* rule that such actions are impermissible.

And besides, the scale of the two suits is where the similarities between this case and *Murthy* end. In *Murthy*, the crux of the standing problem was twofold: First, the plaintiffs could not establish that any harm—suppression of free speech protected by the First Amendment—was fairly traceable to the governmental defendants, rather than to the (nonparty) social media platforms who actually made the decision to restrict their speech. 603 U.S. at 62–68. Second, in

---

[3] For similar reasons, and in light of the fact that the Court would order nationwide relief even if just a single State had standing to press these claims, *see infra* Section IV.B, the Court need not determine which States, if any, do *not* have standing to go the distance in this action. For the limited purposes of this TRO, it is enough for one State to be able to invoke the jurisdiction of this Court. The Court is satisfied that at least some subset of the States—namely, Maryland—has done so.

18

*Murthy* the plaintiffs sought prospective relief against future alleged suppression campaigns, but there was no evidence that the government was continuing its alleged pressure campaign or was likely to do so in the future. *Id.* at 68–72. This case is completely different. First, unlike in *Murthy*, where only prospective relief was sought and it was doubtful that plaintiffs would suffer any future injuries, here the harm is happening right now, and can only be remedied by immediate injunctive relief. More fundamentally, unlike in *Murthy*, the alleged chain of causation does not depend upon the actions of third parties not before the Court. Instead, the allegations are simply that the Government failed to provide the States information to which they are statutorily entitled, and that because of this failure States have been forced to expend resources that they would not otherwise have had to expend. This distinction also goes to redressability. In *Murthy*, it was not clear how a favorable court order would redress the injuries claimed, as nothing in the order would prevent the nonparty social media platforms from continuing to suppress the plaintiffs' speech. *Id.* at 73–74 ("[T]he platforms remain free to enforce, or not to enforce, those policies—even those tainted by initial governmental coercion. The platforms are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." (cleaned up)). Such concerns are simply not at issue here.

2.    Causation

To start, it is plain that at least *some* of the harms the States have experienced—namely, the increase in the cost of administering certain state programs, irrespective of what those programs will be required to pay out—are direct and foreseeable results of the agencies' failures to provide RIF notices. The Government does not argue otherwise. (*See* ECF No. 20 at 12–17.) Accordingly, on that basis alone, the Court is confident there is no causation defect that would wholly defeat the States' standing.

19

As for the harms based on the expected increase in public benefits awards and future lost tax revenues, the Government argued during the TRO hearing that these harms were self-inflicted. The Court disagrees. Costs that States incur in the satisfaction of a mandatory legal duty, even one arising under state law, are not self-inflicted. *See, e.g.*, *Texas*, 809 F.3d at 155. And here, legal duties arise under *both* federal and state law. *See, e.g.*, 20 C.F.R. §§ 682.100–.300 (providing certain duties under the Workplace Innovation and Opportunity Act); Md. Code Ann., Lab. & Empl. §§ 11–303 to –04 (setting out Maryland's "quick response program" with respect to mass unemployment events); N.J. Stat. Ann. § 34:21-5 (similar, but for New Jersey).

Causation is also not defeated by certain theories' reliance on the anticipated behavior of third parties. This element is satisfied when "third parties will likely react in predictable ways to the" conduct at issue. *See Dep't of Com.*, 588 U.S. at 768. For much the same reason the States' appeal to future increased benefits payouts was "actual or imminent" for purposes of injury in fact, that harm is traceable to the Government's terminations: mass layoffs mean more unemployed people, more unemployed people means more unemployment claims. That is textbook predictability.

### 3.    Redressability

Finally, the States have shown their harms to be redressable by the relief sought. To satisfy this element, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

As established above, the States' injuries were caused by the lack of RIF notice. That circumstance, standing alone, might lead one to conclude that the appropriate remedy—and, for that matter, the only one the States would have standing to seek—is *notice*, albeit overdue.

20

But this ignores the nature of the States injuries. While the *initial* harm was caused by a lack of notice, the States' informational harm includes at least some of the serious downstream harms the States assert. Thus, those downstream injuries must be considered in the redressability analysis.

The remedy the States seek is to set aside the Government's allegedly unlawful RIFs—a remedy which, in effect, would require the reinstatement of the terminated employees. (*See* ECF No. 1 ¶¶ 242–43.) The Government appears to agree. (*See, e.g.*, ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by their *reinstatement*." (emphasis in original).) So, too, does the Court. After all, the States' injuries are the result of the increasing pressure on States' rapid-response, unemployment, and other public programs. Were the terminated employees to be reinstated, that pressure would abate. That is enough for redressability.

### B.    Jurisdiction

#### 1.    Final Agency Action

The Court begins by clarifying the conduct at issue in this case, at least for purposes of the pending TRO request. The States challenge two distinct federal actions: first, the OPM directives that allegedly directed other federal agencies to dismiss probationary employees *en masse*; and second, the actual, agency-level dismissals of those employees without notice. (ECF No. 4-1 at 24–25.) But the nub of this lawsuit is the lack of notice the States received with respect to the RIF provisions. (*See, e.g.*, ECF No. 19 at 3 ("The strain on Plaintiffs' rapid response systems is directly traceable to Defendants' unlawful RIFs, conducted without the required advanced notice.")). And the agency actions that are most proximate to that harm are the dismissals without notice, not the OPM directives, for one simple reason: under the RIF regulations, notice must come from the dismissing agencies, not from OPM, except as it concerns OPM's dismissals of its *own*

21

employees. *See* 5 C.F.R. § 351.803(b). For that reason, this Memorandum focuses on the unnoticed dismissals, though the Court makes no final determination at present as to which actions are appropriately reviewed in this litigation.

"Judicial review under the [Administrative Procedure Act ("APA")] is limited to review of 'final agency action.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (quoting 5 U.S.C. § 704). But, as explained below, the unnoticed dismissals fall squarely within that category. Accordingly, the APA poses no jurisdictional obstacle to this Court's review of the States' claims.[4]

To start, "agency action" is a capacious term, "cover[ing] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citation omitted). And while the Government refers to the acts at issue as "alleged final agency actions," (ECF No. 20 at 14, 23), it does not otherwise dispute that the dismissals are "agency actions" within the meaning of the APA's review provision. Nor could it. *See, e.g.*, *Burdue v. FAA*, 774 F.3d 1076, 1080 (6th Cir. 2014) ("[An agency employee's] termination is . . . agency action for purposes of the [APA].").

As for "finality," an action is "final" whenever two conditions are satisfied: (1) the action is the "consummation of the agency's decisionmaking process," and (2) the action is one "by which rights or obligations have been determined or from which legal consequences will flow." *NAACP*, 945 F.3d at 189 (ultimately quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The firings without notice undeniably meet this standard, as any agency's decision to dismiss an employee

---

[4] Notably, the requirement of "final agency action" applies only to the States's two APA claims, not their *ultra vires* claim. This is because the right of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction, not from the APA. *See, e.g.*, *PFLAG, Inc. v. Trump*, Civ. No. BAH-25-337, 2025 WL 685124, at *9 & n.26 (D. Md. Mar. 4, 2025) (citing *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006)). That said, for purposes of the pending TRO request, the Court addresses the merits only of the States' APA claims, not their more unusual *ultra vires* claim, despite jurisdiction to consider each. *See infra* Section III.A.

22

effects self-evident legal consequences for both parties and plainly marks the end of the agency's

decisionmaking with respect to the employee involved. *See, e.g.*, *Burdue*, 774 F.3d at 1080; *cf.*

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, Civ. No. WHA-25-1780, 2025 WL 660053, at *5

(N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss probationary

employees] constituted a final agency action for the purposes of the APA.").

The Court therefore has jurisdiction to review each of the States' claims, at least insofar as

they concern dismissals without notice.

### 2. Claim Channeling

The Government argues that the Court has no jurisdiction to hear the States' claims because

of an alternative administrative review structure set up by Congress.

In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court articulated

a two-step analytical framework to assess whether Congress impliedly divested the district courts

of jurisdiction to hear challenges to an agency action.

First, a reviewing court asks whether some statute, either explicitly or implicitly, channels

certain claims about agency action away from the courts and into an administrative agency. *See*

*Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir.

2016). This inquiry "involves examining the statute's text, structure, and purpose." *Bennett*, 844

F.3d at 181 (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)).

Second, if the reviewing court determines that a statute *does* channel certain claims away

from the courts, it then considers whether the specific claims at issue fall within that category. *See*

*Axon*, 598 U.S. at 185–86; *see also id.* at 186 ("The ultimate question is how best to understand

what Congress has done—whether the statutory review scheme, though exclusive where it applies,

reaches the claim in question."). In essence, the court's task is "to decide if a claim is 'of the type'

23

Congress thought belonged within a statutory scheme." *Id.* at 188–89 (quoting *Thunder Basin*, 510 U.S. at 212). Only in "limited circumstances" is a claim *not* "of th[at] type," *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018), given that procedures "designed to permit agency expertise to be brought to bear on particular problems" ought ordinarily to be understood as exclusive. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)).

To assess whether such "limited circumstances" are present in an individual case, courts apply the three so-called *Thunder Basin* factors: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claims, (2) whether the claims are "wholly collateral to [the] statute's review provisions," and (3) whether the claims are "outside the agency's expertise." *Axon*, 598 U.S. at 186 (alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212–13). "When the answer to all three questions is yes, '[the court] presume[s] that Congress does not intend to limit jurisdiction,'" *id.* (quoting *Free Enter. Fund*, 561 U.S. at 489), though a claim may be judicially reviewable even if the factors "point in different directions," *id.*

As both the States and the Government observe, Congress has provided for the exclusive administrative review of most employment claims brought by federal employees, thus satisfying the first step of the two-step framework. Two statutory review schemes are relevant here. The first is set out in the Federal Service Labor-Management Relations Statute ("FSMLRS"), itself set out in Title VII of the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35). As the District of D.C. recently explained in a similar context, the FSMLRS

> governs labor relations between the executive branch and its employees. It "grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The

24

[FSMLRS] further "establishes a scheme of administrative and judicial review." *Id.* Under that scheme, the Federal Labor Relations Authority ("FLRA"), a three-member agency charged with adjudicating federal labor disputes, reviews matters including "negotiability" and "unfair labor practice" disputes. *See* 5 U.S.C. § 7105(a). When reviewing unfair labor practice complaints, "the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118).

Direct review of the FLRA's decisions is available in the courts of appeals. 5 U.S.C. § 7123(a). The D.C. Circuit has repeatedly held that this scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims." *Trump*, 929 F.3d at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013)).

*Nat'l Treasury Emps. Union v. Trump*, Civ. No. CRC-25-420, 2025 WL 561080, at \*4 (D.D.C. Feb. 20, 2025).

The second statutory review scheme is set out elsewhere in the CSRA, which separately

"established a comprehensive system for reviewing personnel action taken against federal

employees." *See Elgin*, 567 U.S. at 5 (citation omitted). Under *those* provisions,

[i]f an agency takes a final adverse action against an employee—removal, suspension for more than [fourteen] days, reduction in grade or pay, or furlough for [thirty] days or less, 5 U.S.C. § 7512—the employee may appeal to the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Probationary employees, however, generally do not enjoy a right to appeal to the MSPB. *Id.* § 7511(a)(1). Employees may appeal final MSPB decisions to the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.

*Nat'l Treasury Emps. Union*, 2025 WL 561080, at \*5.

Notwithstanding the existence of two exclusive statutory review schemes, the Court

concludes that, under the three *Thunder Basin* factors, those schemes do not foreclose district-

court jurisdiction over the States' claims in this case.

25

On the first factor, foreclosure of meaningful judicial review, it is clear the States prevail. The Government argues that "any affected party" may challenge the RIF dismissals "within the administrative scheme" Congress has provided. (ECF No. 20 at 19.) But that argument is defeated by the plain text of the statutory scheme the Government cites, which forecloses any possibility of the States bringing their claims before an administrative agency. In relevant part, the FLRA has the authority to "conduct hearings and resolve complaints of unfair labor practices," 5 U.S.C. § 7105(a)(2)(G), charges of which may be brought "by any *person*," *id.* § 7118(a)(1); *see also id.* § 7121(g)(3)–(4) (referring to the ability of "a person" to appeal to the MSPB, among other remedies). Yet the labor-management relations chapter of the CSRA defines a "person" as "an individual, labor organization, or agency"—not a State. 5 U.S.C. § 7103(a)(1). Similarly, the MSPB may hear appeals from "[a]n *employee*, or *applicant for employment*," *id.* § 7701; *see also id.* § 7513(d) (permitting appeals by "*employee*[*s*]")—again, categories that could not plausibly include States. *Cf. id.* § 7103(a)(2) (defining "employee," for purposes of the labor-management chapter, as either an individual "employed in an agency" or an individual whose employment "has ceased because of any unfair labor practice," as described elsewhere in the statute).

Beyond being unable to seek review *by* any agencies, the States are also foreclosed from seeking judicial review *of* agency decisions. While the Government is correct that the Federal Circuit has exclusive jurisdiction over challenges to the final decisions of the MSPB, (*see* ECF No. 20 at 19 (citing 28 U.S.C. § 1295(a)(9))), the MSPB's own statute shows that judicial review is available only for "*employee*[*s*] or *applicant*[*s*] *for employment* affected or aggrieved" by the MSPB's decisions, 5 U.S.C. § 7703(a)(1) (emphasis added). Likewise, although the Courts of

Appeals have exclusive jurisdiction over review of most final orders of the FLRA, such review is, again, available only for "[a]ny *person* aggrieved" by such orders. *Id.* § 7123(a).

In short, the Government supplies no authority for the proposition that a *State* would be able to seek review in any relevant setting—and, indeed, conceded during the TRO hearing that none could.[5] This shortcoming alone is arguably fatal to the Government's position, given that "meaningful judicial review is the most important factor in the *Thunder Basin* analysis." *Bennett*, 844 F.3d at 183 n.7 (collecting cases). If the Government were correct, then Congress would have created a statutory entitlement for States to be provided notice under 5 U.S.C. § 3502(d)(3)(A)(i), but provided no judicial review to vindicate that entitlement, a conclusion contrary to the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).

The second factor, claims' collaterality to the statutory review provisions, likewise favors the States. For its part, the Government argues the States seek to "interject themselves into the employment relationship between the United States and government workers." (ECF No. 20 at 3.) But that ignores that the States have suffered unique harms, peculiar to their status *as* states, irrespective of those harms' connection with the agency-employee relationship. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803; *see also supra* Sections I.A, .C. For that reason, the Government's reference to parallel proceedings before the MSPB and Office of Special Counsel ("OSC"), (*see*

---

[5] Likewise, the Government supplies no authority for the related (but equally dubious) proposition that the CSRA wholly divests the district courts of jurisdiction to offer reinstatement as a remedy, (*see, e.g.*, ECF No. 20 at 14), rather than the more limited view that the CSRA divests the courts of jurisdiction to offer that remedy to specific parties. This latter view is the better interpretation of the CSRA's preclusive scope. *See, e.g.*, *Elgin*, 567 U.S. at 13 (explaining that the CSRA's review is exclusive as it concerns federal employees, without any indication that it is exclusive as to reinstatement); (*see also* ECF No. 20 at 14 n.6 (conceding that the district courts *do* have jurisdiction over Title VII claims, which may lead to reinstatement)). Perhaps that is why, when making hay of the fact that two other courts recognized a lack of jurisdiction to entertain certain claims for reinstatement, (*see* ECF No. 20 at 3 (first citing *Nat'l Treasury Emps. Union*, 2025 WL 561080; and then citing *Am. Fed'n of Gov't Emps.*, 2025 WL 660053)), the Government completely elides the fact that those claims were brought by fundamentally different parties—namely, employees and their unions.

27

ECF No. 20 at 10), is unavailing. As the Supreme Court has explained, "decid[ing] when a particular claim is 'of the type' to fall outside a statutory review scheme . . . requires considering the *nature* of the claim, not the status (pending or not) of an agency proceeding." *Axon*, 598 U.S. at 194 (emphasis added) (quoting *Thunder Basin*, 510 U.S. at 212). Indeed, *Thunder Basin* "contemplates . . . that even when a proceeding is pending, an occasional claim may get immediate review—in part because it involves something discrete." *Id.* What's more, *Axon* permitted judicial review of claims directed at ongoing proceedings involving *the very parties seeking judicial review, see id.* at 193–94—in other words, claims much closer (and therefore less collateral) to an administrative proceeding than are the States' claims in this case, particularly given that the States have no administrative remedy available to them.

The third and final factor, the agencies' expertise, is a closer call, but likely also breaks for the States. Again, there is no mechanism for the States to obtain administrative review before the MSPB, the FLRA, or the OSC. There is thus little reason to think those agencies hold special expertise over the States' claims. On the contrary, the States' claims "raise 'standard questions of administrative' . . . law, detached from 'considerations of agency policy.'" *Axon*, 598 at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). And while the MSPB, FLRA, and OSC "know[] a good deal about" unlawful dismissal of federal employees, they know "nothing special about" the central problem the *States* have asserted: a failure to provide proper notice under the RIF statute. *Cf. id.* And as the Court has by now made clear, that the States' problem *connects* with unlawful dismissals hardly means those dismissals are the subject of this suit.

The Government argues, unpersuasively, that the fact *someone* can seek review of similar claims is enough to disclaim jurisdiction over the States' action. (*See* ECF No. 20 at 21 ("[T]he CSRA and FSL-MRS schemes provide for meaningful judicial review over the very claims

28

asserted by the States, even if the States themselves are not the proper parties to assert them.").)

There are multiple problems with this theory. First, as explained above, while certain facts are common to the States' action and any administrative actions that might be brought by terminated employees, the States' interests remain substantially different from the employees', as evinced by the presence of harms that only states *qua* states can experience. Second, it is hard to swallow that the States, to redress their harms, must simply hope and wait for scores of terminated federal employees to pursue administrative relief. For one, the States are suffering precisely the sort of "here-and-now injury" that favors prompt judicial review. *See Axon*, 598 U.S. at 191 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020)). For another, it is highly doubtful that solo employees or their unions would or could adequately represent the States' peculiar interests in an administrative setting. For the States' harms to be fully redressed in that manner, it would seem to require every employee who was dismissed without notice to pursue (and win) administrative relief, either individually or collectively, such that the pressure on state unemployment programs would eventually, and in piecemeal fashion, be alleviated. The Court is not prepared to accept that theory as reality.

In sum, the CSRA does not preclude this Court's jurisdiction over the States' claims. Time and again, the courts have been firm: "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186 (citing *Bowen*, 476 U.S. at 670); *accord Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (collecting cases, and observing that "judicial review of a final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress"); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."). Here, remarkably, the Government argues that not only is there no judicial review for the States, there is no review of *any* kind. That

29

is a startling state of affairs indeed—and one that basic principles of administrative law require this Court to reject.

## V.    TEMPORARY RESTRAINING ORDER

Having determined that the Court has jurisdiction to hear this case, the Court turns to the factors necessary for issuance of a TRO.

"The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's County*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017). The party seeking a temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although Plaintiffs "need not establish a 'certainty of success,'" they must "make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The Court concludes that the States have established all four factors, and that a TRO is warranted.

