**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

STATE OF MARYLAND, *et al.*,　　　*

　　　*Plaintiffs-Appellees*,　　　*

　　　v.　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　No. 25-1248
UNITED STATES DEPARTMENT　　*
OF AGRICULTURE, *et al.*,
　　　　　　　　　　　　　　　　*

　　　*Defendants-Appellants*.　　*

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

**APPELLEES' OPPOSITION TO EMERGENCY**
**MOTION FOR STAY PENDING APPEAL**

　　Appellant Agencies seek extraordinary emergency relief from a temporary restraining order ("TRO") that is scheduled to last only eight more days and with which they have already substantially complied. The Agencies pepper their stay request with rhetoric about "extraordinary incursion[s]" and "significant burdens." Mot. 2. Yet their own actions convey little urgency: Their stay request was filed in this Court four days after the TRO's issuance and several hours after the compliance deadline. At this point, with many employees restored to their previous positions, granting a stay would make no sense.

　　Rather, allowing the TRO to remain in place is the only equitable path forward. Doing so mitigates the chaos of the Agencies' own making that has

significantly strained Appellee States' resources.  In brief, the Agencies recently terminated over 24,000 federal probationary employees through unlawful reductions in force ("RIFs").  They did so without the notice to the States that federal law requires.  States have been left to clean up the mess caused by the spike in unemployment insurance claims and demand for public services.  Although the Agencies deride these injuries as mere "informational" harms, Mot. 1, the record is replete with evidence of the strain and budgetary harms incurred by the States.  Recognizing that the Agencies' conduct was forbidden by clear statutory and regulatory text, the district court acted to maintain the status quo ante by temporarily restraining the Agencies from continuing their string of unlawful mass firings and temporarily reinstating the terminated probationary employees.

This Court should deny the stay.  First, there is no basis to exercise appellate jurisdiction at this stage, because orders granting TROs are ordinarily unappealable.  There is no reason to deviate from that rule here.

Second, the Agencies fail to satisfy any of the criteria for the extraordinary relief they seek.  The law is clear: When federal agencies restructure themselves by engaging in mass terminations, they must follow statutorily prescribed RIF procedures, including giving States notice to enable them to deploy federally mandated support services to aid those employees.  Here, the Agencies abruptly terminated thousands of employees within the States' borders without any notice,

resulting in significant irreparable injury. Further, the Agencies cannot establish their own irreparable injury in the absence of a stay. Not only have they already taken steps to comply with the order, but the TRO's relief simply encompasses the continued employment of personnel whom they previously hired.

Finally, the balance of the equities and the public interest cut firmly against a stay. There is no public interest in unlawful government action. Nor should the States shoulder the administrative burden of locating, supporting, and offering unemployment benefits to thousands of illegally terminated employees while the Agencies continue their campaign to gut the federal workforce without following the requisite procedures. The motion to stay should be denied.

## STATEMENT OF THE CASE

### Legal Framework

#### Probationary Employees

New employees and certain employees who have changed offices or recently received promotions are subject to probationary periods. 5 U.S.C. § 7511(a)(1)(A)(ii), (C)(ii). A federal agency may generally terminate a probationary employee only (1) due to conditions arising prior to employment, 5 C.F.R. § 315.805; (2) for cause, *id.* § 315.804(a); or (3) in accordance with a RIF, 5 U.S.C. § 3502.

Probationary employees may be terminated for cause if their "work performance or conduct . . . fails to demonstrate [their] fitness or [their] qualifications for continued employment." 5 C.F.R. § 315.804(a). The agency "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job," *McGuffin v. SSA*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (internal quotation marks omitted), and must notify the employee in writing "as to why he is being separated and the effective date of the action," including "the agency's conclusions as to the inadequacies of his performance or conduct," 5 C.F.R. § 315.804(a); *id.* § 316.304.

### Reductions in Force

A RIF "is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). "A RIF is not an adverse action against a particular employee, but is directed solely at a position within an agency." *Id.*; 5 C.F.R. § 351.201(a)(2) (an agency "shall" follow RIF regulations when employees are separated due to "lack of work" or "reorganization").

