**No. 25-1248 (L)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

———————————

STATE OF MARYLAND, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

**BRIEF FOR APPELLANTS**

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney
  General*

SARAH WELCH
  *Counsel to the Assistant
  Attorney General*

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division*

  *U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-3180*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION................................................. 4

STATEMENT OF THE ISSUES ..................................................... 5

PERTINENT STATUTES AND REGULATIONS ........................... 5

STATEMENT OF THE CASE ......................................................... 6

    A.    Statutory And Regulatory Background...................................... 6

    B.    Factual Background................................................................. 10

    C.    Prior Proceedings .................................................................. 11

SUMMARY OF ARGUMENT .......................................................17

STANDARD OF REVIEW .............................................................20

ARGUMENT.................................................................................. 21

I.    The District Court Lacked Jurisdiction....................................... 21

    A.    The States Failed To Establish Article III Standing. ................ 21

    B.    Federal Personnel Statutes Divest District Courts Of Subject-Matter Jurisdiction To Consider Claims Concerning The Termination Of Federal Employees. ..............28

II.    The Government Did Not Conduct A Reduction In Force.................36

III.    The States Failed To Establish The Other Preliminary-Injunction Factors.........................................................................38

CONCLUSION............................................................................... 41

CERTIFICATE OF COMPLIANCE................................................ 42

CERTIFICATE OF SERVICE......................................................... 43

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                           <u>**Page(s)**</u>

*AFGE v. Secretary of the Air Force,*
    716 F.3d 633 (D.C. Cir. 2013) ................................................... 28

*AFGE v. Trump,*
    929 F.3d 748 (D.C. Cir. 2019) ....................................... 8, 28-29

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ..................................................... 23, 24

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ................................................................... 33

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984) ................................................................... 30

*Broussard v. Meineke Disc. Muffler Shops, Inc.,*
    155 F.3d 331 (4th Cir. 1998) ..................................................... 35

*Dreher v. Experian Info. Sols., Inc.,*
    856 F.3d 337 (4th Cir. 2017) ............................................... 18, 25

*Elgin v. Department of the Treasury,*
    567 U.S. 1 (2012) ................................................................. 28, 33

*Federal Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ..................................................................... 26

*Federal Law Enf't Officers Ass'n v. Ahuja,*
    62 F.4th 551 (D.C. Cir. 2023) ................................................... 33

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ..................................................... 36

*Garcia v. United States,*
    680 F.2d 29 (5th Cir. 1982) ....................................................... 39

*Graham v. Ashcroft,*
   358 F.3d 931 (D.C. Cir. 2004) .......................................................... 32, 35

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
   560 F.3d 495 (D.C. Cir. 2009) ................................................................ 31

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ................................................................................. 21

*Heckler v. Ringer,*
   466 U.S. 602 (1984) ........................................................................... 33-34

*Hollingsworth v. Perry,*
   558 U.S. 183 (2010) ................................................................................. 40

*James v. Von Zemenszky,*
   284 F.3d 1310 (Fed. Cir. 2002) ......................................................... 7, 37

*Laufer v. Naranda Hotels, LLC,*
   60 F.4th 156 (4th Cir. 2023) .................................................................. 26

*Misegades & Douglas v. Schuyler,*
   456 F.2d 255 (4th Cir. 1972) ................................................................. 27

*National Treasury Emps. Union v. Federal Labor Relations Auth.,*
   737 F.3d 273 (4th Cir. 2013) ............................................................. 6, 7, 9

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................. 15, 20, 38, 40

*OPM v. AFGE,*
   No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ..................... 3, 15, 40

*Pinar v. Dole,*
   747 F.2d 899 (4th Cir. 1984) ........................................................... 32, 35

*Public Citizen v. U.S. Dep't of Justice,*
   491 U.S. 440 (1989) ............................................................................ 25-26

*Regional Mgmt. Corp. v. Legal Servs. Corp.*,
  186 F.3d 457 (4th Cir. 1999) ..................................................... 27

*Sampson v. Murray*,
  415 U.S. 61 (1974) ...................................................... 24, 27, 39

*Spagnola v. Mathis*,
  859 F.2d 223 (D.C. Cir. 1988) ................................................ 33

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................... 21

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ........................................................... 33

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................... 25

*United States v. Fausto*,
  484 U.S. 439 (1988) ............................... 8, 18, 29, 31, 32, 33, 35

*United States v. M/V Sanctuary*,
  540 F.3d 295 (4th Cir. 2008) ................................................. 20

*United States v. Texas*,
  599 U.S. 670 (2023) ........................................... 17, 22, 23, 24

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) .......................................................... 20, 38

## Statutes:

5 U.S.C. § 1204 ..................................................................... 8

5 U.S.C. § 1212 ................................................................... 10

5 U.S.C. § 1214 ................................................................... 10

5 U.S.C. § 3321 ..................................................................... 6

5 U.S.C. § 3502 ................................................................ 3, 7, 8

5 U.S.C. § 7105 ................................................................ 8-9

5 U.S.C. § 7123 ................................................................ 9

5 U.S.C. § 7511 ................................................................ 6, 9

5 U.S.C. § 7512 ................................................................ 8

5 U.S.C. § 7513 ................................................................ 8, 9

5 U.S.C. § 7701 ................................................................ 8

5 U.S.C. § 7703 ................................................................ 8

7 U.S.C. § 608c ................................................................ 30

28 U.S.C. § 1292 ................................................................ 4

28 U.S.C. § 1331 ................................................................ 4

28 U.S.C. § 1361 ................................................................ 4

**Regulations:**

5 C.F.R. § 315.803 ................................................................ 2, 6

5 C.F.R. § 315.804 ................................................................ 7

5 C.F.R. § 315.805 ................................................................ 7

5 C.F.R. § 315.806 ................................................................ 7, 9

5 C.F.R. § 351.201 ................................................................ 7

5 C.F.R. § 351.201 ................................................................ 37

5 C.F.R. § 351.203 ................................................................ 37

5 C.F.R. § 351.501 ............................................................ 37

5 C.F.R. § 351.901 .............................................................. 8

**Rule:**

Fed. R. Civ. P. 65 ............................................................ 39

**Other Authorities:**

Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and
    Acting Heads of Dep'ts & Agencies (Jan. 20, 2025).................................. 10

Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and
    Acting Heads of Dep'ts & Agencies (rev. Mar. 4, 2025),
    https://perma.cc/E8P5-74WZ................................................................. 10

**INTRODUCTION**

The district court entered a preliminary injunction requiring the federal government to reinstate thousands of probationary employees across nearly two dozen federal agencies.  The court entered that extraordinary relief at the behest of several states—but not even one affected employee—to redress the purported violation of a *notice* requirement.  A motions panel of this Court stayed the district court's order pending appeal, concluding that a stay was warranted because, among other reasons, "[t]he Government is likely to succeed in showing the district court lacked jurisdiction."  Order 4-5, Apr. 9, 2025 (Stay Order).  That conclusion was correct, and this Court should now vacate the injunction.

