# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

STATE OF MARYLAND, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

## JOINT APPENDIX VOLUME 1

———————————

ANTHONY G. BROWN
*Attorney General of Maryland*
JULIA DOYLE
*Solicitor General*
ADAM KIRSCHNER
MICHAEL DREZNER
VIRGINIA A. WILLIAMSON
*Assistant Attorneys General*
*200 Saint Paul Place, 20th Floor*
*Baltimore, Maryland 21202*
(410) 576-6424

*Counsel for Plaintiffs-Appellees*
*(continued on inside cover)*

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General, Civil Division*

SARAH WELCH
*Counsel to the Assistant*
*Attorney General, Civil*
*Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
(202) 514-3180

KELLY O. HAYES
*United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
*Attorneys, Appellate Staff*
*Civil Division*

*Counsel for Defendants-*
*Appellants*

Additional Counsel for Plaintiffs-Appellees:

BRIAN L. SCHWALB
*Attorney General for the District of Columbia*
CAROLINE S. VAN ZILE
*Solicitor General*
ASHWIN P. PHATAK
*Principal Deputy Solicitor General*
ANNE DENG
TESSA GELLERSON
CHRIS EDWARD MENDEZ
MARK A. RUCCI
*Assistant Attorneys General*
*400 6th Street N.W., 10th Floor*
*Washington, D.C. 20001*
*(202) 724-6609*

KRISTIN K. MAYES
*Attorney General of Arizona*
HAYLEIGH S. CRAWFORD
*Deputy Solicitor General*
*2005 North Central Avenue*
*Phoenix, Arizona 85004*
*(602) 542-3333*

ROB BONTA
*Attorney General of California*
SATOSHI YANAI
*Senior Assistant Attorney General*
MIRANDA MAISON
*Supervising Deputy Attorney General*
DEMIAN CAMACHO
*Deputy Attorney General*
*California Department of Justice*
*600 W. Broadway, Suite 1800*
*San Diego, CA 92101*
*(619) 738-9132*

KEITH ELLISON
*Attorney General of Minnesota*
LIZ KRAMER
*Solicitor General*
*445 Minnesota Street, Suite 1400*
*St. Paul, Minnesota 55101-2131*
*(651) 757-1059*

WILLIAM TONG
*Attorney General of Connecticut*
MICHAEL SKOLD
*Solicitor General*
*165 Capitol Avenue*
*Hartford, Connecticut 06106*
*(860) 808 5020*

PHIL WEISER
*Attorney General of Colorado*
DAVID MOSKOWITZ
*Deputy Solicitor General*
*Office of the Colorado Attorney General*
*1300 Broadway, #10*
*Denver, Colorado 80203*
*(720) 508-6000*

KATHLEEN JENNINGS
*Attorney General of Delaware*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorney General*
*Delaware Department of Justice*
*820 N. French Street*
*Wilmington, Delaware 19801*
*(302) 683-8899*

ANNE E. LOPEZ
*Attorney General of Hawai'i*
KALIKO'ONĀLANI D. FERNANDES
*Solicitor General*
*425 Queen Street*
*Honolulu, Hawai'i 96813*
*(808) 586-1360*

KWAME RAOUL
*Attorney General of Illinois*
JANE ELINOR NOTZ
*Solicitor General*
SARAH A. HUNGER
*Deputy Solicitor General*
*Office of the Illinois Attorney*
*   General*
*115 South LaSalle Street*
*Chicago, Illinois 60603*
*(312) 814-5202*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
KATHERINE DIRKS
*Chief State Trial Counsel*
*Office of the Attorney General*
*1 Ashburton Pl.*
*Boston, Massachusetts 02108*
*(617) 963-2277*

DANA NESSEL
*Attorney General of Michigan*
BRYAN DAVIS, JR.
DEBBIE TAYLOR
*Assistant Attorneys General*
*Department of Attorney General*
*Labor Division*
*3030 W. Grand Blvd., Ste. 9-600*
*Detroit, Michigan 48202*
*(313) 456-2200*

AARON D. FORD
*Attorney General of Nevada*
HEIDI PARRY STERN
*Solicitor General*
*Office of the Nevada Attorney*
*General*
*1 State of Nevada Way, Ste. 100*
*Las Vegas, Nevada 89119*

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
NATHANIEL LEVY
*Deputy Attorney General*
*25 Market Street*
*Trenton, New Jersey 08625*
*(862) 350-5800*

RAÚL TORREZ
*Attorney General of New Mexico*
ANJANA SAMANT
*Deputy Counsel for Impact*
*   Litigation*
*New Mexico Department of*
*   Justice*
*408 Galisteo St.*
*Santa Fe, New Mexico 87501*
*(505) 490-4060*

LETITIA JAMES
*Attorney General of New York*
MARK S. GRUBE
*Senior Assistant Solicitor General*
*New York Office of the Attorney*
*General*
*28 Liberty St.*
*New York, New York 10005*
*(212) 416-8028*

DAN RAYFIELD
*Attorney General of Oregon*
STACY M. CHAFFIN
*Senior Assistant Attorney General*
*1162 Court Street NE*
*Salem, Oregon 97301*

PETER F. NERONHA
*Attorney General of Rhode Island*
SARAH W. RICE
*Assistant Attorney General*
*150 South Main Street*
*Providence, Rhode Island 02903*
*(401) 274-4400, Ext. 2054*

CHARITY R. CLARK
*Attorney General of Vermont*
JONATHAN T. ROSE
*Solicitor General*
*109 State Street*
*Montpelier, Vermont 05609*
*(802) 828-3171*

JOSHUA L. KAUL
*Attorney General of Wisconsin*
BRIAN P. KEENAN
*Assistant Attorney General*
*Wisconsin Department of Justice*
*Post Office Box 7857*
*Madison, Wisconsin 53707*
*(608) 266-0020*

# TABLE OF CONTENTS

**Page**

**Volume 1**

District Court Docket Report ....................................................................... JA1

Complaint (March 6, 2025) (Dkt. 1) ......................................................... JA22

Exhibits to Motion for Temporary Restraining Order (March 7, 2025)

    Ex. A: Declaration of Portia Wu, Maryland Department of Labor
    (Dkt. 4-5) ............................................................................................ JA77

    Ex. C: Declaration of Anna Hunter, Arizona Department of
    Economic Security (Dkt. 4-6) ........................................................... JA94

    Ex. D: Declaration of Nancy Farias Womack, California
    Employment Development Department (Dkt. 4-7) ....................... JA99

    Ex. E: Declaration of Mireya Hurtado, Illinois Department of
    Employment Security (Dkt. 4-8) ................................................... JA110

    Ex. F: Declaration of Paolo Franzese, Massachusetts Executive
    Office of Labor and Workforce Development (Dkt. 4-9) ............. JA119

    Ex. G: Declaration of Kathleen Walsh, Massachusetts Executive
    Office of Health and Human Services (Dkt. 4-10) ....................... JA131

    Ex. H: Declaration of Robert Asaro-Angelo, New Jersey
    State Department of Labor and Workforce
    Development (Dkt. 4-11) .................................................................. JA138

    Ex. I: Declaration of Kelly Anderson-Thomas, New Jersey
    Department of Health (Dkt. 4-12) ................................................. JA149

    Ex. J: Declaration of Scott Melvin, New York Department of
    Labor (Dkt. 4-13) ........................................................................... JA156

    Ex. K: Declaration of Julia Pontoni, Oregon Higher Education
    Coordinating Commission (Dkt. 4-14) .......................................... JA161

Ex. L: Declaration of Kristine Campagna, Rhode Island Department of Health (Dkt. 4-15).................................................. JA167

Ex. FF: Declaration of Terry Clower (Dkt. 4-35) ........................ JA193

Ex. GG: Declaration of Declaration of Jeffrey Grant (Dkt. 4-36) ................................................................................ JA224

Ex. HH: Declaration of Traci DiMartini (Dkt. 4-37).................... JA231

Ex. II: Declaration of Brooke Lierman, Comptroller of Maryland (Dkt. 4-38) ................................................................................ JA240

Ex. JJ: Declaration of Philip Spesshardt, Colorado Department of Labor and Employment, Comptroller of Maryland (Dkt. 4-39) ........................................................................................... JA243

Redacted Exhibits to Motion for Temporary Restraining Order (March 12, 2025)

Ex. M: Declaration of [Redacted] (Dkt. 33-1) ............................. JA252

Ex. N: Declaration of [Redacted] (Dkt. 33-2) ............................. JA259

Ex. O: Declaration of [Redacted] (Dkt. 33-3) ............................. JA270

Ex. P: Declaration of [Redacted] (Dkt. 33-4)............................... JA279

Ex. Q: Declaration of [Redacted] (Dkt. 33-5) ............................. JA287

Ex. R: Declaration of [Redacted] (Dkt. 33-6) ............................. JA297

Ex. S: Declaration of [Redacted] (Dkt. 33-7) .............................. JA304

Ex. T: Declaration of [Redacted] (Dkt. 33-8)............................... JA314

Ex. U: Declaration of [Redacted] (Dkt. 33-9) ............................. JA322

Ex. V: Declaration of [Redacted] (Dkt. 33-10)............................. JA331

Ex. W: Declaration of [Redacted] (Dkt. 33-11) ........................... JA338

Ex. X: Declaration of [Redacted] (Dkt. 33-12)..............................JA347

Ex. Y: Declaration of [Redacted] (Dkt. 33-13) .............................JA355

Ex. Z: Declaration of [Redacted] (Dkt. 33-14) .............................JA363

Ex. AA: Declaration of [Redacted] (Dkt. 33-15)..........................JA369

Ex. BB: Declaration of [Redacted] (Dkt. 33-16)...........................JA376

Ex. CC: Declaration of [Redacted] (Dkt. 33-17) ..........................JA383

Ex. DD: Declaration of [Redacted] (Dkt. 33-18).........................JA394

Ex. EE: Declaration of [Redacted] (Dkt. 33-19)..........................JA406

## **Volume 2**

Transcript of March 12, 2025 Proceedings (Dkt. 48)...........................JA415

Memorandum Opinion (March 13, 2025) (Dkt. 43) .............................JA475

Temporary Restraining Order (March 13, 2025) (Dkt. 44)...................JA531

Notice of Appeal of Temporary Restraining Order (March 14, 2025)
(Dkt. 46).........................................................................JA535

Status Report (March 17, 2025) (Dkt. 52)............................................JA537

Ex. 1: Declarations in Support (March 17, 2025)
(Dkt. 52-1, 52-2).........................................................JA541

Exhibits to Motion for Preliminary Injunction

Ex. A: Email re: Follow up: CHCO Council Special Session
(March 20, 2025) (Dkt. 78-4) ...................................... JA608

Ex. B: Declaration of Liliana Bachelder (March 20, 2025)
(Dkt. 78-5)...................................................................JA613

Ex. C: Declaration of Dr. Andrew Frassetto (March 20, 2025)
(Dkt. 78-6) .................................................................. JA629

Ex. D: Declaration of Dr. Thomas Evans (March 20, 2025)
(Dkt. 78-7).................................................................. JA669

Ex. E: March 17 Status Report Summary Chart
(March 20, 2025) (Dkt. 78-8).................................................... JA689

Ex. F: Declaration of Katherine Archuleta (March 20, 2025)
(Dkt. 78-9) ..................................................................JA691

Ex. G: Declaration of Pace Schwarz (March 20, 2025)
(Dkt. 78-10)..................................................................JA697

Ex. H: Forms SF-50, Examples (March 20, 2025)
(Dkt. 78-11) ................................................................. JA713

Ex. I: Email Correspondence re: Important: Separation Packet
Regarding Your Departure from GSA  (March 20, 2025)
(Dkt. 78-12)..................................................................JA722

Ex. J: Declaration of Office of Personnel Management
Employee (March 20, 2025) (Dkt. 78-13)....................................JA724

Ex. K: Declaration of National Archives and Records
Administration Employee (March 20, 2025) (Dkt. 78-14) .......... JA731

Ex. L: Declaration of Department of Defense Employee (March
20, 2025) (Dkt. 78-15) ...................................................JA739

Ex. M: Memo re: Independent Department of Defense
Determination to Terminate Probationary Employees (March
20, 2025) (Dkt. 78-16) ...................................................JA753

Ex. N: Declaration of Kimberly Breitmeyer, Michigan
Unemployment Insurance Agency (March 20, 2025)
(Dkt. 78-17) .................................................................JA755

Ex. O: Declaration of Sarita Nair, New Mexico Department of
Workforce Solutions (March 20, 2025) (Dkt. 78-18) ..................JA765

Ex. P: Declaration of USDA Employee (March 20, 2025)
(Dkt. 78-19)..................................................................................JA776

Ex. Q: Declaration of Department of Commerce Employee
(March 20, 2025) (Dkt. 78-20)....................................................JA784

## **Volume 3**

Status Report (March 25, 2025) (Dkt. 103) ..........................................JA793

Ex. 1: Declarations (March 25, 2025) (Dkt. 103-1) ......................JA797

Memorandum Opinion and Order Granting Motion for Temporary
Restraining Order Extension (March 26, 2025) (Dkt. 115) ........ JA852

Transcript of March 26, 2025 Proceedings (March 27, 2025)
(Dkt. 119)................................................................................. JA854

Memorandum Opinion (April 1, 2025) (Dkt. 125) ...............................JA906

Order Granting Preliminary Injunction and Section 705 Stay
(April 1, 2025) (Dkt. 126)............................................................JA990

Notice of Interlocutory Appeal (April 2, 2025) (Dkt. 127) ....................JA995

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:25-cv-00748-JKB

State of Maryland et al v. United States Department of Agriculture et al
Assigned to: Judge James K Bredar
Case in other court: Fourth Circuit Court of Appeals, 25-01248
        USCA, 25-01338
Cause: 05:551 Administrative Procedures Act

Date Filed: 03/06/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AMDDC-11826453.), filed by Connecticut, Oregon, Minnesota, Maryland, Rhode Island, New York, Wisconsin, New Jersey, Illinois, Massachusetts, Nevada, Colorado, District Of Columbia, Hawaii, People of the State of Michigan, New Mexico, Delaware, Arizona, Vermont, California. (Attachments: # 1 Civil Cover Sheet - not flattened, # 2 Summons - not flattened, # 3 Summons - not flattened, # 4 Summons - not flattened, # 5 Summons - not flattened, # 6 Summons - not flattened, # 7 Summons - not flattened, # 8 Summons - not flattened, # 9 Summons - not flattened, # 10 Summons - not flattened, # 11 Summons - not flattened, # 12 Summons - not flattened, # 13 Summons - not flattened, # 14 Summons - not flattened, # 15 Summons - not flattened, # 16 Summons - not flattened, # 17 Summons - not flattened, # 18 Summons - not flattened, # 19 Summons - not flattened, # 20 Summons - not flattened, # 21 Summons - not flattened, # 22 Summons - not flattened, # 23 Summons - not flattened, # 24 Summons - not flattened, # 25 Summons - not flattened, # 26 Summons - not flattened, # 27 Summons - not flattened, # 28 Summons - not flattened, # 29 Summons - not flattened, # 30 Summons - not flattened, # 31 Summons - not flattened, # 32 Summons, - not flattened # 33 Summons - not flattened, # 34 Summons - not flattened, # 35 Summons - not flattened, # 36 Summons - not flattened, # 37 Summons - not flattened, # 38 Summons - not flattened, # 39 Summons - not flattened, # 40 Summons - not flattened, # 41 Summons - not flattened, # 42 Summons - not flattened, # 43 Summons - not flattened)(Handley, James) Modified on 3/7/2025 (kns). (Additional attachment(s) added on 3/7/2025: # 44 Civil Cover Sheet - flattened, # 45 Proposed Summonses - flattened) (kns). (Entered: 03/06/2025) |
| 03/07/2025 | | Case Reassigned to Judge James K Bredar. Judge Adam B Abelson no longer assigned to the case. (kns, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 2 | QC NOTICE regarding: 1 Complaint filed by Massachusetts, New Jersey, Minnesota, New Mexico, Arizona, Oregon, Nevada, People of the State of Michigan, Wisconsin, Hawaii, District Of Columbia, Maryland, Vermont, California, Delaware, New York, Connecticut, Illinois, Rhode Island, Colorado was filed incorrectly. **Not all pdf documents were flattened prior to filing. All pdfs uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing. Please ensure all future documents are flattened prior to uploading to CM/ECF using the following steps: Select File --> Print --> Adobe PDF or Microsoft Print to PDF. |

| | | |
|---|---|---|
| | | *\*\*This filing has been corrected by court staff and no further corrective action is required.* (kns, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 3 | QC NOTICE regarding: 1 Complaint filed by Massachusetts, New Jersey, Minnesota, New Mexico, Arizona, Oregon, Nevada, People of the State of Michigan, Wisconsin, Hawaii, District Of Columbia, Maryland, Vermont, California, Delaware, New York, Connecticut, Illinois, Rhode Island, Colorado.<br>*\*\*The following attachments or exhibits are missing - proposed summonses for the United States Attorney General and the United States Attorney for the District of Maryland. To correct this problem, file proposed summonses using the event Notice (Other) and link proposed summonses to 1 Complaint.* (kns, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 4 | MOTION for Temporary Restraining Order by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, Vermont, Wisconsin (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Attachment Certification of Notice, # 4 Attachment Exhibit Index, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit)(Handley, James) (Entered: 03/07/2025) |
| 03/07/2025 | 5 | -SEALED - NOTICE of Filing Under Seal Exhibits M-EE to Motion for Temporary Restraining Order by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, Vermont, Wisconsin re 4 MOTION for Temporary Restraining Order (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit)(Handley, James) (Entered: 03/07/2025) |
| 03/07/2025 | 6 | MOTION to Seal *Exhibits M-EE to Motion for Temporary Restraining Order* by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, Vermont, Wisconsin (Attachments: # 1 Text of Proposed Order)(Handley, James) (Entered: 03/07/2025) |
| 03/07/2025 | 7 | NOTICE by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, Vermont, Wisconsin re 1 Complaint,,,,,,,, *Proposed Summons to US Attorney for District of Maryland* (Handley, James) (Entered: 03/07/2025) |
| 03/07/2025 | 8 | NOTICE by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, Vermont, Wisconsin re 1 Complaint,,,,,,,, *Summons to The Attorney General of the United States* (Handley, James) (Entered: 03/07/2025) |
| 03/07/2025 | 9 | ORDER Directing the U.S. Attorney for the District of Maryland to file a notice with the Court indicating whether they are aware of this lawsuit and specifically have received notice of the Plaintiff's request that the Court enter a Temporary Restraining Order. |

| | | |
|---|---|---|
| | | Signed by Judge James K Bredar on 3/7/2025. (kb3s, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 10 | MARGINAL ORDER granting 6 MOTION to Seal Exhibits M-EE to Motion for Temporary Restraining Order. Signed by Judge James K Bredar on 3/7/2025. (kb3s, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 11 | NOTICE by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loeffler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Corcoran, Tom) (Entered: 03/07/2025) |
| 03/07/2025 | 12 | ORDER Re: Scheduling Conference Call. Signed by Judge James K Bredar on 3/7/2025. (kb3s, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 13 | NOTICE of Appearance by Beatrice C. Thomas on behalf of All Defendants (Thomas, Beatrice) (Entered: 03/07/2025) |
| 03/07/2025 | 14 | Summons Issued 60 days as to Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loeffler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin, U.S. Attorney and U.S. Attorney General (ols, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 15 | ORDER regarding electronic devices in future proceedings. Signed by Judge James K Bredar on 3/7/2025. (kns, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 16 | Status Conference held on 3/7/2025 before Judge James K Bredar.(Court Reporter: Trish Mitchell - Courtroom 5A) (kmts, Deputy Clerk) (Entered: 03/07/2025) |
| 03/07/2025 | 17 | ORDER directing that the caption of this case shall be "STATE OF MARYLAND, et al., Plaintiffs v. UNITED STATES DEPARTMENT OF AGRICULTURE, et al., Defendants"; that a hearing on the Motion for Temporary Restraining Order is set in for March 12, 2025, at 9:30 a.m. in the J. Frederick Motz Ceremonial Courtroom; that the parties may file briefs on or before March 10, 2025, at 2:00 p.m. and that the parties shall advise the |

| | | Court of any intention to present evidence at the hearing on or before March 10, 2025, at 2:00 p.m. Signed by Judge James K Bredar on 3/7/2025. (kns, Deputy Clerk) (Entered: 03/07/2025) |
|---|---|---|
| 03/10/2025 | 18 | NOTICE by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin *Concerning Plaintiffs' Participation in Hearing* (Handley, James) (Entered: 03/10/2025) |
| 03/10/2025 | 19 | NOTICE by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin re 4 MOTION for Temporary Restraining Order *Supplemental Briefing in Response to the Court's Order of March 7, 2025* (Handley, James) (Entered: 03/10/2025) |
| 03/10/2025 | 20 | RESPONSE in Opposition re 4 MOTION for Temporary Restraining Order filed by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin. (Attachments: # 1 Exhibit)(Thomas, Beatrice) (Entered: 03/10/2025) |
| 03/11/2025 | 21 | NOTICE of Appearance by Virginia Anne Williamson on behalf of State of Maryland (Williamson, Virginia) (Entered: 03/11/2025) |
| 03/11/2025 | 22 | NOTICE of Appearance by Charles Andrew Sinks on behalf of District Of Columbia (Sinks, Charles) (Entered: 03/11/2025) |
| 03/11/2025 | 23 | NOTICE of Appearance by Tessa Gellerson on behalf of District Of Columbia (Gellerson, Tessa) (Entered: 03/11/2025) |
| 03/11/2025 | 24 | NOTICE of Appearance by Nathaniel Ilan Levy on behalf of New Jersey (Levy, Nathaniel) (Entered: 03/11/2025) |
| 03/12/2025 | 25 | MOTION to Appear Pro Hac Vice for Shankar Duraiswamy *as counsel for New Jersey* (Filing fee $100, receipt number AMDDC-11835874.) by New Jersey(Levy, Nathaniel) (Entered: 03/12/2025) |
| 03/12/2025 | 26 | MOTION to Appear Pro Hac Vice for Hayleigh S. Crawford (Filing fee $100, receipt number AMDDC-11835949.) by Arizona(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 27 | MOTION to Appear Pro Hac Vice for David Moskowitz (Filing fee $100, receipt number AMDDC-11836125.) by Colorado(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 28 | Motion Hearing held on 3/12/2025 re 4 MOTION for Temporary Restraining Order filed by Massachusetts, New Jersey, Minnesota, New Mexico, Arizona, Oregon, Nevada, |

| | | |
|---|---|---|
| | | People of the State of Michigan, Wisconsin, Hawaii, District Of Columbia, Vermont, California, Delaware, New York, Connecticut, Illinois, Rhode Island, Colorado, State of Maryland before Judge James K Bredar. (Russell Carrick - Courtroom 1A)(Court Reporter: Kassandra McPherson) (rc2s, Deputy Clerk) (Entered: 03/12/2025) |
| 03/12/2025 | 29 | MOTION to Appear Pro Hac Vice for Michael Kenneth Skold (Filing fee $100, receipt number AMDDC-11836520.) by Connecticut(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 30 | MOTION to Appear Pro Hac Vice for Elizabeth Kramer (Filing fee $100, receipt number AMDDC-11836908.) by Minnesota(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 31 | MOTION to Appear Pro Hac Vice for Gretchen Helfrich (Filing fee $100, receipt number AMDDC-11837480.) by Illinois(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 32 | MOTION to Appear Pro Hac Vice for David Day (Filing fee $100, receipt number AMDDC-11838013.) by Hawaii(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 33 | REDACTED DOCUMENT by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin (Attachments: # 1 Exhibit M, # 2 Exhibit N, # 3 Exhibit O, # 4 Exhibit P, # 5 Exhibit Q, # 6 Exhibit R, # 7 Exhibit S, # 8 Exhibit T, # 9 Exhibit U, # 10 Exhibit V, # 11 Exhibit W, # 12 Exhibit X, # 13 Exhibit Y, # 14 Exhibit Z, # 15 Exhibit AA, # 16 Exhibit BB, # 17 Exhibit CC, # 18 Exhibit DD, # 19 Exhibit EE) (Williamson, Virginia) (Entered: 03/12/2025) |
| 03/12/2025 | 34 | MOTION to Appear Pro Hac Vice for Kaliko'onalani D. Fernandes (Filing fee $100, receipt number AMDDC-11838043.) by Hawaii(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 35 | MOTION to Appear Pro Hac Vice for Satoshi Yanai (Filing fee $100, receipt number AMDDC-11838125.) by California(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 36 | MOTION to Appear Pro Hac Vice for Miranda Maison (Filing fee $100, receipt number AMDDC-11838170.) by California(Handley, James) (Entered: 03/12/2025) |
| 03/12/2025 | 37 | MOTION to Appear Pro Hac Vice for Demian Camacho (Filing fee $100, receipt number AMDDC-11838185.) by California(Handley, James) (Entered: 03/12/2025) |
| 03/13/2025 | 38 | MOTION to Appear Pro Hac Vice for Rabia Muqaddam (Filing fee $100, receipt number AMDDC-11841254.) by New York(Handley, James) (Entered: 03/13/2025) |
| 03/13/2025 | 39 | MOTION to Appear Pro Hac Vice for Anjana Samant (Filing fee $100, receipt number AMDDC-11841330.) by New Mexico(Handley, James) (Entered: 03/13/2025) |
| 03/13/2025 | 40 | MOTION to Appear Pro Hac Vice for Bryan Davis Jr. (Filing fee $100, receipt number AMDDC-11841386.) by People of the State of Michigan(Handley, James) (Entered: 03/13/2025) |
| 03/13/2025 | 41 | MOTION to Appear Pro Hac Vice for Debbie Taylor (Filing fee $100, receipt number AMDDC-11841464.) by People of the State of Michigan(Handley, James) (Entered: 03/13/2025) |
| 03/13/2025 | 42 | NOTICE of Appearance by Cara Jo Spencer on behalf of District Of Columbia (Spencer, Cara) (Entered: 03/13/2025) |
| 03/13/2025 | 43 | MEMORANDUM. Signed by Judge James K Bredar on 3/13/2025. (kns, Deputy Clerk) (Entered: 03/13/2025) |
| 03/13/2025 | 44 | (VACATED See 125 Superseding Order) TEMPORARY RESTRAINING ORDER; Status Report due 3/17/2025, at 1:00 p.m.; any motion for extension of this Order is due |

| | | |
|---|---|---|
| | | 3/21/2025, at 4:00 p.m.; any hearing on a motion for Preliminary Injunction will occur on 3/26/2025, at 9:30 a.m.; each Plaintiff shall post a bond forthwith; unless otherwise ordered, this Order shall expire on 3/27/2025, at 8:00 p.m. Signed by Judge James K Bredar on 3/13/2025. (kns, Deputy Clerk) Modified on 4/1/2025 (jf3s). (Entered: 03/13/2025) |
| 03/14/2025 | 45 | MOTION to Appear Pro Hac Vice for Jonathan Rose (Filing fee $100, receipt number AMDDC-11842599.) by Vermont(Handley, James) (Entered: 03/14/2025) |
| 03/14/2025 | 46 | NOTICE OF APPEAL as to 43 Memorandum Opinion, 44 Temporary Restraining Order, by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin. (Thomas, Beatrice) (Entered: 03/14/2025) |
| 03/14/2025 | 47 | MOTION to Appear Pro Hac Vice for Katherine Dirks (Filing fee $100, receipt number AMDDC-11844327.) by Massachusetts(Handley, James) (Entered: 03/14/2025) |
| 03/16/2025 | 48 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 03/12/2025, before Judge James K. Bredar. Court Reporter Kassandra L. McPherson, Telephone number (410) 962-4544; Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 49. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/7/2025. Redacted Transcript Deadline set for 4/16/2025. Release of Transcript Restriction set for 6/16/2025.(km10, Court Reporter) (Entered: 03/16/2025) |
| 03/16/2025 | 49 | Consent MOTION for Extension of Time *of Deadline to File Status Report from 1 P.M. EDT to 7 P.M. EDT, Monday, March 17, 2025* by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Attachments: # 1 Text of Proposed Order)(Thomas, Beatrice) (Entered: 03/16/2025) |

| 03/17/2025 | 50 | ORDER Granting 49 Motion for Extension of Time. Signed by Judge James K Bredar on 3/17/2025. (bas, Deputy Clerk) (Entered: 03/17/2025) |
|---|---|---|
| 03/17/2025 | 51 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 46 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Additional attachment(s) added on 3/17/2025: # 1 Corrected Transmittal) (slss). (Entered: 03/17/2025) |
| 03/17/2025 | 52 | STATUS REPORT by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Attachments: # 1 Exhibit 1, # 2 Exhibit 1 (con't))(Thomas, Beatrice) (Entered: 03/17/2025) |
| 03/17/2025 | 53 | Consent MOTION for Extension of Time *of 43-Minutes to File Compliance Report* by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Attachments: # 1 Text of Proposed Order)(Thomas, Beatrice) (Entered: 03/17/2025) |
| 03/17/2025 | 73 | USCA Case Number 25-1248 for 46 Notice of Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, |

| | | |
|---|---|---|
| | | General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought. Case Manager - Jeffrey Neal (slss, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 54 | ORDER granting 53 Consent MOTION for Extension of Time of 43-Minutes to File Compliance Report. Signed by Judge James K Bredar on 3/18/2025. (ybs, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 55 | PAPERLESS ORDER granting 26 Motion to Appear Pro Hac Vice on behalf of Hayleigh S. Crawford. Directing attorney Hayleigh S. Crawford to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 56 | PAPERLESS ORDER granting 27 Motion to Appear Pro Hac Vice on behalf of David Moskowitz. Directing attorney David Moskowitz to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 57 | PAPERLESS ORDER granting 29 Motion to Appear Pro Hac Vice on behalf of Michael Kenneth Skold. Directing attorney Michael Kenneth Skold to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 58 | NOTICE of Appearance by Hannah Wynne Cole-Chu on behalf of District Of Columbia (Cole-Chu, Hannah) (Entered: 03/18/2025) |
| 03/18/2025 | 59 | PAPERLESS ORDER granting 30 Motion to Appear Pro Hac Vice on behalf of Elizabeth Kramer. Directing attorney Elizabeth Kramer to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 60 | PAPERLESS ORDER granting 31 Motion to Appear Pro Hac Vice on behalf of Gretchen Helfrich. Directing attorney Gretchen Helfrich to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 61 | PAPERLESS ORDER granting 32 Motion to Appear Pro Hac Vice on behalf of David D. Day. Directing attorney David D. Day to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 62 | PAPERLESS ORDER granting 34 Motion to Appear Pro Hac Vice on behalf of Kaliko'onalani D. Fernandes. Directing attorney Kaliko'onalani D. Fernandes to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |

| 03/18/2025 | 63 | PAPERLESS ORDER granting 35 Motion to Appear Pro Hac Vice on behalf of Satoshi Yanai. Directing attorney Satoshi Yanai to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 64 | PAPERLESS ORDER granting 36 Motion to Appear Pro Hac Vice on behalf of Miranda Maison. Directing attorney Miranda Maison to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 65 | PAPERLESS ORDER granting 37 Motion to Appear Pro Hac Vice on behalf of Demian Camacho. Directing attorney Demian Camacho to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 66 | PAPERLESS ORDER granting 38 Motion to Appear Pro Hac Vice on behalf of Rabia Muqaddam. Directing attorney Rabia Muqaddam to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 67 | QC NOTICE: 39 Motion to Appear Pro Hac Vice filed by New Mexico needs to be modified. See attachment for details and corrective actions needed regarding missing or incomplete information. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 68 | PAPERLESS ORDER granting 40 Motion to Appear Pro Hac Vice on behalf of Bryan W. Davis, Jr. Directing attorney Bryan W. Davis, Jr to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 69 | PAPERLESS ORDER granting 41 Motion to Appear Pro Hac Vice on behalf of Debbie K. Taylor. Directing attorney Debbie K. Taylor to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 70 | PAPERLESS ORDER granting 45 Motion to Appear Pro Hac Vice on behalf of Jonathan Rose. Directing attorney Jonathan Rose to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 71 | PAPERLESS ORDER granting 47 Motion to Appear Pro Hac Vice on behalf of Katherine Dirks. Directing attorney Katherine Dirks to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/18/2025. (mh4s, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 72 | ORDER re 52 Status Report filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human |

| | | |
|---|---|---|
| | | Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought; updated Status Report due 3/24/2025, at 1:00 p.m.; Plaintiffs are reminded of their obligation to post a bond forthwith. Signed by Judge James K Bredar on 3/18/2025. (kns, Deputy Clerk) (Entered: 03/18/2025) |
| 03/18/2025 | 74 | NOTICE of Appearance by David Moskowitz on behalf of Colorado (Moskowitz, David) (Entered: 03/18/2025) |
| 03/18/2025 | 75 | NOTICE of Appearance by Rabia Muqaddam on behalf of New York (Muqaddam, Rabia) (Entered: 03/18/2025) |
| 03/18/2025 | 76 | NOTICE of Appearance by Gretchen E Helfrich on behalf of Illinois (Helfrich, Gretchen) (Entered: 03/18/2025) |
| 03/19/2025 | 77 | NOTICE of Appearance by Sarah W Rice on behalf of Rhode Island (Rice, Sarah) (Entered: 03/19/2025) |
| 03/19/2025 | | Check Received on 3/19/2025 from STATE TREASURER OF MARYLAND. Check Number: 012817. Amount: $100.00. (hmls, Deputy Clerk) (Entered: 03/19/2025) |
| 03/19/2025 | | Check Received on 3/19/2025 from MINNESOTA OFFICE OF THE ATTORNEY GENERAL. Check Number: 5138. Amount: $100.00. (hmls, Deputy Clerk) (Entered: 03/19/2025) |
| 03/19/2025 | | Check Received on 3/19/2025 from STATE OF OREGON DEPARTMENT OF JUSTICE. Check Number: 122767. Amount: $100.00. (hmls, Deputy Clerk) (Entered: 03/19/2025) |
| 03/19/2025 | | Check Received on 3/19/2025 from STATE OF HAWAII OFFICE OF ATTORNEY GENERAL. Check Number: 1362. Amount: $100.00. (hmls, Deputy Clerk) (Entered: 03/19/2025) |
| 03/20/2025 | | Check Received on 3/20/2025 from OFFICE OF THE ARIZONA ATTORNEY GENERAL. Check Number: 359. Amount: $100. (bg3s, Deputy Clerk) (Entered: 03/20/2025) |
| 03/20/2025 | | Check Received on 3/20/2025 from OFFICE OF THE ATTORNEY GENERAL CONNECTICUT. Check Number: 14098. Amount: $100. (bg3s, Deputy Clerk) (Entered: 03/20/2025) |
| 03/20/2025 | | Check Received on 3/20/2025 from STATE OF MICHIGAN DEPARTMENT OF ATTORNEY GENERAL. Check Number: 510209094. Amount: $100. (bg3s, Deputy Clerk) (Entered: 03/20/2025) |
| 03/20/2025 | 78 | MOTION for Preliminary Injunction *and Section 705 Stay* by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Index, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # |

| | | |
|---|---|---|
| | | 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P, # 20 Exhibit Q)(Williamson, Virginia) (Entered: 03/20/2025) |
| 03/20/2025 | 79 | -SEALED - NOTICE of Filing Under Seal Unredacted Exhibits to Motion for Preliminary Injunction and Section 705 Stay by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin (Attachments: # 1 Exhibit B, # 2 Exhibit H, # 3 Exhibit I, # 4 Exhibit J, # 5 Exhibit K, # 6 Exhibit L, # 7 Exhibit P, # 8 Exhibit Q)(Williamson, Virginia) (Entered: 03/20/2025) |
| 03/20/2025 | 80 | MOTION to Seal *Unredacted Exhibits to Motion for Preliminary Injunction and Section 705 Stay* by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin (Attachments: # 1 Text of Proposed Order)(Williamson, Virginia) (Entered: 03/20/2025) |
| 03/21/2025 | 81 | NOTICE of Appearance by Demian Camacho on behalf of California (Camacho, Demian) (Entered: 03/21/2025) |
| 03/21/2025 | 82 | NOTICE of Appearance by Hayleigh S. Crawford on behalf of Arizona (Crawford, Hayleigh) (Entered: 03/21/2025) |
| 03/21/2025 | 83 | NOTICE of Appearance by Satoshi Yanai on behalf of California (Yanai, Satoshi) (Entered: 03/21/2025) |
| 03/21/2025 | 84 | NOTICE by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin re 78 MOTION for Preliminary Injunction *and Section 705 Stay Agreed-Upon Briefing Schedule* (Williamson, Virginia) (Entered: 03/21/2025) |
| 03/21/2025 | 85 | MOTION for Temporary Restraining Order *Extension* by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin (Attachments: # 1 Text of Proposed Order)(Williamson, Virginia) (Entered: 03/21/2025) |
| 03/21/2025 | 86 | NOTICE of Appearance by Miranda Lea Maison on behalf of California (Maison, Miranda) (Entered: 03/21/2025) |
| 03/21/2025 | 87 | MOTION to Appear Pro Hac Vice for Brian P Keenan (Filing fee $100, receipt number AMDDC-11857228.) by Wisconsin(Handley, James) (Entered: 03/21/2025) |
| 03/21/2025 | 88 | MOTION to Appear Pro Hac Vice for Christina Beatty Walters (Filing fee $100, receipt number AMDDC-11857296.) by Oregon(Handley, James) (Entered: 03/21/2025) |
| 03/21/2025 | 89 | MOTION to Appear Pro Hac Vice for Natalya A. Buckler (Filing fee $100, receipt number AMDDC-11857367.) by Rhode Island(Handley, James) (Entered: 03/21/2025) |
| 03/21/2025 | 90 | MOTION to Appear Pro Hac Vice for Heidi Parry Stern (Filing fee $100, receipt number AMDDC-11857420.) by Nevada(Handley, James) (Entered: 03/21/2025) |
| 03/21/2025 | 91 | Check Received on 3/21/2025 from STATE OF VERMONT ATTORNEY GENERAL. Check Number: 268. Amount: $100.00. (bw5s, Deputy Clerk) (Entered: 03/21/2025) |

| Date | No. | Description |
|------|-----|-------------|
| 03/21/2025 | 92 | NOTICE of Appearance by Elizabeth C Kramer on behalf of Minnesota (Kramer, Elizabeth) (Entered: 03/21/2025) |
| 03/21/2025 | 93 | ORDER of USCA Denying appellants' request for an administrative stay or a stay pending the resolution of the appeal as to 46 Notice of Appeal,filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education and Russell Vought. (slss, Deputy Clerk) (Entered: 03/21/2025) |
| 03/21/2025 | 94 | NOTICE of Appearance by Steven Michael Chasin on behalf of All Defendants (Chasin, Steven) (Entered: 03/21/2025) |
| 03/21/2025 | 95 | Consent MOTION for Extension of Time to File *Updated Compliance Status Report by 24 Hours* by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Attachments: # 1 Text of Proposed Order) (Chasin, Steven) (Entered: 03/21/2025) |
| 03/21/2025 | 96 | ORDER granting 95 Consent Motion to Extend Deadline to File Updated Compliance Status Report; Status report due by Tuesday, March 25, 2025 at 1:00 p.m. Signed by Judge James K Bredar on 3/21/2025. (jf3s, Deputy Clerk) (Entered: 03/21/2025) |
| 03/21/2025 | 97 | ORDER setting a briefing schedule re 78 Motion for a Section 705 Stay and Preliminary Injunction. Signed by Judge James K Bredar on 3/21/2025. (jf3s, Deputy Clerk) (Entered: 03/21/2025) |
| 03/24/2025 | 98 | MOTION to Appear Pro Hac Vice for Ryan C. Wilson (Filing fee $100, receipt number AMDDC-11859963.) by District Of Columbia(Handley, James) (Entered: 03/24/2025) |
| 03/24/2025 | 99 | MOTION to Appear Pro Hac Vice for Anne Deng (Filing fee $100, receipt number AMDDC-11860009.) by District Of Columbia(Handley, James) (Entered: 03/24/2025) |

| Date | No. | Description |
|---|---|---|
| 03/24/2025 | 100 | NOTICE of Appearance by Jonathan T Rose on behalf of Vermont (Rose, Jonathan) (Entered: 03/24/2025) |
| 03/24/2025 | | Check Received on 3/24/2025 from STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL. Check Number: 15604. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | | Check Received on 3/24/2025 from THE COMMONWEALTH OF MASSACHUSETTS ATTORNEY GENERALS OFFICE. Check Number: 1233. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | | Check Received on 3/24/2025 from OFFICE OF THE ATTORNEY GENERAL STATE OF ILLINOIS. Check Number: 3442. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | | Check Received on 3/24/2025 from STATE OF NEW JERSEY. Check Number: A0014915991. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | | Check Received on 3/24/2025 from STATE OF CALIFORNIA. Check Number: 529401. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | | Check Received on 3/24/2025 from NEVADA ATTORNEY GENERAL. Check Number: 1678. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/24/2025) |
| 03/24/2025 | 101 | RESPONSE in Opposition re 78 MOTION for Preliminary Injunction *and Section 705 Stay* filed by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin.(Chasin, Steven) (Entered: 03/24/2025) |
| 03/24/2025 | 102 | Memorandum re 78 MOTION for Preliminary Injunction *and Section 705 Stay Scope of Relief* filed by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Williamson, Virginia) (Entered: 03/24/2025) |
| 03/25/2025 | 103 | STATUS REPORT *Restrained Defendants Updated Compliance Status Report* by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United |

| | | States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Attachments: # 1 Exhibit 1)(Chasin, Steven) (Entered: 03/25/2025) |
|---|---|---|
| 03/25/2025 | 104 | PAPERLESS ORDER granting 87 Motion to Appear Pro Hac Vice on behalf of Brian P. Keenan. Directing attorney Brian P. Keenan to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/25/2025. (mh4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 105 | QC NOTICE: 88 Motion to Appear Pro Hac Vice filed by Oregon needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 106 | QC NOTICE: 89 Motion to Appear Pro Hac Vice filed by Rhode Island needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 107 | QC NOTICE: 90 Motion to Appear Pro Hac Vice filed by Nevada needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 108 | PAPERLESS ORDER granting 98 Motion to Appear Pro Hac Vice on behalf of Ryan C. Wilson. Directing attorney Ryan C. Wilson to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/25/2025. (mh4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 109 | PAPERLESS ORDER granting 99 Motion to Appear Pro Hac Vice on behalf of Anne Deng. Directing attorney Anne Deng to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/25/2025. (mh4s, Deputy Clerk) (Entered: 03/25/2025) |
| 03/25/2025 | 110 | NOTICE of Appearance by Eric Hamilton on behalf of All Defendants (Hamilton, Eric) (Entered: 03/25/2025) |
| 03/25/2025 | 111 | CORRECTED MOTION to Appear Pro Hac Vice for Natalya A. Buckler by Rhode Island. The fee has already been paid.(Handley, James) (Entered: 03/25/2025) |
| 03/25/2025 | | Check Received on 3/25/2025 from GOVERNMENT OF THE DISTRICT OF COLUMBIA. Check Number: 007142397. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/26/2025) |
| 03/25/2025 | | Check Received on 3/25/2025 from DEPARTMENT OF JUSTICE FOR DELAWARE. Check Number: 1185. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/26/2025) |
| 03/26/2025 | 112 | Preliminary Injunction Hearing held on 3/26/2025 before Judge James K Bredar.(Court Reporter: Nadine Bachmann) (dg4s, Deputy Clerk) (Entered: 03/26/2025) |
| 03/26/2025 | 113 | ORDER granting 80 Motion to Seal. Signed by Judge James K Bredar on 3/26/2025. (kb3s, Deputy Clerk) (c/e to Virginia Anne Williamson 3.26.25) (Entered: 03/26/2025) |
| 03/26/2025 | 114 | ORDER Directing Parties to provide additional briefing on the following question by 10:00am on March 27, 2025. Signed by Judge James K Bredar on 3/26/2025. (kb3s, |

| | | Deputy Clerk) (Entered: 03/26/2025) |
|---|---|---|
| 03/26/2025 | 115 | (VACATED See 125 Superseding Order) MEMORANDUM AND ORDER granting 85 MOTION for Temporary Restraining Order Extension. Signed by Judge James K Bredar on 3/26/2025. (kb3s, Deputy Clerk) Modified on 4/1/2025 (jf3s). (Entered: 03/26/2025) |
| 03/27/2025 | 116 | Memorandum re 78 MOTION for Preliminary Injunction *and Section 705 Stay Second Supplemental Brief on Scope of Relief* filed by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin.(Williamson, Virginia) (Entered: 03/27/2025) |
| 03/27/2025 | 117 | Memorandum re 78 MOTION for Preliminary Injunction *and Section 705 Stay Defendants' Supplemental Briefing Pursuant to March 26,2025 Order* filed by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loeffler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin. (Attachments: # 1 Transcript)(Chasin, Steven) (Entered: 03/27/2025) |
| 03/27/2025 | | Check Received on 3/27/2025 from STATE OF RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL. Check Number: 0003251698. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/27/2025) |
| 03/27/2025 | | Check Received on 3/27/2025 from NEW MEXICO DEPARTMENT OF JUSTICE. Check Number: 29734356870. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/27/2025) |
| 03/27/2025 | 118 | CORRECTED MOTION to Appear Pro Hac Vice for Christina Beatty Walters by Oregon. The fee has already been paid.(Handley, James) (Entered: 03/27/2025) |
| 03/27/2025 | 119 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 03/26/2025, before Judge Bredar. Court Reporter Nadine Bachmann, Telephone number 410-962-4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 52. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/17/2025. Redacted Transcript Deadline set for 4/28/2025. Release of Transcript Restriction set for 6/25/2025. (nb, Court Reporter) (Entered: 03/27/2025) |
| 03/27/2025 | 120 | PAPERLESS ORDER granting 111 Corrected Motion to Appear Pro Hac Vice on behalf of Natalya A. Buckler. Directing attorney Natalya A. Buckler to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/27/2025. (mh4s, Deputy Clerk) (Entered: 03/27/2025) |

| 03/28/2025 | | Check Received on 3/28/2025 from State of Wisconsin. Check Number: 1003255173. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/28/2025) |
|---|---|---|
| 03/31/2025 | 121 | RETURNED DOCUMENT ORDER. Signed by Judge James K Bredar on 3/28/2025. (Attachments: # 1 Returned Item)(kb3s, Deputy Clerk) (Entered: 03/31/2025) |
| 03/31/2025 | | Check Received on 3/31/2025 from Colorado, Office of the State Controller. Check Number: 8003828083. Amount: $100.00. (kb3s, Deputy Clerk) (Entered: 03/31/2025) |
| 03/31/2025 | 122 | PAPERLESS ORDER granting 118 Corrected Motion to Appear Pro Hac Vice on behalf of Christina L. Beatty-Walters. Directing attorney Christina L. Beatty-Walters to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 3/31/2025. (mh4s, Deputy Clerk) (Entered: 03/31/2025) |
| 04/01/2025 | 123 | CORRECTED MOTION to Appear Pro Hac Vice for Heidi Parry Stern by Nevada. The fee has already been paid.(Handley, James) (Entered: 04/01/2025) |
| 04/01/2025 | 124 | PAPERLESS ORDER granting 123 Corrected Motion to Appear Pro Hac Vice on behalf of Heidi Parry Stern. Directing attorney Heidi Parry Stern to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/1/2025. (mh4s, Deputy Clerk) (Entered: 04/01/2025) |
| 04/01/2025 | 125 | MEMORANDUM OPINION. Signed by Judge James K Bredar on 4/1/2025. (jf3s, Deputy Clerk) (Entered: 04/01/2025) |
| 04/01/2025 | 126 | ORDER granting in part 78 Motion for Preliminary Injunction and Section 705 Stay; directing enjoined Defendants to file a status report on or before Tuesday, April 8, 2025 at 2:00 p.m.; vacating 44 and 115 as superseded by this Order. Signed by Judge James K Bredar on 4/1/2025. (jf3s, Deputy Clerk) (Entered: 04/01/2025) |
| 04/02/2025 | 127 | NOTICE OF INTERLOCUTORY APPEAL as to 125 Memorandum Opinion, 126 Order on Motion for Preliminary Injunction, by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin. (Chasin, Steven) (Entered: 04/02/2025) |
| 04/03/2025 | 128 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 127 Notice of Interlocutory Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices. (av4s, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 129 | USCA Case Number 25-1338 for 127 Notice of Interlocutory Appeal,,,,, filed by United States Agency for International Development, United States Department of Housing and |

| | | |
|---|---|---|
| | | Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loeffler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought. Case Manager - Jeffrey Neal (av4s, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 130 | ORDER of USCA Consolidating USCA Case No. 25-1248 and USCA Case No. 25-1338 as to 46 Notice of Appeal,,,,, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loeffler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought, 127 Notice of Interlocutory Appeal,,,,, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loeffler, Environmental Protection Agency, United States Department of Interior, Scott Bessent, Vincent Micone, Douglas Burgum, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought (av4s, Deputy Clerk) (Entered: 04/03/2025) |
| 04/03/2025 | 131 | MOTION to Stay re 126 Order on Motion for Preliminary Injunction, *Pending Appeal* by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loeffler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, |

| | | United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Chasin, Steven) (Entered: 04/03/2025) |
|---|---|---|
| 04/03/2025 | 132 | NOTICE of Appearance by Heidi Parry Stern on behalf of Nevada (Stern, Heidi) (Entered: 04/03/2025) |
| 04/04/2025 | 133 | RESPONSE in Opposition re 131 MOTION to Stay re 126 Order on Motion for Preliminary Injunction, *Pending Appeal* filed by Arizona, California, Colorado, Connecticut, Delaware, District Of Columbia, Hawaii, Illinois, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, People of the State of Michigan, Rhode Island, State of Maryland, Vermont, Wisconsin.(Williamson, Virginia) (Entered: 04/04/2025) |
| 04/04/2025 | 134 | MEMORANDUM AND ORDER denying 131 MOTION to Stay re 126 Order on Motion for Preliminary Injunction, Pending Appeal. Signed by Judge James K Bredar on 4/4/2025. (kb3s, Deputy Clerk) (Entered: 04/04/2025) |
| 04/07/2025 | 135 | RETURN DOCUMENT ORDER. Signed by Judge James K Bredar on 4/1/2025. (Attachments: # 1 Return Document)(kb3s, Deputy Clerk) (Entered: 04/07/2025) |
| 04/08/2025 | 136 | STATUS REPORT *Enjoined Defendants' Compliance Status Report* by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright (Attachments: # 1 Exhibit 1)(Chasin, Steven) (Entered: 04/08/2025) |
| 04/08/2025 | 137 | NOTICE by Scott Bessent, Douglas Burgum, Douglas A. Collins, Consumer Financial Protection Bureau, Sean P Duffy, Stephen Ehikian, Environmental Protection Agency, Charles Ezell, Federal Deposit Insurance Corporation, General Services Administration, Peter Hegseth, Travis Hill, Robert F. Kennedy, Jr, Kelly Loefler, Howard Lutnick, Linda McMahon, Vincent Micone, National Archives and Records Administration, Kristi Noem, Office of Personnel Management, Brooke Rollins, Marco Rubio, Marco Rubio, Small Business Administration, Scott Turner, United States Agency for International Development, United States Department of Agriculture, United States Department of Commerce, United States Department of Defense, United States Department of Education, United States Department of Energy, United States Department of Health & Human Services, United States Department of Homeland Security, United States Department of Housing and Urban Development, United States Department of Interior, |

| | | |
|---|---|---|
| | | United States Department of Labor, United States Department of Transportation, United States Department of Treasury, United States Department of Veterans Affairs, Russell Vought, Christopher Wright, Lee Zeldin re 136 Status Report,,,,, *of Eratta re Enjoined Defendants' Compliance Status Report* (Attachments: # 1 Errata Corrected Declaration of Jessica M. Parton)(Chasin, Steven) (Entered: 04/08/2025) |
| 04/09/2025 | 138 | (ELECTRONICALLY FILED IN ERROR)ORDER of USCA Granting the Governments motion for a stay of the preliminary injunction pending this appeal as to 46 Notice of Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought, 127 Notice of Interlocutory Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, Environmental Protection Agency, United States Department of Interior, Scott Bessent, Vincent Micone, Douglas Burgum, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought. (slss, Deputy Clerk) Modified on 4/11/2025 (slss). (Entered: 04/09/2025) |
| 04/09/2025 | 139 | ORDER of USCA Granting the Governments motion for a stay of the preliminary injunction pending this appeal as to 46 Notice of Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought, 127 Notice of |

| | | Interlocutory Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, Environmental Protection Agency, United States Department of Interior, Scott Bessent, Vincent Micone, Douglas Burgum, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought. (slss, Deputy Clerk) (Entered: 04/11/2025) |
|---|---|---|
| 04/10/2025 | 140 | ORDER of USCA Denying the motion for and Administrative Stay as to 46 Notice of Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, United States Department of Interior, Environmental Protection Agency, Scott Bessent, Douglas Burgum, Vincent Micone, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought, 127 Notice of Interlocutory Appeal, filed by United States Agency for International Development, United States Department of Housing and Urban Development, Charles Ezell, Howard Lutnick, United States Department of Treasury, Peter Hegseth, United States Department of Veterans Affairs, Federal Deposit Insurance Corporation, United States Department of Transportation, United States Department of Health & Human Services, Linda McMahon, Small Business Administration, Robert F. Kennedy, Jr., Consumer Financial Protection Bureau, Sean P Duffy, United States Department of Energy, Brooke Rollins, Scott Turner, Douglas A. Collins, Kelly Loefler, Environmental Protection Agency, United States Department of Interior, Scott Bessent, Vincent Micone, Douglas Burgum, Christopher Wright, Office of Personnel Management, General Services Administration, United States Department of Commerce, Lee Zeldin, Marco Rubio, United States Department of Homeland Security, National Archives and Records Administration, United States Department of Defense, Travis Hill, United States Department of Labor, United States Department of Agriculture, Kristi Noem, Stephen Ehikian, United States Department of Education, Russell Vought. (slss, Deputy Clerk) (Entered: 04/11/2025) |

| Description: | Docket Report | Search Criteria: | 1:25-cv-00748-JKB |
|---|---|---|---|
| Billable Pages: | 19 | Cost: | 1.90 |
| Exempt flag: | Not Exempt | Exempt reason: | Not Exempt |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND,
200 St. Paul Place
Baltimore, MD 21202

MINNESOTA,
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131

DISTRICT OF COLUMBIA,
400 6th Street NW
Washington, DC 20001

ARIZONA,
2005 North Central Avenue
Phoenix, Arizona 85004

CALIFORNIA,
300 S. Spring Street, Suite 1702
Los Angeles, California 90013

COLORADO,
1300 Broadway
Denver, CO 80203

CONNECTICUT,
165 Capitol Avenue
Hartford, CT 06106

DELAWARE,
820 N. French Street
Wilmington, DE 19801

HAWAII,
425 Queen Street
Honolulu, HI 96813

ILLINOIS,
115 South LaSalle Street, 35th Floor
Chicago, IL  60603

Case No.: 1:25-cv-

**COMPLAINT**

MASSACHUSETTS,
1 Ashburton Pl.
Boston, MA 02108

PEOPLE OF THE STATE OF MICHIGAN,
3030 W. Grand Blvd.
Ste. 9-600
Detroit, MI 48202

NEVADA,
555 E. Washington Ave.,
Las Vegas, NV 89101

NEW JERSEY,
25 Market Street
Trenton, NJ 08625

NEW MEXICO,
P.O. Drawer 1508
Santa Fe, NM  87504-1508

NEW YORK,
28 Liberty St.
New York, NY 10005

OREGON,
100 SW Market Street
Portland, OR 97201

RHODE ISLAND,
150 South Main Street
Providence, RI 02903

VERMONT,
109 State Street
Montpelier, VT 05609

WISCONSIN,
Post Office Box 7857
Madison, Wisconsin 53707

Plaintiffs,

**JA23**

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,
1400 Independence Avenue, S.W.,
Washington, DC 20250

BROOKE ROLLINS, *in her official Capacity
as Secretary of Agriculture*,
     1400 Independence Avenue, S.W.
     Room 214W, Whitten Building
     Washington, DC 20250

UNITED STATES DEPARTMENT OF
COMMERCE,
     1401 Constitution Avenue, N.W.
     Washington, DC 20230

HOWARD LUTNICK, *in his Official
Capacity as Secretary of Commerce*,
     1401 Constitution Avenue, N.W.
     Washington, DC 20230

UNITED STATES DEPARTMENT OF
DEFENSE,
     1000 Defense Pentagon
     Washington, DC 20301-1400

PETER HEGSETH, *in his Official Capacity
as Secretary of Defense*,
     1000 Defense Pentagon
     Washington, DC 20301-1400

UNITED STATES DEPARTMENT OF
EDUCATION,
     400 Maryland Avenue, S.W.
     Washington, DC 20202

LINDA MCMAHON, *in her Official
Capacity as Secretary of Education*,
     400 Maryland Avenue, S.W.
     Washington, DC 20202

**JA24**

UNITED STATES DEPARTMENT OF
ENERGY,
     1000 Independence Avenue, S.W.
     Washington, DC 20024

CHRISTOPHER WRIGHT, *in his Official
Capacity as Secretary of Energy*,
     1000 Independence Avenue, S.W.
     Washington, DC 20024

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
     200 Independence Avenue, S.W.
     Washington, D.C. 20201

ROBERT F. KENNEDY, JR*., in his Official
Capacity as Secretary of Health and Human
Services*,
     200 Independence Avenue, S.W.
     Washington, DC 20201

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,
     300 7th Street, S.W.
     Washington, DC 20201

KRISTI NOEM, *in her Official Capacity as
Secretary of Homeland Security*,
     300 7th Street, S.W.
     Washington, DC 20201

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
     451 7th Street, S.W.
     Washington, DC 20410

SCOTT TURNER, *in his Official Capacity as
Secretary of Housing and Urban
Developmen*t,
     451 7th Street, S.W.
     Washington, DC 20410

4

**JA25**

UNITED STATES DEPARTMENT OF
INTERIOR,
    1849 C Street, N.W.
    Washington, DC 20240


DOUGLAS BURGUM, *in his Official
Capacity as Secretary of the Interior*,
    1849 C Street, N.W.
    Washington, DC 20240


UNITED STATES DEPARTMENT OF
LABOR,
    200 Constitution Avenue, N.W.
    Washington, DC 20210


VINCE MICONE, *in his Official Capacity as
Acting Secretary of Labor*,
    200 Constitution Avenue, N.W.
    Washington, DC 20210


UNITED STATES DEPARTMENT OF
TRANSPORTATION,
    1200 New Jersey Avenue, S.E.
    Washington, DC 20590


SEAN DUFFY, *in his Official Capacity as
Secretary of the Transportation*,
    1200 New Jersey Avenue, S.E.
    Washington, DC 20590


UNITED STATES DEPARTMENT OF
TREASURY,
    1500 Pennsylvania Avenue, N.W.
    Washington, DC 20220


SCOTT BESSENT, *in his Official Capacity
as Secretary of the Treasury*,
    1500 Pennsylvania Avenue, N.W.
    Washington, DC 20220


UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,
    810 Vermont Avenue, N.W.

Washington, DC 20420

DOUGLAS A. COLLINS, *in his Official Capacity as Secretary of the Veterans Affairs*,
　　810 Vermont Avenue, N.W.
　　Washington, DC 20420

CONSUMER FINANCIAL PROTECTION BUREAU,
　　1700 G Street, N.W.
　　Washington, DC 20520

RUSSELL VOUGHT, *in his Official Capacity as Acting Director of the Consumer Financial Protection Bureau*,
　　1700 G Street, N.W.
　　Washington, DC 20520

ENVIRONMENTAL PROTECTION AGENCY,
　　1200 Pennsylvania Avenue, N.W.
　　Washington, DC 20460

LEE ZELDIN, *in his Official Capacity as Administrator of the Environmental Protection Agency*,
　　1200 Pennsylvania Avenue, N.W.
　　Washington, DC 20460

FEDERAL DEPOSIT INSURANCE CORPORATION,
　　550 17th Street, NW
　　Washington, DC 20429

TRAVIS HILL, *in his Official Capacity as Acting Chairman of the Federal Deposit Insurance Corporation*,
　　550 17th Street, NW
　　Washington, DC 20429

GENERAL SERVICES ADMINISTRATION,
　　1800 F Street, NW

**JA27**

Washington, DC 20405

STEPHEN EHIKIAN, *in his Official Capacity as Acting Administrator of the General Services Administration*,
1800 F Street, NW
Washington, DC 20405

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,
700 Pennsylvania Avenue, N.W.
Washington, DC 20001

OFFICE OF PERSONNEL MANAGEMENT
1900 E Street, N.W.
Washington, DC 20415

CHARLES EZELL, *in his Official Capacity as Acting Director of the Office of Personnel Management*
1900 E Street, N.W.
Washington, DC 20415

SMALL BUSINESS ADMINISTRATION,
409 3rd Street, SW
Washington, DC 20416

KELLY LOEFLER, *in her Official Capacity as Administrator of the Small Business Administration*,
409 3rd Street, SW
Washington, DC 20416

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,
1300 Pennsylvania Avenue, NW
Washington, DC 20004

MARCO RUBIO, *in his Official Capacities as Acting Administrator of the United States Agency for International Development and Archivist for the National Archives and Records Administration*,

**JA28**

| 1300 Pennsylvania Avenue, NW Washington, DC 20004 , |  |
|---|---|
| Defendants. |  |

## INTRODUCTION

1.      President Trump and his Administration have made no secret of their contempt for the roughly 2 million committed professionals who form the federal civil service. Nor have they disguised their plans to terminate vast numbers of civil servants, starting with tens of thousands of probationary employees. These large-scale, indiscriminate firings are not only subjecting the Plaintiff States and communities across the country to chaos. They are also against the law.

2.      Federal statutes and regulations set forth procedures that federal agencies must follow when conducting reductions in force ("RIFs"). Critically, these procedures require that federal agencies provide 60 days of advance notice to affected employees and to states, so that they have an opportunity to mitigate the harms of layoffs. Where an agency fails to provide such notice, the employees "may not be released."

3.      Over the past month, the new Administration has run roughshod over the RIF requirements. Specifically, as part of an effort to reduce the size of the federal workforce, the Office of Personnel Management ("OPM") has unlawfully directed federal agencies to conduct mass terminations of probationary employees, suddenly and without any advance notice. Defendants have followed through on this directive, firing employees by the hundreds and, in many instances, thousands— all without following the procedures for conducting RIFs and without providing notice to the affected employees or states.

4.      This campaign has inflicted immense harms on tens of thousands of probationary employees and their families. It has rendered them jobless without providing any advance notice

**JA29**

that might have given them an opportunity to seek other employment or even budget to prepare for the loss of income. As a result, many affected employees and their families are struggling to make ends meet—to pay rent, buy groceries, and care for their loved ones.

5.    This campaign is harming Plaintiff States, too. In addition to the informational and procedural injuries resulting from the deprivation of notice to which they were entitled, the lack of notice has impeded the ability of many Plaintiff States to support affected employees and thereby mitigate the financial and other impacts on state services. In fact, pursuant to federal statutory requirements, Plaintiff States operate rapid response teams that provide immediate services and resources to workers subject to mass layoffs. These services include job placement and job training services as well as connections to social services like unemployment insurance and health insurance. Because of Defendants' failure to adhere to the RIF notice procedures, many Plaintiff States have had to scramble and expend additional resources to identify even which agencies have conducted layoffs and which affected employees require support.

6.    Because of the lack of notice, many Plaintiff States have also faced increased administrative demands related to adjudicating unemployment claims; decreased tax revenues; and increased demands for social services. Some Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare.

7.    To address these harms to Plaintiff States, this action seeks declaratory and injunctive relief requiring Defendants: to cease the RIFs of probationary employees that they have conducted unlawfully and without notice; to reinstate any probationary employees who were terminated as part of mass terminations on or after January 20, 2025; to refrain from separating any employees pursuant to a RIF prior to reinstatement of the unlawfully terminated probationary employees; and

to conduct any future RIFs in accordance with applicable laws and regulations, including providing required notices to Plaintiff States.

## I.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. § 702.

9.    There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361, 2201-2202, 5 U.S.C. §§ 704-706 and the Court's equitable powers.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Maryland is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur in Maryland.

## II.    PARTIES

11.    Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

12.    Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Minnesota is represented by and through its chief legal officer, Attorney General Keith Ellison. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

13.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

14.    Plaintiff the State of Arizona, represented by and through its Attorney General, is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

15.    Plaintiff the State of California, represented by and through its Attorney General, is a sovereign state of the United States of America. California is represented by and through its chief legal officer Rob Bonta who is authorized to act on behalf of the State. Cal. Const. Art. V, § 13.

16.    Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

17.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18.     Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

19.     Plaintiff the State of Hawaiʻi, represented by and through its Attorney General, is a sovereign state of the United States. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

20.     Plaintiff the State of Illinois, represented by and through its attorney general, is a sovereign state of the United States of America. Illinois is presented by and through its chief legal officer, Kwame Raoul, who is authorized to pursue this action on behalf of the State of Illinois. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

21.     Plaintiff Massachusetts is a sovereign commonwealth in the United States of America. Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts, and brings this action on behalf of itself and its residents to protect the Commonwealth's sovereign, proprietary, and quasi-sovereign interests in the conservation and protection of its natural resources and the environment. *See* Mass. Const. Am. Art. 97; Mass. Gen. Laws, ch. 12, §§ 3 and 11D.

22.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

23.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America. Minnesota is represented by and through its chief

legal officer, Attorney General Keith Ellison. The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State. Minn. Stat. § 8.01.

24.    Plaintiff the State of New Jersey, represented by and through its Attorney General, is a sovereign state of the United States of America. New Jersey is represented by and through its chief legal officer, Attorney General Matthew J. Platkin. The Attorney General is authorized to act in federal court on behalf of the State on matters of public concern.

25.    Plaintiff the State of Nevada is a sovereign state of the United States of America. Nevada is represented by and through its chief legal officer, Attorney General Aaron D. Ford. The Attorney General has the authority to file this suit to protect and secure the interests of the State. NRS 228.170.

26.    The State of New Mexico is a sovereign state of the United States of America. The Attorney General of New Mexico is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

27.    Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Letitia James is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

28.    Plaintiff the State of Oregon, represented by and through its Attorney General, is a sovereign state of the United States.  Oregon is represented by and through its chief legal officer, Dan Rayfield, who is authorized to act on behalf of the State.

29.    The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement

officer of Rhode Island and authorized to pursue this action on behalf of the State of Rhode Island. R.I. Gen. Laws § 42-9-6.

30.    Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, who is the State's chief legal officer and authorized to pursue this action on behalf of the State.  Vt. Stat. Ann. tit. 3, § 159.

31.    Plaintiff the State of Wisconsin is a sovereign state of the United States of America. The Attorney General of Wisconsin is the State's chief legal officer and is authorized to act in federal court on behalf of the State on matters of public concern.

32.    Defendant Department of Agriculture is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

33.    Defendant Brooke Rollins is the Secretary of the Department of Agriculture. As secretary, she is responsible for all actions taken by the agency. She is sued in her official capacity.

34.    Defendant Department of Commerce is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

35.    Defendant Howard Lutnick is the Secretary of the Department of Commerce. As Secretary, Defendant Lutnick is responsible for all actions taken by the agency. He is sued in his official capacity

36.    Defendant Department of Defense is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

37.    Defendant Pete Hegseth is the Secretary of the Department of Defense. As Secretary, Defendant Hegseth is responsible for all actions taken by the agency. He is sued in his official capacity.

38.    Defendant Department of Education is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

39.    Defendant Linda McMahon is the Secretary of the Department of Education. As Secretary, Defendant McMahon is responsible for all actions taken by the agency. She is sued in her official capacity.

40.    Defendant Department of Energy is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

41.    Defendant Chris Wright is the Secretary of the Department of Energy. As Secretary, Defendant Wright is responsible for all actions taken by the agency. He is sued in his official capacity.

42.    Defendant Department of Health and Human Services is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

43.    Defendant Robert F. Kennedy, Jr. is the Secretary of the Department of Health and Human Services. As Secretary, Defendant Kennedy is responsible for all actions taken by the agency. He is sued in his official capacity.

44.    Defendant Department of Homeland Security is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

45.    Defendant Kristi Noem is the Secretary of the Department of Homeland Security. As Secretary, Defendant Noem is responsible for all actions taken by the agency. She is sued in her official capacity.

46.    Defendant Department of Housing and Urban Development is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

47.     Defendant Scott Turner is the Secretary of the Department of Housing and Urban Development. As Secretary, Defendant Turner is responsible for all actions taken by the agency. He is sued in his official capacity.

48.     Defendant Department of the Interior is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

49.     Defendant Doug Burgum is the Secretary of the Interior. As Secretary, Defendant Burgum is responsible for all actions taken by the agency. He is sued in his official capacity.

50.     Defendant Department of Labor is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

51.     Defendant Vince Micone is the Acting Secretary of the Department of Labor. As Acting Secretary, Defendant Micone is responsible for all actions taken by the agency. He is sued in his official capacity.

52.     Defendant Department of Transportation is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

53.     Defendant Sean Duffy is the Secretary of the Department of Transportation. As Secretary, Defendant Duffy is responsible for all actions taken by the agency. He is sued in his official capacity.

54.     Defendant Department of the Treasury is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

55.     Defendant Scott Bessent is the Secretary of the Department of the Treasury. As Secretary, Defendant Bessent is responsible for all actions taken by the agency. He is sued in his official capacity.

56.    Defendant Department of Veterans Affairs is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

57.    Defendant Doug Collins is the Secretary of the Department of Veterans Affairs. As Secretary, Defendant Collins is responsible for all actions taken by the agency. He is sued in his official capacity.

58.    Defendant Consumer Financial Protection Bureau is an agency within the meaning of 5 U.S.C. § 552(f).

59.    Defendant Russ Vought is the Acting Director of the Consumer Financial Protection Bureau. As Acting Director, Defendant Vought is responsible for all actions taken by the agency. He is sued in his official capacity.

60.    Defendant Environmental Protection Agency is an agency within the meaning of 5 U.S.C. § 552(f).

61.    Defendant Lee Zeldin is the Administrator of the Environmental Protection Agency. As Administrator, Defendant Zeldin is responsible for all actions taken by the agency. He is sued in his official capacity.

62.    Defendant Federal Deposit Insurance Corporation is an agency within the meaning of 5 U.S.C. § 552(f).

63.    Defendant Travis Hill is the Acting Chairman of the Federal Deposit Insurance Corporation. As Acting Chairman, Defendant Hill is responsible for all actions taken by the agency. He is sued in his official capacity.

64.    Defendant General Services Administration is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

65.    Defendant Stephen Ehikian is the Acting Administrator of the General Services Administration. As Acting Administrator, Defendant Ehikian is responsible for all actions taken by the agency. He is sued in his official capacity.

66.    Defendant National Archives and Record Administration is an agency within the meaning of 5 U.S.C. § 552(f).

67.    Defendant Marco Rubio is the Acting Archivist for the National Archives and Records Administration. As Acting Archivist, Defendant Rubio is responsible for all actions taken by the agency. He is sued in his official capacity.

68.    Defendant Office of Personnel Management is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

69.    Defendant Charles Ezell is the Acting Director of the Office of Personnel Management. As Acting Director, Defendant Ezell is responsible for all actions taken by the agency. He is sued in his official capacity. Defendant Department of Health and Human Services is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

70.    Defendant Small Business Administration is a cabinet agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

71.    Defendant Kelly Loeffler is the Administrator of the Small Business Administration. As Administrator, Defendant Leoffler is responsible for all actions taken by the agency. She is sued in her official capacity.

72.    Defendant United States Agency for International Development is an agency in the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

73.     Defendant Marco Rubio is the Acting Administrator of the United States Agency for International Development. As Acting Administrator, Defendant Rubio is responsible for all actions taken by the agency. He is sued in his official capacity.

74.     Federal workers reside and work in each of the Plaintiff States. The Defendants have conducted—or have announced plans to imminently conduct—illegal RIFs by firing probationary employees in Plaintiff States without adhering to the statutory and regulatory requirements for conducting RIFs.

### III.     LEGAL FRAMEWORK

#### A.     Probationary Employees

75.     OPM's directive to agencies to terminate probationary employees *en masse* has swept up two categories of federal employees whose employment is governed by statute and regulation: probationary employees in the "competitive" service, and employees within their first two years of employment in the "excepted" service. Competitive service employees are hired through an open, competitive hiring process and excepted service employees are appointed through a non-competitive hiring process. Plaintiff States refer herein to all such employees as "probationary employees."

76.     Probationary employees in the competitive service are, with some exceptions, those who have been employed for less than one year. 5 U.S.C. § 7511(a)(1)(A)(ii); 5 C.F.R. § 315.801.

77.     Employees are appointed as "career" or "career-conditional employees" subject to completing the probationary period. 5 C.F.R. § 315.201(a).

78.     The probationary period provides the opportunity for the federal agency to assess the individual performance of the employee. Under governing OPM regulations, an agency "shall utilize the probationary period as fully as possible to determine the fitness of the employee and

shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a).

79.    Most employees in the excepted service are also subject to a statutory trial period of two years, which, like the probationary period in the competitive service, is intended to permit the agency to evaluate the employee's performance and fitness for long-term employment. 5 U.S.C. § 7511(a)(1)(C)(ii).

80.    Outside of the context of a RIF, federal agencies may lawfully terminate probationary employees for one of two reasons.

81.    First, a federal agency may lawfully terminate a probationary employee for reasons based on conditions arising before the employee's probationary appointment. 5 C.F.R. § 315.805.

82.    Second, a federal agency may lawfully terminate a probationary employee based on the agency's assessment of the employee's performance during the probationary period, pursuant to 5 C.F.R. § 315.804(a), which is entitled: "Termination of probationers for unsatisfactory performance or conduct."

83.    Under that regulation, "when an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action." 5 C.F.R. § 315.804(a). "The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct." *Id.* Trial-period employees in the excepted service have the same notice rights when removed from their positions for performance reasons. 5 C.F.R. § 316.304.

**B.    RIF Requirements**

84.    Apart from terminations of probationary employees for conditions arising before their appointments or for unsatisfactory performance or conduct, federal agencies may only terminate probationary employees as part of an agency RIF.

85.    A reduction-in-force "is an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions. A RIF is not an adverse action against a particular employee, but is directed solely at a position within an agency." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (citation omitted); *Schall v. U.S. Postal Serv.*, 73 F.3d 341, 344 (Fed. Cir. 1996) (similar).

86.    An agency must follow specific statutory directives in conducting a RIF, including following the retention preferences in the statute, giving preference to the retention of military veterans, and considering the employee's tenure and length of service. 5 U.S.C. § 3502(a)(1), (3).

87.    Congress delegated to OPM the authority to promulgate regulations that agencies must follow in implementing RIFs. 5 U.S.C. § 3502(a).

88.    Pursuant to that statutory authorization, and through notice-and-comment rulemaking, OPM has issued detailed regulations setting forth the procedures by which agencies must conduct RIFs. *See* 5 C.F.R. Part 351.

89.    All agencies of the federal government are required to comply with the RIF regulations whenever they "determine[] that a reduction [in] force is necessary." 5 C.F.R. § 351.204.

90.    The RIF regulations apply to employees in the competitive and excepted services. 5 C.F.R. § 351.202(a), (b).

91.    Probationary employees are expressly covered by the RIF regulations. 5 C.F.R. §§ 351.501(b)(2), 351.502(b)(2). Probationary employees are included in "group II" of three groups of employees, and may only be released, in order of retention, after the release of

"group III" employees, a group that includes employees under various temporary, term, and other provisional appointments. 5 C.F.R. § 351.501(b).

92.    Under these required RIF procedures, before conducting a RIF a federal agency must: establish "competitive areas in which employees compete for retention"; designate the "competitive areas" of which employees are to compete for retention at least 90 days before the effective date of the RIF; designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption; and rank employees for retention based on factors including their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.402-351.404, 351.504.

**C.    RIF Notice Requirements**

93.    Under the federal RIF statute and associated regulations, federal agencies are required to provide at least 60 days of prior written notice before they may release any federal civil service employee under a RIF. The agency must provide the written notice to (a) the employee, (b) the employee's collective bargaining representative, and (c) the state or District where an affected employee's duty station was located if the RIF would involve at least 50 employees within the competitive area, 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(b).

94.    The notice to the state must be provided to the state or agency designated by the state to perform rapid response activities under the Workforce Investment Act of 1998, now called the Workforce Innovation and Opportunity Act of 2014 ("WIOA Agency"), and must also be provided to "[t]he chief elected official of local government(s) within which these separations will occur." 5 C.F.R. § 351.803(b); *see* 5 U.S.C. § 3502(d)(3)(A).  The purpose of states' "rapid response" activities is to quickly make public and private resources available to workers who are laid off, to minimize the disruption to the affected workers and their communities. To help the state or locality

prepare for the disruptions associated with job losses, notices must include: (a) the number of employees to be separated from service due to the reduction in force, broken down by geographic area and organizational unit, (b) when those separations will occur; and (c) other information that may facilitate the delivery of services to the affected workers. 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(c).

95.    The notice to an affected employee must include: (a) information concerning the right to reemployment consideration and career transition assistance; (b) a release to authorize the federal government to share his or her resume and employment information with the WIOA Agency and potential public or private sector employers; and (c) information about how to apply for unemployment insurance and access other benefits. 5 C.F.R. § 351.803(a).

96.    Where circumstances "not reasonably foreseeable" preclude giving 60 days' written notice, the agency may request that OPM shorten the notice period; however, "[n]o notice period may be shortened to less than 30 days." 5 U.S.C. § 3502(e).

97.    Where an agency fails to provide any of these statutorily required notices, an employee "may not be released, due to a reduction in force." 5 U.S.C. § 3502(d).

## IV.    FACTUAL ALLEGATIONS

98.    Since President Trump took office on January 20, 2025, Defendant Agencies have, at OPM's direction, terminated tens of thousands of probationary employees.

99.    The mass terminations of probationary employees since January 20 were not driven by agency determinations related to the performance or qualifications of any particular probationary employee. Rather, these layoffs have all been part of a coordinated effort directed by the White House and OPM to reduce the size of the federal workforce.

100.    Because the mass terminations of probationary employees are part of an effort to restructure and reduce the workforces at Defendant Agencies, they constitute RIFs. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351.

101.    In terminating probationary employees *en masse*, Defendants have not abided by the statutory and regulatory requirements for RIFs, including the requirement to provide 60 days' notice to the Plaintiff States. This has inflicted and will continue to inflict serious and irreparable harms on the Plaintiff States, as they must now deal with a sudden surge in unemployment, without the advance notice required under the federal RIF statute and regulations.

**A.    Defendants Have Conducted Unlawful RIFs Throughout the Federal Government.**

102.    On January 20, 2025, the day President Trump took office, President Trump appointed Charles Ezell to serve as Acting OPM Director.

103.    The same day, Acting OPM Director Ezell distributed a memo to "Heads and Acting Heads of Departments and Agencies" regarding "Guidance on Probationary Periods, Administrative Leave and Details." In the memo, OPM directed agency heads to "identify all employees on probationary periods . . . and send a report to OPM listing all such employees" no later than January 24, 2025. OPM further directed agencies to "promptly determine whether those employees should be retained by the agency."[1]

104.    Also on January 20, 2025, President Trump signed an executive order entitled "Hiring Freeze."[2] In addition to ordering "a freeze on the hiring of federal civilian employees" throughout the executive branch, he directed the Director of the Office of Management and Budget—in consultation with OPM and the United States Department of Government Efficiency Service

---

[1] https://chcoc.gov/sites/default/files/Guidance%20on%20Probationary%20Periods%2C%20Administrative%20Leave%20and%20Details%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%20FINAL.pdf
[2] https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/

("DOGE")—to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition."

105.    On February 11, 2025, President Trump issued Executive Order 14210, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." The Executive Order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."[3]

106.    Rather than wait for agency heads to develop RIF plans and follow applicable procedures, however, Defendants began mass unlawful terminations of their probationary employees.

107.    On or around February 11, the Consumer Financial Protection Bureau terminated approximately 73 probationary employees.[4] The agency terminated 70-100 additional probationary employees on February 13.[5]

108.    On or around February 12, the Department of Education terminated 60 probationary employees.[6]

109.    On or around February 12, the General Services Administration notified approximately 100 probationary employees that they would be terminated.[7] Upon information and belief, these terminations will become effective on March 7.

---

[3] https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/
[4] https://www.npr.org/2025/02/12/nx-s1-5294479/cfpb-workers-fired-trump-doge
[5] https://www.npr.org/2025/02/14/nx-s1-5298144/federal-layoffs-usda-hud-defense-trump
[6] https://www.npr.org/2025/02/13/nx-s1-5296928/layoffs-trump-doge-education-energy
[7] https://www.reuters.com/world/us/mass-firings-federal-workers-begin-trump-musk-purge-us-government-2025-02-13/

110.    On February 13, OPM officials met with agency officials throughout the federal government and ordered agencies to lay off nearly all of the federal government's approximately 220,0000 probationary employees.[8]

111.    On February 14, OPM sent an email to all agency Chief Human Capital Officers (CHCOs) and their deputies to "clarif[y] immediate next steps for probationary employees."

112.    In its February 14 email, OPM explained its directive to agencies:

> We have asked that you separate probationary employees that you have not identified as mission critical no later than the end of the day Monday, 2/27. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

113.    OPM's February 14 email reiterated that OPM's directive should be followed in light of the "President's directive to dramatically reduce the size of the federal workforce."

114.    OPM's directive at the February 13 meeting and in the February 14 email coincided with a rapid uptick in terminations of probationary employees.

115.    On or around February 13, the Department of Energy terminated nearly 2,000 probationary employees.[9] Days later, the agency rescinded approximately 350 termination notices to probationary employees in the National Nuclear Security Administration, which oversees the nation's nuclear stockpile.[10]

116.    On or around February 13, the Department of Veterans Affairs terminated more than 1,000 probationary employees.[11] The Department of Veterans Affairs fired another 1,400 probationary employees on February 24.[12]

---

[8] https://thehill.com/homenews/administration/5144113-federal-probationary-employees-fired/
[9] https://www.politico.com/news/2025/02/13/trump-federal-worker-layoffs-00204180
[10] https://www.cbsnews.com/news/doge-firings-us-nuclear-weapons-workers-reversing/
[11] https://thehill.com/policy/defense/5162213-va-axes-another-1400-employees/
[12] *Id.*

117.    On or around February 13, OPM fired 250 probationary employees.[13]

118.    On or around February 13, the Small Business Administration terminated around 720 probationary employees.[14]

119.    On or around February 13, the Department of Agriculture terminated approximately 3,400 probationary employees in the Forest Service.[15]

120.    On or around February 13, the Department of Energy terminated around 130 probationary employees in the Bonneville Power Administration.[16] Several days later, the Department of Energy deemed around 30 of those probationary employees as critical and rescinded the terminations.

121.    On or around February 14, the Environmental Protection Agency fired approximately 388 probationary employees.

122.    On or around February 14, the Interior Department fired approximately 2,400 probationary employees, including 800 people from the Bureau of Land Management.[17]

123.    On or around February 14, the Department of Homeland Security terminated 605 probationary employees, including approximately 240 employees from the Transportation Security Administration, 200 employees from the Federal Emergency Management Agency, 130 employees from the Cybersecurity and Infrastructure Security Agency, 50 employees from the U.S. Citizenship and Immigration Services, and 10 employees from the DHS Science and Technology Directorate.[18]

---

[13] https://www.appropriations.senate.gov/news/minority/fact-sheet-trump-and-elons-layoffs-jeopardize-essential-services-americans-rely-on-threaten-critical-agency-objectives-keeping-americans-safe_healthy#:~:text=On%20February%2013%2C%20OPM%20fired,minutes%20to%20leave%20the%20building
[14] https://www.politico.com/news/2025/02/13/trump-federal-worker-layoffs-00204180
[15] https://www.politico.com/news/2025/02/13/forest-services-fires-3400-employees-00204213
[16] https://www.opb.org/article/2025/02/19/bonneville-power-administration-reverses-30-job-cuts-continues-with-plans-to-eliminate-430-positions/
[17] https://www.aol.com/news/trump-administration-lays-off-over-183049169.html
[18] https://www.usatoday.com/story/news/politics/2025/02/20/tsa-trump-workers-fired/79307363007/; https://thehill.com/homenews/5154340-dhs-fires-probationary-employees/

124. On or around February 14, the Department of Health and Human Services terminated around 1,300 probationary employees working for the Centers for Disease Control ("CDC") and Prevention.[19] Upon information and belief, the Department of Health and Human Services has also terminated probationary employees at the National Institutes of Health, the Food and Drug Administration, and the Centers for Medicare and Medicaid Services.

125. Upon information and belief, on or around February 14, the Department of Housing and Urban Development terminated more than 50 probationary employees.

126. On or around February 15, the Department of Interior fired around 1,000 probationary employees in the National Park Service.[20]

127. On or around February 15, the Department of Agriculture fired around 2,000 probationary employees.[21] Several days later, the department rehired several employees who were involved in the government's response to the ongoing bird flu outbreak.

128. On or around February 18, the Department of Transportation terminated around 400 probationary employees in the Federal Aviation Administration.[22]

129. On or around February 18, the Federal Deposit Insurance Corporation terminated approximately 170 probationary employees.[23]

130. On or around February 20, the Department of the Treasury terminated over 6,000 probationary employees, including over 6,000 probationary employees from the Internal Revenue Service and 76 probationary employees from the Office of the Comptroller of the Currency.[24]

---

[19] https://www.npr.org/2025/02/14/nx-s1-5298144/federal-layoffs-usda-hud-defense-trump.
[20] https://apnews.com/article/doge-firings-layoffs-federal-government-workers-musk-d33cdd7872d64d2bdd8fe70c28652654
[21] https://apnews.com/article/doge-firings-layoffs-federal-government-workers-musk-d33cdd7872d64d2bdd8fe70c28652654
[22] https://apnews.com/article/doge-faa-air-traffic-firings-safety-67981aec33b6ee72cbad8dcee31f3437
[23] https://news.bloomberglaw.com/banking-law/fdic-fires-probationary-employees-amid-continued-agency-cull
[24] https://www.reuters.com/world/us/us-irs-expected-fire-6700-employees-thursday-trump-downsizing-spree-2025-02-20/; https://news.bloomberglaw.com/banking-law/occ-starts-firing-probationary-staff-joining-other-regulators

Upon information and belief, the Office of the Comptroller of the Currency terminations will become effective on March 7.

131.    On or around February 20, the National Archives and Records Administration terminated over 60 probationary employees.[25]

132.    Upon information and belief, on or around February 20, the Department of Labor notified more than 50 probationary employees that they will be terminated.  Upon information and belief, the effective date of termination will be March 7.

133.    On February 21, the Department of Defense announced that it was planning to terminate 5,400 probationary workers starting the week of February 24.[26] Upon information and belief, those terminations have not begun, but they may begin at any moment.

134.    Upon information and belief, on or around February 24, the United States Agency for International Development terminated approximately 250 probationary employees.

135.    On February 27, the Department of Commerce fired around 800 probationary employees in the National Oceanic and Atmospheric Administration.[27] Upon information and belief, the agency plans to fire additional probationary employees and those terminations may begin at any moment.

136.    On or around February 28, the Department of Commerce fired 86 probationary employees in the U.S. Patent and Trademark Office.[28]

---

[25] https://www.govexec.com/workforce/2025/02/see-which-federal-agencies-are-firing-new-hires/403033/
[26] https://www.defense.gov/News/Releases/Release/Article/4074278/dod-probationary-workforce-statement/
[27] https://www.cnn.com/2025/02/27/politics/noaa-federal-workers-firings/index.html#:~:text=Probationary%20employees%20%E2%80%94%20those%20who%20have,National%20Weather%20Service%20told%20CNN
[28] https://www.govexec.com/workforce/2025/03/some-agencies-are-still-firing-probationers-while-others-have-recalled-theirs-following-court-ruling/403407/?oref=ge-skybox-post

137.    On or around March 3, the Department of Commerce fired 73 probationary employees at the National Institute for Standards and Technology.[29]

138.    Upon information and belief, Defendants have already terminated tens of thousands of probationary employees.

139.    Defendants have not published official counts and locations of the employees they have terminated, but based on publicly reported numbers and firsthand accounts from affected employees, it appears that Defendants have terminated at least 24,000 probationary employees as of the date of this Complaint. Because Plaintiff States have not received notice of these mass terminations, this accounting is necessarily incomplete and may be far higher.

140.    Thousands of additional terminations are expected any day. To continue to reduce the size of the federal workforce, agencies that have not yet terminated most of their probationary employees may do so at any moment.

**B.    Defendants Have Not Followed Required RIF Procedures for the Mass Layoffs of Probationary Employees**

141.    Although the mass terminations of probationary employees have constituted RIFs, Defendants have failed to follow the RIF procedures required by statute and regulation.

142.    For example, Defendants did not designate the "competitive areas" in which employees would compete for retention, which they must do at least 90 days before the effective date of any RIF. *See* 5 C.F.R. § 351.402.

143.    Defendants did not designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption. *See* 5 C.F.R. § 351.403.

---

[29] https://www.govexec.com/workforce/2025/03/some-agencies-are-still-firing-probationers-while-others-have-recalled-theirs-following-court-ruling/403407/?oref=ge-skybox-post

144.    Defendants did not establish a retention register of employees in each competitive level of positions included in the RIFs. *See* 5 C.F.R. § 351.404.

145.    Defendants did not then rank employees for retention based on their tenure group, time in service (including military service), veteran preference, length of service, and performance. *See* 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.501-351.504.

146.    Defendants did not provide required notices 60 days in advance of the effective date of termination to affected employees, their collective bargaining representatives, or to Plaintiff States. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803.

147.    Especially relevant to Plaintiff States, Defendants did not provide affected employees with the required releases to authorize the release of their resumes and other relevant employment information to the relevant WIOA Agency, for employment referrals to potential public and private sector employers. *See* 5 C.F.R. § 351.803(a).

148.    Likewise, Defendants did not provide Plaintiff States and the relevant WIOA Agencies with any prior notice, much less the 60-day notice required by law, which would have alerted Plaintiff States to the number of employees to be separated from the agencies, broken down by geographic area, and provided the effective date of the planned separations as well as other information that could have facilitated the delivery of rapid response services. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803(b)-(c).

149.    Rather than comply with their legal obligations, Defendants summarily terminated probationary employees *en masse*, providing termination notices to the affected employees by form letters and emails, which frequently included errors and in many instances failed to include even the employee's name or job title.

150.   These form termination notices, issued near-simultaneously to thousands of federal probationary employees, failed to include any particularized agency determinations related to the performance or qualifications of each affected probationary employee to justify their termination. The notices were pretextual because Defendants were actually engaged in RIFs designed to reduce the size of the federal workforce.

151.   For example, agency management at the National Science Foundation informed probationary employees that the NSF had previously chosen to retain its probationary employees but that OPM had directed NSF to terminate the employees. The managers said that terminating the probationary employees was not a decision the agency made," but was "a direction [it had] received" from OPM and that NSF leadership had "no choice" but to "follow[] orders."

152.   Likewise, in response to OPM's directive to terminate probationary employees *en masse*, the Department of Treasury directed the Internal Revenue Service to terminate all probationary employees "based on performance." Without conducting any review of probationary employees' qualifications or performance, the Department of Treasury directed the IRS to terminate approximately 6,700 probationary employees. These terminations were unrelated to the probationary employees' qualifications, performance, or conduct, but were in fact a RIF aimed at reducing the size of the agency's workforce.

153.   The same pattern occurred at the Center for Consumer Information and Insurance Oversight (CCIIO), a subset of the Centers for Medicare & Medicaid Services (CMS) within the Department of Health and Human Services (HHS). CCIIO had determined that none of its probationary employees should be removed from service because all were well qualified for their positions and were performing well. Nevertheless, on February 13, 2025, HHS directed CCIIO to terminate all of its probationary employees and to issue form termination letters that stated falsely

that the affected employees were being terminated "because [their] ability, knowledge, and skills do not fit the Agency's current needs, and [their] performance has not been adequate to justify further employment." The CCIIO terminated 82 probationary employees on February 15, 2025, representing approximately 15% of its workforce of approximately 600.

154.    Defendants' failure to provide required RIF notices rendered any terminations ineffective and unlawful because an employee "may not be released, due to a reduction in force" unless an agency provides all statutorily required notices. 5 U.S.C. § 3502(d).

155.    As explained in further detail below in Section IV.C, Defendants' failure to provide these required notices has harmed Plaintiff States in several ways, including by hindering the ability to provide rapid response services.

**C.    Plaintiffs Are Harmed As a Direct Result of Defendants' Failure to Follow RIF Requirements and Provide Advance Notice to the States.**

156.    Plaintiff States have suffered and will imminently suffer several types of irreparable injury due to the federal government's failure to provide notice of the RIFs.

157.    As noted above, when a federal agency plans to release 50 or more employees in a RIF, the agency must provide 60 days' notice to the affected States' WIOA Agencies as well as the chief elected officials for affected local jurisdictions.

158.    Plaintiff States have not received notice of a federal reduction in force from any federal agency.

159.    In enacting the RIF notice requirements, Congress recognized the harms inherent to sudden, unexpected mass layoffs, including that economic dislocation of workers can easily create a cascade of instability throughout a regional economy. And it sought to provide the states with some protection against those harms by requiring that agencies provide them with advance notice.

160.    Defendants' failure to provide notice has inflicted other harms as well. As a result of the lack of notice, Plaintiff States are unable to proactively reach affected individuals and provide services that would mitigate the harm the employees and their communities suffer as a result of the sudden job loss.

161.    Plaintiff States also suffer procedural injury resulting in additional expenditures and harms to public finances that they would not have to bear if notice had been provided.

### *Rapid Response Expenditures*

162.    The Federal Workforce Innovation and Opportunity Act of 2014, 29 U.S.C. § 3174(A)(2)(i), requires that each state have a rapid response program to conduct outreach to workers affected by a mass layoff and to provide the workers with support services, including job transition services.

163.    The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

164.    The purpose of the rapid response system is to reduce individuals' reliance on public benefit systems, such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

165.    When notified of a forthcoming mass layoff, a state's rapid response team is required to: contact the employer, representatives of the affected workers, and the local community; assess the layoff plans and schedule; and provide information and support to affected employees, including

information about filing for unemployment compensation and career services. 20 CFR §§ 682.300, 682.330.

166.    The rapid response teams also facilitate connections to partner agencies and organizations that can provide terminated workers and their families with critical services, such as home heating assistance, legal aid, and financial advice.

167.    Because Plaintiff States' rapid response teams have received no notice of federal RIFs, certain teams have been required to dedicate significantly more staff, resources, and expenditures to fulfill their statutory mission. In particular, they have had to devote significant time and resources simply to try to identify workers subject to federal mass layoffs and to otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide the legally required notice of mass layoffs.

168.    As one example of these efforts, some state agencies handling unemployment claims have created new websites, requiring significant time and expense. *See* Maryland Workers Impacted by Recent Federal Actions, https://response.maryland.gov/federalpublicservants/. These efforts were a further attempt to provide rapid response resources and services, which could normally be targeted at specific personnel *before* they are laid off, but must now be provided less efficiently and at greater expense to the entire public, because the states' personnel remain unaware of who has been laid off and whether and when the next federal mass layoff event will occur.

169.    As another example, because Maryland's Department of Labor did not receive advance notice, staff have conducted extensive affirmative outreach to dozens of federal agencies and offices to try and determine the location and extent of upcoming layoffs. Despite these efforts, staff have not received any substantive responses. The Department has also had to divert significant additional time of other agency personnel from state projects to instead respond to

federal mass firings, to try and identify recently terminated employees and provide relevant resources and services.

### *Unemployment Benefits Expenditures*

170.    As a general matter, the federal government is required to reimburse states for unemployment benefits provided to former federal employees. Specifically, Plaintiff States are party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

171.    Each Plaintiff State has its own procedures for handling Unemployment Insurance ("UI") claims. Regardless, sudden mass layoffs burden the administrative process for handling UI claims, and the lack of notice and chaotic nature of Defendants' mass layoffs of probationary employees has already exacerbated or likely will exacerbate the strain on the Plaintiff States' systems for administering UI.

172.    Maryland's experience exemplifies the problems with the unlawful way the Defendants have conducted RIFs of probationary employees.

173.    The Maryland Department of Labor manages claims for unemployment benefits by individuals formerly employed to work in Maryland.

174.    Pursuant to Md. Code Ann., Lab. & Empl. § 8-805(a), an individual in Maryland who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Maryland Secretary of Labor. Claimants file claims online using the Department's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. COMAR 09.32.02.05.

175.    The reason for termination alleged by the claimant is then transmitted to the claimant's employer(s) for verification. The employer is then asked to furnish a report of the separation from employment containing, among other information, the reason for the employee's separation and a report of wage history. Md. Code Ann. Lab. & Empl. § 8-627; *see also* COMAR 09.32.02.05.

176.    Maryland law disqualifies some claimants from benefits depending on the circumstances of their separation from employment. *See* Md. Code Ann. Lab. & Empl. § 8-1001, et seq. Disqualifying circumstances include, among other reasons, termination for misconduct, aggravated misconduct, and gross misconduct. *Id.*  In addition, a claimant is disqualified if they quit their job without good cause directly related to employment conditions or employer actions. Md. Code Ann. Lab. & Empl. § 8-1001(a).

177.    If a determination involves a resolution of a dispute of material fact, a claims examiner from the Maryland Department of Labor must conduct a predetermination fact-finding interview after notice is provided to the employee and her employer(s). Md. Code. Ann. Lab & Empl. § 8-806(a)(2). Thereafter, a written initial determination must be made stating, among other things, the weekly benefit amount, maximum benefits payable to the claimant in a benefit year, and the reasons for the determination. Md. Code Ann. Lab. & Empl. § 8-806(c).

178.    If the claims examiner's review of a claim reveals no dispute of material fact, but the information reviewed indicates that claimant may be ineligible or disqualified, the claims examiners must still schedule a call for an appointment for a fact-finding interview and render a written decision.  COMAR 09.32.16(D)-(E).  A claimant or an employer may file an administrative appeal within 15 days.  Md. Code Ann. Lab. & Empl. § 8-806(e)(1).

179.    The Maryland Department of Labor's latest data indicates that 813 former federal employees have applied for unemployment benefits since January 21, 2025.

180.    As noted above, the number of UCFE claims received by the Maryland Department of Labor has increased significantly in just the last few weeks, starting on or around February 14, 2025, with an approximate range of 30 to 60 new such claims *every day*.

181.    In fact, the amount of UCFE claims received by the Maryland Department of Labor in February 2025 is significantly higher than past years.  From January 21 to March 3, 2024, Maryland received only 189 unemployment claims containing federal wages in the claimant's base period.

182.    While not required to apply for unemployment benefits, multiple individuals have attached in their application their letter of employment termination from the federal government. Such letters indicate that these individuals were probationary employees purportedly terminated for cause.

183.    When an employer provides the initial report of separation to the Maryland Department of Labor, the employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct.

184.    Accordingly, if an employer states in its report of separation that an individual was terminated because performance has not been adequate to justify further employment at the agency, the Maryland Department of Labor's procedures require that the claims examiner must investigate the reason for discharge.

185.    The Maryland Department of Labor is also required to verify both wages and reason for separation of employment from each federal agency by sending a request for wage and separation information.  20 C.F.R. §§ 609.6(e)(1), 609.21 through 609.25.  While private employers report wages each quarter for all employees into the Department's database, see COMAR  09.32.01.12, federal agencies are not required to regularly report active employee wages to the States.

186.    The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims. Redirecting staff from handling regular UI claims to process and adjudicate UCFE claims threatens to strain the state's resources.

187.    This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, the state must compromise the efficiency and responsiveness of its claims processing system, ultimately undermining public trust and exacerbating economic hardship.

188.    While the Maryland Department of Labor is only beginning to process these claims, its staff has already begun  contacting relevant federal agencies to request information on relevant terminations, to determine if they were in fact done for cause

189.    Thus far, Maryland has received at least 193 reports of separation from federal agencies, concerning their recently terminated employees.

190.    Several Defendant agencies reported that probationary employees were terminated due to a "permanent lack of work due to a change in Presidential Administration."

191.    In addition, the Maryland Department of Labor received several reports from Defendant agencies explicitly stating that the employees were "laid off due to a reduction in force."

192.    And, as relevant here, certain reports by Defendants asserted that the employee at issue was terminated for cause, for instance due to "unsatisfactory work performance" and similar generic performance-related bases.

193.    Similarly, other reports highlighted various potentially disqualifying circumstances.  For instance, agencies indicated that claimants might not be genuinely unemployed or had voluntarily resigned from their positions.

194.    Due Defendants' assertions that certain federal employees were terminated for cause or otherwise ineligible or disqualified from benefits, or where there is disputed or conflicting information, Maryland will be required to follow our intensive and mandatory investigative process.

195.    The procedures impose a significant strain on the Maryland Department of Labor's financial and temporal resources. Each case demanding interviews and/or a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

196.    Moreover, where federal agencies fail to provide responses to requests for separation information, the Maryland Department of Labor must gather necessary wage and separation information. 20 C.F.R. § 609.6 (e)(2).  This requires claims staff to solicit evidence from the claimants in the form of pay stubs, W-2s and affidavits and to pay benefits based on that information.  In fact, recent federal guidance regarding federal unemployment during recent government shutdowns encourages states to have claimants file an affidavit, using available proof, given "limited federal HR resources" to respond to requests for separation information. "Unemployment Insurance Program Letter 03-22," U.S. Department of Labor, November 2022, https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2021/UIPL_03-22.pdf.

197.    In addition, termination notices issued by federal agencies were not issued in compliance with governing reduction in force procedures.  It is apparent that there are affected individuals, including veterans, who should have been accorded preference under required RIF procedures but

were not. To the extent that preferences and other such requirements would have precluded termination, and federal employees successfully challenge their separations, this will cause the Department to re-adjudicate claims, pursue overpayments, and conduct appeals.

198.    While the federal Government provides grants for the purpose of administrating state unemployment benefit programs, these grants are frequently less than the total administrative costs incurred by Maryland. And that is the case now; the federal grant monies allocated to Maryland are not sufficient to cover Maryland's unemployment benefit program administration.

199.    In these circumstances, Maryland relies on its Special Administrative Expense Fund ("SAEF") when federal funding is insufficient. *See* Md. Code Ann., Labor & Employment §§ 8-419 to 842. This fund may be comprised of previously transferred federal funds (in limited circumstances), as well as monies collected by the state through fines, interest, and other penalties, and contributions by the state legislature. *Id*. § 8-421. Currently, SAEF is comprised entirely of state funds. Accordingly, any increase in administrative costs of Maryland's unemployment benefits program will be covered at least in part by state funds.

200.    Other Plaintiff States must also undergo intensive and mandatory investigation and appeal processes for handling disputes between claimants and employers involving the claimant's eligibility. Many Plaintiff States anticipate a significant increase in these disputes given the Defendants' chaotic and conflicting messaging around the reasons for terminating probationary employees. Handling these disputes will cause those Plaintiff States to divert staff to handle the time-consuming dispute resolutions and hinder the timely processing of ordinary unemployment claims that are not disputed.

201.    For example, the Illinois Department of Employment Security ("IDES") has already received almost the same number of applications for unemployment benefits from former federal

workers this year as it received in all of last year. A substantial number of these claims require resource intensive fact-finding that will cause backlogs and delays in IDES's processing of other claims, exacerbating economic hardship for countless Illinoisans.

202.    IDES is also being forced to divert resources and staff to respond to the latest layoff news, to identify affected federal agencies and ex-employees, provide information, and adjust procedures and resources to assist confused and unemployed workers in Illinois, all in a complicated and rapidly evolving environment. To take one example, IDES had to create a new webpage, at significant time and expense, in an attempt to provide resources and services. *See* https://ides.illinois.gov/unemployment/deferred-resignation-of-federal-employees.html.    Such efforts could normally be targeted at specific personnel subject to impending layoff events but must instead be provided less efficiently and at greater expense to the entire public because IDES personnel remain unaware of the individuals who have already been laid off and whether and when the next federal mass layoff event will occur.

203.    In some jurisdictions, a flood of contested UI claims will cause a backlog that affects the timely adjudication of a wide range of administrative matters that are handled by the same administrative law judges ("ALJs"), ranging from building code enforcement to traffic tickets.

204.    Plaintiff States have seen or anticipate seeing an uptick in UI claims in the areas in which the probationary employee layoffs occurred. This sudden increase—without any advanced notice—has burdened and will continue to burden state agencies charged with administering UI benefits.

### *Expenditures for Other Social Services*

205.    Plaintiff States bear other burdens associated with many residents suddenly losing income. These costs arise in the administration of programs aimed at providing connections to social services, like health care and food assistance.

206.    Newly unemployed individuals apply for Medicaid at high rates, and the Plaintiff States bear a direct economic cost to provide healthcare services to them and their families.

### *Harms to State Programs That Depend on Federal Employees*

207.    Many federal probationary employees who were terminated by the CDC were detailed to work at Plaintiff States' public health agencies. This includes several employees who were hired by the CDC as part of its Public Health Associate Program for Recent Graduates ("PHAP"). PHAP is a two-year program that places recent college graduates with tribal, local, and territorial public health agencies, as well as non-governmental organizations, to work alongside other public health professionals in a variety of settings.

208.    For example, three recently terminated PHAP employees ("Associates") were assigned to New Jersey's Department of Health ("NJDOH"), which is responsible for preventing the spread of infectious diseases and developing emergency preparedness plans in the state.  CDC and NJDOH entered into a two-year contract, pursuant to which CDC agreed to cover all costs for the Associates, including salary and benefits. NJDOH has participated in the PHAP program for several years and often hires PHAP Associates, who gain invaluable training and institutional knowledge over the course of the program, for permanent employment at the conclusion of their two-year term.

209.    The three Associates were detailed to different NJDOH divisions that perform core public health functions: the Division of HIV, STD, and TB Services; the Epidemiology, Environmental

and Occupational Health's Communicable Disease Service; and the Global Tuberculosis Institute at Rutgers University. Each Associate was a member of a small team dedicated to reducing the spread of communicable diseases such as HIV, TB, and foodborne and waterborne illnesses. This work involved laborious investigations, contact tracing, and collaborations with numerous local, state, and federal partners to ensure anyone infected or at risk of infection has access to treatment.

210.    Between February 16 and 17, 2025, NJDOH learned that the three Associates had been terminated from their positions on February 15, 2025—before the expiration of their contractual two-year terms. CDC never notified NJDOH of these terminations. Between March 4 and 5, NJDOH learned that the Associates were being reinstated.

211.    Despite their reinstatement, the sudden loss of essential personnel, coupled with the lack of notice, caused NJDOH significant harm and disruption. NJDOH had invested significant time and resources into months-long training for the Associates, and the agency did not have the budgetary flexibility or hiring authority to replace them, particularly given the lack of any notice. The unexpected staffing shortages and imminent need to reallocate and train existing staff already caused delays and administrative chaos, which impeded NJDOH's ability to fulfill its mission of limiting the spread of infectious diseases in the state.  The timing of the terminations was especially problematic because NJDOH has been dealing with numerous communicable disease challenges, including H5N1, measles, Covid-19, influenza, norovirus, and RSV.  The loss in workforce capacity during this time hampered NJDOH's ability to fully respond to these public health threats.

212.    The lack of notice compounded the challenges created by the terminations. NJDOH was not able to plan for the terminations, resulting in administrative inefficiencies, duplicative work, and delayed notifications to persons exposed to certain communicable diseases.

### *Harms to State Finances*

213.    The mass layoffs that have taken place without the legally required notice to Plaintiff States will also have substantial impacts on the Plaintiff States' finances.

214.    For instance, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program. 42 U.S.C. § 502(a). While many Plaintiff States have been and continue to expend additional resources necessary to address the uptick in federal unemployment claims, it is not yet known whether those additional costs will be fully reimbursed.

215.    Further, Plaintiff States rely in large part on income tax revenue for their budgets. Because Defendant agencies will no longer be withholding and paying income taxes to Plaintiff States on behalf of the terminated probationary employees, the layoffs will result in a decrease to Plaintiff States' revenues. Given the number of employees forced to seek reemployment—with no notice and no opportunity for Plaintiff States to provide support services—it is highly likely that many of the Plaintiff States' residents will be unemployed for prolonged periods, depriving the Plaintiff States of significant income tax receipts.

216.    For example, the District of Columbia estimates that the mass terminations of probationary employees will cause millions of dollars in lost annual income tax revenue. The District estimates that its lost income tax revenue for the first 60 days alone, the period in which it should have received advance notice of any RIFs, will cost the District at least hundreds of thousands of dollars in lost income tax revenue. Had the District received the notice required by law, these losses would likely have been mitigated, including because employees would not have been terminated during the 60-day notice period and some would have been able to obtain alternative employment prior to their termination.

217.    Likewise, the Maryland Comptroller projects that the mass terminations of probationary employees will cause significant decreases in Maryland's income tax revenues. Maryland's budget relies in large part on personal income tax revenue, which represented 55% of Maryland's general fund revenues for fiscal year 2024. Approximately 250,000 federal workers reside in Maryland. Although unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment.

218.    Beyond the direct loss of income tax revenue, the Maryland Comptroller anticipates that a sudden and significant increase of newly unemployed workers will have serious negative effects on Maryland's labor market, including extended periods of unemployment, downward pressure on wages, and the migration of residents out of the state.

219.    The terminations also impact state sales tax revenues.

220.    For example, for the District of Columbia, this impact comes from two primary sources: First, federal employees living outside of the District who commute to work in the District purchase meals at restaurants, pay parking fees, and purchase other goods and services before, during, and after work. Second, in addition to these workday purchases, federal employees who are District residents also contribute to our economy as full-time residents, spending on groceries, household items, restaurants, clothing, and various services.

221.    The District estimates that these mass terminations could cause anywhere from hundreds of thousands to millions of dollars in lost annual sales tax revenue. The District further estimates that for the first 60 days alone, the period in which it should have received advance notice of any RIFs, the District will lose tens to hundreds of thousands of dollars in sales tax revenues. Had the

District received the notice required by law, these losses would likely have been mitigated, including because employees would not have been terminated during the 60-day notice period and some would have been able to obtain alternative employment prior to their termination.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Administrative Procedures Act
### Action Not in Accordance with Law

222.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

223.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

224.    Defendants are agencies subject to the APA. 5 U.S.C. § 701.

225.    Because Defendants' mass terminations of probationary employees are part of an effort to restructure and reduce the federal workforce, they constitute RIFs, and Defendants were obligated to follow RIF procedures set forth by statute and regulation to carry out the terminations. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351.

226.    Defendants violated the law by carrying out the mass terminations of probationary employees without following the required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, including providing 60 days' notice to states and affected employees before releasing the employees, 5 U.S.C. § 3502(d). Absent such notice, an employee "may not be released." 5 U.S.C. § 3502(d).

227.    The actions of Defendants therefore violate the APA because they are not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

**COUNT II**
**Violation of the Administrative Procedures Act**
**Arbitrary and Capricious**

228.     Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

229.     Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

230.     Defendants are agencies subject to the APA. 5 U.S.C. § 701.

231.     The terminations of probationary employees pursuant to OPM's order have been arbitrary and capricious in several respects, including:

232.     Defendants OPM and OPM Director failed to provide a reasoned explanation for their direction to agencies to carry out mass terminations of probationary employees without following RIF procedures.

233.     Defendants failed to provide a reasoned explanation for following OPM's direction and carrying out mass terminations of probationary employees.

234.     Third, to the extent Defendants provided any explanation at all for the mass terminations, the reasons given were pretextual as they purported to relate to individual employees' performance but did not identify any actual unsatisfactory performance or conduct or any reasons preceding the affected employees' appointments that justified their terminations. Rather than Defendants' stated reasons, Defendants' true reason for terminating the probationary employees was to reduce the size of the federal workforce.

235.     The arbitrariness of Defendants' actions and the indiscriminate nature of the terminations is underscored by the fact that Defendants have had to reverse the firings of individuals fulfilling

certain critical functions, such as protecting nuclear weapons and addressing a significant public health threat.

## COUNT III
### Non-Statutory Review of *Ultra Vires* Action

236.    Plaintiffs re-allege and incorporate herein by reference every allegation and paragraph set forth previously.

237.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

238.    Defendants mass terminations of probationary employees were RIFs. These RIFs were unlawful because Defendants conducted them without following required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, including providing 60 days' notice to states and affected employees before releasing the employees, 5 U.S.C. § 3502(d). Absent such notice, an employee "may not be released." 5 U.S.C. § 3502(d).

239.    Defendants' actions terminating probationary employees *en masse* therefore exceeded their lawful authority and were *ultra vires*.

240.    Plaintiffs will suffer irreparable injury if Defendants' actions are not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

241.    The public interest favors issuance of a judicial declaration that Defendants' terminations of federal probationary employees are unlawful and issuance of an injunction requiring Defendants to reinstate the affected employees and to follow RIF procedures for any further RIFs. Defendants' actions have resulted in the unlawful termination of tens of thousands of probationary federal employees, including large numbers of military veterans, causing a sudden surge of unemployment without providing Plaintiff States with notice or an opportunity to prepare.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

242.    Declare unlawful and set aside Defendants' terminations of probationary employees without making specific, individualized determinations regarding the employees' performance or conduct and without adhering to RIF requirements as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A);

243.    Declare unlawful and set aside Defendants' terminations of probationary employees without making specific, individualized determinations regarding the employees' performance or conduct and without adhering to RIF requirements as *ultra vires* and exceeding their lawful authority;

244.    Issue immediate temporary relief restraining Defendants from terminating any probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance and reinstating probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individualized determinations of the inadequacy of the employee's conduct or performance;

245.    Order Defendants to file a status report with the Court within 48 hours of entry of a temporary restraining order, and at regular intervals thereafter, identifying all probationary employees terminated on or after January 20, 2025 (including the following information for each employee: agency, name, position title, grade, termination date, whether the probationary employee has been reinstated, and the date of any reinstatement), and reporting all steps that Defendants have taken to comply with the Court's temporary restraining order;

246.    Enter preliminary and permanent injunctive relief enjoining any further terminations that do not follow the RIF requirements or requirements for separating probationary employees for performance and enjoining Defendants from separating any employees pursuant to a RIF prior to the reinstatement of the probationary employees described above;

247.    Award to Plaintiffs their costs of litigation including, but not limited to, reasonable attorneys' fees, under 28 U.S.C. § 2412, and any other applicable law; and

248.    Order such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

**ANTHONY G. BROWN**
*Attorney General*
*State of Maryland*

*/s/ James D. Handley*
James D. Handley, Bar No. 20299
Virginia A. Williamson**
Assistant Attorneys General

200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
jhandley@oag.state.md.us
Phone: (410) 576-6993
Fax: (410) 576-6955

**BRIAN SCHWALB**
*Attorney General*
*District of Columbia*

Emma Simson
Senior Counsel to the Attorney General

*/s/ Ryan Wilson*
Ryan Wilson**
Senior Counsel

Hannah Cole-Chu, Bar No. 20747

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

*/s/ Liz Kramer*
Liz Kramer*
Solicitor General

445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2131
Phone: 651-757-1059
Fax: 651-282-5832
liz.kramer@ag.state.mn.us

**KRISTIN K. MAYES**
*Attorney General*
*State of Arizona*

*/s/ Hayleigh S. Crawford*
Hayleigh S. Crawford*
Deputy Solicitor General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

**JA72**

Anne Deng*
Pamela Disney**
Tessa Gellerson, Bar No. 21271
Charles Sinks, Bar No. 21185
Cara Spencer, Bar No. 20171
Assistant Attorneys General

Office of the Attorney General
for
the District of Columbia
400 6th Street N.W., 10th Floor
Washington, D.C. 20001
(202) 230-2342
Ryan.Wilson@dc.gov

**ROB BONTA**
*Attorney General*
*State of California*

*/s/ Satoshi Yanai*
Satoshi Yanai*
Senior Assistant Attorney
General

300 S. Spring Street, Suite 1702
Los Angeles, California 90013
Phone: 213-269-6400
satoshi.yanai@doj.ca.gov

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston
Director of Impact Litigation

Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

*/s/ Michael Skold*
Michael Skold*
Solicitor General
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
michael.skold@ct.gov

**ANNE E. LOPEZ**
*Attorney General*
*State of Hawaiʻi*

*/s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

**JA73**

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

*/s/ Gretchen Helfrich*
Gretchen Helfrich, ARDC
#6300004*
Deputy Chief
Special Litigation Bureau
Office of the Illinois Attorney
General
115 South LaSalle Street, 35th
Floor
Chicago, IL  60603
Tel. (312) 814-3000
Gretchen.helfrich@ilag.gov

**ANDREA JOY CAMPBELL**
*Attorney General*
*Commonwealth of Massachusetts*

*/s/ Katherine Dirks*
Katherine Dirks*
Chief State Trial Counsel
Office of the Attorney General
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov

**DANA NESSEL**
*Attorney General*
*State of Michigan*

*/s/ Bryan Davis, Jr.*
Bryan Davis, Jr. (P84206)*
Debbie Taylor (P59382)*
Assistant Attorneys General
Department of Attorney General
Labor Division
3030 W. Grand Blvd., Ste. 9-600
Detroit, MI 48202
davisb47@michigan.gov
taylord8@michigan.gov
(313) 456-2200

**MATTHEW J. PLATKIN**
*Attorney General*
*State of New Jersey*

*/s/ Shankar Duraiswamy*
Shankar Duraiswamy*
Deputy Solicitor General
25 Market Street
Trenton, NJ 08625
Phone: (862) 350-5800
Shankar.Duraiswamy@njoag.gov

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Anjana Samant*
Anjana Samant*
Deputy Counsel for Impact
Litigation
New Mexico Department of
Justice
P.O. Drawer 1508
Santa Fe, NM  87504-1508

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
New York Office of the Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

**JA74**

(505) 490-4060
asamant@nmdoj.gov

**DAN RAYFIELD**
*Attorney General*
*State of Oregon*

By: */s Deanna J. Chang*
Deanna J. Chang**
Senior Assistant Attorney
General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

**CHARITY R. CLARK**
*Attorney General*
*State of Vermont*

*/s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov

**PHIL WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
Deputy Solicitor General
Office of the Colorado Attorney
General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Natalya A. Buckler*
Natalya A. Buckler (RI Bar No. 8415)*
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2022
nbuckler@riag.ri.gov

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*Brian P. Keenan*
BRIAN P. KEENAN*
Assistant Attorney General
State Bar #1056525
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
keenanbp@doj.state.wi.us

**AARON D. FORD**
*Attorney General of Nevada*

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

54

**JA75**

*\* Pro hac vice application forthcoming*
*\*\*Application for admission pending*

**JA76**

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND; et al.,

     Plaintiffs,

v.

    C.A. No. []

United States Department of Agriculture; et al.,

    Defendants.

## DECLARATION OF PORTIA Y. WU

I, PORTIA Y. WU, declare as follows:

1.    I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.    I am currently employed by the Maryland Department of Labor as the Secretary of Labor.

3.    The Maryland Department of Labor (MD Labor) is responsible for connecting Marylanders to good jobs; protecting workers, consumers, and the public; supporting Maryland businesses; and fostering economic growth and competitiveness. The Department administers a wide range of federally funded workforce and training programs, including but not limited to those authorized by the Workforce Innovation and Opportunity Act (WIOA), that are vital to Maryland's economic stability and workforce development. The Department is the designated

1

**JA78**

state agency for oversight and coordination of federally required Rapid Response activities in the state.

4.      As Secretary of Labor, I have access to comprehensive reports and financial records that detail the state of Maryland's labor market, including claims for unemployment benefits, and the allocation and distribution of federal funding received by the Maryland Department of Labor. Additionally, my role includes oversight of the implementation and compliance of federally funded programs within the agency, ensuring all expenditures align with federal guidelines and regulations.

5.      According to our Department's most recent analysis, there are an estimated 160,000 federal civilian jobs located in Maryland and approximately 250,000 individuals reside in Maryland who work in federal civilian service. This includes workers stationed in the District of Columbia who commute from their Maryland residence, and multiple federal agencies that are physically located in the state. The average annual earnings for federal civilian jobs in Maryland is nearly $127,000. At least seven Maryland counties have more than 10,000 residents employed by the federal government.

6.      For example, Montgomery County is home to several large federal agencies, such as the National Institutes for Health (which has approximately 18,000 jobs located in Maryland) and the Food and Drug Administration (which has approximately 13,000 jobs located in Maryland). Baltimore County is home to the Social Security Administration (which has about 9,000 jobs located in Maryland) and the Centers for Medicare & Medicaid Services (which has nearly 4,000 jobs located in Maryland).

2

**JA79**

7.     Furthermore, official estimates of the federal workforce in Maryland undercount the number of potentially impacted jobs due to the heavy presence of classified positions, such as at the National Security Agency located in Anne Arundel County.

8.     Maryland is also home to a significant military presence, hosting over a dozen military installations. According to the most recent statistics from the Department of Defense, there were 29,564 active-duty military personnel and an additional 17,988 national guard/reserve personnel stationed in Maryland as of June 2024 for a total of 47,552 military personnel. Top branches of the military represented in Maryland include 9,701 active-duty Navy personnel, 8,468 active duty Air Force personnel, and 7,822 active duty Army personnel.

**Rapid Response Expenditures**

9.     The Maryland Department of Labor is the designated state agency with responsibility for oversight and coordination of statewide Rapid Response activities, required by 29 U.S.C. § 3174(a)(2)(A) undertaken to provide immediate assistance to Marylanders subject to mass layoffs. Per 20 C.F.R. § 682.302, the State Workforce Agency must deliver Rapid Response services for mass layoffs that meet the agency's definition of mass layoff, as long as the definition does not exceed a minimum threshold of 50 affected workers. In Maryland, "mass layoff" is defined as a layoff from work of 25 or more workers in a single establishment for an expected duration of 7 days or more, at the same time, and for the same reason.

10.    The Maryland Department of Labor oversees state rapid response effort, as required by both the federal Workforce Innovation and Opportunity Act 29 U.S.C. § 3174(a)(2)(A), and Maryland's Economic Stabilization Act, *see* Md. Ann. Code Labor and Employment, § 11-303-304 (referred to as "quick response program").

3

**JA80**

11.     Rapid Response activities are intended to reduce reliance on public benefit systems, such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

12.     Pursuant to both federal and state regulations and policies, when properly notified of a qualifying event Maryland deploys a coordinated Rapid Response "team" comprised of the Department's Dislocated Services Unit (DSU), and Division of Unemployment Insurance staff, as well as personnel from the state's 13 Local Workforce Development Areas (formal subrecipients under WIOA Title I) and the Professional Outplacement Assistance Center. Collaboratively, these partners are required to provide informational resources and reemployment services for workers, including information and support for filing Unemployment Insurance (UI) claims, information regarding health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training.

13.     In addition, the DSU is responsible for contacting affected employers to collect, verify, and distribute information regarding impact on workers so that services can be rapidly deployed. Rapid Response teams, in coordination with the DSU and other listed partners, coordinate directly with employers, workers, and relevant partner organizations to provide rapid support and referrals to the American Job Centers located in the affected jurisdictions to provide support for the affected workers. The Division of Unemployment Insurance will mobilize to streamline and expedite the processing of unemployment claims.

4

**JA81**

14.     Rapid Response partners also facilitate connections to partner agencies and organizations to ensure their ability to provide timely assistance to terminated workers and their families, such as home heating assistance, legal aid, and financial advice. Pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal government is required to provide written notice to Maryland, or "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF. This period may only be shortened upon written notice and in no event shall be less than 30 days. 5 U.S.C. § 3502(e)(3). This notice is to be provided at the same time the federal government issues specific notices of separation to employees.

15.     That notice must include the number of employees to be separated from the agency/agencies, and the effective date of the separations, as well as other information required by the U.S. Office of Personnel Management. The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger Rapid Response activities, since it is explicitly to be given to the state entity required to carry out rapid response activities.

16.     The Maryland Department of Labor has not received the required advance notice of a federal reduction in force from any federal agency with locations in the state. Nor, to the best of my knowledge, has any other entity in the Maryland State Government received notice of a federal reduction in force.

17.     Yet, as detailed more below, the Maryland Department of Labor has already received at least 813 claims by ex-federal employees for unemployment benefits since January 21, 2025. The Department is also aware of public announcements of significant layoffs at

5

**JA82**

Maryland and D.C.-located federal agencies, including the Social Security Administration and Department of Veterans Affairs.

18.     The Department of Labor has also seen a significant uptick of new Unemployment Insurance claims of ex-federal employees just in the last few weeks, with an approximate range of 30 to 60 new such claims *every day*.

19.     In light of these claims and public reporting about ongoing and forthcoming federal layoffs, in order to comply with federal and state obligations, Departmental personnel have contacted dozens of federal agencies and offices to seek information as to whether mass layoffs are being conducted currently or are being planned in the future.

20.     The Division of Workforce Development and Adult Learning, the unit within the Department that administers the Rapid Response program, along with other statewide partners at the county and municipal level, have not received any substantive response as to these agencies' plans for mass layoffs.

21.     Because the Department has received no notice of federal RIFs, despite extensive outreach, we are dedicating significantly more staff, resources, and expenditures to fulfill our statutory obligation.

22.     Indeed, because we have not received the statutorily required advance notice of which agencies are planning to conduct mass layoffs, the Department has been forced to rely on public reporting and word-of-mouth to conduct after-the-fact outreach to potentially affected workers. Reacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law.

6

**JA83**

23.     As referenced above, Department staff have conducted extensive *affirmative* outreach to federal agencies and offices to try and determine the location and extent of upcoming layoffs.

24.     Moreover, the Department of Labor has had to devote significant additional staff time from fiscal, communications, grant management, operational and administrative, and policy teams to conduct broad-based outreach to try and identify recently terminated employees, to attempt to provide relevant resources and services rapidly.

25.     While Rapid Response activities are generally funded through federal appropriations under WIOA Title I, the additional burden of responding and the related expenses has required the Department to divert multiple staff from important state projects.

26.     For example, several individuals in the Department's Office of the Secretary and Office of Administration have been diverted from working on state matters to handle the federal response. Such state matters that are being affected through the diversion of staff include occupational and professional licensing oversight, financial regulation, state workforce development programs, and matters related to other non-federally funded activities of the Maryland Department of Labor.

27.     In addition, other Department personnel have been diverted from state-funded workforce development projects, including the Employment Advancement Right Now ("EARN") program, which is a Maryland's premiere workforce development grant initiative serving over 5,000 constituents annually.

28.     However, such staff have been instead dedicated to reacting to the latest layoff news, trying to identify the affected federal agency and ex-employees, provide information, and

7

**JA84**

otherwise adjust procedures and resources to assist confused and unemployed Marylanders in a complicated and rapidly evolving environment.

29.     As just one example of these efforts, Department staff created a new website, requiring significant time and expense, *see* Maryland Workers Impacted by Recent Federal Actions, https://response.maryland.gov/federalpublicservants/. This effort was a further attempt to provide resources and services, which could normally be targeted at specific personnel impacted in future layoff events, but must instead be provided less efficiently and at greater expense to the entire public, because our personnel remain unaware of whether and when the next federal mass layoff event will occur, and who has been impacted and is in need of support.

30.     In sum, every day that goes by, the Department is devoting significant time, resources, and expense to simply try and identify workers subject to federal mass layoffs, conduct mass outreach, and otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide us the legally required notice of mass layoffs.

**Unemployment Assistance Process**

31.     The Maryland Department of Labor also manages claims for unemployment benefits by individuals formerly employed to work in Maryland.

32.     The Unemployment Compensation Law of Maryland (Title 8 of the Maryland Code, Labor and Employment Article in its entirety), enacted in 1936, provides insurance benefits, over an extended period of time, to persons who become unemployed through no fault of their own. Md. Code Ann. Lab. & Empl. Art. §8-102(d).

33.     As a general matter, the federal Government is required to reimburse Maryland for unemployment benefits provided to former federal employees. Specifically, Maryland is

8

**JA85**

party to an agreement with the United States Secretary of Labor, wherein the Maryland Department of Labor pays, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

34.    Pursuant to 5 U.S.C. § 8502(b), Maryland is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under Maryland Unemployment Compensation Law.

35.    In addition, the Maryland Department of Labor administers its federal-state cooperative unemployment insurance program, financed in large part by grants from the federal government pursuant to the Social Security Act. 42 U.S.C. §§ 501-503.

36.    The Maryland Unemployment Insurance Compensation Program, certified by the U.S. Secretary of Labor under 42 U.S.C. §502(a), provides for payment of insurance benefits for up to twenty-six (26) weeks to persons who find themselves unemployed through no fault of their own. Md Code. Ann. Lab. & Empl. §§ 8-201-223, 8-801, 8-808, 8-901-910, 1001-1009.

37.    While the federal Government provides grants for the purpose of administrating state unemployment benefit programs, these grants are frequently less than the total administrative costs incurred by Maryland. And that is the case now; the federal grant monies allocated to Maryland are not sufficient to adequately cover our unemployment benefit program administration.

38.    In these circumstances, Maryland relies on its Special Administrative Expense Fund (SAEF) when federal funding is insufficient. *See* Md. Code Ann., Labor & Employment §§ 8-419 to 842. This fund may be comprised of previously transferred federal funds (in limited circumstances), as well as monies collected by the state through fines, interest, and other penalties, and contributions by the state legislature. *Id.* § 8-421. Currently, SAEF is comprised

9

**JA86**

entirely of state funds. Accordingly, any increase in administrative costs of our unemployment benefits program will be covered at least in part by state funds.

39.     Pursuant to Md. Code Ann. Lab. & Empl. § 8-805(a), an individual in Maryland who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Maryland Secretary of Labor.

40.     Claimants file claims online using the Department's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. Md. Code Regs. § 09.32.02.05.

41.     The reason for termination alleged by the claimant is then transmitted to the claimant's employer(s) for verification. The employer is then asked to furnish a report of the separation from employment containing, *inter alia*, the reason for the employee's separation and a report of wage history. Md. Code Ann. Lab. & Empl. § 8-627; *see also* Md. Code Regs. § 09.32.02.05.

42.     There are various reasons why a claimant may be ineligible for, or disqualified from, receiving benefits. As a baseline, to be eligible for unemployment benefits, the individual must be unemployed. Md. Code. Ann. Lab. & Empl. § 8-801(a). A person is considered unemployed during any week they: (1) do not perform work for which wages are payable; or (2) work less than full-time and earn wages less than their assigned weekly benefit amount. Md. Code. Ann. Lab. & Empl. § 8-801(b). However, a part-time worker is not considered unemployed if they are working all the hours they are available for. Md. Code. Ann. Lab. & Empl. § 8-801(c).

10

**JA87**

43.     Additionally, a claimant is ineligible if they did not earn requisite wages within the first four of the last five completed calendar quarters, or alternatively the four most recent calendar quarters, before their claim is filed. Md. Code. Ann. Lab. & Empl. §§ 8-101(b) and 8-802.

44.     Maryland law disqualifies some claimants from benefits depending on the circumstances of their separation from employment. *See* Md. Code Ann. Lab. & Empl. § 8-1001, et seq. A claimant is disqualified if they quit their job without good cause directly related to employment conditions or employer actions. Md. Code Ann. Lab. & Empl. § 8-1001(a). Other disqualifying circumstances include, *inter alia*, termination for misconduct, aggravated misconduct, and gross misconduct. *Id.*

45.     A claims examiner at the Maryland Department of Labor is charged with making an initial determination on the claim. Md. Code. Ann. Lab. & Empl. §8-806(a)(1).

46.     If a determination involves a resolution of a dispute of material fact, the claims examiner must conduct a predetermination fact-finding interview after notice is provided to the employee and her employer(s). Md. Code. Ann. Lab & Empl. § 8-806(a)(2); Md. Code Regs. 09.32.02.16E. At the fact-finding proceeding, conducted by the claims examiner, the parties can offer evidence and argument, cross-examine witnesses, and otherwise develop an administrative record. Md. Code Regs. § 09.32.02.16E.

47.     Thereafter, a written initial determination must be made stating, *inter alia*, the weekly benefit amount, maximum benefits payable to the claimant in a benefit year, and the reasons for the determination. Md. Code Ann. Lab. & Empl. § 8-806(c).

48.     If the claims examiner's review of a claim reveals no dispute of material fact, but the information reviewed indicates that claimant may be ineligible or disqualified, the claims

11

**JA88**

examiners must still schedule a call for an appointment for a fact-finding interview and render a written decision. Md. Code Regs. 09.32.02.16(D) and (E).

49.     A claimant or an employer may file an administrative appeal within 15 days. Lab. & Empl. § 8-806(e)(1).

**Unemployment Benefits Recent Experience and Investigatory Process**

50.     The Department of Labor's latest data indicates that at least 813 former federal employees have applied for unemployment benefits since January 21, 2025.

51.     As noted above, the number of UCFE claims has increased significantly in just the last few weeks, starting on or around February 14, 2025.

52.     In fact, the amount of UCFE claims received by the Maryland Department of Labor since January 21, 2025, is significantly higher than past years. By way of example, from January 21, 2024, to March 3, 2024, we received only 189 unemployment claims containing federal wages in the claimant's base period.

53.     While not required to apply for unemployment benefits, multiple individuals have attached in their application their letter of employment termination from the federal government. Such letters indicate that these individuals were probationary employees purportedly terminated for cause.

54.     When an employer provides the initial report of separation to the Department, the employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct.

55.     Accordingly, if an employer states in its report of separation that an individual was terminated because performance has not been adequate to justify further employment at the

12

**JA89**

Agency, the Maryland Department of Labor's procedures require that the claims examiner must investigate the reason for discharge.

56.     The Maryland Department of Labor is required to verify both wages and reason for separation of employment from each federal agency by sending a request for wage and separation information.  20 C.F.R. §§ 609.6(e)(1), 609.21 through 609.25.  While private employers report wages each quarter for all employees into the Department's database, see Code Md. Regs. § 09.32.01.12, federal agencies are not required to regularly report active employee wages to the States.

57.     The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims.  Redirecting staff from regular Unemployment Insurance (UI) claims to process and adjudicate Unemployment Compensation for Federal Employees (UCFE) claims threatens to strain our resources - especially because the lack of notice denied the Department the opportunity to educate potential claimants on claims filing, certification of work search, and other matters. Lack of claimant awareness of program processes and requirements has historically led claimants to compliance errors affecting their entitlement to benefits absent extensive work by Department staff to fix issues with their claims.

58.     This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, we compromise the efficiency and responsiveness of our claims processing system, ultimately undermining public trust and exacerbating economic hardship.

13

**JA90**

59.     While the Department of Labor is only beginning to process these claims, our staff has already begun the process of contacting relevant federal agencies to request information on relevant terminations, to determine if they were in fact done for cause.

60.     Thus far, we have received at least 193 reports of separation from federal agencies, concerning their recently terminated employees.

61.     Several of the reports gave as a reason for termination only that there was a "permanent lack of work due to a change in Presidential Administration."

62.     In addition, the Department received several reports from federal agencies explicitly stating that the employees were "laid off due to a reduction in force." Such reports were received from multiple federal agencies not disclosed here out of an abundance of caution to preserve privacy.

63.     And, as relevant here, certain reports asserted that the employee at issue was terminated for cause, for instance due to "unsatisfactory work performance" and similar generic performance-related bases.

64.     Similarly, other reports highlighted various potentially disqualifying circumstances.  For instance, agencies indicated that claimants might not be genuinely unemployed or had voluntarily resigned from their positions.

65.     These reports were received from multiple federal agencies not disclosed here out of an abundance of caution to preserve privacy.

66.     Yet at the same time, termination letters, as well as recent statements of the President and other federal officials, indicate that the overwhelming majority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but

14

**JA91**

instead constitute a Government-wide effort to shrink the size of the federal workforce, an effective reduction in force.

67.     Where federal agencies assert that certain individual federal employees were terminated for cause or are otherwise ineligible or disqualified from benefits, or where there is disputed or conflicting information, our Department will be required to follow an intensive and mandatory investigative process for those unemployment claims.

68.     Department staff, due to regulatory requirements, must treat these separations as potential misconduct firings. This necessitates extensive investigations and fact-finding, leading to a considerable drain on resources and time, and adds delay to the benefit process.

69.     The procedures impose a significant strain on the Maryland Department of Labor's financial and temporal resources. Each case demanding interviews and/or a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

70.     Moreover, where federal agencies fail to provide responses to requests for separation information, the onus is on the Department to gather necessary wage and separation information. 20 C.F.R. § 609.6 (e)(2). This requires claims staff to solicit evidence from the claimants in the form of pay stubs, W-2s and affidavits and to pay benefits based on that information. In fact, recent federal guidance regarding federal unemployment during recent government shutdowns encourages states to have claimants file an affidavit, using available proof, given "limited federal HR resources" to respond to requests for separation information.

15

"Unemployment Insurance Program Letter 03-22," U.S. Department of Labor, November 2022, https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2021/UIPL_03-22.pdf.

71.     Further, payment to large numbers of claimants without employer verification was a direct cause of thousands of erroneous overpayments during the COVID-19 pandemic – causing the Department to investigate, issue overpayment determinations, and litigate appeals.

72.     Additionally complicating matters, it has come to our attention that termination notices issued by federal agencies were not issued in compliance with governing reduction in force procedures. It is apparent that there are affected individuals, including veterans, who should have been accorded preference under required RIF procedures but were not. To the extent that preferences and other requirements would have precluded termination, and federal employees successfully challenge their separations, this will cause the Department to re-adjudicate claims, pursue overpayments, and conduct appeals.

73.     As noted above, because current federal appropriations are insufficient to fully support our unemployment benefits program, Maryland is already relying on state SAEF monies to cover the difference. Further administrative burdens and strain imposed by administrative investigations will therefore likely require additional state funds.

74.     The cumulative effect of these investigations translates to substantial expenditures on personnel, administrative overhead, and the technological infrastructure required to manage the burgeoning caseload, ultimately depleting the department's budget and hindering its ability to address other critical labor-related issues.

Executed on March 6, 2025, at Annapolis, Maryland.

Portia Y. Wu

16

**JA93**

# Exhibit C

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

**DECLARATION OF ANNA HUNTER,
ASSISTANT DIRECTOR,
DIVISION OF EMPLOYMENT AND REHABILITATION SERVICES, ARIZONA
DEPARTMENT OF ECONOMIC SECURITY**

I, Anna Hunter, declare as follows:

1.      I am a resident of the State of Arizona. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the Arizona Department of Economic Security ("ADES") as the Assistant Director, Division of Employment and Rehabilitation Services ("DERS").

3.      ADES works with families, community organizations, advocates and State and federal partners towards ensuring the safety and economic security of all Arizonans.  In furtherance of this goal, ADES assists individuals who are unemployed or underemployed, and

1

**JA95**

those with barriers to employment, to prepare for, obtain, and sustain gainful employment.
Among other things, ADES delivers employment and training services administered through
various programs at the state and local level under the    orkforce Innovation and Opportunity
Act (    IOA).

.      For example, ADES manages claims for unemployment benefits by individuals
formerly employed to work in Arizona.

5.      As Assistant Director, DERS, I can re  uest and be given information about
records relating to claims for unemployment benefits through the Unemployment Insurance (UI)
program.

.      Currently, those records show that in 2  2  , ADES received 23   regular UI initial
claims for benefits for which a federal employer was identified as the last employer during the
months of  anuary and February.  In 2  25, ADES received 28   regular UI initial claims for
benefits for which a federal employer was identified as the last employer during the same time
period.

.      ADES also is the state entity responsible for conducting outreach and providing
unemployment services re  uired by the federal    orkforce Investment Act of 1   8, as amended
by the federal    orkforce Innovation and Opportunity Act of 2  1  .  Specifically, ADES oversees
Arizona s Rapid Response program. *See* 2   U.S.C.    31   (A)(2)(i).

8.      Arizona s Rapid Response program is a    orkforce Reduction Support service
that provides prompt layoff transition support and reemployment services to employers and
employees affected by workplace layoffs and closures in Arizona.  Employers and affected
employees are supported through no-cost, customized services to help mitigate the effects of
workforce reduction.

.       I understand on information and belief that, under 5 U.S.C.   35 2(d)(3)(A)(i), the federal Government is re uired to notify "the State or entity designated by the State to carry out rapid response activities under section 13 (a)(2)(A) of the    orkforce Investment Act of 1 8" of a plan for a reduction-in-force (RIF) of a significant number of federal employees, generally at least    days in advance of any proposed RIF.

1 .      To the best of my knowledge ADES has not received notice from the federal government of a RIF at any federal agency that would trigger the Arizona Rapid Response program.

11.      At this time, ADES does not know how many federal employees who may be permitted to file for unemployment benefits in Arizona have been terminated from their employment since  anuary 2 , 2 25.

Executed on March 5, 2 25, in Maricopa County, Arizona.


 s/ Anna Hunter
Anna Hunter, Assistant Director,
Division of Employment and Rehabilitation
Services, Arizona Department of Economic
Security

 A copy of the signature page bearing an
original signature is attached hereto.

3

**JA97**

9.    I understand on information and belief that, under 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of a significant number of federal employees, generally at least 60 days in advance of any proposed RIF.

10.    To the best of my knowledge ADES has not received notice from the federal government of a RIF at any federal agency that would trigger the Arizona Rapid Response program.

11.    At this time, ADES does not know how many federal employees who may be permitted to file for unemployment benefits in Arizona have been terminated from their employment since January 20, 2025.

Executed on March 5, 2025, in Maricopa County, Arizona.

Anna Hunter, Assistant Director,
Division of Employment and Rehabilitation
Services, Arizona Department of Economic
Security

*A copy of the signature page bearing an
original signature is attached hereto.

3

# Exhibit F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND; ET AL., | |
| Plaintiffs, | |
| v. | Case No.: 1:25-cv- |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., | |
| Defendants. | |

1

## DECLARATION OF NANCY FARIAS WOMACK

I, Nancy Farias Womack, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed as the Director of the California Employment Development Department (EDD or Department).

3.      EDD enhances California's economic growth and prosperity by collaboratively delivering valuable and innovative services to meet the evolving needs of employers, workers, and job seekers. The Department connects employers with job seekers, administers California's Unemployment Insurance, Disability Insurance, and Paid Family Leave programs, and provides employment and training programs under the federal Workforce Innovation and Opportunity Act of 2014, 29 U.S.C. §§ 3101-3361 (WIOA). Additionally, the Department collects various employment payroll taxes, including the personal income tax, and collects and provides comprehensive economic, occupational, and socio-demographic labor market information concerning California's workforce.

4.      As EDD's Director, I have access to comprehensive reports and financial records that detail the state of California's labor market, including claims for unemployment benefits, and the allocation and distribution of federal funding received by EDD. Additionally, my role includes overseeing the implementation and compliance of federally funded programs within the agency, ensuring all expenditures align with federal guidelines and regulations.

5.      The ongoing mass layoff of federal workers is irreparably harming California in

2

**JA101**

several ways.

### The Rapid Response Program and Associated Costs

6.      EDD oversees a coordinated strategy to provide immediate assistance to Californians subject to mass layoffs. EDD is the state entity responsible for conducting outreach and providing unemployment services required by the Federal Workforce Investment Act of 1998, as amended by WIOA.

7.      Specifically, a state rapid response program (Rapid Response Program) is required by both WIOA, 29 U.S.C. § 3174(a)(2)(A)(i), and its implementing federal regulations, 20 C.F.R. § 665.300-.370. See also 5 C.F.R. § 351.803(b)(1) (reduction in federal workforce).

8.      As relevant here, when a private employer with more than 100 employees contemplates a mass layoff, terminating 50 or more employees, the federal Worker Adjustment and Retraining Notification (WARN) Act imposes critical notice requirements. 29 U.S.C. §§ 2101, 2102. Specifically, the employer is required to notify certain groups, including State dislocated worker units, at least 60 days in advance of the layoffs, so that rapid response activities can be undertaken to ameliorate the negative effects of large unemployment events. 29 U.S.C. § 2102(a)(2).

9.      The Rapid Response Program has several purposes: to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

10.     When notified of a forthcoming mass layoff, EDD will initiate internal resources to coordinate services with the Local Workforce Development Areas, as requested and arranged

by the employer and/or union to quickly provide informational resources and reemployment services for workers, including but not limited to: information and support for filing Unemployment Insurance (UI) claims; information on the impacts of layoffs on health coverage or other benefits; and information on and referral to career services, reemployment-focused workshops and services, and occupational training.

11.    I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i) and 5 C.F.R. § 351.803(b)(1), the federal Government is similarly required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of 50 or more federal employees in a competitive area, generally at least 60 days in advance of any proposed RIF.

12.    The notice required by 5 U.S.C. § 3502(d)(3)(A) and 5 C.F.R. § 351.803(b)(1) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

13.    To the best of my knowledge, neither EDD nor any other entity in the California State Government has received notice of a federal RIF at any federal agency.

14.    Yet, as detailed more below, EDD has already received 1,621 claims by former federal employees for unemployment benefits since February 1, 2025.

15.    In the month of February 2025, there was a 149 percent uptick in unemployment insurance claims filed by individuals recently terminated from federal service.

16.    Because we have received no notice of federal RIFs, EDD has been required to dedicate significantly more staff, resources, and expenditures to fulfill our statutory mission.

17.    Indeed, because we have not received advance notice of which agencies are

4

planning to conduct mass layoffs, we have been forced to rely on public reporting and word-of-mouth to conduct after-the-fact outreach to potentially affected workers. Reacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law.

18.    Instead, EDD staff have been dedicated to reacting to the latest layoff news, trying to respond to the increase in claims filed by former federal employees relating to affected federal agencies, provide information, and otherwise adjust procedures and resources to assist confused, newly unemployed Californians in a complicated and rapidly evolving environment.

19.    As just one example of these efforts, EDD has been forced to expend resources to set up a dedicated telephone line for the narrow purpose of providing information about unemployment-related resources and services to displaced federal employees.  This effort is a further attempt to provide resources and services, which could normally be targeted at specific personnel impacted in future layoff events, but must instead be provided less efficiently and at greater expense to the entire State because our personnel remain unaware of whether and when the next federal mass layoff event will occur.

20.    In sum, with every day that goes by, EDD is devoting significant time, resources, and expense to react to the abrupt and material increase in workers subject to federal mass layoffs and make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide the legally required notice of mass layoffs.

**The Process for Obtaining Unemployment Insurance Benefits**

21.    EDD also manages claims for unemployment benefits filed by individuals formerly employed to work in California.

22.    The California Unemployment Insurance Code (CUIC) establishes California's unemployment insurance program, which generally provides insurance benefits to persons who

5

**JA104**

become unemployed through no fault of their own.  Cal. Unempl. Ins. Code § 100 et seq.

23.    As a general matter, the Federal Government is required to reimburse California for unemployment benefits provided to former federal employees. Specifically, California is party to an agreement with the United States Secretary of Labor wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

24.    Pursuant to 5 U.S.C. § 8502(b), California is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under the California Unemployment Insurance Code.

25.    Pursuant to  Cal. Unempl. Ins. Code §§ 1251-1253.92, an individual in California who wishes to collect unemployment insurance benefits must file a claim and provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for the separation, work experience, and other relevant information.

26.    The reason for termination alleged by the claimant is then transmitted to the claimant's employer(s) for verification. The employer is asked to furnish a report of the separation from employment containing, *inter alia*, the reason for the employee's separation and a report of wage history.  *Id.* at § 1327.

27.    California law disqualifies some claimants from benefit eligibility depending on the circumstances of their separation from employment. *See, e.g.,* Cal. Unempl. Ins. Code § 1256.  Disqualifying circumstances include, *inter alia*, voluntary separation without good cause, or termination for misconduct connected with the most recent work.  *Ibid.*

28.    If a determination involves a resolution of a dispute of material fact, the claims examiner must conduct a fact-finding interview after notice is provided to the employee and their

6

**JA105**

employer(s). *Id.* at § 1326. Thereafter, per federal Department of Labor guidelines, a written determination must be made within 21 days of the claimant's first certification, stating the result of the determination. *Id.* at § 1334; 20 C.F.R. § 650.4. That determination must be delivered to the claimant and the employer "promptly." Cal. Unempl. Ins. Code § 1334; 20 C.F.R. § 650.4. Pursuant to 20 C.F.R. § 650.4, if the initial determination is favorable to the claimant, payments must begin "promptly."

29.    A claimant or an employer may file an administrative appeal within 30 days. Cal. Unempl. Ins. Code § 1328. Once the appeal is received, EDD reviews the information provided, then either makes a redetermination depending on additional information or transmits the appeal to the California Unemployment Insurance Appeals Board ("CUIAB"). CUIAB is responsible for scheduling the hearing for all parties, deliberating on the information presented in the hearing, and rendering a decision. CUIAB provides its decision to all parties, including EDD. EDD then takes any necessary and appropriate actions depending on the decision rendered by the Administrative Law Judge.

### Unemployment Benefits: Recent Experience and Investigatory Process

30.    EDD's latest data indicates that 1,621 former federal employees have applied for unemployment benefits since February 1, 2025. This amounts to a 149 percent increase in claims made by former federal employees from February 2024, when EDD received 650 unemployment claims.

31.    A worker is ineligible to receive unemployment benefits if they were terminated for misconduct connected with their most recent work. Cal. Unempl. Ins. Code § 1256.

32.    When a claim is filed, a notice is mailed to the employer, allowing the employer the opportunity to respond or contest the reason for separation listed by the claimant. The

employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct. *Id.* at § 1327.

33.     If the employer stated in its report of separation that an individual was terminated because "[their] performance has not been adequate to justify further employment at the Agency," EDD's procedures require that it must investigate the reason for termination.

34.     The same EDD staff who handle regular unemployment claims also process disaster-related claims and adjudicate UCFE claims. Redirecting staff from handling disaster-related claims, including claims arising from the wildfires in Southern California, or regular UI claims to process and adjudicate UCFE claims threatens to strain our resources.

35.     This diversion of personnel will undoubtedly impede the timely processing of UI claims filed in the ordinary course, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, we compromise the efficiency and responsiveness of our claims processing system, ultimately undermining public trust and exacerbating economic hardship.

36.     If any federal agencies maintain the position that the terminated probationary employees were fired for cause, and are accordingly ineligible, at least in part, for unemployment benefits under California law, the employees' claims will have to be investigated.

37.     As soon as EDD receives such an assertion, EDD will be required to follow its intensive and mandatory investigative process. And while designed to ensure fairness, the procedures impose a significant strain on EDD's financial and temporal resources. Each case requires a fact-finding proceeding that necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send

notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

38.    The cumulative effect of these investigations translates to substantial expenditures on personnel, administrative overhead, and the technological infrastructure required to manage the burgeoning caseload, ultimately depleting the Department's budget and hindering its ability to address other critical labor-related issues.

39.    Recent statements of the President and other federal officials have indicated that the majority of recent federal terminations were not for-cause firings, which would be based on individualized assessments of performance, but instead constitute a government-wide effort to shrink the size of the federal workforce, an effective RIF.

40.    As a result, it is likely that the majority of recently terminated federal employees will in fact be eligible for state unemployment benefits because they were not terminated for cause.

41.    However, the federal Government's pretextual claim that such terminations are for-cause will necessitate extensive and irreparable investigatory costs and resource expenditures by EDD as well as negatively impact former federal workers as they cannot receive benefit payments until EDD adjudicates their separation and finds the claimant eligible for benefits.

**Increased Costs Related to Unemployment Benefits**

42.    Finally, California will also bear increased costs in the form of unemployment benefits of former federal employees.  While the federal Government is generally required to reimburse California for UCFE benefits, California must pay such benefits in the first instance, depleting the statewide trust fund that is supported by private employers in the state.  Further, the

9

federal Government could deny California's request for reimbursement of benefits paid to former federal workers on the pretext that the workers were terminated for-cause.

43.    Moreover, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program. 42 U.S.C. § 502(a). While California has been and continues to expend additional resources necessary to address the uptick in federal unemployment claims, it is thus entirely uncertain whether EDD's costs will be fully reimbursed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 4, 2025, at Sacramento, California.

NANCY FARIAS WOMACK

# Exhibit E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **STATE OF MARYLAND, ET AL ,** | |
| **P        ,** | **C    N** |
| **UNITED STATES DEPARTMENT OF A   RICULTURE, ET AL ,** | |
| **D     d** | |

**DECLARATION OF MIREYA HURTADO**
**DEPUTY DIRECTOR OF THE ILLINOIS DEPARTMENT OF EMPLOYMENT**
**SECURITY**

I, Mireya Hurtado, declare as follows:

1.      I am a resident of the State of Illinois. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed as the Deputy Director, Service Delivery of the Illinois Department of Employment Security ("IDES").

1

3.      IDES is the department of the Illinois state government that administers state unemployment insurance benefits, runs the employment service and Illinois labor exchange system, and publishes labor market information.

.      As IDES Deputy Director, Service Delivery, I have access to comprehensive reports and financial records that detail the State of Illinois  labor market, including claims for unemployment insurance benefits, and the allocation and distribution of federal funding received by IDES. Additionally, my role includes overseeing the implementation of and compliance with federally funded programs within the agency, ensuring expenditures align with federal guidelines and regulations.

5.      The ongoing mass-layoff of federal workers is irreparably harming the State of Illinois in several ways.

**U                A           Pr**

.      IDES manages claims for unemployment insurance benefits by individuals formerly employed to work in the State of Illinois.

.      The Illinois Unemployment Insurance Act ("UI Act"), 82   ILCS    5 1    , *et seq*., provides unemployment insurance benefits, over an extended period of time, to persons who become unemployed through no fault of their own and meet eligibility re uirements.   enefits are funded through contributions made by Illinois employers to the Illinois Unemployment Insurance Trust Fund ("Trust Fund"). *Id.*

8.      As a general matter, the federal government is re uired to pay for unemployment insurance benefits provided to former federal employees. Specifically, the State of Illinois is party to an agreement with the United States Secretary of Labor, under which the Secretary shall

2

pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. 85 2(a).

.      Pursuant to 5 U.S.C. 85 2(b), UCFE payments to federal employees are to be made in the same amount, on the same terms, and sub ect to the same conditions as would apply to them under the UI Act.

1 .      For unemployment insurance claims in general, an individual who wishes to collect benefits in Illinois must file a claim in accordance with the re uirements of the UI Act and 5 Ill. Admin Code 2 12 through 2 2 , generally. *See* 82 ILCS 5 . Claimants may file claims online using the IDES system to initiate a claim and to provide information indicating the basis of the claim, the name of the claimant s previous employer, the reason for the ob separation, work experience, and other relevant information. Notice of the claim is then transmitted to the claimant s former employer(s) for a response. The employer is asked to furnish information about the separation from employment and other information the employer wishes to provide.

11.      Illinois law dis ualifies some claimants from unemployment insurance benefits depending on the circumstances of their separation from employment. Dis ualifying circumstances include, *inter alia*, discharge for misconduct and voluntary leaving, as defined by the UI Act. *See* 82 ILCS 5 1 and 2.

12.      If an eligibility determination involves a resolution of a dispute of material fact, the claims ad udicator must conduct a predetermination fact-finding interview(s) after notice is provided to the employee and her employer(s). 82 ILCS 5 2; 5 Ill. Admin Code 2 2 .135. Thereafter, a written initial determination must be made stating, *inter alia*, the weekly benefit amount, maximum benefits payable to the claimant in a benefit year, and the

3

reasons for the determination. 82   ILCS    5   2. That determination must be delivered to the claimant and the employer "promptly." *Id*. If the initial determination is favorable to the claimant, payments must begin "promptly." 82   ILCS    5    .

13.    A claimant or an employer may file an administrative appeal, generally within 3 days. 82   ILCS    5 8  .

1 .    The unemployment insurance benefit amount a specific individual receives is generally based on their prior wages. Illinois businesses are re uired to report wages to the Department on a monthly and or  uarterly basis. 82   ILCS    5 1   2. However, the federal government is not re uired to and does not report wages to the Department. As a result, for each claim that is filed by a former federal employee, staff must manually process the claim in order for the appropriate federal agency or agencies that employed the claimant to send the wage report to IDES.

**U           B    R    E   r        d I          r Pr**

15.    IDES  data indicates that approximately      claims for unemployment insurance benefits have been filed by former federal employees in Illinois between  anuary 1  , 2 25 and March 1, 2 25 where the last date worked was after  anuary 18, 2 25.

1 .    During the entire calendar year of 2 2 , IDES data indicates that approximately  53 claims were filed by former federal employees for unemployment insurance benefits.

1 .    Each claim filed by a federal employee re uires manual processing to obtain the wage records for that employee, work that is not re uired in regular unemployment insurance claims.

18.    In addition, when an employer responds to a notice of claim to IDES, the employer indicates the reason for the separation, including whether the employee was discharged for cause, such as misconduct.

1 .    If an employer indicates in its response that an individual was separated due to performance issues, unspecified discharge, or voluntarily leaving, IDES procedures re uire that the claims ad udicator investigate the reason for separation.

2 .     etween February 2, 2 25, and February 28, 2 25, a substantial number of the responses from federal employers have indicated a performance issue, unspecified discharge, or voluntarily leaving.

21.    As soon as we receive such a response, the Department is re uired to follow our intensive and mandatory investigative process, in addition to seeking wages from the federal employing agency as stated above. And while designed to ensure fairness, the procedures impose a significant strain on IDES  financial and temporal resources. Each case re uiring a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices and accommodate witness testimony further escalates the time commitment. Moreover, the potential for subse uent appeals triggers a cascade of additional hearings and reviews.  All of these activities divert resources from other essential departmental functions.

22.    The same IDES staff who handle regular unemployment insurance claims also process and ad udicate UCFE claims.

23.    The cumulative effect of these increased claims by federal workers and increased investigations is translating into substantial expenditures on personnel, administrative overhead, and the technological infrastructure re uired to manage the burgeoning caseload, ultimately

5

JA115

depleting the department s budget and hindering its ability to address other critical labor-related issues.

2 .    As the trends noted above continue, the diversion of personnel to handle UCFE claims will impede the timely processing of regular unemployment insurance claims, creating backlogs and delays. The conse uences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods.    y diverting resources, we compromise the efficiency and responsiveness of our claims processing system, ultimately exacerbating economic hardship for Illinoisans and undermining public trust.

25.    Statements by the President and other federal officials have indicated that the overwhelming ma ority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but instead constitute a government-wide effort to shrink the size of the federal workforce; effectively, a reduction in force.

2 .    As a result, IDES anticipates that the overwhelming ma ority of recently-terminated federal employees will be eligible for state unemployment benefits because they were not terminated for cause and lost their  obs through no fault of their own.

2 .    However, the federal government s pretextual claims that terminations are for-cause or voluntary leaving will necessitate extensive and unrecoverable expenditures of resources by IDES.

**E    d   r  D      F  d  r  Fr**

28.    IDES has another statutory mission to: reduce reliance on public benefit systems such as unemployment insurance benefits; promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and prevent or minimize the impact of mass layoffs on workers, businesses, and

communities.  In direct and sole response to the federal firings and the increase in claims filed by former federal employees, IDES is expending increased resources to fulfill this responsibility.

2 .    To the best of IDES  knowledge, there has never been advance notice of which federal agencies are planning to conduct mass layoffs, or when. *See* 5 U.S.C.   35 2(d)(3)(A). Accordingly, we have been forced to rely on public reporting and word-of-mouth to conduct after-the-fact outreach to potentially affected workers.

3 .    Due to the increase in claims for UCFE benefits, and due to public reporting about ongoing and forthcoming federal layoffs, IDES staff around the entire State of Illinois were engaged to: develop a rapid plan of action; set up a specialized force of claims ad udicators and other staff to address and investigate the increased UCFE claims; create direct I  R call center  ueues for UCFE claimants; develop communications to federal employee claimants based on the uni ue circumstances of this mass firing; develop and present virtual weekly workshops for this distinctive group of individuals; and coordinate with other Illinois agencies to meet the specialized needs of these individuals.

31.    Instead of performing their normal duties, staff have instead been dedicated to reacting to the latest layoff news, trying to identify affected federal agencies and ex-employees, provide information, and otherwise ad ust procedures and resources to assist confused and unemployed workers in Illinois in a complicated and rapidly evolving environment.

32.    As  ust one example of these efforts, Department staff created a new webpage, re uiring significant time and expense. *See* https:  ides.illinois.gov unemployment deferred-resignation-of-federal-employees.html. This effort was a further attempt to provide resources and services, which could normally be targeted at specific personnel impacted in future layoff events but must instead be provided less efficiently and at greater expense to the entire public, because

our personnel remain unaware of whether and when the next federal mass layoff event will occur.

33.     Moreover, IDES has had to devote significant additional staff time from communications and policy staff to conduct broad-based outreach to try and identify recently-terminated employees and provide relevant resources and services. Such staff are normally engaged in creating guidance for stakeholders and general strategy around connecting employers to skilled workers and other affirmative efforts to help grow and support Illinois' job market.

34.     In sum, every day that goes by, IDES is devoting significant time, resources and expense to simply try and identify workers subject to federal mass layoffs, conduct mass outreach, and otherwise make resources available to potentially affected individuals in new ways due to the mass layoffs, specifically because of the lack of any notice.

**Reimbursement of Costs**

35.     Finally, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment insurance programs, including UCFE. 42 U.S.C. § 502(a). While IDES has been and continues to expend additional resources necessary to address the increase in federal unemployment insurance claims, IDES has no way to know whether in fact our costs will be fully reimbursed.


DECLARANT STATES NOTHING FURTHER.


Executed on March 4, 2025, at Springfield, Illinois.

MIREYA HURTADO
Deputy Director, Service Delivery
Illinois Department of Employment Security

8

# Exhibit H

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THE STATE OF MARYLAND; et al.,

       Plaintiffs,

    v.

U.S. DEPARTMENT OF AGRICULTURE; et al.,

       Defendants.

C.A. No.

## DECLARATION OF PAOLO FRANZESE

I, Paolo Franzese, declare as follows:

1.      I am a resident of the Commonwealth of Massachusetts. I am over the age of 18 and have personal knowledge of all the facts stated herein or have knowledge of the matters based on my review of information and records provided to me by Executive Office of Labor and Workforce Development employees and I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the Executive Office of Labor and Workforce Development (EOLWD) as Undersecretary and Chief Operating Officer.

3.      EOLWD works to support the Commonwealth's workforce by making available new opportunities and training, protecting the rights of workers, preventing workplace injuries and illnesses, providing temporary assistance when employment is interrupted, promoting labor-management partnerships and ensuring equal access to economic self-sufficiency and opportunity for all citizens of the Commonwealth.  In addition, EOLWD is the secretariat

comprising the Department of Unemployment Assistance (DUA), MassHire Department of

Career Services (MDCS), Department of Economic Research (DER), Department of Family and

Medical Leave (DFML), Department of Industrial Accidents, Department of Labor Standards,

Department of Labor Relations, and Department of Apprentice Standards. DUA administers the

Commonwealth's unemployment insurance ("UI") program, MDCS oversees the state's career

centers and related services, and DER supports economic research efforts—including Labor

Market Information (LMI).

4.     As Undersecretary/Chief Operating Officer, I oversee the DUA. As a result, I

have access to comprehensive reports and records that detail the Commonwealth's LMI,

including aggregate data regarding unemployment insurance claims. Additionally, my role

includes oversight of the DFML, EOLWD's Information Technology (IT) systems, audit and

compliance management, and other operations. I work collaboratively with EOLWD's

departments, including the finance department, which disburses UI benefits on behalf of the

DUA.

5.     The ongoing mass-layoff of federal workers is irreparably harming Massachusetts

in several ways.

**Rapid Response Team Expenditures**

6.     In Massachusetts, services are provided to workers, jobseekers, and

unemployment insurance claimants in accordance with federal and state laws and requirements,

including the federal Workforce Investment Act of 1998, as amended by the federal Workforce

Innovation and Opportunity Act of 2014. A state rapid response program is required by the

federal Workforce Innovation and Opportunity Act, 29 U.S.C. § 3174(A)(2)(i).

2

7.      The MDCS oversees Massachusetts's network of Career Centers and provides
career services and training opportunities across the state. This includes aiding businesses in
finding qualified talent, offering career services and referrals to jobseekers, and overseeing the
state's Rapid Response program.

8.      At its core, Rapid Response is an early intervention service provided at no cost to
businesses and employees experiencing layoffs, downturns, or growth challenges in
Massachusetts.

9.      As relevant here, when a private employer with more than 100 employees
contemplates a mass layoff, terminating 50 or more employees, the federal Worker Adjustment
and Retraining Notification (WARN) Act imposes critical notice requirements. Specifically, the
employer is required to notify certain groups, including State dislocated worker units, at least
sixty days in advance of the layoffs, so that rapid response activities can be undertaken to
ameliorate the negative effects of large unemployment events. 29 U.S.C. § 2101 *et seq.*

10.     The purpose of Rapid Response is to reduce reliance on public benefit systems
such as unemployment insurance; promote economic recovery and vitality by developing an
ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations;
and prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

11.     When notified of a forthcoming mass layoff, the Rapid Response team quickly
mobilizes to provide informational resources and reemployment services for workers, including
but not limited to: information and support for filing UI claims, information on the impacts of
layoffs on health coverage or other benefits, information on and referral to career services,
reemployment-focused workshops and services, and referrals to occupational training.

3

**JA122**

12.     In addition, the Rapid Response team will contact affected businesses to collect, verify, and distribute pertinent information.  Rapid Response will coordinate with state and local workforce area staff at the American Job Centers, also called MassHire Career Centers, located across the state.

13.     The Rapid Response team also facilitates connections to partner agencies and organizations to ensure that terminated workers and their families can continue to access resources such as home heating assistance, legal aid, and financial advice.

14.     I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal government is similarly required to notify Massachusetts, or "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

15.     To the best of my knowledge, neither EOLWD, including its constituent agencies, nor any other entity in the Massachusetts state government has yet received a notice of a federal reduction in force at any federal agency.

16.     Yet, as detailed further below, Massachusetts has already received approximately 251 claims from terminated federal employees for unemployment benefits in February of 2025.

17.     DUA has also seen a significant uptick of new unemployment claims from ex-federal employees just in the last few weeks, with 32 claims filed on February 24 alone.  DUA is seeing and expects to continue seeing new claims filed every day.

18.     Due to these increasing claims for unemployment benefits, and due to public reporting about ongoing and forthcoming federal layoffs, our Rapid Response team personnel have proactively contacted dozens of federal agencies and offices to ensure accurate information

4

is being provided and to seek information as to whether mass layoffs are being conducted

currently or are being planned in the future. Similarly, the MDCS Rapid Response team has

been fielding calls and meeting requests from concerned federal agencies, their representatives,

and others. The U.S. Department of Health and Human Services, U.S. Department of Labor, the

U.S. Department of the Interior, the U.S. Department of Treasury, the U.S. Department of

Veterans Affairs, and others, all of whom have a significant presence in Massachusetts, have

raised concerns regarding layoffs.

19.     The Rapid Response team has not received any substantive information as to

these federal agencies' plans for mass layoffs.

20.     Because our Rapid Response team has received no notice of federal RIFs, despite

extensive outreach, EOLWD has been required to dedicate significantly more staff, resources,

and expenditures to fulfill its statutory mission.

21.     Indeed, because EOLWD and its constituent agencies have not received advance

notice of which agencies are planning to conduct mass layoffs, we have been forced to rely on

public reporting and word-of-mouth to conduct after-the-fact outreach to potentially impacted

individuals. Reacting after a layoff is far more resource-intensive than the advance planning and

assistance process required by law.

22.     This approach has ensured that those impacted by the layoffs have access to

crucial information and assistance. However, the extensive work required to implement these

initiatives has strained the departments' resources, while still trying to maintain effective levels

of support in the face of ongoing challenges.

5

**JA124**

23.    For instance, as referenced above, staff have conducted extensive proactive outreach to federal agencies and offices to try to determine the location and extent of upcoming layoffs.

24.    Moreover, EOLWD and its constituent agencies have had to devote significant additional staff time from communications, policy, and legal staff to field questions from concerned stakeholders and legislators, conduct broad-based outreach to try and identify recently-terminated employees, and provide relevant resources and services.

25.    Under normal circumstances, such personnel are engaged in creating guidance for stakeholders and general media strategy around connecting Massachusetts residents to jobs, growing apprenticeship programs, program and grant administration, and other efforts to help grow and support Massachusetts employers, workers, jobseekers, and more broadly the Massachusetts economy.

26.    However, such staff have instead been dedicated to reacting to the latest layoff news, developing resource guides and fact sheets, trying to identify affected federal agencies and ex-employees, provide information, and otherwise adjust procedures and resources to assist confused and recently unemployed Massachusetts residents in a complicated and rapidly evolving environment.

27.    Since February 3, 2025, this has included reallocation of work for approximately seven MDCS staff members on the Rapid Response team. Specifically, this has meant diverting staff from other important work for a combined total of at least 25 to 30 hours per week over the last five weeks. This level of effort is expected to continue—if not increase—across the Rapid Response team. Services provided to affected federal employees by the Rapid Response team so far in 2025 have included but are not limited to: resume support; one-on-one meetings and career

6

**JA125**

counseling; providing information regarding use of LMI and how it can be useful in job search; and providing information about available resources, including MDCS Career Center services, and referrals to other internal and external resources.

28.     In addition to the Rapid Response team staff time already being dedicated to these efforts, if work continues at this pace, MDCS staff not currently on the Rapid Response team will be diverted from other critical career services programs.

29.     The Rapid Response team is also responsible for processing WARN notices for Massachusetts companies affected by layoffs.

30.     Other EOLWD and MDCS resources have been supporting Rapid Response efforts, but if federal layoffs continue at their current pace, MDCS resources will need to be cross-trained to support increased Rapid Response programming, diverting staff from other critical career services programs across the state.

**Unemployment Assistance Process**

31.     The Massachusetts unemployment insurance program, which is certified by the U.S. Secretary of Labor under 42 U.S.C. § 502(a) and administered by the Massachusetts Department of Unemployment Assistance, provides for payment of UI benefits for eligible claimants in Massachusetts. Specifically, DUA provides temporary payments for up to twenty-six weeks to eligible workers who lose their job through no fault of their own, are able and available to work, and actively searching for a job while receiving benefits. Such benefits are administered pursuant to Chapter 151A of the Massachusetts General Laws.

32.     As a general matter, the federal government is required to reimburse Massachusetts for unemployment benefits provided to former federal employees. Specifically, Massachusetts is party to an agreement with the U.S. Secretary of Labor, wherein the Secretary

7

**JA126**

shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

33.     Pursuant to 5 U.S.C. § 8502(b), Massachusetts is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under Chapter 151A of the Massachusetts General Laws.

34.     In addition, DUA administers its federal-state cooperative unemployment insurance program financed in large part by federal administrative grants pursuant to the Social Security Act. 42 U.S.C. §§ 501-503.

35.     An individual in Massachusetts who wishes to collect UI benefits must file a claim in accordance with DUA's statutory and regulatory requirements.

36.     Claimants file claims using DUA's online UI system to establish a claim initially and to provide information to indicate the basis of the claim, the reason for separation from employment, the name of the employer, work experience, and other relevant information. G.L. c. 151A, § 38.

37.     The reason for termination alleged by the claimant is transmitted to the claimant's employer for verification. The employer is asked to furnish a report of the separation from employment containing, *inter alia*, the reason for the employee's separation and a report of wage history. G.L. c. 151A, §§ 38, 38A.

38.     Massachusetts law disqualifies some claimants from benefits depending on the circumstances of their separation from employment or their failure to comply with state requirements, for example, to continue to seek suitable employment while collecting unemployment insurance benefits. *See* G.L. c. 151A, § 25. In addition to failing to comply with

8

technical filing and registration requirements, disqualifying circumstances include termination

for deliberate misconduct in willful disregard of the employer's interest. *Id.*

    39.    DUA adjudicators are charged with making initial determinations on claims. G.L.

c. 151A, § 39.

    40.    A claimant or an employer who disputes a determination on a UI claim may file

an appeal within ten calendar days of notification. Following such an appeal, a hearing is held

by a DUA review examiner. For a second level of review, appeals may be made to the Board of

Review within thirty days of the mailing of a hearing decision. The three-member Board of

Review is administered independently of the DUA and has the authority to uphold, reverse, or

modify, a review examiner's decision. Parties may appeal decisions by the Board of Review to a

Massachusetts District Court or Boston Municipal Court within thirty days of the mailing of the

Board's decision. G.L. c. 151A.

**Unemployment Benefits Recent Experience and Investigatory Process**

    41.    EOLWD's latest data indicates that 251 former federal employees have applied

for unemployment benefits since January 21, 2025.

    42.    This data also shows that 86 of these individuals were formerly employed by the

U.S. Department of Treasury, 26 by the U.S. Department of the Interior, 22 by the U.S.

Department of Transportation, 21 by the U.S. Department of Agriculture, and 18 by the U.S.

Department of Veterans Affairs. To-date, in February alone, former employees from thirty-five

federal agencies or entities have filed to collect UI benefits in Massachusetts.

    43.    The number of UCFE claims in Massachusetts has increased significantly,

beginning on or around February 9, 2025.

9

44.     In fact, the number of federal unemployment claims and inquiries received by the DUA in February of 2025 is significantly higher than past years.

45.     By way of example, in February 2024, DUA received 58 total federal UI claims. So far, in February 2025, DUA has received 251. The total volume of claims for February 2025 is expected to be higher still because eligible claimants can still file UI claims with a separation date in February.

46.     Claimants must indicate the reason for their separation from employment in their UI applications. In Massachusetts, many recently separated federal workers are reporting either lack of work (due to a reorganization or restructure) or discharge for job performance (if performance is cited in the dismissal as the reason for separation). Under Massachusetts law, poor job performance alone does not automatically disqualify someone from benefits. See G. L. c. 151A, § 25(e)(2).

47.     When an employer replies to DUA fact-finding with information related to a separation, the employer is asked to provide the reason for the separation, including whether the employee was fired for cause, such as deliberate misconduct in willful disregard of the employer's interest.

48.     Every eligibility determination at the DUA is made on a case-by-case basis. When there is a dispute of material fact between the employer and the claimant, such as whether a termination was for cause, an adjudicator sends a written notice notifying the parties of fact-finding and conducting a proceeding in which the parties can offer evidence. Thereafter, the adjudicator drafts a written decision and delivers it to the parties.

49.     Each case demanding a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The

10

**JA129**

need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment.

50.    The cumulative effect translates to substantial expenditures on personnel, administrative overhead, and technological infrastructure, at a time when DUA is preparing to launch a new online unemployment system.

51.    From that point, either party may initiate the administrative appeals process described above.

52.    Recent statements of the President and other federal officials have indicated that the overwhelming majority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but instead constitute a government-wide effort to shrink the size of the federal workforce, an effective reduction in force.

53.    As a result, it is likely that the overwhelming majority of recently-terminated federal employees will in fact be eligible for state unemployment benefits, because they were not terminated for cause.

54.    However, the federal government's claim that such terminations are for-cause will necessitate extensive investigatory costs and resource expenditures by EOLWD.

Executed on March 5, 2025, at Boston, Massachusetts.

Paolo Franzese, Esq.
Undersecretary & Chief Operating Officer

11

**JA130**

Exhibit I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, *et al.,*

                    *Plaintiffs,*

   v.                             No.

U.S. DEPT. OF AGRICULTURE, *et al.,*

                    *Defendants.*

### DECLARATION OF KATHLEEN WALSH

I, Kathleen Walsh, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

**I.**      **Background**

1.      I am the Secretary for the Massachusetts Executive Office of Health and Human Services ("EOHHS"). I have held this position since March 1, 2023. As the Secretary of EOHHS, I oversee 11 state agencies, which include the Department of Public Health ("DPH") and the Department of Transitional Assistance ("OTA"). EOHHS also serves as the single state agency responsible for the administration of the Medicaid program and the State Children's Health Insurance Program within Massachusetts (collectively, "MassHealth") and other health and human services programs designed to pay for medical services for eligible individuals pursuant to M.G.L. c. 118E, Title XIX of the Social Security Act (42 U.S.C. sec. 1396 et seq.), Title XXI of the Social Security Act (42 U.S.C. sec. 1397aa et seq.), and other applicable laws and waivers. Our Secretariat has an annual operating budget of approximately $30 billion and touches one out of every three residents of the Commonwealth.

2.      I hold a Bachelor of Arts degree and a Master's degree in public health from Yale University. Before joining the Healey-Driscoll Administration I served as the President and Chief

**JA132**

Operating Officer of Boston Medical Center ("BMC") for approximately 13 years. BMC is a private, not-for-profit 496-bed academic medical center in Boston. BMC health system has approximately 10,000 employees, 1,200 physicians, owns and operates Wellsense Insurance plan which provides access to health care to 600,000 people across Massachusetts and New Hampshire and an annual operating budget of roughly $6 billion. Prior to my appointment at BMC, I served as Executive Vice President and Chief Operating Officer of Brigham and Women's Hospital for five years.

3.      As EOHHS Secretary, I have personal knowledge of the rules, regulations, and processes governing EOHHS and its agencies. I have personal knowledge, or knowledge based on review in my capacity as Secretary of information and records gathered by EOHHS and agency staff, of the matters set forth below.

I.      **The Department of Public Health**

4.      DPH promotes and protects health and wellness and prevents injury and illness for 7 million residents of our Commonwealth. DPH prevents illness and disease, gives children a healthy start, and makes sure food and water supplies are safe. They prepare for and respond to a wide range of emergencies and disasters, and they maintain vital records and collect important health-recorded data across the state. DPH also assesses the quality and safety of health care facilities and services and oversees the integrity and competency of health care professions. DPH is the state agency responsible for overseeing the statewide system of prevention, intervention, treatment, recovery and support services for individuals and families affected by substance addiction. In 2023, 2,125 people died as a result of an opioid related overdose in Massachusetts. On or about February 28, the federal Substance Abuse and Mental Health Services terminated the Region I Regional Director effective immediately and without notice, leaving Massachusetts and all of New England without a federal regional coordinating body.   This gap in staffing increases

2

**JA133**

the risk that harmful changes to drugs prone to abuse may not be timely identified as they travel throughout New England. For example, in 2023, comprehensive communication with the Regional Director allowed programs throughout Massachusetts to understand and address the presence of a new adulterant, nitazene. Information received through public health partners in Vermont and the Massachusetts Drug Supply Data Stream ("MADDS"), and managed by the Regional Director, enabled Massachusetts harm reduction providers to recognize clinical changes in presentation that could be attributed to nitazene and to respond accordingly. The sharing of this information allowed providers to collaborate and stay informed about changes in street drug supply availability, potency, and new drug-related health risks.

II.    **The Department of Transitional Assistance - SNAP**

5.    The Supplemental Nutrition Assistance Program ("SNAP") provides financial assistance to low-income individuals and families to help them buy food. Nearly 1.1 million people in Massachusetts receive SNAP benefits, one in six Massachusetts residents. There are SNAP recipients in every city and town across the Commonwealth. Nearly 25% of SNAP recipients are older adults (age 60 and older), 28% of SNAP recipients have a disability, and about one-third of SNAP recipients are children. SNAP eligibility is based on income and expenses. Most households must have a gross monthly income at or below 200% of the Federal Poverty Level to qualify for SNAP in Massachusetts. In Massachusetts, the average SNAP benefit is $330 per household at the rate of $10.80 per household per day.

6.    OTA has been working with US Digital Services since February 2024 to develop and pilot a new technical Consent Based Verification app, which would improve and expand the ability to collect and validate employment information for applying and existing **SNAP** households. Not only would the tool be implemented in Massachusetts, but it was also anticipated

3

**JA134**

that this service would ultimately be made available to all SNAP states, offering reduced administrative costs for income verification to both states and the federal government. After a successful phase one pilot in late 2024, Massachusetts and the USDS team broadened and accelerated the engagement in anticipation of a full-scale rollout of the technology in early spring 2025. However, over recent weeks this engagement has been seriously disrupted by the termination, loss, or relocation of USDS employees working on the project. As a result, the likelihood of implementing CBV on time in Massachusetts has changed from expected to unlikely.

III.    **MassHealth Programs**

7.    EOHHS administers several publicly funded programs that enable qualifying Massachusetts residents to access free or low-cost healthcare coverage. These programs include the Medicaid plan, Children's Health Insurance Program ("CHIP"), and the 1115 Demonstration Project-collectively known in Massachusetts as "MassHealth." Jointly funded by state and federal dollars, MassHealth provides coverage for a wide range of health services to children, the elderly, families, and individuals with disabilities. MassHealth benefits may vary depending on, among other things, a person's citizenship and immigration status and household income.

8.    Depending on household income, children who are U.S. citizens or who have qualifying immigration status are eligible for MassHealth's more comprehensive health benefits. For example, children whose household income is no more than 200% of the federal poverty level (for children under 1) or 150% of the federal poverty level (for children 1 through 18) are eligible for MassHealth Standard benefits. These MassHealth plans, which are funded in part by federal dollars, cover comprehensive medical and behavioral health care, primary and specialty physician services, inpatient and outpatient hospital services, long-term services and supports, comprehensive dental and vision care, lab tests, and pharmacy services.

4

**JA135**

9.    The majority of MassHealth's 2.3 million members receive their MassHealth services through a managed care delivery system that MassHealth has implemented under federal regulations promulgated by the Centers for Medicare and Medicaid Services ("CMS") at 42 CFR Part 438. MassHealth's managed care programs include mandatory managed care programs for individuals under the age of 65 for whom MassHealth is their primary insurer, as well as two voluntary managed care programs for adults and seniors who have dual Medicare and Medicaid enrollment. As of February 2025, over 1.6 million members were enrolled in a MassHealth managed care program, which include managed care organizations ("MCOs"), primary care case management entities ("PCCM entities"), a prepaid inpatient health plan ("PIHP"), and primary care case managers ("PCCMs"), as defined under 42 CFR 438.2. These managed care programs, authorized and regulated by CMS, are responsible for ensuring that their 1.6 million MassHealth enrollees have access to the benefits and entitlements guaranteed under federal law.

10.    In accordance with CMS regulations and subregulatory requirements, MassHealth submits documents related to its managed care programs to CMS for review and approval. The managed care documents required to be submitted to CMS for review and approval include contracts and contract amendments, actuarially developed rate certifications, and state directed payment "preprints." In calendar year 2024, MassHealth submitted 23 contract amendments, 18 rate certifications or amended rate certifications, and 56 state directed payment preprints or amended preprints for CMS review and approval. In order to garner the requisite federal approvals on these documents, MassHealth is also required to respond to CMS questions on these documents. In 2024, MassHealth submitted 5 sets of responses to CMS questions on our contract amendments, 20 sets of responses to CMS questions on our rate certifications, and 32 sets of responses to CMS questions on our state directed payment preprints. In all, the state submitted

5

**JA136**

157 sets of managed care related documents to CMS as part of the CMS-mandated review and approval process. CMS's inability to process these submissions due to loss of staff will negatively impact MassHealth's ability to garner the necessary managed care approvals in a timely manner creating uncertainty about whether and if CMS will be approving them at all.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __6__ day of March 2025.

_Kathleen Walsh_

Kathleen Walsh
*Secretary, Massachusetts Executive Office of Health and Human Services*

6

# Exhibit J

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND; et al.,

       Plaintiffs,

     v.

UNITED STATES DERPARTMENT OF
AGRICULTURE; et al.,

       Defendants.

Case No.: 1:25-cv-

## <u>DECLARATION OF ROBERT ASARO-ANGELO</u>

I, Robert Asaro-Angelo, declare as follows:

1.   I am a resident of the State of New Jersey. I am over the age of 18. I am currently the Commissioner of the New Jersey State Department of Labor and Workforce Development ("NJDOL").

2.   I provide this declaration regarding certain facts based on my personal knowledge and review of information provided to me by NJDOL personnel.

3.   The mission of NJDOL is to protect New Jersey's workforce, strengthen its businesses, and promote the dignity of work. NJDOL oversees New Jersey's three wage-protection programs (Unemployment, Temporary Disability, and Family Leave Insurance),

which provide cash benefits to workers who lose their jobs through no fault of their own, or are unable to work because they are sick or injured, caring for a family member, or bonding with a new child. The NJDOL also oversees the Division of Disability Determination Services program, which helps individuals who are disabled and are unable to work apply for cash benefits through the federal Social Security Program; oversees and operates the Division of Workforce Development, which is responsible for New Jersey's workforce services, including vocational rehabilitation services, veterans' services, and more; and oversees the Division of Employer Accounts, which helps employers throughout New Jersey maintain compliance with Unemployment and Disability Insurance laws. Additionally, NJDOL enforces the New Jersey Public Employees Occupational Safety and Health Act as an Occupational Safety and Health Administration State Plan.

4.    As Commissioner, I have access to comprehensive reports and financial records that detail the state of New Jersey's labor market, including claims for unemployment benefits, and the allocation and distribution of federal funding received by NJDOL. Additionally, my role includes overseeing the implementation of, and compliance with, federally funded programs within the agency, ensuring all expenditures align with federal guidelines and regulations.

5.    The ongoing mass-layoff of federal workers is irreparably harming New Jersey in several ways.

**<u>Rapid Response Team Expenditures</u>**

6.    NJDOL oversees the Rapid Response Program, a coordinated, multiple-partner strategy to provide immediate assistance to New Jerseyans subject to mass layoffs. NJDOL is the state entity responsible for conducting outreach and providing unemployment services

required by the federal Workforce Investment Act of 1998, as amended by the federal Workforce Innovation and Opportunity Act of 2014.

7.  Specifically, a state rapid response program is required by both the federal Workforce Innovation and Opportunity Act 29 U.S.C. § 3174(A)(2)(i) and N.J.S.A. 34:21-5.

8.  When a private employer with more than 100 employees contemplates a mass layoff, terminating 50 or more employees, the federal Worker Adjustment and Retraining Notification (WARN) Act imposes critical notice requirements.  Specifically, the employer is required to notify certain groups including State dislocated worker units, at least sixty days in advance of the layoffs, so that rapid response activities can be undertaken to ameliorate the negative effects of large unemployment events. 29 U.S.C. § 2101 et seq.

9.  The purpose of the Rapid Response Program is to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

10. When notified of a forthcoming mass layoff, the Rapid Response team will quickly provide informational resources and reemployment services for workers, including but not limited to: information and support for filing Unemployment Insurance (UI) claims, information on the impacts of layoffs on health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training. The information is either presented virtually or on site at the discretion of the employer.

11. I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is similarly required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

12. My understanding is that the notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

13. To the best of my knowledge, neither the NJDOL nor any other entity in the New Jersey State Government have received notice of a federal reduction in force at any federal agency.

14. NJDOL's data indicates that 388 former federal employees, both probationary and non-probationary, have applied for unemployment benefits from January 21, 2025, to February 26, 2025. There was a material increase in the number of such claims beginning in mid-February.

15. During the same period in 2024, only 104 federal unemployment claims were filed with NJDOL. In the four months preceding the Executive Order, an average of 79 federal unemployment claims were filed each month.

16.  Due to the lack of notice of these wide-scale federal employee firings, NJDOL will have to devote a significant amount of time to conduct broad-based outreach to try to identify recently terminated employees, and provide relevant resources and assistance in processing claims.

17. In addition, because of the lack of notice, NJDOL has been unable to plan in advance to allocate more staff, resources, and expenditures as needed to fulfill our statutory mission and address the influx of claims.

18. In sum, my office needs to devote significant time, resources, and expense to simply try to identify workers subject to federal mass layoffs and otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide us the legally required notice of mass layoffs.

### Unemployment Assistance Process

19. NJDOL also manages claims for unemployment benefits by individuals formerly employed to work in New Jersey.

20. The Unemployment Compensation Law of New Jersey provides insurance benefits, over an extended period of time, to persons who become unemployed through no fault of their own.  N.J. Stat. Ann. §§ 43:21-1–24.30.

21. As a general matter, the federal Government is required to reimburse New Jersey for unemployment benefits provided to former federal employees. Specifically, the Division of Employment Security is party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a). N.J. Stat. Ann. § 43:21-5.2.

22. Pursuant to 5 U.S.C. § 8502(b), New Jersey is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under the New Jersey Unemployment Compensation Law.

23. Pursuant to N.J. Stat. Ann. § 43:21-6, an individual in New Jersey who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the Director of the Division of Unemployment and Temporary Disability Insurance of the Department of Labor and Workforce Development of the State of New Jersey.

24. Claimants file claims online or by phone using NJDOL's system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for her separation, work experience, and other relevant information. The claimant is then provided a notice from the Division informing them that the claim is being processed as well as their expected monetary determination, if wage information is available to the Division.

25. The employer is then contacted and asked to furnish a report of the separation from employment containing the reason for the employee's separation and, if not already available to the Division, a report of wage history. N.J. Admin. Code § 12:17-5.5; see also N.J. Admin. Code § 12:17-3.2.

26. New Jersey law disqualifies or delays some claimants from receiving benefits depending on the circumstances of their separation from employment or other factors. *See* N.J. Stat. Ann. § 43:21-5. Disqualifying or delaying circumstances include, *inter alia*, termination for misconduct, which if confirmed after investigation by NJDOL results in a six-week waiting period before receiving benefits. *Id.*, see also N.J. Admin. Code §§ 12:17-10.1–10.8.

27. After a claimant has filed a claim, the claimant may be required to participate in fact-finding and electronic adjudication to determine eligibility for benefits. N.J. Admin. Code § 12:17-4.3(g). Thereafter, a benefit determination notice will be made stating, *inter alia*, the

information used to determine monetary eligibility and if he or she is found ineligible or disqualified for benefits. N.J. Admin. Code § 12:17-4.7.

28. A claimant may file an appeal within 21 days from the mailing date of the benefit determination notice. An employer may file for appeal within 7 days of confirmed receipt of notification of an initial determination.  N.J. Stat. Ann § 43:21-6(b)(1). An initial determination is final unless an appeal is filed, and such appeals may proceed through administrative and then judicial review. N.J. Admin. Code §§ 1:12-1–18.5.

## Unemployment Benefits Recent Experience and Investigatory Process

29. As noted above, there has been a significant increase in unemployment claims for former federal employees received by NJDOL since January 20, 2025 and in particular since mid-February.

30. Private sector employers are required to file quarterly wage information via WR-30 and NJ-927s with NJDOL.  However, federal public sector employers are not required to provide such wage information.

31. For claims submitted by federal public sector employees, including every UCFE claim, NJDOL must reach out to the employer to determine wage information and the employer's reasons for the dismissal.  The federal employer then has 10 days to respond to the request. Only when the information is received can the benefit amount calculation proceed. If the information is not received, additional outreach to the claimant is required to obtain pay stubs and other wage verifying information. As a result, NJDOL must expend more time and resources to process UCFE claims than regular UI claims.

32. Furthermore, if there is a dispute between the employer and employee as to the reason for the termination, or if any reason is provided for the separation other than an

agreement of lack of work between the employer and claimant, NJDOL's procedures require that the claims examiner investigate the reason for discharge.

33. I understand from public reporting that many probationary workers were notified that they were being terminated for performance. I therefore anticipate that at least some federal agencies will maintain the position that the terminated probationary employees were fired due to poor performance.

34. NJDOL thus expects that it will have to follow our intensive investigative process to investigate the reasons for the firings of many probationary employees. While designed to ensure fairness, the procedures impose a significant strain on NJDOL's financial and temporal resources. Each case demands a fact-finding proceeding and necessitates extensive staff hours for scheduling, conducting phone interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

35. The cumulative effect of these investigations translates to substantial expenditures on personnel, administrative overhead, and the technological infrastructure required to manage the burgeoning caseload, ultimately impacting NJDOL's budget and hindering its ability to address other critical labor-related issues.

36. The same Department staff who handle regular unemployment claims also process and adjudicate UCFE claims. Redirecting staff from handling regular Unemployment Insurance (UI) claims to process and adjudicate this sudden influx of resource-intensive UCFE claims threatens to strain our resources.

37. This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods.

38. Recent statements of the President and other federal officials have indicated that the overwhelming majority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but instead constitute a Government-wide effort to shrink the size of the federal workforce, an effective reduction in force.

39. As a result, it is likely that the overwhelming majority of recently-terminated federal employees will in fact be eligible for state unemployment benefits, because they were not terminated for cause.

40. However, statements in termination letters provided to probationary employees state such terminations are for-cause and will necessitate extensive and irreparable investigatory costs and resource expenditures by NJDOL.

**Increased Unemployment Benefits**

41. Finally, New Jersey will also bear increased costs in the form of unemployment benefits of ex-federal employees. While the federal government is generally required to reimburse New Jersey for UCFE benefits, New Jersey must pay such benefits in the first instance, depleting the statewide trust fund that is supported by private employers in the state.

42. Moreover, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program. 42 U.S.C. § 502(a). While New Jersey has been and continues to expend additional resources necessary to address the uptick in federal unemployment claims, it is thus entirely speculative whether our Department's costs will be fully reimbursed.

Executed on March  5, 2025, at Trenton, New Jersey.

_____
Robert Asaro-Angelo, Commissioner

New Jersey Department of Labor & Workforce Development

# Exhibit K

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., | |
| Plaintiffs, | |
| v. | Case No.: 1:25-cv- |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., | |
| Defendants. | |

## DECLARATION OF KELLY ANDERSON-THOMAS, MPH, MS

I, Kelly Anderson-Thomas, hereby declare as follows:

1.      I am a resident of the State of New Jersey.  I am over the age of 18.

2.      I am the Deputy Commissioner of the Public Health Services Branch at the New Jersey Department of Health ("NJDOH") and have been held this position since March 2024.  I have a Masters in Public Health as well as a Masters in Science.  I am responsible for overseeing operations and policy implementation across six divisions: Epidemiology, Environmental and Occupational Health; Family Health Services; HIV, STD and TB Services; Disaster Preparedness, Resiliency and Emergency Medical Services; Public Health and Environmental Laboratories; Local Public Health; and two offices: Opioid Response and Policy; and Women's Health.

3.      The information in the statements set forth below was compiled through personal knowledge, and from DOH personnel who have assisted in gathering this information from our agency.

1

4.    NJDOH's mission is to protect public health, promote healthy communities, and continue to improve the quality of health care in New Jersey.  Among its many functions, NJDOH dedicates substantial resources to preventing the spread of infectious diseases, developing comprehensive emergency preparedness plans to coordinate disaster response efforts, and implementing public health programs.

5.    To support those critical goals, NJDOH has a long-standing history of securing federal civil service personnel detail from the Centers for Disease Control and Prevention ("CDC") through its Public Health Associate Program for Recent Graduates ("PHAP"). PHAP is a competitive, two-year training program created by the CDC that places new college graduates ("Associates") with tribal, local, and territorial public health agencies and nongovernmental organizations.  Associates work alongside other public health professionals in a range of settings. Pursuant to the Public Health Service Act, 42 U.S.C. § 215, NJDOH enters into a two-year agreement with the CDC for each Associate detailed to NJDOH. CDC covers all the Associate's costs, including their salary and benefits. In the past, NJDOH has hosted Associates to support critical public health work through emergency preparedness and placements at CDC's Newark Port Health station and public health laboratories in the state.

6.    Pursuant to the PHAP program, CDC has recently detailed three Associates at different NJDOH divisions to perform core public health functions. One Associate was placed at the Division of HIV, STD, and TB Services (for the term starting October 21, 2024 and ending October 30, 2026).  The purpose of this Division is to prevent and reduce the spread of HIV, STDs, and TB, and to ensure that those infected or at risk of infection of these diseases have access to care.  The Associate worked on contact tracing for persons with STDs or TB to ensure both patients and their partners had access to treatment and testing, and to limit the spread of

these communicable diseases. The Associate constituted one member of a four-person regional team.  These employees are responsible for tracking 800 new HIV cases and 3,500 syphilis cases per year, and each member investigates 30 to 50 STD/HIV cases at a time. Their duties consist of labor-intensive tasks such as calling medical providers to confirm treatment, calling patients to ask about their risk and partners, and calling and advising partners of their exposure and testing/treatment options. The division investigates approximately 2,000 named contacts per year.

       7.     A second Associate was assigned to the Epidemiology, Environmental and Occupational Health's Communicable Disease Service ("CDS") (starting in November 2023 and ending in November 2025) and conducted investigations in the Foodborne and Waterborne Disease Unit. The purpose of this Unit is to prevent the spread of foodborne and waterborne diseases and investigate potential clusters and outbreaks.  The Unit routinely collaborates with local, state, and federal partners to bolster surveillance, curb disease transmission, and improve capacity for detection and response.  This Associate was part of a two-person team responsible for reviewing Campylobacteriosis case investigations; with over 2000 cases reported every year, Campylobacteriosis is the most common reportable foodborne and waterborne disease in New Jersey. The Associate also worked closely with other CDS teams to develop the performance metrics dashboard for local health department use. The Associate also assisted the Influenza Surveillance Unit with data cleaning during the current influenza season and was expected to assist the Foodborne and Waterborne Disease Unit over the summer with planning and enhancing surveillance strategies for Harmful Algal Bloom investigations, which is an increasingly emergent issue in New Jersey.

8.      The third Associate was detailed to the Global Tuberculosis Institute at Rutgers University (from July 2023 to July 2025) and supported TB investigations and contact tracing for persons diagnosed with TB in two populous counties in New Jersey. Among his many duties, the Associate compiled quarterly statistical reports for NJDOH, ensured TB patients adhered to their treatment regimen, and provided robust care by connecting clients to housing, food, and other essential services.  These tasks were all in service of ensuring adequate treatment for those afflicted with TB and preventing the broader spread of the disease.

9.      NJDOH invested significant time and resources to train these Associates—which typically takes four to six months to complete—to investigate reports of persons with reportable disease conditions and integrate them into the state's existing teams performing the same work. Their work was especially critical at this time because NJDOH has been dealing with numerous communicable disease challenges, including H5N1, measles, Covid-19, influenza, norovirus, and RSV.

10.     On February 16, 2025, the HIV/STD and CDS Associates informed NJDOH that CDC had terminated their positions on February 15, 2025, effective March 14, 2025, but placed them on immediate administrative leave. NJDOH reached out to the Rutgers Global TB Institute on February 17, 2025 and learned that their Associate had also been terminated under similar circumstances as the other Associates. My understanding is the terminations were pursuant to a memorandum from the Office of Personnel Management that directed many federal agencies to lay off all probationary employees, which included the Associates detailed to NJDOH. NJDOH did not receive any notice before the Associates were terminated and placed on administrative leave.

4

**JA153**

11.     On March 5, 2025, NJDOH learned that CDC had just rescinded the terminations

of its three Associates.  Although the PHAP Associates have apparently been reinstated, the

Associate from the HIV, STD, and TB Services Division informed NJDOH on March 6, 2025

that she does not intend to return. While CDC sent NJDOH written confirmation that it was

reinstating the PHAP Associates, it provided no assurances that the terminations would not

happen again, nor did it agree to provide advance notice if they did.

12.     Since the Associates served on small teams while handling large caseloads, the

loss of any one Associate materially hinders NJDOH's operations. Diverting current staff to fill

the vacant position long-term presents significant challenges: NJDOH does not have the

budgetary flexibility to replace the Associate and is currently under a hiring freeze, and the

overall reduced workforce constrains the effectiveness of NJDOH's critical public health work.

Further, without any reassurance from CDC that the terminations will not recur, NJDOH is left

in a position of ongoing uncertainty, which perpetuates its inability to plan accordingly. Beyond

the immediate disruption to NJDOH's functioning, the loss of an Associate removes a valuable

source of young public health professional talent who use the two-year PHAP to build expertise

and institutional knowledge that can ultimately serve New Jersey's many public health agencies

long-term. For example, NJDOH was able to seamlessly transition a former PHAP Associate in

the HIV, STD, and TB Services Division to permanent employment due to the training she

received through the program.

13.     Regardless of whether the Associates all return to their positions, NJDOH has

already been adversely impacted by the terminations. NJDOH had devised its already-limited

budget and work priorities in reliance on the CDC providing the full-time Associates at no cost

to the State for two years, consistent with long-standing arrangements with CDC. Because the

Associates were laid off without notice, NJDOH was unable to prepare for the sudden loss of labor it was relying on to perform crucial public health services. It has already contended with significant disruption caused by the unexpected staff shortages. Each Associate managed their own set of time-sensitive cases, which had been transferred to existing staff members. In addition to substantially increasing those staff members' daily workload, the unplanned terminations prevented the Associates from ensuring their files were complete and ready for transition to a new handler. This resulted in administrative inefficiencies, duplicative work, and most importantly, delayed notifications to persons exposed to syphilis, HIV, and TB, which in turn increased the risk of spreading disease in New Jersey. The lack of advance notice of the terminations significantly compounded these problems.

14.    Overall, the unexpected terminations and reinstatements were avoidable disruptions that have cost NJDOH time and resources which should have been directed to fulfilling its important public health duties.


Executed on March 6, 2025, at Trenton, New Jersey.


Kelly Anderson-Thomas, Deputy Commissioner

6

JA155

Exhibit L

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

## DECLARATION OF SCOTT MELVIN

I, Scott Melvin, declare as follows:

1.      I am a resident of the State of New York. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Executive Deputy Commissioner of the New York State Department of Labor (NY DOL) and have nearly 30 years of government experience, including over 11 years at NY DOL. I began my tenure with NY DOL as a Special Assistant to the Commissioner in 2014, advanced to Chief of Staff in 2016, and became Acting Executive Deputy Commissioner in 2020, followed by my appointment to my current role in 2021. I am responsible for the comprehensive management of NY DOL's day-to-day operations and spending, overseeing 14 distinct divisions and offices within NY DOL, including the Workforce Development, Unemployment Insurance, and Worker Protection divisions.

3.      The NY DOL is responsible for helping New Yorkers find the careers they will love by connecting them to employment, training, and up-skilling opportunities. As part of this mission, we assist workers who have been laid off from their jobs and process unemployment applications. NY DOL performs this function for all New Yorkers, including those who were employed by the federal government.  As Executive Deputy Commissioner, I have access to data maintained by NY DOL documenting recent layoffs of federal workers in New York State.

4.      We have seen a significant increase in our most recent data of New Yorkers terminated by the federal government and seeking unemployment benefits. From January 21 – February 20, NY DOL received 178 new unemployment claims from federal employees.  From

February 21 – February 27, the most recently available data set, NY DOL logged an additional 372 new unemployment claims from federal employees.

5.     These layoffs will require us to assist more New Yorkers and process more unemployment applications than expected, as we were not prepared for these numbers.

6.     NY DOL is designated as New York State's lead workforce development agency pursuant to N.Y. Labor Law § 851. In this capacity, NY DOL oversees a Rapid Response program that facilitates immediate assistance to New Yorkers subject to mass layoffs as required by the federal Workforce Innovation and Opportunity Act, 29 U.S.C. § 3174(A)(2)(i).  NY DOL's no-cost services include, but are not limited to, skill-based resume development, access to user friendly job search tools, and opportunities to engage in mock interviews to improve interviewing skills.

7.     The federal Worker Adjustment and Retraining Notification Act imposes notice requirements on private employers with respect to certain mass layoffs.  Similarly, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal government is required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF. Pursuant to 29 U.S.C. § 3361(a), the reference to section 134(a)(2)(A) of the Workforce Investment Act of 1998 is deemed to refer to the Workforce Innovation and Opportunity Act, 29 U.S.C. § 3174(A)(2)(i). The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is directed to the state entity required to carry out rapid response activities.

8.     To the best of my knowledge, NY DOL has not received any notices under 5 U.S.C. § 3502(d)(3)(A) since January 20, 2025.

Executed on March 6, 2025, at New York, New York,


/s/ Scott Melvin
Scott Melvin
Executive Deputy Commissioner
New York State Department of Labor


*Counsel hereby certifies she has a signed copy of the foregoing document available for inspection at any time by the court or a party to this action.

# Exhibit M

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND; et al., | |
| Plaintiffs, | |
| v. | C.A. No. |
| UNITED STATES DEPARTMENT OF AGRICULTURE; et al., | |
| Defendants. | |

**<u>DECLARATION OF JULIA PONTONI</u>**

I, Julia Pontoni, declare as follows:

1.      I am a resident of the State of Oregon. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by Oregon's Higher Education Coordinating Commission (HECC) as the Director of the Office of Workforce Investments (OWI).

3.      The HECC, and specifically OWI, is responsible for ensuring that job-seekers have the skills, work-related training, and support needed to secure good-paying jobs, and ensuring that employers have the workforce they need to thrive. The HECC and OWI administer a range of federally funded workforce and training programs, including but not limited to those authorized by Title I-B of the Workforce Innovation and Opportunity Act (WIOA), that are vital to Oregon's economic stability and workforce development.

1

4.  The ongoing layoff of federal workers is irreparably harming Oregon in several ways.

5.  The OWI oversees Rapid Response, a coordinated, multiple-partner strategy to provide immediate assistance to Oregonians subject to layoffs, plant closings, and other economic dislocations.  OWI is the state entity responsible for conducting outreach to employers and affected workers required by the federal Workforce Investment Act of 1998, as amended by the federal Workforce Innovation and Opportunity Act of 2014.

6.  Specifically, a state rapid response program is required by the federal Workforce Innovation and Opportunity Act 29 U.S.C. § 3174(A)(2)(i).

7.  HECC has designated most Rapid Response activities to Oregon's nine local workforce development boards. The workforce development boards provide localized assistance to both employers and employees across the state. A Rapid Response Coordinator works with the local workforce development boards and reports to me.

8.  As relevant here, when a private employer with more than 100 employees contemplates a mass layoff, terminating 50 or more employees, the federal Worker Adjustment and Retraining Notification (WARN) Act imposes critical notice requirements.  Specifically, the employer is required to notify certain groups including HECC, at least sixty days in advance of the layoffs, so that rapid response activities can be undertaken to ameliorate the negative effects of large unemployment events. 29 U.S.C. § 2101 et seq.

9.  The purpose of the Rapid Response system is to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and

dislocations; and to prevent or minimize the impact of layoffs on workers, businesses, and communities.

10.    When notified of a forthcoming layoff or closure, local Rapid Response teams will quickly attempt to contact the employer to collect information about affected workers and to coordinate the dissemination of information to those workers.

11.    Local Rapid Response teams will provide informational resources and reemployment services for workers, including but not limited to: information and support for filing Unemployment Insurance (UI) claims, information on the impacts of layoffs on health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training.

12.    I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is similarly required to notify Oregon, or "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

13.    The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger Rapid Response activities since it is explicitly to be given to the state entity required to carry out Rapid Response activities.

14.    To the best of my knowledge, neither HECC nor any other entity in the Oregon State Government have received notice of a federal reduction in force at any federal agency.

15.    The failure to receive the required notice in advance of the RIFs has resulted in the local workforce boards having to be reactive instead of proactive in providing assistance and information to laid off workers. Local workforce boards are put in the position of having to

3

contact the federal agency to obtain information which the federal agencies often do not have. Local managers and supervisors at the federal agencies often have very little knowledge of the basis for the termination or even who is being laid off.

16.    With additional layoffs happening daily or weekly without notice, OWI's Rapid Response Coordinator and local workforce boards have begun tracking lay off information via news and media reports. Some local workforce development boards have resorted to conducting outreach efforts to identify the laid off workers and presenting "generic" Rapid Response Information Sessions, publicizing them as "If you have been laid off from the federal government come to the Rapid Response Information Session."

17.    In addition, my staff has set up a separate folder in our computer system to track what we know about the federal layoffs.  The purpose of this folder is to be the focal point for disseminating information statewide to help local areas respond to the layoffs.

18.    The lack of notice of the layoffs has resulted in increased expenditure of staff resources and time attempting to gather information that should have been provided in the notices, and to provide the services we are required by statute to provide.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

4

19.    In sum, every day that goes by, affected workers may not be receiving the information they need and OWI's Rapid Response Coordinator and local rapid response teams are devoting time, resources and expense, to simply try and identify workers subject to federal mass layoffs and make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide us the legally required notice of layoffs.

Executed on March 5, 2025, at Salem, Oregon

_Julia Pontoni_

Julia Pontoni, Director
Office of Workforce Investments

5

Exhibit N

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv- |

**DECLARATION OF KRISTINE CAMPAGNA**

I, Kristine Campagna, hereby declare as follows:

1. I am a resident of the State of Rhode Island and over the age of 18.

2. I am the Associate Director for Community and Health Equity ("CHE") Division at the Rhode Island Department of Health ("RIDOH") and have been held this position since January 2022.

3. I hold a Master's Degree in Education and have been with RIDOH since 2009. I provide leadership, strategic vision, and policy direction to staff and programs in the Division of CHE. I work directly with the Director of RIDOH and other executive leadership staff to implement RIDOH's mission to eliminate health disparities and achieve health equity for all Rhode Islanders.

4. The information in the statements set forth below was compiled through personal knowledge, and from RIDOH personnel who have assisted in gathering this information from our agency.

5. RIDOH's mission is to protect public health, promote healthy communities, and continue to improve the quality of health care in Rhode Island. Among its many functions, RIDOH

dedicates substantial resources to preventing the spread of infectious diseases, developing comprehensive emergency preparedness plans to coordinate disaster response efforts, and implementing public health programs.

6. In conjunction with the mission of RIDOH, the Division of CHE strives to prevent diseases and protect and promote health and safety of the people of Rhode Island.

7. To support these critical goals, RIDOH and CHE have a long-standing history of securing federal civil service personnel detail from the Centers for Disease Control and Prevention ("CDC") through its Public Health Associate Program for Recent Graduates ("PHAP"). PHAP is a competitive, two-year training program created by the CDC that places new college graduates ("Associates") with tribal, local, and territorial public health agencies and nongovernmental organizations. Associates work alongside other public health professionals in a range of settings. Pursuant to the Public Health Service Act, 42 U.S.C. § 215, RIDOH enters into a two-year agreement with the CDC for each Associate detailed to RIDOH. CDC covers all the Associate's costs, including their salary and benefits.

8. Since 2017, RIDOH has hosted numerous PHAP Associates in the areas of emergency preparedness, violence and injury prevention, and adolescent health. Their work has greatly contributed to the work of RIDOH.

9. Over the past two years, CDC detailed two (2) Associates at different RIDOH divisions to perform core public health functions.

10. One Associate was placed in RIDOH's Violence and Injury Prevention Program ("VIPP"), which applied to become a host site for PHAP in February 2024. The VIPP Associate began his 2-year term placement with VIPP in October 2024.

11. RIDOH's VIPP planned to have the VIPP Associate contribute to cross-cutting initiatives focused primarily on prevention of Adverse Childhood Experiences ("ACEs"). There is no dedicated funding or focus in the current VIPP portfolio for this type of work, despite ACEs being a common risk factor of suicide and domestic violence.

12. The work undertaken by the VIPP Associate provides an opportunity to advance initiatives pertaining to violence prevention at multiple levels. As such, the VIPP Associate's work is critical to the work undertaken throughout RIDOH. Notably, at the time of his termination, the VIPP Associate was working on a comprehensive landscape analysis on Adverse Childhood Experiences. This work, in turn, informs initiatives associated with Child Death Review recommendations to identify preventable circumstances to improve health and safety for all children.

13. The second PHAP Associate was placed in RIDOH's Adolescent, School and Reproductive Health ("ASRH") Programs, which has been a host site for the competitive PHAP since 2020.

14. In February 2023, ASRH Programs applied to serve as a host site for another PHAP Associate. In September 2023, RIDOH was notified that ASRH Programs were awarded as a host site and matched with a PHAP candidate based upon our application. The ASRH Programs Associate began her two-year term placement with the program in November 2023.

15. ASRH Programs have invested nearly fifteen months hiring, onboarding, training, and supporting the ASRH Programs Associate, to contribute to cross-cutting initiatives that advance health and well-being for school-age children and adolescents in Rhode Island.

16. Among other activities, the ASRH Programs Associate supported implementation of evidence-based youth programming, technical assistance for schools and community-based partners, and community outreach and engagement. The goal for this position was to help expand initiatives

for positive youth-development programming, support communities of youth-serving professionals, and develop collaborative community engagement and partnerships.

17. RIDOH invested significant time and resources to train these Associates—which typically takes four to six months to complete—to carry out the above-described work and integrate them into the state's existing teams performing the same work.

18. On February 19, 2025, RIDOH learned that the two Associates had been terminated from their positions on February 15, 2025—before the expiration of their contractual two-year terms—and placed on immediate administrative leave. Adding to the confusion, on March 5, 2025, RIDOH informally learned that the two Associates have been notified that their positions will be reinstated. RIDOH has yet to receive confirmation of this change from the CDC.

19. Despite their reinstatement, the sudden loss of essential personnel, coupled with the lack of notice, caused RIDOH significant harm and disruption. RIDOH had invested significant time and resources into months-long training for the Associates, and the agency did not have the budgetary flexibility or hiring authority to replace them, particularly given the lack of any notice. The unexpected staffing shortages and imminent need to reallocate and train existing staff have already caused delays and administrative chaos, which impeded RIDOH's ability to fulfill its mission of preventing disease and promoting public health in the state. The loss in workforce capacity during this time hampered RIDOH's ability to fully respond to these public health threats.

20. The lack of notice compounded the challenges created by the terminations. RIDOH was not able to plan for the terminations, resulting in administrative inefficiencies, duplicative work, and impeded critical work undertaken by RIDOH.

Dated: March 6, 2025                          Signed: _/s/ Kristine Campagna_ *
                                             Kristine Campagna
                                             RIDOH Division Director

                                             *A copy of the signature page bearing an
                                             original signature is attached hereto.

20. The lack of notice compounded the challenges created by the terminations. RIDOH was not able to plan for the terminations, resulting in administrative inefficiencies, duplicative work, and impeded critical work undertaken by RIDOH.


Dated: ___3/6/2025___

Signed: _Kristine Campagna_
Kristine Campagna
RIDOH Division Director

*A copy of the signature page bearing an original signature is attached hereto.

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                    *

_____                      *
**Plaintiff,**
                                             *
**v.**                                              **Case No.**  1:25-cv-00748-JKB
                                             *                  _____
United States Department of Agriculture, et. al,

_____                      *
**Defendant.**                                      *

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒    Exhibit  M_____  which is an attachment to  _____

Plaintiffs' Motion for Temporary Restraining Order_____

will be electronically filed under seal within 24 hours of the filing of this Notice.


☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025_____          _____
Date                                  Signature

                                      James D. Handley, Bar No. 20299
                                      _____
                                      Printed Name and Bar Number

                                      200 Saint Paul Place, 20th Floor
                                      _____
                                      Address

                                      jhandley@oag.state.md.us
                                      _____
                                      Email Address
                                      (410) 576-6993
                                      _____
                                      Telephone Number


                                      _____
                                      Fax Number

**JA174**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.

    **Plaintiff,**

    **v.**

United States Department of Agriculture, et. al,

    **Defendant.**

\*

\*

\*

\*

\*

**Case No.** 1:25-cv-00748-JKB

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒   Exhibit N which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐   _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

_James D. Handley_ (signature)

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA175**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                          *

_____                          *

**Plaintiff,**                                    *

    **v.**                    *        **Case No.**  1:25-cv-00748-JKB

United States Department of Agriculture, et. al,   *

_____                          *

**Defendant.**                                    *

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒   Exhibit  O   which is an attachment to _____

    Plaintiffs' Motion for Temporary Restraining Order

    will be electronically filed under seal within 24 hours of the filing of this Notice.

☐   _____

                    (title of document)

    will be electronically filed under seal within 24 hours of the filing of this Notice.

    I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland .

March 7, 2025                                    _James D. Handley_ (signature)
_____                          _____
Date                                             Signature

                           James D. Handley, Bar No. 20299
                           _____
                           Printed Name and Bar Number

                           200 Saint Paul Place, 20th Floor
                           _____
                           Address

                           jhandley@oag.state.md.us
                           _____
                           Email Address

                           (410) 576-6993
                           _____
                           Telephone Number

                           _____
                           Fax Number

**JA176**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                          *

_____
  **Plaintiff,**                                  *

                                                  *     **Case No.**  1:25-cv-00748-JKB
  **v.**                                                            _____

United States Department of Agriculture, et. al,  *

_____
  **Defendant.**                                  *

## NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒     Exhibit  P_____   which is an attachment to  _____

      Plaintiffs' Motion for Temporary Restraining Order
      _____

      will be electronically filed under seal within 24 hours of the filing of this Notice.

☐     _____
                          (title of document)

      will be electronically filed under seal within 24 hours of the filing of this Notice.

      I certify that at the same time I am filing this Notice, I will serve copies of the document
identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland .

March 7, 2025
_____          _____
Date                                    Signature

                                        James D. Handley, Bar No. 20299
                                        _____
                                        Printed Name and Bar Number

                                        200 Saint Paul Place, 20th Floor
                                        _____
                                        Address

                                        jhandley@oag.state.md.us
                                        _____
                                        Email Address

                                        (410) 576-6993
                                        _____
                                        Telephone Number

                                        _____
                                        Fax Number

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.                    *

_____

**Plaintiff,**                               *

                                             *        **Case No.**  1:25-cv-00748-JKB
**v.**                                                             _____

United States Department of Agriculture, et. al,    *

_____

**Defendant.**                               *

## NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

[x]    Exhibit  Q_____  which is an attachment to  _____

Plaintiffs' Motion for Temporary Restraining Order _____

will be electronically filed under seal within 24 hours of the filing of this Notice.

[ ]    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland .

March 7, 2025                                _____
_____                 Signature
Date
                                            James D. Handley, Bar No. 20299
                                            _____
                                            Printed Name and Bar Number

                                            200 Saint Paul Place, 20th Floor
                                            _____
                                            Address

                                            jhandley@oag.state.md.us
                                            _____
                                            Email Address

                                            (410) 576-6993
                                            _____
                                            Telephone Number

                                            _____
                                            Fax Number

NoticeofFilingofDocumentUnderSeal (11/2017)               **JA178**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.

    **Plaintiff,**

    **v.**

United States Department of Agriculture, et. al,

    **Defendant.**

\*    \*    \*    \*    \*

**Case No.** 1:25-cv-00748-JKB

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒    Exhibit R which is an attachment to

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA179**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.                    *

**Plaintiff,**                               *

v.                                           *        **Case No.**  1:25-cv-00748-JKB

United States Department of Agriculture, et. al,   *

**Defendant.**                               *

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒    Exhibit  S         which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.


☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025                              _____

Date                                      Signature

                                          James D. Handley, Bar No. 20299

                                          Printed Name and Bar Number

                                          200 Saint Paul Place, 20th Floor

                                          Address

                                          jhandley@oag.state.md.us

                                          Email Address

                                          (410) 576-6993

                                          Telephone Number

                                          _____

                                          Fax Number

**JA180**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                          *

_____

   **Plaintiff,**                                      *

   **v.**                                              *        **Case No.**    1:25-cv-00748-JKB
                                                                                      _____
United States Department of Agriculture, et. al,        *

_____

   **Defendant.**                                  *

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒    Exhibit   T  _____ which is an attachment to  _____

Plaintiffs' Motion for Temporary Restraining Order
_____

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

                                     (title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

     I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland .

March 7, 2025
_____                          _____
Date                                             Signature

                                                 James D. Handley, Bar No. 20299
                                                 _____
                                                 Printed Name and Bar Number

                                                 200 Saint Paul Place, 20th Floor
                                                 _____
                                                 Address

                                                 jhandley@oag.state.md.us
                                                 _____
                                                 Email Address

                                                 (410) 576-6993
                                                 _____
                                                 Telephone Number

                                                 _____
                                                 Fax Number

**JA181**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.                    *

**Plaintiff,**                               *

v.                                           *        **Case No.** 1:25-cv-00748-JKB

United States Department of Agriculture, et. al,    *

**Defendant.**                               *

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒    Exhibit  U  which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA182**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.

    **Plaintiff,**

    **v.**

United States Department of Agriculture, et. al,

    **Defendant.**

\*

\*

\*

\*

\*

**Case No.** 1:25-cv-00748-JKB

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒    Exhibit ___V___ which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

                            (title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

    I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA183**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                    *

_____
   **Plaintiff,**                            *

                                             *        **Case No.**   1:25-cv-00748-JKB
   **v.**                                              _____

United States Department of Agriculture, et. al,    *

_____
   **Defendant.**                            *

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

[×]     Exhibit ___W___ which is an attachment to _____

        Plaintiffs' Motion for Temporary Restraining Order

        will be electronically filed under seal within 24 hours of the filing of this Notice.

[ ]     _____

                              (title of document)

        will be electronically filed under seal within 24 hours of the filing of this Notice.

        I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025                                   _James D. Handley_
_____                           _____
Date                                           Signature

                                               James D. Handley, Bar No. 20299
                                               _____
                                               Printed Name and Bar Number

                                               200 Saint Paul Place, 20th Floor
                                               _____
                                               Address

                                               jhandley@oag.state.md.us
                                               _____
                                               Email Address

                                               (410) 576-6993
                                               _____
                                               Telephone Number

                                               _____
                                               Fax Number

**JA184**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.

   **Plaintiff,**

   **v.**

United States Department of Agriculture, et. al,

   **Defendant.**

*

*

*

*

*

**Case No.** 1:25-cv-00748-JKB

## NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒   Exhibit **X** which is an attachment to _____

   Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐   _____

               (title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

    I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

*James D. Handley*

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA185**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.                    *

_____
**Plaintiff,**                               *

                                             *        **Case No.**  1:25-cv-00748-JKB
**v.**                                                          _____

United States Department of Agriculture, et. al,   *

_____
**Defendant.**                               *

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒     Exhibit  Y_____ which is an attachment to  _____

Plaintiffs' Motion for Temporary Restraining Order
_____

will be electronically filed under seal within 24 hours of the filing of this Notice.


☐     _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025
_____                      _____
Date                                         Signature

                                             James D. Handley, Bar No. 20299
                                             _____
                                             Printed Name and Bar Number

                                             200 Saint Paul Place, 20th Floor
                                             _____
                                             Address

                                             jhandley@oag.state.md.us
                                             _____
                                             Email Address

                                             (410) 576-6993
                                             _____
                                             Telephone Number

                                             _____
                                             Fax Number

**JA186**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.

    **Plaintiff,**

    **v.**

United States Department of Agriculture, et. al,

    **Defendant.**

\*

\*

\*

\*

\*

**Case No.** 1:25-cv-00748-JKB

## NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

[x]  Exhibit   Z   which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

[ ]  _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA187**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                          *

_____
**Plaintiff,**                                      *

                                                    *        **Case No.**   1:25-cv-00748-JKB
**v.**                                                              _____
                                                    *
United States Department of Agriculture, et. al,

_____                     *
**Defendant.**                                      *

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒    Exhibit   AA_____   which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order_____

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____
                                    (title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025_____              _James D. Handley (signature)_____
Date                                                Signature

                                                James D. Handley, Bar No. 20299____
                                                Printed Name and Bar Number

                                                200 Saint Paul Place, 20th Floor____
                                                Address

                                                jhandley@oag.state.md.us_____
                                                Email Address

                                                (410) 576-6993_____
                                                Telephone Number

                                                _____
                                                Fax Number

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.

_____
**Plaintiff,**

**v.**                                                    **Case No.** 1:25-cv-00748-JKB

United States Department of Agriculture, et. al,
_____
**Defendant.**

\*
\*
\*
\*
\*

### NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

[×]    Exhibit **BB**_____ which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order_____

will be electronically filed under seal within 24 hours of the filing of this Notice.

[ ]    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

I certify that at the same time I am filing this Notice, I will serve copies of the document

identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025
_____
Date

_____
Signature

James D. Handley, Bar No. 20299
_____
Printed Name and Bar Number

200 Saint Paul Place, 20th Floor
_____
Address

jhandley@oag.state.md.us
_____
Email Address

(410) 576-6993
_____
Telephone Number

_____
Fax Number

NoticeofFilingofDocumentUnderSeal (11/2017)

**JA189**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.

    **Plaintiff,**

    **v.**

United States Department of Agriculture, et. al,

    **Defendant.**

\*

\*

\*

\*

\*

**Case No.**   1:25-cv-00748-JKB

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒    Exhibit   CC   which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

    I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA190**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

State of Maryland, et al.                        *

    **Plaintiff,**                                    *

    **v.**                                            *        **Case No.**  1:25-cv-00748-JKB

United States Department of Agriculture, et. al,          *

    **Defendant.**                                    *

**NOTICE OF FILING OF DOCUMENT UNDER SEAL**

**Check one.**

☒    Exhibit _DD___ which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

                                  (title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

    I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

**JA191**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

State of Maryland, et al.

    **Plaintiff,**

    **v.**

United States Department of Agriculture, et. al,

    **Defendant.**

*

*

*

*

*

**Case No.** 1:25-cv-00748-JKB

## NOTICE OF FILING OF DOCUMENT UNDER SEAL

**Check one.**

☒    Exhibit   EE   which is an attachment to _____

Plaintiffs' Motion for Temporary Restraining Order

will be electronically filed under seal within 24 hours of the filing of this Notice.

☐    _____

(title of document)

will be electronically filed under seal within 24 hours of the filing of this Notice.

    I certify that at the same time I am filing this Notice, I will serve copies of the document identified above by emailing as directed by the Office of the U.S. Attorney for the District of Maryland.

March 7, 2025

Date

Signature

James D. Handley, Bar No. 20299

Printed Name and Bar Number

200 Saint Paul Place, 20th Floor

Address

jhandley@oag.state.md.us

Email Address

(410) 576-6993

Telephone Number

_____

Fax Number

# Exhibit FF

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**STATE OF MARYLAND**, *et al.*,

       *Plaintiffs,*

  v.

**UNITED STATES DEPARTMENT OF**
**AGRICULTURE**, *et al.*,

       *Defendants.*

## DECLARATION OF TERRY CLOWER

    I, Terry Clower, declare under penalty of perjury that the following statements are true and correct:

1.    My name is Terry Clower. I am over the age of 18 and able to provide true and accurate testimony under oath.

2.    I give this declaration based upon my personal knowledge of the facts recited.

3.    I serve as Northern Virginia Chair in Local Government and Professor of Public Policy in the Schar School of Policy and Government at George Mason University. I am also the director of the Center for Regional Analysis and the Stephen Fuller Institute at George Mason University. The analysis and opinions described herein are my own work and do not reflect the views or endorsement of George Mason University, its Board of Visitors, or the Commonwealth of Virginia.

4.    Prior to joining George Mason University in August of 2014, I spent 23 years as an applied economic researcher at the University of North Texas with my final roles being an Associate Professor of Applied Economics and Director of the Center for Economic Development and Research. I have performed or supervised more than three hundred analyses assessing the

economic and fiscal contributions of industries and employment in every state of the union.

5.    At the request of the Office of the Attorney General for the District of Columbia, I have prepared a preliminary analysis of the potential tax revenue and economic losses that would result from a reduction in the number of federal jobs based in the District of Columbia. I describe my findings, methods, assumptions, and sources of data in the report attached hereto as Exhibit A. I reserve the right to modify this report based on the availability of new data and information.

6.    The findings described in my report assess the loss of economic activity, jobs, and labor earnings and resulting loss of government revenues associated with a reduction in the number of federal jobs based in the District of Columbia under five scenarios of direct federal job losses: 1,000 jobs; 2,000 jobs; 5,000 jobs; 10,000 jobs; and 50,000 jobs.

7.    To estimate how the loss of federal jobs in the District of Columbia will impact District revenues and economic activity, I estimated total compensation for federal employees and used job losses as modeling inputs into an IMPLAN[1] economic input-output model. The IMPLAN model is widely used in academic and professional research and provides estimates of how a change in economic activity, such as jobs, spreads through a regional economy.

8.    Table 1 below shows the findings of the analysis expressed as annual losses from a permanent reduction in force of federal workers, expressed in current (2025) dollars. As Table 1 shows, my analysis projects that the termination of 1,000 federal workers in the District would reduce the District's annual income tax revenues by $1,952,225 and sales tax revenues by $352,481. These projected revenue effects grow in proportion to the number of terminated federal workers, and the termination of 50,000 federal workers in the District would reduce the District's annual income tax revenues by $97,611,267 and sales tax revenues by $17,624,042.

---

[1] Impact Modeling for PLANning, developed by MIG, Inc.

**Table 1: Economic and Tax Revenue Losses from a Reduction in Federal Jobs in the District of Columbia, annual losses, ($2025)**

| Number of Federal Jobs Lost | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 |
|---|---|---|---|---|---|
| **Economic Losses** | | | | | |
| Economic Activity Reduction | $207,277,628 | $414,555,256 | $1,036,388,140 | $2,072,776,280 | $10,363,881,400 |
| Gross State Product Lost | $200,052,171 | $400,104,342 | $1,000,260,855 | $2,000,521,710 | $10,002,608,550 |
| Labor Income | $160,487,108 | $320,974,216 | $802,435,539 | $1,604,871,078 | $8,024,355,390 |
| Total Direct & Induced Jobs | 1,112.3 | 2,224.6 | 5,561.5 | 11,123.0 | 55,615.0 |
| **Tax Losses** | | | | | |
| Corporate Profits Tax | $749,361 | $1,498,722 | $3,746,805 | $7,493,610 | $37,468,050 |
| Income Tax | $1,952,225 | $3,904,451 | $9,761,127 | $19,522,253 | $97,611,267 |
| Sales Tax | $352,481 | $704,962 | $1,762,404 | $3,524,808 | $17,624,042 |
| Property Tax | $682,456 | $1,364,911 | $3,412,278 | $6,824,557 | $34,122,784 |
| Other Taxes & Assessments | $179,287 | $358,573 | $896,433 | $1,792,865 | $8,964,326 |
| TOTAL TAX LOSSES | $3,915,809 | $7,831,619 | $19,579,047 | $39,158,094 | $195,790,470 |

9.      To estimate the direct economic and revenue losses attributable to the failure to provide notice of terminations to the District, Table 2 below shows the projected impacts over a period of 60 days. As Table 2 shows, my analysis projects that the termination of 1,000 federal workers in the District would, over a period of 60 days, reduce the District's income tax revenues by $320,914 and sales tax revenues by $57,942. As with the annualized projections, these projected 60-day revenue effects grow in proportion to the number of terminated federal workers, and the termination of 50,000 federal workers in the District would, over a period of 60 days, reduce the District's income tax revenues by $16,045,688 and sales tax revenues by $2,897,103.

3

**JA196**

**Table 2: Economic and Tax Revenue Losses from a Reduction in Federal Jobs in the District of Columbia, 60-Day Period, ($2025)**

| Number of Federal Jobs Lost | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 |
|---|---|---|---|---|---|
| **Economic Losses** | | | | | |
| Economic Activity Reduction | $34,073,035 | $68,146,069 | $170,365,174 | $340,730,347 | $1,703,651,737 |
| Gross State Product Lost | $32,885,288 | $65,770,577 | $164,426,442 | $328,852,884 | $1,644,264,419 |
| Total Labor Income | $26,381,442 | $52,762,885 | $131,907,212 | $263,814,424 | $1,319,072,119 |
| **Tax Loses** | | | | | |
| Total Corporate Profits Tax | $123,183 | $246,365 | $615,913 | $1,231,826 | $6,159,132 |
| Total Income Tax | $320,914 | $641,828 | $1,604,569 | $3,209,138 | $16,045,688 |
| Total Sales Tax | $57,942 | $115,884 | $289,710 | $579,421 | $2,897,103 |
| Total Property Tax | $112,184 | $224,369 | $560,922 | $1,121,845 | $5,609,225 |
| Total Other Taxes & Assessments | $29,472 | $58,944 | $147,359 | $294,718 | $1,473,588 |
| **TOTAL TAX LOSSES** | $643,695 | $1,287,389 | $3,218,473 | $6,436,947 | $32,184,735 |

10.    To assess the extent to which terminated federal workers may be able to mitigate the potential economic and revenue losses associated with their termination by quickly finding alternative employment, I have conducted an analysis comparing federal jobs by occupation and posted open positions in the District of Columbia using data from Lightcast, a labor market data source.

11.    As might be expected, this analysis shows that some displaced federal workers, particularly those in certain information technology occupations will be able to find alternative employment at lower levels of federal job losses. However, flooding the market with new job seekers in a brief period will quickly exceed existing labor market demand. This could result in an out-migration of workers that will permanently impact the local and regional economy; however, that analysis is beyond the scope of this initial impact assessment.

12.    Table 3 below shows that at lower numbers of federal worker terminations, many displaced workers may be able to find alternative employment, which could somewhat mitigate the economic and fiscal losses for the District of Columbia. As Table 3 shows, my analysis projects that where affected workers have the opportunity to find alternative employment, the termination of 1,000

4

federal workers in the District would reduce the District's annual income tax revenues by $548,482

(rather than the $1,952,225 from Table 1) and sales tax revenues by $99,030 (rather than the

$352,481 from Table 1). My analysis projects that the proportion of workers who are able to find

alternative employment diminishes as the scale of terminations of federal workers increases;

however, even for larger numbers of terminations, the ability of workers to seek alternative

employment would continue to mitigate the revenue effects somewhat. For instance, I project that

where affected workers have the opportunity to find alternative employment, the termination of

50,000 federal workers in the District would reduce the District's annual income tax revenues by

$84,508,449 (rather than the $97,611,267 in Table 1) and sales tax revenues by $15,258,284

(rather than the $17,624,042 in Table 1).

**Table 3: Economic and Tax Revenue Losses from a Reduction in Federal Jobs in the District of Columbia, Assuming Similar Alternative Employment for Displaced Workers, Annual Losses ($2025)**

| Number of Federal Jobs Lost | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 |
|---|---|---|---|---|---|
| Number of Net Jobs Lost | 204 | 505 | 1,642 | 4,732 | 41,514 |
| **Economic Losses** | | | | | |
| Economic Activity Reduction | $58,235,110 | $134,153,824 | $412,195,150 | $1,130,899,335 | $8,972,689,044 |
| Gross State Product Lost | $56,205,102 | $129,477,377 | $397,826,506 | $1,091,477,500 | $8,659,911,541 |
| Labor Income | $45,089,210 | $103,870,154 | $319,146,876 | $875,611,928 | $6,947,208,571 |
| Total Direct & Induced Jobs | 227.0 | 561.6 | 1,826.8 | 5,263.1 | 46,176.4 |
| **Tax Loses** | | | | | |
| Corporate Profits Tax | $210,535 | $485,000 | $1,490,190 | $4,088,487 | $32,438,538 |
| Income Tax | $548,482 | $1,263,515 | $3,882,222 | $10,651,272 | $84,508,449 |
| Sales Tax | $99,030 | $228,132 | $700,948 | $1,923,123 | $15,258,284 |
| Property Tax | $191,737 | $441,698 | $1,357,141 | $3,723,454 | $29,542,323 |
| Other Taxes & Assessments | $50,371 | $116,037 | $356,532 | $978,181 | $7,761,003 |
| TOTAL TAX LOSSES | $1,100,155 | $2,534,383 | $7,787,033 | $21,364,516 | $169,508,598 |

13.    In summary, my analysis has found that large-scale terminations of federal workers are

likely to cause significant reductions to District of Columbia's tax revenues and to economic

activity within the District. Over the course of 60 days, these effects would include reductions to

5

**JA198**

the District's income tax and sales tax revenues of tens of thousands to several millions of dollars, depending on the number of terminated federal employees, with the effects becoming more pronounced with larger numbers of terminations. My analysis also projects that these effects would be mitigated where federal employees are able to seek and obtain alternative employment.

14.     I note that IMPLAN modeling assumes that the general structure of the regional economy studied will generally retain its current shape. That assumption is unlikely to hold true where the number of terminated federal employees becomes extremely high (such as the 10,000 and 50,000 listed in the tables above). The numbers listed in the tables above therefore likely understate the fiscal and economic impacts of terminations of federal employees of those magnitudes.

15.     I also note that my findings regarding the economic and fiscal impacts of mass layoffs of federal employees are consistent with recent projections from the February 2025 Revenue Estimates of the District of Columbia's Office of the Chief Financial Officer (OCFO), attached hereto as Exhibit B. As with my analysis, OCFO found that a projected reduction of 40,000 federal employees would likely cause significant harms to the District's economy and tax base, reducing sales tax revenues by $15 million in FY 2025, escalating to nearly $80 million by FY 2028 and reducing income tax revenues by $94.7 million in FY 2026 and an average reduction of $139.7 million per year thereafter. Although OCFO's projections assume different numbers of affected employees and may have used a different methodology from my analysis, their projection is similar and anticipates that mass terminations of federal workers would cause significant fiscal and economic impacts in the District.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 5, 2025 in Stafford, Virginia.

Terry Clower

6

# Exhibit A

**Analysis of the Tax Revenue Impacts of Federal Job Losses**

**Prepared by: Terry L. Clower, Ph.D.**

**March 4, 2025**

At the request of the Office of the Attorney General for the District of Columbia, I have prepared a preliminary assessment of the potential tax revenue and economic losses that would result from a reduction in the number of federal jobs based in the District of Columbia. The following provides a description of the findings, methods used, key assumptions, and sources of data in preparing this analysis. I reserve the right to modify this report based on the availability of new data and information.

I serve as Northern Virginia Chair in Local Government and Professor of Public Policy in the Schar School of Policy and Government at George Mason University. I am also the director of the Center for Regional Analysis and the Stephen Fuller Institute at George Mason University. The analysis described here is my own work and does not reflect the views or endorsement of George Mason University, its Board of Visitors, or the Commonwealth of Virginia. Prior to joining George Mason University in August of 2014, I spent 23 years as an applied economic researcher at the University of North Texas with my final roles being an Associate Professor of Applied Economics and Director of the Center for Economic Development and Research. I have performed or supervised more than three hundred analyses assessing the economic and fiscal contributions of industries and employment in every state of the union.

**Description of the Analysis**

The findings reported below assess the loss of economic activity, jobs, and labor earnings and associated local government revenues associated with a reduction in the number of federal jobs based in the District of Columbia under five scenarios of direct federal job losses: 1,000 jobs; 2,000 jobs; 5,000 jobs; 10,000 jobs; and 50,000 jobs.

**Data**

There is little data immediately available on the exact positions and pay scales of jobs that are being eliminated or are being targeted for elimination by the current federal administration. Therefore, this analysis relies on several data assumptions that will tend toward understating the total potential impacts on the District of Columbia's economy and government revenue.

The following data are used to model the impacts of federal job losses:

- Pay scale: The analysis uses the General Schedule (GS) Grades (1-15) in estimating lost direct wages associated with the impacted federal jobs. This pay scale represents most federal jobs. Executive, senior, and special scale jobs will typically have higher levels of compensation. By using the GS pay scale, the impact estimates are likely to be conservative in nature.
- Distribution of federal employees by GS Grade: The current distribution of federal workers by GS Grade was not readily available during the preparation of this analysis. Therefore, we assumed the current distribution is the same as reported by the U.S. Equal Employment Opportunity Commission for Fiscal Year 2013.[1] This assumption likely results in understating the

---

[1] https://www.eeoc.gov/federal-sector/reports/table-3b-government-wide-employment-workers-gs-grades-1

total potential losses since previous trends and the aging federal workforce[2] suggests that a higher proportion of federal workers has likely shifted to higher GS levels. (See Table A-1 below.)

- Pay Level: Using the GS pay scale for 2025, adjusted for the District of Columbia Region, as reported by FederalPay.org, and applying the distribution of federal workers as described above, the weighted average wage/salary for the federal workers who have or may lose their jobs is assumed to be $104,274 per annum. Using data from a federal employment information website[3], the average full time federal job has benefits valued at about 43.7% of direct pay. This adjustment results in total assumed average compensation for federal jobs in the District of Columbia at $149,844 per annum.

**Model**

To estimate how the loss of federal jobs in the District of Columbia will impact District revenues and economic activity, assumed job losses at the estimated total compensation (wages, salaries, and benefits) are used as modeling inputs into the IMPLAN[4] economic input-output model. The IMPLAN model is widely used in academic and professional research and provides estimates of how a change in economic activity, such as jobs, spreads through a regional economy. In a typical analysis of business activity, the IMPLAN model includes direct spending and/or job creation, indirect effects resulting from business spending by vendors in a given firm's supply chains, and induced impacts that represent the economic activity from employees of the direct firm and vendors spending a portion of their earnings for goods and services in the economy. The IMPLAN adjusts the spending to account for economic leakage—spending that leaves the study area as purchases of imported goods and services. For example, many federal workers spend a portion of their earnings on automobiles and gasoline, neither of which is produced in the District of Columbia but is sold there. When added together, the adjusted spending represented by direct, indirect, and induced effects is often greater than the direct spending, which is the "multiplier" effect. Unfortunately, multipliers work in both directions. A loss of a federal job means that former job holders will have less household income to purchase goods and services, which lowers aggregate demand and has spillover effects on other jobs in the District of Columbia.[5]

An important caveat and feature of modeling the impacts, positive or negative, of federal jobs is that the IMPLAN model only estimates induced (household spending) impacts for this sector of the economy. Indirect effects, purchases related to supporting that job, are treated through separately assessing government procurement. In this analysis, we have no information that allows us to estimate how these job losses would be reflected in government procurement. For example, we do not know if the workers are in federally owned or leased buildings or what equipment and supplies will not be required by government agencies with reduced staffing levels. Therefore, the estimates offered below do not include indirect government spending effects.

The IMPLAN model provides estimates of:

- Economic Activity: A measure of business transactions.
- Gross State Product: The regional equivalent of economic value added similar to gross domestic product.

---

[2] https://www.washingtonpost.com/opinions/2023/02/07/fauci-government-workforce-aging-hire-young/
[3] https://federaljobs.net/benefits/
[4] Impact Modeling for PLANning, developed by MIG, Inc.
[5] The IMPLAN model has constant coefficients. At high levels of employment disruption, the fundamental structure of the District's economy would change, and an input-output model framework will likely understate the total losses in economic activity and tax revenue.

- Labor Income: Salaries, wages, and benefits.
- Jobs: Expressed as modified full-time equivalent jobs.
- Corporate Profits Tax: Taxes paid on corporate earnings. Even when calculating induced (household spending) impacts, there are business earnings such as a landlord paying income tax on home rent.
- Personal Income Taxes
- Sales Taxes
- Property Taxes
- Other Taxes and Assessments: Includes motor vehicle licenses, fees for permits and other licenses, and other revenue.

**Findings**

Table 1 below shows the findings of the analysis expressed as annual losses from a permanent reduction in force of federal workers, expressed in current (2025) dollars.

**Table 1: Economic and Tax Revenue Losses from a Reduction in Federal Jobs in the District of Columbia, Annual Losses, ($2025)**

| Number of Federal Jobs Lost | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 |
|---|---|---|---|---|---|
| **Economic Losses** | | | | | |
| Economic Activity Reduction | $207,277,628 | $414,555,256 | $1,036,388,140 | $2,072,776,280 | $10,363,881,400 |
| Gross State Product Lost | $200,052,171 | $400,104,342 | $1,000,260,855 | $2,000,521,710 | $10,002,608,550 |
| Labor Income | $160,487,108 | $320,974,216 | $802,435,539 | $1,604,871,078 | $8,024,355,390 |
| Total Direct & Induced Jobs | 1,112.3 | 2,224.6 | 5,561.5 | 11,123.0 | 55,615.0 |
| **Tax Loses** | | | | | |
| Corporate Profits Tax | $749,361 | $1,498,722 | $3,746,805 | $7,493,610 | $37,468,050 |
| Income Tax | $1,952,225 | $3,904,451 | $9,761,127 | $19,522,253 | $97,611,267 |
| Sales Tax | $352,481 | $704,962 | $1,762,404 | $3,524,808 | $17,624,042 |
| Property Tax | $682,456 | $1,364,911 | $3,412,278 | $6,824,557 | $34,122,784 |
| Other Taxes & Assessments | $179,287 | $358,573 | $896,433 | $1,792,865 | $8,964,326 |
| TOTAL TAX LOSSES | $3,915,809 | $7,831,619 | $19,579,047 | $39,158,094 | $195,790,470 |

Sources: U.S. Equal Employment Opportunity Commission, FederalPay.org, FederalJobs.net, IMPLAN, author's calculations.

Many of the terminations enacted by the federal administration this year have been imposed with immediate effect. Typically, a reduction in force action would have a 60 day notice. Table 2 shows the impacts of the economic and revenue losses directly attributable to not having a 60 day notice period for terminating federal positions using the same methods and assumptions as above. Total jobs losses are not shown since the calculation of jobs is in modified annual full-time equivalent terms.

**Table 2: Economic and Tax Revenue Losses from a Reduction in Federal Jobs in the District of Columbia, 60-Day Period, ($2025)**

| Number of Federal Jobs Lost | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 |
|---|---|---|---|---|---|
| **Economic Losses** | | | | | |
| Economic Activity Reduction | $34,073,035 | $68,146,069 | $170,365,174 | $340,730,347 | $1,703,651,737 |
| Gross State Product Lost | $32,885,288 | $65,770,577 | $164,426,442 | $328,852,884 | $1,644,264,419 |
| Total Labor Income | $26,381,442 | $52,762,885 | $131,907,212 | $263,814,424 | $1,319,072,119 |
| **Tax Loses** | | | | | |
| Total Corporate Profits Tax | $123,183 | $246,365 | $615,913 | $1,231,826 | $6,159,132 |
| Total Income Tax | $320,914 | $641,828 | $1,604,569 | $3,209,138 | $16,045,688 |
| Total Sales Tax | $57,942 | $115,884 | $289,710 | $579,421 | $2,897,103 |
| Total Property Tax | $112,184 | $224,369 | $560,922 | $1,121,845 | $5,609,225 |
| Total Other Taxes & Assessments | $29,472 | $58,944 | $147,359 | $294,718 | $1,473,588 |
| **TOTAL TAX LOSSES** | $643,695 | $1,287,389 | $3,218,473 | $6,436,947 | $32,184,735 |

Sources: U.S. Equal Employment Opportunity Commission, FederalPay.org, FederalJobs.net, IMPLAN, author's calculations.

## Alternative Impact Scenario

There has been public discussion that the loss of federal jobs will have little meaningful impact because of the availability of alternative employment, either state and local government or private sector jobs. To assess the potential economic and revenue losses under an assumption that federal workers quickly find alternative employment, the analysis presented below compared federal jobs by occupation and posted open positions in the District of Columbia. The key assumption, which may not hold in practice, is that displaced federal workers can obtain other employment in a matching occupation. For example, the assumption is that a private sector, for-profit business will see a long term federal employee as being qualified based on government job experience.

In performing this analysis, data on federal staffing patterns (jobs by occupation) for the District of Columbia from Lightcast are compared to a listing of job postings also from Lightcast. The job postings data are gathered through web-scraping online job advertisement postings that are algorithmically adjusted to prevent duplicating job postings across differing websites. Both data sets include estimates of wages by occupation, which allows an estimate of any wage differentials and the resulting impacts on economic activity and tax revenue.[6] There is emerging concern among labor market analysts that an increasing share of job posting are "ghost" jobs, meaning that employers use the advertisements and postings to collect resumes for filling *potential* future job openings. However, to be conservative, this analysis assumes the counts of unique job postings represent opportunities for similarly skilled displaced federal workers. In addition, it appears that about 4.3% of the matching job ads are for federal jobs. We have left these jobs in the calculations of alternative jobs, which may result in underestimating total job and tax revenue losses. The appendix includes a sample of the data gathered.

---

[6] There is earnings data missing for some occupations in the job posting data. Absent any other information, this analysis assumes the same federal and private sector wage rate for those occupations.

One important adjustment made to the Lightcast data is to convert wage/salary data to total compensation levels that include the value of benefits.[7]  For federal jobs, the adjustment is the same as described above. For private sector jobs, benefits add an average 29.6% increase to wages based on data from the U.S. Bureau of Labor Statistics' Employer Costs for Employee Compensation data series. As might be expected, in some occupations, such as those in certain information technology occupations, at lower levels of federal job losses it is reasonable to assume the displaced federal workers can find alternative employment. However, flooding the market with new job seekers in a brief period will exceed current labor demand. This could result in an out-migration of workers that will permanently impact the local and regional economy. That analysis is beyond the scope of this initial impact assessment. Even adjusted for higher benefit levels, in most occupations, a federal worker could potentially receive an effective pay raise for moving to the private sector. For purposes of adjusting our initial estimates to account for alternative employment opportunities, the analysis uses partial, not whole number, job counts.

It is important to emphasize that this analysis is based on the distribution of occupations across all District of Columbia based civilian federal workers. There is no information available for this analysis that details the distribution of occupations of those positions that have been and will be terminated.

The alternative analysis shows that at lower levels of federal job disruption, many of the displaced workers may be able to find alternative employment, which will mitigate the economic and fiscal losses for the District of Columbia (see Table 3).

**Table 3: Economic and Tax Revenue Losses from a Reduction in Federal Jobs in the District of Columbia, Assuming Similar Alternative Employment for Displaced Workers, Annual Losses, ($2025)**

| Number of Federal Jobs Lost | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 |
|---|---|---|---|---|---|
| Number of Net Jobs Lost | 204 | 505 | 1,642 | 4,732 | 41,514 |
| **Economic Losses** | | | | | |
| Economic Activity Reduction | $58,235,110 | $134,153,824 | $412,195,150 | $1,130,899,335 | $8,972,689,044 |
| Gross State Product Lost | $56,205,102 | $129,477,377 | $397,826,506 | $1,091,477,500 | $8,659,911,541 |
| Labor Income | $45,089,210 | $103,870,154 | $319,146,876 | $875,611,928 | $6,947,208,571 |
| Total Direct & Induced Jobs | 227.0 | 561.6 | 1,826.8 | 5,263.1 | 46,176.4 |
| **Tax Loses** | | | | | |
| Corporate Profits Tax | $210,535 | $485,000 | $1,490,190 | $4,088,487 | $32,438,538 |
| Income Tax | $548,482 | $1,263,515 | $3,882,222 | $10,651,272 | $84,508,449 |
| Sales Tax | $99,030 | $228,132 | $700,948 | $1,923,123 | $15,258,284 |
| Property Tax | $191,737 | $441,698 | $1,357,141 | $3,723,454 | $29,542,323 |
| Other Taxes & Assessments | $50,371 | $116,037 | $356,532 | $978,181 | $7,761,003 |
| TOTAL TAX LOSSES | $1,100,155 | $2,534,383 | $7,787,033 | $21,364,516 | $169,508,598 |

Sources: U.S. Equal Employment Opportunity Commission, FederalPay.org, Bureau of Labor Statistics, FederalJobs.net, Lightcast, IMPLAN, author's calculations.

---

[7] Lightcast reports estimates of median earnings. The analysis compared federal and other sector median earnings to calculate compensation ratios used to adjust the impact estimates.

**Appendix**

**Table A-1: Distribution of Federal Workers by General Schedule Cohort**

|  | **2009** | **2010** | **2011** | **2012** | **2013** |
|---|---|---|---|---|---|
| **GS 1-5** | 14.4% | 12.7% | 11.7% | 11.0% | 10.0% |
| **GS 6-10** | 31.2% | 29.4% | 28.3% | 29.1% | 28.6% |
| **GS 11-15** | 54.4% | 57.9% | 59.9% | 59.9% | 61.4% |

*Totals may not add to 100% due to rounding. Source: U.S. Equal Employment Opportunity Commission.

**Table A-2: Comparing Federal Occupations with Available Job Postings**

| Occupation | Federal Job Losses | | | | | Job Postings 1/2025 |
|---|---|---|---|---|---|---|
| | 1,000 | 2,000 | 5,000 | 10,000 | 50,000 | |
| Business Operations Specialists, All Other | 159 | 319 | 796 | 1,593 | 7,963 | 31 |
| Computer Occupations, All Other | 76 | 151 | 378 | 757 | 3,784 | 773 |
| Managers, All Other | 72 | 143 | 358 | 717 | 3,584 | 283 |
| Lawyers | 63 | 127 | 317 | 634 | 3,169 | 282 |
| Management Analysts | 56 | 112 | 279 | 559 | 2,793 | 350 |
| General and Operations Managers | 31 | 63 | 157 | 314 | 1,571 | 276 |
| Registered Nurses | 23 | 46 | 114 | 229 | 1,145 | 607 |
| Compliance Officers | 19 | 37 | 94 | 187 | 937 | 86 |
| Human Resources Specialists | 19 | 37 | 94 | 187 | 937 | 175 |
| Detectives and Criminal Investigators | 14 | 29 | 72 | 144 | 722 | 116 |
| Accountants and Auditors | 14 | 28 | 71 | 141 | 707 | 204 |
| Engineers, All Other | 14 | 28 | 70 | 140 | 701 | 12 |

Sources: Lightcast, author's calculations.

**Table A-3: Comparing Federal Occupations with Available Job Postings inc. Wages, Partial List**

| Occupation | Federal Jobs (2024) | % of Total Jobs | Median Wages w/ Benefits | Job Postings 1/2025 | Advertised Wages w/ Benefits |
|---|---|---|---|---|---|
| Business Operations Specialists, All Other | 30,639 | 15.9% | $148,852 | 31 | $148,987 |
| Computer Occupations, All Other | 14,559 | 7.6% | $189,652 | 773 | $181,505 |
| Managers, All Other | 13,789 | 7.2% | $234,576 | 283 | $173,542 |
| Lawyers | 12,193 | 6.3% | $263,689 | 282 | $254,506 |
| Management Analysts | 10,747 | 5.6% | $171,688 | 350 | $154,960 |
| General and Operations Managers | 6,044 | 3.1% | $234,218 | 276 | $160,933 |
| Registered Nurses | 4,404 | 2.3% | $151,213 | 607 | $143,014 |
| Compliance Officers | 3,604 | 1.9% | $144,189 | 86 | $146,333 |
| Human Resources Specialists | 3,604 | 1.9% | $145,116 | 175 | $114,478 |
| Detectives and Criminal Investigators | 2,778 | 1.4% | $230,362 | 116 | $146,333 |
| Accountants and Auditors | 2,722 | 1.4% | $146,491 | 204 | $128,414 |
| Engineers, All Other | 2,698 | 1.4% | $228,240 | 12 | $142,019 |

Sources: FederalJobs.net, Bureau of Labor Statistics, Lightcast, IMPLAN, author's calculations.

Exhibit D

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### OFFICE OF THE CHIEF FINANCIAL OFFICER



**Glen Lee**
Chief Financial Officer

February 28, 2025

The Honorable Muriel Bowser
Mayor of the District of Columbia
1350 Pennsylvania Avenue, NW, Suite 306
Washington, DC 20004

The Honorable Phil Mendelson
Chairman
Council of the District of Columbia
1350 Pennsylvania Avenue, NW, Suite 504
Washington, DC 20004

**Re: February 2025 Revenue Estimates**

Dear Mayor Bowser and Chairman Mendelson:

This letter certifies the revenue estimate for the FY 2025 – FY 2029 Budget and Financial Plan of the District of Columbia. The FY 2025 local source revenue forecast has been revised downward by $21.6 million as year-to-date collections show lower-than-expected receipts for the sales and non-tax revenue sources. The revenue forecast for the rest of the financial plan period has also been revised downward by an average of $342.1 million annually, largely due to forecasted sharp declines in employment levels as the Federal government proceeds with reducing its workforce significantly. The resulting decline in income and consumption means lower revenue from the District's individual income and sales taxes. Real property tax revenue in this estimate has also been lowered based on lower assessed values across almost all classes of properties. This reflects ongoing weakness in commercial property values due to expanded remote work since the pandemic and a recent decline in residential home prices.

### February 2025 Revenue Estimate Compared to Previous Estimate

| | Actual | Estimate | | Projections | | |
|---|---|---|---|---|---|---|
| **Local Source, General Fund Revenue Estimate ($M)** | **FY 2024** | **FY 2025** | **FY 2026** | **FY 2027** | **FY 2028** | **FY 2029** |
| *December 2024 Revenue Estimate* | *10,232.2* | *10,701.8* | *10,955.6* | *11,255.2* | *11,642.0* | |
| *February Revision to the Estimate-Local* | -8.3 | -21.6 | -325.0 | -337.8 | -363.2 | |
| *February 2025 Revenue Estimate* | *10,223.9* | *10,680.2* | *10,630.6* | *10,917.4* | *11,278.7* | *11,656.4* |
| | | | | | | |
| **Revenue Change From Previous Year** | | | | | | |
| Amount | 249.4 | 456.3 | (49.6) | 286.7 | 361.4 | 377.6 |
| *Year-Over-Year Percent Change* | *2.5%* | *4.5%* | *-0.5%* | *2.7%* | *3.3%* | *3.3%* |

John A. Wilson Building * 1350 Pennsylvania Avenue, NW * Suite 203 * Washington, DC 20004
Phone: (202) 727-2476 * Fax: (202) 727-1643 * www.cfo.dc.gov

JA208

Year-to-date tax receipts through January grew 5 percent, but do not reflect major tax payments for the District's primary revenue sources, such as property taxes (first half payments are due in March) and final income tax payments (due in April). Changes in the economic landscape as the new administration proceeds with reductions to the federal workforce will shape revenue trends for the remainder of FY 2025.

Due to ongoing and planned federal workforce reductions, the District's economic outlook has deteriorated significantly from the December forecast. Nationally, over 75,000 federal employees have accepted buyouts, many probationary federal employees have been fired, and the administration has instituted a hiring freeze, allowing only one replacement employee for every four that leave. Federal employment in the District is projected to decline by approximately 40,000, or 21 percent, by the end of the financial plan period. With fewer federal employees in the region, spending on restaurants, retail, transportation, and other taxable goods and services is expected to decline, particularly for businesses that rely on federal workers. Job losses are also anticipated for federal contracting, hospitality, and transportation sectors, as reduced federal employment leads to lower demand in these sectors. There is a high degree of uncertainty around the forecast as some of the new administration's executive actions have or likely will be challenged in the courts, as new ones emerge, making meaningful economic impact analysis extremely difficult.

A variety of sources provide the basis for this estimate, including cash collection reports; federal data on District population, employment, and income; private data sources on housing, commercial real estate, and hotels; forecasts of the U.S. economy prepared by the Congressional Budget Office, and private-sector economists, including the Blue Chip consensus forecast of 50 private sector economists and two private-sector firms (S&P Global and Moody's Analytics) that also prepare forecasts of the District's economy. In addition, comments were received from recent meetings of three advisory groups of external subject-matter experts. These discussions focused on general business and economic conditions and real estate market developments in the District and the neighboring jurisdictions.

## Revenue Highlights

### Real Property Tax

Real property tax revenue for FY 2025 is unchanged from the December forecast. For FY 2026, the revenue forecast has been revised downward by $113 million due to a 2.2 percent decline in the total taxable real property assessments compared to FY 2025. These assessments reflect a significant adjustment that includes the most recent market valuations. With the reductions in assessments, real property tax revenue for FY 2026 is expected to decline by 3.2 percent.

While the revenue forecast for FY 2027 and FY 2028 has been revised downward from previous estimates, the projected growth rates have been adjusted upward from the December forecast for two key reasons. First, CoStar's latest projections indicate that office market values will rise in 2026, driven by improving vacancy rates, higher rents per square foot, and favorable market capitalization rates. Second, the substantial downward adjustment to FY 2026 property assessments means the forecasted improvements in market valuations start from a lower base. As a result, real property tax revenue is expected to grow by an average of 2.6 percent annually during the period FY 2027 through FY 2029.

## Sales Tax

The February forecast for general sales tax revenue has been lowered significantly across the forecast period due to anticipated sharp reductions in federal employment and their ripple effect on the District's economy and tax base. Downward revisions begin with a relatively modest $15 million in FY 2025, escalating to nearly $80 million by FY 2028. The smaller impact in FY 2025 is based on substantial collections for the first quarter, amounting to nearly 4 percent growth year-to-date. However, as District employment deteriorates, consumers are expected to spend less, reducing sales tax receipts.

The average annual growth rate of 2.9 percent for sales tax over the financial plan period is primarily driven by incremental sales tax rate increases enacted under the FY 2025 Budget Support Act (BSA); from 6 percent in FY 2025 to 6.5 percent in FY 2026 and 7 percent in FY 2027 and onwards. Without these rate increases, underlying sales tax revenue growth would be notably weaker due to employment reductions.

## Income Taxes

### Individual Income Taxes

Year-to-date individual income tax receipts have grown 6.9 percent, driven entirely by an 8.2 percent increase in withholding tax collections compared to last year. However, withholding tax revenue growth is expected to slow as the federal workforce reductions decrease the wages and salaries of District residents. For FY 2025, the economic outlook for resident wages has been revised only slightly, meaning the strong year-to-date collections will help offset any immediate impact. The withholding tax revenue forecast for FY 2026 through FY 2029 has been revised downward to reflect the full impact of the federal job cuts; by $94.7 million in FY 2026 and an average reduction of $139.7 million per year for the rest of the financial plan period.

Non-withholding income taxes are down 3.4 percent year-to-date compared to last year, primarily due to higher refunds. However, January estimated payments, a key indicator of the upcoming April tax filings, rose 3.8 percent. This is a notable improvement from the double-digit declines seen in FY 2023 and FY 2024. As a result, the FY 2025 non-withholding tax revenue forecast was revised upward and is now projected to increase by 9.5 percent to reflect the improved estimated payments performance in January. Beyond FY 2025, the forecast for non-withholding taxes has been revised downward, reflecting expectations of weaker S&P 500 earnings as the market adjusts to align with its long-term average after the increases over the last two years.

Overall individual income tax is projected to increase by 4.5 percent in FY 2025 and decline by 0.7 percent in FY 2026. Growth is expected to average 3.2 percent for the remainder of the financial plan period.

### Corporate Franchise Tax

Year-to-date corporation franchise tax receipts have risen 13.9 percent compared to the same period last year, driven by higher estimated and final tax payments. As a result, the FY 2025 corporate franchise tax revenue forecast has been revised upward by $13.4 million.

The forecast for the out years is slightly reduced, reflecting the lower earnings forecasts for large public companies in defense and other government support service sectors. As a result, corporate

franchise taxes are expected to decline by 1.4 percent in FY 2026 and revert to an average growth of 1.3 percent through the remainder of the financial plan period.

*Unincorporated Business Franchise Tax*

Year-to-date unincorporated business tax receipts have surged by 18.2 percent, a sharp reversal from the 10.4 percent decline projected in the December forecast. This growth is largely driven by higher January estimated tax payments, which historically served as a key indicator for the April tax filing season. As a result, the FY 2025 unincorporated business tax revenue forecast has been revised upward by $15.8 million, reflecting both the strong year-to-date gains and adjustments for the estimated impact of previously enacted tax credits. While the previously forecasted decline in unincorporated business tax revenue for FY 2025 has been revised to 2.2 percent (an improvement from the earlier 10.4 percent decline), the growth rate for the remainder of the financial plan period is expected to remain negative, amidst continued challenges for the real estate sector, from which most District unincorporated businesses derive their earnings.

**Gross Receipts Tax Revenues**

Year-to-date gross receipts tax collections have increased 15.2 percent in FY 2025, driven primarily by higher sports wagering and public utility tax payments compared to FY 2024. The extreme cold weather has likely contributed to increased public utility consumption, prompting an upward revision to the previous forecast. Additionally, insurance premium tax receipts, another key component of gross receipts, have shown strong year-to-date gains, benefiting from the impact of higher inflation on insurance premium collections. As a result, the gross receipts tax revenue forecast has been revised upward by $18.1 million for FY 2025, and by an average of $31.8 million annually from FY 2026 to FY 2028.

**Deed Tax Revenues**

Year-to-date deed tax collections—including deed recordation, deed transfer, and economic interest taxes—have increased 20 percent compared to FY 2024, driven by a higher volume and value of commercial, single-family, and vacant property sales. This growth aligns with the December forecast, and as a result, the deed taxes revenue forecast remains largely unchanged.

**Non-Tax Revenue**

The non-tax revenue forecast for the financial plan period has been significantly reduced, primarily due to downward revisions in fines and miscellaneous revenue. Recent data on the expanded automated traffic enforcement units implemented last year indicate lower-than-expected ticket issuance rates, leading to a downward revision in fines and forfeitures revenue by an average of $23.1 million annually throughout the forecast period. Additionally, lower than expected investment income from reserves—driven by a combination of reduced investible reserves and lower interest rates compared to the previous year—has led to a significant reduction in the miscellaneous revenue component of local fund revenue.

## National and Regional Economies

### National Economy

U.S. GDP grew at an annual rate of 2.3 percent in the fourth quarter, according to the Bureau of Economic Analysis' (BEA) advance estimate. Final sales to private domestic purchasers, a key measure of underlying demand, rose 3.2 percent, reflecting strong momentum. For the full year of 2024, the economy expanded by a solid 2.8 percent, exceeding economists' expectations. The primary driver of GDP growth was consumer spending, which accounted for 1.9 percent of the annual growth rate. Consumer spending has remained the cornerstone of economic growth in the post-pandemic years, supporting robust expansion despite the Federal Reserve's efforts to slow the economy in its fight against inflation.

Inflation continued to ease in 2024, but progress toward the Federal Reserve's 2 percent target has slowed. For the year, the Personal Consumption Expenditures (PCE) price index rose by only 2.5 percent, a significant decline from 3.8 percent in 2023. Excluding food and energy, the core PCE price index increased by 2.8 percent, down from 4.1 percent the previous year. However, inflationary pressures picked up toward the end of the year, with the core CPI inflation rate rising from 2.4 percent in Q3 to 3.6 percent in Q4.

The labor market rebounded after a slowdown in the third quarter of 2024, demonstrating renewed momentum. The January 2025 employment report showed a strong increase in payrolls, significant upward revisions to job growth for November and December 2024, and a drop in the unemployment rate to 4 percent.

Employment growth in the Washington metropolitan area continued to lag the national average in 2024, with regional employment increasing 0.8 percent for the year compared to 1.3 percent nationally. Slowing job growth is likely to remain a drag on the region's economy.

*U.S. Recent History*

|  | 2023q4 | 2024q1 | 2024q2 | 2024q3 | 2024q4 |
|---|---|---|---|---|---|
| Real GDP (% change from prior year) | 3.2 | 2.9 | 3.0 | 2.7 | 2.5 |
| Nominal GDP (% change from prior year) | 5.8 | 5.4 | 5.7 | 5.0 | 5.0 |
| Nominal Personal Income (% change from prior year) | 5.1 | 5.9 | 5.5 | 5.2 | 5.4 |
| Unemployment rate (%) | 3.8 | 3.8 | 4.0 | 4.2 | 4.1 |
| CPI (% change from prior year) | 3.2 | 3.2 | 3.2 | 2.6 | 2.7 |
| Yield on 10-Yr Treasury (%) | 4.4 | 4.2 | 4.4 | 4.0 | 4.3 |
| S&P 500 (avg level) | 4,472 | 4,996 | 5,254 | 5,546 | 5,911 |

*Source: Bureau of Economic Analysis, Bureau of Labor Statistics, SP Global and Moody's Analytics.*

*U.S. Economic Outlook*

| | FY 2024 (actual) | FY 2025 (est.) | FY 2026 (est.) | FY 2027 (est.) | FY 2028 (est.) | FY 2029 (est.) |
|---|---|---|---|---|---|---|
| Real GDP (% change) | 3.0 | 2.4 | 1.9 | 1.8 | 2.0 | 2.0 |
| Nominal GDP (% change) | 5.5 | 5.1 | 5.0 | 4.3 | 4.3 | 4.2 |
| Nominal Personal Income (% change) | 5.5 | 4.7 | 5.2 | 4.9 | 4.5 | 4.5 |
| Unemployment rate (%) | 3.9 | 4.1 | 4.2 | 4.3 | 4.3 | 4.2 |
| CPI (% change) | 3.1 | 2.7 | 2.9 | 2.6 | 2.1 | 2.2 |
| Yield on 10-Yr Treasury (%) | 4.2 | 4.4 | 4.3 | 4.1 | 4.0 | 4.0 |
| S&P 500 (level last quarter) | 5,911.0 | 5,710.8 | 5,450.0 | 5,229.2 | 5,069.9 | 5,045.2 |

There is significant uncertainty in three key federal policy areas: tariffs, fiscal policy, and efforts to reshape the federal government. Many analysts predict that implementing substantial import tariffs temporarily increases inflation in 2025, while workforce reductions may slow national employment growth. However, since federal employees (excluding the U.S. Postal Service) account for just over 1.4 percent of the civilian workforce, overall employment is still expected to expand in the coming months.

The Federal Reserve held the federal funds rate steady at its January 2025 meeting, maintaining a total of 100 basis points in rate cuts since the Federal Open Market Committee (FOMC) began adjusting the target range in September 2024. While moderating inflation has given the Federal Reserve room to ease monetary policy, strong job growth and a recent increase in core CPI inflation have reduced the urgency for further cuts. Lower rates will be welcomed by prospective homebuyers, many of whom were priced out of the housing market due to previously high borrowing costs. Additionally, rate cuts should relieve pressure on other interest-sensitive sectors, providing a boost to the broader economy, and greater stability in the job market. The Federal Reserve is expected to pause additional rate reductions in the first half of 2025 to assess the economic impact of federal policy changes.

Based on insights from sources such as S&P Global and Moody's, we expect the recent strength in economic growth to be carried over to the first half of calendar 2025. However, growth is expected to moderate in the second half of 2025 and in 2026 due to policy uncertainties and high interest rates. The GDP projections, along with forecasts for other economic activities in the nation and the District of Columbia, depend on a combination of factors, including key economic indicators, global market trends, geopolitical events, and changes in monetary and fiscal policy. The inherent uncertainties and complexities influencing current economic dynamics make it crucial to monitor these factors closely to gain a comprehensive understanding of the evolving economic landscape.

**District Economy**

While the District's economy continues to recover from the pandemic-induced recession of 2020, it has consistently underperformed the national economy across most indicators. The District remains below pre-pandemic employment levels, with approximately 26,600 fewer jobs recorded in the fourth quarter of 2024 compared to early 2020 (Q1 2020). Among major industries, only the

Professional and Management sector and the District of Columbia government had surpassed their early 2020 employment levels by the fourth quarter of 2024.

Employment growth in the District has accelerated this year. From the fourth quarter of 2023 to the fourth quarter of 2024, total employment in the District increased by 11,200 jobs (1.4 percent year-over-year), surpassing both the District's historical average and the national growth rate of 1.2 percent.

The professional and management sector led job gains, adding 5,261 positions over the year. The Leisure and Hospitality sector, which suffered severe job losses during the pandemic—shedding 60 percent of its workforce in the second quarter of 2020—has rebounded to 97 percent of pre-pandemic levels. Additionally, the Other Services sector, which includes nonprofit organizations, recorded a strong gain of 3,433 jobs.

Other sectors, including trade, transportation and utilities, education and health, and the District government experienced modest job growth. In contrast, employment in the federal government, information and financial services, and business services sectors, along with other private industries, saw slight declines.

The District's unemployment rate averaged 5.6 percent in the fourth quarter of 2024. Although still near historically low levels, it increased from 4.9 percent in the same quarter of the previous year, and has been rising for the past two years. This trend suggests that the District's labor market is struggling to absorb the new residents it continues to attract.

In the third quarter of 2024, the District's real gross state product (GSP) reached $149.5 billion, growing 2 percent from the second quarter. The economy is driven primarily by five key sectors—Government (including Federal and D.C.) at 30 percent, Professional, Management and Business Services at 22 percent, Finance and Real Estate Services at 13 percent, Information Services at 9 percent, and Other Services at 6 percent—which together account for 80 percent of the District's GSP. Growth in the third quarter was largely concentrated in just two sectors: professional, management and business services and information services, which accounted for 80 percent of the expansion.

Personal income in the District grew by 5.1 percent in the third quarter of 2024, slightly trailing the national increase of 5.2 percent during the same period. Per capita personal income in the District has consistently exceeded that of all 50 states. In 2023, it reached $106,816, compared to the national average of $69,810, according to the U.S. Bureau of Economic Analysis. The District serves as a hub for high-paying jobs, driven largely by the substantial presence of the federal government, which offers salaries well above the national average. In the third quarter of 2024, the federal government accounted for 27.6 percent of all wages in the District. Additionally, proximity to federal agencies attracts private contractors that provide competitive wages to skilled professionals. Despite its high-income sectors, the District also has a significant lower-income population, with 14 percent of residents living below the poverty line in 2023.

*D.C. Recent History*

|  | 2023q3 | 2023q4 | 2024q1 | 2024q2 | 2024q3 |
|---|---|---|---|---|---|
| Real GDP (% change from prior year.) | 1.3 | 2.1 | 1.6 | 0.6 | 1.8 |
| Nominal GDP (% change from prior year) | 6.7 | 6.9 | 6.1 | 4.9 | 5.6 |
| Nominal Personal Income (% change from prior year | 6.4 | 6.3 | 5.6 | 4.8 | 5.1 |
| Wages in D.C. (% change from prior year) | 4.9 | 5.9 | 6.2 | 4.5 | 5.0 |
| D.C. Resident Wages (% change from prior year) | 6.4 | 7.3 | 6.6 | 5.1 | 5.1 |
| Employment in D.C. (% change from prior year) | 0.5 | 0.7 | 0.5 | 0.4 | 0.7 |
| D.C. Resident Employment (% change from prior year) | 1.7 | 3.0 | 2.9 | 2.4 | 1.0 |
| Unemployment rate (%) | 4.8 | 4.9 | 5.1 | 5.3 | 5.6 |
| Washington area CPI (% change from prior year) | 4.3 | 3.8 | 3.9 | 3.0 | 2.7 |

*Source: BEA; BLS; ORA*

By the third quarter of 2024, total income in the District had risen by 31.2 percent since the first quarter of 2020, while prices increased by 20.7 percent over the same period, resulting in real income growth of 10.5 percent for District residents. Although personal income growth in the District lagged the national average during the pandemic years, it experienced a strong rebound in 2022–2023. As a result, by the third quarter of 2024, the District's personal income had nearly returned to pace with the national trend.

Tourism is a vital component of the District's economy, employing approximately 10 percent of the city's workforce. According to Destination DC, the city welcomed nearly 26 million visitors in the past year, including 24 million domestic and 1.95 million international travelers. Strong demand from both consumers and businesses has driven a surge in activity at the region's major airports—Ronald Reagan Washington National, Washington Dulles International, and Baltimore/Washington International—with airport traffic increasing by 7 percent in the 12 months ending September 2024 compared to the previous year. The hospitality sector has also seen gains, with 3.2 percent more hotel-room-days sold in the fourth quarter of 2024 than a year ago, while the average room rate rose by 4.6 percent. Additionally, weekend rail ridership on WMATA in 2024 surpassed pre-pandemic levels, marking an 11 percent increase from 2023.

Higher mortgage interest rates have slowed existing home sales both nationally and regionally from their post-pandemic highs. In the District, the number of active housing units for sale remains exceptionally low, with closed sales of existing homes in 2024 totaling approximately 6,900 units, the lowest level in over a decade. Housing starts have also declined sharply, falling to an annual rate of 1,426 units in the fourth quarter. Although this represents a slight rebound from the decade-low of 972 units in the third quarter, it is still below the 2,131 units recorded in the same period of 2023. This slowdown has had a broad economic impact, reducing revenue in real estate and construction-related sectors, and likely contributing to the region's tight labor market, further limiting economic expansion.

Highlighting a positive trend, the District's civilian labor force and resident employment surpassed their pre-pandemic peak in the first quarter of 2024. After experiencing a significant population decline in 2020, the District has recorded three consecutive years of population growth, reversing the losses seen during the COVID-19 pandemic. In December 2024, the U.S. Census Bureau released updated estimates showing that the District's population grew from 687,324 to 702,250

between July 2023 and July 2024, a net increase of 14,926 residents. The majority of this growth (12,502 individuals) was driven by international migration.

*D.C. Economic Outlook*

| | FY 2024 (actual) | FY 2025 (est.) | FY 2026 (est.) | FY 2027 (est.) | FY 2028 (est.) | FY 2029 (est.) |
|---|---|---|---|---|---|---|
| Real GDP (% change) | 1.5 | 0.9 | -1.9 | 0.8 | 1.5 | 1.7 |
| Nominal GDP (% change) | 5.9 | 4.0 | 1.1 | 3.2 | 3.7 | 3.9 |
| Nominal Personal Income (% change) | 5.4 | 3.3 | 0.4 | 3.6 | 3.8 | 3.8 |
| Wages in D.C. (% change) | 5.4 | 4.0 | 1.6 | 3.1 | 3.4 | 3.5 |
| D.C. Resident Wages (% change) | 6.0 | 4.0 | 0.1 | 2.7 | 2.7 | 2.7 |
| Population (% change) | 2.1 | 1.3 | 0.2 | -0.2 | 0.0 | 0.2 |
| Employment in D.C. (% change) | 0.6 | 0.1 | -2.6 | -0.4 | 0.0 | 0.2 |
| D.C. Resident Employment (% change) | 2.3 | -0.3 | -0.9 | -0.4 | 0.1 | 0.5 |
| Unemployment rate (%) | 5.2 | 5.7 | 6.2 | 6.3 | 6.2 | 6.0 |
| Washington area CPI (% change) | 3.3 | 3.0 | 3.1 | 2.7 | 1.9 | 2.4 |

*Source: Office of Revenue Analysis February 2024 Outlook*

Looking ahead, the District's economy faces considerable uncertainty. The District has the most government-centered economy in the United States, a characteristic that offers both stability and challenges. Historically, the substantial presence of federal agencies helps buffer against economic fluctuations that may disrupt private-sector industries. During the early months of the pandemic, federal employment in the District expanded as the government increased its role in crisis response, hiring more staff for agencies focused on health, safety, and economic recovery.

The efforts to reduce the federal workforce are expected to have a disproportionate impact on the District's economy. While federal jobs (excluding the U.S. Postal Service) make up just 1.4 percent of the U.S. civilian workforce, they account for close to 25 percent of total civilian employment in the District. Additionally, a significant portion of the Professional and Management Services sector depends on federal funding and contracts. As a result, widespread federal layoffs could have major ripple effects throughout the District's economy.

We have updated our February forecast to reflect the impact of ongoing and planned federal workforce reductions on the District's economy. Federal employment in the District is expected to drop to 150k by the end of our forecasting period, a reduction of 40,000, or 21%, compared to the previous forecast. Real GDP is now projected to grow by 0.9 percent in FY 2025, trailing the national growth rate of 2.4 percent. The District's economy is expected to enter a mild recession in FY 2026, with GDP contracting by 1.9 percent, before beginning a gradual recovery in FY 2027 and returning to trend growth by FY 2028 and FY 2029. Employment in the District is expected to remain flat in FY 2025, decline by 2.6 percent in FY 2026, and decrease by 0.4 percent in FY 2027. Other key economic indicators have also been adjusted to reflect these latest trends.

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 10*

## Risks to the Forecast

The current forecast carries several notable risks. As a government-driven economy, the District relies heavily on federal jobs and related economic activity, making the new administration's policies a key factor in shaping the city's economic outlook. The uncertainty surrounding federal policies adds complexity to forecasting. While some of the administration's proposed budget and personnel cuts may be curtailed by legal challenges, the economic impact on the District will be more severe if more job cuts than assumed in the forecast are implemented.

The office real estate market poses a significant risk to the forecast, with the growing volume of vacant office space a major concern. The average vacancy rate for office buildings in the central business district reached 18.1% in the fourth quarter of 2024. A recent study by the D.C. Office of Revenue Analysis revealed that between 2020 and 2023, vacant office space increased by 8.4 million square feet, a 46.2% rise, primarily driven by the shift toward remote work. This trend is expected to persist for at least the next few years, even with the recent return-to-office order for federal employees. The assessed values of hundreds of office buildings are projected to remain depressed through 2029. A sharper-than-anticipated decline in property values could pose a risk to commercial property and deed tax revenues.

Additionally, potential WMATA service reductions to address its budget shortfall represent another risk to the forecast. Other risks include a surge in oil prices due to the escalation of regional conflicts and the prospect of a prolonged government shutdown, which could place significant strain on the economy. Previous government shutdowns disrupted the District's economy and had a range of impacts on revenue.

The prevailing risks and high degree of uncertainty make for a challenging forecasting environment. As such, we will continue to monitor international, national, and local economic activity for any developments that would impair the forecast.

If you have any questions regarding these matters, please contact me at (202) 727-2476.

Sincerely,

Glen Lee

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 11*

## DISTRIBUTION LIST
Councilmember Anita Bonds (At-Large)
Councilmember Robert White (At-Large)
Councilmember Christina Henderson (At-Large)
Councilmember Kenyan McDuffie (At-Large)
Councilmember Brianne Nadeau (Ward 1)
Councilmember Brooke Pinto (Ward 2)
Councilmember Matthew Frumin (Ward 3)
Councilmember Janeese Lewis George (Ward 4)
Councilmember Zachary Parker (Ward 5)
Councilmember Charles Allen (Ward 6)
Councilmember Wendell Felder (Ward 7)
Kevin Donahue, City Administrator
Lindsey Parker, Chief of Staff, Executive Office of the Mayor
Jennifer Reed, Director, Mayor's Office of Budget and Performance Management
Jennifer Budoff, Budget Director, Council of the District of Columbia
Kathy Patterson, District of Columbia Auditor

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 12*

**TABLE 1: REVENUE SUMMARY TABLE**

| $ in Thousands | ACTUAL | ESTIMATE | | OUT YEAR PROJECTIONS | | |
|---|---|---|---|---|---|---|
| | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 |
| PROPERTY | 3,039,519 | 2,962,559 | 2,869,971 | 2,923,002 | 2,991,302 | 3,094,247 |
| Real Property | 2,916,752 | 2,840,877 | 2,751,103 | 2,803,929 | 2,870,687 | 2,972,995 |
| Personal Property | 83,354 | 82,388 | 80,392 | 79,857 | 81,398 | 82,033 |
| Public Space Rental | 39,413 | 39,294 | 38,477 | 39,216 | 39,217 | 39,218 |
| *Dedicated to other funds* | *-52,541* | *-33,513* | *-28,399* | *-28,913* | *-24,610* | *-25,319* |
| PROPERTY (NET) | 2,986,978 | 2,929,046 | 2,841,572 | 2,894,088 | 2,966,691 | 3,068,927 |
| SALES & EXCISE | 2,084,378 | 2,131,157 | 2,209,560 | 2,282,908 | 2,335,999 | 2,388,608 |
| General Sales | 2,001,987 | 2,050,696 | 2,127,033 | 2,201,667 | 2,254,202 | 2,312,104 |
| Alcohol | 7,027 | 6,886 | 6,817 | 6,715 | 6,782 | 6,850 |
| Cigarette | 9,763 | 8,770 | 8,673 | 8,578 | 8,484 | 8,391 |
| Motor Vehicle | 43,823 | 43,282 | 45,884 | 45,163 | 46,097 | 41,179 |
| Motor Fuel | 21,778 | 21,523 | 21,152 | 20,786 | 20,434 | 20,084 |
| *Dedicated to other funds* | *-593,709* | *-579,313* | *-573,083* | *-563,399* | *-553,477* | *-561,132* |
| SALES & EXCISE(NET) | 1,490,670 | 1,551,844 | 1,636,477 | 1,719,509 | 1,782,522 | 1,827,475 |
| INCOME | 4,271,954 | 4,413,057 | 4,356,061 | 4,492,741 | 4,597,600 | 4,703,284 |
| Individual Income | 3,138,951 | 3,281,725 | 3,258,162 | 3,368,786 | 3,473,995 | 3,578,790 |
| Corporate Franchise | 932,363 | 935,123 | 922,100 | 954,457 | 951,058 | 958,657 |
| U.B. Franchise | 200,640 | 196,210 | 175,798 | 169,498 | 172,547 | 165,837 |
| INCOME (NET) | 4,271,954 | 4,413,057 | 4,356,061 | 4,492,741 | 4,597,600 | 4,703,284 |
| GROSS RECEIPTS | 421,622 | 570,483 | 628,500 | 634,221 | 639,548 | 648,099 |
| Public Utilities | 122,724 | 124,702 | 124,559 | 123,993 | 123,428 | 124,415 |
| Toll Telecommunications | 35,869 | 35,347 | 34,347 | 33,506 | 32,221 | 32,478 |
| Insurance Premiums | 167,070 | 174,769 | 186,780 | 188,692 | 190,627 | 192,584 |
| Ballpark Fee | 51,519 | 50,768 | 52,266 | 53,508 | 54,699 | 55,916 |
| Private sports wagering | 3,795 | 18,734 | 18,884 | 19,035 | 19,188 | 19,341 |
| Games of Skill | 121 | 135 | 136 | 138 | 139 | 140 |
| Health Related Taxes | 40,524 | 166,027 | 211,528 | 215,350 | 219,248 | 223,224 |
| *Dedicated to other funds* | *-177,002* | *-326,490* | *-385,554* | *-392,569* | *-399,752* | *-353,761* |
| GROSS RECEIPTS (NET) | 244,620 | 243,993 | 242,946 | 241,652 | 239,795 | 294,338 |
| OTHER TAX | 375,079 | 437,957 | 485,227 | 530,744 | 665,267 | 743,102 |
| Estate | 44,965 | 45,087 | 45,606 | 46,132 | 46,665 | 47,204 |
| Deed Recordation | 168,985 | 215,469 | 241,620 | 263,494 | 335,129 | 378,412 |
| Deed Transfer | 147,327 | 157,234 | 177,834 | 200,950 | 263,306 | 297,318 |
| Economic Interest | 13,803 | 20,168 | 20,168 | 20,168 | 20,168 | 20,168 |
| *Dedicated to other funds* | *-49,888* | *-50,986* | *-52,010* | *-53,055* | *-54,029* | *-55,114* |
| OTHER TAX (NET) | 325,191 | 386,972 | 433,217 | 477,689 | 611,238 | 687,988 |
| **TOTAL TAX (GROSS)** | **10,192,552** | **10,515,213** | **10,549,320** | **10,863,617** | **11,229,717** | **11,577,340** |
| **TOTAL TAX (NET)** | **9,319,412** | **9,524,911** | **9,510,273** | **9,825,680** | **10,197,848** | **10,582,013** |
| NONTAX | 865,118 | 1,120,786 | 1,089,223 | 1,059,564 | 1,048,938 | 1,042,364 |
| Licenses & Permits | 142,463 | 144,828 | 146,551 | 147,325 | 148,939 | 150,590 |
| Fines & Forfeits | 232,947 | 310,948 | 304,764 | 298,704 | 292,765 | 286,945 |
| Charges for Services | 73,874 | 70,873 | 72,690 | 72,287 | 74,132 | 73,828 |
| Miscellaneous | 415,834 | 594,137 | 565,218 | 541,248 | 533,102 | 531,001 |
| *Dedicated to other funds* | *0* | *0* | *0* | *0* | *0* | *0* |
| NONTAX (NET) | 865,118 | 1,120,786 | 1,089,223 | 1,059,564 | 1,048,938 | 1,042,364 |
| LOTTERY | 39,350 | 34,472 | 31,112 | 32,112 | 31,962 | 32,000 |
| *Dedicated to other funds* | *0* | *0* | *0* | *0* | *0* | *0* |
| LOTTERY (NET) | 39,350 | 34,472 | 31,112 | 32,112 | 31,962 | 32,000 |
| | | | | | | |
| GROSS REVENUE | 11,097,020 | 11,670,471 | 11,669,654 | 11,955,293 | 12,310,617 | 12,651,704 |
| LOCAL FUND REVENUE | 10,223,880 | 10,680,169 | 10,630,608 | 10,917,356 | 11,278,748 | 11,656,377 |
| OTHER FUNDS | 873,140 | 990,302 | 1,039,046 | 1,037,937 | 1,031,869 | 995,326 |

**JA219**

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 13*

**TABLE 1: REVENUE SUMMARY TABLE (Continued)**

| % Change from Year Ago | ACTUAL | ESTIMATE | | OUT YEAR PROJECTIONS | | |
|---|---|---|---|---|---|---|
| | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 |
| PROPERTY | 2.5% | -2.5% | -3.1% | 1.8% | 2.3% | 3.4% |
| Real Property | 2.7% | -2.6% | -3.2% | 1.9% | 2.4% | 3.6% |
| Personal Property | -0.7% | -1.2% | -2.4% | -0.7% | 1.9% | 0.8% |
| Public Space Rental | -5.0% | -0.3% | -2.1% | 1.9% | 0.0% | 0.0% |
| *Dedicated to other funds* | *20.1%* | *-36.2%* | *-15.3%* | *1.8%* | *-14.9%* | *2.9%* |
| PROPERTY (NET) | 2.2% | -1.9% | -3.0% | 1.8% | 2.5% | 3.4% |
| SALES & EXCISE | 3.6% | 2.2% | 3.7% | 3.3% | 2.3% | 2.3% |
| General Sales | 4.2% | 2.4% | 3.7% | 3.5% | 2.4% | 2.6% |
| Alcohol | 2.6% | -2.0% | -1.0% | -1.5% | 1.0% | 1.0% |
| Cigarette | 4.4% | -10.2% | -1.1% | -1.1% | -1.1% | -1.1% |
| Motor Vehicle | -14.4% | -1.2% | 6.0% | -1.6% | 2.1% | -10.7% |
| Motor Fuel | -3.1% | -1.2% | -1.7% | -1.7% | -1.7% | -1.7% |
| *Dedicated to other funds* | *4.5%* | *-2.4%* | *-1.1%* | *-1.7%* | *-1.8%* | *1.4%* |
| SALES & EXCISE(NET) | 3.3% | 4.1% | 5.5% | 5.1% | 3.7% | 2.5% |
| INCOME | 2.3% | 3.3% | -1.3% | 3.1% | 2.3% | 2.3% |
| Individual Income | 3.0% | 4.5% | -0.7% | 3.4% | 3.1% | 3.0% |
| Corporate Franchise | 2.9% | 0.3% | -1.4% | 3.5% | -0.4% | 0.8% |
| U.B. Franchise | -9.0% | -2.2% | -10.4% | -3.6% | 1.8% | -3.9% |
| INCOME (NET) | 2.3% | 3.3% | -1.3% | 3.1% | 2.3% | 2.3% |
| GROSS RECEIPTS | 3.9% | 35.3% | 10.2% | 0.9% | 0.8% | 1.3% |
| Public Utilities | -1.1% | 1.6% | -0.1% | -0.5% | -0.5% | 0.8% |
| Toll Telecommunications | -2.3% | -1.5% | -2.8% | -2.4% | -3.8% | 0.8% |
| Insurance Premiums | 6.0% | 4.6% | 6.9% | 1.0% | 1.0% | 1.0% |
| Ballpark Fee | 10.1% | -1.5% | 3.0% | 2.4% | 2.2% | 2.2% |
| Private sports wagering | 141.4% | 393.7% | 0.8% | 0.8% | 0.8% | 0.8% |
| Games of Skill | 222.9% | 12.2% | 0.8% | 0.8% | 0.8% | 0.8% |
| Health Related Taxes | 4.3% | 309.7% | 27.4% | 1.8% | 1.8% | 1.8% |
| *Dedicated to other funds* | *7.6%* | *84.5%* | *18.1%* | *1.8%* | *1.8%* | *-11.5%* |
| GROSS RECEIPTS (NET) | 1.4% | -0.3% | -0.4% | -0.5% | -0.8% | 22.7% |
| OTHER TAX | -13.4% | 16.8% | 10.8% | 9.4% | 25.3% | 11.7% |
| Estate | -52.4% | 0.3% | 1.2% | 1.2% | 1.2% | 1.2% |
| Deed Recordation | -13.4% | 27.5% | 12.1% | 9.1% | 27.2% | 12.9% |
| Deed Transfer | 10.0% | 6.7% | 13.1% | 13.0% | 31.0% | 12.9% |
| Economic Interest | 43.9% | 46.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| *Dedicated to other funds* | *-1.6%* | *2.2%* | *2.0%* | *2.0%* | *1.8%* | *2.0%* |
| OTHER TAX (NET) | -15.0% | 19.0% | 12.0% | 10.3% | 28.0% | 12.6% |
| **TOTAL TAX (GROSS)** | 2.0% | 3.2% | 0.3% | 3.0% | 3.4% | 3.1% |
| **TOTAL TAX (NET)** | 1.7% | 2.2% | -0.2% | 3.3% | 3.8% | 3.8% |
| NONTAX | 10.6% | 29.6% | -2.8% | -2.7% | -1.0% | -0.6% |
| Licenses & Permits | -3.1% | 1.7% | 1.2% | 0.5% | 1.1% | 1.1% |
| Fines & Forfeits | 48.8% | 33.5% | -2.0% | -2.0% | -2.0% | -2.0% |
| Charges for Services | 4.7% | -4.1% | 2.6% | -0.6% | 2.6% | -0.4% |
| Miscellaneous | 1.9% | 42.9% | -4.9% | -4.2% | -1.5% | -0.4% |
| *Dedicated to other funds* | | | | | | |
| NONTAX (NET) | 11.2% | 29.6% | -2.8% | -2.7% | -1.0% | -0.6% |
| LOTTERY | 17.6% | -12.4% | -9.7% | 3.2% | -0.5% | 0.1% |
| *Dedicated to other funds* | | | | | | |
| LOTTERY (NET) | 17.6% | -12.4% | -9.7% | 3.2% | -0.5% | 0.1% |
| | | | | | | |
| GROSS REVENUE | 2.7% | 5.2% | 0.0% | 2.4% | 3.0% | 2.8% |
| LOCAL FUND REVENUE | 2.5% | 4.5% | -0.5% | 2.7% | 3.3% | 3.3% |
| OTHER FUNDS | 5.0% | 13.4% | 4.9% | -0.1% | -0.6% | -3.5% |

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 14*

**TABLE 2: DEDICATED/ENTERPRISE REVENUE**

$ in Thousands

| DEDICATED TO | Tax Type | ACTUAL FY2024 | ESTIMATE FY2025 | FY2026 | OUT YEAR PROJECTIONS FY2027 | FY2028 | FY2029 |
|---|---|---|---|---|---|---|---|
| TIF | Real Property | 15,254 | 14,829 | 14,465 | 15,109 | 10,497 | 10,850 |
| | General Sales | 29,080 | 29,095 | 30,448 | 31,154 | 29,434 | 30,360 |
| PILOT | Real Property | 36,346 | 17,742 | 12,992 | 12,862 | 13,171 | 13,527 |
| | General Sales | 24,330 | 8,871 | - | - | - | - |
| Walter Reed Development | Real Property | 638 | 639 | 639 | 639 | 639 | 639 |
| St. Elizabeth East Campus Red. Fund | Real Property | 304 | 304 | 304 | 304 | 304 | 304 |
| | General Sales | 131 | 141 | 143 | 146 | 149 | 148 |
| Convention Center | General Sales | 167,086 | 170,206 | 170,579 | 172,438 | 174,172 | 177,949 |
| Convention Center-DestinationDC | General Sales | 32,211 | 33,332 | 33,411 | 19,223 | 7,786 | 7,942 |
| Ballpark* | General Sales | 13,872 | 16,382 | 16,640 | 16,864 | 17,103 | 17,345 |
| | Public Utility | 7,324 | 7,851 | 7,842 | 7,807 | 7,771 | 7,833 |
| | Toll Telecom | 2,062 | 2,067 | 1,997 | 1,922 | 1,950 | 1,938 |
| | Ballpark Fee | 51,519 | 50,768 | 52,266 | 53,508 | 54,699 | - |
| Healthy DC - Marijuana | General Sales | 1,861 | 1,898 | 1,936 | - | - | - |
| Medical Cannabis Social Equity Fund | General Sales | - | - | - | 1,975 | 2,014 | 2,055 |
| Healthy DC - MCO | Insurance premium | 75,573 | 83,580 | 95,575 | 97,486 | 99,436 | 101,425 |
| WMATA - Operations | General Sales | 75,256 | 75,461 | 75,492 | 76,859 | 77,522 | 79,460 |
| WMATA - Capital | General Sales | 178,500 | 178,500 | 178,500 | 178,500 | 178,500 | 178,500 |
| Healthy Schools | General Sales | 5,690 | - | - | - | - | - |
| ABRA | General Sales | 870 | - | - | - | - | - |
| Comm. on Arts and Humanities | General Sales | 43,044 | 43,905 | 44,783 | 45,454 | 46,363 | 47,290 |
| Highway Trust Fund | Motor Fuel | 21,778 | 21,523 | 21,152 | 20,786 | 20,434 | 20,084 |
| Nursing Facility Quality of Care | Health Related | 19,145 | 18,021 | 21,569 | 22,001 | 22,441 | 22,890 |
| Hospital Fund | Health Related | 8,716 | 8,454 | 8,454 | 8,454 | 8,454 | 8,454 |
| Hospital Provider Fee Fund | Health Related | 7,339 | 6,603 | 6,603 | 6,603 | 6,603 | 6,603 |
| Inpatient Hospital Directed Payment Pr| Health Related | - | 81,164 | 106,225 | 108,349 | 110,516 | 112,727 |
| Outpatient Hospital Directed Payment F| Health Related | - | 46,398 | 63,289 | 64,555 | 65,846 | 67,163 |
| ICF-IDD Stevie Sellows | Health Related | 5,325 | 5,388 | 5,388 | 5,388 | 5,388 | 5,388 |
| Child Trust Fund | Sports Wager | - | 16,196 | 16,346 | 16,497 | 16,650 | 19,341 |
| Vision Zero Enhancement Fund | Traffic Fines-ATE | - | - | - | - | - | - |
| Housing Production | Deed Recordation | 23,094 | 24,951 | 25,296 | 25,347 | 26,067 | 26,662 |
| Trust Fund (HPTF) | Deed Transfer | 22,099 | 20,273 | 20,936 | 21,916 | 22,251 | 22,722 |
| | Economic Interest | 2,070 | 3,025 | 3,025 | 3,025 | 3,025 | 3,025 |
| HPTF-Debt Service | Deed Recordation | 2,253 | 2,257 | 2,260 | 2,260 | 2,257 | 2,262 |
| | Deed Transfer | - | - | - | - | - | - |
| | Economic Interest | - | - | - | - | - | - |
| West End Maintenance | Deed Recordation | 185 | 239 | 246 | 254 | 215 | 222 |
| | Deed Transfer | 185 | 239 | 246 | 254 | 215 | 222 |
| | | 873,140 | 990,302 | 1,039,046 | 1,037,937 | 1,031,869 | 995,326 |

*\* Begining FY2029, dedications to Ballpark dedications would go to Ballpark Preservation and Improvement Fund*

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 15*

**Supplemental Tables**
**TABLE 1-1 REVENUE COMPONENTS**

| $ in Thousands | ACTUAL | ESTIMATE | | OUT YEAR PROJECTIONS | | |
|---|---|---|---|---|---|---|
| | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 |
| 1. REAL PROPERTY | 2,916,752 | 2,840,877 | 2,751,103 | 2,803,929 | 2,870,687 | 2,972,995 |
| | | | | | | |
| Residential (C1) | 1,202,617 | 1,238,030 | 1,255,771 | 1,295,384 | 1,335,326 | 1,394,013 |
| Commercial (C2) | 1,676,265 | 1,557,921 | 1,448,785 | 1,460,136 | 1,485,016 | 1,526,623 |
| Vacant & Blighted | 37,870 | 44,926 | 46,547 | 48,409 | 50,345 | 52,359 |
| | | | | | | |
| 2. GENERAL SALES | 2,001,987 | 2,050,696 | 2,127,033 | 2,201,667 | 2,254,202 | 2,312,104 |
| General (6%) | 911,239 | 951,878 | 1,025,944 | 1,098,054 | 1,145,950 | 1,178,086 |
| Food and drink for immediate consum | 549,305 | 544,962 | 546,068 | 557,484 | 570,537 | 584,801 |
| Hotel and short term lodging (15.95%) | 396,078 | 408,953 | 409,925 | 398,057 | 388,003 | 395,763 |
| All others | 145,365 | 144,904 | 145,097 | 148,072 | 149,712 | 153,454 |
| | | | | | | |
| 3. INDIVIDUAL INCOME TAX | 3,138,951 | 3,281,725 | 3,258,162 | 3,368,786 | 3,473,995 | 3,578,790 |
| Withholding | 2,846,218 | 2,961,322 | 2,941,484 | 3,025,827 | 3,119,350 | 3,213,688 |
| Nonwithholding | 292,732 | 320,402 | 316,679 | 342,959 | 354,646 | 365,102 |

Remark: Commercial (C2) includes hotel, retail stores and other industrical complex properties

**Supplemental Tables**
**TABLE 1-1 REVENUE COMPONENTS (Continued)**

| % Change from Year Ago | ACTUAL | ESTIMATE | OUT YEAR PROJECTIONS | | | |
|---|---|---|---|---|---|---|
| | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 |
| 1. REAL PROPERTY | 2.7% | -2.6% | -3.2% | 1.9% | 2.4% | 3.6% |
| | | | | | | |
| Residential (C1) | 2.6% | 2.9% | 1.4% | 3.2% | 3.1% | 4.4% |
| Commercial (C2) | 1.9% | -7.1% | -7.0% | 0.8% | 1.7% | 2.8% |
| Vacant & Blighted | 65.1% | 18.6% | 3.6% | 4.0% | 4.0% | 4.0% |
| | | | | | | |
| 2. GENERAL SALES | 4.2% | 2.4% | 3.7% | 3.5% | 2.4% | 2.6% |
| General (6%) | 4.8% | 4.5% | 7.8% | 7.0% | 4.4% | 2.8% |
| Food and drink for immediate consu | -0.8% | -0.8% | 0.2% | 2.1% | 2.3% | 2.5% |
| Hotel and short term lodging (15.95% | 13.1% | 3.3% | 0.2% | -2.9% | -2.5% | 2.0% |
| All others | -1.8% | -0.3% | 0.1% | 2.1% | 1.1% | 2.5% |
| | | | | | | |
| 3. INDIVIDUAL INCOME TAX | 3.0% | 4.5% | -0.7% | 3.4% | 3.1% | 3.0% |
| Withholding | 8.2% | 4.0% | -0.7% | 2.9% | 3.1% | 3.0% |
| Nonwithholding | -30.1% | 9.5% | -1.2% | 8.3% | 3.4% | 2.9% |

*February 2025 Revenue Estimates*
*February 28, 2025*
*Page 16*

## Estimated Key Economic Indicators for the DC Economy - February 2025

Forecast Period Fiscal Year 2019 to Fiscal Year 2029

| Variable | Actual | | | | | | Estimated | | Forecast | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 | FY2026 | FY2027 | FY2028 | FY2029 |
| Gross Domestic Product - DC ($billions) | 143.9 | 145.9 | 153.9 | 163.9 | 173.6 | 183.7 | 191.0 | 193.2 | 199.4 | 206.8 | 214.9 |
| *% change annual* | *3.1%* | *1.4%* | *5.5%* | *6.5%* | *5.9%* | *5.9%* | *4.0%* | *1.1%* | *3.2%* | *3.7%* | *3.9%* |
| Real GDP-DC (2017 $billions) | 138.4 | 137.8 | 141.8 | 144.9 | 145.3 | 147.5 | 148.8 | 145.9 | 147.0 | 149.2 | 151.8 |
| *% change annual* | *0.9%* | *-0.4%* | *2.9%* | *2.2%* | *0.3%* | *1.5%* | *0.9%* | *-1.9%* | *0.8%* | *1.5%* | *1.7%* |
| Personal Income ($billions) | 57.4 | 60.0 | 64.5 | 66.7 | 71.4 | 75.3 | 77.8 | 78.1 | 80.9 | 84.0 | 87.2 |
| *% change annual* | *2.8%* | *4.7%* | *7.4%* | *3.4%* | *7.2%* | *5.4%* | *3.3%* | *0.4%* | *3.6%* | *3.8%* | *3.8%* |
| Real Personal Income (2017 $billions) | 50.7 | 52.1 | 53.9 | 51.7 | 53.6 | 55.6 | 56.6 | 56.0 | 56.8 | 57.9 | 59.0 |
| *% change annual* | *2.7%* | *2.8%* | *3.3%* | *-3.9%* | *3.6%* | *3.7%* | *1.8%* | *-1.1%* | *1.4%* | *1.9%* | *1.8%* |
| Per capita personal income | 81,083 | 87,942 | 96,544 | 98,608 | 104,166 | 107,607 | 109,778 | 109,930 | 114,106 | 118,509 | 122,728 |
| *% change annual* | *2.1%* | *8.5%* | *9.8%* | *2.1%* | *5.6%* | *3.3%* | *2.0%* | *0.1%* | *3.8%* | *3.9%* | *3.6%* |
| Real per capita personal income (2017 $) | 71,670 | 76,359 | 80,656 | 76,539 | 78,202 | 79,479 | 79,858 | 78,845 | 80,133 | 81,676 | 83,012 |
| *% change annual* | *2.1%* | *6.5%* | *5.6%* | *-5.1%* | *2.2%* | *1.6%* | *0.5%* | *-1.3%* | *1.6%* | *1.9%* | *1.6%* |
| Wages in DC ($billions) | 78 | 80 | 83 | 88 | 92 | 96 | 100 | 102 | 105 | 109 | 112 |
| *% change annual* | *3.2%* | *1.9%* | *4.3%* | *5.6%* | *4.4%* | *5.4%* | *4.0%* | *1.6%* | *3.1%* | *3.4%* | *3.5%* |
| Wages of DC residents ($billions) | 30.3 | 30.9 | 32.3 | 34.9 | 37.1 | 39.4 | 40.9 | 41.0 | 42.1 | 43.2 | 44.4 |
| *% change annual* | *4.4%* | *2.2%* | *4.4%* | *7.9%* | *6.5%* | *6.0%* | *4.0%* | *0.1%* | *2.7%* | *2.7%* | *2.7%* |
| Personal Consumption Expenditure ($billions) | 49.3 | 47.7 | 51.1 | 57.0 | 61.3 | 64.9 | 67.6 | 69.1 | 71.6 | 74.6 | 77.8 |
| *% change annual* | *4.3%* | *-3.4%* | *7.3%* | *11.5%* | *7.6%* | *5.8%* | *4.2%* | *2.2%* | *3.7%* | *4.2%* | *4.3%* |
| Population (000s) | 707.6 | 683.8 | 667.7 | 676.0 | 685.8 | 699.9 | 709.1 | 710.6 | 709.1 | 709.1 | 710.4 |
| *% change annual* | *0.7%* | *-3.4%* | *-2.3%* | *1.2%* | *1.4%* | *2.1%* | *1.3%* | *0.2%* | *-0.2%* | *0.0%* | *0.2%* |
| Households (000s) | 321.0 | 314.8 | 319.2 | 330.2 | 339.4 | 346.9 | 352.4 | 354.0 | 354.5 | 355.2 | 356.7 |
| *% change annual* | *1.9%* | *-1.9%* | *1.4%* | *3.4%* | *2.8%* | *2.2%* | *1.6%* | *0.4%* | *0.1%* | *0.2%* | *0.4%* |
| Employment in DC (000s) | 796.0 | 762.1 | 728.2 | 757.7 | 764.9 | 769.4 | 770.3 | 750.1 | 746.8 | 746.5 | 748.3 |
| *% change annual* | *0.6%* | *-4.4%* | *-4.4%* | *4.1%* | *0.9%* | *0.6%* | *0.1%* | *-2.6%* | *-0.4%* | *0.0%* | *0.2%* |
| Employment of DC residents (000s) | 376.4 | 363.9 | 349.6 | 366.8 | 375.6 | 384.4 | 383.2 | 379.8 | 378.3 | 378.6 | 380.4 |
| *% change annual* | *1.0%* | *-3.3%* | *-3.9%* | *4.9%* | *2.4%* | *2.3%* | *-0.3%* | *-0.9%* | *-0.4%* | *0.1%* | *0.5%* |
| Civilian labor force (000s) | 398.8 | 392.1 | 376.9 | 386.8 | 394.5 | 405.7 | 404.7 | 399.2 | 396.7 | 396.4 | 397.5 |
| *% change annual* | *0.8%* | *-1.7%* | *-3.9%* | *2.6%* | *2.0%* | *2.8%* | *-0.2%* | *-1.3%* | *-0.6%* | *-0.1%* | *0.3%* |
| Unemployment rate | 5.6 | 7.2 | 7.3 | 5.2 | 4.8 | 5.2 | 5.7 | 6.2 | 6.3 | 6.2 | 6.0 |
| Housing Starts | 5,963 | 4,811 | 5,475 | 4,458 | 5,212 | 1,337 | 1,823 | 2,363 | 2,557 | 2,552 | 2,548 |
| Home Sales (000s) | 10 | 10 | 13 | 11 | 8 | 7 | 7 | 8 | 9 | 9 | 10 |
| *% change annual* | *-3.2%* | *2.1%* | *26.5%* | *-11.8%* | *-31.2%* | *-12.3%* | *2.7%* | *15.8%* | *13.0%* | *3.9%* | *2.9%* |
| Avg Home Sale Price (000s) | 765.9 | 798.2 | 823.1 | 821.1 | 781.7 | 785.1 | 787.0 | 802.8 | 828.3 | 859.8 | 895.2 |
| *% change annual* | *1.7%* | *4.2%* | *3.1%* | *-0.2%* | *-4.8%* | *0.4%* | *0.2%* | *2.0%* | *3.2%* | *3.8%* | *4.1%* |
| Multifamily residential average rent per unit ($) | 2,180 | 2,183 | 2,176 | 2,294 | 2,345 | 2,393 | 2,476 | 2,588 | 2,678 | 2,762 | 2,842 |
| *% change annual* | *2.7%* | *0.2%* | *-0.3%* | *5.4%* | *2.2%* | *2.1%* | *3.5%* | *4.5%* | *3.5%* | *3.1%* | *2.9%* |
| CBD office Vacancy rate | 11.0% | 11.9% | 14.0% | 15.4% | 16.8% | 18.0% | 18.6% | 19.7% | 20.2% | 20.6% | 20.8% |
| SP 500 Stock Index | 14.7% | 15.2% | 29.4% | -16.3% | 16.1% | 32.2% | -3.4% | -4.6% | -4.1% | -3.4% | -2.9% |
| US 10 Year Treasury | 2.5 | 1.1 | 1.3 | 2.4 | 3.8 | 4.2 | 4.4 | 4.3 | 4.1 | 4.0 | 4.0 |
| Washington Area CPI: % change prior year | 1.7% | 1.5% | 4.2% | 7.3% | 5.2% | 3.3% | 3.0% | 3.1% | 2.7% | 1.9% | 2.4% |

Note: Estimated by the D.C. Office of Revenue Analysis based on forecasts of the D.C. and national economies prepared by S&P Global Market Intelligence (Aug. 2024); Moodys Analytics (Aug. 2024); BLS labor market information from Aug. 2024; the Census Bureau estimates of DC population (July 2023); BEA estimates of DC personal income (2024q1) and CoStar D.C. property market data (Q2 2024).

Exhibit I I

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| **STATE OF MARYLAND**, *et al*., |
| *Plaintiffs,* |
| v. |
| **UNITED STATES DEPARTMENT OF AGRICULTURE**, *et al.,* |
| *Defendants.* |

<u>**DECLARATION OF JEFFREY GRANT**</u>

I, Jeffrey Grant, declare under penalty of perjury that the following statements are true and correct:

1.    My name is Jeffrey Grant. I am over the age of 18 and able to provide true and accurate testimony under oath.

2.    I give this declaration based upon my personal knowledge of the facts recited.

3.    I am a resident of the State of Maryland.

4.    On February 28, 2025, I retired from my role as the Deputy Director for Operations in the Center for Consumer Information and Insurance Oversight (CCIIO) within the Centers for Medicare & Medicaid Services (CMS) after 41 years of federal service.

5.    In my role as Deputy Director for Operations I was responsible for all external facing operations, including Healthcare.gov, and internal operations including, personnel, contracts, budgets, and facilities for CCIIO. In this role, I was responsible for supervising eight group directors and a support office, who in turn oversaw CCIIO's more than 600 employees, including

82 who were initially identified as probationary employees.[1]

6.      Beginning after January 20, 2025, the CMS Chief Human Capital Officer (CHCO) asked CMS center directors to evaluate their probationary employees and determine any that should be removed from service.

7.      Thereafter, a manager within the CMS Office of Human Capital (OHC) followed up to request updates on a daily basis regarding which probationary employees should be removed from service. This was unusual because in my experience OHC had never proactively inquired about whether particular probationary employees should be retained, and certainly not on a daily basis. OHC explained that their ongoing requests for information about probationary employees were at the request of the Department of Health and Human Services.

8.      In accordance with the direction from the CMS CHCO, I met with group directors who reported to me and communicated to them that they should identify for removal all probationary employees with any performance issues, even those with marginal performance issues that in other circumstances would not have resulted in their termination.

9.      The group of directors uniformly assured me that none of the probationary employees in CCIIO should be removed from service because their performance uniformly met and typically exceeded the expectations and needs of the agency for probationary employees. Accordingly, I did not identify to OHC any probationary employees at CCIIO who should be removed from service.

10.     At or about 11:00 a.m. on February 14, 2025, the Deputy Chief Operating Officer of CMS convened an emergency meeting of CMS's Strategic Planning and Management Council, which is a coordinating body for all of the non-political center directors, deputy center directors, and

---

[1] Although 82 employees were initially identified as probationary employees, approximately 10 of these employees were not ultimately determined not to be probationary.

career civil service officials leading offices at CMS.

11.     This Strategic Planning and Management Council meeting was conducted by Zoom. During the meeting, Stephanie Bovell, CHCO of CMS reported that at 1:00 pm that day, all probationary employees at CMS would begin to be terminated, effective later that afternoon, a process that would run between 1:00 and 4:00 pm that day. Ms. Bovell informed the meeting that the HHS CHCO had informed her and all other HHS Agency CHCOs of the decision to terminate all probationary employees during a call the previous evening. Ms. Bovell further explained that the HHS CHCO informed the Agency CHCOs that probationary employees would be terminated *en masse* via letters that would say that the employees' unsatisfactory performance was the reason for removal. Ms. Bovell stated that she and other HHS Agency CHCOs had told the HHS CHCO during the February 13 call that they did not believe that the proposed termination letters were a legitimate basis for the mass terminations of probationary employees because there was no basis for the reasons stated in the letter. Ms. Bovell stated during the meeting that although the terminations were going forward it was unclear at the time of the Strategic Planning and Management Council meeting whether the Agency CHCOs' feedback would result in HHS changing the reasons for termination given in the letters.

12.     During a 4:00 p.m. all-managers meeting at CMS, Ms. Bovell informed CMS managers that the termination letters had not yet been distributed to probationary employees, and it was unclear when the terminations would take place.

13.     On the morning of February 15, 2025, CMS distributed near-identical form termination letters to probationary employees across CMS, including 82 employees at CCIIO.[2] No CCIIO

---

[2] As explained above in note 1, CMS subsequently determined that approximately 10 of these employees were not in fact probationary employees, and it has subsequently rescinded the terminations of those non-probationary employees.

3

managers were copied on the letters that terminated the probationary employees who worked for us, including their direct line supervisors who ordinarily would be aware of any adverse personnel action taken against any direct report.

14.    These termination letters purported to justify the terminations of probationary employees by saying, "Unfortunately, the Agency finds that you are not fit for continued employment because your ability, knowledge, and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the agency." The justifications written in these termination letters were false.

15.    All of the probationary employees at CCIIO who received the February 15, 2025 termination letter were hired into positions that were tailored to the agency's needs. Specifically, every position approved during the last few years, including every position filled by one of the probationary employees terminated on February 15, had undergone a formal review, first by me, then by CMS's Enterprise Workforce Investment Council (EWIC), and ultimately by CMS's Chief Operating Officer (COO). My review of these positions was to ensure that they aligned with the priorities and needs of CCIIO. EWIC's review was to ensure that the positions aligned with the agency's needs. And the COO reviewed the EWIC's recommendations to ensure that the senior official in charge of our human capital strategy was aware of and agreed with our assessments.

16.    Every one of the terminated probationary employees had the knowledge, skills, and abilities that CCIIO required to accomplish our work and that met the specific requirements of the positions for which we hired them. In selecting these individuals, we reviewed between one and two thousand resumes, many of which came from other fully qualified people. We chose the best from hundreds of very highly qualified candidates. I personally interviewed at least a third of these candidates. I reviewed their resumes. They were truly the best of the best. They had exceptional

knowledge, skills, and ability as measured against the work we asked them to perform.

17.     The termination letters were also false because they were not in fact based on any evaluation of the individual probationary employees' performance. I am lucky to have witnessed the incredible performance of some of the probationary employees who had been with us the longest. They personally briefed me on their work. I talked about their performance with their managers. Many of these workers received the highest possible performance ratings, with these ratings having been completed within a month of their being terminated, ostensibly for inadequate performance. The HHS CHCO could have obtained data from the system to assess the CCIIO probationary employees' performance, and if he had done so, he would have seen that the employees' performance was outstanding.

18.     Some of the terminated probationary employees did not have the minimum 90 days on the job that HHS's Performance Management Appraisal Program requires prior to making any formal performance assessment, and under HHS personnel rules, management may not make a performance-based termination prior to actually evaluating those employees' performance.

19.     The mass terminations of probationary employees at CCIIO were not based on any individualized assessment of the probationary employees. The CMS CHCO did not review the positions for suitability, never read a single person's resume, never spoke with any of the terminated probationary employees, and had no personal knowledge of their individual performance. Having actually reviewed the knowledge, skills, and abilities of these probationary employees and having observed their performance and having been briefed on their performance evaluations, I can state with confidence that none of the probationary employees' terminations at CCIIO were justified by the reasons stated in the termination letters.

20.     In addition, the terminations of probationary employees were not justified by the fact that

a new Administration has taken office with new priorities, nor will the terminations improve efficiency. The probationary employees at CCIIO fulfilled roles that are necessary for the center to make the very sorts of changes to our operations and regulations that would support the new Administration's priorities. These probationary employees were hired to add efficiencies to CMS enrollment processes, making it easier for consumers to obtain and retain coverage and saving administrative processing funds. They were going to work on writing and implementing the recently announced Program Integrity rule, a top Trump Administration priority that is projected to save billions in program dollars. These probationary employees were some of the lowest paid CMS employees who nevertheless had a huge financial impact. That is, they were the ultimate in government efficiency, the thing that the new Administration says is its most salient priority.

21.     The only conceivable explanation for the mass terminations is that they are part of a concerted effort to reduce the overall size of the workforce at HHS, CMS, and other agencies. In other words, these terminations were a reduction in force. However, agencies are required to follow applicable statutes, regulations, and policies when conducting reductions-in-force, none of which were followed here.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 5, 2025 in Silver Spring, MD.

Jeffrey Grant

**JA230**

# Exhibit HH

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> [LEAD DEFENDANT NAME], ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

## <u>DECLARATION OF TRACI DIMARTINI</u>

I, Traci DiMartini, swear under penalty of perjury,

1.      My name is Traci DiMartini and I am an adult resident of Gaithersburg, Maryland.

2.      I served as a Human Capital Officer for the Internal Revenue Service ("IRS") until March 3, 2025, when the IRS put me on administrative leave.  The IRS is the largest bureau within the Department of Treasury ("Treasury").

3.      I am a career civil servant and have worked for the federal government for over 21 years, including at the Departments of Labor, Education, Interior, and Agriculture, as well as the Office of Personnel Management ("OPM"). I was sworn in as a member of the Senior Executive Service in 2016 and since that time, I have served as a Chief Human Capital Officer at the Equal Employment Opportunity Commission, Peace Corps, the General Services Administration, and the IRS, where I served as the Human Capital Officer from June 2023 to March 2025.  I have worked under both Democratic and Republican administrations.

4.     During my time as the Human Capital Officer for the IRS, I was the Senior Executive responsible for overseeing all Human Capital operations at the IRS.

5.     After President Trump took office on January 20, 2025, OPM issued guidance instructing agencies to terminate probationary employees. Around the first week of February, shortly following OPM's issuance of this guidance, the Chief Human Capital Officer for Treasury, Trevor Norris, instructed my office to begin terminating probationary employees at the IRS. Specifically, he instructed me to identify all probationary employees at the IRS and terminate all of them "based on performance."

6.     In all my decades of human resource management for the federal government, I had never before received a directive such as this one. Typically, the decision to terminate a probationary employee lies solely with the probationary employee's manager. Even then, the circumstances under which you can terminate a probationary employee are limited to instances where: (1) the employee is failing to meet the basic requirements of the job, or (2) the employee engages in highly inappropriate conduct while on the job. In any scenario, the poor performance or conduct must be evaluated and documented.

7.     Further, I have never heard of mass probationary employee firings. Because the basis for any probationary employee termination is a highly individualized determination, terminating probationary employees on a large scale has never been done, to my knowledge.

8.     I attended several virtual meetings with Trevor Norris and other Human Capital Officers at Treasury agencies (which include the Office of the Comptroller of the Currency, the Bureau of Engraving and Printing, and the U.S. Mint) during which we discussed the directive to conduct mass terminations of probationary employees. The other agency Human Capital Officers

and I asked Mr. Norris why Treasury was directing us to terminate probationary employees, and Mr. Norris informed us that it was what OPM "wants to do."

9.     We also asked whether the terminations were legal.  Mr. Norris explained that OPM was taking the position that the probationary period of employment was an "extension of the application process."  In my experience, this is never how probationary employment has been viewed and, candidly, makes no sense.

10.     Mr. Norris informed us that Charles Ezell, the Acting Director of OPM, Amanda Scales, Mr. Ezell's Chief of Staff, and Noah Peters, were the individuals spearheading the termination of probationary employees at OPM.  All three are political appointees and, as I understand it, they do not have civil service staff assisting them in this process.  OPM was communicating these directives to the political appointees at Treasury, including Mr. York and Treasury Secretary Scott Bessent, who were passing the directives down to Mr. Norris and the other Human Capital Officers at Treasury agencies.

11.     To comply with OPM's directive to Treasury, my office pulled an initial list of 17,000 probationary employees.  We carved out employees from the Taxpayer Services, Taxpayer Advocate, and IT departments, all of whom are essential personnel for tax filing season, as well as some other categories of workers, resulting in a list of approximately 6,700 probationary employees located around the country.

12.     Mr. Norris specifically instructed me and the other Human Capital Officers at Treasury that OPM would not allow us to exempt military veterans from the probationary terminations.

13.     My colleagues and I asked Mr. Norris what the termination letter for affected probationary employees should consist of, and they informed me that OPM had drafted a letter,

Treasury made a few modifications, and that we were instructed to send this letter out. My office was not permitted to make any changes to the letter. I refused to sign these termination notices, as did Acting IRS Commissioner Doug O'Donnell, so the termination notices were sent on February 14, 2025 from a generic agency email to approximately 6,700 probationary employees at IRS, terminating their employment immediately.

14.     My office did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I also know that Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings. Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.

15.     Although I did not review the personnel files of any of these employees, it is a statistical certainty in my mind that many of the nearly 6,700 probationary employees terminated by IRS had written documentation of positive performance.

16.     The OPM directive, communicated to me by Mr. York through Mr. Norris, was plainly an effort to reduce headcount and did not involve any evaluation of the job performance of probationary employees.

17.     To me, the mass firings were clearly a Reduction in Force ("RIF") without following the rules for a RIF.

18.     To ensure that a RIF is conducted lawfully, an agency spends approximately 12 to 18 months simply *preparing* for the RIF. *See* Exhibit 1 (Reduction in Force (RIF) Fact Sheet). An agency's Human Capital office begins by spending months verifying that personnel records are complete and free of errors. This is to ensure, for example, that veterans' status is correctly

annotated and that employees' service date computations are correct, among other things. The agency then typically takes months to determine the competitive area where the RIF will take place. After these and other initial steps are taken, the agency will then try to reassign employees to other divisions or give them an opportunity to take an early retirement offer instead of separating them in a RIF. These effort are made in close consultation with the managers in these offices. The RIF is the last step of the process, which must be done in accordance with required RIF procedures, including providing employees and their unions with notice. Notice to employees is critical because it allows them to make preparations and minimize the devastating impact of losing a job. I understand that an agency is also required to give notice to the state where an affected employee's duty station was located.

19.     On or about February 25, 2025, Acting IRS Commissioner O'Donnell retired, and Melanie Krause, previously the Chief Operating Officer of the IRS, became Acting Commissioner of the IRS.

20.     On Friday, February 28, 2025, Gavin Kliger, a member of the Department of Government Efficiency (DOGE), arrived at the IRS around 12:30, along with Sam Cronus a new, unpaid political advisor to Tom Krause, a Treasury political appointee. Mr. Kliger demanded that Mr. Cronus be issued an IRS personal identity verification card and information technology equipment immediately. I informed the Chief of Staff via email that that Mr. Kliger's request would not be completed that day because: (1) the necessary paperwork to onboard him was not prepared because we did not have advance notice that he was starting; (2) any new IRS employee must undergo a tax check and that can take up to 10 days to complete; and (3) Treasury is required to comply with a Temporary Restraining Order issued by the U.S. District Court for the Southern

District of New York, which limits access to Treasury systems without prior approval and written agreement executed by our General Counsel.

21.    Accordingly, I scheduled Mr. Cronus' onboarding to take place as soon as possible, which was the next business day, Monday, March 3, 2025 at 8:00 a.m. I notified my staff that we had a political appointee to process for onboarding and to be ready with the appropriate paperwork. I also notified our General Counsel's office to arrange for an ethics briefing and the Chief Privacy officer to request a briefing for Mr. Cronus on the confidentiality and information security requirements of Internal Revenue Code section 6103.

22.    On Saturday, March 1, 2025, Acting Commissioner Krause contacted me and requested that I complete a tax check on Mr. Cronus, the DOGE employee, that day.  I do not personally conduct the tax check, and the tax checks are not performed on the weekends.  I informed Ms. Krause that we could conduct it on Monday morning.  Ms. Krause stated that I was being uncooperative and that, in essence, I was expected to jump if DOGE told me to jump.  I simply responded that we were following established processes and protocols.

23.    On the morning of Monday, March 3, 2025, we had arranged for Mr. Cronus, the DOGE employee, to undergo the tax check at 8:00am, but he did not arrive at our offices until 10:45am.  That afternoon, Acting Commissioner Krause placed me on administrative leave with the intention of terminating my employment as a career Senior Executive.  Acting Commissioner Krause gave three reasons for placing me on administrative leave pending termination: (1) that I did not effectively implement the termination of probationary employees; (2) that I did not implement the deferred resignation program correctly; and (3) that I was insubordinate and uncooperative with the DOGE employees.

24.    Following my meeting with Acting Commissioner Krause, security escorted me to my office where I was asked to turn over my government ID, my government issued laptop, iPhone, iPad, and parking pass. I was then escorted to my car and left the premises by 3:00 PM.


Dated: March 6, 2025

Signed: _Traci DiMartini_
_____
Traci DiMartini

*A copy of the signature page bearing an original signature is attached hereto.

24.    Following my meeting with Acting Commissioner Krause, security escorted me to my office where I was asked to turn over my government ID, my government issued laptop, iPhone, iPad, and parking pass. I was then escorted to my car and left the premises by 3:00 PM.

Dated: March 6, 2025

Signed: _Traci DiMartini_

Traci DiMartini

*A copy of the signature page bearing an original signature is attached hereto.

Exhibit KK

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND; et al.,

          Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
AGRICULTURE; et al.,

          Defendants.

C.A. No. _____

**<u>DECLARATION OF BROOKE E. LIERMAN</u>**

I, BROOKE E. LIERMAN, declare as follows:

1.  I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I currently serve as the Comptroller of Maryland ("Comptroller").

3.  The Comptroller is the chief fiscal officer of the State.  My duties as Comptroller include the following: having the general superintendence of the fiscal affairs of the State; digesting and preparing plans for the improvement and management of the revenue and for the support of the public credit; preparing and reporting estimates of the revenue and expenditures of the State; superintending and enforcing the prompt collection of all taxes and revenue; adjusting and settling, on terms prescribed by law, with delinquent collectors and receivers of taxes and State revenue; preserving all public accounts; and deciding on the forms of keeping and stating accounts. *See* MD Constitution, Art. 6, § 2.

4.  Maryland's budget relies in large part on personal income tax revenue. In fiscal year 2024, personal income tax revenue represented 55% of our general fund revenues.

5.  Although unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they

were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment.

6.  Accordingly, any firings and layoffs causing Marylanders to become unemployed will necessarily result in a significant decrease to Maryland income tax revenues.

7.  Upon information and belief, I understand that hundreds of federal employees who reside in Maryland and were recently terminated by the federal government have applied for unemployment benefits.

8.  Accordingly, the terminations that have occurred to date and the anticipated continuation of these terminations will cause significant decreases in Maryland's income tax revenues.

9.  Approximately 250,000 federal workers reside in Maryland.

10. Beyond the loss of income tax revenue, the sudden and significant increase of newly unemployed workers will have serious negative effects on Maryland's labor market. These effects include extended periods of unemployment, downward pressure on wages, and the migration of residents out of the State.

Executed on March 6, 2025, at Annapolis, Maryland.


BROOKE E. LIERMAN
COMPTROLLER OF MARYLAND

Exhibit JJ

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |
|---|
| MARYLAND; et al., |
|        Plaintiffs, |
|    v. |
| UNITED STATE DEPARTMENT OF AGRICULTURE; et al., |
|        Defendants. |

## <u>DECLARATION OF PHILIP SPESSHARDT</u>

I, Philip Spesshardt, declare as follows:

1.     I am a resident of the State of Colorado. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am currently employed by the Colorado Department of Labor and Employment (CDLE) as the Director of the Colorado Division of Unemployment Insurance.

3.     CDLE is responsible for connecting job seekers to great jobs; protecting workplaces and communities with a variety of consumer protection and safety programs; assisting workers injured on the job; ensuring fair labor practices; providing accurate economic data; and helping those who lost their jobs by providing temporary wage replacement.  CDLE administers a wide range of federally funded workforce and training programs, including but not

limited to those authorized by the Workforce Innovation and Opportunity Act (WIOA), that are vital to Colorado's economic stability and workforce development.

4.    As Director of the Colorado Division of Unemployment Insurance, I have access to records that detail the state of Colorado's labor market, including claims for unemployment benefits, and the allocation and distribution of funding received by CDLE.

5.    The ongoing mass-layoff of federal workers is irreparably harming Colorado in several ways.

**Rapid Response Team Expenditures**

6.    CDLE oversees Rapid Response, a coordinated, multiple-partner strategy to provide immediate assistance to Coloradans subject to mass layoffs.  Rapid Response is the state entity responsible for conducting outreach and providing unemployment services required by the federal Workforce Investment Act of 1998, as amended by the federal Workforce Innovation and Opportunity Act of 2014.

7.    The purpose of Rapid Response is to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

8.    At the core of our Rapid Response team is CDLE's Dislocated Worker Unit (DSU).  DSU works in close partnership with other stakeholders, such as the state's ten Local Workforce Development Areas, which provide localized assistance to both employers and employees across the state.

9.    When notified of a forthcoming mass layoff, Rapid Response will quickly provide informational resources and reemployment services for workers, including but not limited to:

information and support for filing Unemployment Insurance (UI) claims, information on the impacts of layoffs on health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training.

10.    In addition, Rapid Response will contact affected businesses to collect, verify, and distribute information regarding Rapid Response activities. Rapid Response will also coordinate with state staff and local workforce area staff at the American Job Centers located in the affected area to provide support for the affected workers. The Division of Unemployment Insurance will mobilize to streamline and expedite the processing of unemployment claims.

11.    Rapid Response also facilitates connections to partner agencies and organizations to ensure their ability to provide assistance to terminated workers and their families, such as home heating assistance, legal aid, and financial advice.

12.    I understand that, pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is required to notify "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

13.    The notice required by 5 U.S.C. § 3502(d)(3)(A) is intended to trigger rapid response activities since it is explicitly to be given to the state entity required to carry out rapid response activities.

14.    To the best of my knowledge, neither CDLE, Rapid Response, nor any other entity in the Colorado State Government has received notice of a federal reduction in force at any federal agency.

15.     Yet, as detailed more below, since January 21, 2025, CDLE has already received 544 claims from ex-federal workers who list a federal agency as their last employer.  This is compared to 135 claims from ex-federal workers who list a federal agency as their last employer for the same time period one year ago. CDLE has also seen a significant uptick of new unemployment claims of ex-federal employees just in the last two weeks, with an approximate range of 20-30 new such claims *every day*. CDLE has been receiving substantially more unemployment claims of ex-federal employees than in past years.

16.     Because our Rapid Response team has received no notice of federal RIFs, CDLE has been required to dedicate significantly more staff, resources, and expenditures to fulfill our statutory mission. In light of the increasing claims for unemployment benefits and the public reporting about ongoing and forthcoming federal layoffs, Rapid Response has been attempting to compensate for the lack of notice and information regarding the terminations. Rapid Response has been conducting substantial outreach across the state, including issuing revised guidance documents. CDLE has been conducting town halls and engaging with elected officials and other stakeholders to provide information and engage with individuals regarding the resources described above. We have internally had to divert staff from other critical tasks to monitor and develop reporting dashboards in response to these unprecedented federal terminations. These substantial efforts and expenditures would not have been necessary had the federal agencies properly provided the notice required by law.

**Harms Related to the Colorado Unemployment Insurance Act**

17.     CDLE, through the Division of Unemployment Insurance, also manages claims for unemployment benefits by individuals formerly employed to work in Colorado.

18.     The statutory framework of the Colorado Unemployment Insurance Act (the Act) is primarily governed by the Colorado Employment Security Act (CESA), which is codified at Title 8, Sections 8-70-101 through 8-82-105, C.R.S.

19.     Colorado is party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees (UCFE) pursuant to 5 U.S.C. § 8502(a). Generally, the federal Government is required to reimburse Colorado for unemployment benefits provided to former federal employees, in the same amount, on the same terms, and subject to the same conditions which would be payable to them under the Act. 5 U.S.C. § 8502(b). These insurance benefits are generally payable for up to twenty-six (26) weeks. C.R.S. § 8-73-104.

20.     The Act is designed to provide unemployment benefits to individuals who are unemployed through no fault of their own and to ensure the fair and efficient administration of these benefits. C.R.S. §§ 8-70-102 & 8-73-108(1)(a).

21.     The Act does not define "fault" but in the context of unemployment benefits, courts have defined "fault" as "requiring a volitional act or the exercise of some control or choice by the claimant in the circumstances resulting in the separation such that the claimant can be said to be responsible for the separation." *Mesa Cnty. Pub. Libr. Dist. v. Indus. Claim Appeals Off.*, 396 P.3d 1114, 1119 (Colo. 2017) (internal quotation marks and citations omitted).

22.     An individual in Colorado who wishes to collect unemployment insurance benefits must register for work and file a claim for benefits in accordance with applicable statutes and regulations. C.R.S. § 8-74-101; 7 CCR 1101-2.

23.     At the time of separation, the employer must provide the employee, in writing, information regarding the availability of unemployment compensation benefits, which must

include the (1) employer's name and address; (2) employee's name and address; (3) employee's identification number or the last four numbers of the employee's social security number; (4) employee's start date, date of last day worked, year-to-date earnings, and wages for the last week the employee worked; and (5) reason the employee separated from the employer. C.R.S. § 8-74-101.

24.    Upon receipt of a claim, the Division of Unemployment Insurance must notify interested parties of the claim. C.R.S. § 8-74-102(1). Interested parties are afforded an opportunity to present information pertinent to the claim. *Id.* A deputy, as assigned by the Director of the Division, will review the material and issue a decision that sets forth findings of fact, conclusions of law, and an order. *Id.*

25.    Any interested party that is dissatisfied with a deputy's decision may appeal the decisions within twenty calendar days after the date of notification of the decision and will be afforded a hearing. C.R.S. § 8-74-103(1). A hearing officer will afford interested parties a reasonable opportunity for a fair hearing, and thereafter, will decide each relevant issue raised, including findings of fact, conclusions of law, and an issued an order. *Id.* § 8-74-103(3).

26.    Throughout this process, the Division must consider the circumstances of a person's separation "in determining the amount of benefits he [or she] may receive," and must also take into account "that certain acts of individuals are the direct and proximate cause of their unemployment, and such acts may result in such individuals receiving a disqualification" from unemployment benefits.  C.R.S. § 8-73-108(1)(a); *see Debalco Enters., Inc. v. Indus. Claim Appeals Office*, 32 P.3d 621, 623 (Colo. App. 2001) (whether a claimant is entitled to benefits depends on the reason for separation) (citing § 8-73-108(1)(a), (4), & (5)(e)).

27.     The current situation involving the mass termination of probationary federal employees is causing, and will continue to cause, significant harms to Colorado associated with the processing of unemployment claims. Many federal employees received termination notices suggesting that they were fired for performance reasons, for example, because their performance has not been adequate to justify further employment at the federal agency. As a result, the Division of Unemployment Insurance is required to investigate and make findings whether these individuals are eligible for benefits when, as noted above, Colorado state law limits benefits to those who are unemployed through no fault of their own. These inquiries are often resource intensive and will require the Division to make individualized determinations in each case as to the real reasons for the termination.

28.     The resources necessary to undertake these individualized investigations for former federal employees is a substantial burden on CDLE. It will cause the diversion of staffing to investigate these claims. This will likely cause delays and backlogs for other unemployment claims within the state. Colorado will be required to expend these substantial additional resources with no guarantee that it will be reimbursed for these expenses by the federal government.

Executed on March 6, 2025, at Denver, Colorado.

_____/s/*_____
Philip Spesshardt

Director, Colorado Division of Unemployment Insurance

*A copy of the signature page bearing an original signature is attached hereto.

JA250

27.     The current situation involving the mass termination of probationary federal employees is causing, and will continue to cause, significant harms to Colorado associated with the processing of unemployment claims. Many federal employees received termination notices suggesting that they were fired for performance reasons, for example, because their performance has not been adequate to justify further employment at the federal agency. As a result, the Division of Unemployment Insurance is required to investigate and make findings whether these individuals are eligible for benefits when, as noted above, Colorado state law limits benefits to those who are unemployed through no fault of their own. These inquiries are often resource intensive and will require the Division to make individualized determinations in each case as to the real reasons for the termination.

28.     The resources necessary to undertake these individualized investigations for former federal employees is a substantial burden on CDLE. It will cause the diversion of staffing to investigate these claims. This will likely cause delays and backlogs for other unemployment claims within the state. Colorado will be required to expend these substantial additional resources with no guarantee that it will be reimbursed for these expenses by the federal government.

Executed on March 6, 2025, at Denver, Colorado.

Philip Spesshardt

Director, Colorado Division of Unemployment Insurance

7

# Exhibit M

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, ET AL.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, ET AL.,

Defendants.

Case No.: 1:25-cv-

## DECLARATION OF ███████████

I, ██████████, swear under penalty of perjury:

1. My name i██████████ and I am an adult resident of ██████████ Maryland.

2. I began working for the Department of Transportation (Transportation) as an ██████████████████████████████████████ on August 12, 2024. My duty station was Washington, D.C.

3. Transportation hired me as an ██████████ via its Schedule A hiring authority.

4. From the date of my hire, Transportation classified me as a probationary employee. My probationary period was one year, or until August 12, 2025.

5. On February 14, 2025, I received by email a notice signed b██████████ that Transportation was terminating my employment effective immediately. *See* Exhibit 1.

6. The notice states, "The U.S. Department of Transportation – OST finds, that based on your performance you have not demonstrated that your further employment at the

1

Department of Transportation – OST would be in the public interest.  For this reason, the

Department of Transportation – OST is removing you from your position with the Department of

Transportation and the federal civil service effective today."

7.     The February 14, 2025, termination notice from ██████████ was the first I

had learned of my termination.  If I had more warning, I would have started looking for a new

position immediately.

8.     I am now unemployed and have been working temporary jobs to make ends meet.

9.     I pay income taxes to the government of Maryland.  Each pay period,

Transportation withheld and paid income taxes from my paycheck to the Maryland government.

10.     Before I was terminated, my job duties as a ██████████████

████████████████████████████████

███████████

█████████████████████████████████████

12.     I had not yet received formal performance evaluations during my tenure as an

████████████     However, my supervisor consistently gave me positive, informal feedback

about my performance.

Dated: <u>March 5, 2025</u>                                   ████████████████

                                                            *A copy of the signature page
                                                            bearing an original signature is
                                                            attached hereto.

2

**JA254**

Department of Transportation – OST would be in the public interest. For this reason, the

Department of Transportation – OST is removing you from your position with the Department of

Transportation and the federal civil service effective today."

7.     The February 14, 2025, termination notice from ████████████ was the first I

had learned of my termination. If I had more warning, I would have started looking for a new

position immediately.

8.     I am now unemployed and have been working temporary jobs to make ends meet.

9.     I pay income taxes to the government of Maryland. Each pay period,

Transportation withheld and paid income taxes from my paycheck to the Maryland government.

10.    Before I was terminated, my job duties as an ████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

12.    I had not yet received formal performance evaluations during my tenure as an

████████████████    However, my supervisor consistently gave me positive, informal feedback

about my performance.

Dated: 3|5|2025

\*A copy of the signature page
bearing an original signature is
attached hereto.

# EXHIBIT 1



US Department
of Transportation

■■■■■■

# Memorandum

---

FOR: ■■■■■■■■■■■■■■

FROM: ■■■■■■■■■■■■■■

SUBJECT: Notification of Termination During Probationary Period

REFERENCES: 5 U.S.C. § 7511
5 U.S.C. § 3321(a)
5 C.F.R. §§ 315.803 and 804
5 C.F.R. § 316.304

I regrettably inform you that I am hereby removing you from your position with the ■■■■■■■■■■ and federal service consistent with the above references, effective February 14, 2025.

As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states that an appointment is not final until the probationary period is over, and the probationary period is part of the hiring process for employees. A probationer is still an applicant for a finalized appointment to a particular position as well as to the federal service. Until the probationary period has been completed a probationer has the burden to demonstrate why it is in the public interest for the Government to finalize their appointment to the civil service.

The U.S. Department of Transportation - OST finds, that based on your performance you have not demonstrated that your further employment at the Department of Transportation – OST would be in the public interest. For this reason, the Department of Transportation – OST  is removing you from your position with the Department of Transportation and the federal civil service effective today.

**Rights and Procedures**

If you believe this action is based on discrimination because of marital status or partisan political reasons, you may appeal this action to the Merit Systems Protection Board (MSPB). You may also appeal this action to the MSPB if you believe it is the result of

2

discrimination based on your race, color, religion, sex, national origin, age, disability or reprisal for prior EEO activity if such discrimination is alleged in addition to marital status or partisan political reasons. If you appeal to the MSPB, your appeal may be submitted in writing or electronically at **https://e-appeal.mspb.gov/.** Your appeal must be submitted no later than 30 calendar days following the effective date of your termination. You may obtain additional information concerning the MSPB appeal process and access the "e-Appeal" procedure on the internet at **www.mspb.gov.**

If you believe this action was taken against you in retaliation for making protected whistleblower disclosures, you may seek corrective action before the U.S. Office of Special Counsel, **www.osc.gov.** Finally, you have the right to file an EEO complaint if you believe that this action is being taken because of your race, color, religion, sex, national origin, disability, age, or in retaliation for your previous participation in the EEO process. If you wish to do so, you must contact an Equal Employment Opportunity counselor within 45 calendar days following the effective date of your termination to initiate the informal EEO process. For further information as to your rights, you should contact the Departmental Office of Civil Rights at (202) 366-4648.

You are to surrender your DOT identification badge and any other Agency property in your possession to your supervisor or agency official before leaving the premises today. If you are not onsite, your supervisor will provide instructions on how to return your equipment.

If you have any questions concerning your benefits, last paycheck and leave payout, or would like information on how this action affects your retirement eligibility or other benefits, please contact your benefits office**.**

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.

Exhibit N

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., | |
| Plaintiffs, | |
| v. | Case No.: 1:25-cv- |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., | |
| Defendants. | |

**<u>DECLARATION OF</u>** ███████████

I ███████ swear under penalty of perjury:

1.      My name is ███████ and I am an adult resident of ███████ Maryland.

2.      I began working for the Department of Health and Human Services (HHS) as a ████████████████████████████████████ ████████████████ on February 25, 2024.  My duty station was Rockville, Maryland.

3.      From the date of my hire, HHS classified me as a probationary employee.  My probationary period was one year, or until February 25, 2025.

4.      On February 14, 2025, I received by email a notice signed by ███████ that HHS was terminating my employment, effective March 14, 2025.  *See* Exhibit 1.  Four days later, on February 18, 2025, I received a second, nearly identical notice that was also signed by ███████  See Exhibit 2.  The second notice moved up the effective date of my termination to February 23, 2025.

1

**JA260**

5.      Both notices state, "the Agency finds that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the Agency."

6.      The February 14, 2025, termination notice from ███████████ was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

7.      I know of many other probationary employees at HHS that received this same termination letter.  I understand that 37 probationary employees within the ███████████ ███████████ were terminated on or around February 14, 2025.  I also understand that 180 probationary employees across all divisions and bureaus of █████ were terminated on or around February 14, 2025.

8.      I am now unemployed, and I have not received any severance pay following my abrupt termination.  I have applied for unemployment insurance benefits with the Maryland government.

9.      I can no longer afford to support the local economy in the same way.  If I do not find a job in the next few months, I will likely need to move in with my parents or other family members.

10.     As a resident, I pay income taxes to Maryland.  Each pay period, HHS withheld and paid income taxes from my paycheck to the Maryland government.

11.     Before I was terminated, my job duties as a ███████████████ ███████████████████████████████████████████████ ███████████████████████████████

12.     I was a ███████████████████████████

13.      In the one year I worked at HHS, I received one mid-cycle performance evaluation during which I discussed my annual performance plan with my supervisor.  My supervisor gave me positive feedback about my performance.  Additionally, on February 5, 2025, just nine days before I first learned that I was being terminated, my supervisor had informed me that she had submitted paperwork to promote me from the ███████████████████  I was told that my promotion would be effective February 23, 2025.

Dated: _March 6, 2025_____

███████████████████████████

*A copy of the signature page bearing an
original signature is attached hereto.

3

13.    In the one year I worked at HHS, I received one mid-cycle performance evaluation during which I discussed my annual performance plan with my supervisor. My supervisor gave me positive feedback about my performance. Additionally, on February 5, 2025, just nine days before I first learned that I was being terminated, my supervisor had informed me that she had submitted paperwork to promote me from the ████████████████ I was told that my promotion would be effective February 23, 2025.

Dated: 3/6/25

████████████████

*A copy of the signature page bearing an original signature is attached hereto.

# EXHIBIT 1

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

Washington, D.C. 20201

February 14, 2025

MEMORANDUM FOR ███████████████████████████

FROM:

SUBJECT:          Notification of Termination During Probationary Period
REFERENCES:    5 U.S.C. § 7511
                        5 U.S.C. § 3321(a)
                        5 C.F.R. §§ 315.803 and 804
                        5 C.F.R. § 316.304

This is to provide notification that I am removing you from your position of ███████ ███████████████ and federal service consistent with the above references.

On 2/25/2024,  the agency appointed you to the position of ██████████████ ███████████ As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[109] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service" [110] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[111]

Unfortunately, the Agency finds that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the Agency.

---

[109] OPM, *Practical Tips for Supervisors of Probationers*.
[110] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[111] *Id.*

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

For these reasons, I regrettably inform you that I am terminating your employment with the agency during your probationary/trial period, effective March 14, 2025. You will be carried in an administrative leave status and receive pay from today through the end or your employment. You must turn in any government property, including but not limited to any government-furnished equipment, government issued credit cards, and PIV card and clear any indebtedness immediately.

If you believe this action is being taken based on partisan political reasons or marital status, you have a right to file an appeal with the Merit Systems Protection Board (MSPB) under 5 C.F.R. § 315.806. You must file an appeal within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office (see attached).

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact hhsdas-hr-chco@hhs.gov.



Attachment: MSPB Regional and Field Offices

# EXHIBIT 2

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

Washington, D.C. 20201

February 14, 2025

MEMORANDUM FOR ███████████████████████████
███████████████

FROM:            ███████████████████████
                 ███████████████████████
                 ███████████████████████

SUBJECT:        Notification of Termination During Probationary Period
REFERENCES:     5 U.S.C. § 7511
                5 U.S.C. § 3321(a)
                5 C.F.R. §§ 315.803 and 804
                5 C.F.R. § 316.304

    This is to provide notification that I am removing you from your position of ██████ ████████████ and federal service consistent with the above references.

    On 2/25/2024,  the agency appointed you to the position of ███████████ ██████████  As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

    Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[109] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service" [110] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[111]

    Unfortunately, the Agency finds that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the Agency.

---

[109] OPM, *Practical Tips for Supervisors of Probationers*.
[110] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[111] *Id.*

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

For these reasons, I regrettably inform you that I am terminating your employment with the agency during your probationary/trial period, effective February 23, 2025. You will be carried in an administrative leave status and receive pay from today through the end or your employment. You must turn in any government property, including but not limited to any government-furnished equipment, government issued credit cards, and PIV card and clear any indebtedness immediately.

If you believe this action is being taken based on partisan political reasons or marital status, you have a right to file an appeal with the Merit Systems Protection Board (MSPB) under 5 C.F.R. § 315.806. You must file an appeal within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office (see attached).

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact hhsdas-hr-chco@hhs.gov.



Attachment: MSPB Regional and Field Offices

JA269

# Exhibit O

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., | |
| Plaintiffs, | |
| v. | Case No.: 1:25-cv- |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., | |
| Defendants. | |

**<u>DECLARATION OF</u>** ███████

I ███████ swear under penalty of perjury,

    1.     My name is ███████ and I am an adult resident of Washington, D.C.

    2.     I began working for the U.S. Agency for International Development ("USAID") ███████ on approximately December 2, 2024.  My duty station was Washington, D.C.

    3.     I am an active duty Air Force veteran.  I currently serve in the Air Force Reserves.

    4.     From the date of my hire, USAID classified me as a probationary employee.  My probationary period was one year, or until approximately December 1, 2025.

    5.     On February 24, 2025, I received by email a memorandum signed by ███████ ███████ that USAID was terminating my employment, effective immediately, on the basis that "it is in the best interest of the U.S. Government."  *See* Exhibit 1. The memorandum did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

6.     The February 24, 2025 termination notice from ███████████ was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

7.     I am now unemployed, aside from my periodic reservist duties.  I plan to apply for unemployment insurance benefits with the D.C. government if I am eligible.

8.     I can no longer afford to support the local economy in the same way due to the sudden termination.  For example, I have canceled plans to eat out at restaurants and order delivery, and will need to drive outside of the city to Maryland or Virginia for cheaper groceries. I will likely not renew my fitness memberships and class passes after February, and have to cut down on all other recreational expenses, dissuading me patronizing any establishments for gatherings with my friends and community members. I also will likely have to put off upcoming healthcare needs for my pets. Prior to my termination, I was also planning to buy property within D.C., with the help of my Veteran Affairs benefits, but am no longer searching due to the unexpected termination of my job.

9.     If I do not find a new job in the District in the next few months, I will need to relocate out of the District, and may need to terminate my rental lease early to do so.

10.    Prior to my termination, my job duties ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

2

11.    ███████████████████████████████████
█████

12.    As a resident of the District of Columbia, I pay income taxes to the District.  Each pay period, USAID withheld and paid income taxes from my paycheck to the District government.

13.    I received one midterm review during my two and a half months at USAID, during which my supervisor and I discussed my progress on my performance plan and we both executed a Form AID 462-1, acknowledging we conducted this review.  My supervisor gave me positive feedback regarding my performance.

14.    I am in contact with many other probationary employees at USAID that received this same termination letter. I believe my agency terminated roughly 200 probationary employees on February 24, 2025.


Dated: <u>March 5, 2025</u>    ████████████████████████
████████████████████████
████████████████████████
████████████████████████
████████████████████████

11. ███████████████████████████████

███

12.    As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, USAID withheld and paid income taxes from my paycheck to the District government.

13.    I received one midterm review during my two and a half months at USAID, during which my supervisor and I discussed my progress on my performance plan and we both executed a Form AID 462-1, acknowledging we conducted this review. My supervisor gave me positive feedback regarding my performance.

14.    I am in contact with many other probationary employees at USAID that received this same termination letter. I believe my agency terminated roughly 200 probationary employees on February 24, 2025.

Dated: MARCH 5, 2025

██████████████████████

# Exhibit 1



**MEMORANDUM**

Date:        February 24, 2025

To:

From:        ████████████████████████████████████

Subject:     Notification of Termination of Probationary Appointment

On  2018-06-17  , you were appointed to the position of ████████████████ ,
████ .  In accordance with 5 C.F.R. Section 315.801, your appointment to the competitive
service is subject to completion of a one-year probationary period.

        This letter is to inform you that your employment with the United States Agency for
International Development (USAID) has been terminated, effective immediately upon receipt of
this memorandum.  I am terminating you on the basis that it is in the best interest of the U.S.
Government.

        This is a final decision.  You have the right to contest this action through the avenues
outlined below.  Please read carefully as you may only elect one avenue under some
circumstances and your election will be considered final on the date any appeal or complaint is
filed.

1.  If you believe this action resulted from discrimination based on marital status or
    partisan political reasons, or because of conditions arising before your appointment,
    you may appeal this action to the Merit Systems Protection Board (MSPB) by mail,
    electronic filing, facsimile at (703) 756-7112, commercial overnight delivery, or
    personal delivery to the Regional Director, U.S. Merit Systems Protection Board,
    Washington, DC Regional Office, 1901 S. Bell Street, Suite 950, Arlington, Virginia
    22202.  Any appeal to the Board must be filed within thirty (30) calendar days after the
    effective date of this action, or thirty (30) calendar days after receipt of this letter,

**JA276**

whichever is later.  If you do not submit an appeal within that timeframe or a different time frame provided by an order of an MSPB administrative judge, your appeal will be dismissed by the MSPB as untimely filed unless a good reason for the delay is shown.  An MSPB administrative judge will provide you with an opportunity to show why the appeal should not be dismissed as untimely.  A copy of the MSPB appeal form and regulations may be downloaded from the MSPB's website, www.mspb.gov or obtained from the cited Point of Contact below.  You must submit two (2) copies of both your appeal and all attachments unless you file an appeal electronically by using e-Appeal, the MSPB's Internet Filing Procedure, at http://e-appeal.mspb.gov.  E-appeal instructions and filing instructions may be found at www.mspb.gov/appeals/appeals.htm.

2.  If you believe that this action was based in whole or in part on discrimination because of race, color, religion, national origin, sex, age, disability, protected genetic information, and/or prior Equal Employment Opportunity (EEO) activity, you may elect to pursue a complaint through the EEO procedures under the provisions of 29 C.F.R. Part 1614.  Also, if you believe this action was based in whole or in part on discrimination based on your parental status, you may elect to pursue a complaint through the EEO procedures under the provisions of Executive Order 11478, as amended.  To pursue a complaint through the EEO procedures under the provisions of 29 C.F.R. Part 1614 or Executive Order 11478, as amended, you must first consult with an EEO Counselor or staff from the Office of Civil Rights via email at EEOcomplaints@usaid.gov, within forty-five (45) calendar days from the effective date of your termination.

3.  If you believe that this action is being taken against you because of reprisal for whistleblowing activity, you may seek corrective action under subchapters II and III of 5 U.S.C. Chapter 12, by filing a complaint with the Office of Special Counsel (OSC).  After a complaint is filed with OSC, you may file an Individual Right of Action (IRA) appeal with the MSPB.

PLEASE READ CAREFULLY BEFORE CHOOSING AN OPTION UNDER THIS SECTION:

If you choose option 3 above and first seek corrective action by filing a complaint with OSC, your subsequent appeal to the MSPB will be deemed an IRA appeal.  Pursuant to 5 C.F.R. Section 1209.2, you will be limited to the rights associated with an IRA appeal.  Specifically, the MSPB will only consider whether you have demonstrated that one or more whistleblowing disclosures was a contributing factor in the Agency taking this personnel action against you, and if so, whether the Agency has demonstrated by clear and convincing evidence that it would have taken this personnel action in the absence of the protected disclosure or disclosures.  You may not raise affirmative defenses other than reprisal for whistleblowing activities, such as claims of discrimination or harmful procedural error.

**Probationary Termination**
**Page 3**

      If you have any questions about your appeal rights, you may contact HCTM/ELR at hctm.elr@usaid.gov. If you are in a bargaining unit, you may also seek information from your union representative.

Exhibit P

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STATE OF MARYLAND, ET AL.,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, ET AL.,

Defendants.

Case No.: 1:25-cv-

**<u>DECLARATION OF</u>** ████████

I, ████████ swear under penalty of perjury,

1.      My name is ████████ and I am an adult resident of Washington, D.C.

2.      I began working for the U.S. Department of Housing & Urban Development ("HUD") as ██████████████████████████████████████████ ████████████████████████ on approximately January 13, 2025. My duty station was Washington, D.C.

3.      From the date of my hire, HUD classified me as a probationary employee. My probationary period was one year, or until approximately January 12, 2026.

4.      On February 14, 2025, I received by email a Notice of Termination from ████████ ████████ stating that HUD was terminating my employment, effective immediately, "in order to promote the efficiency of the federal service in accordance with the priorities of the Administration." *See* Exhibit 1. The Notice gave no other reason. It did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

1

5.      The February 14, 2025 Notice was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

6.      I know of many other probationary employees at HUD that received this same termination letter.  I believe HUD terminated dozens of probationary employees on or around February 14, 2025.

7.      I am now unemployed.  I plan to apply for unemployment insurance benefits with the D.C. government if I am eligible.  If I do not find a job soon, I may need to apply for Medicaid benefits and food stamps.

8.      I can no longer afford to support the local economy in the same way.  I have stopped eating out at restaurants, going to concerts, spend less money in general because I need to save it.

9.      As a resident of the District of Columbia, I pay income taxes to the District.  Each pay period, HUD withheld and paid income taxes from my paycheck to the District government.

10.      I was a ██████████████████████████████████████████

11.      Before I was terminated, my main job duty as a ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████

12.      In the one month I worked at HUD, I did not receive a performance evaluation, but I received verbal feedback from my supervisor that was positive. I never received any feedback that there were any issues with my performance.

Dated: <u>March 4, 2025        </u>        ████████████████████

████████████████████

████████████████████

2

*A copy of the signature page bearing an original signature is attached hereto.

3

5.     The February 14, 2025 Notice was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

6.     I know of many other probationary employees at HUD that received this same termination letter. I believe HUD terminated dozens of probationary employees on or around February 14, 2025.

7.     I am now unemployed. I plan to apply for unemployment insurance benefits with the D.C. government if I am eligible. If I do not find a job soon, I may need to apply for Medicaid benefits and food stamps.

8.     I can no longer afford to support the local economy in the same way. I have stopped eating out at restaurants, going to concerts, spend less money in general because I need to save it.

9.     As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, HUD withheld and paid income taxes from my paycheck to the District government.

10.    I was a ███████████████████████████████████████

11.    Before I was terminated, my main job duty as a ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

12.    In the one month I worked at HUD, I did not receive a performance evaluation, but I received verbal feedback from my supervisor that was positive. I never received any feedback that there were any issues with my performance.

Dated:  _03/04/2025_

Exhibit 1



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

*Via e-mail*

February 14, 2025

FROM:

SUBJECT:          Notice of Termination During Trial Period (Excepted Service)

The purpose of this notice is to notify you of the decision to terminate your employment with the U.S. Department of Housing and Urban Development (HUD), during your trial period, in order to promote the efficiency of the federal service in accordance with the priorities of the Administration.

The purpose of the trial period is to provide the federal government with an opportunity to evaluate a new federal employee's conduct and performance on the job in order to determine if an appointment should become final and if continued employment as a federal employee is warranted.

After careful consideration, the Agency is terminating your employment as of the date of the transmission of this email, during your trial period as part of a workforce restructuring of the Agency. You should work with your supervisor to initiate the separation process and return your HUD equipment before your termination date.  Failure to return government property may result in a deduction of your paycheck. Any personal items left behind in your work area will be mailed to your current address of record. Please let your supervisor know if you have changed your mailing address.

If you had opted into the Deferred Resignation Program by messaging OPM prior to its closing at 7:20pm ET on February 12, 2025, you will receive an Agreement to sign and will be allowed to resign or retire in accordance with the terms of the program. If you believe you opted into the program and are receiving this notice in error, please contact [DeferredResignationQuestions@HUD.Gov](mailto:DeferredResignationQuestions@HUD.Gov) for verification. Please annotate Probationary Verification in the subject line.

You are advised that you do not have a right to reply to this personnel action or to grieve your termination under either the administrative or negotiated grievance procedure. However, if you believe you received this notice in error because you are not currently in a trial period, please send an e-mail to: [ProbationaryNotice@hud.gov](mailto:ProbationaryNotice@hud.gov) with the subject "Verification of Probationary Status."

If you believe that the Department discriminated against you on the basis of your race, color, religion, sex, national origin, age, disability, genetic information, and/or reprisal, you may file a complaint of discrimination. In order to pursue this matter through the discrimination complaints process, you must

contact a HUD EEO Counselor within 45 days of the effective date of this adverse action. A HUD EEO Counselor may be contacted through the HUD Office of Departmental Equal Employment Opportunity (ODEEO) by telephone at (202) 708-3362 or by writing to:

>        Department of Housing and Urban Development
>        Director of EEO
>        451 7th Street, S.W., Room 2102
>        Washington, D.C. 20410

Should you elect to file a complaint of discrimination, your complaint will be processed in accordance with 29 CFR § 1614.

If you believe this termination is being taken against you in reprisal for acts covered under the Whistleblower Protection Enhancement Act, you may seek corrective action by filing a complaint with the Office of Special Counsel (OSC) (see www.osc.gov). If you choose to file a complaint with OSC, and if OSC does not take corrective action, you may then file an Individual Right of Action (IRA) appeal with the MSPB. In an IRA appeal, the only issues before the MSPB are those listed in 5 U.S.C. § 1221(e), i.e., whether the appellant has demonstrated that a protected disclosure or protected activity was a contributing factor in one or more covered personnel actions and, if so, whether the agency has demonstrated by clear and convincing evidence that it would have taken the same personnel action(s) in the absence of the protected disclosure(s). Other than raising an affirmative defense of reprisal for whistleblowing activities, other affirmative defenses, such as claims of discrimination or harmful procedural error, may not be raised. In an IRA appeal that concerns an adverse action under 5 U.S.C. § 7512, the agency need not prove its charges, nexus, or the reasonableness of the penalty.

Your election of one of these avenues of review will be considered final on the date any appeal or complaint is filed.

Exhibit Q

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

## DECLARATION OF ███████████

I, ███████████ swear under penalty of perjury,

      1.      My name is ███████████ and I am an adult resident of Washington, D.C.

      2.      I began working for the Department of the Interior ("DOI") as an ███████████ ███████████████████████████████████████████████ on approximately May 5, 2024. My duty station was Washington, D.C.

      3.      From the date of my hire, DOI classified me as a probationary employee. My probationary period was one year, or until approximately May 5, 2025.

      4.      On February 14, 2025, I received by email a notice signed by ███████████ that DOI was terminating my employment immediately. It stated: "The Department has determined that you have failed to demonstrate fitness or qualifications for continued employment because your subject matter knowledge, skills, and abilities do not meet the Department's current needs." *See* Exhibit 1. The notice did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

1

5.    The February 14, 2025 termination notice from ████████ was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

6.    I know of several other probationary employees at Interior that received this same termination letter.  I believe DOI terminated dozens of other probationary employees on or around February 14, 2025.

7.    I am now unemployed.  I may need to apply for unemployment insurance benefits with the D.C. government in the coming weeks if I do not find a job.

8.    I can no longer afford to support the local economy in the same way.  For example, I am spending less on groceries, not eating out at restaurants, and spending less on recreational activities.  If I do not find a new job in the next few months, I will relocate out of the District.

9.    As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, USAID withheld and paid income taxes from my paycheck to the District government.

10.    I was a ████████████████████████████████████

11.    As an ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

12.    In the eight months I worked at Interior, I received one performance review, in November 2024.  My performance rating was Exceeds Expectations.

2

**JA289**

Dated: <u>March 4, 2025</u>            Signed █████████████

*A copy of the signature page bearing an
original signature is attached hereto.

3

Dated: _3/4/25_

*A copy of the signature page bearing an
original signature is attached hereto.

Exhibit 1



United States Department of the Interior
Office of the Assistant Secretary - Indian Affairs
Washington, DC 20240

**Memorandum**

| | |
|---|---|
| To: | ███████████████████████████████████ |
| From: | |
| Date: | February 14, 2025 |
| Subject: | Notice of Decision to Terminate Competitive Service Appointment During Probationary Period |

Consistent with applicable Federal laws, rules, and regulations, this Memorandum documents and provides written notice of my decision to terminate, during the probationary period, your competitive service appointment to the position of █████████████████████ at Washington, DC. The decision becomes effective immediately, on the date of this Memorandum, which you have received by hand delivery on the same date. You are instructed to coordinate immediately with your supervisor to satisfy all off-boarding administrative requirements (*e.g.*, surrender all keys to the Federal workplace, Federal access badge, government-owned materials, and government-owned electronic equipment, etc...) and to leave the workplace immediately after satisfying all administrative requirements. The Department will attend to all applicable timekeeping requirements on your behalf and will ensure that you receive full pay through the close of regular business (including any grant of administrative leave, if necessary and appropriate) on the date of this Memorandum.

Your competitive service appointment, which became effective on May 5, 2024, was subject to a probationary period, as indicated on your appointment SF-50. During your probationary period, the Department has continued to evaluate your fitness for the position to determine whether you have fully demonstrated your qualifications for continued employment. Until the probationary period has ended, you, as a competitive service appointee, have the burden to demonstrate why the Department should finalize your appointment in the civil service. If, during the probationary period, a competitive service appointee's work performance, which includes any relevant knowledge, skill, or ability, does not satisfy the needs of the Department, and thus the appointee fails to demonstrate the competitive service appointee's fitness or qualifications for continued employment, the Department shall initiate action to separate the competitive service appointee during the probationary period. The probationary period is a highly significant step, and the final step, in the evaluation process, which is used to determine a competitive service appointee's fitness and qualifications for the position. The Department has determined that you have failed to

demonstrate fitness or qualifications for continued employment because your subject matter knowledge, skills, and abilities do not meet the Department's current needs, and it is necessary and appropriate to terminate, during the probationary period, your appointment to the position of ████████████████████████████████████████████████████████████

As written above, the decision becomes effective immediately on the date of this Memorandum.

## Probationary Appointee Rights and Procedures

If you believe that you meet the definition of "employee" under 5 U.S.C. § 7511(a)(1), and accordingly, that the Department has erroneously determined that your appointment remains subject to a probationary period, please notify your first-level supervisor immediately.

As a career-conditional competitive service appointee with less than one year of current continuous service, you have no statutory right to file an appeal with the U.S. Merit Systems Protection Board (MSPB). However, pursuant to Federal regulations, you may appeal this decision to the MSPB only if you raise a non-frivolous allegation that partisan political reasons or marital status motivated this termination decision. An appeal to the MSPB must be filed no later than 30 days after the date of, and your corresponding receipt of, this Memorandum. If you do not submit an MSPB appeal within the time set forth by statute, regulation, or order of an MSPB Administrative Judge, the MSPB may dismiss your appeal as untimely filed, unless you show good reason for the delay. The assigned MSPB Administrative Judge may provide you the opportunity to show why your appeal should not be dismissed as untimely. If you choose to file an appeal, your appeal must be filed with the MSPB, must give reasons for contesting this termination decision, must include a copy of this decision being appealed, and if available, include a copy of the SF-50 or similar notice of personnel action.

To appeal this action, you must send your appeal to the MSPB, Washinton DC Regional Office. The appropriate MSPB Regional Office can be identified through information found on MSPB's website at  https://www.mspb.gov/about/contact.htm.  Your appeal may be filed with the MSPB by mail addressed to 1901 S. Bell Street, Suite 950 Arlington, Virgina 22202, by personal delivery to that office during normal business hours, by facsimile, or by commercial overnight delivery. The facsimile number is (703) 756-7112.  Alternatively, you may submit an appeal online through the MSPB e-appeal system at https://e-appeal.mspb.gov/. More information about MSPB contacts and locations can be found on MSPB's website at https://www.mspb.gov/about/contact.htm.

A copy of the MSPB's regulations concerning appeals is available at http://www.mspb.gov.  If you would like a paper copy of the MSPB's regulations concerning appeals, you may contact Mr. Bennett Tuchawena, Supervisory Human Resources Specialist (ER/LR), via email at bennett.tuchawena@bia.gov.

If you decide to file an appeal with the MSPB, you should notify the Board that the Department's contact for the purpose of your appeal is:

> Division of Employment and Labor Law (DEL)
> U.S. Department of the Interior
> Office of the Solicitor
> 1849 C Street, N.W., Mailstop 6440
> Washington, D.C. 20240

sol-inbox-del@sol.doi.gov

If you believe that this action constitutes a prohibited personnel practice under 5 U.S.C. § 2302(b), including but not limited to, claims that the Department took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures or engaging in protected activity, you may seek corrective action before the U.S. Office of Special Counsel, which you may contact electronically at www.osc.gov, or by mail at U.S. Office of Special Counsel, 1730 M Street NW, Suite 218, Washington, DC 20036-4505. If your complaint concerns retaliation under 5 U.S.C. § 2302(b)(8) or (b)(9), and OSC dismisses your claim, you may have the right to file a Individual Right-of-Action (IRA) appeal with the MSPB within sixty-five (65) days of OSC's determination. However, in accordance with 5 U.S.C. § 7121(g)(2), if you elect to file a complaint with OSC prior to filing a complaint with the MSPB, you will be deemed to have elected to pursue corrective action under Subchapters II and III of 5 U.S.C. Chapter 12 and may be required to exhaust administrative procedures before OSC prior to filing an IRA appeal with the MSPB. For further information regarding your right to seek corrective action, please refer to 5 U.S.C. § 1221 and 5 C.F.R. §§ 1209.2 & 1209.5.

If you believe that discrimination based on race, color, sex, religion, national origin, age (40 and over), disability, genetic information, or protected activity, in violation of federal antidiscrimination laws, motivated this decision in whole or in part, you may contact an EEO counselor within forty-five (45) days of receiving this Memorandum to discuss your claim(s) and file a complaint. The contact information for an EEO counselor is:

> BIA Office of Equal Opportunity and
> Civil Rights Programs (EEOCP)
> 1849 C Street, NW
> MS-4660-MIB
> Washington, DC 20240
> Phone number: (202) 219-1650
> Email:  bia_bie_eeo@bia.gov (Preferred Method)

You can also find contact information for the applicable servicing EEO office on the Department's website at https://www.doi.gov/pmb/eeo/EEO-COUNSELORS.

Please note that in accordance with 29 C.F.R. §1614.302 you may not initially file both a mixed case EEO complaint and an MSPB appeal that involves allegations of discrimination on the same matter. Whichever action is filed first shall be considered your election to proceed in that forum.

Information about appeal rights and procedures may be obtained from Mr. Bennett Tuchawena, Supervisory Human Resources Specialist (ER/LR), via email at Bennett.Tuchawena@bia.gov.

**Acknowledgment of Receipt**

Please acknowledge receipt of this written notice by signing and dating below. Your signature does not mean that you agree or disagree with the contents of this Memorandum, and by acknowledging receipt, you will not forfeit any of the rights described above. However, your failure to sign will not void the contents of this Memorandum.

_____          _____

Exhibit R

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, ET AL.,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, ET AL.,

    Defendants.

Case No.: 1:25-cv-

## DECLARATION OF ███████████

I, ████████████ swear under penalty of perjury,

1. My name is ████████████ and I am an adult resident of ████████ MD.

2. I began working for the Department of Labor ("DOL") as an ████████████ ████████████████████████████████████████████ ██████ on approximately April 22, 2024. My duty station was Washington, D.C.

3. From the date of my hire, DOL classified me as a probationary employee. My probationary period was one year, or until approximately April 21, 2025.

4. On February 20, 2025, I received by email a Notification of Termination During Probationary Period ("Termination Notice), signed by ████████████ stating that DOL was terminating my employment, effective March 7, 2025. The Termination Notice states as the reason for my termination: "The Agency finds your further employment would not be in the public interest." *See* Exhibit 1. The notice did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

1

5.  The February 20, 2025 Termination Notice was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

6.  I know of several other probationary employees at DOL that received this same termination letter. I believe DOL terminated around 200 probationary employees on or around February 20, 2025.

7.  I am now unemployed. I plan to apply for unemployment insurance benefits with the D.C. government and may also apply for Medicaid and SNAP benefits.

8.  I can no longer afford to support the local economy in the same way. For example, I am disabled and used to pay someone to help me around the house a couple hours per week, something I can now no longer do. I will also need to reduce my discretionary income, like going to the movies or buying new household items.

9.  As a resident of Maryland, I pay income taxes to the state of Maryland. Each pay period, DOL withheld and paid income taxes from my paycheck to the state of Maryland.

10. I was a ████████████████████████████████████

11. Before I was terminated, my job duties as ██████████████████████
    ██████████████████████████████████████████
    ████████████████████████████████████
    ██████████████████████████████████████
    ████████████████████████████████████████
    ██████████████

12. In the ten months I worked at DOL, I received one performance review in October 2024. My performance rating was Outstanding.

Dated: <u>March 4, 2025</u>          Signed: ████████████████

*A copy of the signature page bearing an original signature is attached hereto.

3

Dated: _March 4, 2025_
 _3/4/25_



Exhibit 1



**U.S. Department of Labor**
**Office of the Assistant Secretary for Administration and Management**
Washington, D.C. 20210

February 20, 2025

MEMORANDUM FOR: ████████████████████████████████

FROM: ████████████████████████████████

SUBJECT:     Notification of Termination During Probationary Period

REFERENCES:     5 U.S.C. § 7511
        [5 U.S.C. § 3321(a)]
        [5 C.F.R. §§ 315.803 and 804]
        [5 C.F.R. § 316.304]

      This is to provide notification that the Agency is removing you from your position of ████████ and federal service consistent with the above references.

      On April 21, 2024, the Agency appointed you to the position of ████████ As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

      Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

      The Agency finds your further employment would not be in the public interest. For this reason, the Agency is removing you from your position of ████████ with the Agency and the federal civil service effective March 7, 2025.

      You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov. For further appeal rights, please see the attachment.

      We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact DOL Employee Relations at Employee.Relations@dol.gov.

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

**JA303**

Exhibit S

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

## DECLARATION OF ██████████████

I, ████████████ swear under penalty of perjury,

1.     My name is ████████████ and I am an adult resident of Washington, D.C.

2.     I began working for the General Service Administration ("GSA") as a P███ ████████████████████████████████████████████████████ on April 7, 2024.  My duty station was Washington, D.C.

3.     From the date of my hire, GSA classified me as a probationary employee.  My probationary period was one year, or until approximately April 6, 2025.

4.     On February 14, 2025, I received by email a notice signed by ████████ that GSA was terminating my employment, effective March 7, 2025, on the basis that ████████ did not consider it "in the best interest of the U.S. government" to retain me.  *See* Exhibit 1.  The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

1

5.      The February 13, 2025 termination notice was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

6.      I believe many other probationary employees at GSA that received this same termination letter.  I believe my agency terminated more than 100 probationary employees the week of February 10, 2025.

7.      I will be unemployed after my termination effective date of March 7, 2025.  I plan to apply for unemployment insurance benefits with the D.C. government.

8.      Because of my termination, I will not be able to support D.C.'s local economy in the same way.  My family and I have had to scale back our spending significantly, including not eating out at restaurants as often and shopping for groceries outside of D.C. where groceries are cheaper.  We also will likely need to cancel my children's enrollment at a summer camp in the District.

9.      As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, GSA withheld and paid income taxes from my paycheck to the District government.

10.      Before I was terminated, my job duties as ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

11.      I was a ███████████████████████████████████████████

12.      In the approximately ten months I worked at GSA, I received one performance review in November 2024.  My performance rating was Fully Successful.

Dated: <u>March 4, 2025     </u>                    Signed ███████████████

2

████████

\*A copy of the signature page bearing an
original signature is attached hereto.

3

5.    The February 13, 2025 termination notice was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

6.    I believe many other probationary employees at GSA that received this same termination letter. I believe my agency terminated more than 100 probationary employees the week of February 10, 2025.

7.    I will be unemployed after my termination effective date of March 7, 2025. I plan to apply for unemployment insurance benefits with the D.C. government.

8.    Because of my termination, I will not be able to support D.C.'s local economy in the same way. My family and I have had to scale back our spending significantly, including not eating out at restaurants as often and shopping for groceries outside of D.C. where groceries are cheaper. We also will likely need to cancel my children's enrollment at a summer camp in the District.

9.    As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, GSA withheld and paid income taxes from my paycheck to the District government.

10.    Before I was terminated, my job duties as █████████████████

11.    ████████████████████

12.    In the approximately ten months I worked at GSA, I received one performance review in November 2024. My performance rating was Fully Successful.

Dated: *March 4ᵗʰ 2025*    ████████████████████

*A copy of the signature page bearing an original signature is attached hereto.

Exhibit 1



General Services Administration

<u>**Delivery Via Electronic Submission**</u>

February 13, 2025

MEMORANDUM FOR



FROM:

SUBJECT:          Probationary Period Termination

The purpose of this memorandum is to inform you of your termination from your position of
. Your last day in pay status will be March 7, 2025.

On April 7, 2024, you began employment with the General Services Administration (GSA). Your
competitive service appointment is subject to completion of a one-year probationary period.
You have served less than a year in your competitive service appointment.

Probationary periods are an essential tool for agencies to assess employee performance and
manage staffing levels. In accordance with The Office of Personnel Management (OPM),
Guidance on Probationary Periods, Administrative Leave and Details, January 20, 2025, I made
the determination related to your retention. I do not consider it in the best interest of the
government to retain you in the Federal service and have decided to terminate your
appointment during your probationary period.

Employees who are terminated during the probationary period have limited appeal rights.

<u>**Merit Systems Protection Board**</u>

You may appeal to the Merit Systems Protection Board (MSPB) if you allege that your
termination was based on partisan political reasons or marital status, or was taken for pre-
appointment reasons, or in violation of agency regulations.

An appeal may be directed to:

U.S. Merit Systems Protection Board

Washington DC Regional Office
1901 S. Bell Street Suite 950
Arlington, Virginia 22202
703-526-6250 (telephone)
703-756-7112 (fax)
washingtonregionaloffice@mspb.gov

An appeal may be received by MSPB no later than 30 days after your receipt of this notice, or 30 days after the effective date of this action, whichever is later. (If an appeal is not submitted within the time limit, it will be dismissed, unless a good reason for the delay is shown. MSPB will provide a late-filing party an opportunity to show why the appeal should not be dismissed as untimely.) You may obtain additional information and a copy of the appeal form from the MSPB website at http://www.mspb.gov/appeals/appeals.htm. If you file an appeal, you should notify MSPB that the Agency copy of its Acknowledgement Order should be addressed to:

Marcia Smart
Supervisory Senior Assistant General Counsel
U.S. General Services Administration
Office of the General Counsel
202-360-2031
marcia.smart@gsa.gov

**Equal Employment Opportunity Procedure**

If you believe this personnel action is based in whole or in part on discrimination because of race, color, religion, sex, age, national origin, physical or mental disability, genetic information, or reprisal for protected EEO activity, you may consult with an EEO Counselor. To initiate this process, you must contact an EEO Counselor within 45 calendar days of the effective date of this action. If you wish to initiate an informal complaint you may do so by email, phone or you may electronically file your complaint. You may do so by phone by calling 202-501-4571 or Speech-to-Speech Relay 1-800-898-0740.  You may initiate a complaint by email at eeo@gsa.gov .  You may do so by electronic filing: initiate an informal complaint of discrimination through - eFile (this link is on the Office of Civil Rights InSite webpage).  You may do so by regular U.S. mail at: U.S. General Services Administration, Office of Civil Rights (OCR), 1800 F Street, NW, Room 2240, Washington, DC 20405.  Additional information is available at www.eeoc.gov.

You may not pursue both an EEO complaint and an appeal to the MSPB on the same matter. You will be deemed to have exercised your option to elect the EEO complaint procedure or the MPSB appeals procedure when you timely file a formal EEO complaint or file an MSPB appeal, whichever occurs first.

**Office of Special Counsel**

You also have the right to seek corrective action before the U.S. Office of Special Counsel (OSC).  At OSC, consideration may include whether GSA took one or more personnel actions

Docusign Envelope ID: 2B3E56C6-A8A3-4B77-8F15-15FD8D1B9C48

against you: in retaliation for protected whistleblowing disclosures, in violation of a prohibited personnel practice or in violation of any other rule or regulation within OSC's purview. Additional information and the OSC appeal form are available at www.osc.gov.

You will be paid for any salary and/or annual leave due to you under current regulations. You are required to return all government issued equipment, keys, ID cards and any government property issued to you by the Agency. A Notification of Personnel Action, SF-50, will be provided to you separately as it becomes available.

If you have any questions concerning this memorandum, you may contact █████████

# Exhibit T

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

**DECLARATION OF** █████████████

I, ████████████ swear under penalty of perjury,

1.    My name is ████████ and I am an adult resident of ███████████ Maryland.

2.    I began working for the Department of Education ("ED") as ████████ ████████████████████████████████████ ██████████████████████ on approximately August 11, 2024.  My duty station was Washington, D.C.

3.    From the date of my hire, ED classified me as a probationary employee.  My probationary period was one year, or until approximately August 10, 2025.

4.    On February 12, 2025, I received by email a Notification of Termination during Probationary/Trial Period ("Termination Notice") from ████████ *See* Exhibit 1.  The Termination Notice informed me that ED was removing me from my position and federal service.  The Termination Notice gave no reason for my termination.  It also did not identify any

1

issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

     5.     The February 12, 2025 Termination Notice was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

     6.     I know of several other probationary employees at ED that received this same termination letter.

     7.     I am now unemployed.  I plan to apply for unemployment insurance benefits with the D.C. government.  I may need to apply for Medicaid and other public assistance programs.

     8.     I can no longer afford to support the local economy of D.C. or Maryland in the same way.  I commuted into the District for work and paid for parking and lunch around my office.  I also frequently went out to restaurants in the District after work.  On the weekends, I was often in the District at restaurants, bars, clubs, and museums.  Because I am now unemployed, I will be in the District much less often, both because I will no longer be commuting to work and also because I will need to scale back my spending significantly.

     9.     I will also need to scale back my spending significantly in Maryland.  I am in the process of building a new house in Maryland and if I do not find a new job soon, I may not get approved for my mortgage or be able to afford mortgage payments.

     10.    As a resident of Maryland, I pay income taxes to the state of Maryland.  Each pay period, ED withheld and paid income taxes from my paycheck to the state of Maryland.

     11.    I was a ███████████████████████████████

     12.    Before I was terminated, my job duties as an █████████████

███████████████████████████████████████

████████████████████████████████████████

██████

13.     In the six months I worked at ED, I received one performance evaluation, in

January 2025.  My performance rating was High Results Achieved.


Dated: <u>March 5, 2025     </u>          █████████████████████████████

*A copy of the signature page bearing an
original signature is attached hereto.

3

**JA317**

grantees at higher education institutions and in state governments who received federal education grants.

13.    In the six months I worked at ED, I received one performance evaluation, in January 2025. My performance rating was High Results Achieved.

Dated: _08/05/2025_

█████████████████████████

*A copy of the signature page bearing an
original signature is attached hereto.

Exhibit 1



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SPECIAL EDUCATION AND REHABILITATIVE SERVICES

February 12, 2025

**MEMORANDUM FOR** ████████████████████████████████
████████████████████████████

FROM:        ████████████████
             ████████████████████████████████████████████

SUBJECT:     Notification of Termination During Probationary/Trial Period

REFERENCES:  5 U.S.C. § 7511
             5 U.S.C. § 3321(a)
             5 C.F.R. §§ 315.803 and 804
             5 C.F.R. § 316.304
             HCP 315.1 (Probationary Period)
             HCP 302.1 (Employment in Excepted Service)

This is to provide notification that I am removing you from your position of ████████████████████ and federal service consistent with the above references.

On August 11, 2024, the agency appointed you to the position of ████████████████ ████████  As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary/trial period is over," and the probationary/trial period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service"[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

I regretfully inform you that I am removing you from your position of ████████ ████████████ with the agency and the federal civil service effective today, February 12, 2025.

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

**JA320**

If you believe this action is being taken based on partisan political reasons or marital status, you have a right to file an appeal with the Merit Systems Protection Board (MSPB) under 5 C.F.R. § 315.806. You must file an appeal within thirty (30) days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: Washington Regional Office: 1901 S. Bell Street, Suite 950, Arlington, VA 22202 Telephone: (703) 756-6250; Fax: (703) 756-7112

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact me directly at

Exhibit U

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

## <u>DECLARATION OF</u> ███████████████

I, ███████████ swear under penalty of perjury,

    1.     My name i█████████ and I am an adult resident of Washington, D.C.

    2.     I began working for the U.S. Department of the Treasury as a█████████████ ██████████████████████████████ on approximately October 6, 2024.  My duty station was Washington, D.C.

    3.     From the date of my hire, my agency classified me as a probationary employee. My probationary period was one year, or until approximately October 5, 2025.

    4.     On February 21, 2025, in a virtual meeting, ██████████████████ ████████████████ informed me that my agency was terminating my employment, effective March 8, 2025.  They informed me that the reason for my termination was based on "current mission needs."  They informed me that my agency would send me a termination notice, which I did not receive until March 3, 2025.

    5.     The termination notice I received on March 3, 2025 was dated February 21, 2025 and confirmed that my agency was terminating my employment, effective March 8, 2025,

because "[b]ased on . . . guidance [from the Office of Personnel Management] and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest."  See Exhibit 1.  The notice did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

6.      The February 21, 2025 meeting was the first notice I received of my termination. If I had more warning, I would have started looking for a new position immediately.

7.      I know other probationary employees at my agency that received similar termination letters.

8.      As of March 8, 2025, I will be unemployed.  If I do find new employment, it will likely pay significantly less than my position at the ███

9.      I will no longer be able to afford to support the local economy in the same way. For example, I will not be able to eat out at restaurants as often, go out for coffee, buy concert tickets at local music venues, or spend the same amount on groceries.  I may need to relocate out of the District if potential employment opportunities require me to do so.

10.      As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, my agency withheld and paid income taxes from my paycheck to the District government.

11.      ████████████████████████████████

12.      Before I was terminated, my job duties as ████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████
██████████████████

13.     In the four months I worked at my agency, I did not receive a formal performance review, but I did receive positive feedback by email from my supervisors on several occasions. No one raised any issues or concerns relating to my job performance.


Dated: <u>March 5, 2025    </u>



*A copy of the signature page bearing an original signature is attached hereto.

13.    In the four months I worked at my agency, I did not receive a formal performance review, but I did receive positive feedback by email from my supervisors on several occasions. No one raised any issues or concerns relating to my job performance.

Dated: 3/5/25

*A copy of the signature page bearing an original signature is attached hereto.

Exhibit 1



February 21, 2025

███████████████████████████████████████████████████

FROM:                ████████████         ███████████████████████
                     ████████████████████████████

SUBJECT:             Notification of Termination During Trial Period

REFERENCES:          5 U.S.C. § 7511
                     5 U.S.C. § 3321(a)
                     5 C.F.R. §§ 315.803 and 804
                     5 C.F.R. § 316.304
                     Article 26, Sections 3 and 4 of the Collective Bargaining
                     Agreement between the ████ and NTEU

This is to provide notification that the Agency is removing you from your position of ██████ and federal service consistent with the above references, as applicable.

On October 6, 2024, the Agency appointed you to the excepted service position of ██████ As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a one year trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

In its January 20, 2025, memorandum entitled *Guidance on Probationary Periods, Administrative Leave and Details,* OPM advised that "[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels." Based on that guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest.

For these reasons, I regrettably inform you that I am removing you from your position of ██████ with the agency and the federal civil service effective March 8, 2025.

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

[3] *Id.*

██████████

On February 21, 2025, you were placed on administrative leave consistent with Policies and Procedures Manual (PPM) 3100-9. To ensure an orderly transition, while on administrative leave, I am instructing you to be available during your regular work schedule. While you are in an administrative leave status, you must remain ready, willing, and able to perform work. If during any day of your work week you are unavailable to return to duty status, you are required to request appropriate leave to cover the duration of your unavailability. While in this status you will continue to receive your pay and employee benefits. While on approved leave or administrative leave, your access to ████ systems will be disabled temporarily and you are prohibited from using your government computer, cell phone, and entering any ████ office or facility. The ████ Office of Security has been advised of this action. Please note that any attempt to gain access to your government computer, cell phone, and ████ offices without authorization from your supervisor will be considered a violation. Please provide your supervisor your personal email, phone number and mailing address so the Agency can contact you while you are in administrative leave status.

You must return all ████ property assigned to you upon ████ of this Notice. If you do not have all property with you today, you must return all outstanding ████ property assigned to you upon receipt of a postage pre-paid box. The items include (as applicable): your ████ badge and any other ████ issued identification (e.g., Examiner ID); any office key(s); ████ iPhone; travel card; laptop computer including the case, accessories, and reference material; building security/parking card; and any work documents and files. You must also complete the off-boarding procedures and ensure that any outstanding travel vouchers are completed.

NOTICE OF APPEAL RIGHTS

Discrimination complaint procedure

Pursuant 5 CFR 315.806, Appeal rights to the Merit Systems Protection Board, if you believe this action is based on unlawful discrimination because of race, color, religion, sex,, age (40 years and older), national origin, disability (physical or mental), parental status, protected genetic information, or in retaliation for prior protected EEO activity, you have the right to file a complaint of discrimination. To do so, you must contact the ████ EEO Officer at (202) 345-3096 or the central EEO complaints line at (202) 649-5589 within 45 calendar days of the effective date of this action. Contact with the ████ EEO Officer may also be made via email to EEOComplaintsInformation@occ.treas.gov or facsimile to (571) 293-4419. Failure to make this contact within 45 calendar days of the effective date of this action may result in the dismissal of your discrimination complaint. You can obtain information about the EEO complaint process at EEO Complaint Process (occnet.occ) or by calling the EEO Officer at (202) 345-3096. Federal Relay Service is available for callers with a hearing or speech disability at 7-1-1.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact ████████████████

cc:

Exhibit V

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv- |

## <u>DECLARATION OF</u> ████████

I, ██████████ swear under penalty of perjury,

      1.     My name is ██████████ and I am an adult resident of Washington, D.C.

      2.     I began working for the Internal Revenue Service ("IRS") as a ██████████ ████████████████████████████████ on approximately November 18, 2024.  My duty station was Washington, D.C.

      3.     From the date of my hire, the IRS classified me as a probationary employee.  My probationary period was one year, or until approximately November 17, 2025.

      4.     On February 20, 2025, I received a Notification of Termination During Probationary Period by email from my agency terminating my employment, effective immediately.  The termination notice cited the January 20, 2025 OPM memorandum called *Guidance on Probationary Periods, Administrative Leave and Details* and stated that "[b]ased on that guidance, taking into account your performance, and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest."  *See*

1

Exhibit 1.  The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

5.     The February 20, 2025 termination notice was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

6.     I am now unemployed.  I plan to apply for unemployment insurance benefits with the D.C. government.

7.     I can no longer afford to support the local economy in the same way.  For example, I will not be able to go out to restaurants as often.  If I do not find a new job in the next few months, I may need to relocate out of the District.

8.     As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, the IRS withheld and paid income taxes from my paycheck to the District government.

9.     Before I was terminated, my job duties as a ███████████████████████
███████████████████████████

10.     ███████████████████████████████████████████████ear.

11.     In the three months I worked at the IRS, I did not receive a formal performance review but my supervisor provided me with positive feedback regarding my performance.

Dated: <u>March 5, 2025      </u>



2

Exhibit 1. The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

5.      The February 20, 2025 termination notice was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

6.      I am now unemployed. I plan to apply for unemployment insurance benefits with the D.C. government.

7.      I can no longer afford to support the local economy in the same way. For example, I will not be able to go out to restaurants as often. If I do not find a new job in the next few months, I may need to relocate out of the District.

8.      As a resident of the District of Columbia, I pay income taxes to the District. Each pay period, the IRS withheld and paid income taxes from my paycheck to the District government.

9.      Before I was terminated, my job duties as ███████████████████████ ███████████████████████

10.     ███████████████████████████████████████

11.     In the three months I worked at the IRS, I did not receive a formal performance review but my supervisor provided me with positive feedback regarding my performance.

Dated: 3/5/2025          ███████████████████████

███████████████████████

# Exhibit 1

██████████████

**From:**          *Probationary
**Sent:**          Thursday, February 20, 2025 12:15 PM
**To:**            █████████
**Subject:**       Notification of Termination During Probationary Period
**Attachments:**   Resources for Probationary Employees.docx

**Importance:**    High

Personally Identifiable Information (PII): Share only with authenticated authorized persons with need to know.

MEMORANDUM FOR ████████████████████████ INTERNAL REVENUE SERVICE

SUBJECT: Notification of Termination During Probationary Period

REFERENCES:

- 5 U.S.C. § 7511
- 5 U.S.C. § 3321(a)
- 5 C.F.R. §§ 315.803 and 804
- 5 C.F.R. § 316.304
- IRM 6.315.2, Probationary Period for Career and Career-Conditional Employment

This is to provide notification that the Agency is removing you from your position of ████████ and federal service consistent with the above references.

On **11/18/2024**, the Agency appointed you to the position of ████████. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

In its January 20, 2025, memorandum entitled *Guidance on Probationary Periods, Administrative Leave and Details*, OPM advised that "[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels." Based on that guidance, taking into account your performance, and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest.

For these reasons, I regrettably inform you that I am removing you from your position of ████████ with the agency and the federal civil service effective **Thursday, February 20, 2025.**

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively.

1

For more information, please visit www.mspb.gov and search for your local MSPB regional or field office.

In addition to any right you may have to appeal to the MSPB or the EEOC, you may also have the right to file charges or complaints with the Federal Labor Relations Authority (FLRA), Office of Special Counsel (OSC), OPM or other federal agencies if you believe your rights have been violated and your claims are within their jurisdiction.

If you believe your probationary designation was erroneous, please contact probationers_dashr@treasury.gov.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact the Employee Resource Center at 1-866-743-5748 or send an email to separation@irs.gov.

1.   OPM, Practical Tips for Supervisors of Probationers.
2.   See U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A Critical Assessment Opportunity (August 2005)
3.   Id.

**Please do not reply to this email as the message will not be received. Contact the ERC or email separation@irs.gov.**

**JA337**

# Exhibit W

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv- |

**DECLARATION OF** ███████████

I, ████████ swear under penalty of perjury,

1.    My name is ██████████ and I am an adult resident of ██████ Virginia.

2.    I began working for the Federal Emergency Management Agency ("FEMA") as a ████████████████████████████████████████████████ on approximately July 14, 2024. My duty station was Washington, D.C.

3.    From the date of my hire, FEMA classified me as a probationary employee. Because I was a Presidential Management Fellow, my probationary period was two years, or until approximately July 13, 2026.

4.    On February 17, 2025, I received by email a notice signed by ████████████ stating that FEMA was terminating my employment, effective immediately.  The notice stated, "[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest."  *See* Exhibit 1. It did not give any other reason.  The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

1

5.      I was not aware that I would be terminated prior to February 17, 2025.  If I had more warning, I would have started looking for a new position immediately.

6.      I know of many other probationary employees at FEMA that received this same termination letter.  I believe my agency terminated around 300 probationary employees on February 18, 2025.

7.      I am now unemployed.  I have applied for unemployment insurance benefits with the D.C. government.

8.      Although I am a Virginia resident I regularly travel into D.C. and participate in the local economy, I will not be able to do so in the same way.  As a commuter to D.C., I spent money on lunch, parking, and Metro fare in the District, and I frequently went to D.C. restaurants and sports events, all of which I will need to scale back significantly or stop entirely. I will likely not be able to renew my membership with the Washington Canoe Club.

9.      I was a ███████████████████████████████████

10.     Before I was terminated, my job duties as a ███████████████ ███████ were primarily as a ██████████ for the ███████████████████  My work was ████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████

11.     In the approximately seven months I worked at FEMA, I received two performance reviews.  One was my annual performance review, conducted at the end of 2024, and the other was conducted in November 2024 and focused on my deployments for ████████ ███████  For both reviews, I received the highest rating: Outstanding.

Dated: <u>March 5, 2025    </u>                   Signed: ██████████████-

2

*A copy of the signature page bearing an original signature is attached hereto.

3

it identify any conditions arising before my appointment to justify my termination.

5. I was not aware that I would be terminated prior to February 17, 2025. If I had more warning, I would have started looking for a new position immediately. 6. I know of many other probationary employees at FEMA that received this same termination letter. I believe my agency terminated around 300 probationary employees on February 18, 2025.

7. I am now unemployed. I have applied for unemployment insurance benefits with the D.C. government.

8. Although I am a Virginia resident I regularly travel into D.C. and participate in the local economy, I will not be able to do so in the same way. As a commuter to D.C., I spent money on lunch, parking, and Metro fare in the District, and I frequently went to D.C. restaurants and sports events, all of which I will need to scale back significantly or stop entirely. I will likely not be able to renew my membership with the Washington Canoe Club.

9. I was a ███████████████████████████████████████████ 10. Before I was terminated, my job duties as a ████████████████████████ were primarily as a ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ 11. In the approximately seven months I worked at FEMA, I received two performance reviews. One was my annual performance review, conducted at the end of 2024, and the other was conducted in November 2024 and focused on my deployments for ████████████ For both reviews, I received the highest rating: Outstanding.

Dated: _3/5/25_    Signed: ████████████████████████████████

*A copy of the signature page bearing an
original signature is attached hereto.

Exhibit 1

February 17, 2025

MEMORANDUM FOR ████████████████████████

FROM: ████████████ ✎ _____

████████████████████████████

SUBJECT: Notification of Termination During Probationary Period

REFERENCES: 5 U.S.C. § 7511

This is to provide notification that the Agency is removing you from your position of ████████████████ and federal service consistent with the above references.

On 7/14/2024 the Agency appointed you to the position of ████████████. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of ████████ ████████ with the Agency and the federal civil service effective February 18, 2025.

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or identify your local MSPB regional or field office at the following link: U.S. Merit Systems Protection Board | Contacts and Locations (mspb.gov).

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id*.

**JA345**

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact fema-hc-employee-relations@fema.dhs.gov.



Exhibit X

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

### DECLARATION OF ▮▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮ swear under penalty of perjury,

    1.    My name is ▮▮▮▮▮▮▮ and I am an adult resident of Washington, D.C.

    2.    I began working for the Department of Energy ("DOE") as a ▮▮▮▮▮▮▮ ▮▮▮▮ in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on approximately April 8, 2024. My duty station was Washington, D.C.

    3.    From the date of my hire, DOE classified me as a probationary employee. My probationary period was one year, or until approximately April 7, 2025.

    4.    On February 13, 2025, I received by email a Notification of Termination During Probationary/Trial Period signed by ▮▮▮▮▮▮▮ that DOE was terminating my employment, effective immediately, on the basis that my "further employment would not be in the public interest." *See* Exhibit 1. The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

1

5.      The February 13, 2025 termination notice was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.

6.      I know of other probationary employees at DOE that received this same termination letter.  I believe DOE terminated more than 40 probationary employees in my office alone.

7.      I am now unemployed.  I plan to apply for unemployment insurance benefits with the D.C. government.  I will also need to sign up for health insurance using the District's health insurance marketplace.

8.      I can no longer afford to support the local economy in the same way.  For example, I will not be able to go to restaurants, bars, or coffee shops in the District as often, I will not attend sports events, and will stop attending shows at local establishments like the Kennedy Center. If I do not find a new job in the next few months, I will relocate out of the District.

9.      As a resident of the District of Columbia, I pay income taxes to the District.  Each pay period, DOE withheld and paid income taxes from my paycheck to the District government.

10.     I was a ████████████████████████████████████

11.     Before I was terminated, my job duties as a ███████████████ included ███████████████████████████████████████████████ ██████████████████████████████████████████████

12.     In the 10 months I worked at DOE, I received one performance evaluation, in November 2024.  My performance rating was Exceeds Expectations.

Dated: <u>March 4, 2025</u>                    Signed: ██████████████

\*A copy of the signature page bearing an
original signature is attached hereto.

3

Dated: _03/04/2025_

Signed: ██████████████████

*A copy of the signature page bearing an
original signature is attached hereto.

Exhibit 1



## Department of Energy
### Washington, DC 20585

February 13, 2025

MEMORANDUM:

TO:                    ████████████████
                       ████████████████████

FROM:                  ████████████████████████
                       ████████████████████████

SUBJECT:               Notification of Termination During
                       Probationary/Trial Period

REFERENCES:            5 U.S.C. § 7511
                       5 U.S.C. § 3321(a)
                       5 C.F.R. § 316.304, if applicable

This is to provide you with notice that the Department of Energy (DOE) is removing you from your position of ████████████████████████ and federal service consistent with the above references.

Your appointment to this position was subject to the satisfactory completion of an initial probationary/trial period ending on April 6, 2025.

Guidance from the Office of Personnel Management (OPM) states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

Per OPM instructions, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today.

Terminations during probationary/trial period are not covered under applicable grievance procedures. Your status as an employee serving a probationary period provides you with limited appeal rights to the Merit Systems Protection Board (MSPB).

---

[1] OPM, Practical Tips for Supervisors of Probationers.
[2] See U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A Critical Assessment Opportunity (August 2005)
[3] Id.




Printed with soy ink on recycled paper

**JA353**

According to 5 CFR § 315.806, you may appeal this termination to MSPB only if you feel this action was based on discrimination of partisan political activity or marital status. An appeal must be filed within 30 calendar days of the effective date of this action. The MSPB regulations are available on its website, www.mspb.gov. Appeals may be filed by mail, by facsimile, by commercial overnight delivery, by personal delivery, or by the Board's electronic filing procedure, e-Appeal Online (https://e-appeal.mspb.gov). We have also included a copy of the MSPB Form 185 for your convenience. If you decide to file an appeal with MSPB, you should notify the MSPB that the Agency point of contact for your MSPB appeal is:

> Jenny Knopinski
> Deputy Assistant General Counsel for
>   Personnel Law and Administrative Litigation
> Office of the General Counsel, GC-21
> U.S. Department of Energy
> 240-678-7837
> jenny.knopinski@hq.doe.gov

You have the right to contact an Equal Employment Opportunity counselor and to file a complaint through the discrimination complaint process within 45 days of your receipt of this letter if you believe this action is being taken because of your race, color, religion, sex, national origin, disability, age, genetics, or in retaliation for your previous participation in the EEO process. You can initiate or amend a complaint by email civilrights@hq.doe.gov, or by phone at (202) 586-2218. Information regarding the EEOC complaint process can be found at www.eeoc.gov.

If you believe this action was taken because of a prohibited personnel practice, you have the right to seek corrective action with the Office of Special Counsel (OSC). Information regarding the OSC complaint process can be found at www.osc.gov.

Please note your filing with any of these entities, including MSPB, may impact your right to file with the other entities.

You may contact the Employee Benefits Division at: OHROCBenefits@hc.doe.gov for benefits guidance.

DOE's Employee Assistance Program (EAP) and its services are available to you and your immediate family at no cost and are confidential. Should you or a family member need individual counseling you may contact, at your discretion, the Federal Occupational Health (FOH) at 1-800-222-0364 (888-262-7848, hearing-impaired) for support.

We appreciate your service to DOE and wish you success in your future endeavors. If you have any questions, please contact OPLER@hq.doe.gov.

Exhibit Y

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv- |

### DECLARATION OF ██████████

I, ██████████ swear under penalty of perjury,

1.  My name is ██████████ and I am an adult resident of the State of California.

2.  I began working for the Federal Deposit Insurance Corporation ("FDIC") as an ███████████████████████████████████████████████ on approximately February 26, 2024. I was a full-time employee who worked remotely out of ████████ California. My closest geographic headquarters was Dallas, Texas.

3.  From the date of my hire, the FDIC classified me as a term employee. My term period was two years, or until approximately February 26, 2026, with possibility of extension.

4.  On February 6, 2025, I received an email from "Human Resources Organization" informing that because I was "currently in a probationary or trial period," my name was included in the FDIC's submission of "government-wide data" to the Office of Personnel Management. The email stated, "Your probation/trial period ends on 2/26/25." *See* Exhibit 1.

1

5.    On February 17, 2025, my manager, ▓▓▓▓▓▓ called to tell me that I was being terminated. That same day, I received by email a notice signed by ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that FDIC was terminating my employment, effective February 18, 2025. The email stated, "[T]he FDIC finds that you have not demonstrated that your further employment at the FDIC would be in the public interest." The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination. *See* Exhibit 2.

6.    The February 17, 2025 call from my manager and email from ▓▓▓▓▓▓ was the first notice I received of my termination. If I had more warning, I would have started looking for a new position immediately.

7.    I am now unemployed. I have applied for unemployment insurance benefits with the State of California.

8.    I can no longer afford to support the local economy in the same way. For example, I have had to cut back on healthcare costs and discretionary spending. I am pushing off the purchase of new contact lenses and not booking overnight travel for my kids' weekend soccer tournaments in nearby San Diego and Orange counties. I am having to give serious thought to budgeting since unemployment benefits cannot cover the cost of my mortgage.

9.    As a resident of the State of California, I pay state income taxes. Each pay period, FDIC withheld and paid income taxes from my paycheck to the state government.

10.    Before I was terminated, my job duties as an ▓▓▓▓▓▓▓▓ in the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ included ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓

2

11.    I was a ███████████████████████████████████████████ Due to

superior performance, I got a raise in January 2025 ███████████████████

12.    In the 12 months I worked at the FDIC, I consistently received positive feedback

from my supervisor as well as a satisfactory annual review. I was never told there were any

performance or skills-based issues.

Dated: 3/5/2025                              Signed: ████████████████████

3

**JA358**

# Exhibit 1

**SO** **Staffing Operations**
StaffingOperations@fdic.gov

...

To: ███████████

Thursday, February 6, 8:54 AM

☺

Dear ███████████

We are writing to inform you that, as part of a recent, government-wide data request from the Office of Personnel Management (OPM), the FDIC provided the names of all employees currently in probationary or trial periods to OPM.

You are currently in a probationary or trial period, and as a result, your name was included in the FDIC s submission to OPM.  Your probation/trial period ends on 2/26/2025.

If you have any questions about this message or the probationary/trial period in general, please do not hesitate to reach out to _Probationary or trial period inquiry- Employee Center_

Sincerely,
Human Resources Organization

↩ ⌄    Reply

✉
Mail

📅
Calendar

▦
Apps

# Exhibit 2

30/30

**Termination Letter -** ▮

⨯

DOCX - 55 KB

**MEMORANDUM FOR** ▮

▮

**SUBJECT:**    Notification of Termination During Probationary/Trial Period

**REFERENCES:**    5 U.S.C. § 7511

5 U.S.C. § 3321(a)

5 C.F.R. §§ 315.803 and 804

5 C.F.R. § 316.304

FDIC Directive Probationary or Trial Period for New Employees

Nationwide Agreement between FDIC and NTEU, Article 42, Section 7

This is to provide notification that the FDIC is removing you from your position and federal service consistent with the above references. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The FDIC also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees." "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."

In accordance with the above references, the FDIC finds that you have not demonstrated that your further employment at the FDIC would be in the public interest. For this reason, the FDIC is removing you from your position and the federal civil service **effective February 18, 2025**.

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office.

We appreciate your service to the FDIC and wish you the greatest of success in your future endeavors. If you have any questions, please contact Joe Arellano at joarellano@fdic.gov.

**Open Microsoft 365 (Office)**



# Exhibit Z

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

<u>**DECLARATION OF** ████████████</u>

I, ████████████ swear under penalty of perjury,

1.     My name is ████████████ and I am an adult resident of the State of California.

2.     I began working for the Consumer Financial Protection Bureau ("CFPB") as an ████████████████████████████████ on approximately July 15, 2024.  My duty station was San Francisco, California.

3.     From the date of my hire, the CFPB classified me as a probationary employee. My probationary period was two years, or until approximately July 15, 2026.

4.     On February 11, 2025, I received by email a notice signed by ████████████ ████████████████████ that CFPB was terminating my employment, effective February 10, 2025, on the basis that I was "not a fit for continued employment" because my "ability, knowledge and skills do not fit the Agency's current needs."  The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.  *See* Exhibit 1.

1

**JA364**

5.    The February 11, 2025 termination notice from ████████████ was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

6.    I am now unemployed. I have applied for unemployment insurance benefits with the State of California.

7.    I can no longer afford to support the local economy in the same way. For example, I have had to cut back on spending, eating out, shopping. I only buy things that I need and must budget for student loan repayment obligations.

8.    As a resident of the State of California, I pay state income taxes. Each pay period, CFPB withheld and paid income taxes from my paycheck to the state government.

9.    Before I was terminated, my job duties as an ████████████████ included ████████████████████████████████

10.    I was a ████████████████████████████████████

11.    In the eight months I worked at CFPB, I did not get an official evaluation. However, I consistently received positive feedback about my work from my supervisor. I was never told there were any performance or skills-based issues.

Dated: March 5, 2025          Signed ████████████████████████

2

**JA365**

# Exhibit 1

**cfpb** Consumer Financial
Protection Bureau

1700 G Street, N.W., Washington, DC 20552

February 11, 2025

MEMORANDUM FOR ████████████████████████████
████████████████████████

FROM:                ████████████████████████
                     ████████████████████████
                     ████████████████████████

SUBJECT:             Notification of Termination During Probationary Period

REFERENCES:          5 U.S.C. § 7511
                     5 U.S.C. § 3321(a)
                     5 C.F.R. §§ 315.803 and 804
                     5 C.F.R. § 316.304

      This is to provide notification that I am removing you from your position of ██████████████████████████████████████ and federal service consistent with the above references.

      On 7/13/2024, the agency appointed you to the position of ████████████████ ██████████████████████ As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

      Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service"[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

      Unfortunately, the Agency finds that that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs.

      For these reasons, I regretfully inform you that I am removing you from your position of ████████████████████████████████████ with the agency and the federal civil service effective 2/10/2025.

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

If you believe this action is being taken based on partisan political reasons or marital status, you have a right to file an appeal with the Merit Systems Protection Board (MSPB) under 5 C.F.R. § 315.806. You must file an appeal within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office.

You will be sent a postage paid box to return your CFPB ID badge, laptop, iPhone, and other equipment or items owned by CPFB.

For questions related to employee benefits (such as continuation of coverage for health coverage, withdrawal of retirement contributions, etc.) or other matters associated with employee benefits contact CFPB_HRBenefits@cfpb.gov.

I appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please you may contact the CFPB Employee Relations team at CFPB_EmployeeRelations@cfpb.gov.

# Exhibit AA

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

### DECLARATION OF ███████████

I, ████████████, swear under penalty of perjury,

1. My name is ████████████, and I am an adult resident of ████ Delaware.

2. I began working for the National Oceanic and Atmospheric Administration (NOAA) in ████████████████████ on June 16, 2024, as ████████████. My duty station was Silver Spring, Maryland.

3. From the date of my hire, NOAA classified me as a probationary employee. My probationary period was two years, or until approximately June 16, 2026.

4. On February 27, 2025, I received by email a notice Notification of Termination During Trial Period [Exhibit A] signed by ████████████ that NOAA was terminating my employment, effective immediately, on the basis that "In light of OPM guidance, the Agency finds that you are not fit for continued employment because your ability, knowledge and/or skills do not fit the Agency's current needs." The email did not

identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

5. February 27, 2025, the termination notice from ████████████ was the first I had learned of my termination. If I had a warning, I would have started looking for a new position immediately.

6. I am now unemployed. I plan to apply for unemployment insurance benefits with the State of Delaware.

7. I can no longer afford to support the local economy in the same way. For example, I am unable to contribute to local restaurants and businesses that I regularly patronize, as I'm now forced to prioritize essential expenses, such as my mortgage, utilities, and groceries leaving no room for discretionary spending. I am now confronted with the very real and daunting possibility of having to apply for Delaware's assistance programs, including Supplemental Nutrition Assistance, Medicaid, and even mortgage relief, along with any other available services that could help my family navigate this severe and unjust hardship caused by this wrongful and unlawful termination.

8. As a resident of Delaware, I pay income taxes to the State. Each pay period, NOAA withheld and paid income taxes from my paycheck to the state government.

9. Before I was terminated, my job duties as a ████████████ included ███████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

███████████████████

10. My Pay Plan, Band and Interval ███████████████████████

████████████████████

11. In the more than eight months I worked at NOAA, I did not receive a written review of

my performance. Up until the date of the termination email, my Branch Chief, ███████

███ and Finance Director ███████████ gave me positive feedback regarding my

performance.

Dated: March 5, 2025          Signed: ███████████████████████████████

Exhibit A attached

# Exhibit A

 Gmail                                                        ███████████████████████▶

---

## Fwd: Notification of Termination During Trial Period

████████████████████████████                                    Thu, Feb 27, 2025 at 4:47 PM
To: ████████████████████

---------- Forwarded message ---------
From: <trusted.staff.sender@noaa.gov>
Date: Thu, Feb 27, 2025 at 3:45 PM
Subject: Notification of Termination During Trial Period
To: ████████████████████

February 27, 2025

MEMORANDUM FOR ████████████████████████ NOAA Federal Employee, ████
FROM: ████████████████████████

SUBJECT: Notification of Termination During Trial Period
REFERENCES: 5 U.S.C. § 3321(a)
DAO 202-315

This is to provide notification that I am terminating you from the position of
and federal service consistent with the above references.

On June 16, 2024, the agency appointed you to the
position of NOAA Federal Employee. As documented on your appointment Standard Form 50 (SF-50), your
appointment is subject to the completion of a probationary/trial period. The agency also
informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An
appointment is not final until the probationary period is over," and the probationary period
is part of "the hiring process for employees." (1) "A probationer is still an applicant for a
finalized appointment to a particular position as well as to the Federal service" (2) "Until the
probationary period has been completed," a probationer has "the burden to demonstrate
why it is in the public interest for the Government to finalize an appointment to the civil
service for this particular individual." (3)

OPM has advised that "[p]robationary periods are an essential tool for agencies to
assess employee performance and manage staffing levels." (4) In light of that guidance, the
Agency finds that you are not fit for continued employment because your ability,
knowledge and/or skills do not fit the Agency's current needs.

For these reasons, I am terminating you from the position of NOAA Federal Employee with the
agency and the federal civil service effective February 27, 2025 at 5 p.m. EST.

If you believe that your termination is the result of discrimination, you have the right to file a complaint pursuant to 29
C.F.R. Part 1614.  Any allegation of discrimination based on race, color, religion, sex, national origin, physical or mental
disability, and/or age, must be brought to the attention of an Agency Equal Employment Opportunity (EEO) Counselor
within forty-five (45) days of the effective date of this action.  https://www.noaa.gov/civil-rights/eeo-counseling-complaints

If you elect to seek corrective action by the Office of Special Counsel's (OSC)
Complaints Examining Unit, your appeal will be limited to a determination as to whether
the Agency took one or more covered personnel actions against you in retaliation for
making one or more protected whistleblowing disclosures, which constitutes a prohibited
personnel practice in accordance with 5 U.S.C. § 2302(b). If OSC dismisses your claim,
you may file an individual right of action appeal to the MSPB, but the MSPB will only
adjudicate whether you proved that your protected disclosure was a contributing factor in

the effected action. For more information, you may visit the OSC's website at:
https://osc.gov/pages/file-complaint.aspx

If you have any questions regarding this notice, please contact Octavia Saine, Acting Director of the NOAA Office of Human Capital Services, at octavia.saine@noaa.gov.

(1)  OPM, Practical Tips for Supervisors of Probationers.
(2)  *See* U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A Critical Assessment Opportunity (August 2005)
(3)  Id.
(4)  OPM, *Guidance on Probationary Periods, Administrative Leave and Details*

# Exhibit BB

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **STATE OF MARYLAND, ET AL.,** | |
| **Plaintiffs,** | |
| **v.** | Case No.: 1:25-cv- |
| **UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,** | |
| **Defendants.** | |

### DECLARATION OF ████████████

I, ███████████████ swear under penalty of perjury,

1.      My name is ███████████ and I am an adult resident of ███ Delaware.

2.      I began working for the U.S. Department of Agriculture (USDA) as a ████ ████████████████████████████████████████████ on approximately June 2, 2024. My duty station was Dover, Delaware.

3.      From the date of my hire, USDA classified me as a probationary employee. My probationary period was one year, or until approximately June 2, 2025.

4.      On February 13, 2025, I received by HRFO@usda.gov a notice [Exhibit A] signed by ███████████████████████████ that USDA was terminating my employment, effective immediately, on the basis that "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of ████████████████████ with the Agency and the

federal civil service effective close of business, February 13, 2025." The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

5.    The February 13, 2025 termination notice from ███████████ was the first I had learned of my termination.  If I had more warning, I would have started looking for a new position immediately.  I work in a small, highly specialized field and finding a job often takes several months, if not longer.

6.    I am now unemployed.  I plan to apply for unemployment insurance benefits with the State of Delaware

7.    I can no longer afford to support the local economy in the same way.  For example, I have had to dramatically reduce my spending.  I am not eating out and must choose products by cost when food shopping.  Medical costs for my child's diabetic products are going to be an issue going forward.  I have had to cancel home repairs to my windows and deck with a local carpenter.  I've also had to cancel an upcoming family vacation flying out of Avelo Airlines in New Castle, DE.

8.    As a resident of Delaware, I pay income taxes to the State. Each pay period, UDSA withheld and paid income taxes from my paycheck to the State government.

9.    Before I was terminated, my job duties as ███████████ included ███████████████████████████████████████ ███████████████████████████████████ ██████.

10.    I was a ████████████████████████████████

11.    In the more than eight months I worked at USDA, I received one positive written review of my performance.  My supervisor, ███████████ also gave me additional positive feedback regarding my performance, including stating I was always willing and ready to learn processes and applications regarding ██████████████████.  ███ supported her word by approving my access to more complex ████ projects.

Dated: March 5, 2025                              Signed:

Attachment:
Exhibit A

# Exhibit A



**United States Department of Agriculture**

███████████████████████████

February 13, 2025

MEMORANDUM FOR ████████████████████████████████████████████
████████████████████

FROM:                    ██████████████████████
                         ██████████████████████████████

SUBJECT:                 Notification of Termination During Probationary Period

REFERENCES:              5 U.S.C. § 7511
                         5 U.S.C. §2103
                         5 CFR §213.101
                         5 C.F.R. §§ 315.803, 315.804, and 315.806
                         Departmental Regulation 4020-250-1

This is to provide notification that the Agency is removing you from your position of ████████████████████████████ and federal service consistent with the above references.

On 6/2/2024, the Agency appointed you to the position of █████████ ████████ As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of ████████

---

[1] OPM, Practical Tips for Supervisors of Probationers.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A Critical Assessment Opportunity (August 2005)
[3] *Id.*

███████████████████ with the Agency and the federal civil service effective **close of business, February 13, 2025**.

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: Northeastern Regional Office, 1601 Market Street Suite 1700, Philadelphia, PA 19103, Phone: (215) 597-9960.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact HRFO@usda.gov.

████████████████
████████████████████

# Exhibit CC

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv- |

**DECLARATION OF** ███████████████

I, ████████████████ hereby declare as follows:

1.  I am a resident of ██████ Rhode Island and am over the age of 18.

2.  I began working for the Environmental Protection Agency (the "EPA") as an ████████████████████████ in ████████████████████████ ████████████████████ on or about December 29, 2024. My duty station was located in Boston, Massachusetts.

3.  From the date of my hire, the EPA classified me as a probationary employee. My probationary period was one (1) year, or until approximately December 28, 2025.

4.  On Thursday, February 6, 2025, after about five (5) weeks on the job, I was summoned to a meeting with regional EPA staff and told that I was being placed on administrative leave indefinitely. Shortly after that meeting, I received an email, from the email address Notice1@epa.gov, similarly advising me that I was being placed on administrative leave. I was

advised that my administrative leave was effective at the end of my tour of duty that same day. Job performance was not given as a reason for me being placed on leave.

5.     I am aware of four (4) other probationary employees on my ███████ team who received the same email on February 6, 2024, placing them on administrative leave.

6.     On Tuesday, February 18, 2025, while on administrative leave, I received an email, sent to my personal email address from the email address <u>Notice2@epa.gov,</u> notifying me that I was being terminated. The email referred appeals to ██████████ Assistant General Counsel, U.S. Environmental Protection Agency, Office of General Counsel. The email stated as the reason for my termination that I "failed to demonstrate fully [my] qualifications for continued employment." *See* Exhibit 1. The email did not identify any issues with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

7.     I am aware of other probationary employees on my ███████ team who were terminated on or around the same time as me.

8.     The February 18, 2025 termination notice to my personal email was the first I had learned of my termination. I work in a small, highly specialized field and finding a job often takes several months, if not longer.

9.     I was receiving health insurance through my job at the EPA. After I was terminated, I filed for Medicaid benefits, which in Rhode Island is administered and managed by the Executive Office of Health and Human Services ("EOHHS").

10.     Since losing my job, I can no longer afford to support the local economy in the same way. For example, I stopped eating out at restaurants and ordering food delivery. I also cut down on all other recreational expenses, stopped patronizing local establishments for gatherings with my friends and community members. I was also planning to buy property in Rhode Island or

Massachusetts (I live in Rhode Island but on the Massachusetts border), but stopped searching due to the unexpected termination of my job. Additionally, it is likely that I will no longer be able to pursue an advanced degree at the University of Rhode Island. I had been planning on taking classes in the Masters of Environmental Science and Management program part-time beginning Fall of 2025. However, without stable income, I will no longer be able to afford tuition.

11.     Because I worked in Massachusetts, I also paid nonresident income taxes to Massachusetts. Each pay period, the EPA withheld and paid income taxes from my paycheck to the Massachusetts government.

12.     Before I was terminated, my job duties as an ███████████████████ at ████████ included ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████

13.     I was a ████████████ and earned a salary of approximately ████████ per year.

14.     At the time of my termination, I had not undergone any performance reviews or evaluations, and in the six (6) weeks I was employed by the EPA, no one had communicated to me that there were any problems with my performance.

Dated: March 6, 2025                                  Signed: ██████████████████████ ████████████████████████

*A copy of the signature page bearing an original signature is attached hereto.

3

Massachusetts (I live in Rhode Island but on the Massachusetts border), but stopped searching due to the unexpected termination of my job. Additionally, it is likely that I will no longer be able to pursue an advanced degree at the University of Rhode Island. I had been planning on taking classes in the Masters of Environmental Science and Management program part-time beginning Fall of 2025. However, without stable income, I will no longer be able to afford tuition.

11. Because I worked in Massachusetts, I also paid nonresident income taxes to Massachusetts. Each pay period, the EPA withheld and paid income taxes from my paycheck to the Massachusetts government.

12. Before I was terminated, my job duties as an ███████████████████ at ███████ included ███████████████████████████████



13. I was a ███████, and earned a salary of approximately ████ per year.

14. At the time of my termination, I had not undergone any performance reviews or evaluations, and in the six (6) weeks I was employed by the EPA, no one had communicated to me that there were any problems with my performance.

Dated: 3/6/2025

Signed: ███████████

*A copy of the signature page bearing an original signature is attached hereto.

3

Exhibit 1

**From:** ████████
**To:** ████████
**Subject:** Fwd: Notification of Termination During Probationary Period
**Date:** Wednesday, March 5, 2025 5:13:36 PM

<span style="color:red">[External email: Use caution with links and attachments]</span>

---------- Forwarded message ---------
From: **Notice2** <Notice2@epa.gov>
Date: Tue, Feb 18, 2025 at 11:10 AM
Subject: Notification of Termination During Probationary Period
To:

SUBJECT:             Notification of Termination During Probationary Period

REFERENCES:            5 U.S.C. § 7511

                       5 U.S.C. § 3321(a)

                       5 C.F.R. §§ 315.803 and 804

                       5 C.F.R. § 316.304

This is to provide notification that the Agency is removing you from your position and federal service consistent with the above references.

As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

The Agency finds that you have failed to demonstrate fully your qualifications for continued employment. For this reason, the Agency informs you that the Agency is removing you from your position with the Agency and the federal civil service effective **5:00 p.m. EST, February 18, 2025**.

If in the office today, you must turn in your EPA badge, laptop, parking hang tag, travel credit card, office keys, and any other EPA property in your possession immediately. If out of the office today, you will be sent a post-paid box in which you will return these items to EPA.

If you believe that your termination was based on partisan political reasons or marital status, you have the right to appeal your termination to the U.S. Merit Systems Protection Board (MSPB). An appeal to the MSPB must be in writing and filed no later than thirty (30) calendar days after the effective date of this action, or thirty (30) calendar days after the date of receipt of this decision, whichever is later. If your appeal is found untimely, it will be dismissed by an MSPB Administrative Judge unless you can demonstrate a good reason for the delay. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at:

| | |
|---|---|
| 0. Washington, DC<br>1. Maryland (counties of Montgomery and Prince George's)<br>2. North Carolina<br>3. Virginia<br>4. All overseas areas not otherwise covered | Merit Systems Protection Board<br><br>Washington DC Regional Office<br><br>1901 S. Bell Street, Suite 950<br><br>Arlington, VA 22202<br><br>(703) 756-7112 (facsimile) |
| 0. Tennessee<br>1. South Carolina<br>2. Georgia<br>3. Florida<br>4. Alabama<br>5. Mississippi | Merit Systems Protection Board<br><br>Atlanta Regional Office<br><br>401 W. Peachtree Street, NW<br><br>10th Floor<br><br>Atlanta, GA 30308-3519<br><br>(404) 730-2767 (facsimile) |
| 0. Illinois<br>1. Indiana<br>2. Iowa<br>3. Kansas City, KS<br>4. Kentucky | Merit Systems Protection Board<br><br>Central Regional Office |

| | |
|---|---|
| 5. Michigan<br>6. Minnesota<br>7. Missouri<br>8. Ohio<br>9. Wisconsin | 230 South Dearborn Street<br>31st Floor<br>Chicago, IL 60604-1669<br><br>(312) 886-4231 (facsimile) |
| 0. Connecticut<br>1. Delaware<br>2. Maine<br>3. Maryland (except Montgomery and<br>   Prince George's counties)<br>4. Massachusetts<br>5. New Hampshire<br>6. New Jersey (except Bergen, Essex,<br>   Hudson and Union counties)<br>7. Pennsylvania<br>8. Rhode Island<br>9. Vermont<br>10. West Virginia | Merit Systems Protection Board<br><br>Northeastern Regional Office<br><br>1601 Market Street<br>Suite 1700<br>Philadelphia, PA 19103<br><br>(215) 597-3456 (facsimile) |
| 0. Arkansas<br>1. Louisiana<br>2. Oklahoma<br>3. Texas | Merit Systems Protection Board<br><br>Dallas Regional Office<br><br>1100 Commerce Street<br>Room 620<br>Dallas, TX 75242-9979<br><br>(214) 767-0555 (facsimile) |
| 0. Alaska<br>1. California<br>2. Hawaii<br>3. Idaho<br>4. Nevada<br>5. Oregon<br>6. Washington<br>7. Pacific overseas | Merit Systems Protection Board<br><br>Western Regional Office<br><br>201 Mission Street Suite 2310<br>San Francisco, CA 94105-1831<br><br>(415) 904-0580 (facsimile) |
| 0. New Jersey (counties of Bergen,<br>   Essex, Hudson, and Union)<br>1. New York<br>2. Puerto Rico<br>3. Virgin Islands | Merit Systems Protection Board<br><br>New York Field Office<br><br>26 Federal Plaza<br>Room 3137-A<br>New York, NY 10278-0022<br><br>(212) 264-1417 (facsimile) |
| 0. Arizona<br>1. Colorado<br>2. Kansas (except Kansas City)<br>3. Montana<br>4. Nebraska | Merit Systems Protection Board<br><br>Denver Field Office |

| | |
|---|---|
| 5. New Mexico<br>6. North Dakota<br>7. South Dakota<br>8. Utah<br>9. Wyoming | 165 South Union Boulevard<br>Suite 318<br>Lakewood, CO 80228-2211<br><br>(303) 969-5109 (facsimile) |

If you choose to file an appeal with the MSPB, you must include the following information which identifies the Agency official to whom the MSPB will send a copy of your MSPB appeal and the Acknowledgment Order issued on your appeal:

██████████████

Assistant General Counsel

U.S. Environmental Protection Agency

Office of General Counsel

1200 Pennsylvania Ave., N.W.

Mail Code 2377A

Washington, DC 20460

█████████████████

Phone: ████████████

Fax: ███████████

If you believe that this action is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age and/or reprisal, you may include this allegation in your appeal to MSPB, if any, or you may file a discrimination complaint with the Agency by first contacting an EPA Equal Employment Opportunity (EEO) Counselor within forty-five (45) calendar days of the effective date of this action, in accordance with the procedures contained in Title 29, Code of Federal Regulations, Part 1614. More information concerning EEO rights and remedies may be found at www.epa.gov/civilrights.

You must choose between filing an appeal with the MSPB or filing a discrimination complaint with the Agency. You cannot elect to follow more than one of these procedures.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact notice2@epa.gov.

1 OPM, *Practical Tips for Supervisors of Probationers*.

2 *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

3 *Id*.

_____

_____

[1] OPM, *Practical Tips for Supervisors of Probationers*.

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

[3] *Id*.

# Exhibit DD

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND; et al.,

        Plaintiffs,

    v.

United States Department of Agriculture; et al.,

        Defendants.

C.A. No. []

**<u>DECLARATION OF</u>** ███████████████

I, ██████████ declare as follows:

1.    I am a resident of the State of Minnesota. I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.    I am a veteran of the United States Air Force from November 2003 to February 2010. I left the Air Force as a Staff Sergeant, ███████████████

3.    On July 1, 2024, I was hired for the position of ███████████ at the Small Business Administration ("SBA") in Minneapolis, Minnesota.

4.    In my role as a ████████████████ I was responsible for ██████ ███████████████

5.      Specifically, I was responsible for ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

6.      On February 7, 2025, I received an unsigned, form letter termination notice.  A true and correct copy of this notice is attached to this declaration as **Exhibit A**.  On February 10, senior management told me that was a mistake, and Human Resources said I was not terminated.  Then on February 11, I received another letter from Everett M. Woodel, Jr., Acting Administrator of the SBA, stating that I was terminated because I had "failed to demonstrate fitness for continued federal employment. The Agency finds that that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the Agency."  A true and correct copy of this is attached as **Exhibit B** to this declaration.

7.      Both of these letters came as a surprise to me.  I had not received any prior negative feedback regarding my work.  In fact, my direct supervisors reiterated that I was performing well and were unaware of my termination until after it had occurred.  I had received positive reviews on my last two performance appraisals.

8.      As a result of this termination and the loss of my position, there will be a negative impact on ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

■■■■■■■■■■

■■■■

9.     This was my dream job. I am a former small business owner and was recruited from private sector doing financial advising to take this job. I was fired after eight months on the job which creates questions on my resume and was before I could develop lasting relationships in the community about my qualifications if I were to seek another job. This termination basically drove a stake through career goals. Moreover, as someone who has served this country, the termination has forever identified me as a failure and put a black mark on my record because of these two official notices in federal record.

I declare under penalty of perjury that everything I have stated in this document is true and correct. Minn. Stat. § 358.116.

     Executed on March 6, 2025 at Hennepin County, Minnesota.

■■■■■■■■

# Exhibit A

February 7, 2025

<u>Emailed</u>

███████████████████

████████████████████████

██████████████████████

████████████████

On 06/30/2024 you received an Permanent Career Conditional as a ███████████
████████████████████ with the Small Business Administration, ████████████████
████████████████ Your appointment was subject to the successful completion of your one-year
probationary period or two-year trial period, as applicable, beginning 06/30/2024. The
probationary or trial period, as applicable, is the final step in the examination process of an
employee.  It is the time in which an employee has the opportunity to demonstrate, through
actual performance and/or conduct, their fitness or qualifications for continued employment.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final
until the probationary period is over," and the probationary period is part of "the hiring process for
employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position
as well as to the Federal service" [2] "Until the probationary period has been completed," a
probationer has "the burden to demonstrate why it is in the public interest for the Government to
finalize an appointment to the  civil service for this particular individual."[3]

During this probationary or trial period, it has been determined that your continued employment
does not promote the efficiency of the service because you have failed to demonstrate fitness for
continued federal employment.   The Agency finds that that you are not fit for continued
employment because your ability, knowledge and skills do not fit the Agency's current needs, and
your performance has not been adequate to justify further employment at the Agency.

Therefore, in accordance with Title 5 of the Code of Federal Regulations §315.804, you are
hereby notified that your employment with the U.S. Small Business Administration (SBA) is
being terminated effective close of business February 21, 2025. Please return all SBA property to
your supervisor prior to your departure.

You have the right to appeal to the Merit Systems Protection Board (MSPB) within 30 calendar
days of the effective date of termination if you believe that you were terminated for partisan
political reasons or because of your marital status.  In addition, you may appeal to the Board if
you believe that the proper procedures for terminating a probationary employee have been
followed.

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id*.

If you chose to file an e-appeal, you may do so at: <u>MSPB e-Appeal 2.3.0.19 - Sign On</u>. Otherwise, you must file an appeal with the MSPB's regional office serving the area where your duty station was located when this action was taken. Your submission, if any, shall be addressed to the Regional Director in your area, contacts and addresses can be found here, <u>https://www.mspb.gov/about/contact.htm</u>.

In addition, if you decide to file an appeal, you should notify the MSPB that the Agency contact official for the purpose of your appeal is:

███████████ Paralegal, Office of General Law
U.S. Small Business Administration
409 Third Street, S.W., Seventh Floor
Washington, DC 20416
Phone: ████████████
Fax: ████████████

Additional information concerning the procedures for filing an appeal with MSPB to include forms and regulations may be viewed at <u>www.mspb.gov</u>.

You have the right to contact an Equal Employment Opportunity counselor and to file a complaint through the discrimination process within 45 days of termination if you believe that you are being terminated because of your race, color, national origin, sex (including pregnancy), religion, age (over 40 years old), disability, genetic information, or in retaliation for opposing a prohibited practice or participating in an equal employment opportunity matter.  Information about the Equal Employment Opportunity (EEO) complaint procedure may be obtained from the Office of Equal Employment Opportunity and Civil Rights at <u>eeoinquiries@sba.gov</u>.

If you believe the action taken against you was a prohibited personnel practice as defined in 5 U.S.C. § 2302, you may contact the Office of Special Counsel (OSC). Likewise, if you believe that you have been subject to retaliation due to whistleblower activities, you may contact the OSC and pursue an Individual Right of Action. Further information may be found at <u>www.osc.gov</u>.

You should contact the SBA Ethics Official, Ms. Lisa Lopez-Suarez at (202) 205-8570 or <u>lisa.lopez-suarez@sba.gov</u>  for a briefing on the post-Federal government employment restrictions and other ethics rules that may apply to you.

For further information regarding your rights, you may contact <u>HR4U@sba.gov</u> within the Subject line: OHRS Workforce Relations Division.

A Standard Form 50, Notification of Personnel Action, effecting your termination will be forwarded to you when available along with a summary of your benefits options.

Sincerely,

Everett M. Woodel Jr., Acting SBA Administrator

Please sign the acknowledgement of receipt below. Your signature does not indicate agreement with this action; it only represents receipt of this notice on the date signed.


Acknowledgement of Receipt: _____

                                                  █████████████          Date

**JA401**

# Exhibit B



**U.S. SMALL BUSINESS ADMINISTRATION**
WASHINGTON, D.C. 20416

OFFICE OF THE ADMINISTRATOR

February 11, 2025

<u>Emailed</u>

██████████████

████████████████████

████████████████

██████████

On 06/30/2024 you received an Permanent Career Conditional as a ████████████ ████████████ with the Small Business Administration, ███████████ ████████████ Your appointment was subject to the successful completion of your one-year probationary period or two-year trial period, as applicable, beginning 06/30/2024. The probationary or trial period, as applicable, is the final step in the examination process of an employee.  It is the time in which an employee has the opportunity to demonstrate, through actual performance and/or conduct, their fitness or qualifications for continued employment.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service"[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

During this probationary or trial period, it has been determined that your continued employment does not promote the efficiency of the service because you have failed to demonstrate fitness for continued federal employment.  The Agency finds that that you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs, and your performance has not been adequate to justify further employment at the Agency.

Therefore, in accordance with Title 5 of the Code of Federal Regulations §315.804, you are hereby notified that your employment with the U.S. Small Business Administration (SBA) is

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

[3] *Id.*

being terminated effective close of business February 11, 2025. Please return all SBA property to your supervisor prior to your departure.

If you are an individual appointed in the excepted service, you have no regulatory right to appeal under *5 C.F.R. § 315.806* to the Merit Systems Protection Board (MSPB or Board).

If you were appointed under the competitive service, you may have the right to appeal to the MSPB within 30 calendar days of the effective date of termination if you believe that you were terminated for partisan political reasons or because of your marital status.

If you chose to file an e-appeal, you may do so at: <u>MSPB e-Appeal 2.3.0.19 - Sign On</u>. Otherwise, you must file an appeal with the MSPB's regional office serving the area where your duty station was located when this action was taken. Your submission, if any, shall be addressed to the Regional Director in your area, contacts and addresses can be found here, <u>https://www.mspb.gov/about/contact.htm</u>.

In addition, if you decide to file an appeal, you should notify the MSPB that the Agency contact official for the purpose of your appeal is:

███████████ Paralegal, Office of General Law
U.S. Small Business Administration
409 Third Street, S.W., Seventh Floor
Washington, DC 20416
Phone: ████████████
Fax:   ████████████

Additional information concerning the procedures for filing an appeal with MSPB to include forms and regulations may be viewed at <u>www.mspb.gov</u>.

You have the right to contact an Equal Employment Opportunity counselor and to file a complaint through the discrimination process within 45 days of termination if you believe that you are being terminated because of your **race, color, national origin, sex (including pregnancy), religion, age (over 40 years old), disability, genetic information, or in retaliation for opposing a prohibited practice or participating in an equal employment opportunity matter**.  Information about the Equal Employment Opportunity (EEO) complaint procedure may be obtained from the Office of Equal Employment Opportunity and Civil Rights at <u>eeoinquiries@sba.gov</u>.

If you believe the action taken against you was a prohibited personnel practice as defined in 5 U.S.C. § 2302, you may contact the Office of Special Counsel (OSC). Likewise, if you believe that you have been subject to retaliation due to whistleblower activities, you may contact the OSC and pursue an Individual Right of Action. Further information may be found at <u>www.osc.gov</u>.

You should contact your ethics official in their area for questions for a briefing on the post-Federal government employment restrictions and other ethics rules that may apply to you.

For further information regarding your rights, you may contact your Servicing Human Resources Office: Disaster Enterprise Staff – AskHRdisaster@sba.gov, Non-Disaster SBA Staff – HR4U@sba.gov. Indicate Workforce Relations Division in the subject line.

A Standard Form 50, Notification of Personnel Action, effecting your termination will be forwarded to you when available along with a summary of your benefits options. Please ensure your personal residential/home mailing address is current in MyEPP.

Sincerely,

Everett M. Woodel, Jr.
Acting Administrator

Please sign the acknowledgement of receipt below and send a signed copy to CHCOAlert1@sba.gov. Your signature does not indicate agreement with this action; it only represents receipt of this notice on the date signed.

Acknowledgement of Receipt: _____

                                                Date

# Exhibit EE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND; et al.,

        Plaintiffs,

   v.                                                                    C.A. No. []

United States Department of Agriculture; et al.,

        Defendants.

**DECLARATION OF** ▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮ declare as follows:

1.    I am a resident of the State of Minnesota. I am over the age of 18 and have personal knowledge of all the facts stated herein.

2.    I am a veteran of the United States Navy, having served from 2010 to 2014 as a Ship's Serviceman aboard the destroyer USS Pinckney.

3.    On December 16, 2024, I was hired as a ▮▮▮▮▮▮▮ at the Veterans Benefits Administration in St. Paul, which is part of the United States Department of Veterans Affairs (VA). As a veteran myself, this role was a dream job, as it allowed me to contribute directly to ensuring that veterans receive the benefits they deserve.

4.     In my role as a ▮▮▮▮▮▮▮▮, my duties included ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

5.     On February 13, 2025, I received an email from ▮▮▮▮▮▮ the Chief Human Capital Officer for the VA, informing me of my termination due to performance concerns. A copy of my termination letter is attached as **EXHIBIT** A to this declaration.  This termination came as a complete surprise, as I had never received any prior negative feedback regarding my work. In fact, my direct supervisor had affirmed that I was performing well and was unaware of my termination until after it had occurred.

6.     As a result of my termination and the loss of my role as a ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

I declare under penalty of perjury that everything I have stated in this document is true and correct. Minn. Stat. § 358.116.

Executed on March 6, 2025 at ▮▮▮▮▮▮▮, Minnesota.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Exhibit A

**From:** ████████████████████████

**Sent:** Thursday, February 13, 2025 6:12 PM

**To:** ███████████████████████

**Subject:** Termination During Probation Notice

February 13, 2025

MEMORANDUM FOR ██████████████████

FROM:                    ███████████████

                        Chief Human Capital Officer

SUBJECT:                Notification of Termination During Probationary Period

REFERENCES:             5 U.S.C. § 7511

                        5 U.S.C. § 3321(a)

                        5 C.F.R. §§ 315.803 and 804

    This is to provide notification that the Agency is removing you from federal

EXHIBIT A

service consistent with the above references.

On 12/15/2024, the Agency appointed you to your position. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position with the Agency and the federal civil service effective February 13, 2025.

You may seek review of this action.  Such reviews include:

a. appealing this action to the Merit Systems Protection Board (MSPB) if you allege you were discriminated against due to marital status or partisan political reasons or your removal was not effected in accordance with the procedural requirements of 5 C.F.R. 315.805; or
b. requesting corrective action before the Office of Special Counsel (OSC) for prohibited personnel practices; or
c. pursuing a discrimination complaint with the Office of Resolution Management (ORM).

Please see below for details on your ability to file some of these claims concurrently. If you are not a supervisor, you shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB. If you believe this action constitutes a prohibited personnel practice, other than discrimination, under 5 U.S.C. § 2302(b), including retaliation for protected whistleblowing, you may elect to file either an appeal to MSPB, or request corrective action from OSC, and your election is based on which election you file first.  If you are not a supervisor, your election of one of these options precludes the other. If you are a supervisor, the election of remedies does not apply to you, and you may pursue all three

EXHIBIT A

options. If you believe that this action was taken against you for discriminatory reasons, other than marital status or political affiliation, refer to the paragraph immediately below.

Equal Employment Opportunity Commission (EEOC):  If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, pregnancy, age or disability, you may file a complaint of discrimination.  If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-566-3982.   Such a complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614.  Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

If this action is also appealable to MSPB, such a discrimination complaint may be a "mixed case complaint," or if you raise the issue of discrimination in any appeal to MSPB, it may be a "mixed case appeal." You may not initially file both a mixed case complaint and a mixed case appeal on the same matter, unless you are a supervisor. If you are not a supervisor, whichever you file first, the MSPB appeal or the complaint of discrimination, will be considered an election to proceed in that forum and will determine the procedures that will be followed. If you are a supervisor, you may elect both MSPB and EEOC.

Merit Systems Protection Board (MSPB):  If you appeal to the MSPB, your appeal may be submitted by mail, facsimile, by commercial overnight delivery, by electronic filing the MSPB Appeal Form (https://e-appeal.mspb.gov), or in person at any time after you receive this letter, but not later than 30 calendar days after the separation has been effected, or 30 calendar days after the date of the your receipt of this decision, whichever is later.  The address to mail your appeal can be found here: U.S. Merit Systems Protection Board | Contacts and Locations (https://www.mspb.gov/about/contact.htm).  You must submit an original and one copy of both your appeal and all attachments.  If you do not submit an appeal within the time set by statute, regulation, or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown.  The judge will provide you an opportunity to show why the appeal should not be dismissed as untimely.  A copy of the form is available by request if you are unable to access it at the MSPB website.  Please refer to the MSPB website (www.mspb.gov) for information regarding the appeals process and procedures that must be followed.  You may be represented by an attorney or other representative of your choice.  If you believe this action was taken against you for discriminatory reasons, refer to the paragraph on EEOC. If you decide to file an appeal with MSPB, you should notify the Board that the agency's point of contact for this appeal is Ochcofrontoffice@va.gov

Office of Special Counsel (OSC):  If you elect to request corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 U.S.C. § 2302(b) (prohibited personnel

EXHIBIT A

practices). This can include, but is not limited to, claims of reprisal for whistleblowing and/or engaging in protected activity. If you are not a supervisor and you elect to request corrective action with OSC, you will have waived your right to file an appeal with MSPB (if eligible), regarding the same matter, except as follows. If you are making a covered claim of retaliation for engaging in certain protected activities, or for making protected disclosures and OSC terminates its investigation and/or has not timely notified you it will seek corrective action, you may have the right to file an individual right of action (IRA) appeal to the MSPB. Such an appeal will be limited to an adjudication of whether you proved that your protected activity or disclosure was a contributing factor in the effected action (5 U.S.C. § 1214; 5 U.S.C. § 1221). If you are a supervisor, you may pursue remedies from MSPB and OSC concurrently.

If you are not a supervisor, whichever option you may choose to pursue regarding this action (an appeal to the MSPB, a request for corrective action to OSC, or a discrimination complaint), shall be considered an election by you to proceed under that appeal process. However, if you are not a supervisor, you may still concurrently file a corrective action to OSC and a discrimination complaint. If you are a supervisor, you may elect all three remedies concurrently.

Separating VA employees are required to return their PIV card to their PIV issuing office and their government furnished IT equipment and peripherals to the Office of Information Technology (OIT) for redeployment or disposition.

<u>GFE Equipment</u>

You will immediately take your equipment to the closest VA medical center or 810 Vermont Avenue to turn in your IT equipment. The local OIT staff will collect all assigned government furnished equipment (GFE), including peripherals such as monitors, docking stations, printers, etc.

Regardless of the original issuing site, all local IT teams will accept returned GFE and will adhere to local procedures for equipment accountability.

A return receipt for the equipment will be issued to the employee by local IT staff to acknowledge receipt of the employee's GFE and peripherals.

OIT Facility Requirements

Return any non-IT equipment, office and/or card keys, and PIV card to local facility.

If there is lost equipment a report of survey needs to be completed before you

EXHIBIT A

separate.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Ochcofrontoffice@va.gov .

/s/

▮▮▮▮▮

_____

_____

[1] OPM, *Practical Tips for Supervisors of Probationers*.

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)

[3] *Id.*

EXHIBIT A

**JA414**