### A.    Likelihood of Success on the Merits

The States are very likely to succeed on the merits of (at least) their APA contrary-to-law claim. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For purposes of a contrary-to-law claim, the legal standards against which the federal government's conduct is assessed are supplied not by the APA itself, but by a separate statute—in

30

this case, the RIF statute, 5 U.S.C. § 3502. The Court concludes that the States are highly likely to show that they are within the zone of interests of the RIF statute, that the Government conducted RIFs, and that, when doing so, it wholly failed to comply with the statutory and regulatory demand that notice be provided to the States.

          1.    Zone of Interests

In general, statutory protections "extend[] only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked,'" whether or not a statute is invoked under the APA. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Nevertheless, "in the APA context, that . . . test is not 'especially demanding.'" *Id.* at 130 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). All it requires is that a plaintiff's interest be "*arguably* within the zone of interests to be protected or regulated" by the underlying statute. *Match–E–Be–Nash–She–Wish Band*, 567 U.S. at 224 (emphasis added) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 357 U.S. 150, 153 (1970)). Indeed, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 497 U.S. 388, 399 (1987)).

Far beyond merely coming within the legal "zone of interests," the States' interests in this case strike at the very heart of the RIF provisions.

For one, the statute expressly identifies States and the notice they are due. *See* 5 U.S.C. § 3502(d)(3)(A)(i) ("Notice . . . shall be given to . . . the State or entity designated by the State to carry out rapid response activities under . . . the [Workplace Innovation and Opportunity Act ("WIOA")].");  *see also* 5 C.F.R. § 351.803(b) (similar). It also describes precisely *what* must be

ADD.37

shared with the States. *See* 5 U.S.C. § 3502(d)(3)(B) (requiring notice of "the number of employees to be separated from service" due to a RIF, "broken down by geographic area or on such other basis as may be required by" other regulations; "when those separations will occur"; and "any other matter which might facilitate the delivery of rapid response assistance or other services under . . . the [WIOA]"); *see also* 5 C.F.R. § 351.803(c) (similar). Based on the text of the statute alone, Congress clearly envisioned for the States an important role in the RIF process.

Beyond occupying a place of prominence in the RIF statutory text, the States also hold legal duties under the WIOA and its implementing regulations to offer rapid-response services to alleviate the societal stresses brought on by sudden mass unemployment. As the Court has discussed above, *see supra* Section I.A, the States are required by federal law to respond to assist workers in finding new employment. 20 C.F.R. § 682.200. The States have their own binding requirements regarding rapid-response activities. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11–303 to –04. And the States provide unemployment and similar benefits to their own citizens. *See generally, e.g.*, Md. Code Ann., Lab. & Empl. §§ 8–101 to –1608; N.J. Stat. Ann. §§ 43:21–1 to –71.

All of this underscores the general proposition that the States have important—indeed, mandatory—uses for RIF notice from the Government, and therefore strong interests in such notice being provided on time and in full. It would defy common sense to say these are not among those interests "arguably" protected by the RIF provisions. *See Match–E–Be–Nash–She–Wish Band*, 567 U.S. at 224.

### 2. The Agencies Conducted RIFs

Having determined that the States may bring this action under the APA, the Court turns to the substantive core of this case—whether the States are likely to succeed in showing that the

32

Government's mass terminations, without providing notice to the States, were unlawful. The Government makes essentially two arguments in support of its contention that it has not acted contrary to law. (*See* ECF No. 20 at 23–25.) First, it argues that it had the discretion to terminate the probationary employees in the manner that it did. (*See id.* at 23 ("The States fundamentally misunderstand Defendants' discretion to terminate probationers.").) Second, it argues that it did not conduct a RIF. (*See id.* at 24–25 ("[T]he States ignore fundamental differences between a RIF and the termination of a probationer. The actions they challenge here are the latter, not the former.").) These arguments are unavailing.

Agencies are, of course, permitted to terminate probationary employees. That is not what this case is about. Indeed, agencies are directed to "utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). However, agencies are permitted to terminate probationary employees under only three circumstances: (1) due to conditions arising prior to their employment, 5 C.F.R. § 315.805; (2) due to unsatisfactory performance or conduct, 5 C.F.R. § 315.804(a); and (3) pursuant to a RIF. Neither the Court nor the parties has identified any other permissible reason to terminate a probationary employee. Indeed, the Government was invited at the TRO hearing to identify any other permissible ways to terminate probationary employees, and it could not do so.

Here, the terminated probationary employees were plainly not terminated for cause. The sheer number of employees that were terminated in a matter of days belies any argument that these terminations were due to the employees' individual unsatisfactory performance or conduct. As

33

Plaintiffs allege, the Government has terminated at least 24,000 probationary employees.[6] (ECF No. 1 ¶ 139 ("Defendants have not published official counts and locations of the employees they have terminated, but based on publicly reported numbers and firsthand accounts from affected employees, it appears that Defendants have terminated at least 24,000 probationary employees as of the date of this Complaint.").) It is simply not conceivable that the Government could have conducted individualized assessments of the relevant employees in the relevant timeframe. (*See, e.g.,* ECF No. 4-37 ¶ 14 ("Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.").)

The States also provided affidavits from individuals who worked at certain Defendant Agencies, reflecting that the termination decisions were not based upon individualized assessments of the relevant employees. (ECF No. 4-36 ¶¶ 4, 19 (former "Deputy Director for Operations in the Center for Consumer Information and Insurance Oversight (CCIIO) within the Centers for Medicare & Medicaid Services (CMS)" explaining that "[t]he mass terminations of probationary employees at CCIIO were not based on any individualized assessment of the probationary employees. The CMS [chief human resources officer] did not review the positions for suitability, never read a single person's resume, never spoke with any of the terminated probationary employees, and had no personal knowledge of their individual performance."); ECF No. 4-37 ¶ 14 (former "Human Capital Officer for the Internal Revenue Service ('IRS')" explaining that "Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings.").)

---

[6] At the TRO hearing, the Government was unable to supply the Court with the number of probationary employees who, to date, have been terminated from the relevant agencies. The Government likewise provided the Court with no evidence to suggest that the States' estimate was inaccurate.

34

The Government offers no contrary evidence, yet it insists that these were for-cause terminations and that the notices provided to individual employees were not defective because "[a] statement that a probationer has been terminated because of his or her performance during the probationary period is sufficient." (ECF No. 20 at 24.)

The Court does not render any conclusions regarding what precise language a termination for cause must contain; however, the law is clear that when dismissing an employee due to unsatisfactory performance, "[t]he employer . . . must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. Soc. Sec. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (emphasis added) (citation and internal quotation marks omitted). The affidavits filed by terminated probationary employees reflect that they received boilerplate termination notices explaining that their performance was inadequate, but that they had all received either formal or informal positive feedback from their supervisors. (*E.g.*, ECF No. 33-1 (affidavit and termination letter from former U.S. Department of Transportation probationary employee); ECF No. 33-2 (affidavit and termination letter from former U.S. Department of Health and Human Services probationary employee); ECF No. 33-5 (affidavit and termination letter from former U.S. Department of the Interior probationary employee); ECF No. 33-10 (affidavit and termination letter from former Internal Revenue Service[7] probationary employee); ECF No. 33-11 (affidavit and termination letter from former Federal Emergency Management Agency[8] probationary employee); ECF No. 33-14 (affidavit and termination letter from former Consumer Financial Protection Bureau probationary employee); ECF No. 33-15 (affidavit and termination letter from former National Oceanic and Atmospheric

---

[7] Although the IRS is not named as a Defendant, it sits within the Department of the Treasury, which is named.

[8] Although the Federal Emergency Management Agency is not named as a Defendant, it sits within the Department of Homeland Security, which is named.

35

Administration probationary[9] employee); ECF No. 33-16 (affidavit and termination letter from former U.S. Department of Agriculture probationary employee); ECF No. 33-17 (affidavit and termination letter from former Environmental Protection Agency probationary employee); ECF No. 33-18 (affidavit and termination letter from former Small Business Administration probationary employee); ECF No. 33-19 (affidavit and termination letter from former U.S. Department of Veterans Affairs probationary employee).)

Further underscoring the Court's conclusion that these terminations were not based upon qualifications or performance is that many notices to employees did not even cursorily identify any issues with the individual's performance, but rather explained that their terminations were in the public interest or due to the priorities of the current administration, or else provided no reason at all. (*E.g.*, ECF No. 33-3 at 7 (U.S. Agency for International Development termination letter indicating that "I am terminating you on the basis that it is in the best interest of the U.S. Government"); ECF No. 33-4 at 7 (U.S. Department of Housing and Urban Development termination letter indicating that "this notice is to notify you of the decision to terminate your employment . . . in order to promote the efficiency of the federal service in accordance with the priorities of the Administration"); ECF No. 33-6 at 7 (U.S. Department of Labor termination letter indicating that "[t]he Agency finds your further employment would not be in the public interest"); ECF No. 33-7 at 8 (General Services Administration termination letter indicating "I do not consider it in the best interest of the government to retain you in the Federal service and have decided to terminate your appointment during your probationary period."); ECF No. 33-8 at 7 (U.S. Department of Education termination letter indicating that "I regrettably inform you that I am removing you from your position of [redacted] with the agency and the federal civil service

---

[9] Although the National Oceanic and Atmospheric Administration is not named as a Defendant, it sits within the U.S. Department of Commerce, which is named.

36

effective today, February 12, 2025."); ECF No. 33-9 at 7 (U.S. Department of the Treasury termination letter stating that "[b]ased on [OPM] guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest"); ECF No. 33-12 at 7 (U.S. Department of Energy termination letter stating "[p]er OPM instructions, DOE finds that your further employment would not be in the public interest"); ECF No. 33-13 at 8 (Federal Deposit Insurance Corporation termination letter stating that "the FDIC finds that you have not demonstrated that your further employment at the FDIC would be in the public interest").)

In short, the record reflects that these probationary employees were not terminated for cause. *Cf. Roe v. Dep't of Defense*, 947 F.3d 207, 222 (4th Cir. 2020) (holding that the Air Force did not perform "individualized determination[s]" when the "the Air Force discharge memoranda contain identical language briefly stating that each servicemember's HIV-positive status 'renders him ineligible for deployment'"). The Government's contention to the contrary borders on the frivolous. Moreover, to the extent that the Government counsel tries to justify these terminations as for cause after the fact, such an attempt must fail, as "the *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). And, as the Government conceded at the hearing, probationary employees may only be terminated for cause (either due to qualifications and performance, or for issues arising prior to employment) or through a RIF.

The actions of the Government reflect that these terminations were RIFs. The relevant regulations provide that "[e]ach agency shall follow this part when it releases a competing employee from his or her competitive level by . . . separation . . . , when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position

37

ADD.43

[due] to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." 5 C.F.R. § 351.201(a)(2); *see also* U.S. Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook*, 25–26 (2017) (explaining that "[a] personnel action must be effected under RIF procedures when both the action to be taken and the reason for the action are covered by the RIF regulations"; including, under "actions to be taken," an employee's separation; and including, under "reason for the action," a "lack of work," "shortage of funds," "insufficient personnel ceiling," and/or "reorganization"). The wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization, even if the Government does not refer to it as such.

That these terminations were RIFs is evident from the sheer number of employees fired in such a short timespan. Further, the Secretary of Labor for the Maryland Department of Labor reported that, in response to queries from her office, federal agencies have reported, as reasons for the terminations, a "permanent lack of work due to a change in Presidential administration," and have also noted that the employees were "laid off due to a reduction in force." (ECF No. 4-5 ¶¶ 61–62.) On this point, the Court again observes that several employee termination notices evince that the terminations were plainly not due to any individual employee's performance, but rather reflected a reorganization within the relevant federal agencies. For instance, a termination letter issued by the Department of the Treasury states the following: "In its January 20, 2025, memorandum entitled *Guidance on Probationary Periods, Administrative Leave and Details*, OPM advised that '[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.' Based on that guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public

38

interest." (ECF No. 33-9 at 7 (alterations in original).) On top of that, the terminations came on the heels of an Executive Order directing agency heads to conduct RIFs.

The States have not carried their burden, however, of showing a likelihood of success on the merits with respect to three Defendant Agencies—the Department of Defense ("Defense"), the National Archives and Records Administration ("Archives"), and OPM. With respect to these three named agencies only, the States have not provided any affidavits from, for example, former employees attesting to their terminations, or to the presence of widespread terminations of probationary employees. (*See generally* ECF No. 33 (affidavits attesting to terminations at all Defendant Agencies except for Defense, Archives, and OPM).) While the Court does not rely solely on these affidavits and termination letters in reaching its above conclusion, those records provide an important link between the individual Defendant Agencies and the broader allegations about the number of employees terminated and the general statements, discussed above, that these actions constituted RIFs. So, although it is a close call, at this early stage, and given that a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22 (citation omitted), there is insufficient basis in the record for the Court to conclude that RIFs likely occurred at these three agencies. This conclusion is without prejudice to the presentation of additional evidence with respect to these three agencies.

### 3. The Agencies' Actions Were Contrary to Statutory RIF Requirements

Thus, the Court turns to whether the Government followed requisite RIF procedures. If employees are terminated as part of a RIF, there are legal requirements the agencies must follow. *See generally* 5 U.S.C. § 3502; 5 C.F.R. Part 351. And it is undisputed—and indisputable—that these requirements apply to probationary employees. *See* 5 C.F.R. § 351.501(a)–(b). One such

39

requirement is that, whenever a RIF involves at least fifty employees within a competitive area,[10]

the agency must provide notice to "[t]he State or the entity designated by the State to carry out

rapid response activities under [the WIOA]." 5 C.F.R. § 351.803(a). That notice must include (1)

"[t]he number of employees to be separated from the agency by reduction in force (broken down

by geographic area or other basis specified by OPM)"; (2) "[t]he effective date of the separations";

and (3) "[a]ny other information specified by OPM, including information needs identified from

consultation between OPM and the Department of Labor to facilitate delivery of placement and

related services." *Id.* § 351.803(c).

The Government did not follow the requisite notice procedures, and it does not attempt to

argue that it did. Indeed, the Government's substantive arguments are aimed only at its view that

it did not conduct RIFs. And the consequence of the Government's failure to follow the requisite

notice procedures is clear: if an agency fails to provide notice, an employee "may not be released[]

due to a reduction in force." 5 U.S.C. § 3502(d).

Because the States have shown that the Government's actions were highly likely "not in

accordance with law," 5 U.S.C. § 706, they are likely to prevail on the merits of their APA claims.[11]

---

[10] Although the Court is focused on the lack of requisite notice, there is no evidence that the Government followed *any* of the requisite RIF procedures, including defining the competitive area. But "[a] competitive area may consist of all or part of an agency," 5 C.F.R. § 351.402, and given the sheer number of terminated employees, it is implausible that the fifty-person threshold necessary to trigger this requirement has not been met. (*See, e.g.*, ECF No. 4-5 ¶ 17 (declaration by the Maryland Secretary of Labor explaining that "the Maryland Department of Labor has already received at least 813 claims by ex-federal employees for unemployment benefits" and that it "is also aware of public announcement of significant layoffs at Maryland and D.C.-located federal agencies"); ECF No. 4-7 ¶ 30 (Declaration by the Director of the California Employment Development Department explaining that her office has received "1,621 claims by former federal employees for unemployment benefits since February 1, 2025"); ECF No. 4-8 ¶ 15 (Declaration by the Deputy Director, Service Delivery of the Illinois Department of Employment Security, explaining that her office has received 446 claims for unemployment insurance by former federal employees); ECF No. 4-13 ¶ 4 ("From January 21 – February 20, [the New York Department of Labor] received 178 new unemployment claims from federal employees. From February 21 – February 27, the most recently available data set, [that office] logged an additional 372 new unemployment claims from federal employees.").)

In any event, the Government cannot be permitted to skirt RIF notice requirements by simply not defining the competitive area as required, then claiming the preconditions for RIF notice have not been met.

[11] Having resolved the matter on the basis of the APA, the Court makes no findings as to the States' likelihood of success on their *ultra vires* claim.

40

## B.    Irreparable Harm

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer

harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline,*

*LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019)

(quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)).

Further, "the harm must be irreparable, meaning that it 'cannot be fully rectified by the final

judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th

Cir. 2012)).

Although the harms the States face are largely economic, "economic damages may

constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain*

*Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019)

(citation omitted).  Here, the harm is irreparable because money damages are likely not available.

*See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives

the federal government's sovereign immunity for a limited set of suits, brought by 'a person

suffering legal wrong because of agency action' to obtain relief '*other than money damages*.'"

(quoting 5 U.S.C. § 702) (emphasis added)); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F.

Supp. 3d 101, 115–16 (D.D.C. 2022) (explaining that the unavailability of money damages for

APA claims counsels in favor of a finding of irreparable harm).

Further, even if damages were available, where economic damages are "difficult to

ascertain," there may be irreparable harm. *Multi–Channel TV Cable Co. v. Charlottesville Quality*

*Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d

1033, 1037 (2d Cir. 1973)).  The damages incurred by the States are difficult to ascertain, and an

injunction is necessary to mitigate the chaos caused by the Government.

41

The States' diversion of resources as a result of the lack of notice also constitutes an irreparable harm. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (recognizing the "diversion of resources away from . . . core missions" as irreparable); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) (explaining that "the forced diversion of resources" has been "recognized as irreparable harm in other suits" (collecting cases).)

In addition, the notice provision contemplates providing notice sixty days before a RIF. The information to be provided is therefore time sensitive, and the harm itself is temporal and immediate. This likewise weighs in favor of finding that the harm is irreparable. *Cf. Heritage Found. v. U.S. Dep't of State*, Civ. No. TJK-24-2862, 2024 WL 4607501, at *10 (D.D.C. Oct. 29, 2024).

## C.    Balance of the Equities & the Public Interest

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court is mindful that it may not collapse this inquiry with the first *Winter* factor. *See USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success argument").

In cases such as this, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe*, 947 F.3d at 230–31 (internal quotation marks and citation omitted). But the public interest goes beyond that. As discussed above, these mass terminations conducted without appropriate notice have placed enormous strain on the States. And the public has a great interest in the States not unnecessarily diverting resources from other functions. (*See,*

42

*e.g.*, ECF No. 4-5 ¶ 27 (Declaration from the Maryland Secretary of Labor that Maryland Department of Labor personnel "have been diverted from state-funded workforce development projects, including the Employment Advancement Right Now ('EARN') program, which is a . . . workforce development grant initiative serving over 5,000 constituents annually"); *id.* ¶ 26 (explaining that state matters that have been affected by the diversion of resources includes "occupational and professional licensing oversight, financial regulation, [and] state workforce development programs"); *id.* ¶ 58 (explaining that the diversion will also "impede the timely processing of regular [unemployment claims], creating significant backlogs and delays"); ECF No. 4-8 ¶ 24 (declaration from the Deputy Director, Service Delivery of the Illinois Department of Employment Security providing that "the diversion of personnel to handle [Unemployment Compensation for Federal Employees] claims will impede the timely processing of regular unemployment insurance claims, creating backlogs and delays").) It is in the public interest to provide immediate relief to the States so as to alleviate the extreme burdens placed upon them by the Government. The Court also recognizes that there exists an interest in a presidential administration carrying out its priorities, which may take the form of mass terminations. However, the Court concludes that the public's interest in governmental institutions following the law, and in reducing burdens on the States is greater. These harms to the States—and to the public—will be further exacerbated if emergency relief is not granted.