Conducting a RIF is a lengthy process, as preparing for a RIF can take upwards of 12 to 18 months. (ECF 4-37, DiMartini Decl. ¶ 18.) Among other requirements, agencies must establish "competitive areas" within which "employees compete for retention," 5 C.F.R. § 351.402(a); establish a retention register of

4

employees in each competitive level, *id.* §§ 351.403-351.404; and rank employees for retention based on their tenure group, time in service (including military service), veteran preference, length of service, and performance, *see* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.501-351.504. These regulations expressly extend to probationary employees and, in fact, grant them some retention preferences. 5 C.F.R. § 351.202(a)-(b); *id.* § 351.501(b).

### RIF Notices to States

When a RIF will result in the termination of "50 or more employees in a competitive area," an agency must "provide written notification of the action" to the "State or the entity designated by the State to carry out rapid response activities under title I of the Workforce Investment Act of 1998," as well as the "chief elected official of local government(s) within which these separations will occur." 5 C.F.R. § 351.803(b); *see* 5 U.S.C. § 3502(d)(3)(A).

The notice requirement is absolute: Absent such notice, "an employee may not be released[] due to a reduction in force." 5 U.S.C. § 3502(d)(1). Agencies generally must provide notice 60 days before any employee is terminated. *Id.* § 3502(d)(1)(B). When a RIF is caused by circumstances "not reasonably foreseeable," a shorter notice period may apply—but even then, the notice period must "cover at least 30 full days before the effective date of release." 5 C.F.R. § 351.801(b); *see* 5 U.S.C. § 3502(e).

## States' Rapid Response to Displacement of Workers

Under the Workforce Investment Act and the Workforce Innovation and Opportunity Act of 2014,[1] states must carry out "rapid response activities" to assist dislocated workers in obtaining reemployment when there is a "mass layoff" or "other event" causing a "substantial increase[] in the number of unemployed individuals." 29 U.S.C. § 2864(a)(2)(A)(i)(II); *see id.* § 3174(a)(2)(A)(i)(II). State law imposes similar requirements. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11-303, 11-304 (LexisNexis 2016); N.J. Stat. Ann. § 34:21-5. The purpose of the rapid response system is to cushion the blow of sudden mass layoffs.

The States provide rapid response services to those terminated as part of a RIF. (*See, e.g.*, ECF 4-5, Maryland Labor Decl. ¶ 14.) These services include "onsite contact with employers and employee representatives," "employment and training" activities, and "assistance to the local community in developing a coordinated response and in obtaining access to State economic development." 29 U.S.C. § 3102(51).

---

[1] Rapid response duties imposed on States under § 134(a)(2)(A) of the Workforce Investment Act—referenced in 5 U.S.C. § 3502(d)(3)(A)(i)—still apply under § 134(a)(2)(A) of the Workforce Innovation and Opportunity Act. *Compare* 29 U.S.C. § 2864(a)(2)(A), *with* 29 U.S.C. § 3174(a)(2)(A).

**Factual Background**

**The Agencies' Mass Terminations Without Notice.**

It is no secret that the Administration aims to dramatically reduce the size of the federal workforce.  Consistent with that goal, on January 20, Acting Office of Personnel Management ("OPM") Director Charles Ezell directed agency heads to "identify all employees on probationary periods . . . and send a report to OPM listing all such employees."  Mem. from Charles Ezell to Heads & Acting Heads of Dep'ts & Agencies 1 (Jan. 20, 2025), tinyurl.com/y4cjp5wh.  He further directed agency heads to "promptly determine whether those employees should be retained."  *Id.*

On February 13, OPM ordered the firing of probationary employees.  Chris Megerian & Michelle L. Price, *Trump Administration Begins Sweeping Layoffs with Probationary Workers, Warns of Larger Cuts to Come*, Associated Press (Feb. 13, 2025), tinyurl.com/mtzwfc6j.  OPM reiterated that demand a day later and drafted a template termination letter for agencies to send to their probationary employees (DiMartini Decl. ¶¶ 10, 13), informing the employees that their "unsatisfactory performance was the reason for removal" (ECF 4-36, Grant Decl. ¶ 11).