First, as the motions panel's stay order confirms, the district court lacked jurisdiction to superintend the federal government's employment relationships at the request of states that are strangers to those relationships.  The states lack Article III standing to complain of downstream economic effects caused by the federal government's employment actions, and the district court's attempt to repackage plaintiffs' injuries as "informational" is a dead end.  There is no connection between the purported informational injury that the states assert and the sweeping reinstatement remedy the district court ordered.

1

Moreover, Congress has channeled all federal employment disputes into an administrative process with judicial review in the Federal Circuit. Allowing states to circumvent that process and challenge federal employment decisions directly in district court would upend that reticulated statutory scheme and contravene Supreme Court precedent recognizing that where an exclusive remedial scheme permits claims by only a particular class of plaintiffs, it shuts the door to claims by anyone else.

Second, even if the district court had jurisdiction, its decision on the merits rests on a fundamental misunderstanding of the relevant statutory and regulatory provisions. Under federal law, a probationary employee may be terminated, among other reasons, upon an agency's determination that the employee has "fail[ed] to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). The district court believed that the government had not identified sufficient cause for terminating any probationary employees—itself a remarkable conclusion to reach in litigation to which the employees are not parties—but the court did not stop there. Instead, the court reasoned that since the government did not have sufficient cause for the terminations, the government must have *actually* conducted a reduction in force (RIF), a specific process for

2

eliminating positions that may require advance notice to states.  5 U.S.C.
§ 3502(d).  But even if the court were correct that the government lacked
sufficient cause to fire probationary employees, that would not mean that
the government had conducted unlawful RIFs—it would just mean that the
probationary employees could challenge their terminations through the
mechanisms created by Congress, as indeed some are endeavoring to do.

Finally, the district court mis-weighed the equities in granting
preliminary relief.  The states do not suffer any cognizable harm (let alone
irreparable harm) from the federal government's determination that it no
longer wishes to employ certain of their citizens.  By contrast, the district
court's reinstatement order interferes with the government's ability to
manage its workforce, and "the Government is unlikely to recover the funds
disbursed to reinstated probationary employees" if it later wins this case, as
the stay panel recognized.  *See* Stay Order 5.  Indeed, "[t]he Supreme
Court" recently "stayed a similar preliminary injunction issued by the
United States District Court for the Northern District of California."  *Id.*
(citing *OPM v. AFGE*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8,
2025) (mem.)).

To correct these errors, and the lopsided balance of harms they have
caused, this Court should vacate the injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1361. *See* JA31. On March 13, 2025, the district court entered a temporary restraining order, JA531, and the government noticed an appeal from that order on March 14, 2025, JA535, docketed in this Court as No. 25-1248. On April 1, 2025, the district court entered a preliminary injunction, JA990, and defendants filed a notice of appeal on April 2, 2025, JA995, docketed in this Court as No. 25-1338. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).[1]

---

[1] Appeal No. 25-1248 of the district court's temporary restraining order became moot upon the district court's entry of a preliminary injunction.

## STATEMENT OF THE ISSUES

On April 1, 2025, the district court entered a preliminary injunction that required 20 different federal agencies to reinstate thousands of previously terminated probationary employees.  The issues presented are:

**1.**  Whether the district court lacked jurisdiction over the states' claims where the states lack Article III standing and where Congress has established a comprehensive system that provides the exclusive means for reviewing the federal personnel actions at issue here.

**2.**  Whether the district court erred on the merits in concluding that because the federal government purportedly did not have sufficient cause to terminate probationary employees, the federal government in effect conducted an unlawful reduction in force, a separate type of employment action that may require advance notice to states.

**3.**  Whether the district court erred in holding that the states established irreparable harm and that the balance of equities and the public interest support a preliminary injunction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.   Statutory And Regulatory Background

**1.**     "Congress has provided for a probationary period since it created the modern civil-service system with the 1883 Pendleton Act[.]" *National Treasury Emps. Union v. Federal Labor Relations Auth.* (*NTEU*), 737 F.3d 273, 276 (4th Cir. 2013).  Under current law, the "President may ... provide ... for a period of probation" for federal employees "before an appointment in the competitive service becomes final."  5 U.S.C. § 3321(a)(1); *see id.* § 7511(a)(1)(A) (providing up to one year of probationary status for competitive-service employees).  Exercising this authority, the Office of Personnel Management (OPM) has issued rules defining the probationary term for the competitive service and directing agencies to "utilize the probationary period as fully as possible to determine the fitness of the employee" and to "terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."  5 C.F.R. § 315.803(a).  Employees in the excepted service are subject to a trial period of up to two years.  *See* 5 U.S.C. § 7511(a)(1)(B)-(C).

As the term "probationary" reflects, "employees so designated are on probation and subject to summary dismissal."  *NTEU*, 737 F.3d at 276.  OPM's regulations provide procedural protections when agencies terminate

6

probationary employees in certain circumstances. *See id.* The regulations specify, for example, that where an agency terminates a probationary employee "because his work performance or conduct during th[e probationary] period fails to demonstrate his fitness or his qualifications for continued employment," the employee must receive notice "in writing as to why he is being separated and the effective date of the action." 5 C.F.R. § 315.804(a). Similarly, the regulations provide that where an agency terminates a probationary employee "for reasons based in whole or in part on conditions arising before his appointment," the employee is entitled, among other things, to "written notice" and an opportunity to respond. *Id.* § 315.805; *see also id.* § 315.806.