The Government argues that a TRO would "impose significant and unrecoverable costs on Defendants." (ECF No. 20 at 27.) The Court does not discount this reality. However, by the Government's own admission, reinstatement of the probationary employees is the *only relief* that will provide redress to the States. (*See* ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by [the employees'] *reinstatement*."); *id.* at 17 ("To prevent or stem

43

the diversion of state assistance resources, the Court again would have to order reinstatement of the removed probationers into their former agency jobs.").) The Court recognizes the breadth of the relief it will grant, but the Court cannot allow the Government to benefit from chaos of its own making.

For instance, in *HIAS*, 985 F.3d, the Fourth Circuit upheld the district court's entry of a preliminary injunction barring the Government from enforcing an Executive Order concerning refugee resettlement that was found to be likely violative of the federal Refugee Act, 8 U.S.C. § 1522. As the Fourth Circuit explained, "[t]he resettlement agencies face enormous burdens to comply with the Order and Notice, as well as the likelihood of affiliates closing entirely in jurisdictions that refuse consent. In contrast, under the district court's injunction, the government must continue to implement the refugee resettlement program according to the Act's well-established processes refined over several decades." *Id.* at 326. So too here, the States are faced with enormous burdens in the face of the Government's failure to provide notice, and under an order reinstating employees and enjoining the Government from further illegal action, the Government must simply act according to well-established law.

On balance, the Court finds that the public interest and the equities weigh in favor of granting a TRO.

## VI.     SCOPE OF RELIEF

### A.     TRO Purpose & Limitations

Before turning to the specific relief that will be ordered in this case, it is necessary to review fundamental principles about the nature of a TRO and the kinds of relief that are available at the TRO stage.

44

The purpose of a preliminary injunction is to preserve the status quo until there is a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The purpose of a TRO is to preserve the status quo until the Court is able to hold a preliminary injunction hearing. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). Each "aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted).

The Government argues that an order reinstating fired workers would not be a proper invocation of the Court's authority to "restrain[]", but would rather be an impermissible "mandatory injunction." (ECF No. 20 at 25 n.9.) The Government is mistaken. A mandatory injunction, which is "disfavored" and issued in only the "most extraordinary circumstances," is one that changes the status quo. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). A prohibitory injunction, by contrast, is one that maintains the status quo. *League of Women Voters*, 769 F.3d at 236. Critically, the "status quo," for purposes of injunctive relief, "is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (citation and internal quotation marks omitted). As the Fourth Circuit has recognized, "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters*, 769 F.3d at 236 (cleaned up) (quoting *Aggarao*, 675 F.3d at 378). As the Second Circuit has explained:

> The "status quo" in preliminary-injunction parlance is really a "status quo ante." *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the *status quo ante*"); *accord O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has recently disturbed the status quo to reverse its actions . . . restores, rather than disturbs, the status quo ante,

45

and is thus not an exception" to the ordinary standard for preliminary injunctions). This special "ante" formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current "status quo" precipitated by their wrongdoing.

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018).

It is in the context of the broader conceptual distinction between a prohibitory and mandatory injunction that Rule 65's use of the word "restraining" must be understood. *See Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir. 1989) (stating that a TRO, "by the very word 'restraining[,'] should issue only for the purpose of preserving the status quo and preventing irreparable harm and for just so long as is necessary to hold a hearing"). This is not a case in which the Court is asked, at the TRO stage, to order a defendant to take on new burdens or obligations that it had previously not shouldered. *Cf., e.g., Sosa v. Lantz*, 660 F. Supp. 2d 283, 290 (D. Conn. 2009) (declining to issue a TRO that would have required a state prison to move an inmate to a larger cell, on the grounds that such an order "would provide [the inmate] with affirmative relief *changing* the status quo" (emphasis in original)). Instead, the Court is asked to order the Government to preserve the situation that existed before it embarked on the likely illegal mass terminations without providing requisite notice to the States. Although such an order will inevitably require the Government to take affirmative steps to comply, it nevertheless fits comfortably within the scope of the Court's TRO authority. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2951 (3d ed. 2024) ("[A]lthough they are rare, temporary restraining orders can be framed to require affirmative action on the part of the 'restrained' party.").[12]

---

[12] Alternatively, as discussed in more detail below, the Court has statutory authority to order appropriate preliminary relief under the APA. 5 U.S.C. § 705.

46

**B.    Geographic Scope**

The Court must determine the appropriate scope of any injunctive relief. This task "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citations omitted). As the Fourth Circuit has explained:

> District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that "a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citations and internal quotation marks omitted). A district court may issue a nationwide injunction so long as the court "mold[s] its decree to meet the exigencies of the particular case." *Id.* (quoting *Trump v. Int'l Refugee Assistance Project*, [582 U.S. 571, 580] (2017)). And a nationwide injunction may be appropriate when the government relies on a "categorical policy," and when the facts would not require different relief for others similarly situated to the plaintiffs. *Id.* at 232–33.

*HIAS*, 985 F.3d at 326 (first alteration in original).

In *HIAS*, the Fourth Circuit upheld the district court's entry of a preliminary injunction barring the Government from enforcing an Executive Order concerning refugee resettlement that was found to be likely violative of the federal Refugee Act, 8 U.S.C. § 1522. 985 F.3d at 316–18. The Court held that the district court did not abuse its discretion in enjoining the application of the executive order nationwide, rather than limiting the relief to the three plaintiff resettlement agencies. As the panel explained:

> The refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country. Enjoining the Order and Notice only as to the plaintiff resettlement agencies would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect.

*Id.* at 326–27.

Much like how the program challenged in *HIAS* "impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country," here, the challenged

47

dismissals without notice apply to federal workers spread throughout the United States. When, as is likely the case here, the Government's policy is violative of the law across the board, it is appropriate for injunctive relief to be nationwide in scope, rather than limited to specific plaintiffs. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he the scope of injunctive relief is dictated by the extent of the violation established . . . ."); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 178 (D.D.C. 2021) (affirming "the propriety of nationwide injunctions in APA cases where the challenged policy is found to be arbitrary and capricious or otherwise facially unlawful" (citation omitted)); *cf. Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 733 (5th Cir. 1977) ("[A] nationwide or companywide injunction is appropriate only when the facts indicate a company policy or practice in violation of the statute."). To limit the scope of the injunction only to Plaintiff States would mean that an individual federal employee's job status would depend on the fortuity of their physical location, a result that would be inequitable and "undermine . . . national consistency" in the federal workforce and application of federal civil service law. *HIAS*, 985 F.3d at 326. Moreover, any attempt to disaggregate federal government–wide employment policy on a state-by-state-level is bound to be unworkable, as it would functionally create two separate, drastically different regimes with respect to probationary employees in each affected agency. In these circumstances, a nationwide injunction—rather than one tied only to these specific States—is warranted. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (upholding the district court's grant of a nationwide preliminary injunction when "the facts would not require different relief for others similarly situated" (cleaned up) (quoting *HIAS*, 985 F.3d at 326–27)).

48

## C.    Content of the Injunction

Under the APA, to prevent irreparable injury, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. at 16), *order dissolved*, Civ. No. PX-20-2118, 2023 WL 3547497 (D. Md. May 18, 2023). Furthermore, it is well established that the Court "may craft declaratory and injunctive relief designed to preclude a federal agency from acting in contravention of its statutory and regulatory authority," and that it "may require an agency to modify its current or future practices in order to account for past violations of its statutes or regulations." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004) (citations omitted).

The ordinary remedy for unlawful agency actions is vacatur. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law' . . . ." (quoting 5 U.S.C. § 706(2)(A))); *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (similar); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (cleaned up)). Although some courts have occasionally endorsed a practice of remanding an agency action to the agency for further consideration without vacatur, *see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), the Fourth Circuit "has never formally embraced the *Allied-Signal* remand-without-vacatur approach." *Sierra Club v. U.S. Army Corps of Eng'rs*,

49

909 F.3d 635, 655 (4th Cir. 2018). Even assuming that remand without vacatur may be appropriate in some instances, such a remedy is warranted only when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Id.* (quoting *Allied-Signal*, 988 F.2d at 150–51 (alteration in original)). Here, however, it is likely that the Government's actions were plainly contrary to law, and there is no plausible scenario in which the Government's procedures for terminating probationary employees could be adequately justified on remand to the agencies. In such instances, the likely final remedy is that the Government's actions must be vacated in their entirety. *See id.* (holding that vacatur was required when the challenged actions were "legally deficient" such that there was no realistic possibility of the actions being justified upon agency reconsideration).

Here, the Court finds that—just as vacatur would likely be the appropriate remedy at the final judgment stage under the APA, 5 U.S.C. § 706—the proper provisional remedy under Rule 65 and § 705 is a stay of the Government's efforts to terminate probationary employees *en masse* and without notice to the States. *Cf. Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[W]e conclude that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."), *cert. granted in part*, ___ S. Ct. ___, 2025 WL 65914 (Mem.) (Jan. 10, 2025); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020) ("Nationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated."); *see generally Gomez v. Trump*, 485 F. Supp. 3d 145, 202–04 (D.D.C. 2020) (explaining the relationship between vacatur under § 706 and enjoining a likely unlawful agency action under § 705).

50

Only an order staying the Government's likely unlawful RIF process can prevent the States from suffering irreparable injury in the form of the disruption and costs imposed by the mass terminations. Indeed, the Government admits as much. (ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by their reinstatement." (emphasis omitted).) Were the Court to withhold from granting such interim relief, it would likely be impossible adequately to remedy the States' injuries at the final judgment stage, which may be many months if not years away. Given the complexity and unprecedented nature of the terminations, it would be difficult, if not impossible, to retrospectively assign a dollar amount to the burdens incurred by the States from the Government's likely unlawful terminations—and in any event, money damages are likely categorically unavailable in a suit of this type, as discussed above, *see supra* Section III.B.

As a practical matter, a stay of the Government's terminations of probationary employees means that the Government must reinstate all affected employees working for the Defendant Agencies. Then, if the Government wishes to continue pursuing its RIF agenda, the Government must start from square one, acting in compliance with federal law. Only by following the procedures set forth in federal law can the Court ensure that the States receive the notice to which they are statutorily entitled. The Court is not blind to the practical reality that the relief being ordered today will have far-reaching impacts on the federal workforce and will require the Government to expend considerable resources in an effort to undo the RIFs that have been put into place. But, as explained above, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano*, 442 U.S. at 702. When, as is likely the case here, the Government has engaged in an illegal scheme spanning broad swaths of the federal workforce, it is inevitable that the remediation of that scheme will itself be a significant task.

### D.    Agencies Restrained

The final issue pertaining to the scope of the TRO is which specific Defendants are to be restrained.  As discussed above, there are three agencies named as Defendants in this action—namely, Defense, OPM, and Archives—with respect to which Plaintiffs have provided insufficient evidence that RIFs have occurred.[13]  It is of course axiomatic that a movant is not entitled to a TRO against a defendant when the movant has not shown that it is likely to prevail on the merits as to that defendant.  Accordingly, Defense, OPM, and Archives will be excluded from the TRO.  This exclusion is without prejudice to the States' right, at the preliminary injunction stage, to produce evidence showing that RIFs occurred at these agencies and to seek appropriate relief.

## VII.    SECURITY/BOND REQUIREMENT

Under Federal Rule of Civil Procedure 65(c), a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  District courts have discretion to set the required security at a nominal amount, *see Hoechst Diafoil Co.*, 174 F.3d at 421 n.3, and this approach has long been followed in public-interest litigation cases, *Alabama ex rel. Baxley v. Corps of Eng'rs of U.S. Army*, 411 F. Supp. 1261, 1275–76 (N. D. Ala. 1976) (collecting cases); *South Carolina v. United States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018) (same), *vacated on other grounds*, 912 F.3d 720 (4th Cir. 2019); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, Civ. No. ABA-25-0333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025); *see also* Wright & Miller, *supra*, § 2954.

---

[13] A related issue is the contention urged by counsel for the Government at the TRO hearing—namely, that certain affidavits refer to agencies that are not Defendants in this action.  In particular, the Government cited to affidavits from an employee from the Federal Emergency Management Agency ("FEMA") and the National Oceanic and Atmospheric Administration ("NOAA").  (*See* ECF No. 5-11, 5-15 (affidavits attesting to terminations of probationary employees at FEMA and NOAA, respectively).)  But FEMA and NOAA are housed within the Departments of Homeland Security and Commerce, respectively, which *are* expressly named as Defendants.  (*See* ECF No. 1 at 3–4.)

52

Here, the Court concludes that a nominal bond is appropriate. Although the risk of harm to the Government is not remote, the potential cost of an improvidently granted TRO on the federal government is too complex to calculate in this expedited proceeding. And even if a dollar amount could be put on the Government's actions, it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing. Accordingly, the Court will require each Plaintiff State to pay a bond of $100.

## VIII.   STAY PENDING APPEAL

The Government requests that any order issuing injunctive relief be stayed pending appeal. (ECF No. 20 at 28.) In deciding whether to issue a stay pending appeal, the Court considers:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (citation omitted). These factors "substantial[ly] overlap" with the *Winter* factors. *Id.*

It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites. *See, e.g.*, *PFLAG, Inc. v. Trump*, Civ. No. 25-337-BAH, 2025 WL 685124, at *32 (D. Md. Mar. 4, 2025) (granting a request for a preliminary injunction, then denying a request for a stay pending appeal "[f]or all the [same] reasons"). Here, the stay applicant (*i.e.,* the Government) has *not* made a strong showing of likelihood of success on the merits; indeed, the Court concluded that the Government will likely *lose* on the merits. Accordingly, for the reasons stated above in the discussion of the *Winter* factors, the Government's request for a stay pending appeal will be denied.

53

## IX.   CONCLUSION

For the reasons stated herein, a TRO will issue.

Dated this ___13___ day of March, 2025.

BY THE COURT:

James K. Bredar
United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MARYLAND,<br>200 St. Paul Place<br>Baltimore, MD 21202 | |
| MINNESOTA,<br>445 Minnesota Street, Suite 1400<br>St. Paul, Minnesota 55101-2131 | Case No.: 1:25-cv- |
| DISTRICT OF COLUMBIA,<br>400 6th Street NW<br>Washington, DC 20001 | **COMPLAINT** |
| ARIZONA,<br>2005 North Central Avenue<br>Phoenix, Arizona 85004 | |
| CALIFORNIA,<br>300 S. Spring Street, Suite 1702<br>Los Angeles, California 90013 | |
| COLORADO,<br>1300 Broadway<br>Denver, CO 80203 | |
| CONNECTICUT,<br>165 Capitol Avenue<br>Hartford, CT 06106 | |
| DELAWARE,<br>820 N. French Street<br>Wilmington, DE 19801 | |
| HAWAII,<br>425 Queen Street<br>Honolulu, HI 96813 | |
| ILLINOIS,<br>115 South LaSalle Street, 35th Floor<br>Chicago, IL  60603 | |

MASSACHUSETTS,
1 Ashburton Pl.
Boston, MA 02108

PEOPLE OF THE STATE OF MICHIGAN,
3030 W. Grand Blvd.
Ste. 9-600
Detroit, MI 48202

NEVADA,
555 E. Washington Ave.,
Las Vegas, NV 89101

NEW JERSEY,
25 Market Street
Trenton, NJ 08625

NEW MEXICO,
P.O. Drawer 1508
Santa Fe, NM  87504-1508

NEW YORK,
28 Liberty St.
New York, NY 10005

OREGON,
100 SW Market Street
Portland, OR 97201

RHODE ISLAND,
150 South Main Street
Providence, RI 02903

VERMONT,
109 State Street
Montpelier, VT 05609

WISCONSIN,
Post Office Box 7857
Madison, Wisconsin 53707

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,
1400 Independence Avenue, S.W.,
Washington, DC 20250

BROOKE ROLLINS, *in her official Capacity
as Secretary of Agriculture*,
        1400 Independence Avenue, S.W.
        Room 214W, Whitten Building
        Washington, DC 20250

UNITED STATES DEPARTMENT OF
COMMERCE,
        1401 Constitution Avenue, N.W.
        Washington, DC 20230

HOWARD LUTNICK, *in his Official
Capacity as Secretary of Commerce*,
        1401 Constitution Avenue, N.W.
        Washington, DC 20230

UNITED STATES DEPARTMENT OF
DEFENSE,
        1000 Defense Pentagon
        Washington, DC 20301-1400

PETER HEGSETH, *in his Official Capacity
as Secretary of Defense*,
        1000 Defense Pentagon
        Washington, DC 20301-1400

UNITED STATES DEPARTMENT OF
EDUCATION,
        400 Maryland Avenue, S.W.
        Washington, DC 20202

LINDA MCMAHON, *in her Official
Capacity as Secretary of Education*,
        400 Maryland Avenue, S.W.
        Washington, DC 20202

UNITED STATES DEPARTMENT OF
ENERGY,
     1000 Independence Avenue, S.W.
     Washington, DC 20024

CHRISTOPHER WRIGHT, *in his Official
Capacity as Secretary of Energy*,
     1000 Independence Avenue, S.W.
     Washington, DC 20024

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
     200 Independence Avenue, S.W.
     Washington, D.C. 20201

ROBERT F. KENNEDY, JR*., in his Official
Capacity as Secretary of Health and Human
Services*,
     200 Independence Avenue, S.W.
     Washington, DC 20201

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
     300 7th Street, S.W.
     Washington, DC 20201

KRISTI NOEM, *in her Official Capacity as
Secretary of Homeland Security*,
     300 7th Street, S.W.
     Washington, DC 20201

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
     451 7th Street, S.W.
     Washington, DC 20410

SCOTT TURNER, *in his Official Capacity as
Secretary of Housing and Urban
Developmen*t,
     451 7th Street, S.W.
     Washington, DC 20410

UNITED STATES DEPARTMENT OF
INTERIOR,
  1849 C Street, N.W.
  Washington, DC 20240


DOUGLAS BURGUM, *in his Official
Capacity as Secretary of the Interior*,
  1849 C Street, N.W.
  Washington, DC 20240


UNITED STATES DEPARTMENT OF
LABOR,
  200 Constitution Avenue, N.W.
  Washington, DC 20210


VINCE MICONE, *in his Official Capacity as
Acting Secretary of Labor*,
  200 Constitution Avenue, N.W.
  Washington, DC 20210


UNITED STATES DEPARTMENT OF
TRANSPORTATION,
  1200 New Jersey Avenue, S.E.
  Washington, DC 20590


SEAN DUFFY, *in his Official Capacity as
Secretary of the Transportation*,
  1200 New Jersey Avenue, S.E.
  Washington, DC 20590


UNITED STATES DEPARTMENT OF
TREASURY,
  1500 Pennsylvania Avenue, N.W.
  Washington, DC 20220


SCOTT BESSENT, *in his Official Capacity
as Secretary of the Treasury*,
  1500 Pennsylvania Avenue, N.W.
  Washington, DC 20220


UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,
  810 Vermont Avenue, N.W.