Agencies have obeyed, firing over 24,000 probationary employees as of the filing of the complaint, with more terminations expected.  (ECF 1, Compl. ¶¶ 102-40.)  Each termination occurred without proper notice to the States.

In carrying out the terminations, the Agencies largely relied on OPM's

7

template language, which generally stated that the employees were being terminated because their "ability, knowledge and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment." (ECF 33-2, Redacted Decl. ¶ 5; *see* DiMartini Decl. ¶ 13.)

These terminations were not based on individualized findings regarding the employees' performance.[2]  As a former IRS human capital officer explained, "it would take weeks or months to evaluate the job performance of [thousands of] employees." (DiMartini Decl. ¶ 14.)  Indeed, leadership "discussed openly in meetings" that the agency "did not review or consider the actual job performance or conduct" of any terminated probationary employee. (DiMartini ¶ 14Decl. ¶ 16; ECF 4-36, Grant Decl. ¶ 19 (similar as to another agency)).  In fact, some agencies have now confirmed that the terminations were not for cause but instead due to a "reduction in force" or a "permanent lack of work due to a change in Presidential Administration." (Maryland Labor Decl. ¶¶ 61-62.)

### Spikes in Unemployment and Demand for Public Services

Many States have seen material increases in the number of unemployment claims filed by former federal employees compared to the same period last year.

---

[2] Many employees purportedly terminated for performance had recently received stellar reviews. (*See, e.g.*, ECF 33-11, Redacted Decl. ¶ 11 ("Outstanding"); ECF 33-12, Redacted Decl. ¶ 12 ("Exceeds Expectations")).

(*See, e.g.*, Maryland Labor Decl. ¶¶ 18, 50, 52 (30-60 claims *per day*, 330% increase); ECF 4-11, New Jersey Labor Decl. ¶¶ 14-15 (273%); ECF 4-7, California Employment Decl. ¶ 30 (149%); ECF 4-8, Illinois Employment Decl. ¶¶ 15-16 (almost the same number of claims filed in the last several weeks as in all of 2024).)

To fulfill their rapid response duties, and because they have received no notice of these terminations, States must devote significant resources and expense to affirmatively contact various federal agencies, monitor public reporting, and conduct mass outreach to identify impacted workers. (*See, e.g.*, Maryland Labor Decl. ¶¶ 16, 19-23; ECF 4-11, New Jersey Labor Decl. 16-¶¶ 17-18.) Some are also diverting staff from pressing projects to retrain them to provide rapid response services. (*See, e.g.*, Maryland Labor Decl. ¶¶ 24-28.) Others have created new websites or set up dedicated phone lines to find and assist terminated federal employees. (*See, e.g.*, Maryland Labor Decl. ¶ 29; ECF 4-8, Illinois Employment Decl. ¶ 32; ECF 4-7, California Employment Decl. ¶ 19.)

**Procedural History**

On March 6, 2025, the States filed suit, challenging the mass termination of probationary employees without following RIF procedures. The next day, the States moved for a TRO, requesting that the district court (1) restrain the Agencies from terminating probationary employees without making individualized determinations based on conduct or performance; (2) reinstate probationary employees terminated

9

on or after January 20, 2025, as part of terminations that did not comply with RIF procedures and were not based on individual determinations; and (3) order the Agencies to file a status report within 48 hours of entry of a TRO, and at regular intervals thereafter, identifying under seal all probationary employees terminated on or after January 20, 2025, and reporting all steps taken to comply with a TRO. (ECF 4-1, at 3-4.) Following a hearing, on Thursday, March 13, the district court granted the States' motion with respect to all but three defendants and denied the Agencies' request for a stay pending appeal.[3] The Agencies appealed the following day.