**2.**     Federal law also authorizes the government to conduct a reduction in force, a distinct "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002); *see* 5 U.S.C. § 3502; 5 C.F.R. § 351.201. When conducting a RIF, agencies must generally provide 60 days' advance written notice to an employee who is to be released from employment, 5 U.S.C. § 3502(d)(1)(A)-—and if the RIF would affect a "significant number of employees" in a jurisdiction, such notice must also be provided to "the State or entity

7

designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998," *id.* § 3502(d)(1)(B), (d)(3)(A)(i).

**3.**    The Civil Service Reform Act (CSRA) establishes the "comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). Under the CSRA, most civilian employees can appeal a major adverse personnel action to the Merit Systems Protection Board (MSPB).  5 U.S.C. §§ 7512, 7513(d), 7701.  Employees released from employment in a RIF may also pursue relief before the MSPB.  *See* 5 C.F.R. § 351.901.  The CSRA empowers the MSPB to order relief, including reinstatement.  5 U.S.C. §§ 1204(a)(2), 7701(g).  An employee aggrieved by a final decision of the MSPB may obtain judicial review.  *Id.* § 7703(a)(1); *see also id.* § 7703(b) (providing the Federal Circuit with exclusive jurisdiction over most final MSPB decisions).

In addition, the Federal Service Labor–Management Relations Statute (FSLMRS) governs labor relations between the Executive Branch and its employees.  *See* 5 U.S.C. §§ 7101-7135; *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019).  The Federal Labor Relations Authority (FLRA) is charged with adjudicating most federal labor disputes.  5 U.S.C.

§ 7105(a)(2).  Review of the FLRA's decisions is available in the courts of

appeals.  *Id.* § 7123(a).

Unlike most civilian employees, probationary employees have no

statutory right to challenge their terminations before the MSPB.  *See* 5

U.S.C. § 7511(a)(1)(A) (defining an "employee" to exclude an individual who

is "serving a probationary or trial period under an initial appointment");

*see also NTEU*, 737 F.3d at 277 (observing that probationary employees

"are explicitly excluded from the protections against demotion or removal

for unacceptable performance," "are not afforded the full rights that non-

probationary employees have to appeal a removal or demotion for

unacceptable performance to the MSPB," and "do not possess the

protections granted to non-probationary employees against removals for

such reasons 'as will promote the efficiency of the service.'" (quoting 5

U.S.C. § 7513(a))).  Pursuant to OPM regulation, however, probationary

employees in the competitive service may challenge certain "removals

based on partisan political reasons or marital status; improper procedures;

or other forms of discrimination, if such discrimination is accompanied by

terminations based on partisan politics, marital status, or improper

procedure."  *NTEU*, 737 F.3d at 278; *see also* 5 C.F.R. § 315.806.  In

addition, probationary employees may in appropriate circumstances pursue

relief by filing complaints alleging certain prohibited personnel practices with the Office of Special Counsel, which can investigate and may pursue administrative relief before the MSPB.  *See* 5 U.S.C. §§ 1212, 1214.

### B.    Factual Background

On January 20, 2025, OPM transmitted a guidance memo to Executive Branch agencies identifying probationary periods as "an essential tool for agencies to assess employee performance."  Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Dep'ts & Agencies 1 (Jan. 20, 2025).  The memo directed agencies to "identify all employees on probationary periods" and "promptly determine whether those employees should be retained at the agency."  *Id.*  On March 4, OPM issued revised guidance emphasizing that agencies "have ultimate decision-making authority over, and responsibility for, such personnel actions."  Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Dep'ts & Agencies 2 (rev. Mar. 4, 2025), https://perma.cc/E8P5-74WZ.

Invoking their legal authorities to manage their workforces, several federal agencies have terminated certain probationary employees. According to plaintiffs, between February 13 and March 3, the government terminated "at least 24,000 probationary employees."  *See* JA911.  The

plaintiff states allege that they "were not provided any advance notice of such terminations." JA911.

### C.    Prior Proceedings

**1.**    Plaintiffs—19 states and the District of Columbia— commenced this action by suing 21 federal agencies on March 6, 2025, and they sought a temporary restraining order the following day. *See* JA22; Dkt. No. 4. On March 13, the district court entered a nationwide temporary restraining order requiring the government to "REINSTATE all Affected Probationary Employees … FORTHWITH, and in any event before March 17, 2025, at 1:00 p.m. EDT." JA531. The court further restrained the government from "conduct[ing] any future [RIFs]—whether formally labeled as such or not— except in compliance with" notice and other applicable requirements. JA531-532. The temporary restraining order did not extend to defendants Department of Defense, National Archives and Records Administration, and OPM, as the states failed to present sufficient evidence concerning terminations at those agencies. *See* JA515.

The government endeavored to promptly comply with the court's order in the limited time provided, *see generally* JA537-607, JA793-851, while also seeking emergency relief from this Court, *see* Emergency Mot. for Stay Pending Appeal, Mar. 17, 2025. On March 21, this Court denied

11

the government's motion, noting the "district court's stated intention to hold a hearing on March 26, 2025, and to promptly grant or deny preliminary injunctive relief thereafter." *See* Order 2, Mar. 21, 2025. Judge Rushing concurred, noting "the timing of the government's stay motion and the district court's anticipated ruling on preliminary injunctive relief." *Id.* at 4 (Rushing, J., concurring). But she criticized the district court's grant of nationwide relief. *See id.* at 4-5.

**2.** After extending the temporary restraining order, *see* JA852, the district court entered a preliminary injunction on April 1. *See* JA906-994. Like the temporary restraining order, the preliminary injunction stays the "purported terminations of Affected Probationary Employees" and provides that defendants shall not "conduct any future [RIFs]—whether formally labeled as such or not—… except in compliance with" statutory and regulatory requirements. JA990-991. And the injunction directs agency defendants to "undo the purported terminations" by "Tuesday, April 8, 2025, at 2:00 p.m. EDT," to the extent agencies have not already done so pursuant to the temporary restraining order. JA990. The injunction extends to two agencies not included in the temporary restraining order— the Department of Defense and OPM. *See* JA992-993. But the injunction is geographically narrower than the temporary restraining order, insofar as

12

it applies only to employees "[w]hose duty station (prior to any purported termination) and/or residence is in" a plaintiff jurisdiction. JA993. The district court recognized that plaintiffs had not shown at the preliminary-injunction stage that nationwide relief was appropriate. JA979-981.