Washington, DC 20420

DOUGLAS A. COLLINS, *in his Official
Capacity as Secretary of the Veterans Affairs*,
    810 Vermont Avenue, N.W.
    Washington, DC 20420

CONSUMER FINANCIAL PROTECTION
BUREAU,
    1700 G Street, N.W.
    Washington, DC 20520

RUSSELL VOUGHT, *in his Official
Capacity as Acting Director of the Consumer
Financial Protection Bureau*,
    1700 G Street, N.W.
    Washington, DC 20520

ENVIRONMENTAL PROTECTION
AGENCY,
    1200 Pennsylvania Avenue, N.W.
    Washington, DC 20460

LEE ZELDIN, *in his Official Capacity as
Administrator of the Environmental
Protection Agency*,
    1200 Pennsylvania Avenue, N.W.
    Washington, DC 20460

FEDERAL DEPOSIT INSURANCE
CORPORATION,
    550 17th Street, NW
    Washington, DC 20429

TRAVIS HILL, *in his Official Capacity as
Acting Chairman of the Federal Deposit
Insurance Corporation*,
    550 17th Street, NW
    Washington, DC 20429

GENERAL SERVICES
ADMINISTRATION,
    1800 F Street, NW

Washington, DC 20405

STEPHEN EHIKIAN, *in his Official Capacity as Acting Administrator of the General Services Administration*,
1800 F Street, NW
Washington, DC 20405

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,
700 Pennsylvania Avenue, N.W.
Washington, DC 20001

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street, N.W.
Washington, DC 20415

CHARLES EZELL, *in his Official Capacity as Acting Director of the Office of Personnel Management*
1900 E Street, N.W.
Washington, DC 20415

SMALL BUSINESS ADMINISTRATION,
409 3rd Street, SW
Washington, DC 20416

KELLY LOEFLER, *in her Official Capacity as Administrator of the Small Business Administration*,
409 3rd Street, SW
Washington, DC 20416

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,
1300 Pennsylvania Avenue, NW
Washington, DC 20004

MARCO RUBIO, *in his Official Capacities as Acting Administrator of the United States Agency for International Development and Archivist for the National Archives and Records Administration*,

| 1300 Pennsylvania Avenue, NW Washington, DC 20004 , | |
|---|---|
| Defendants. | |

## INTRODUCTION

1.      President Trump and his Administration have made no secret of their contempt for the roughly 2 million committed professionals who form the federal civil service. Nor have they disguised their plans to terminate vast numbers of civil servants, starting with tens of thousands of probationary employees. These large-scale, indiscriminate firings are not only subjecting the Plaintiff States and communities across the country to chaos. They are also against the law.

2.      Federal statutes and regulations set forth procedures that federal agencies must follow when conducting reductions in force ("RIFs"). Critically, these procedures require that federal agencies provide 60 days of advance notice to affected employees and to states, so that they have an opportunity to mitigate the harms of layoffs. Where an agency fails to provide such notice, the employees "may not be released."

3.      Over the past month, the new Administration has run roughshod over the RIF requirements. Specifically, as part of an effort to reduce the size of the federal workforce, the Office of Personnel Management ("OPM") has unlawfully directed federal agencies to conduct mass terminations of probationary employees, suddenly and without any advance notice. Defendants have followed through on this directive, firing employees by the hundreds and, in many instances, thousands— all without following the procedures for conducting RIFs and without providing notice to the affected employees or states.

4.      This campaign has inflicted immense harms on tens of thousands of probationary employees and their families. It has rendered them jobless without providing any advance notice

that might have given them an opportunity to seek other employment or even budget to prepare for the loss of income. As a result, many affected employees and their families are struggling to make ends meet—to pay rent, buy groceries, and care for their loved ones.

5.      This campaign is harming Plaintiff States, too. In addition to the informational and procedural injuries resulting from the deprivation of notice to which they were entitled, the lack of notice has impeded the ability of many Plaintiff States to support affected employees and thereby mitigate the financial and other impacts on state services. In fact, pursuant to federal statutory requirements, Plaintiff States operate rapid response teams that provide immediate services and resources to workers subject to mass layoffs. These services include job placement and job training services as well as connections to social services like unemployment insurance and health insurance. Because of Defendants' failure to adhere to the RIF notice procedures, many Plaintiff States have had to scramble and expend additional resources to identify even which agencies have conducted layoffs and which affected employees require support.

6.      Because of the lack of notice, many Plaintiff States have also faced increased administrative demands related to adjudicating unemployment claims; decreased tax revenues; and increased demands for social services. Some Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare.

7.      To address these harms to Plaintiff States, this action seeks declaratory and injunctive relief requiring Defendants: to cease the RIFs of probationary employees that they have conducted unlawfully and without notice; to reinstate any probationary employees who were terminated as part of mass terminations on or after January 20, 2025; to refrain from separating any employees pursuant to a RIF prior to reinstatement of the unlawfully terminated probationary employees; and

to conduct any future RIFs in accordance with applicable laws and regulations, including providing required notices to Plaintiff States.

## I.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

9.    There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706 and the Court's equitable powers.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Maryland is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in Maryland.

## II.    PARTIES

11.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

12.    Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

13.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

14.     Plaintiff the State of Arizona, represented by and through its Attorney General, is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

15.     Plaintiff the State of California, represented by and through its Attorney General, is a sovereign state of the United States of America. California is represented by and through its chief legal officer Rob Bonta who is authorized to act on behalf of the State. Cal. Const. Art. V, § 13.

16.     Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

17.     Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18.     Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

19.     Plaintiff the State of Hawaiʻi, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

20.     Plaintiff the State of Illinois, represented by and through its attorney general, is a sovereign state of the United States of America. Illinois is presented by and through its chief legal officer, Kwame Raoul, who is authorized to pursue this action on behalf of the State of Illinois. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

21.     Plaintiff Massachusetts is a sovereign commonwealth in the United States of America. Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts, and brings this action on behalf of itself and its residents to protect the Commonwealth's sovereign, proprietary, and quasi-sovereign interests in the conservation and protection of its natural resources and the environment. *See* Mass. Const. Am. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 and 11D.

22.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

23.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Minnesota is represented by and through its chief

legal officer, Attorney General Keith Ellison. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

24.    Plaintiff the State of New Jersey, represented by and through its Attorney General, is a sovereign state of the United States of America. New Jersey is represented by and through its chief legal officer, Attorney General Matthew J. Platkin. The Attorney General is authorized to act in federal court on behalf of the State on matters of public concern.

25.    Plaintiff the State of Nevada is a sovereign state of the United States of America. Nevada is represented by and through its chief legal officer, Attorney General Aaron D. Ford. The Attorney General has the authority to file this suit to protect and secure the interests of the State. NRS 228.170.

26.    The State of New Mexico is a sovereign state of the United States of America. The Attorney General of New Mexico is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

27.    Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Letitia James is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

28.    Plaintiff the State of Oregon, represented by and through its Attorney General, is a sovereign state of the United States. Oregon is represented by and through its chief legal officer, Dan Rayfield, who is authorized to act on behalf of the State.

29.    The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement

officer of Rhode Island and authorized to pursue this action on behalf of the State of Rhode Island.
R.I. Gen. Laws § 42-9-6.

30.     Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, who is the State's chief legal officer and authorized to pursue this action on behalf of the State.  Vt. Stat. Ann. tit. 3, § 159.

31.     Plaintiff the State of Wisconsin is a sovereign state of the United States of America. The Attorney General of Wisconsin is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

32.     Defendant Department of Agriculture is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

33.     Defendant Brooke Rollins is the Secretary of the Department of Agriculture. As secretary, she is responsible for all actions taken by the agency. She is sued in her official capacity.

34.     Defendant Department of Commerce is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

35.     Defendant Howard Lutnick is the Secretary of the Department of Commerce. As Secretary, Defendant Lutnick is responsible for all actions taken by the agency. He is sued in his official capacity

36.     Defendant Department of Defense is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

37.     Defendant Pete Hegseth is the Secretary of the Department of Defense. As Secretary, Defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

38.     Defendant Department of Education is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

39.     Defendant Linda McMahon is the Secretary of the Department of Education. As Secretary, Defendant McMahon is responsible for all actions taken by the agency. She is sued in her official capacity.

40.     Defendant Department of Energy is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

41.     Defendant Chris Wright is the Secretary of the Department of Energy. As Secretary, Defendant Wright is responsible for all actions taken by the agency. He is sued in his official capacity.

42.     Defendant Department of Health and Human Services is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

43.     Defendant Robert F. Kennedy, Jr. is the Secretary of the Department of Health and Human Services. As Secretary, Defendant Kennedy is responsible for all actions taken by the agency. He is sued in his official capacity.

44.     Defendant Department of Homeland Security is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

45.     Defendant Kristi Noem is the Secretary of the Department of Homeland Security. As Secretary, Defendant Noem is responsible for all actions taken by the agency. She is sued in her official capacity.

46.     Defendant Department of Housing and Urban Development is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

47.     Defendant Scott Turner is the Secretary of the Department of Housing and Urban Development. As Secretary, Defendant Turner is responsible for all actions taken by the agency. He is sued in his official capacity.

48.     Defendant Department of the Interior is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

49.     Defendant Doug Burgum is the Secretary of the Interior. As Secretary, Defendant Burgum is responsible for all actions taken by the agency. He is sued in his official capacity.

50.     Defendant Department of Labor is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

51.     Defendant Vince Micone is the Acting Secretary of the Department of Labor. As Acting Secretary, Defendant Micone is responsible for all actions taken by the agency. He is sued in his official capacity.

52.     Defendant Department of Transportation is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

53.     Defendant Sean Duffy is the Secretary of the Department of Transportation. As Secretary, Defendant Duffy is responsible for all actions taken by the agency. He is sued in his official capacity.

54.     Defendant Department of the Treasury is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

55.     Defendant Scott Bessent is the Secretary of the Department of the Treasury. As Secretary, Defendant Bessent is responsible for all actions taken by the agency. He is sued in his official capacity.

56.     Defendant Department of Veterans Affairs is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

57.     Defendant Doug Collins is the Secretary of the Department of Veterans Affairs. As Secretary, Defendant Collins is responsible for all actions taken by the agency. He is sued in his official capacity.

58.     Defendant Consumer Financial Protection Bureau is an agency within the meaning of 5 U.S.C. § 552(f).

59.     Defendant Russ Vought is the Acting Director of the Consumer Financial Protection Bureau. As Acting Director, Defendant Vought is responsible for all actions taken by the agency. He is sued in his official capacity.

60.     Defendant Environmental Protection Agency is an agency within the meaning of 5 U.S.C. § 552(f).

61.     Defendant Lee Zeldin is the Administrator of the Environmental Protection Agency. As Administrator, Defendant Zeldin is responsible for all actions taken by the agency. He is sued in his official capacity.

62.     Defendant Federal Deposit Insurance Corporation is an agency within the meaning of 5 U.S.C. § 552(f).

63.     Defendant Travis Hill is the Acting Chairman of the Federal Deposit Insurance Corporation. As Acting Chairman, Defendant Hill is responsible for all actions taken by the agency. He is sued in his official capacity.

64.     Defendant General Services Administration is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

65.     Defendant Stephen Ehikian is the Acting Administrator of the General Services Administration. As Acting Administrator, Defendant Ehikian is responsible for all actions taken by the agency. He is sued in his official capacity.

66.     Defendant National Archives and Record Administration is an agency within the meaning of 5 U.S.C. § 552(f).

67.     Defendant Marco Rubio is the Acting Archivist for the National Archives and Records Administration. As Acting Archivist, Defendant Rubio is responsible for all actions taken by the agency. He is sued in his official capacity.

68.     Defendant Office of Personnel Management is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

69.     Defendant Charles Ezell is the Acting Director of the Office of Personnel Management. As Acting Director, Defendant Ezell is responsible for all actions taken by the agency. He is sued in his official capacity. Defendant Department of Health and Human Services is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

70.     Defendant Small Business Administration is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

71.     Defendant Kelly Loeffler is the Administrator of the Small Business Administration. As Administrator, Defendant Leoffler is responsible for all actions taken by the agency. She is sued in her official capacity.

72.     Defendant United States Agency for International Development is an agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

73.    Defendant Marco Rubio is the Acting Administrator of the United States Agency for International Development. As Acting Administrator, Defendant Rubio is responsible for all actions taken by the agency. He is sued in his official capacity.

74.    Federal workers reside and work in each of the Plaintiff States. The Defendants have conducted—or have announced plans to imminently conduct—illegal RIFs by firing probationary employees in Plaintiff States without adhering to the statutory and regulatory requirements for conducting RIFs.

### III.    LEGAL FRAMEWORK

#### A.    Probationary Employees

75.    OPM's directive to agencies to terminate probationary employees *en masse* has swept up two categories of federal employees whose employment is governed by statute and regulation: probationary employees in the "competitive" service, and employees within their first two years of employment in the "excepted" service. Competitive service employees are hired through an open, competitive hiring process and excepted service employees are appointed through a non-competitive hiring process. Plaintiff States refer herein to all such employees as "probationary employees."

76.    Probationary employees in the competitive service are, with some exceptions, those who have been employed for less than one year. 5 U.S.C. § 7511(a)(1)(A)(ii); 5 C.F.R. § 315.801.

77.    Employees are appointed as "career" or "career-conditional employees" subject to completing the probationary period. 5 C.F.R. § 315.201(a).

78.    The probationary period provides the opportunity for the federal agency to assess the individual performance of the employee. Under governing OPM regulations, an agency "shall utilize the probationary period as fully as possible to determine the fitness of the employee and

shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a).

79.    Most employees in the excepted service are also subject to a statutory trial period of two years, which, like the probationary period in the competitive service, is intended to permit the agency to evaluate the employee's performance and fitness for long-term employment. 5 U.S.C. § 7511(a)(1)(C)(ii).

80.    Outside of the context of a RIF, federal agencies may lawfully terminate probationary employees for one of two reasons.

81.    First, a federal agency may lawfully terminate a probationary employee for reasons based on conditions arising before the employee's probationary appointment. 5 C.F.R. § 315.805.

82.    Second, a federal agency may lawfully terminate a probationary employee based on the agency's assessment of the employee's performance during the probationary period, pursuant to 5 C.F.R. § 315.804(a), which is entitled: "Termination of probationers for unsatisfactory performance or conduct."

83.    Under that regulation, "when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action." 5 C.F.R. § 315.804(a). "The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." *Id.* Trial-period employees in the excepted service have the same notice rights when removed from their positions for performance reasons. 5 C.F.R. § 316.304.

**B.    RIF Requirements**

84.    Apart from terminations of probationary employees for conditions arising before their appointments or for unsatisfactory performance or conduct, federal agencies may only terminate probationary employees as part of an agency RIF.

85.    A reduction-in-force "is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions. A RIF is not an adverse action against a particular employee, but is directed solely at a position within an agency." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (citation omitted); *Schall v. U.S. Postal Serv.*, 73 F.3d 341, 344 (Fed. Cir. 1996) (similar).

86.    An agency must follow specific statutory directives in conducting a RIF, including following the retention preferences in the statute, giving preference to the retention of military veterans, and considering the employee's tenure and length of service. 5 U.S.C. § 3502(a)(1), (3).

87.    Congress delegated to OPM the authority to promulgate regulations that agencies must follow in implementing RIFs. 5 U.S.C. § 3502(a).

88.    Pursuant to that statutory authorization, and through notice-and-comment rulemaking, OPM has issued detailed regulations setting forth the procedures by which agencies must conduct RIFs. *See* 5 C.F.R. Part 351.

89.    All agencies of the federal government are required to comply with the RIF regulations whenever they "determine[] that a reduction [in] force is necessary." 5 C.F.R. § 351.204.

90.    The RIF regulations apply to employees in the competitive and excepted services. 5 C.F.R. § 351.202(a), (b).

91.    Probationary employees are expressly covered by the RIF regulations. 5 C.F.R. §§ 351.501(b)(2), 351.502(b)(2). Probationary employees are included in "group II" of three groups of employees, and may only be released, in order of retention, after the release of

"group III" employees, a group that includes employees under various temporary, term, and other provisional appointments. 5 C.F.R. § 351.501(b).

92.    Under these required RIF procedures, before conducting a RIF a federal agency must: establish "competitive areas in which employees compete for retention"; designate the "competitive areas" of which employees are to compete for retention at least 90 days before the effective date of the RIF; designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption; and rank employees for retention based on factors including their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.402-351.404, 351.504.

## C.    RIF Notice Requirements

93.    Under the federal RIF statute and associated regulations, federal agencies are required to provide at least 60 days of prior written notice before they may release any federal civil service employee under a RIF. The agency must provide the written notice to (a) the employee, (b) the employee's collective bargaining representative, and (c) the state or District where an affected employee's duty station was located if the RIF would involve at least 50 employees within the competitive area, 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(b).

94.    The notice to the state must be provided to the state or agency designated by the state to perform rapid response activities under the Workforce Investment Act of 1998, now called the Workforce Innovation and Opportunity Act of 2014 ("WIOA Agency"), and must also be provided to "[t]he chief elected official of local government(s) within which these separations will occur." 5 C.F.R. § 351.803(b); *see* 5 U.S.C. § 3502(d)(3)(A).    The purpose of states' "rapid response" activities is to quickly make public and private resources available to workers who are laid off, to minimize the disruption to the affected workers and their communities. To help the state or locality

prepare for the disruptions associated with job losses, notices must include: (a) the number of employees to be separated from service due to the reduction in force, broken down by geographic area and organizational unit, (b) when those separations will occur; and (c) other information that may facilitate the delivery of services to the affected workers. 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(c).

95.     The notice to an affected employee must include: (a) information concerning the right to reemployment consideration and career transition assistance; (b) a release to authorize the federal government to share his or her resume and employment information with the WIOA Agency and potential public or private sector employers; and (c) information about how to apply for unemployment insurance and access other benefits. 5 C.F.R. § 351.803(a).

96.     Where circumstances "not reasonably foreseeable" preclude giving 60 days' written notice, the agency may request that OPM shorten the notice period; however, "[n]o notice period may be shortened to less than 30 days." 5 U.S.C. § 3502(e).

97.     Where an agency fails to provide any of these statutorily required notices, an employee "may not be released, due to a reduction in force." 5 U.S.C. § 3502(d).

## IV.     FACTUAL ALLEGATIONS

98.     Since President Trump took office on January 20, 2025, Defendant Agencies have, at OPM's direction, terminated tens of thousands of probationary employees.

99.     The mass terminations of probationary employees since January 20 were not driven by agency determinations related to the performance or qualifications of any particular probationary employee. Rather, these layoffs have all been part of a coordinated effort directed by the White House and OPM to reduce the size of the federal workforce.

100.    Because the mass terminations of probationary employees are part of an effort to restructure and reduce the workforces at Defendant Agencies, they constitute RIFs. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351.

101.    In terminating probationary employees *en masse*, Defendants have not abided by the statutory and regulatory requirements for RIFs, including the requirement to provide 60 days' notice to the Plaintiff States. This has inflicted and will continue to inflict serious and irreparable harms on the Plaintiff States, as they must now deal with a sudden surge in unemployment, without the advance notice required under the federal RIF statute and regulations.

**A.    Defendants Have Conducted Unlawful RIFs Throughout the Federal Government.**

102.    On January 20, 2025, the day President Trump took office, President Trump appointed Charles Ezell to serve as Acting OPM Director.

103.    The same day, Acting OPM Director Ezell distributed a memo to "Heads and Acting Heads of Departments and Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details." In the memo, OPM directed agency heads to "identify all employees on probationary periods . . . and send a report to OPM listing all such employees" no later than January 24, 2025. OPM further directed agencies to "promptly determine whether those employees should be retained by the agency."[1]

104.    Also on January 20, 2025, President Trump signed an executive order entitled "Hiring Freeze."[2] In addition to ordering "a freeze on the hiring of federal civilian employees" throughout the executive branch, he directed the Director of the Office of Management and Budget—in consultation with OPM and the United States Department of Government Efficiency Service

---

[1] https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Administrative%20Leave%20and%20Details%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%20FINAL.pdf
[2] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/

("DOGE")—to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition."