Not until Monday, March 17, at around 5:30 p.m.—well after the 1:00 p.m. TRO compliance deadline (ECF 44 ¶ 3)—did the Agencies request a stay of that order in this Court. Shortly thereafter, the Agencies filed a status report in the district court stating that they had rescinded many of the terminations and acknowledging that the terminations were not actually due to performance. (*See, e.g.*, ECF 52-1, at 14 (explaining that Department of Homeland Security's report of 313 probationary employee terminations "excludes [those] terminated in individualized actions based on their performance"); ECF 52-1, at 18 n.1 (similar); ECF 52-1, at 44 (similar).)

---

[3] The district court excluded the Department of Defense, the National Archives and Records Administration, and OPM but noted that its conclusion was without prejudice to the presentation of additional evidence. (ECF 43, at 39.)

# ARGUMENT

## I.    THE COURT SHOULD DENY A STAY FOR LACK OF JURISDICTION.

An order granting a TRO is generally not appealable. *Drudge v. McKernon*, 482 F.2d 1375, 1376 (4th Cir. 1973) ("[W]e are aware of [no authority], that, as a general rule, the granting . . . of a motion for a temporary restraining order is an appealable order."). The Agencies do not contest that principle, Mot. 10, and there is no reason to depart from it here.

The Agencies' attempt to recast the TRO as an appealable preliminary injunction is unpersuasive, for they gloss over the key distinction between preliminary injunctions and TROs: duration. While a preliminary injunction "is of indefinite duration extending during the litigation," TROs are "limited in duration." *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 281 n.1 (4th Cir. 2006). Absent a motion for an extension, the TRO at issue here is set to expire after the standard 14-day period—in a mere 8 days—and the district court has ordered that any hearing on a motion for preliminary injunction shall occur within that window. (ECF 44 ¶¶ 7, 9.) This TRO thus bears no resemblance to a preliminary injunction of indefinite duration. Indeed, if this Court were to order briefing and consider an appeal on the merits, the issue would likely become moot before a single brief could be filed. And issuing a stay pending review of a near-expired order over which this court lacks jurisdiction would make little sense.

Contrary to the Agencies' assertions, the scope of relief granted by the district court did not convert this TRO into a preliminary injunction. To begin, the Agencies' assertion that the TRO requires them to take affirmative action misses the mark. Mot. 11. As the district court explained, an order reverting to the status quo ante is not a mandatory injunction and does not exceed the bounds of permissible TRO relief. (ECF 43, at 45-46); *see* Fed. R. Civ. P. 65(d)(1)(C) (requiring that TROs describe the acts "restrained *or required*"). The status quo ante to be preserved by interim relief is "the last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (internal quotation marks omitted).

Here, the status quo ante is the period *before* the unlawful mass terminations. Were it otherwise, the Agencies would perversely benefit from breaking the law quickly and without notice, placing their actions beyond the scope of immediate relief—or entitling them to an immediate appeal unavailable to more circumspect defendants. That cannot be right. *See North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018) (reverting to the status quo ante "shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing").

Because this Court lacks jurisdiction over this appeal, it should deny the stay. *See Office of Personnel Mgmt. v. American Fed'n of Gov't Emps.,* 473 U.S. 1301,

1306 (1985) (Burger, C.J., in chambers) (concluding the motions panel was without authority to grant a stay where it "was without jurisdiction over the appeal"); *AIDS Advocacy Coalition v. U.S. Dep't of State*, No. 25-5046, 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025) (declining to treat a minute order enforcing a TRO as an appealable injunction and therefore denying a stay).

## II.     THE AGENCIES ARE NOT ENTITLED TO A STAY.

Even if this Court had jurisdiction, the Agencies cannot satisfy the stay factors. A stay pending appeal is "an exercise of judicial discretion," and "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks omitted). The moving party bears a "heavy burden" of demonstrating entitlement to this "extraordinary" remedy. *Winston-Salem/Forsyth County Bd. of Ed. v. Scott*, 404 U.S. 1221, 1231 (1971). In determining whether to grant a stay, a court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (internal quotation marks omitted). These factors overwhelmingly disfavor a stay.