The district court's legal analysis was otherwise substantially similar to the analysis supporting its temporary restraining order. With respect to standing, the district court explained that the "the States' theory of injury boil[s] down to one of informational harm" because "each State did not receive information to which it was legally entitled and each State experienced harm as a result of that deprivation." JA916; *see also* JA924 (acknowledging that informational injury must cause real-world harm). The court found that the states had sufficiently shown harms flowing from the informational injury, including "the monetary costs and losses of services associated with" providing social services "to the suddenly unemployed." JA925. The court further accepted that a reduction of "state income tax revenues" that had already occurred was "real enough" for purposes of Article III. JA926. The court found that these injuries were caused by defendants' failure to provide notice, JA932-933, and that they were redressable because reinstatements would rectify the "downstream harms" that flowed from the asserted informational injury, JA934.

13

The court rejected the government's contention that the states' claims concerning the termination of federal employment may be pursued only under the CSRA and the FSLMRS, reasoning that the statutory scheme "is about where employees and unions must go to press claims relevant to them" but "not about where *States* may go to press wholly distinct claims based on wholly distinct injuries." JA941.

On the merits, the court found that the termination of probationary employees constituted a RIF because, in the court's view, the "terminations were not based upon any individualized review." JA951; *see also* JA952 ("The record reflects that the terminations were effected by means of form letters terminating employees *en masse*, despite good performance by those employees."). The district court then held that the government had failed to comply with the requirements governing RIFs, including advance notice to states. *See* JA963-969.

The district court found that the remaining preliminary injunction factors were satisfied. It acknowledged that any harms faced by the states were "largely economic," but it found that they were irreparable because the states "are unlikely to be able to recover money damages at the time of judgment to remedy their harms." JA970. And it found that the balance of the equities and the public interest favored the states. JA972-973.

14

**3.** The government again sought a stay pending appeal from this Court. On April 9, a motions panel of this Court granted the government's motion. Stay Order 4-5, (recognizing the government "has satisfied the factors for a stay under *Nken v. Holder*, 556 U.S. 418, 426 (2009)). The Court emphasized, in particular, that the government was "likely to succeed in showing the district court lacked jurisdiction over [the states'] claims," Stay Order 5, and that the government had established irreparable harm because it "is unlikely to recover the funds disbursed to reinstated probationary employees," *id.* The motions panel further noted that the Supreme Court had recently "stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California," which had directed the reinstatement of probationary employees at the Departments of Veterans Affairs, Agriculture, Defense, Energy, Interior, and Treasury. *Id.* (citing *OPM v. AFGE*, No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) (mem.)); *see also AFGE v. OPM*, No. 3:25-cv-01780 (N.D. Cal. Mar. 13, 2025), Dkt. No. 115.[2] Judge Benjamin dissented. *See* Stay Order 6-12 (Benjamin, J., dissenting).

---

[2] The government's appeal of that separate preliminary injunction is pending in the Ninth Circuit. *See AFGE v. OPM*, No. 25-1677 (9th Cir. filed Mar. 13, 2025) (opening brief filed April 10, 2025).

**4.**     The states moved for an administrative stay of the motions panel's stay decision, noting the states' intent to file a petition for rehearing en banc.  Stay Mot., Apr. 9, 2025.  The Court denied the motion.  Order, Apr. 10, 2025.  The states filed a petition for en banc rehearing on April 10, 2025.  Pet., Apr. 10, 2025.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's extraordinary injunction ordering the reinstatement of thousands of probationary employees. As the motions panel recognized in granting a stay pending appeal, the district court lacked jurisdiction to enter the injunction at the behest of states who allege downstream harms from the federal government's personnel decisions. Nor was the court's reinstatement order otherwise proper.

**I.** As the Court recognized in granting a stay, the district court erred in concluding that it had jurisdiction to hear this matter at all. The district court committed two independent jurisdictional errors.

**A.** First, the states lack Article III standing. The states are strangers to the federal employment decisions at issue, which concern agencies' decisions to terminate probationary employees. The states allege downstream harms to their state resources and budgets from the federal government's personnel actions, but the Supreme Court has made clear that such indirect harms are not cognizable Article IIII injuries. *See United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). Repackaging those downstream harms as an "informational" injury does not resuscitate the states' theory. An informational injury cannot by itself create Article III standing but rather must cause "real" harms that "are of the type that have

17

traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quotation marks omitted). And here, the only harms the district court identified are the purported harms to state resources which do not suffice. Nor, in any case, does any such "informational" injury support the district court's extraordinary reinstatement order, which does not provide plaintiffs with any information they presently lack.

**B.** Second, even if the states had standing, the district court lacks subject-matter jurisdiction because Congress has established a comprehensive scheme for reviewing the personnel actions the states challenge here. The CSRA permits certain categories of employees to appeal certain personnel actions to the MSPB, with judicial review in the U.S. Court of Appeals for the Federal Circuit. The Supreme Court has held that those who are not given appellate rights under the CSRA cannot bypass that administrative-review scheme and seek judicial review in district courts. *United States v. Fausto*, 484 U.S. 439, 445 (1988). Permitting states to challenge federal personnel actions in federal court, without any of the limitations that Congress placed on employees' own claims, would upend the comprehensive scheme Congress established.

18

**II.** The district court's merits analysis was likewise flawed. The district court reasoned that the government had not identified sufficient cause for terminating any probationary employee and that the government must have therefore *actually* conducted RIFs that required notice to the states. But even if the court were correct that the government lacked sufficient cause to terminate probationary employees, that would not mean that the government had conducted RIFs—it would just mean that the probationary employees could challenge their terminations through the mechanisms created by Congress. A RIF is a specific type of personnel procedure that eliminates a *position*, as opposed to terminating an *employee*. The district court ignored this distinction and erroneously concluded without relevant evidence—which the states had the burden to supply—that the challenged personnel actions must have been "essentially reorganizations" that amounted to a RIF.