105.    On February 11, 2025, President Trump issued Executive Order 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." The Executive Order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."[3]

106.    Rather than wait for agency heads to develop RIF plans and follow applicable procedures, however, Defendants began mass unlawful terminations of their probationary employees.

107.    On or around February 11, the Consumer Financial Protection Bureau terminated approximately 73 probationary employees.[4] The agency terminated 70-100 additional probationary employees on February 13.[5]

108.    On or around February 12, the Department of Education terminated 60 probationary employees.[6]

109.    On or around February 12, the General Services Administration notified approximately 100 probationary employees that they would be terminated.[7] Upon information and belief, these terminations will become effective on March 7.

---

[3] https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/
[4] https://www.npr.org/2025/02/12/nx-s1-5294479/cfpb-workers-fired-trump-doge
[5] https://www.npr.org/2025/02/14/nx-s1-5298144/federal-layoffs-usda-hud-defense-trump
[6] https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy
[7] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

110.    On February 13, OPM officials met with agency officials throughout the federal government and ordered agencies to lay off nearly all of the federal government's approximately 220,0000 probationary employees.[8]

111.    On February 14, OPM sent an email to all agency Chief Human Capital Officers (CHCOs) and their deputies to "clarif[y] immediate next steps for probationary employees."

112.    In its February 14 email, OPM explained its directive to agencies:

> We have asked that you separate probationary employees that you have not identified as mission critical no later than the end of the day Monday, 2/27. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

113.    OPM's February 14 email reiterated that OPM's directive should be followed in light of the "President's directive to dramatically reduce the size of the federal workforce."

114.    OPM's directive at the February 13 meeting and in the February 14 email coincided with a rapid uptick in terminations of probationary employees.

115.    On or around February 13, the Department of Energy terminated nearly 2,000 probationary employees.[9] Days later, the agency rescinded approximately 350 termination notices to probationary employees in the National Nuclear Security Administration, which oversees the nation's nuclear stockpile.[10]

116.    On or around February 13, the Department of Veterans Affairs terminated more than 1,000 probationary employees.[11] The Department of Veterans Affairs fired another 1,400 probationary employees on February 24.[12]

---

[8] https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/
[9] https://www.politico.com/news/2025/02/13/trump-federal-worker-layoffs-00204180
[10] https://www.cbsnews.com/news/doge-firings-us-nuclear-weapons-workers-reversing/
[11] https://thehill.com/policy/defense/5162213-va-axes-another-1400-employees/
[12] *Id.*

117.    On or around February 13, OPM fired 250 probationary employees.[13]

118.    On or around February 13, the Small Business Administration terminated around 720 probationary employees.[14]

119.    On or around February 13, the Department of Agriculture terminated approximately 3,400 probationary employees in the Forest Service.[15]

120.    On or around February 13, the Department of Energy terminated around 130 probationary employees in the Bonneville Power Administration.[16] Several days later, the Department of Energy deemed around 30 of those probationary employees as critical and rescinded the terminations.

121.    On or around February 14, the Environmental Protection Agency fired approximately 388 probationary employees.

122.    On or around February 14, the Interior Department fired approximately 2,400 probationary employees, including 800 people from the Bureau of Land Management.[17]

123.    On or around February 14, the Department of Homeland Security terminated 605 probationary employees, including approximately 240 employees from the Transportation Security Administration, 200 employees from the Federal Emergency Management Agency, 130 employees from the Cybersecurity and Infrastructure Security Agency, 50 employees from the U.S. Citizenship and Immigration Services, and 10 employees from the DHS Science and Technology Directorate.[18]

---

[13] https://www.appropriations.senate.gov/news/minority/fact-sheet-trump-and-elons-layoffs-jeopardize-essential-services-americans-rely-on-threaten-critical-agency-objectives-keeping-americans-safe_healthy#:~:text=On%20February%2013%2C%20OPM%20fired,minutes%20to%20leave%20the%20building

[14] https://www.politico.com/news/2025/02/13/trump-federal-worker-layoffs-00204180

[15] https://www.politico.com/news/2025/02/13/forest-services-fires-3400-employees-00204213

[16] https://www.opb.org/article/2025/02/19/bonneville-power-administration-reverses-30-job-cuts-continues-with-plans-to-eliminate-430-positions/

[17] https://www.aol.com/news/trump-administration-lays-off-over-183049169.html

[18] https://www.usatoday.com/story/news/politics/2025/02/20/tsa-trump-workers-fired/79307363007/; https://thehill.com/homenews/5154340-dhs-fires-probationary-employees/

27

124.    On or around February 14, the Department of Health and Human Services terminated around 1,300 probationary employees working for the Centers for Disease Control ("CDC") and Prevention.[19] Upon information and belief, the Department of Health and Human Services has also terminated probationary employees at the National Institutes of Health, the Food and Drug Administration, and the Centers for Medicare and Medicaid Services.

125.    Upon information and belief, on or around February 14, the Department of Housing and Urban Development terminated more than 50 probationary employees.

126.    On or around February 15, the Department of Interior fired around 1,000 probationary employees in the National Park Service.[20]

127.    On or around February 15, the Department of Agriculture fired around 2,000 probationary employees.[21] Several days later, the department rehired several employees who were involved in the government's response to the ongoing bird flu outbreak.

128.    On or around February 18, the Department of Transportation terminated around 400 probationary employees in the Federal Aviation Administration.[22]

129.    On or around February 18, the Federal Deposit Insurance Corporation terminated approximately 170 probationary employees.[23]

130.    On or around February 20, the Department of the Treasury terminated over 6,000 probationary employees, including over 6,000 probationary employees from the Internal Revenue Service and 76 probationary employees from the Office of the Comptroller of the Currency.[24]

---

[19] https://www.npr.org/2025/02/14/nx-s1-5298144/federal-layoffs-usda-hud-defense-trump.
[20] https://apnews.com/article/doge-firings-layoffs-federal-government-workers-musk-d33cdd7872d64d2bdd8fe70c28652654
[21] https://apnews.com/article/doge-firings-layoffs-federal-government-workers-musk-d33cdd7872d64d2bdd8fe70c28652654
[22] https://apnews.com/article/doge-faa-air-traffic-firings-safety-67981aec33b6ee72cbad8dcee31f3437
[23] https://news.bloomberglaw.com/banking-law/fdic-fires-probationary-employees-amid-continued-agency-cull
[24] https://www.reuters.com/world/us/us-irs-expected-fire-6700-employees-thursday-trump-downsizing-spree-2025-02-20/; https://news.bloomberglaw.com/banking-law/occ-starts-firing-probationary-staff-joining-other-regulators

Upon information and belief, the Office of the Comptroller of the Currency terminations will become effective on March 7.

131.    On or around February 20, the National Archives and Records Administration terminated over 60 probationary employees.[25]

132.    Upon information and belief, on or around February 20, the Department of Labor notified more than 50 probationary employees that they will be terminated.  Upon information and belief, the effective date of termination will be March 7.

133.    On February 21, the Department of Defense announced that it was planning to terminate 5,400 probationary workers starting the week of February 24.[26] Upon information and belief, those terminations have not begun, but they may begin at any moment.

134.    Upon information and belief, on or around February 24, the United States Agency for International Development terminated approximately 250 probationary employees.

135.    On February 27, the Department of Commerce fired around 800 probationary employees in the National Oceanic and Atmospheric Administration.[27] Upon information and belief, the agency plans to fire additional probationary employees and those terminations may begin at any moment.

136.    On or around February 28, the Department of Commerce fired 86 probationary employees in the U.S. Patent and Trademark Office.[28]

---

[25] https://www.govexec.com/workforce/2025/02/see-which-federal-agencies-are-firing-new-hires/403033/
[26] https://www.defense.gov/News/Releases/Release/Article/4074278/dod-probationary-workforce-statement/
[27] https://www.cnn.com/2025/02/27/politics/noaa-federal-workers-firings/index.html#:~:text=Probationary%20employees%20%E2%80%94%20those%20who%20have,National%20Weather%20Service%20told%20CNN
[28] https://www.govexec.com/workforce/2025/03/some-agencies-are-still-firing-probationers-while-others-have-recalled-theirs-following-court-ruling/403407/?oref=ge-skybox-post

137.    On or around March 3, the Department of Commerce fired 73 probationary employees at the National Institute for Standards and Technology.[29]

138.    Upon information and belief, Defendants have already terminated tens of thousands of probationary employees.

139.    Defendants have not published official counts and locations of the employees they have terminated, but based on publicly reported numbers and firsthand accounts from affected employees, it appears that Defendants have terminated at least 24,000 probationary employees as of the date of this Complaint. Because Plaintiff States have not received notice of these mass terminations, this accounting is necessarily incomplete and may be far higher.

140.    Thousands of additional terminations are expected any day. To continue to reduce the size of the federal workforce, agencies that have not yet terminated most of their probationary employees may do so at any moment.

**B.    Defendants Have Not Followed Required RIF Procedures for the Mass Layoffs of Probationary Employees**

141.    Although the mass terminations of probationary employees have constituted RIFs, Defendants have failed to follow the RIF procedures required by statute and regulation.

142.    For example, Defendants did not designate the "competitive areas" in which employees would compete for retention, which they must do at least 90 days before the effective date of any RIF. *See* 5 C.F.R. § 351.402.

143.    Defendants did not designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption. *See* 5 C.F.R. § 351.403.

---

[29] https://www.govexec.com/workforce/2025/03/some-agencies-are-still-firing-probationers-while-others-have-recalled-theirs-following-court-ruling/403407/?oref=ge-skybox-post

144.    Defendants did not establish a retention register of employees in each competitive level of positions included in the RIFs. *See* 5 C.F.R. § 351.404.

145.    Defendants did not then rank employees for retention based on their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.501-351.504.

146.    Defendants did not provide required notices 60 days in advance of the effective date of termination to affected employees, their collective bargaining representatives, or to Plaintiff States. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803.

147.    Especially relevant to Plaintiff States, Defendants did not provide affected employees with the required releases to authorize the release of their resumes and other relevant employment information to the relevant WIOA Agency, for employment referrals to potential public and private sector employers. *See* 5 C.F.R. § 351.803(a).

148.    Likewise, Defendants did not provide Plaintiff States and the relevant WIOA Agencies with any prior notice, much less the 60-day notice required by law, which would have alerted Plaintiff States to the number of employees to be separated from the agencies, broken down by geographic area, and provided the effective date of the planned separations as well as other information that could have facilitated the delivery of rapid response services. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(b)-(c).

149.    Rather than comply with their legal obligations, Defendants summarily terminated probationary employees *en masse*, providing termination notices to the affected employees by form letters and emails, which frequently included errors and in many instances failed to include even the employee's name or job title.

150.    These form termination notices, issued near-simultaneously to thousands of federal probationary employees, failed to include any particularized agency determinations related to the performance or qualifications of each affected probationary employee to justify their termination. The notices were pretextual because Defendants were actually engaged in RIFs designed to reduce the size of the federal workforce.

151.    For example, agency management at the National Science Foundation informed probationary employees that the NSF had previously chosen to retain its probationary employees but that OPM had directed NSF to terminate the employees. The managers said that terminating the probationary employees was not a decision the agency made," but was "a direction [it had] received" from OPM and that NSF leadership had "no choice" but to "follow[] orders."

152.    Likewise, in response to OPM's directive to terminate probationary employees *en masse*, the Department of Treasury directed the Internal Revenue Service to terminate all probationary employees "based on performance." Without conducting any review of probationary employees' qualifications or performance, the Department of Treasury directed the IRS to terminate approximately 6,700 probationary employees. These terminations were unrelated to the probationary employees' qualifications, performance, or conduct, but were in fact a RIF aimed at reducing the size of the agency's workforce.

153.    The same pattern occurred at the Center for Consumer Information and Insurance Oversight (CCIIO), a subset of the Centers for Medicare & Medicaid Services (CMS) within the Department of Health and Human Services (HHS). CCIIO had determined that none of its probationary employees should be removed from service because all were well qualified for their positions and were performing well. Nevertheless, on February 13, 2025, HHS directed CCIIO to terminate all of its probationary employees and to issue form termination letters that stated falsely

that the affected employees were being terminated "because [their] ability, knowledge, and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment." The CCIIO terminated 82 probationary employees on February 15, 2025, representing approximately 15% of its workforce of approximately 600.

154.    Defendants' failure to provide required RIF notices rendered any terminations ineffective and unlawful because an employee "may not be released, due to a reduction in force" unless an agency provides all statutorily required notices. 5 U.S.C. § 3502(d).

155.    As explained in further detail below in Section IV.C, Defendants' failure to provide these required notices has harmed Plaintiff States in several ways, including by hindering the ability to provide rapid response services.

**C.    Plaintiffs Are Harmed As a Direct Result of Defendants' Failure to Follow RIF Requirements and Provide Advance Notice to the States.**

156.    Plaintiff States have suffered and will imminently suffer several types of irreparable injury due to the federal government's failure to provide notice of the RIFs.

157.    As noted above, when a federal agency plans to release 50 or more employees in a RIF, the agency must provide 60 days' notice to the affected States' WIOA Agencies as well as the chief elected officials for affected local jurisdictions.

158.    Plaintiff States have not received notice of a federal reduction in force from any federal agency.

159.    In enacting the RIF notice requirements, Congress recognized the harms inherent to sudden, unexpected mass layoffs, including that economic dislocation of workers can easily create a cascade of instability throughout a regional economy. And it sought to provide the states with some protection against those harms by requiring that agencies provide them with advance notice.

160.    Defendants' failure to provide notice has inflicted other harms as well. As a result of the lack of notice, Plaintiff States are unable to proactively reach affected individuals and provide services that would mitigate the harm the employees and their communities suffer as a result of the sudden job loss.

161.    Plaintiff States also suffer procedural injury resulting in additional expenditures and harms to public finances that they would not have to bear if notice had been provided.

### *Rapid Response Expenditures*

162.    The Federal Workforce Innovation and Opportunity Act of 2014, 29 U.S.C. § 3174(A)(2)(i), requires that each state have a rapid response program to conduct outreach to workers affected by a mass layoff and to provide the workers with support services, including job transition services.

163.    The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

164.    The purpose of the rapid response system is to reduce individuals' reliance on public benefit systems, such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

165.    When notified of a forthcoming mass layoff, a state's rapid response team is required to: contact the employer, representatives of the affected workers, and the local community; assess the layoff plans and schedule; and provide information and support to affected employees, including

information about filing for unemployment compensation and career services.  20 CFR §§ 682.300, 682.330.

166.    The rapid response teams also facilitate connections to partner agencies and organizations that can provide terminated workers and their families with critical services, such as home heating assistance, legal aid, and financial advice.

167.    Because Plaintiff States' rapid response teams have received no notice of federal RIFs, certain teams have been required to dedicate significantly more staff, resources, and expenditures to fulfill their statutory mission. In particular, they have had to devote significant time and resources simply to try to identify workers subject to federal mass layoffs and to otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide the legally required notice of mass layoffs.

168.    As one example of these efforts, some state agencies handling unemployment claims have created new websites, requiring significant time and expense. *See* Maryland Workers Impacted by Recent Federal Actions, https://response.maryland.gov/federalpublicservants/.  These efforts were a further attempt to provide rapid response resources and services, which could normally be targeted at specific personnel *before* they are laid off, but must now be provided less efficiently and at greater expense to the entire public, because the states' personnel remain unaware of who has been laid off and whether and when the next federal mass layoff event will occur.

169.    As another example, because Maryland's Department of Labor did not receive advance notice, staff have conducted extensive affirmative outreach to dozens of federal agencies and offices to try and determine the location and extent of upcoming layoffs. Despite these efforts, staff have not received any substantive responses. The Department has also had to divert significant additional time of other agency personnel from state projects to instead respond to

federal mass firings, to try and identify recently terminated employees and provide relevant resources and services.

### *Unemployment Benefits Expenditures*

170.    As a general matter, the federal government is required to reimburse states for unemployment benefits provided to former federal employees. Specifically, Plaintiff States are party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

171.    Each Plaintiff State has its own procedures for handling Unemployment Insurance ("UI") claims. Regardless, sudden mass layoffs burden the administrative process for handling UI claims, and the lack of notice and chaotic nature of Defendants' mass layoffs of probationary employees has already exacerbated or likely will exacerbate the strain on the Plaintiff States' systems for administering UI.

172.    Maryland's experience exemplifies the problems with the unlawful way the Defendants have conducted RIFs of probationary employees.

173.    The Maryland Department of Labor manages claims for unemployment benefits by individuals formerly employed to work in Maryland.

174.    Pursuant to Md. Code Ann., Lab. & Empl. § 8-805(a), an individual in Maryland who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Maryland Secretary of Labor. Claimants file claims online using the Department's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. COMAR 09.32.02.05.

175.    The reason for termination alleged by the claimant is then transmitted to the claimant's employer(s) for verification. The employer is then asked to furnish a report of the separation from employment containing, among other information, the reason for the employee's separation and a report of wage history. Md. Code Ann. Lab. & Empl. § 8-627; *see also* COMAR 09.32.02.05.

176.    Maryland law disqualifies some claimants from benefits depending on the circumstances of their separation from employment. *See* Md. Code Ann. Lab. & Empl. § 8-1001, et seq. Disqualifying circumstances include, among other reasons, termination for misconduct, aggravated misconduct, and gross misconduct. *Id.* In addition, a claimant is disqualified if they quit their job without good cause directly related to employment conditions or employer actions. Md. Code Ann. Lab. & Empl. § 8-1001(a).

177.    If a determination involves a resolution of a dispute of material fact, a claims examiner from the Maryland Department of Labor must conduct a predetermination fact-finding interview after notice is provided to the employee and her employer(s). Md. Code. Ann. Lab & Empl. § 8-806(a)(2). Thereafter, a written initial determination must be made stating, among other things, the weekly benefit amount, maximum benefits payable to the claimant in a benefit year, and the reasons for the determination. Md. Code Ann. Lab. & Empl. § 8-806(c).

178.    If the claims examiner's review of a claim reveals no dispute of material fact, but the information reviewed indicates that claimant may be ineligible or disqualified, the claims examiners must still schedule a call for an appointment for a fact-finding interview and render a written decision. COMAR 09.32.16(D)-(E). A claimant or an employer may file an administrative appeal within 15 days. Md. Code Ann. Lab. & Empl. § 8-806(e)(1).

179.    The Maryland Department of Labor's latest data indicates that 813 former federal employees have applied for unemployment benefits since January 21, 2025.

180.    As noted above, the number of UCFE claims received by the Maryland Department of Labor has increased significantly in just the last few weeks, starting on or around February 14, 2025, with an approximate range of 30 to 60 new such claims *every day*.

181.    In fact, the amount of UCFE claims received by the Maryland Department of Labor in February 2025 is significantly higher than past years.  From January 21 to March 3, 2024, Maryland received only 189 unemployment claims containing federal wages in the claimant's base period.

182.    While not required to apply for unemployment benefits, multiple individuals have attached in their application their letter of employment termination from the federal government. Such letters indicate that these individuals were probationary employees purportedly terminated for cause.

183.    When an employer provides the initial report of separation to the Maryland Department of Labor, the employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct.

184.    Accordingly, if an employer states in its report of separation that an individual was terminated because performance has not been adequate to justify further employment at the agency, the Maryland Department of Labor's procedures require that the claims examiner must investigate the reason for discharge.