**A.     The Agencies Are Not Likely to Prevail on the Merits.**

As the district court explained, federal agencies may terminate probationary employees for three reasons: (1) conditions arising before their employment, 5 C.F.R. § 315.805; (2) unsatisfactory performance or conduct, *id.* § 315.804(a); and (3) in accordance with a RIF, 5 U.S.C. § 3502.  (ECF 43, at 2-3.)  The Agencies chose the third option but ignored the legal requirements governing RIFs, instead issuing boilerplate letters claiming employees were terminated due to performance.

That reasoning was plainly pretext, as the district court concluded based on extensive record evidence.  To terminate probationary employees for unsatisfactory performance, employers "must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin*, 942 F.3d at 1102 (emphasis added) (internal quotation marks omitted).  Here, the Agencies' claim that they evaluated performance is overwhelmingly refuted by the evidence— including OPM's directive to terminate, not evaluate, employees (DiMartini Decl. ¶ 5); declarations of agency officials stating that individual assessments were not undertaken (ECF 4-36, Grant Decl. ¶ 19; DiMartini Decl. ¶ 16); employee declarations revealing exemplary evaluations shortly before termination, *see* note 2 above; the Agencies' admission that many employees were terminated due to a "reduction in force" (Maryland Labor Decl. ¶ 62); the district court's factual determination that "[t]he sheer number of employees that were terminated in a matter

14

of days belies any argument that these terminations were due to the employees' individual unsatisfactory performance or conduct" (ECF 43, at 33); and the Agencies' own status-report declarations confirming that hundreds of employees were not "terminated in individualized actions based on their performance" (ECF 52-1, at 14). These terminations, conducted en masse due to a "permanent lack of work" and without any individualized performance assessments, were transparently large-scale RIFs. (Maryland Labor Decl. ¶ 61.)

The Agencies do not dispute that they are required to provide advance notice to states to enact such RIFs. Mot. 4. RIFs affecting 50 or more employees require advance notice to "the State or entity designated by the State to carry out rapid response activities." 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803(b)(1). To mitigate the burden on state resources, Congress sought to aid States in proactively assisting soon-to-be terminated residents. Indeed, the Agencies conceded as much below. (3/12/25 Tr. at 23-24.) Yet the Agencies failed to comply with these clear requirements, and they nowhere suggest otherwise. Because the Agencies' legal violations are clear and obvious, they have no likelihood of success on the merits. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (denying stay request for failure to make "strong showing" of likelihood of success given that "circuit precedent foreclose[d] the government's position").

The Agencies advance two jurisdictional arguments for why they are likely to succeed, but neither comes close to the "strong showing" needed to grant a stay. *See Nken*, 556 U.S. at 434. First, the Agencies contend that the States lack Article III standing. That is wrong, for several reasons. To start, the Agencies mischaracterize the issue, asserting that States are "su[ing] the federal government on behalf of their citizens as parens patriae." Mot. 11. This is not a suit in which the States have attempted to vindicate a right that they themselves do not possess or to "represent the interests of particular citizens who, for whatever reason, cannot represent themselves." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982). To the contrary, the States have asserted a direct injury based on their own right to advance notice under the RIF statutes and regulations.

The Agencies' reliance on *United States v. Texas*, 599 U.S. 670 (2023), also is unpersuasive. The States' injury-in-fact is an informational one that has caused specific harms, including (1) costs from the hasty rollout of rapid-response protocols; (2) burdens associated with processing an unanticipated surge in unemployment claims; (3) sudden disruptions to state programs depending on federal workers; and (4) unexpected financial harms from decreased tax revenue and increased reliance on state social service programs. (ECF 43, at 7-11.) These are cognizable injuries that flow directly from the statutory right to notice that Congress provided the States, not "attenuated" or "indirect" harms associated with the federal

government's decision to alter enforcement and prosecutorial priorities like those at issue in *Texas*. *See* 599 U.S. at 680 n.3; *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 171 (4th Cir. 2023) (recognizing Article III injury from the deprivation of information required to be disclosed by statute). And contrary to the Agencies' assertion, Mot. 14, the States continue to seek information with respect to the unlawfully terminated employees to meet their own federal and state statutory obligations to provide rapid response services to those affected. The States thus have standing.