**III.** Finally, the district court abused its discretion in ordering reinstatement because the states failed to establish any of the equitable factors necessary for such relief. The states failed to show an Article III injury-in-fact, let alone imminent irreparable harm. And the public interest and the balance of harms, which merge here, tilt sharply in favor of the government. The district court's order requires the federal government to

19

continue employing and paying unrecoverable sums to employees whose services it has determined are no longer needed.  In granting a stay pending appeal, the motions panel necessarily concluded that the harms to the government and the public interest outweighed any harm to the states.  *See* Stay Order 4-5 (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)).  For the same reason that the balance of equities justified a stay pending appeal, those lopsided equities show that an injunction never should have issued in the first place.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish," by a "clear showing," "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 22 (2008).

This Court reviews a preliminary injunction "for abuse of discretion, with factual determinations considered for clear error and legal conclusions considered de novo."  *United States v. M/V Sanctuary*, 540 F.3d 295, 302 (4th Cir. 2008).

20

## ARGUMENT

## I.  The District Court Lacked Jurisdiction.

As the motions panel determined in granting a stay pending appeal, the states are unlikely to succeed on the merits because the district court likely lacked jurisdiction.  Stay Order 5.  The states failed to establish Article III standing, and Congress has divested district courts of subject-matter jurisdiction to hear challenges to the federal personnel actions at issue here.

### A.  The States Failed To Establish Article III Standing.

States cannot sue the federal government on behalf of their citizens as parens patriae.  *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023).  The states therefore cannot establish Article III standing by relying on injuries allegedly suffered by terminated probationary employees who are not before the court.

Instead, to establish Article III standing, a state—like any other litigant—must demonstrate that it has itself suffered an injury-in-fact that is "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  In granting a preliminary injunction, the district court concluded that the states have standing based on downstream harms

21

to state budgets and operations from the termination of probationary employees. *E.g.*, JA926. That theory would permit states to access the federal courts to supervise nearly any federal government action, and it is irreconcilable with Supreme Court precedent.

    **1.** The states' standing theory rests on their assertions that, as a result of the federal government's personnel actions, they will have to take steps to provide resources to their citizens who were terminated and that they will suffer losses to their tax bases. *See* JA56-64; Dkt. No. 78-1, at 7-8, 13-14.

    That theory is foreclosed by Supreme Court precedent. In *United States v. Texas*, states challenged a federal immigration policy that would "impose[] costs on the States." 599 U.S. 670, 674 (2023). The states claimed the federal government's immigration-enforcement decisions would force them to "supply social services such as healthcare and education" to additional persons. *Id.* The Supreme Court held the states lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. The Court emphasized that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* And the

states' theory of standing based on those "indirect effects" was too "attenuated" to amount to a constitutionally sufficient injury. *Id.*; *accord, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury").

Similarly, here, the states assert that the federal government's employment decisions have inflicted downstream harms on the states' budgets and resources. They allege, for example, that the terminations have imposed burdens on state "administrative process[es] for handling [unemployment insurance] claims," JA57-58; threatened increased enrollment in social services such as Medicaid, *e.g.*, JA64; and caused the states to expend funds to establish informational resources for their citizens, *e.g.*, JA56, JA63-64. Such harms are not cognizable injuries-in-fact. *See Texas*, 599 U.S. at 674, 680 n.3. Were the rule otherwise, states could claim standing to second-guess nearly any federal personnel decision—whether that be hirings, firings, relocations, etc.—on the theory that the decision has a downstream effect on state resources. The theory could reach far beyond federal personnel decisions, too, to the litany of federal policies that "frequently generate indirect effects on state revenues

23

or state spending." *Id.* at 680 n.3; *see Arizona*, 40 F.4th at 386 (rejecting a peripheral-costs theory as "boundless" and "a bridge much too far").

The district court erred in suggesting that *Texas* is distinguishable because it involved a challenge to "core Executive Branch functions." *See* JA928-929. Although the Court in *Texas* stressed numerous reasons why "federal courts have not traditionally entertained lawsuits" challenging the federal government's prosecutorial decisions, 599 U.S. at 678, its discussion of the insufficiency of the states' indirect harms was plainly not limited to that context, *see id.* at 680 n.3. And in any event, the states here *also* challenge a "core Executive Branch function[]," JA928—the federal government's management of its own workforce, *see Sampson v. Murray*, 415 U.S. 61, 83 (1974). The district court did not identify any cases establishing that federal courts have "traditionally entertained lawsuits of this kind" brought by states alleging downstream harms to their budgets and resources as a result of the federal government's employment decisions. *See Texas*, 599 U.S. at 678. Rather, those actions would traditionally be challenged, if at all, by affected employees. *See infra* pp. 29-35.

**2.** The district court's attempt to repackage the states' alleged injuries as "informational," JA916, does not rehabilitate the states' flawed

24

theory.  The district court understood the states' asserted harms to "boil[]
down" to just one injury: an "informational harm" from the government's
alleged failure to provide states notice of its terminations, which the district
court believed would be redressed by an order of reinstatement.  JA916,
JA933-934.  That fails in every respect.

As the district court correctly recognized, *see* JA924, informational
injury does not by itself create Article III standing.  *See TransUnion LLC v.
Ramirez*, 594 U.S. 413, 426 (2021).  Instead, an asserted informational
injury must cause "real" harms that "are of the type that have traditionally
been regarded as providing a basis for a lawsuit in English or American
courts."  *Dreher*, 856 F.3d at 345 (quotation marks omitted).  Here, the
only harms the district court identified are the purported harms to state
resources discussed above, which cannot suffice.  *See, e.g.*, JA917-918
(emphasizing burdens on state "social-service programs," loss of "income-
tax revenue," and an increase in "unemployment benefits applications").

In any event, the district court's reinstatement order does not redress
any "informational" injury.  A plaintiff seeking injunctive relief on a theory
of informational injury asserts that a judicial order would lead him to
obtain information he lacks—"[a]s when an agency denies requests for
information under the Freedom of Information Act."  *Public Citizen v. U.S.*

25

*Dep't of Justice*, 491 U.S. 440, 449 (1989); *see also, e.g.*, *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) ("The 'injury in fact' that respondents have suffered consists of their inability to obtain information … that, on respondents' view of the law, the statute requires [the committee] make public."); *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 171 (4th Cir. 2023) (disabled plaintiff sought injunction requiring hotel to provide information about accessible rooms).  Here, at least as to terminations that have already occurred, the states do not allege that any information is now being withheld from them.  Any informational injury no longer exists and could not possibly be grounds for the district court's sweeping reinstatement order.