185.    The Maryland Department of Labor is also required to verify both wages and reason for separation of employment from each federal agency by sending a request for wage and separation information.  20 C.F.R. §§ 609.6(e)(1), 609.21 through 609.25.  While private employers report wages each quarter for all employees into the Department's database, see COMAR  09.32.01.12, federal agencies are not required to regularly report active employee wages to the States.

186.    The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims. Redirecting staff from handling regular UI claims to process and adjudicate UCFE claims threatens to strain the state's resources.

187.    This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, the state must compromise the efficiency and responsiveness of its claims processing system, ultimately undermining public trust and exacerbating economic hardship.

188.    While the Maryland Department of Labor is only beginning to process these claims, its staff has already begun  contacting relevant federal agencies to request information on relevant terminations, to determine if they were in fact done for cause

189.    Thus far, Maryland has received at least 193 reports of separation from federal agencies, concerning their recently terminated employees.

190.    Several Defendant agencies reported that probationary employees were terminated due to a "permanent lack of work due to a change in Presidential Administration."

191.    In addition, the Maryland Department of Labor received several reports from Defendant agencies explicitly stating that the employees were "laid off due to a reduction in force."

192.    And, as relevant here, certain reports by Defendants asserted that the employee at issue was terminated for cause, for instance due to "unsatisfactory work performance" and similar generic performance-related bases.

193.    Similarly, other reports highlighted various potentially disqualifying circumstances.  For instance, agencies indicated that claimants might not be genuinely unemployed or had voluntarily resigned from their positions.

194.    Due Defendants' assertions that certain federal employees were terminated for cause or otherwise ineligible or disqualified from benefits, or where there is disputed or conflicting information, Maryland will be required to follow our intensive and mandatory investigative process.

195.    The procedures impose a significant strain on the Maryland Department of Labor's financial and temporal resources. Each case demanding interviews and/or a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

196.    Moreover, where federal agencies fail to provide responses to requests for separation information, the Maryland Department of Labor must gather necessary wage and separation information. 20 C.F.R. § 609.6 (e)(2).  This requires claims staff to solicit evidence from the claimants in the form of pay stubs, W-2s and affidavits and to pay benefits based on that information.  In fact, recent federal guidance regarding federal unemployment during recent government shutdowns encourages states to have claimants file an affidavit, using available proof, given "limited federal HR resources" to respond to requests for separation information. "Unemployment Insurance Program Letter 03-22," U.S. Department of Labor, November 2022, https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2021/UIPL_03-22.pdf.

197.    In addition, termination notices issued by federal agencies were not issued in compliance with governing reduction in force procedures.  It is apparent that there are affected individuals, including veterans, who should have been accorded preference under required RIF procedures but

were not.  To the extent that preferences and other such requirements would have precluded termination, and federal employees successfully challenge their separations, this will cause the Department to re-adjudicate claims, pursue overpayments, and conduct appeals.

198.   While the federal Government provides grants for the purpose of administrating state unemployment benefit programs, these grants are frequently less than the total administrative costs incurred by Maryland. And that is the case now; the federal grant monies allocated to Maryland are not sufficient to cover Maryland's unemployment benefit program administration.

199.   In these circumstances, Maryland relies on its Special Administrative Expense Fund ("SAEF") when federal funding is insufficient.  *See* Md. Code Ann., Labor & Employment §§ 8-419 to 842. This fund may be comprised of previously transferred federal funds (in limited circumstances), as well as monies collected by the state through fines, interest, and other penalties, and contributions by the state legislature. *Id*. § 8-421. Currently, SAEF is comprised entirely of state funds. Accordingly, any increase in administrative costs of Maryland's unemployment benefits program will be covered at least in part by state funds.

200.   Other Plaintiff States must also undergo intensive and mandatory investigation and appeal processes for handling disputes between claimants and employers involving the claimant's eligibility. Many Plaintiff States anticipate a significant increase in these disputes given the Defendants' chaotic and conflicting messaging around the reasons for terminating probationary employees. Handling these disputes will cause those Plaintiff States to divert staff to handle the time-consuming dispute resolutions and hinder the timely processing of ordinary unemployment claims that are not disputed.

201.   For example, the Illinois Department of Employment Security ("IDES") has already received almost the same number of applications for unemployment benefits from former federal

workers this year as it received in all of last year. A substantial number of these claims require resource intensive fact-finding that will cause backlogs and delays in IDES's processing of other claims, exacerbating economic hardship for countless Illinoisans.

202.    IDES is also being forced to divert resources and staff to respond to the latest layoff news, to identify affected federal agencies and ex-employees, provide information, and adjust procedures and resources to assist confused and unemployed workers in Illinois, all in a complicated and rapidly evolving environment. To take one example, IDES had to create a new webpage, at significant time and expense, in an attempt to provide resources and services. *See* https://ides.illinois.gov/unemployment/deferred-resignation-of-federal-employees.html. Such efforts could normally be targeted at specific personnel subject to impending layoff events but must instead be provided less efficiently and at greater expense to the entire public because IDES personnel remain unaware of the individuals who have already been laid off and whether and when the next federal mass layoff event will occur.

203.    In some jurisdictions, a flood of contested UI claims will cause a backlog that affects the timely adjudication of a wide range of administrative matters that are handled by the same administrative law judges ("ALJs"), ranging from building code enforcement to traffic tickets.

204.    Plaintiff States have seen or anticipate seeing an uptick in UI claims in the areas in which the probationary employee layoffs occurred. This sudden increase—without any advanced notice—has burdened and will continue to burden state agencies charged with administering UI benefits.

### *Expenditures for Other Social Services*

205.    Plaintiff States bear other burdens associated with many residents suddenly losing income. These costs arise in the administration of programs aimed at providing connections to social services, like health care and food assistance.

206.    Newly unemployed individuals apply for Medicaid at high rates, and the Plaintiff States bear a direct economic cost to provide healthcare services to them and their families.

### *Harms to State Programs That Depend on Federal Employees*

207.    Many federal probationary employees who were terminated by the CDC were detailed to work at Plaintiff States' public health agencies. This includes several employees who were hired by the CDC as part of its Public Health Associate Program for Recent Graduates ("PHAP"). PHAP is a two-year program that places recent college graduates with tribal, local, and territorial public health agencies, as well as non-governmental organizations, to work alongside other public health professionals in a variety of settings.

208.    For example, three recently terminated PHAP employees ("Associates") were assigned to New Jersey's Department of Health ("NJDOH"), which is responsible for preventing the spread of infectious diseases and developing emergency preparedness plans in the state.  CDC and NJDOH entered into a two-year contract, pursuant to which CDC agreed to cover all costs for the Associates, including salary and benefits. NJDOH has participated in the PHAP program for several years and often hires PHAP Associates, who gain invaluable training and institutional knowledge over the course of the program, for permanent employment at the conclusion of their two-year term.

209.    The three Associates were detailed to different NJDOH divisions that perform core public health functions: the Division of HIV, STD, and TB Services; the Epidemiology, Environmental

and Occupational Health's Communicable Disease Service; and the Global Tuberculosis Institute at Rutgers University. Each Associate was a member of a small team dedicated to reducing the spread of communicable diseases such as HIV, TB, and foodborne and waterborne illnesses. This work involved laborious investigations, contact tracing, and collaborations with numerous local, state, and federal partners to ensure anyone infected or at risk of infection has access to treatment.

210.    Between February 16 and 17, 2025, NJDOH learned that the three Associates had been terminated from their positions on February 15, 2025—before the expiration of their contractual two-year terms. CDC never notified NJDOH of these terminations. Between March 4 and 5, NJDOH learned that the Associates were being reinstated.

211.    Despite their reinstatement, the sudden loss of essential personnel, coupled with the lack of notice, caused NJDOH significant harm and disruption. NJDOH had invested significant time and resources into months-long training for the Associates, and the agency did not have the budgetary flexibility or hiring authority to replace them, particularly given the lack of any notice. The unexpected staffing shortages and imminent need to reallocate and train existing staff already caused delays and administrative chaos, which impeded NJDOH's ability to fulfill its mission of limiting the spread of infectious diseases in the state.  The timing of the terminations was especially problematic because NJDOH has been dealing with numerous communicable disease challenges, including H5N1, measles, Covid-19, influenza, norovirus, and RSV.  The loss in workforce capacity during this time hampered NJDOH's ability to fully respond to these public health threats.

212.    The lack of notice compounded the challenges created by the terminations. NJDOH was not able to plan for the terminations, resulting in administrative inefficiencies, duplicative work, and delayed notifications to persons exposed to certain communicable diseases.

### *Harms to State Finances*

213.    The mass layoffs that have taken place without the legally required notice to Plaintiff States will also have substantial impacts on the Plaintiff States' finances.

214.    For instance, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program. 42 U.S.C. § 502(a). While many Plaintiff States have been and continue to expend additional resources necessary to address the uptick in federal unemployment claims, it is not yet known whether those additional costs will be fully reimbursed.

215.    Further, Plaintiff States rely in large part on income tax revenue for their budgets. Because Defendant agencies will no longer be withholding and paying income taxes to Plaintiff States on behalf of the terminated probationary employees, the layoffs will result in a decrease to Plaintiff States' revenues. Given the number of employees forced to seek reemployment—with no notice and no opportunity for Plaintiff States to provide support services—it is highly likely that many of the Plaintiff States' residents will be unemployed for prolonged periods, depriving the Plaintiff States of significant income tax receipts.

216.    For example, the District of Columbia estimates that the mass terminations of probationary employees will cause millions of dollars in lost annual income tax revenue. The District estimates that its lost income tax revenue for the first 60 days alone, the period in which it should have received advance notice of any RIFs, will cost the District at least hundreds of thousands of dollars in lost income tax revenue. Had the District received the notice required by law, these losses would likely have been mitigated, including because employees would not have been terminated during the 60-day notice period and some would have been able to obtain alternative employment prior to their termination.

217.    Likewise, the Maryland Comptroller projects that the mass terminations of probationary employees will cause significant decreases in Maryland's income tax revenues. Maryland's budget relies in large part on personal income tax revenue, which represented 55% of Maryland's general fund revenues for fiscal year 2024. Approximately 250,000 federal workers reside in Maryland. Although unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment.

218.    Beyond the direct loss of income tax revenue, the Maryland Comptroller anticipates that a sudden and significant increase of newly unemployed workers will have serious negative effects on Maryland's labor market, including extended periods of unemployment, downward pressure on wages, and the migration of residents out of the state.

219.    The terminations also impact state sales tax revenues.

220.    For example, for the District of Columbia, this impact comes from two primary sources: First, federal employees living outside of the District who commute to work in the District purchase meals at restaurants, pay parking fees, and purchase other goods and services before, during, and after work. Second, in addition to these workday purchases, federal employees who are District residents also contribute to our economy as full-time residents, spending on groceries, household items, restaurants, clothing, and various services.

221.    The District estimates that these mass terminations could cause anywhere from hundreds of thousands to millions of dollars in lost annual sales tax revenue. The District further estimates that for the first 60 days alone, the period in which it should have received advance notice of any RIFs, the District will lose tens to hundreds of thousands of dollars in sales tax revenues. Had the

District received the notice required by law, these losses would likely have been mitigated, including because employees would not have been terminated during the 60-day notice period and some would have been able to obtain alternative employment prior to their termination.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedures Act
### Action Not in Accordance with Law

222.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

223.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

224.    Defendants are agencies subject to the APA. 5 U.S.C. § 701.

225.    Because Defendants' mass terminations of probationary employees are part of an effort to restructure and reduce the federal workforce, they constitute RIFs, and Defendants were obligated to follow RIF procedures set forth by statute and regulation to carry out the terminations. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351.

226.    Defendants violated the law by carrying out the mass terminations of probationary employees without following the required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, including providing 60 days' notice to states and affected employees before releasing the employees, 5 U.S.C. § 3502(d). Absent such notice, an employee "may not be released." 5 U.S.C. § 3502(d).

227.    The actions of Defendants therefore violate the APA because they are not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

## COUNT II
### Violation of the Administrative Procedures Act
### Arbitrary and Capricious

228.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

229.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

230.    Defendants are agencies subject to the APA. 5 U.S.C. § 701.

231.    The terminations of probationary employees pursuant to OPM's order have been arbitrary and capricious in several respects, including:

232.    Defendants OPM and OPM Director failed to provide a reasoned explanation for their direction to agencies to carry out mass terminations of probationary employees without following RIF procedures.

233.    Defendants failed to provide a reasoned explanation for following OPM's direction and carrying out mass terminations of probationary employees.

234.    Third, to the extent Defendants provided any explanation at all for the mass terminations, the reasons given were pretextual as they purported to relate to individual employees' performance but did not identify any actual unsatisfactory performance or conduct or any reasons preceding the affected employees' appointments that justified their terminations. Rather than Defendants' stated reasons, Defendants' true reason for terminating the probationary employees was to reduce the size of the federal workforce.

235.    The arbitrariness of Defendants' actions and the indiscriminate nature of the terminations is underscored by the fact that Defendants have had to reverse the firings of individuals fulfilling

certain critical functions, such as protecting nuclear weapons and addressing a significant public health threat.

## COUNT III
## Non-Statutory Review of *Ultra Vires* Action

236.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

237.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

238.    Defendants mass terminations of probationary employees were RIFs. These RIFs were unlawful because Defendants conducted them without following required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, including providing 60 days' notice to states and affected employees before releasing the employees, 5 U.S.C. § 3502(d). Absent such notice, an employee "may not be released." 5 U.S.C. § 3502(d).

239.    Defendants' actions terminating probationary employees *en masse* therefore exceeded their lawful authority and were *ultra vires*.

240.    Plaintiffs will suffer irreparable injury if Defendants' actions are not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

241.    The public interest favors issuance of a judicial declaration that Defendants' terminations of federal probationary employees are unlawful and issuance of an injunction requiring Defendants to reinstate the affected employees and to follow RIF procedures for any further RIFs. Defendants' actions have resulted in the unlawful termination of tens of thousands of probationary federal employees, including large numbers of military veterans, causing a sudden surge of unemployment without providing Plaintiff States with notice or an opportunity to prepare.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

242.    Declare unlawful and set aside Defendants' terminations of probationary employees without making specific, individualized determinations regarding the employees' performance or conduct and without adhering to RIF requirements as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A);

243.    Declare unlawful and set aside Defendants' terminations of probationary employees without making specific, individualized determinations regarding the employees' performance or conduct and without adhering to RIF requirements as *ultra vires* and exceeding their lawful authority;

244.    Issue immediate temporary relief restraining Defendants from terminating any probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance and reinstating probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individualized determinations of the inadequacy of the employee's conduct or performance;

245.    Order Defendants to file a status report with the Court within 48 hours of entry of a temporary restraining order, and at regular intervals thereafter, identifying all probationary employees terminated on or after January 20, 2025 (including the following information for each employee: agency, name, position title, grade, termination date, whether the probationary employee has been reinstated, and the date of any reinstatement), and reporting all steps that Defendants have taken to comply with the Court's temporary restraining order;

246.   Enter preliminary and permanent injunctive relief enjoining any further terminations that do not follow the RIF requirements or requirements for separating probationary employees for performance and enjoining Defendants from separating any employees pursuant to a RIF prior to the reinstatement of the probationary employees described above;

247.   Award to Plaintiffs their costs of litigation including, but not limited to, reasonable attorneys' fees, under 28 U.S.C. § 2412, and any other applicable law; and

248.   Order such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**ANTHONY G. BROWN**
*Attorney General*
*State of Maryland*

/s/ James D. Handley
James D. Handley, Bar No. 20299
Virginia A. Williamson**
Assistant Attorneys General

200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
jhandley@oag.state.md.us
Phone: (410) 576-6993
Fax: (410) 576-6955

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ Liz Kramer
Liz Kramer*
Solicitor General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
liz.kramer@ag.state.mn.us

**BRIAN SCHWALB**
*Attorney General*
*District of Columbia*

Emma Simson
Senior Counsel to the Attorney General

/s/ Ryan Wilson
Ryan Wilson**
Senior Counsel

Hannah Cole-Chu, Bar No. 20747

**KRISTIN K. MAYES**
*Attorney General*
*State of Arizona*

/s/ Hayleigh S. Crawford
Hayleigh S. Crawford*
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

Anne Deng*
Pamela Disney**
Tessa Gellerson, Bar No. 21271
Charles Sinks, Bar No. 21185
Cara Spencer, Bar No. 20171
Assistant Attorneys General

Office of the Attorney General
for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 230-2342
Ryan.Wilson@dc.gov

**ROB BONTA**
*Attorney General*
*State of California*

*/s/ Satoshi Yanai*
Satoshi Yanai*
Senior Assistant Attorney
General

300 S. Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6400
satoshi.yanai@doj.ca.gov

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation

Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Michael Skold*
Michael Skold*
Solicitor General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
michael.skold@ct.gov

**ANNE E. LOPEZ**
*Attorney General*
*State of Hawaiʻi*

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Gretchen Helfrich*
Gretchen Helfrich, ARDC
#6300004*
Deputy Chief
Special Litigation Bureau
Office of the Illinois Attorney
General
115 South LaSalle Street, 35th
Floor
Chicago, IL  60603
Tel. (312) 814-3000
Gretchen.helfrich@ilag.gov

**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Katherine Dirks*
Katherine Dirks*
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

*/s/ Bryan Davis, Jr.*
Bryan Davis, Jr. (P84206)*
Debbie Taylor (P59382)*
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy*
Deputy Solicitor General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
Shankar.Duraiswamy@njoag.gov

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact
Litigation
New Mexico Department of
Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

(505) 490-4060
asamant@nmdoj.gov

**DAN RAYFIELD**
*Attorney General*
*State of Oregon*

By: */s Deanna J. Chang*
Deanna J. Chang**
Senior Assistant Attorney
General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

**CHARITY R. CLARK**
*Attorney General*
*State of Vermont*

*/s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

**PHIL WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Office of the Colorado Attorney
General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Natalya A. Buckler*
Natalya A. Buckler (RI Bar No. 8415)*
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*Brian P. Keenan*
BRIAN P. KEENAN*
Assistant Attorney General
State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

**AARON D. FORD**
*Attorney General of Nevada*

By: */s/ Heidi Parry Stern*
  Heidi Parry Stern (Bar. No. 8873)*
  Solicitor General
  Office of the Nevada Attorney General
  555 E. Washington Ave., Ste. 3900
  Las Vegas, NV 89101
  HStern@ag.nv.gov

*\* Pro hac vice application forthcoming*
*\*\*Application for admission pending*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.,

Plaintiffs,

v.

United States Department of Agriculture, et al.,

Defendants.