Second, contrary to the Agencies' contentions, the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act of 1978 ("CSRA") do not preclude federal court jurisdiction. Mot. 14-17. Though ignored by the Agencies, *Thunder Basin Coal Co. v. Reich* sets forth the well-established, two-step framework for determining whether Congress has divested jurisdiction over agency action. *See* 510 U.S. 200, 207 (1994). A court must first "ask whether Congress's intent to preclude district-court jurisdiction is fairly discernible in the statutory scheme." *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016). It next asks "whether plaintiffs' claims are of the type Congress intended to be reviewed within this statutory structure." *Id.* At this second step, the court considers three factors: "(1) whether the statutory scheme forecloses all meaningful judicial review"; "(2) the extent to which the plaintiff's claims are wholly collateral to the statute's review

17

provisions"; and "(3) whether agency expertise could be brought to bear on the . . . questions presented." *Id.* "[M]eaningful judicial review is the most important factor." *Id.* at 183 n.7.

Application of the *Thunder Basin* factors confirms that the district court had jurisdiction here. At step one, the "text, structure, and purpose" of the CSRA do not display a "fairly discernible" intent to limit jurisdiction over the States' claims. *See Elgin v. Department of Treasury*, 567 U.S. 1, 10 (2012). The CSRA's administrative tribunals—the Merit Systems Protection Board and the Federal Labor Relations Authority—are available only to employees, labor organizations, and agencies. . 5 U.S.C. § 7103(a)(1)-(2); *id.* § 7123; *id.* § 7703. Yet *States* have clear statutory rights to notice, making it illogical to conclude that Congress intended CSRA preclusion to encompass suits like this one. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 66-67 (1992); *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (no preclusion where Congress did not "foreclose[] review to the *class* to which the plaintiff belongs" (internal quotation marks omitted) (emphasis added)).

Even if this Court were to proceed to step two, the CSRA still would not preclude this suit. ECF 43, at 27-30.) If the district court lacked jurisdiction, the States would be left without review and without a remedy because they cannot litigate in the relevant administrative tribunals. Further, the States' claims about notice are "wholly collateral" to the CSRA's administrative review scheme, *Thunder*

*Basin*, 510 U.S. at 212, because notice to States has "nothing to do with" the labor-related matters that the administrative tribunals "regularly adjudicate" between unions, employees, and employers. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 193 (2023). Lastly, the administrative tribunals specialize in individualized adjudications of prototypical employee disputes and lack the expertise to handle the States' claims—i.e., that the Agencies are indiscriminately targeting a swath of the federal workforce to gut the civil service without warning to the States.

The Agencies' reliance on cases involving ordinary employment disputes between employees, unions, and employers is misguided. *See* Mot. 14-16 (citing, *e.g.*, *United States v. Fausto*, 484 U.S. 439 (1988)). The States are not asserting garden-variety employment claims but, rather, are challenging the Agencies' failure to provide them with statutorily required notice, which is not the "type of personnel action covered by" the CSRA. *Fausto*, 484 U.S. at 448. *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), is similarly inapposite. *See* Mot. 15. There, the statutory scheme allowed milk producers and handlers to participate in the adoption of milk market orders, but "[n]owhere in the Act" permitted "participation by consumers." *Block*, 467 U.S. at 347. The Court thus concluded that consumers, having no statutory rights, could not seek judicial review. *Id.* In contrast, here, Congress expressly conferred on States the right to notice, and thus did not "intend[] to foreclose" the States' ability to vindicate that right. *Id.*

**B.      The Agencies Are Not Irreparably Harmed.**

As to the equitable factors, the Agencies first contend that having to employ "individuals whose services the government has determined it no longer requires" irreparably injures them. Mot. 19-20. That claim lacks merit. It improperly assumes that the Agencies can immediately terminate employees whenever they wish to downsize without following RIF procedures. The district court expressly found otherwise. And the temporary reinstatement of employees who were likely terminated unlawfully is just a return to the status quo ante. *Accord Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (explaining that the government does not suffer harm from restraint of an unlawful practice).