The district court nevertheless suggested that its reinstatement remedy was "sufficient and necessary to redress the overarching informational injury" because the "downstream harms stem from the increased pressure on state programs," and "an adequate remedy is one that relieves that pressure."  JA934.  Yet neither the district court nor the states has cited any authority suggesting that an informational injury remains redressable even after the plaintiff has obtained all the information it claimed was missing, so long as the plaintiff experiences some follow-on consequential injury.  Nor may courts grant relief for a supposed

26

"informational injury" that goes far beyond redressing the lack of information itself. Indeed, lawsuits involving "informational" injuries typically come to an end when the plaintiff obtains the information sought. *See, e.g.*, *Regional Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465 (4th Cir. 1999) (explaining that "a challenge to a particular denial of a [Freedom of Information Act] request becomes moot if an agency produces the requested documents"); *Misegades & Douglas v. Schuyler*, 456 F.2d 255, 256 (4th Cir. 1972) (per curiam) ("Since appellant has been provided with the document, there is no longer any matter in controversy before this court."). The mismatch between the states' informational injury theory and the district court's order is further underscored by the fact that, under the states' own theory, they are entitled to at most 60 days' notice, but the district court's order of indefinite reinstatement was untethered to even that timeline.

Thus, even if the district court were correct that it had the equitable power to order indefinite reinstatement of wrongfully terminated employees—and it isn't, *see, e.g.*, *Sampson*, 415 U.S. at 83—such relief was plainly improper here on the states' asserted informational harms.

27

**B.** **Federal Personnel Statutes Divest District Courts Of Subject-Matter Jurisdiction To Consider Claims Concerning The Termination Of Federal Employees.**

Even if the states had Article III standing, the district court would still lack jurisdiction over their claims because Congress has "established a comprehensive system" that provides the "exclusive means" for reviewing challenges to the employment decisions of federal agencies. *Elgin v. Department of the Treasury*, 567 U.S. 1, 5, 8 (2012) (quotation marks omitted).

**1.** The CSRA, including the FSLMRS, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (alterations, citation, and quotations marks omitted). Congress allowed certain individual federal employees who are affected by agency personnel decisions to challenge those decisions "by litigating their claims through the statutory scheme in the context of [a] concrete" dispute, with limitations imposed by Congress on the kinds of claims and remedies available. *See AFGE v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019). The purpose of this statute was to "replace the haphazard arrangements for administrative and judicial

28

review of personnel action, part of the outdated patchwork of statutes and rules built up over almost a century that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (quotation marks omitted).

**2.**     The district court never disputed that if this lawsuit were brought by the real parties in interest—terminated probationary employees—it could proceed only through the scheme enacted by Congress. *See, e.g.*, JA941 (court agreeing that "the CSRA offers a limited review scheme" for "suit[s] brought by employees or unions"). Yet the district court concluded that those statutory limitations are irrelevant here because states are not entitled to seek administrative or judicial review under the CSRA. JA941.

That gets it exactly backwards. Even if the states are excluded from the CSRA process, that does not turn the states into *favored* plaintiffs who can challenge the federal government's termination decisions directly in district court, without any of the limitations that would apply if the real parties in interest were to bring suit. To the contrary, when a comprehensive remedial scheme permits only some plaintiffs to seek review, the scheme implicitly precludes judicial review by other plaintiffs (here, the states) who are not authorized to bring claims.

29

The Supreme Court has repeatedly recognized this fundamental principle. In *Block v. Community Nutrition Institute*, 467 U.S. 340, 347 (1984), the Supreme Court considered a statute that permitted dairy *handlers* to obtain review of certain "market orders" after exhausting administrative remedies but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy *consumers* sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding." *Id.* at 347. In the "complex scheme" Congress had provided, "the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* Accordingly, the Court explained, the statute's "structure … indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other result, the Court said, would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348.

Not long after *Block*, the Supreme Court applied the same reasoning to the CSRA itself. In *Fausto*, the Court again explained that the

"exclusion" of a party "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "*prevents* [the party] from seeking review" under other provisions. 484 U.S. at 455 (emphasis added). There, a federal employee who lacked any "right to administrative or judicial review" under the CSRA challenged his suspension in federal claims court under the Back Pay Act. *See id.* at 440, 443. The Supreme Court explained that Congress's choice to "withhold[]" a remedy under the CSRA "preclude[d] judicial review" for that employee—it did not "leave [the employee] free to pursue" different remedies in a different forum. *Id.* at 443-44, 448-49. The Court emphasized that the CSRA's "comprehensive nature," its express provisions for different kinds of review for different kinds of plaintiffs, and its exclusion of those in the plaintiffs' position from the comprehensive scheme, reflected a "considered congressional judgment" that those employees "should not have statutory entitlement to review for" that type of personnel action covered by the CSRA. *Id.* at 448-49; *see Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (Kavanaugh, J.) ("[T]he CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under the CSRA.").

Those principles likewise foreclose the district court's exercise of subject-matter jurisdiction here. Just as Congress "intentionally foreclosed judicial review to" certain employees under the CSRA, *see Pinar v. Dole*, 747 F.2d 899, 912 (4th Cir. 1984), it intentionally foreclosed judicial review by parties other than those whom it specifically authorized to seek relief. As in *Fausto*, it would turn the CSRA's comprehensive structure "upside down" for states who are strangers to the federal government's employment relationships to challenge the terminations of probationary employees in federal district court, "free" from any of the restrictions that would apply if the claim were brought by the terminated employees themselves. *See* 484 U.S. at 449-50. The exclusion of states from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for states to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) ("[I]t is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies" that precludes jurisdiction. (quoting *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988) (en banc) (per curiam))).