Case No. 1:25-cv-00748-JKB

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.   Statutory and Regulatory Background ................................................................... 2

II.  Factual Background ............................................................................................... 5

     A.   OPM's January 20 Guidance Memorandum on Probationary Periods and
          Revised March 4 Guidance Memorandum ................................................. 5

     B.   Executive Order 14,210 ............................................................................. 6

     C.   Agency Terminations of Certain Probationers; District Court Challenges
          and Stay Proceedings Before the MSPB ................................................... 7

THE STATES' CLAIMS IN THIS ACTION ................................................................... 9

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT ................................................................................................................... 9

I.   The States Have Not Shown Likelihood of Success on the Merits Because They
     Cannot Establish Jurisdiction over their Claims. ............................................... 10

     A.   The States Cannot Show Standing. .......................................................... 10

     B.   Jurisdiction over the Claims Asserted by the States is Channeled Away
          from Federal District Courts under the CSRA and FSL-MRS. ............... 15

     C.   The States Have Not Shown that Defendants Acted Contrary to Law. ..... 21

II.  The States Cannot Show Irreparable Harm. ........................................................ 23

III. The Public Intereset Weighs Against Temporary Relief. .................................... 24

IV.  Any Temporary Relief Should Clarify tahat it Preserves the Executive's
     Discretionary Authority. ..................................................................................... 25

V.   Any Injunctive Relief Should Require the Provision of a Bond by the Plaintiff
     States. .................................................................................................................. 26

CONCLUSION ............................................................................................................. 26

i

## <u>INTRODUCTION</u>

This is an action by 20 States, against 41 federal agencies and agency heads, seeking to challenge allegedly widespread terminations of probationary federal employees. The action has no hope of success, because third parties cannot interject themselves into the employment relationship between the United States and government workers, which is governed by a comprehensive statutory scheme that provides an exclusive remedial avenue to challenge adverse personnel actions. The States cannot circumvent that channeling scheme by asserting downstream harm from those employment actions. Nor do the States have any legitimate claims of their own. The Court should therefore deny their motion for a temporary restraining order ("TRO").

Notably, this is not the first lawsuit to seek this relief. A set of unions sued in federal court in the District of Columbia a few weeks ago to rescind the termination of the probationary workers. *National Treasury Employees Union (NTEU) v. Trump*, No. 25-cv-420 (CRC), 2025 WL 561080, at *1 (Feb. 20, 2025). The district court denied relief based on the exclusive channeling regime. *See id.* Then, other unions and organizational plaintiffs sued in the Northern District of California, also claiming downstream harms from the terminations. While the court there agreed to restrain since-revised guidance on probationary removals from the Office of Personnel Management (OPM), it acknowledged that it could not and would not rescind terminations. *See Am. Fed'n of Gov't Emps. (AFGE) v. Ezell, et al.*, No. C 25-01780 WHA (N.D. Cal).

The third time is not the charm. Like the unions and the organizational plaintiffs, the States are strangers to the employment relationships at issue, and cannot disrupt the exclusive remedial scheme that Congress put in place to adjudicate these disputes. Beyond that, the States fail to identify any act Defendants have taken inconsistent with law. Nor can they carry their burden to establish irreparable harm or that the public interest favors the extraordinary relief they seek.

1

# BACKGROUND

## I.     Statutory and Regulatory Background

Probationers are individuals whose employment with the federal government has not been finalized. *See* 5 C.F.R. § 315.804. "The purpose of the probationary period is to provide the Government with an opportunity to evaluate an individual's conduct and performance on the job to determine if an appointment to the civil service should become final." Merit Systems Protection Board, "The Probationary Period: A Critical Assessment Opportunity" i (August 2005).[1] The probationary period enables agencies "to determine an individual's potential to fulfill the needs of the specific position, the agency, and the civil service." *Id.* at ii. Probationers should "be assessed in light of the organization's strategic goals and the role of the position in the accomplishment of those goals." *Id.* at 22. "Until the probationary period has been completed, a probationer is still an applicant for an appointment, with the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual." *Id.* Termination is mandatory where this showing is not made; an "agency . . . shall terminate [a probationer's] services . . . if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a).

Employment-related disputes between federal employees and their employing agencies within the Executive Branch—including challenges to employee removals or terminations—are governed by the comprehensive, reticulated administrative-judicial review scheme set forth in the Civil Service Reform Act of 1978, 5 U.S.C. § 2101 *et seq.* That expansive scheme also includes parallel provisions governing labor relations between agencies and their employees, the Federal

---

[1] *See*
https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

Service Labor-Management Relations Statute ("the Statute" or "FSL-MRS"), set forth in Title VII of the CSRA (codified at 5 U.S.C. §§ 7101-35). Taken as a whole, the scheme governs nearly all aspects of the federal employer-employee relationship, and largely covers the field when it comes to judicial rights and remedies for alleged constitutional and statutory violations arising out of that relationship. As the D.C. Circuit has put it, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (then-Judge Roberts).

Relevant here, the CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted). If an agency takes a statutorily defined major adverse action against a covered employee—including removal, *see* 5 U.S.C. § 7512—the employee may appeal that action to the Merit Systems Protection Board ("MSPB") under the provisions of the CSRA's Chapter 75. *Id.* § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id*. §§ 1204(a)(2), 7701(g). Final MSPB decisions generally are appealable to the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This review scheme is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13. Other than limited circumstances, it does not permit covered employees to bring suit in federal district court. *Id*. at 14-15; *United States v. Fausto*, 484 U.S. 439, 447 (1988); *Fornaro*, 416 F.3d at 67.

Terminated probationers generally do not enjoy the same guaranteed right to appeal removal decisions to the MSPB, as Congress placed them outside the definition of "employee[s]" for purposes of the CSRA's Chapter 75. *See* 5 U.S.C. § 7511(a)(1). Instead, probationers remain properly considered "applicants" under the extended hiring and evaluation period the CSRA sets forth for new career employees. *See* 5 U.S.C. § 7511(a)(1)(A)-(B), (C); 5 C.F.R. § 315.801,

301.806.[2]  But that does not leave them without recourse for alleged constitutional or statutory violations by their employing agencies: the CSRA's Chapter 23, which sets forth the merit system principles underlying the entire statutory scheme and provides remedies for alleged violations of those principles, generally applies to both "applicants and employees." *See*, *e.g.*, 5 U.S.C. § 2302(a)(2)(A)(i)–(xii) (identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in any agency").

Thus, probationers whose employment has been terminated by their employing agencies may in appropriate circumstances pursue relief that may result in MSPB adjudication, with judicial review potentially available after the completion of that process.  There are at least two routes to such review.  *First*, a removed probationer may file a complaint alleging one or more statutorily defined "prohibited personnel practices" with the Office of Special Counsel, 5 U.S.C. §§ 1211-1219, *et seq.*, which is statutorily charged with investigating such complaints and which may in turn pursue administrative relief before the MSPB.[3]  *Second*, under OPM regulations, a removed probationer may appeal to the MSPB if they allege that the removal was based upon one of the reasons set forth in the regulations. *See id.* § 315.806.

---

[2] As noted *supra*, OPM regulations promulgated under the CSRA provide that agencies are to use the probationary or trial period "as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). When an agency decides to terminate an employee covered by these regulations because his or her work performance or conduct during the probationary or trial period fails to demonstrate fitness or qualifications for continued employment, it must notify the employee and provide "the agency's conclusions as to the inadequacies of his [or her] performance or conduct." *Id*. § 315.804(a).

[3] Congress also created the Office of Special Counsel to, among other things, protect employees, applicants for employment, and former employees. 5 U.S.C. § 1212. The Special Counsel may receive and investigate complaints of prohibited personnel practices and may petition the MSPB for a stay of the personnel actions pending investigation, and based on the results of an investigation, seek corrective action from the Board. *Id*. § 1214.

II.    **Factual Background**

### A. OPM's January 20 Guidance Memorandum on Probationary Periods and Revised March 4 Guidance Memorandum

President Trump campaigned on a promise to raise standards for federal government employment and improve the Civil Service workforce. On his first day in office, President Trump signed a memorandum declaring that "American citizens deserve an excellent and efficient Federal workforce that attracts the highest caliber of civil servants committed to achieving the freedom, prosperity, and democratic rule that our Constitution promotes." Reforming the Federal Hiring Process and Restoring Merit to Government Service (Jan. 20, 2025). Consistent with the new administration's focus on federal employee performance, OPM Acting Director Charles Ezell transmitted a guidance memo to Executive Branch agencies identifying probationary periods as "an essential tool for agencies to assess employee performance." Mem. from Charles Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments and Agencies, titled "Guidance on Probationary Periods, Administrative Leave and Details," at 1 (Jan. 20, 2025) ("OPM Mem."). The memo directed agencies to "identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees[.]" Further, the OPM Memorandum directed agencies to "promptly determine whether those employees should be retained at the agency." OPM Mem. at 1.

Following a lawsuit in the U.S. District Court for the Northern District of California and the resulting entry of a limited temporary restraining order governing OPM's guidance to federal agencies regarding probationary removals, OPM issued revised guidance on March 4. In relevant part, the revised OPM guidance clarified and emphasized that "OPM is not directing agencies to take any specific performance-based actions regarding probationers. Agencies have ultimate

5

decision-making authority over, and responsibility for, such personnel actions." Revised Mem. from Charlies Ezell, Acting Director, U.S. Office of Personnel Management, to Heads and Acting Heads of Departments, titled "Guidance on Probationary Periods, Administrative Leave and Details," at 2 (Revised: March 4, 2025) ("Rev. OPM Mem.").

### B. Executive Order 14,210

On February 11, 2025, President Trump signed Executive Order 14,210, which "commences a critical transformation of the Federal bureaucracy" to "restore accountability to the American public" by "eliminating waste, bloat and insularity." *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order. No. 14,210, § 1, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce E.O."). The Workforce E.O. directed the Director of the Office of Management and Budget ("OMB") to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." *Id.* § 3. It further required that new career appointment hiring decisions shall be made "in consultation with the agency's DOGE Team Lead, consistent with applicable law," and that the agency shall not fill vacancies for career appointments that the DOGE Team Lead assesses should not be filled, "unless the Agency Head determines the positions should be filled." *Id.* § 3(b)(i)–(ii).

The Workforce E.O. directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id.* § 3(c). The Workforce E.O. also directed the Director of OPM to initiate a rulemaking by March 11, 2025 that proposes to revise 5 C.F.R. § 731.202(b) to include additional suitability criteria. *Id.* § 3(e). In addition, by March 11, 2025, agency heads must submit to the Director of OMB a report that identifies any statutes that establish the agency, or subcomponents

of the agency, as statutorily required entities, and discuss whether the agency or any of its subcomponents should be eliminated or consolidated. *Id.* Pursuant to the Workforce E.O., the USDS Administrator must submit a report to the President within 240 days of the date of the E.O. "regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified or terminated." *Id.* § 3(f).

### C. Agency Terminations of Certain Probationers; District Court Challenges and Stay Proceedings Before the MSPB

Certain federal agencies have terminated probationers. *See, e.g.*, Mem. Op. & Order at 3, *NTEU v. Trump*, No. 25-cv-420 (CRC), ("*NTEU v. Trump*"), ECF No. 28 (noting the termination of certain probationers working at federal agencies). Legal challenges in district court followed. In *NTEU v. Trump*, the U.S. District Court for the District of Columbia denied a motion for temporary restraining order and preliminary injunction on February 20, holding that the union plaintiffs' claims fell outside of district court jurisdiction under the FSL-MRS and the CSRA. *NTEU v. Trump*, 2025 WL 561080 (Feb. 20, 2025) at *1.

And in *American Federation of Government Employees (AFGE) v. Ezell, et al.*, No. C 25-01780 WHA (N.D. Cal), the U.S. District Court for the Northern District of California issued a narrow temporary restraining order on March 4 enjoining OPM from taking any action characterized as "ordering" federal agencies to terminate their probationers. *Id.* at 24.[4] (OPM maintains that it has never issued any such order, and litigation remains ongoing.) The court, like the court in *NTEU v. Trump*, held that the union plaintiffs' claims fell outside of its jurisdiction under the FSL-MRS and the CSRA. *Id.* at 11. It concluded, on the basis of the TRO record and

---

[4] A copy of the North District of California district court transcript in *AFGE* is attached for the Court's convenience, as it does not appear to be not available on Westlaw at this time. (Attached as Ex. 1).

briefing before it, that it could assert limited jurisdiction over certain claims brought against OPM by non-union, non-employee organizational plaintiffs. *Id.* at 21-22. As the States note, OPM has issued revised guidance, though they are mistaken that the *AFGE* court required it. *See Id.* at 24 (requiring OPM to notify NPS, BLM, VA, DOD, SBA, and NSF [sic NWS] that any efforts to direct the termination of employees "are illegal"). At the same time, the court disclaimed any power to rescind terminations taken by agencies of their own force; the court understood its role as only enjoining OPM from *directing* such terminations, and ensuring that the agencies appreciated the scope of their own decision-making authority.

On a parallel track, removed probationers have pursued relief before the Office of Special Counsel. On February 21, 2025, the Special Counsel requested a stay of the termination of six probationers. *See* Special Counsel's Initial Request for Stay or Personnel Action, *Special Counsel ex rel. Doe v. OPM*, No. CB-1208-25-17-U-1 (MSPB). On February 25, 2025, the MSPB granted that request. *See* Non-Precedential Stay Order, *Special Counsel ex rel. Doe v. OPM*, No. CB-1208-25-17-U-1 (MSPB). And as recently as March 5, 2025, on a February 28 stay request submitted by the Special Counsel on behalf of a J. Doe complainant, the MSPB Chair stayed the removal of several thousand USDA probationers, ordering that "Mr. Doe shall be placed in the position that he held prior to the probationary termination. Likewise, all other probationary employees whom the agency has terminated since February 13, 2025, pursuant to letters stating, 'The [a]gency finds, based on your performance, that you have not demonstrated that your further employment at the [a]gency would be in the public interest,' shall be placed in the positions that they held prior to the probationary terminations[.]" *See* Non-Precedential Stay Order, *Special Counsel ex rel. Doe v. Dep't of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB).

ADD.125

## THE STATES' CLAIMS IN THIS ACTION

The States base their motion for a TRO on claims under the Administrative Procedure Act ("APA") and a claim alleging *ultra vires* action. They seek an order providing three forms of temporary relief, all explicitly personnel-related:

- "Temporarily restraining Defendants from terminating federal probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance;"

- "Compelling Defendants to reinstate federal probationary employees fired on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individual determinations of conduct or performance;" and

- "Requiring Defendants to file a status report with the Court within 48 hours, and at regular intervals thereafter, identifying under seal all probationary employees terminated on or after January 20, 2025 . . . and describing all steps Defendants have taken to comply with the Court's Order."

States' Br. at 2.

## STANDARD OF REVIEW

"A [TRO or] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)). "A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation omitted).

## ARGUMENT

The States cannot make the "clear showing" of entitlement to a TRO required for that extraordinary relief. Most obviously, they cannot establish a likelihood of success on the merits

9

because they cannot show standing to sue; the claims they assert are jurisdictionally channeled away from federal district courts under the CSRA; and they have not identified any unlawful terminations regardless. Further, they have not shown irreparable harm absent temporary relief. Finally, the balance of equities and the public interest strongly favor Defendants.

## I.     The States Have Not Shown Likelihood of Success on the Merits Because They Cannot Establish Jurisdiction over their Claims.

To establish likelihood of success on the merits of their claims, the States must show, at minimum, that they have Article III standing, and that their claims otherwise would fall within the Court's subject-matter jurisdiction. They cannot make either showing here: they lack standing, and their asserted claims would be jurisdictionally channeled away from district court review in any event under the comprehensive scheme governing federal employment disputes. They also fail to show that Defendants acted inconsistent with law.

### A.     The States Cannot Show Standing.

To invoke the jurisdiction of this Court, the States "must show" that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). The alleged injury-in-fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "certainly impending," and "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted). In addition, "standing is not dispensed in gross," and "'plaintiffs must demonstrate standing for each claim they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

The States fail to satisfy these fundamental principles. They premise their standing assertion primarily on resource-diversion and financial-harm grounds, arguing that removals of probationers will result in loss of tax revenue attributable to those employees' lost income (States' Br. at 28); diversion of resources to assist such employees and provide unemployment benefits (*id.* at 24-25) (while conceding unemployment insurance benefits "are generally reimbursed by the federal government" for federal workers, *id.* at 25); and increased enrollments in state insurance programs (*id.* at 27).[5] Such indirect injuries are insufficient to create standing to sue. In *United States v. Texas*, 599 U.S. 670, 674 (2023), states sued the federal government to challenge an immigration policy that would "impose[] costs on the States." *Id.* The States claimed the policy would force them to "supply social services such as healthcare and education" to persons it otherwise would not. *Id.* The Supreme Court held the States lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* "And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.*

The absence of a concrete injury is highlighted by the extraordinary breadth of the States' suit. Plaintiffs admit that their suit treats the "termination of tens of thousands of employees" as "final agency actions subject to this Court's review." States' Br. at 16. And they seek to prevent

---

[5] The States' claim they are "struggling" to provide unemployment insurance and other benefits for terminated probationers warrants skepticism. States' Br. at 2. The States allege that Defendants have terminated about 24,000 probationers nationwide since January 20. By comparison, more than 220,000 individuals made claims for unemployment insurance in just the week ending March 1. Dep't of Labor, https://www.dol.gov/ui/data.pdf. And the States do not explain what share of the 24,000 allegedly terminated probationers reside in their States, which account for fewer than half of the States overall.

11

alleged final agency actions that have not even happened yet in attempting to bar nearly every cabinet department and other agencies from terminating probationers in the future. Significantly, they fail to connect nearly any of these past and potential future personnel actions to any of the 20 State plaintiffs. They also offer little specificity with these thousands of purported agency actions. The States provide the most detail on terminations made by the National Science Foundation, States' Br. at 11, but that agency's terminations are not even part of this suit because the States chose to omit it as a defendant. The States' choice to sue 41 Executive Branch officials and agencies resembles *Murthy*, where two States and five individuals "sued dozens of Executive Branch officials and agencies." 603 U.S. at 54. The plaintiffs lacked standing to litigate that "sprawling suit," *id.* at 61, the Supreme Court again held, because of the absence of "any concrete link between their injuries and the defendants' conduct," *id.* at 76. Here too, "standing doctrine prevents [courts] from "exercis[ing] such general legal oversight" of the other branches of Government." *Id.*

And even if those conjectural assertions could suggest an injury-in-fact traceable to Defendants' actions, the States cannot satisfy standing's redressability prong. All of the States' claims derive from those of any removed probationers: the States' asserted injuries could only be conceivably redressed by their *reinstatement*. But reinstatement of removed probationers is a remedy overwhelmingly, if not exclusively, channeled away from federal district courts under the CSRA.[6] Because the Court lacks subject-matter jurisdiction to award the only remedy that might

---

[6] Limited exceptions to the CSRA's comprehensive scope exist. For example, Title VII claims are heard in district court, consistent with the CSRA's exception for claims under that scheme. And certain agencies are subject to different (and similarly preclusive) statutory administrative-judicial review schemes, such as that applicable to Title 38 employees of the Veterans Health Administration, part of the Department of Veterans Affairs. *See* 38 U.S.C. § 714.

redress the States' claimed harms here, the States cannot show redressability, and thus cannot establish standing.

To flesh this out further, take the States' asserted loss of tax revenue (States' Br. at 28). Any injury attributable to future lost tax revenue attributable to probationer removals (or future probationary removals) in 2025 is neither concrete nor certainly imminent at this point. But even if the States could surmount that injury-in-fact hurdle, they cannot show how a federal district court could award them any remedy that would redress such injury. The only remedy that might restore potential lost tax revenue for any of these States would be reinstatement of the removed probationers at issue, thereby restoring them (and their taxable incomes) to the States' tax bases. And under the CSRA, that remedy is unavailable under the facts asserted here.