Further, reviving established employment relationships with probationary employees who were only recently separated imposes minimal burdens. *See League of Women Voters*, 769 F.3d at 248 (finding burden on government to restore status quo was lessened because relevant "systems have existed, do exist, and simply need to be resurrected," and other measures "merely require[] the revival of previous practices"). What is more, the Agencies claim to already be in substantial compliance with the TRO. In fact, on March 17, they represented that they had quickly reinstated most terminated probationary employees covered by the order. While the Agencies now allege that unspecified "administrative tasks" remain, Mot.

20

19, such vague workforce management duties cannot support the extraordinary remedy of a stay.

### C.   The Remaining Equitable Factors Cut Against the Agencies.

By contrast, staying the TRO would "substantially injure the other parties interested in the proceeding," *Nken*, 556 U.S. at 426—namely, the States, who are responsible for providing rapid response services, as well as thousands of probationary employees abruptly and unlawfully terminated.  Similarly, the public interest supports the States' request for relief.  At this point, given the Agencies' representations that they have reinstated the bulk of their probationary employees, it would be profoundly inequitable to terminate them again in connection with a belated stay motion.

Each day that probationary employees are unemployed means rising and likely unrecoverable costs for the States.  As the district court found, the States have suffered an informational injury and "have incurred substantial follow-on harms as a result of the [Agencies'] failure to provide the required RIF notice."  (ECF 43, at 14.)  These harms include costs associated with diverting personnel for statutorily required rapid response activities, managing and investigating an unanticipated surge of federal unemployment claims, and the sudden loss of various employees' services.  (ECF 43, at 15.)

The district court recognized that these harms are "temporal and immediate" (ECF 43, at 42), and tied to the States' legal obligations to provide rapid response services and to otherwise discharge their responsibilities to their residents (ECF 43, at 15). The Agencies' suggestion that preliminary relief is unnecessary because terminated employees "may obtain back pay from the federal government," Mot. 20, highlights again that this is *not* a personnel action, for back pay to employees would not redress injuries to the States. As the Agencies conceded below, "the States' asserted injuries could only be conceivably redressed by [] reinstatement." (ECF 20, at 12.14, 17). The district court agreed and ordered temporary reinstatement, which mitigates the States' ongoing injuries. That decision temporarily pausing likely unlawful conduct is plainly in the public interest. *See Roe v. Department of Def.*, 947 F.3d 207, 371 (4th Cir. 2020).

For terminated probationary employees, the injuries that would result from a stay are manifest. Until the Agencies began complying with the TRO, many employees remained out of the workforce and in limbo because of the Agencies' unlawful actions. Most have now been reinstated, and a stay pending appeal would again subject them to a sudden, mass termination. Nor can the Agencies justify a stay based on potential "uncertainty" on the part of returning employees. Mot. 19. The affected employees will decide whether returning to work in the present

circumstances is in their best interest; the Agencies that fired them en masse should not purport to speak for them.

Finally, the Agencies have not shown that the district court abused its "wide discretion" in fashioning the scope of relief. *CASA, Inc.*, 2025 WL 654902, at *1. They suggest that a nationwide injunction is per se improper because this suit was brought by "less than half the states in the nation." Mot. 20. But this Court has recognized that nationwide relief is appropriate where "necessary to provide complete relief to the plaintiffs." *CASA, Inc.*, 2025 WL 654902, at *1; *Roe*, 947 F.3d at 232. A TRO with nationwide effect is particularly appropriate here because TROs must be clear and definite. *See Kadel v. Folwell*, 100 F.4th 122, 159 (4th Cir. 2024). A "piecemeal approach is not appropriate" where it would undermine plaintiffs' relief by "caus[ing] confusion." *Association of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 504 (D. Md. 2020). Here, the district court reasonably concluded that state-by-state relief would be "unworkable" because it "would functionally create two separate, drastically different regimes with respect to probationary employees in each affected agency." (ECF 43, at 48). The Agencies do not dispute this point, much less explain how it was an abuse of discretion.

## CONCLUSION

The emergency motion for stay should be denied.