Contrary to the district court's suggestion (JA942-944), the Supreme Court's more recent decisions in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 186 (2023), reflect these same principles, and the analysis above readily maps onto the frameworks they distill. Those cases underscore that where, as here, Congress has established a "comprehensive" review scheme, district courts lack subject-matter jurisdiction over a claim that is, as here, "of the type Congress intended to be reviewed within" the statutory structure. *See id.* (quoting *Thunder Basin*, 510 U.S. at 208, 212); *see also Elgin*, 567 U.S. at 12-14 (reaffirming that the CSRA establishes an "integrated scheme of administrative and judicial review" for challenges to federal employment actions (quoting *Fausto*, 484 U.S. at 445)).

The district court erred in concluding that the states' claim falls outside the CSRA because it is "fundamentally different" from those that employees may bring under the CSRA. JA939-940, 943. The states' claim, "at bottom," rests on allegations that the government unlawfully terminated probationary employees. *Federal Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). The states specifically allege that the terminations were "against the law," JA29, and the states dispute—as "pretext"—agencies'

stated reasons for terminating probationary employees, Dkt. No. 78-1, at 4, 10.  Moreover, the states sought—and the district court granted—reinstatement of terminated employees.  JA982 (granting relief to "return[]" individuals "to the Government's employ").  The states' claim thus falls in the heartland of challenges that Congress wanted only the MSPB (and, eventually, the Federal Circuit and Supreme Court) to resolve.  *See supra* pp. 8-10, 31-32.  Indeed, some terminated employees are invoking the CSRA to seek exactly that relief on the same theory that the states advance here.  *See, e.g.*, U.S. Office of Special Counsel's Initial Request for Stay of Personnel Actions at 10-15, *U.S. Office of Special Counsel ex rel. Doe v. Department of Agric.*, No. CB-1208-25-0020-U-1 (M.S.P.B. Feb. 28, 2025) (alleging that terminations of probationary employees unlawfully failed to follow RIF procedures).

The district court was therefore plainly incorrect in concluding that there is no "identity of interests between the States and the fired employees," where the states challenge the terminations as unlawful and seek to have those employees reinstated.  JA944.  If the district court were correct that the states' interests diverge from the terminated employees' interests, that would only make all the more apparent the impropriety of permitting the states to seek relief on the terminated employees' behalf,

34

where no employee is a party to this suit. *Cf., e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 338 (4th Cir. 1998) (in class action context, "basic due process requires that named plaintiffs possess undivided loyalties to absent class members").

In short, Congress did not establish an implausible scheme in which employees must litigate their terminations through a comprehensive, integrated scheme, but states are left free to challenge those same employment actions directly in federal district court with "greater rights" than the affected employees themselves. *See Graham*, 358 F.3d at 934. That scheme would allow states to "bypass" the reticulated statutory scheme Congress established "and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established." *Pinar*, 747 F.2d at 913 (quotation marks omitted). And it would risk conflicting decisions concerning the same personnel actions, recreating the very "haphazard" "patchwork" that Congress enacted the CSRA to avoid. *See Fausto*, 484 U.S. at 444-45. Instead, Congress limited review of federal employment actions to actions by affected employees themselves, in a different forum. And as then-Judge Roberts summed up, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).

35

## II.    The Government Did Not Conduct A Reduction In Force.

The motions panel was correct to conclude that the district court likely "lacked jurisdiction over Plaintiffs' claims." Stay Order 5. That alone suffices to vacate the injunction. But the district court's merits analysis is no sounder. The essential premise of the district court's order—that agencies' terminations of probationary employees amounted to an unannounced RIF—is wrong. The district court emphasized that "[n]early every termination letter in the record reflects that the terminations purport to be for-cause." JA948. But the court doubted that sufficient cause existed to terminate probationary employees. JA951. Even if the district court were correct, however, that sufficient cause did not exist for any particular employee, that would be a claim that affected employees may pursue—and are pursuing—through the procedures created by the CSRA. It would not mean the government has conducted unannounced unlawful RIFs.

"A RIF is not an adverse action against a particular employee" but is rather "an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). Reflecting this difference, the regulations governing RIFs focus on the "positions" that

are to be filled, abolished, or vacated—not the specific employees. 5 C.F.R. § 351.201(a)(1). When an agency "formally announce[s] a reduction in force," it may take action to release employees "because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position d[u]e to erosion of duties," subject to requirements in which employees compete for continued employment based on their seniority level, veteran status, and performance history. *See generally id.* §§ 351.201(a), 351.501.

The district court reasoned that, because a large number of probationary employees were terminated, the terminations must have been "essentially reorganizations" that amounted to a RIF. JA950. But under the regulations, a reorganization is "the planned elimination, addition, or redistribution of *functions or duties* in an organization," 5 C.F.R. § 351.203 (emphasis added). The court identified no record evidence that any agency had eliminated functions or duties, nor did it find that any "positions" (as distinct from employees) had been eliminated. Instead, the district court simply stated that because the government's efforts were "aimed at a reduction in probationers across the board," JA953, it must have actually conducted a RIF.

37

The district court erred by concluding that the states would likely
succeed in showing that the government illegally conducted a RIF, even
though the states failed to carry their burden of supplying evidence that any
positions were actually eliminated or any agency functions or duties were
actually changed. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).
Accordingly, should the Court reach the merits, those errors independently
support reversal.

## III.  The States Failed To Establish The Other Preliminary-Injunction Factors.

The district court likewise erred in concluding that the remaining
equitable factors favored a preliminary injunction.  As discussed above, the
states' allegations of downstream economic effects do not establish an
injury-in-fact, let alone amount to irreparable harm.  *See supra* pp. 21-27.
Nor, in any event, do those downstream harms outweigh the significant
harms the injunction inflicts on the government and the public interest,
which "merge" here. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Across the government, agencies have determined that the continued
employment of certain employees is unnecessary and inconsistent with
those agencies' missions.  It obviously disserves the government to require
it to continue employing individuals whose services it no longer needs, for
the government has "traditionally been granted the widest latitude in the

'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83. And on a practical level, the government "is unlikely to recover the [taxpayer] funds disbursed to reinstated probationary employees," even if the government eventually wins this case. *See* Stay Order 5; JA988 (acknowledging this irreparable harm). That harm could theoretically have been addressed by a bond under Federal Rule of Civil Procedure 65(c), but the district court further abused its discretion by setting the amount of the bond at a nominal $100 per plaintiff state, JA987-989—which is plainly inadequate to protect the government from the losses that it is incurring while the district court's order is in effect. Finally, the district court's exercise of jurisdiction, despite the exclusive administrative process for handling federal employment matters, has an ongoing "disruptive effect on the administrative processes established by the government to handle cases such as these." *Garcia v. United States*, 680 F.2d 29, 32 (5th Cir. 1982).