As explained above, removals of covered federal employees must generally be appealed to the MSPB, with judicial review available exclusively in the Federal Circuit. *See Elgin*, 567 U.S. at 5, 11-13. That administrative-judicial review pathway bypasses district court entirely, even for constitutional claims (which the States have not asserted in any event). *Id.* The same rule holds true for probationers, who cannot appeal their removals to the MSPB as of right, but must instead pursue relief through the Office of Special Counsel complaint process (which may result in review by the MSPB). The bottom line is the same: any administrative-judicial review pathway bypasses district court entirely, meaning that district courts lack jurisdiction to review their claims under the CSRA. *NTEU v. Trump*, 2025 WL 561080, at *1. And lacking jurisdiction to review challenges to probationary employee removals, federal district courts likewise lack jurisdiction to issue the only remedy that might redress the States' asserted loss of tax revenue.

The district court opinion in *NTEU* is particularly instructive here. The unions alleged that a large-scale removal of probationers would reduce their membership numbers and revenues,

13

divert their resources, and reduce their heft at the bargaining table. 2025 WL 561080 at *6. Assessing its jurisdiction over the unions' claims under the *Thunder Basin* doctrine, *see* Part I.B, *infra*, the court concluded that jurisdiction over those claims was channeled exclusively through the Federal Labor Relations Authority ("FLRA"), and from there to a court of appeals, under the special review scheme established by the FSL-MRS. *Id.* at **6-7. In particular, the court observed, "[if] the FLRA finds an unfair labor practice, for instance, it may 'require reinstatement of an employee with backpay'" under 5 U.S.C. § 7118(a)(7)(C). *Id.* at *7. And having determined both that the unions could pursue their claims through the FLRA, *id.*, and that individual employees with appeal status could pursue similar recourse before the MSPB, *id.* at n.2, the court concluded that the jurisdictional scheme is exclusive, thus foreclosing district court review. *Id.* at **5-8. What that means for the States' standing assertion is this: lacking jurisdiction to even consider (much less remedy) the claims of removed employees, district courts cannot redress the States' asserted injuries-in-fact, thus depriving them of Article III standing.

Not does it matter that the States seek to assert claims under the APA: courts have uniformly held that the CSRA precludes claims under the APA. *See Hall v. Clinton*, 235 F.3d 202, 206 (4th Cir. 2000); *Bolton v. Colvin*, 674 Fed. Appx. 282, 290–91 (4th Cir. 2017); *Mann v. Haigh*, 120 F.3d 34, 38 (4th Cir. 1997). The comprehensive preclusion of APA review (and remedies) for those most directly affected by the employment-based actions here, federal employees themselves, is no less comprehensive for parties that are affected by those actions (if at all) in a derivative, attenuated, and downstream way.

The same outcome holds true for the States' other asserted injuries: diversion of assistance resources (States' Br. at 2, 13) and increased enrollment in state-administered insurance programs (*id.* at 27). Here too, the existence of an injury-in-fact is speculative, attenuated, downstream, and

unproven. But setting that aside, neither of these alleged injuries would be redressable by any relief within the Court's power to award. To prevent or stem the diversion of state assistance resources, the Court again would have to order reinstatement of the removed probationers into their former agency jobs. And to reduce enrollment in state-administered insurance programs back to their baseline levels, the Court would have to enter the same relief. As explained above, that sort of remedy falls outside of district court jurisdiction under the CSRA.

Finally, the States claim they are entitled to specific, advance notice of every probationary employee that each federal agency has removed since January 20 or intends to remove. (States' Br. at 2, 17-18). They do not have standing to press that claim either. As explained below, the States' claim is without merit; it rests on a misunderstanding of both the facts and the applicable statutory and regulatory provisions. But, regardless, "notice" would not redress the States' claimed injuries-in-fact, which again amount to asserted loss of tax revenue, diversion of resources, and increased enrollment in state insurance programs. On this front, there is a basic mismatch between the States' asserted injuries and their supposed right to relief.

**B.      Jurisdiction over the Claims Asserted by the States is Channeled Away from Federal District Courts under the CSRA and FSL-MRS.**

Relatedly, the States cannot show that the claims they assert would fall within this Court's jurisdiction given how comprehensively the CSRA and FSL-MRS govern employment-related disputes between federal employees and agencies. Even though they cast their claims in terms of direct injury, everything about their claims, and the remedies they seek, derives from the relationship between the federal government and its employees, to which they are strangers. The States cannot step into the shoes of those employees and assert claims against federal agencies that the employees themselves cannot assert in federal district court, but must instead pursue before the FLRA or the MSPB.

15

And there is no question that these claims cannot be asserted in district court, by employees or anyone else.  Under the familiar test for implied statutory preclusion under *Thunder Basin v. Coal Co. v. Reich*, 510 U.S. 200 (1994), a claim will be found to fall outside the scope of a special statutory review scheme "only in limited circumstances: when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim is wholly collateral to the statutory review provisions; and (3) the claim is beyond the expertise of the agency."  *NTEU*, 2005 WL 561080 at *5 (cleaned up).  Since *Thunder Basin*, the Supreme Court and the D.C. Circuit have both held federal employment or labor challenges to be exclusively channeled away from district court review under both the CSRA and the FSL-MRS.  *See Elgin*, 567 U.S. at 13 (CSRA review is "exclusive, even for employees who bring constitutional challenges to federal statutes"); *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*").

Again, the district court's recent decision in *NTEU* is especially instructive.  The court there held that the union plaintiffs could not sue in district court to challenge these very same actions, but must instead pursue relief through the FLRA.  2005 WL 561080 at **5-8.  Further, in addressing the unions' argument that pursuing redress before the FLRA (and from there to a court of appeals) would be less efficient than doing so before a district court, the court emphasized that NTEU "provides no reason why it could not seek relief from the FLRA on behalf of a class of plaintiffs and admits that it would ask other agencies to follow an administrative judge's ruling in its favor."  *Id*. at *7.  In rejecting a challenge to OPM's "Fork in the Road" deferred resignation program last month, the federal district court similarly held that the FSL-MRS precluded jurisdiction.  *Am. Fed. of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) ("Congress intended for the FSL-MRS and [CSRA] . . .  to provide the exclusive procedures for disputes involving employees and their federal employer.").

The States make no mention of *NTEU* in their opening brief.[7]  Nor do they address *Thunder Basin* preclusion, or explain why their claims are not precluded by the comprehensive administrative-judicial review schemes created by Congress in the CSRA and FSL-MRS.  But any such argument would be unavailing for the same reasons already recognized by the court in *NTEU*.

Specifically, Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon*, 598 U.S. at 185. Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.*  Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin*, 510 U.S. at 207, 212).

The first step under *Thunder Basin*—Congress's intent to preclude—is plainly satisfied here: Congress established a detailed statutory scheme for adjudicating federal employment and labor disputes.  The CSRA sets forth a process for covered employees to appeal removal decisions first to the MSPB, with judicial review available before the Federal Circuit following a final decision from the MSPB.  28 U.S.C. § 1295(a)(9). And probationers may similarly challenge their removals through at least two pathways: via complaint to the Office of Special Counsel or, in more limited instances, direct appeal to the MSPB.  *See* 5 U.S.C. § 2302(a)(2)(A)(i)–(xii).

---

[7] Plaintiffs discuss the Northern District of California's decision in *AFGE*.  But they do not acknowledge that the *AFGE* court rejected the union plaintiffs' claims as they were channeled exclusively through the FLRA; instead, the court rested its assertion of subject-matter jurisdiction solely on the non-union, non-employee organizational plaintiffs.  Defendants address that aspect of the district court's oral TRO ruling *infra*.

Likewise, the FSL-MRS provides for "administrative and judicial review" regarding disputes between federal-employee unions and the federal government. *AFGE*, 929 F.3d at 752. Congress decided, through the FSL-MRS, that federal labor disputes must first be administratively exhausted before the FLRA. Judicial review, if any, is available only in a court of appeals. *See id.* at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *see also* 5 U.S.C. § 7703(b) (judicial review in Federal Circuit or other court of appeals). "Congress typically chooses . . . review in a court of appeals following the agency's own review process" when designing an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme includes. Accordingly, as the D.C. Circuit has repeatedly recognized, the FSL-MRS precludes jurisdiction in the district courts over federal union disputes. *See AFGE v. Trump*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force* ("*Air Force*"), 716 F.3d 633, 636 (D.C. Cir. 2013)).

Turning to the second *Thunder Basin* step—whether particular claims are of the type Congress intended to be reviewed in this scheme—the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Id.* The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (internal quotation marks, citation, and alteration omitted). These "considerations" are ultimately merely guideposts to "best [] understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

18

All three *Thunder Basin* factors are satisfied here. First, the CSRA and FSL-MRS schemes provide for meaningful judicial review over the very claims asserted by the States, even if the States themselves are not the proper parties to assert them. *See AFGE*, 929 F.3d at 755. Here, as in *AFGE v. Trump*, federal unions can challenge probationary removals or RIFs through the administrative process "in the context of concrete . . . disputes." *Id.* at 757; *NTEU*, 2025 WL 561080 at *7. Similarly, if any affected party thinks that the probationary removals or RIFs conflict with any federal rule, guidance, or statute, it may assert that within the administrative scheme. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. VA*, 273 F. App'x 929, 931 (Fed. Cir. 2008) (considering whether a regulation was violated); *Fed. L. Enf't Officers Ass'n v. Ahuja* ("*FLEOA*"), 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system).

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *FLEOA*, 62 F.4th at 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Much like the union plaintiffs in NTEU, the States challenge certain

probationary removals and ongoing (and future) RIFs. But those are all the kinds of federal personnel and labor issues that lie at the heart of the CSRA and the FSL-MRS.

Third, and for similar reasons, the MSPB and FLRA may bring respective expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point in the CSRA context. As the Court noted: "preliminary questions unique to the employment context" include fact questions about a "resignation" (there whether it "amounted to a constructive discharge") as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the FLRA, these "threshold questions" may "alleviate [the other] concerns." *See id.*

Again, the States have said nothing so far about *Thunder Basin*, *Elgin*, *AFGE v. Trump*, or *NTEU*, or about why they can assert claims in district court substantively identical to those held to be jurisdictionally precluded from district court review when asserted directly by federal employees themselves or the unions that represent them. But it would be an odd result if claims that cannot be raised in district court by the plaintiffs most directly affected by the challenged actions could be raised by States whose asserted injuries are entirely derivative of such plaintiffs. And to Defendants' knowledge, no court has countenanced the States' argument here.

The most the States might be able to say on this point—and all they have said—is that the district court in *AFGE v. Ezell* issued a limited TRO against OPM on the basis of similar claims asserted by non-employee organizational plaintiffs. But that does not help the States here. The States acknowledge that since *AFGE*, OPM has clarified that the agency "is not directing agencies to take any specific performance-based actions regarding probationary employees." States' Br. at 12. And the *AFGE* suit relied on an altogether different theory of relief. There, the plaintiffs sued

OPM and its agency head alone. They did not attempt to seek APA review of tens of thousands of alleged final agency actions involving 41 federal government defendants.

### C.    The States Have Not Shown that Defendants Acted Contrary to Law.

Even if the States' suit were procedurally proper, they have established that Defendants took action inconsistent with law. The States fundamentally misunderstand Defendants' discretion to terminate probationers. "Congress . . . saw summary terminations as essential to an effective and efficient service, and it has repeatedly acted to preserve agencies' discretion summarily to remove probationary employees." *U.S. Dep't of Justice v. Fed. Labor Relations Authority*, 709 F.2d 724, 730 (D.C. Cir. 1983). And "[i]t has, throughout this time, delegated the task of defining and administering the specific probationary term to the President and other officials within the Executive Branch." *Id.* "[S]econd-guessing of the agency's decision . . . undermines the scheme Congress envisioned . . . ." *Id.* at 289-90.

President Trump campaigned on a promise to improve the federal government workforce. The recent increase in the number of terminations of probationers is consistent with his administration's pledge to raise standards for federal employment. The States have not cited anything requiring a newly elected president to have his administration measure probationers by standards set under a previous government. Proposals for heightened standards for probationers have long circulated among federal workforce policymakers. During the Bush Administration, for example, the MSPB advocated for greater scrutiny of probationers. MSPB, "The Probationary Period: A Critical Assessment Opportunity" (Aug. 2005).[8]

---

[8]https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

The States also fail to explain why an agency could not consider its needs and goals in determining whether it will make a probationer an employee. The agency must use the probationary period "to determine the fitness of the employee." 5 C.F.R. § 315.803(a). At the same time, the probationer must "demonstrate fully his or her qualifications for continued employment." Any fitness inquiry necessarily requires some consideration of the role that the probationer is seeking. An agency's needs and goals for specific roles can change during a probationary period—especially during any intervening change in leadership. To the extent Defendants considered their needs in terminating probationers, that was permissible.

The States also wrongly suggest that Defendants issued defective notices to terminated probationers. An OPM regulation obligates agencies to tell a terminated probationer "why he is being separated." 5 C.F.R. § 315.804(a). The States suggest this requires a "particularized assessment of performance or conduct." States' Br. at 18. But no statute or regulation requires that. Instead, the regulation clarifies that an agency satisfies its notice obligation by stating its termination conclusion: "The information in the notice as to why the employee is being terminated shall, at a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." 5 C.F.R. § 315.804(a). A statement that a probationer has been terminated because of his or her performance during the probationary period is sufficient.

Finally, the States cast doubt on Defendants' terminations of probationers by calling them reductions in force (RIFs). Based on that same premise, the States argue that Defendants violated requirements that agencies undertaking certain RIF proceedings must timely notify states or state entities designated to carry out rapid response activities under the Workforce Investment Act of 1998. *See* 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803. But the premise is mistaken; the States ignore fundamental differences between a RIF and the termination of a probationer. The actions

22

they challenge here are the latter, not the former. Separately, agencies have begun to implement the President's directive to consider and undertake RIFs, but there is no allegation in the States' briefing that any agency has failed to comply with RIF requirements in connection with those distinct actions. Importantly, RIFs and probationary terminations are different things. Agencies cannot replace employees terminated as part of a RIF; the position is eliminated. But a terminated probationer can be replaced.

The States also imply that OPM's circulation of a template for the termination of probationers converted those terminations into a RIF. Not so. If anything, that template shows that OPM did not direct Defendants to implement a RIF. Consistent with the probationer termination notice regulation, that template suggested as model language: "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." *See* TRO Mot. at 10. That rationale belies the States' mischaracterization of probationer terminations as a reduction in force.[9]

## II.    The States Cannot Show Irreparable Harm.

The States assert irreparable harm based on an increased demand for services they already provide. That does not suffice. The States have not asserted "an invasion of a legally protected interest," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that is, an injury "traditionally redressable in federal court," *United States v. Texas*, 599 U.S. 670, 676 (2023). The States do not claim that the firings of probationers cause them direct injury by, for example, requiring them to act or refrain from acting, determining their federal funding, or depriving them of a legal right. *Cf.*

---

[9] The States also seek relief that goes beyond Federal Rule of Civil Procedure 65(b)'s authority to "issue a temporary restraining order." A "restraint" is a "[p]rohibition of action; holding back." Restraint, Black's Law Dictionary (12th ed. 2024). The States' request for an order reinstating thousands of probationers to their roles is the opposite, a mandatory injunction. *See Northeast Ohio Coal. for Homeless & Serv. Emps. v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006).

*Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) ("The Secretary's plan will cut … revenues," which is "necessarily a direct injury."). Rather, they contend that the firings have the incidental effect of increasing the States' burden to provide services. States' Br. at 16-17. That is the same theory advanced and rejected in *Texas*. *Compare* States' Br. at 12 with *Texas*, 599 U.S. at 674, 680 n.3 (citing *Massachusetts v. Laird*, 400 U.S. 886 (1970); *Florida v. Mellon*, 273 U.S. 12, 16-18 (1927)). Moreover, while the States focus on the number of probationers fired, the reality is that any firing of a federal employee will only "impose[] peripheral costs on a State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). If those downstream costs are sufficient to state a cognizable injury, "what limits on state standing remain?" *Id.*

It cannot be that a federal employment action that increased—or decreased—a State's unemployment obligations and thus affected social-services spending or tax revenue could be challenged in federal court. It would mean that Justice Douglas was correct in *Laird* and that a State can sue to enjoin military action if it would result in lost tax revenue or other indirect costs. *See* 400 U.S. at 887-91 (Douglas, J., dissenting); see also *id.* at 886 (summarily rejecting suit to enjoin Vietnam War).

In short, just as the States lack standing, they also lack cognizable irreparable harm.

### III. The Public Interest Weighs Against Temporary Relief.

Turning to the third and fourth factors governing issuance of temporary injunctive relief, the States cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a TRO. These final two factors merge in cases where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A TRO would be especially harmful to Defendants because probationary periods are time limited. For probationers whose probationary periods end during a TRO, Defendants may be unable to later exercise their authority

to determine that the probationer is not fit for federal employment. In addition, the States'
requested TRO would interfere with the President's ability to manage, shape, and streamline the
federal workforce to more closely reflect policy preferences and the needs of the American public.

A temporary restraining order would also impose significant and unrecoverable costs on
Defendants. The relief sought by the States would require the federal government to pay salaries
and benefits for persons who it otherwise would not be obligated to pay. These expenses are likely
unrecoverable from terminated probationers even if Defendants ultimately prevail in this action.
Defendants thus request that any relief be accompanied by a bond under Fed. R. Civ. P. 65(c),
which provides that "[t]he court may issue a preliminary injunction or a temporary restraining
order only if the movant gives security in an amount that the court considers proper to pay the
costs and damages sustained by any party found to have been wrongfully enjoined or restrained."
A bond is appropriate here given that any preliminary relief would potentially mandate that the
Executive spend money that may not be recouped once distributed.[10]

### IV.    Any Relief Should Preserve the Executive's Discretionary Authority.

To the extent the Court considers entering the States' proposed request for relief, any order
should be limited to mitigate (albeit not eliminate) the significant harms it would cause to the
Executive's abilities to exercise its lawful statutory authority and discretion. To that end,
Defendants respectfully request that any preliminary relief clarify that it does not prohibit the
President from reissuing a different directive and/or Executive Order or limit the defendant

---

[10] Indeed, the States seek relief that exceeds Federal Rule of Civil Procedure 65(b)'s authority to
"issue a temporary restraining order." A "restraint" is a "[p]rohibition of action; holding back."
Restraint, Black's Law Dictionary (12th ed. 2024). The States' request for an order reinstating
thousands of probationers to their roles is the opposite: a mandatory injunction. *See Ne. Ohio
Coal. for Homeless & Serv. Emps. v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006).

agencies from taking actions pursuant to their legal authority to regulate in furtherance of this substantive policy priority.

Moreover, Defendants respectfully request that any preliminary relief be appropriately narrowly tailored to preserve the Executive's authority to exercise its Article II authority over the Executive Branch.  That is the normal equitable remedy, and anything broader would constitute a significant intrusion on the separation of powers. *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 698 F.3d 171, 179 (4th Cir. 2012) (under *ultra vires* review standard, court "may not dictate how government goes about its business but [rules] only [on] whether a public entity has acted within the bounds of its authority or overstepped them" (citation omitted)).

## V.      Any Injunctive Relief Should Be Stayed Pending Appeal.

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

26

DIANE KELLEHER
Branch Director

*/s/ Christopher R. Hall*
Christopher R. Hall
Assistant Director, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-4778
Email: Christopher.hall@usdoj.gov

Kelly O. Hayes
United States Attorney

*/s/ Beatrice C. Thomas*
Beatrice C. Thomas
Assistant United States Attorney
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, MD 21202
beatrice.thomas@usdoj.gov

*Attorneys for Defendants*

27