Respectfully submitted,

KEITH ELLISON
Attorney General of Minnesota

LIZ KRAMER
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
651-757-1059
651-282-5832 (facsimile)
liz.kramer@ag.state.mn.us

Attorneys for the State of Minnesota

BRIAN SCHWALB
Attorney General of the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE DENG
TESSA GELLERSON
CHRIS MENDEZ
MARK RUCCI
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

Attorneys for the District of Columbia

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Virginia A. Williamson
ADAM KIRSCHNER
MICHAEL DREZNER
VIRGINIA A. WILLIAMSON
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6584
(410) 576-6437 (facsimile)
vwilliamson@oag.state.md.us

Attorneys for the State of Maryland

KRISTIN K. MAYES
Attorney General of Arizona

HAYLEIGH S. CRAWFORD
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

24

ROB BONTA
Attorney General of California

SATOSHI YANAI
Senior Assistant Attorney General
MIRANDA MAISON
Supervising Deputy Attorney General
DEMIAN CAMACHO
Deputy Attorney General
California Department of Justice
600 W. Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9132
Demian.Camacho@doj.ca.gov


Attorneys for the State of California


WILLIAM TONG
Attorney General of Connecticut

MICHAEL SKOLD
Solicitor General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
michael.skold@ct.gov


Attorneys for Connecticut

PHIL WEISER
Attorney General of Colorado

DAVID MOSKOWITZ
Deputy Solicitor General
Office of the Colorado Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

Attorneys for the State of Colorado


KATHLEEN JENNINGS
Attorney General of Delaware

IAN R. LISTON
Director of Impact Litigation

VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for Delaware

ANNE E. LOPEZ
Attorney General of Hawai'i

KALIKO'ONĀLANI D. FERNANDES
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

Attorneys for the State of Hawai'i

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

KATHERINE DIRKS
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

Attorneys for the Commonwealth of
Massachusetts

AARON D. FORD
Attorney General of Nevada

HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

Attorneys for the State of Nevada

KWAME RAOUL
Attorney General of Illinois

JANE ELINOR NOTZ
Solicitor General

SARAH A. HUNGER
Deputy Solicitor General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
sarah.hunger@ilag.gov

Attorneys for the State of Illinois

DANA NESSEL
Attorney General of Michigan

BRYAN DAVIS, JR.
DEBBIE TAYLOR
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

Attorneys for the State of Michigan

RAÚL TORREZ
Attorney General of New Mexico

ANJANA SAMANT
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 490-4060
asamant@nmdoj.gov

Attorneys for the State of New Mexico


DAN RAYFIELD
Attorney General of Oregon

STACY M. CHAFFIN
Senior Assistant Attorney General
1162 Court Street NE
Salem, OR 97301
Stacy.Chaffin@doj.oregon.gov

Attorneys for the State of Oregon


CHARITY R. CLARK
Attorney General of Vermont

JONATHAN T. ROSE
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

Attorneys for the State of Vermont


MATTHEW J. PLATKIN
Attorney General of New Jersey

NATHANIEL LEVY
Deputy Attorney General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
Nathaniel.Levy@njoag.gov

Attorneys for the State of New Jersey


LETITIA JAMES
Attorney General of New York

MARK S. GRUBE
Senior Assistant Solicitor General
New York Office of the Attorney
General
28 Liberty St.
New York, NY 10005
(212-) 416-8028
mark.grube@ag.ny.gov

Attorneys for the State of New York


PETER F. NERONHA
Attorney General of Rhode Island

NATALYA A. BUCKLER
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

Attorneys for the State of Rhode Island

JOSHUA L. KAUL
Attorney General of Wisconsin

BRIAN P. KEENAN
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

Attorneys for the State of Wisconsin

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limitations of Fed. R.

App. P. 27(d)(2)(A) because the brief contains 5,160 words, excluding the parts of

the document exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief

has been prepared in a 14-point proportionally spaced typeface, Times New Roman,

using Microsoft Word.

/s/ *Virginia A. Williamson*
Virginia A. Williamson

## CERTIFICATE OF SERVICE

I certify that on this 19th day of March 2025, the foregoing Opposition to Emergency Motion for Stay Pending Appeal was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ *Virginia A. Williamson*
Virginia A. Williamson