The motions panel's grant of a stay pending appeal underscores the conclusion that the equities tilt sharply in the government's favor. The motions panel balanced plaintiffs' asserted harms against the government's harms and the public interest and determined that a stay was warranted. *See* Stay Order 4-5 (citing *Nken*, 556 U.S. at 426, and recognizing that the government had satisfied the stay factors). That is consistent with a similar

decision reached by the Supreme Court in *OPM v. AFGE*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025) (mem.), which "stayed a similar preliminary injunction issued by the United States District Court for the Northern District of California," *see* Stay Order 5.  In granting a stay of that injunction, which required the reinstatement of terminated probationary employees at six agencies, the Supreme Court necessarily concluded that that injunction irreparably harmed the government.  *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam) ("To obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show … a likelihood that irreparable harm will result from the denial of a stay.").  For the same reasons the balance of equities justify a stay pending appeal, the district court's injunction never should have issued in the first place.

**CONCLUSION**

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General, Civil Division*

<u>*s/ Sarah Welch*</u>
SARAH WELCH
*Counsel to the Assistant Attorney*
*General, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
(202) 514-3180

KELLY O. HAYES
*United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division*

April 16, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,858 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ Sarah Welch*
Sarah Welch

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ Sarah Welch*
Sarah Welch

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 3321(a) ........................................................................ A1

5 U.S.C. § 3502(d)(1), (3) ............................................................ A1

5 C.F.R. § 315.803 ....................................................................... A2

5 C.F.R. § 315.804(a) ................................................................... A2

5 C.F.R. § 315.805 ........................................................................ A2

5 C.F.R. § 351.201 ........................................................................ A3

**5 U.S.C. § 3321(a)**

**(a)** The President may take such action, including the issuance of rules, regulations, and directives, as shall provide as nearly as conditions of good administration warrant for a period of probation—

    **(1)** before an appointment in the competitive service becomes final; and

    **(2)** before initial appointment as a supervisor or manager becomes final.

**5 U.S.C. § 3502(d)(1), (3)**

    **(1)** Except as provided under subsection (e), an employee may not be released, due to a reduction in force, unless—

        **(A)** such employee and such employee's exclusive representative for collective-bargaining purposes (if any) are given written notice, in conformance with the requirements of paragraph (2), at least 60 days before such employee is so released; and

        **(B)** if the reduction in force would involve the separation of a significant number of employees, the requirements of paragraph (3) are met at least 60 days before any employee is so released.

    ...

    **(3)** Notice under paragraph (1)(B)—

        **(A)** shall be given to—

            **(i)** the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998; and

            **(ii)** the chief elected official of such unit or each of such units of local government as may be appropriate; and

        **(B)** shall consist of written notification as to—

            **(i)** the number of employees to be separated from service due to the reduction in force (broken down by geographic area or on such other basis as may be required under paragraph (4));

            **(ii)** when those separations will occur; and

**(iii)** any other matter which might facilitate the delivery of rapid response assistance or other services under title I of the Workforce Investment Act of 1998.

## 5 C.F.R. § 315.803

### § 315.803 Agency action during probationary period (general).

**(a)** The agency shall utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment.

**(b)** Termination of an individual serving a probationary period must be taken in accordance with subpart D of part 752 of this chapter if the individual has completed one year of current continuous service under other than a temporary appointment limited to 1 year or less and is not otherwise excluded by the provisions of that subpart.

## 5 C.F.R. § 315.804(a)

### § 315.804 Termination of probationers for unsatisfactory performance or conduct.

**(a)** Subject to § 315.803(b), when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct.

### § 315.805 Termination of probationers for conditions arising before appointment.

Subject to § 315.803(b), when an agency proposes to terminate an employee serving a probationary or trial period for reasons based in whole or in part on conditions arising before his appointment, the employee is entitled to the following:

A2

**(a)** Notice of proposed adverse action. The employee is entitled to an advance written notice stating the reasons, specifically and in detail, for the proposed action.

**(b)** Employee's answer. The employee is entitled to a reasonable time for filing a written answer to the notice of proposed adverse action and for furnishing affidavits in support of his answer. If the employee answers, the agency shall consider the answer in reaching its decision.

**(c)** Notice of adverse decision. The employee is entitled to be notified of the agency's decision at the earliest practicable date. The agency shall deliver the decision to the employee at or before the time the action will be made effective. The notice shall be in writing, inform the employee of the reasons for the action, inform the employee of his right of appeal to the Merit Systems Protection Board (MSPB), and inform him of the time limit within which the appeal must be submitted as provided in § 315.806(d).

**5 C.F.R. § 351.201**

**§ 351.201 Use of regulations.**

**(a)**

**(1)** Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated. This includes determining when there is a surplus of employees at a particular location in a particular line of work.

**(2)** Each agency shall follow this part when it releases a competing employee from his or her competitive level by furlough for more than 30 days, separation, demotion, or reassignment requiring displacement, when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position die to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days.

**(b)** This part does not require an agency to fill a vacant position. However, when an agency, at its discretion, chooses to fill a vacancy by an employee

who has been reached for release from a competitive level for one of the reasons in paragraph (a)(2) of this section, this part shall be followed.

**(c)** Each agency is responsible for assuring that the provisions in this part are uniformly and consistently applied in any one reduction in force.

**(d)** An agency authorized to administer foreign national employee programs under section 408 of the Foreign Service Act of 1980 (22 U.S.C. 3968) may include special plans for reduction in force in its foreign national employee programs. In these special plans an agency may give effect to the labor laws and practices of the locality of employment by supplementing the selection factors in subparts D and E of this part to the extent consistent with the public interest. Subpart I of this part does not apply to actions taken under the special plans authorized by this paragraph.