# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————

STATE OF MARYLAND, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

## JOINT APPENDIX VOLUME 2

———————————

ANTHONY G. BROWN
*Attorney General of Maryland*
JULIA DOYLE
*Solicitor General*
ADAM KIRSCHNER
MICHAEL DREZNER
VIRGINIA A. WILLIAMSON
*Assistant Attorneys General*
*200 Saint Paul Place, 20th Floor*
*Baltimore, Maryland 21202*
(410) 576-6424

*Counsel for Plaintiffs-Appellees*
  *(continued on inside cover)*

YAAKOV M. ROTH
  *Acting Assistant Attorney*
    *General, Civil Division*

SARAH WELCH
  *Counsel to the Assistant*
    *Attorney General, Civil*
    *Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  (202) 514-3180

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division*

  *Counsel for Defendants-*
    *Appellants*

**Additional Counsel for Plaintiffs-Appellees:**

BRIAN L. SCHWALB
*Attorney General for the District of
  Columbia*
CAROLINE S. VAN ZILE
*Solicitor General*
ASHWIN P. PHATAK
*Principal Deputy Solicitor General*
ANNE DENG
TESSA GELLERSON
CHRIS EDWARD MENDEZ
MARK A. RUCCI
*Assistant Attorneys General*
*400 6th Street N.W., 10th Floor*
*Washington, D.C. 20001*
*(202) 724-6609*

KRISTIN K. MAYES
*Attorney General of Arizona*
HAYLEIGH S. CRAWFORD
*Deputy Solicitor General*
*2005 North Central Avenue*
*Phoenix, Arizona 85004*
*(602) 542-3333*

ROB BONTA
*Attorney General of California*
SATOSHI YANAI
*Senior Assistant Attorney General*
MIRANDA MAISON
*Supervising Deputy Attorney
  General*
DEMIAN CAMACHO
*Deputy Attorney General*
*California Department of Justice*
*600 W. Broadway, Suite 1800*
*San Diego, CA 92101*
*(619) 738-9132*

KEITH ELLISON
*Attorney General of Minnesota*
LIZ KRAMER
*Solicitor General*
*445 Minnesota Street, Suite 1400*
*St. Paul, Minnesota 55101-2131*
*(651) 757-1059*

WILLIAM TONG
*Attorney General of Connecticut*
MICHAEL SKOLD
*Solicitor General*
*165 Capitol Avenue*
*Hartford, Connecticut 06106*
*(860) 808 5020*

PHIL WEISER
*Attorney General of Colorado*
DAVID MOSKOWITZ
*Deputy Solicitor General*
*Office of the Colorado Attorney
  General*
*1300 Broadway, #10*
*Denver, Colorado 80203*
*(720) 508-6000*

KATHLEEN JENNINGS
*Attorney General of Delaware*
IAN R. LISTON
*Director of Impact Litigation*
VANESSA L. KASSAB
*Deputy Attorney General*
*Delaware Department of Justice*
*820 N. French Street*
*Wilmington, Delaware 19801*
*(302) 683-8899*

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
*Solicitor General*
*425 Queen Street*
*Honolulu, Hawaiʻi 96813*
*(808) 586-1360*

KWAME RAOUL
*Attorney General of Illinois*
JANE ELINOR NOTZ
*Solicitor General*
SARAH A. HUNGER
*Deputy Solicitor General*
*Office of the Illinois Attorney*
  *General*
*115 South LaSalle Street*
*Chicago, Illinois 60603*
*(312) 814-5202*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*
KATHERINE DIRKS
*Chief State Trial Counsel*
*Office of the Attorney General*
*1 Ashburton Pl.*
*Boston, Massachusetts 02108*
*(617) 963-2277*

DANA NESSEL
*Attorney General of Michigan*
BRYAN DAVIS, JR.
DEBBIE TAYLOR
*Assistant Attorneys General*
*Department of Attorney General*
*Labor Division*
*3030 W. Grand Blvd., Ste. 9-600*
*Detroit, Michigan 48202*
*(313) 456-2200*

AARON D. FORD
*Attorney General of Nevada*
HEIDI PARRY STERN
*Solicitor General*
*Office of the Nevada Attorney*
*General*
*1 State of Nevada Way, Ste. 100*
*Las Vegas, Nevada 89119*

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
NATHANIEL LEVY
*Deputy Attorney General*
*25 Market Street*
*Trenton, New Jersey 08625*
*(862) 350-5800*

RAÚL TORREZ
*Attorney General of New Mexico*
ANJANA SAMANT
*Deputy Counsel for Impact*
  *Litigation*
*New Mexico Department of*
  *Justice*
*408 Galisteo St.*
*Santa Fe, New Mexico 87501*
*(505) 490-4060*

LETITIA JAMES
*Attorney General of New York*
MARK S. GRUBE
*Senior Assistant Solicitor General*
*New York Office of the Attorney*
*General*
*28 Liberty St.*
*New York, New York 10005*
*(212) 416-8028*

DAN RAYFIELD
*Attorney General of Oregon*
STACY M. CHAFFIN
*Senior Assistant Attorney General*
*1162 Court Street NE*
*Salem, Oregon 97301*

PETER F. NERONHA
*Attorney General of Rhode Island*
SARAH W. RICE
*Assistant Attorney General*
*150 South Main Street*
*Providence, Rhode Island 02903*
*(401) 274-4400, Ext. 2054*

CHARITY R. CLARK
*Attorney General of Vermont*
JONATHAN T. ROSE
*Solicitor General*
*109 State Street*
*Montpelier, Vermont 05609*
*(802) 828-3171*

JOSHUA L. KAUL
*Attorney General of Wisconsin*
BRIAN P. KEENAN
*Assistant Attorney General*
*Wisconsin Department of Justice*
*Post Office Box 7857*
*Madison, Wisconsin 53707*
*(608) 266-0020*

# TABLE OF CONTENTS

**Page**

**Volume 1**

District Court Docket Report ................................................................. JA1

Complaint (March 6, 2025) (Dkt. 1) .........................................................JA22

Exhibits to Motion for Temporary Restraining Order (March 7, 2025)

> Ex. A: Declaration of Portia Wu, Maryland Department of Labor (Dkt. 4-5).........................................................................................JA77

> Ex. C: Declaration of Anna Hunter, Arizona Department of Economic Security (Dkt. 4-6) ........................................................ JA94

> Ex. D: Declaration of Nancy Farias Womack, California Employment Development Department (Dkt. 4-7) ...................... JA99

> Ex. E: Declaration of Mireya Hurtado, Illinois Department of Employment Security (Dkt. 4-8) .................................................. JA110

> Ex. F: Declaration of Paolo Franzese, Massachusetts Executive Office of Labor and Workforce Development (Dkt. 4-9) ............. JA119

> Ex. G: Declaration of Kathleen Walsh, Massachusetts Executive Office of Health and Human Services (Dkt. 4-10) ....................... JA131

> Ex. H: Declaration of Robert Asaro-Angelo, New Jersey State Department of Labor and Workforce Development (Dkt. 4-11) ...............................................................JA138

> Ex. I: Declaration of Kelly Anderson-Thomas, New Jersey Department of Health (Dkt. 4-12) ................................................JA149

> Ex. J: Declaration of Scott Melvin, New York Department of Labor (Dkt. 4-13) ........................................................................JA156

> Ex. K: Declaration of Julia Pontoni, Oregon Higher Education Coordinating Commission (Dkt. 4-14)......................................... JA161

Ex. L: Declaration of Kristine Campagna, Rhode Island Department of Health (Dkt. 4-15)................................................. JA167

Ex. FF: Declaration of Terry Clower (Dkt. 4-35) ........................ JA193

Ex. GG: Declaration of Declaration of Jeffrey Grant (Dkt. 4-36) ................................................................................ JA224

Ex. HH: Declaration of Traci DiMartini (Dkt. 4-37).................... JA231

Ex. II: Declaration of Brooke Lierman, Comptroller of Maryland (Dkt. 4-38) ................................................................................ JA240

Ex. JJ: Declaration of Philip Spesshardt, Colorado Department of Labor and Employment, Comptroller of Maryland (Dkt. 4-39) .......................................................................................... JA243

Redacted Exhibits to Motion for Temporary Restraining Order (March 12, 2025)

Ex. M: Declaration of [Redacted] (Dkt. 33-1) .............................. JA252

Ex. N: Declaration of [Redacted] (Dkt. 33-2) .............................. JA259

Ex. O: Declaration of [Redacted] (Dkt. 33-3) .............................. JA270

Ex. P: Declaration of [Redacted] (Dkt. 33-4).............................. JA279

Ex. Q: Declaration of [Redacted] (Dkt. 33-5) .............................. JA287

Ex. R: Declaration of [Redacted] (Dkt. 33-6) .............................. JA297

Ex. S: Declaration of [Redacted] (Dkt. 33-7) .............................. JA304

Ex. T: Declaration of [Redacted] (Dkt. 33-8)............................... JA314

Ex. U: Declaration of [Redacted] (Dkt. 33-9) .............................. JA322

Ex. V: Declaration of [Redacted] (Dkt. 33-10)............................. JA331

Ex. W: Declaration of [Redacted] (Dkt. 33-11) ........................... JA338

Ex. X: Declaration of [Redacted] (Dkt. 33-12) .............................JA347

Ex. Y: Declaration of [Redacted] (Dkt. 33-13) .............................JA355

Ex. Z: Declaration of [Redacted] (Dkt. 33-14) .............................JA363

Ex. AA: Declaration of [Redacted] (Dkt. 33-15) ...........................JA369

Ex. BB: Declaration of [Redacted] (Dkt. 33-16) ...........................JA376

Ex. CC: Declaration of [Redacted] (Dkt. 33-17) ...........................JA383

Ex. DD: Declaration of [Redacted] (Dkt. 33-18) ..........................JA394

Ex. EE: Declaration of [Redacted] (Dkt. 33-19) ...........................JA406

## Volume 2

Transcript of March 12, 2025 Proceedings (Dkt. 48) ............................JA415

Memorandum Opinion (March 13, 2025) (Dkt. 43) .............................JA475

Temporary Restraining Order (March 13, 2025) (Dkt. 44)...................JA531

Notice of Appeal of Temporary Restraining Order (March 14, 2025)
(Dkt. 46).........................................................................JA535

Status Report (March 17, 2025) (Dkt. 52) ...........................................JA537

Ex. 1: Declarations in Support (March 17, 2025)
(Dkt. 52-1, 52-2) ..........................................................JA541

Exhibits to Motion for Preliminary Injunction

Ex. A: Email re: Follow up: CHCO Council Special Session
(March 20, 2025) (Dkt. 78-4) ..................................... JA608

Ex. B: Declaration of Liliana Bachelder (March 20, 2025)
(Dkt. 78-5).......................................................................JA613

Ex. C: Declaration of Dr. Andrew Frassetto (March 20, 2025)
(Dkt. 78-6) ................................................................................... JA629

Ex. D: Declaration of Dr. Thomas Evans (March 20, 2025)
(Dkt. 78-7) ................................................................................... JA669

Ex. E: March 17 Status Report Summary Chart
(March 20, 2025) (Dkt. 78-8) ...................................................... JA689

Ex. F: Declaration of Katherine Archuleta (March 20, 2025)
(Dkt. 78-9) ................................................................................... JA691

Ex. G: Declaration of Pace Schwarz (March 20, 2025)
(Dkt. 78-10) ................................................................................. JA697

Ex. H: Forms SF-50, Examples (March 20, 2025)
(Dkt. 78-11) ................................................................................. JA713

Ex. I: Email Correspondence re: Important: Separation Packet
Regarding Your Departure from GSA  (March 20, 2025)
(Dkt. 78-12) ................................................................................. JA722

Ex. J: Declaration of Office of Personnel Management
Employee (March 20, 2025) (Dkt. 78-13) .................................... JA724

Ex. K: Declaration of National Archives and Records
Administration Employee (March 20, 2025) (Dkt. 78-14) .......... JA731

Ex. L: Declaration of Department of Defense Employee (March
20, 2025) (Dkt. 78-15) ................................................................. JA739

Ex. M: Memo re: Independent Department of Defense
Determination to Terminate Probationary Employees (March
20, 2025) (Dkt. 78-16) ................................................................. JA753

Ex. N: Declaration of Kimberly Breitmeyer, Michigan
Unemployment Insurance Agency (March 20, 2025)
(Dkt. 78-17) ................................................................................. JA755

Ex. O: Declaration of Sarita Nair, New Mexico Department of
Workforce Solutions (March 20, 2025) (Dkt. 78-18) ................... JA765

Ex. P: Declaration of USDA Employee (March 20, 2025)
(Dkt. 78-19) ................................................................. JA776

Ex. Q: Declaration of Department of Commerce Employee
(March 20, 2025) (Dkt. 78-20) ..................................... JA784

## Volume 3

Status Report (March 25, 2025) (Dkt. 103) ......................................... JA793

Ex. 1: Declarations (March 25, 2025) (Dkt. 103-1) ...................... JA797

Memorandum Opinion and Order Granting Motion for Temporary
Restraining Order Extension (March 26, 2025) (Dkt. 115) ........ JA852

Transcript of March 26, 2025 Proceedings (March 27, 2025)
(Dkt. 119) .................................................................. JA854

Memorandum Opinion (April 1, 2025) (Dkt. 125) ............................... JA906

Order Granting Preliminary Injunction and Section 705 Stay
(April 1, 2025) (Dkt. 126) ........................................... JA990

Notice of Interlocutory Appeal (April 2, 2025) (Dkt. 127) .................... JA995

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   STATE OF MARYLAND, et al.,)
               Plaintiffs,    )
 4                            )
               vs.            )   CIVIL CASE NO. JKB-25-748
 5                            )
     UNITED STATES DEPARTMENT )   TRO HEARING
 6   OF AGRICULTURE, et al.,  )
               Defendants.    )
 7   _____)

 8                    WEDNESDAY, MARCH 12, 2025
                          Courtroom 1A
 9                      Baltimore, Maryland

10      BEFORE:  THE HONORABLE JAMES K. BREDAR, Senior Judge

11   On Behalf of the Plaintiffs:
             VIRGINIA WILLIAMSON, ESQUIRE
12               Maryland Office of the Attorney General
                 200 St. Paul Place
13               Baltimore, MD 21202

14           TESSA GELLERSON, ESQUIRE
                 611 S. Charles Street, Unit 624
15               Baltimore, MD 21230

16           CHARLES SINKS, ESQUIRE
                 Office of the Attorney General, District of Columbia
17               Public Advocacy Division
                 400 6th Street N.W.
18               Washington, D.C. 20001

19   On Behalf of the Defendants:
             ERIC HAMILTON, ESQUIRE
20           CHRISTOPHER HALL, ESQUIRE
             Federal Program Branch, U.S. Department of Justice
21
     _____
22         (Computer-aided Transcript of Stenotype Notes.)

23           Reported by:  Kassandra L. McPherson, RPR
                   Federal Official Court Reporter
24               101 W. Lombard Street, 4th Floor
                     Baltimore, MD 21201
25                      (410) 962-4544
```

```
 1                    P R O C E E D I N G
                           9:37 a.m.
 2

 3           THE COURT:  Clerk will call the case.

 4           THE CLERK:  Calling the State of Maryland et al,

 5   versus United States Department of Agriculture, Case Number

 6   JKB-23-748.  Case is called for a hearing on a motion for

 7   temporary restraining order.

 8       And the plaintiffs' counsel can introduce themselves,

 9   please.

10           MS. WILLIAMSON:  Yes.  Good morning, Your Honor.

11   Virginia Williamson, on behalf of the State of Maryland.  And I

12   also want to welcome Attorney General for the State of Maryland,

13   Mr. Anthony Brown.

14           THE COURT:  Good morning.  And good morning, General

15   Brown.

16       Yes, ma'am.

17           MS. GELLERSON:  Tessa Gellerson from the District of

18   Columbia.

19           THE COURT:  Good morning.

20           MR. SINKS:  Charles Sinks for the District of

21   Columbia.

22           THE COURT:  Good morning.

23           THE CLERK:  And defendant counsel, please.

24           MR. HAMILTON:  Good morning, Your Honor.  Eric

25   Hamilton, Deputy Assistant Attorney General for the Federal
```

1    Programs Branch, U.S. Department of Justice for defendants.

2              THE COURT:  Good morning.

3              MR. HALL:  Christopher Hall from the Federal Programs

4    Branch for the defendants as well.

5              THE COURT:  Good morning.

6         Plaintiffs, which include 19 states and the District of

7    Columbia have filed suit against, by my count, 41 defendants,

8    which include cabinet agencies, secretaries, other federal

9    agencies, heads of those agencies.  All this is detailed in the

10   complaint, which is docketed at ECF Number 1.

11        The States challenge the Government's termination of

12   probationary federal employees.  The States allege violations of

13   the Administrative Procedures Act.

14        Importantly, at the outset, I think it's important to

15   clarify that the States challenge the Federal Government's

16   action, not so much for its impact on the federal employees

17   themselves, who are not parties to this action, but for its

18   impact on the States as states.  The States also allege that the

19   Government's actions here were ultra vires.

20        And beyond the complaint itself, the State has come to the

21   court seeking the issuance of a temporary restraining order, a

22   TRO.  Today's hearing, held just days after this lawsuit was

23   initiated, is to address the petition or the motion for

24   temporary restraining order, extraordinary early relief that is

25   sometimes appropriate in the first days after a case has been

1  filed, but there are stringent standards that, of course, must

2  be met.

3        Sometimes temporary restraining order hearings occur ex

4  parte with just the party seeking the restraint present.  The

5  rules permit that under certain circumstances, but that's never

6  ideal in our adversarial system of justice, it's always better

7  if the party against whom such an order might be entered has

8  notice and then is given the opportunity to be present, to be

9  heard, and so forth.

10       So I'm grateful that, although we are here this morning to

11  consider whether the Court should issue a TRO, we will hear from

12  the defendants.  In fact, the defendants accepted the Court's

13  invitation to submit a brief in anticipation of the hearing.

14  They submitted their brief on Monday and the Court has carefully

15  reviewed it, along with the other materials accumulated in the

16  record.

17       My understanding is that neither side intends to present

18  evidence during this hearing.  Is that right, Ms. Williamson?

19             MS. WILLIAMSON:  That is right, Your Honor.

20             THE COURT:  Is that right, Mr. Hamilton?

21             MR. HAMILTON:  Yes, Your Honor.

22             THE COURT:  Okay.  So essentially then, we're going to

23  entertain legal argument.

24       I don't want to forget one technical detail that I think is

25  important.  As we look down the road to the Court's treatment of

 1    the information that's in the record, the Government -- the

 2    States ask that certain affidavits be sealed, but the content of

 3    those would seem to be quite important to the States' theory of

 4    whether they're entitled to this emergency relief.

 5         So I want the State, at the conclusion of this hearing, to

 6    look carefully at those exhibits and ascertain, as I think they

 7    can, how to redact them in such a way as to protect privacy,

 8    perhaps to some extent anonymize the public version of such

 9    documents and so forth.  And then, of course, leaving the full

10    unredacted document on the record, but sealed.  Also submit, for

11    the Court and the public to the docket, a redacted version.

12         Can you take care of that Ms. Williamson?

13              MS. WILLIAMSON:  Yes, Your Honor.

14              THE COURT:  Let's try to get that done by the end of

15    the day.

16         All right.  The plaintiffs are the ones seeking this

17    relief.  I'll hear from you first.  You may proceed.

18              MS. WILLIAMSON:  Your Honor, this case concerns the

19    defendant's failure to comply with a mandate from Congress that

20    requires them to provide notice to plaintiff states before

21    conducting any reductions in force.

22         In this case, the primary issue is a statute; that's 5

23    U.S.C. section 3502, and that statute leaves no doubt that the

24    defendant agencies are required to provide notice before RIF,

25    and that that notice must include particular things, including

1    the number of employees --

2              THE COURT:  Let's get to that in a minute.  But let's

3    get to a fundamental question first and that is, was this even a

4    RIF?  I think your opponents contend that they didn't conduct a

5    RIF.  They evaluated 21,000, 23,000, 24,000 employees and found

6    that their performance was deficient.  And, federal law is

7    crystal clear, if a probationary employee is not performing

8    adequately, they can be summarily discharged.

9              MS. WILLIAMSON:  Your Honor --

10             THE COURT:  So first of all, is that your

11   understanding of where your opponents are?  And if so, what's

12   wrong with that theory?

13             MS. WILLIAMSON:  That is my understanding of my friend

14   on the other side's arguments, Your Honor, but this was a

15   reduction in force.  This was multiple reductions in force

16   simultaneously by 21 agencies over the course of just a few

17   weeks.  And there's plenty of evidence in the record indicating

18   that, Your Honor.

19        I would start with the Executive Order from the President

20   indicating a desire to effectively reduce the size of the

21   Federal Government.

22        The guidance from the Office of -- -- from OPM, the Office

23   of Personnel Management, the initial guidance seeking a list of

24   probationary employees and then later guidances in February,

25   February 13th meetings and February 14th guidances to

1  effectively fire those employees.

2      I would point, Your Honor, to declarations in the record

3  from Ms. DiMartini, who worked for the Treasury Department and

4  was in the meeting with OPM where OPM instructed her, without

5  reviewing personnel files, without making individualized

6  determinations to fire probationary employees.

7      I would point to the declaration of Mr. Grant, a former

8  employee of CNS, who attested to the same behavior.  Who

9  attested to OPM coming and requiring him effectively to fire

10 probationary employees without any individualized consideration.

11         THE COURT:  So let's pay a little bit of attention to

12 a simple factual question, and that is, is there enough time

13 that has passed that's plausible that 20,000 or more employees

14 received individualized reviews of their performance prior to

15 their termination?

16         MS. WILLIAMSON:  Your Honor, I think that would be

17 quite an undertaking to review that many files over the course

18 of just a few weeks.

19         THE COURT:  So your answer is no.

20         MS. WILLIAMSON:  My answer is no, Your Honor, yes.

21         THE COURT:  So I don't think we need to spend much

22 more time on that issue, because that seems clear.

23      But then, let's move to a more subtle question, and that

24 is, who says they have to spend any time reviewing?  Who says

25 that it has to be an actual review?  I read the Government's

 1   brief to say, we said we reviewed their performance.  Said it in
 2   the letter.  And that's all that the statute actually requires.
 3   There's no requirement that we actually review anyone's
 4   performance.  In other words, there no requirement that the
 5   statement be true, it's just that it be made.
 6           MS. WILLIAMSON:  Your Honor, I think that would
 7   effectively render OPM limitations on firing probationary
 8   employees a nullity.  There are limits on when OPM can fire a
 9   probationary employee, and that includes for circumstances where
10   that employee's work performance or conduct during the period
11   fails to demonstrate the fitness or qualification for that
12   continued employment.
13       And so without a -- if the government could simply assert
14   that it had done -- had done some sort of evaluation and assert
15   that it was performance-based, the statute itself would
16   essentially -- or rather the regulation itself would essentially
17   fall away.  If there's no criteria, if there's no actual
18   evaluation required by the Government to determine that anyone
19   is probationary, OPM's regulations, on this point, mean nothing.
20           THE COURT:  Was every employee that was discharged
21   told that their performance was deficient?
22           MS. WILLIAMSON:  Absolutely not, Your Honor.  In fact,
23   as the declarations of individual employees show, some of these
24   employees were in the process of being promoted.  Many had
25   received positive performance reviews from their supervisors,

1   some even in the days leading up to their firing.  So no, Your

2   Honor, it's strains credulity to believe that each of these

3   employees who were fired, in fact, performed -- performed in

4   such a manner that -- their firing was warranted on performance.

5            THE COURT:  So please, continue.  I interrupted you.

6            MS. WILLIAMSON:  Yes, Your Honor.

7        As I was saying, Your Honor, the statute, 5 U.S.C. 3502,

8   makes clear that notice is required.  As we've discussed, Your

9   Honor, a RIF took place here, reduction in force.  None of the

10  agency defendants suggest that they provided notice as required

11  by the statute and as required by OPM's regulations.  That is

12  not part of, as I understand it, my friend on the other side's

13  argument.  And the states are suffering real and irreparable

14  harm as a result of the failure to provide notice.

15       THE COURT:  So tell me about that.  Because, obviously,

16  that's significant just on the substance, but it's significant

17  for standing.  What -- tell me how the States are being harmed

18  in a concrete way right now, today and irreparably.

19           MS. WILLIAMSON:  Yes, Your Honor.  I begin with the

20  injury that is sort of the central injurious case and that's an

21  informational injury.  The statute itself requires that certain

22  information be provided to states.  The states use that

23  information.  They, in fact, require that information to perform

24  certain functions, including functions that Congress requires of

25  them.

1    State rapid response agencies across the country need

2  information about the number of employees who are going to be

3  laid off in a mass lay-off like the ones that the defendants did

4  in order to provide up information about resources for job

5  hiring, information about unemployment benefits, to essentially

6  forestall harms that could befall the state -- that will befall

7  the state absent any sort of intervention.

8    So I'd point to the informational injury as the central

9  injury.  There's injury to the rapid response services --

10    THE COURT:  But information injury can be a basis,

11  there's no question about that, and the case law is elaborate,

12  but ultimately clear on that issue.  But you've still got to

13  show that it's concrete and real in the circumstances of this

14  case.  So tell me about how that informational issue is

15  impacting the plaintiff states last week when you filed this,

16  today, et cetera, such that there's an imperative tact.

17    MS. WILLIAMSON:  Yes, Your Honor.  The harm is

18  manifest and it's set out in the many declarations that we

19  supplied in the many plaintiff states in this case.

20    I would focus though on the declaration from Secretary of

21  Labor, Secretary Wu, who attested that her department has been,

22  as she put it, forced to rely on public reporting and word of

23  mouth to conduct their investigations; outreach to effective

24  workers.  She has set out in her declaration that, because of

25  the lack of notice of these reductions in force, that she's had

1   to conduct extensive outreach that she normally would not

2   require her agency to conduct.  That her staff has had to

3   dedicate additional resources to fight -- essentially providing

4   the workforce development services that they would normally

5   provide given the information to --

6           THE COURT:  So in the first instance, in a nutshell,

7   you're saying they're entitled to be told what's going on and

8   they weren't, so they've had to expend resources in an effort to

9   find the truth, to search for evidence, and information as to

10  what was occurring.

11          MS. WILLIAMSON:  That's exactly right, Your Honor.

12  And I would also point to just the use of services within the

13  state by newly unemployed people who are residents of the state.

14  At the time that Secretary Wu filed her declaration, just as one

15  State's example, 813 former federal employees had applied for

16  unemployment insurance benefits with the State of Maryland as of

17  January 21st of this year.  As of today, that number is more

18  than a thousand.  That's -- that is a 200 person increase over

19  the course of just a week.

20      And the issue is the state has no way of predicting

21  precisely how many applications it's going to get, has no way of

22  forestalling the harm that it is suffering, and it has no way of

23  getting resources to the many people who were fired without

24  notice, and without notice to the states to try to sort of get

25  those people in -- into an employment situation, so they aren't

 1  using state resources.

 2       Your Honor, the other injuries we discussed in our brief we

 3  include injuries to state finances, the loss of tax revenue.

 4  That is people were fired without any notice at all and that

 5  effectively meant a loss -- an instant loss of tax revenue to

 6  the State.

 7       And I would also point out, Your Honor, that in some

 8  states, there is a reliance on imbedded federal personnel.  For

 9  example, the Centers for Disease Control has a program where

10  imbedded public health professionals work with local and state

11  agencies.  And those personnel, although some of them have since

12  been reinstated, those personnel were fired without notice

13  requiring those state agencies to scramble.

14       THE COURT:  If things went as you say they should

15  have, the most these employees would have gotten 60 days notice.

16  Really how much difference is there in terms of state tax

17  revenues, when we consider this case isn't about reinstating

18  federal employees for the rest of tax year 2025 and the

19  indefinite future, but it would seem to be, at most, for a

20  couple months.

21       MS. WILLIAMSON:  It's --

22       THE COURT:  Especially in light of the checkered case

23  law on loss of tax revenue as a real cognizable harm and basis

24  for standing.

25       MS. WILLIAMSON:  It's true, Your Honor, that the

 1    injuries to state finances would be for a few months, except
 2    that with notice to the states, the states rapid response
 3    services may intervene, leading people to employment and such so
 4    that they wouldn't lose.  They would continue to be earners who
 5    are earning tax revenue for the state as well.
 6              THE COURT:  You contend that that's part of the
 7    purpose of the statute that Congress passed in terms of how RIFs
 8    are supposed to be managed?
 9              MS. WILLIAMSON:  I do, Your Honor.  I think Congress
10    acted intentionally in requiring notice to the states.  The
11    provision there was part of the Workforce Investment Act and
12    then an amended version of that Act, the Workforce Innovation
13    Opportunity Act of 2014.  And the whole purpose behind that Act
14    was this sort of intervention, was creating programs at the
15    state level to avoid loss of work, to intervene early when
16    massive layoffs happened, of the sort that happened here.
17              THE COURT:  Tell me about what your experts say about
18    how a RIF is actually conducted when done according to the
19    statute.
20         I take it, from what you've submitted, that a RIF is
21    seldom, if ever, sort of just suddenly implemented on day one
22    with notice given and the terminations occur on day 60.  But
23    instead, there are certain preparatory steps that have to be
24    taken, that themselves necessarily consume time, competitive
25    areas, and so forth.  Can you talk to me about that?

1          MS. WILLIAMSON:  That's precisely right, Your Honor.

2     In order to conduct a RIF under the law, an agency has to

3     organize its personnel, rank them based on certain preferences.

4     There are preferences in the law, for example, for veterans.

5     There are preferences -- there's sort of an organization

6     depending on how long a person has spent in federal service or

7     in service as a veteran.  There are preferences that an agency

8     has to account for.  And then, there are competing areas where

9     different personnel sort of compete to remain in their

10    positions.

11         There's a -- as Your Honor set out, typically, as our

12    experts are attested, RIFs take 12 to 18 months at times,

13    certainly not a few days or a few weeks.

14         THE COURT:  Please continue.

15         MS. WILLIAMSON:  Yes, Your Honor.

16         Defendants, again, provided no notice to the states.  As a

17    result, the states are suffering injuries as we discussed.

18    These injuries flow from the Defendant's conduct here.  I

19    already addressed the categories of injury here, the

20    informational injury, the injury to -- to the ability to provide

21    unemployment benefits, the injury to state finances, the injury

22    to state programmatic -- to state programs, the injury to our

23    state rapid response programming that's required by law.  And

24    these harms are irreparable.  There's no way for the states

25    without an injunction by the Court to receive this money back,

 1    to mitigate the harm other than through action by the court.

 2    And it's mounting every single day as more and more people apply

 3    for state benefits.

 4              THE COURT:  But that might be a good argument in terms

 5    of the ultimate claims you've brought.  I'm not sure how strong

 6    that is in favor of entering a TRO, because presumably you

 7    prevail later.  Even without a TRO, everything then gets sorted

 8    out, including the payment of wages and then the payment of back

 9    taxes.

10              MS. WILLIAMSON:  Your Honor --

11              THE COURT:  So what's the urgency associated with that

12    issue?

13              MS. WILLIAMSON:  The urgency, Your Honor, is that the

14    states are having to re-shuttle resources right now.  So the

15    states have devoted resources and, for example, Secretary Wu's

16    declaration outlines this.  The states have had to do things

17    like put up additional websites, host new events.  The states

18    have to act now because people are suddenly unemployed now.

19    Because the requirement for their rapid response services

20    especially that kicks in not down the line --

21              THE COURT:  So your point is that if the law provides

22    for a rapid response, and there isn't an immediate remedy

23    ordered by the court, the capacity of the state to respond

24    rapidly is lost.

25              MS. WILLIAMSON:  Precisely, Your Honor.

```
 1           THE COURT:  And can't be restored.
 2           MS. WILLIAMSON:  Yes.
 3           THE COURT:  Because a response that comes next June,
 4  next October, whenever the litigation ended and you prevailed,
 5  on the assumption that you do prevail, an assumption I make only
 6  for purposes of this discussion, there wouldn't be any way to go
 7  back to March and mitigate the harms that were inflicted then by
 8  the illegal action that the Government took.
 9           MS. WILLIAMSON:  Exactly, Your Honor.  Yes.
10           THE COURT:  You may continue.
11           MS. WILLIAMSON:  Yes, Your Honor.  So again, the harms
12  here are irreparable.
13      I want to touch briefly on two jurisdictional arguments
14  that my friend on the other side has raised.  First, the issue
15  of standing.  This court has standing.  The plaintiffs' states
16  have suffered a host of injuries, injuries that are --
17           THE COURT:  It's not really about whether this Court
18  has standing, it's about whether you have standing.
19           MS. WILLIAMSON:  Sorry, excuse me.  Yes.  The States
20  have standing.  The States have standing, excuse me.  The Court
21  has jurisdiction, the States have standing.  So the states have
22  standing.  The states have suffered a host of injuries.  Those
23  injuries include the many injuries that we've talked about, the
24  ability to -- the injury to the ability to perform rapid
25  response, the ability of the injury to state finances, the host
```

1  of administrative expenses that the states are suffering as a

2  result of the need to rapidly regroup and devote its own

3  resources, new resources to trying to provide services to --

4  that are required -- that they're required to provide under law.

5      Although my friend on the other side cites chiefly United

6  States verse Texas, in suggesting that the states don't have

7  standing, that case in sort of proper context is not a case that

8  is on point here.

9      And I'd point out at least two things about the case.

10 Number one, that case was a follow-on decision following and

11 applying a prior decision of the Supreme Court in a case called

12 Linda RS and that case held that in the criminal context, in a

13 criminal enforcement context, a state -- a third party can't

14 intervene saying that sort of follow-on affects of enforcement

15 activity or lack of enforcement activity that they suffered,

16 that won't be a cognizable harm.

17     So in Linda RX -- or RS, the plaintiff there sought to rely

18 on the child support payments and say there needs to be

19 essentially more enforcement of child support payments, and the

20 Court said that's not a space that we are going to allow a third

21 party to intervene in.

22     In the Texas case, the Supreme Court simply said we've

23 already decided that in an enforcement type context, and this

24 enforcement context in the Texas case was the immigration space.

25 We're not going to say that the injuries -- those are not

1   judicially cognizable injuries to these third parties.

2       My friends on the other side primarily rely on a footnote,

3   footnote three of that opinion.  But that footnote doesn't stand

4   for the proposition that direct injuries to the state aren't --

5   aren't injuries under understanding principles.  They are, in

6   fact, injuries understanding principles.  And we know that, in

7   part, because the very term that the Supreme Court decided the

8   Texas decision, it decided other cases upholding state standing.

9       So, for example, the Biden versus Nebraska decision.

10  There, the Supreme Court said that the state of Missouri had

11  standing because the instrumentality of the state could show

12  that it had been harmed in the form of moneys that it would no

13  longer receive under a contract if the state forgave certain

14  student loans, because the state, which would service the

15  contract, couldn't service the contract if loans were forgiven.

16  And those injuries were recognized by the court as sufficient to

17  demonstrate the state standing.  In fact, the government in that

18  case didn't even contest that that was -- that financial injury

19  was, in fact, a sufficient injury for standing.

20      There are a host of other decisions.  Your Honor, I would

21  also note for example, I think a situation that's quite

22  analogous to this, in a sort of DOPA litigation, the Supreme

23  Court upheld in a case that's also called United States verse

24  Texas, the Supreme Court upheld a decision of Fifth Circuit that

25  had held that the State of Texas had standing where the injuries

1   it would suffer were derived from its requirement that it would

2   have to produce new driver's licenses for people who were

3   allowed to, under federal programs, to apply for -- to get

4   certain licenses; that the state would now have to bear that

5   cost.  And the Supreme Court affirmed that decision without an

6   opinion.

7          So yes, the states have standing.  The decisions on which

8   of which my friends, on the other side, rely don't undermine

9   that point.

10         On the issue of traceability, I also point out my friends

11  on the other side primarily rely on the Murthy decision of the

12  Supreme Court.  But Murthy is plainly distinguishable.  That

13  case, yes, it involved many defendants, but the issue -- the

14  court didn't take issue with, just the number of defendants in

15  the case, what the court took issue with was that there was sort

16  of a knot, as the court framed it; a tangle of where it was

17  unclear what defendant did what to who, at what time.  It was --

18  there was no ability for the court -- in fact, the court

19  described itself as untangling in the opinion, to figure out,

20  who had -- what the allegations were against each defendant.

21         There's no such thing in this case.  In this case, it's

22  quite clear what the allegations are and what each of the

23  defendant agencies failed to do.  So Murthy is also not on point

24  for this situation.  And the state's harms would be rejust by an

25  order of the court providing an injunction, a preliminary

 1    injunction.  Or excuse me, a temporary restraining order in this

 2    case.

 3         I want to briefly, if Your Honor has no more questions,

 4    just address my friend's request for a bond in their briefing.

 5    We don't think, to the extent the court orders relief, that the

 6    plaintiff states just don't think that a bond is warranted.

 7              THE COURT:  Well, how common are bonds other than

 8    nominal bonds in public interest litigation?

 9              MS. WILLIAMSON:  Very uncommon, Your Honor.

10              THE COURT:  So enough on that.  I don't think that's a

11    serious issue.

12         Okay.  Well, perhaps we'll invite you back up for rebuttal.

13              MS. WILLIAMSON:  Thank you.

14              THE COURT:  Good morning once again, Mr. Hamilton.

15    Will you be arguing for the government?

16              MR. HAMILTON:  Yes, Your Honor.  Would it be alright

17    if I use the podium to my left here?

18              THE COURT:  You are welcome to.

19         In the 19 states and the District of Columbia, how many

20    probationary employees are within the scope framed by these

21    plaintiffs?  How many probationary employees has your client

22    terminated?  Your clients terminated?

23              MR. HAMILTON:  I can't make a representation on that

24    right now.  As Your Honor knows, I have 41 clients in this

25    litigation, we're at a very early phase in this case.  And right

 1  now, it's plaintiffs' burden to show they are entitled to the

 2  extraordinary remedy of the temporary restraining order.

 3            THE COURT:  So give me an estimate.  If you can't give

 4  me the exact number.

 5            MR. HAMILTON:  I can't.

 6            THE COURT:  Is there more than 50?

 7            MR. HAMILTON:  I can't give an estimate.

 8            THE COURT:  It might be less than 50.

 9            MR. HAMILTON:  I suspect it is not, but I really

10  can't.

11            THE COURT:  Is it more than a hundred?

12            MR. HAMILTON:  I really can't.

13            THE COURT:  Less than a hundred.

14            MR. HAMILTON:  I suspect it's not less than a hundred.

15            THE COURT:  How about a thousand?

16            MR. HAMILTON:  Your Honor --

17            THE COURT:  Is it less than a thousand?

18            MR. HAMILTON:  Your Honor, what I am able to talk

19  about is the submissions that plaintiffs have made.

20            THE COURT:  But that's not what I'm asking.

21            MR. HAMILTON:  Right.

22            THE COURT:  What's the Government's position?

23            MR. HAMILTON:  We haven't taken a position at this

24  stage of the litigation.

25            THE COURT:  This is your time to do so.

 1                MR. HAMILTON:  Your Honor, I'm not in a position to

 2    make representations to the number of probationary employees

 3    that have been terminated.

 4                THE COURT:  You don't know?

 5                MR. HAMILTON:  I don't know.

 6                THE COURT:  Does anybody in the Government know?

 7                MR. HAMILTON:  I don't know, Your Honor.

 8                THE COURT:  You don't know if anybody in the

 9    Government knows.  Okay.  Go ahead.

10                MR. HAMILTON:  Your Honor, I'll start with standing.

11    Plaintiffs have not shown that they have standing to litigate

12    this case.  The plaintiffs rely nearly exclusively on downstream

13    incidental effects of probationary employee terminations.

14          The U.S. Supreme Court considered injuries like --

15                THE COURT:  So let's just jump ahead for a moment.  If

16    the court were to conclude that, actually, you engaged in a RIF

17    or multiple RIFs, would you concede that then, the states do

18    have standing?

19                MR. HAMILTON:  No, Your Honor, I don't think they

20    would have standing.

21                THE COURT:  Well, doesn't the statute specifically

22    talk about states when it is crafting the procedures that must

23    be followed with respect to RIFs?

24                MR. HAMILTON:  It says that when there's a RIF, the

25    states get a notice of that.  But just because a statute says

 1  that a state --

 2          THE COURT:  Well, why would Congress require that the

 3  states be given a notice?

 4          MR. HAMILTON:  I suspect it's because they wanted the

 5  states to have the notice to be able to do the rapid response

 6  activities that the plaintiffs were talking about.

 7          THE COURT:  To mitigate the consequences for the state

 8  of the RIF.  True?

 9          MR. HAMILTON:  To allow the states to participate in

10  helping employees, I think, mitigate the consequences of their

11  termination.

12      But my bottom-line point is, that this is an informational

13  injury in the end and that isn't sufficient to confer standing.

14  The Trans Union case holds that an injury in law is not

15  necessarily an injury in fact.  And in assessing the

16  concreteness of an injury in fact, the harm has to have some

17  kind of a close relationship to a harm traditionally recognized

18  at common law.

19      Failing to get a notice does not mean that, in the end,

20  what plaintiffs are relying on are these downstream incidental

21  effects of the termination of probationaries.

22          THE COURT:  Well, wouldn't there be some significance

23  to the particular notice that was failed to be given?  In other

24  words, what's the purpose of a notice?  What's the purpose of

25  the information?

 1          MR. HAMILTON:  I'm not disputing that the purpose is

 2    to allow states to participate in assisting individuals in their

 3    states with relocating employees, helping them find some sort of

 4    a new role.  But in the end, that is a downstream effect of what

 5    the plaintiffs are trying to challenge, which is this decision

 6    by the Federal Government in connection with its employees to

 7    separate probationary employees.

 8          THE COURT:  I don't read the complaint that way.  The

 9    complaint is trying to get relief for the impact on the states.

10    The employees are not parties to this litigation.  They've gone

11    to other courts and been told to go to the Merit System

12    Protection Board.  Fair enough.  That issue is not before me.

13    But the states, themselves, have their own issues, their own

14    impacts, their own consequences from a RIF procedure not being

15    properly executed.

16        That's why I think it's a critical question at this very

17    early stage as to whether or not this was a RIF.  Because if it

18    was, the rest of it seems pretty clear, including standing.

19          MR. HAMILTON:  Well, the -- I mean, they're talking

20    about injuries like loss of tax revenue, having to enroll people

21    on unemployment insurance.  They note, though, that they aren't

22    actually required to pay out the unemployment insurance and that

23    the Federal Government reimburses that.  So it's an

24    administrative burden, one that wouldn't even be redressable by

25    a temporary restraining order because we would be talking about

1    reinstating employees, and the administrative burden of

2    enrolling someone in unemployment insurance through the state

3    system would have already happened.

4         THE COURT:  Yes, I'm less interested in that also.

5    I'm much more interested in the intent of Congress to make sure

6    that states are prepared and ready to take on the social

7    services consequences and burdens that will be inflicted upon

8    them when thousands of people lose their jobs.  And this is also

9    why this is different from United States versus Texas.  It's a

10   very explicit plan, expressed in the statute, that the states be

11   notified and that the states in fact do form their rapid

12   response elements and get ready and mitigate the inevitable

13   harms that come from a lot of people suddenly losing their jobs.

14        MR. HAMILTON:  But viewing the issue through a

15   standing lens, I take my friend on the other side to be saying,

16   if this had happened through RIF procedures, we would be

17   engaging in a rapid response right now.  But that hasn't

18   happened and so there is no injury.  I don't take them to be

19   saying we're very concerned that the Federal Government is going

20   to bring some lawsuit against us saying that we haven't complied

21   with our rapid response obligations.  There's no injury in fact.

22   And it also isn't redressable by the temporary restraining order

23   that they are seeking.

24        THE COURT:  Well, the states not injured when some

25   third party does something to them that leaves them or impairs

 1  their capacity to perform their responsibilities; their legal

 2  responsibilities to their citizens?

 3          MR. HAMILTON:  Well, that's not an injury in fact

 4  though.  It's, you know, they're not spending money, they

 5  weren't doing anything.  It's the absence of an injury.  And I

 6  also don't know what --

 7          THE COURT:  But how haven't they in their affidavit

 8  said that they are -- that they're diverting resources, they're

 9  scrambling, that they're setting up websites that they otherwise

10  wouldn't necessarily have to.  They're searching for -- they're

11  deploying resources to search for information that should have

12  been conveyed to them clearly, crisply, directly; here's how

13  many people we're going to fire, here's when we're going to fire

14  them, here are the counties that they live in, et cetera.

15      Instead, they're left to deploy their workers, interns,

16  whoever they can get hold of; go scour the newspapers, watch the

17  television shows, see what they're announcing they're going to

18  do next and try to read the tea leaves about who might actually

19  get fired and who might not, as opposed to the orderly

20  notifications that the statute contemplates.

21          MR. HAMILTON:  So that's conduct that they're all

22  choosing to undertake right now.  They're not required to do

23  that because there never was a RIF in the first place.

24      On standing, I also want to address my friend's comments on

25  the --

 1           THE COURT:  But I asked you to assume there was a RIF.

 2   If there was a RIF, do you concede then that the standing

 3   arguments are resolved?

 4           MR. HAMILTON:  I don't think so.  I think we're still

 5   talking about downstream effects of the termination of a

 6   probationary employee, which is what the plaintiffs are trying

 7   to do here.  They aren't even asking the Court to order

 8   defendants to provide notice of a RIF, they're seeking a

 9   temporary restraining order that they say would have the effect

10   of restoring tens of thousands of employees to the Federal

11   Government and then they want an additional temporary

12   restraining order that would prevent the Federal Government from

13   terminating probationary employees in certain situations.

14           THE COURT:  Well, I read it they want the RIF

15   rescinded.  They want a restoration under a TRO to the status

16   quo.  You executed a RIF; you didn't do it correctly.  Back up,

17   start over if you want; you don't have to do anything.  But you

18   can't do this RIF because you didn't execute this RIF correctly.

19           MR. HAMILTON:  And that doesn't even seem to address

20   their injury because they're still going to end up spending the

21   same money, engaging in the same conduct in the end.  And I'd

22   add also --

23           THE COURT:  Well, that assumes that you're going to

24   execute the same policy over again.  If you do, at least

25   presumably the next time you would do it in a lawful manner,

 1  which allows them to make preparations, do their planning in an

 2  orderly way, not be in a completely chaotic state.  And then

 3  upon the passage of 60 days, when the terminations actually

 4  start to occur, they're ready to shoulder the burden that falls

 5  upon them when thousands of people are laid off.

 6          MR. HAMILTON:  But in the end, those are downstream

 7  effects of the termination of an employee.  And we read United

 8  States against Texas to throw a huge doubt on the viability of

 9  that downstream action by the state and the connection of the

10  termination of an -- excuse me -- downstream action and the

11  context of the determination of a probationer.

12          On the Murthy case --

13          THE COURT:  Let's go on to some other element of this.

14  We're not going to get anywhere on this one.

15          MR. HAMILTON:  Thank you, Your Honor.

16          THE COURT:  What else you got?

17          MR. HAMILTON:  I wanted to respond to my friend's

18  comments on the Murthy case because this really is quite similar

19  to the Murthy case.  The Supreme Court called that a sprawling

20  suit, dozens of Federal Government defendants were sued.  This

21  is similar; 41 federal agencies and agency head defendants.

22          And Your Honor, I'd note that this suit is so

23  extraordinarily large that plaintiffs already struggling to

24  manage its huge breadth.  They submitted 19 declarations of

25  individuals, who they say were terminated as probationary

1    employees.  Two declarations are from employees and they haven't

2    even sued the agencies that those employees work at; FEMA and

3    NOAA.  That's Exhibits W and AA.

4          They submitted a declaration of someone who admitted he

5    doesn't even live in any of the plaintiff states.  That's

6    Exhibit W, who lives in Virginia.

7          They also sued five agencies without identifying anyone

8    terminated by them; DOD, Commerce, DHS, NARA and SVA.  They even

9    admit in their complaint that the Department of Defense has not

10   terminated a probationary employee, leaving us to wonder what

11   the agency action could conceivably be for the Department of

12   Defense and these other defendants.

13         Plaintiffs are framing the agency actions at issue as OPM

14   memos, which have since been revised.  They were revised after

15   the District Court in California entered a very narrow TRO just

16   directed at OPM.  And then they conceptualized these, what they

17   say are tens of thousands of probationary employee terminations

18   as each independent agency actions and ultra vires acts of the

19   government.

20         Looking ahead in this case, it seems likely plaintiffs will

21   be filing amended complaints any time a new agency announces the

22   termination of probationary employees.  There are hundreds of

23   federal agencies.  So far, plaintiffs have made 21 defendants

24   here.  This is not the kind of lawsuit that -- excuse me -- this

25   is not the sort of dispute that is designed for adjudication in

 1   federal courts.  Instead, we note the court lacks jurisdiction

 2   because a Civil Service Reform Act created a scheme to resolve

 3   disputes over a federal employee's termination by the Federal

 4   Government.  Those are litigated in the Merit Service Protection

 5   Board.

 6             THE COURT:  So the states would have standing before

 7   the Merit System Protection Board to go in and litigate their

 8   interests?

 9             MR. HAMILTON:  States do not have --

10             THE COURT:  Of course they don't.  So where do the

11   states go?

12             MR. HAMILTON:  Well, their injuries are not of the

13   sort that --

14             THE COURT:  If they did have injuries, where would

15   they go?

16             MR. HAMILTON:  If they did have injuries?

17             THE COURT:  Yeah.  If they had cognizable injuries, in

18   what form do they seek their redress?  I can answer that for

19   you.  That's in the United States District Court.

20             MR. HAMILTON:  The problem though would be that

21   separate from the standing issue, the SYSTRA, under the Thunder

22   Basin test, preempts federal court jurisdiction in this space.

23   Because at least to the extent if --

24             THE COURT:  That's if they're in court trying to

25   vindicate the rights of the federal employees.  I'm not going to

 1  concede that to you, but it's at least a strong argument.  But

 2  are you suggesting that because of Thunder Basin they don't have

 3  the right to pursue a particular remedy even though they are not

 4  the employees?  They're not the parties that the Thunder Basin

 5  criteria would seem to apply to.

 6          MR. HAMILTON:  I'll say this.  They don't have the

 7  right to the remedy they're seeking today, which is a temporary

 8  restraining order reinstating what they say are tens of

 9  thousands of probationary employees.

10      Again, they aren't asking today for --

11          THE COURT:  How about a lesser order that simply

12  orders the recission of the RIF?

13          MR. HAMILTON:  That -- at least if construed to result

14  in restoring individuals to federal employment, I don't see how

15  that is distinguishable.

16          THE COURT:  So even though they're entitled to a

17  rescission of the RIF, because it was done illegally, if that

18  has the consequence of reinstating employees, something that

19  employees themselves can only seek before the MSPB, then the

20  Court can't order that.

21          MR. HAMILTON:  Because it is --

22          THE COURT:  But the MSPB owns that remedy and then no

23  court can order it, even if it is remedying some completely

24  different harm.

25          MR. HAMILTON:  That's right.  That's right.  And

 1   that's --

 2          THE COURT:  What case law supports that proposition?

 3          MR. HAMILTON:  I mean, there's federal circuit

 4   precedent recognizing and -- you know, the MSPB's work in this

 5   space.  And the Thunder Basin Doctrine exists to determine what

 6   sort of claims are channeled exclusively to the MSPB and other

 7   civil service bodies.

 8          THE COURT:  But how do you apply Thunder Basin to say

 9   the state's claims trying to remedy their unique harms, not as

10   federal employees, as states bound by federal law and state law,

11   to provide certain services on a rapid or emergency basis, are

12   barred from seeking, as you say four times in your brief, the

13   only remedy that could possibly resolve this:  Reinstatement.

14      How does that hold?

15          MR. HAMILTON:  Well, so I think it's notable that they

16   aren't even seeking to get notice from the Federal Government.

17   They're, at least at this stage of the case, they're just

18   focusing on reinstating these employees.  They haven't asked the

19   court to enter any sort of order on the actual statute that

20   touches them, which is that requirement when there's a RIF to

21   give notice to the states.

22      One more point on Thunder Basin, Your Honor.  I think the

23   thrust of the plaintiff's argument here is they don't seem to

24   disagree that individual employees cannot bring an argument in

25   an Article III Court to get their probationary termination

 1    rescinded.  Instead, it seems to be that under their view,

 2    Congress created this scheme, recognizing the questions about

 3    federal employment and whether an employee should be restored to

 4    federal service should go to this Merit Service Protection

 5    Board, but if some party, like a state, a third party to that

 6    employment relationship can identify some incidental way that a

 7    federal employment termination affects them, then they can bring

 8    a lawsuit in an Article III Court, and seek here, according to

 9    plaintiffs, the restoration of tens of thousands of employees

10    into Federal Government service, compelling them, compelling the

11    executive branch to employ them, to pay their salaries.  Your

12    Honor, that makes no sense of the statute that Congress has

13    enacted, and I'd note that this is something that now two courts

14    --

15              THE COURT:  Why does that make no sense?

16              MR. HAMILTON:  Well, it makes no sense because --

17              THE COURT:  Because your argument is couched whether

18    explicitly or implicitly in a notion that states in this case

19    are functionally kind of like the unions, I guess, before Judge

20    Shutkin, that they are surrogates for the employees.

21         The Government isn't responding to the core contention that

22    is operating in this space in this case.  That is the states

23    have their own interests, their own harms that when a large

24    employer, like the Federal Government, suddenly lays off

25    thousands of people, that there's a burden that falls on other

 1   levels of government.  In this case State Government.  That's

 2   its own issue.

 3            MR. HAMILTON:  Sure.  But the missing link is why

 4   would restoring tens of thousands of workers into the Federal

 5   Government be the remedy for that?

 6            THE COURT:  Because those people, once back in

 7   employment, don't need the rapid emergency services this weekend

 8   that the state is otherwise bound to provide to them.  And had

 9   they been given 60 days, would have been better prepared to

10   provide to them.

11            MR. HAMILTON:  But in the end, it's a notice that the

12   state -- that the statute requires the Federal Government to

13   give the states and that's only when there's a RIF and there

14   hasn't been a RIF here.

15       I can move to our merits arguments.

16            THE COURT:  Why don't you.  I think we've exhausted

17   this part of it.  So tell me why it's not a RIF and tell my what

18   it was.

19            MR. HAMILTON:  So, Your Honor, these were terminations

20   of probationary employees.  And the OPM regulations, as well as

21   statutes, give Federal Government employers substantial

22   discretion in separating probationary employees.

23            THE COURT:  See if you agree with this proposition.

24   Studying the law, as I have over the last few days, it seems to

25   me that there's basically three ways that you can terminate a

 1   probationary civil servant, whether it's in the accepted service

 2   or the regular service.

 3         In their probationary period, if it comes to light that

 4   they didn't tell the employer about something that really is a

 5   disqualifier in terms of their qualifications and abilities and

 6   so forth, then the government is authorized, because they're

 7   still on probation, to essentially reconsider the decision to

 8   hire them in the first place.  It was erroneous; it was made on

 9   a faulty premise, you're fired.

10         Second avenue would be if the employee is not performing.

11   They're in their probationary period and they're not fully

12   successful at performing the job that they were hired to do.

13   And on that basis, while the employee is still on probation,

14   they can be pretty summarily terminated.

15         And the third avenue would be, we don't have any complaint

16   with you in particular, and you didn't -- you weren't deceptive

17   and you didn't mislead us about your qualifications and so

18   forth, but the government has decided to move into a different

19   direction, broadly speaking, and we are going to have a major

20   course correction.  We're going to substantially diminish the

21   size of the department of government.  We're going to pursue

22   different policies, perhaps because there was an election and

23   new leadership has come into the government and we have decided,

24   pursuant to the authority that's implicit in that process, to

25   take the government in a different direction.  And accordingly,

1    we're going to diminish, substantially diminish the size of a

2    particular agency or a part thereof, and we're going to engage

3    in a reduction in force.

4          Those are the three ways that I have been able to identify

5    that the government can terminate probationary employees.  Am I

6    missing the fourth or fifth category?

7              MR. HAMILTON:  I don't have anything to supplement

8    that with right now.  There may be additional provisions of the

9    Title 5 that allow for termination of employees.

10             THE COURT:  So the government contends in this case

11   that, well, this was not a reduction in force.  You don't know

12   how many employees were terminated.  There's evidence in this

13   record suggesting that it was in the thousands, perhaps in the

14   tens of thousands of probationary employees who were dismissed.

15   So it's not the third option in your view; it wasn't a RIF.

16   What was it?

17             MR. HAMILTON:  It was the termination of probationary

18   employees.  And plaintiffs have put forward 19 documents under

19   seal right now that contain the different agencies terminations

20   to separate probationary employees.  Those documents vary in

21   different ways.  They don't all follow a single template.  And

22   all of them are consistent with the OPM regulations for the

23   separation of an individual who is still in the probationary

24   period.

25          The probationary employee bears the burden of establishing

1   that the Federal Government should extend to that person an

2   offer of employment at the end of the probationary term.  And

3   the standard is pretty simple in the OPM regulation.  It says

4   that the agency has a duty to determine the fitness of the

5   employee.  And I think there are a number of different ways to

6   measure that.

7          THE COURT:  So let's take an employee that got their

8   performance appraisal a couple weeks ago and it was exemplary.

9   And yet, nonetheless, they receive a notice terminating them

10  during the probationary period.  I take it that that wasn't

11  because something was discovered that was deceptive about their

12  application, so we're really just in that second pathway, which

13  is their performance is not satisfactory; they're not fully

14  successful in the job.

15         MR. HAMILTON:  Well, a few points, Your Honor.  One --

16  one point would be that one evaluator's evaluation of an

17  individual employee might not be the same evaluation that

18  someone else in the agency would give to that same employee.

19         THE COURT:  But at least under your hypothetical, they

20  were re-evaluated.  So all of these people, whether it's 50

21  people, you've conceded it's probably not less than 50, the

22  suggestion of the plaintiff is it's in tens of thousands; they

23  were re-evaluated, each of them.  They were re-evaluated and

24  their performance was found to be substandard, inefficient, not

25  fully successful and that's why they were terminated.

1          MR. HAMILTON:  Well, we only have documents from 19

2     employees in the record.  And what those documents say is that

3     the agency made a determination under the Probationary Employee

4     Regulations that OPM has put out, that they were not fit for

5     employment.  And --

6          THE COURT:  Can the Court make a determination as a

7     finding of fact in support of a request for a TRO that the

8     notion that tens of thousands of probationary employees were

9     evaluated or re-evaluated, their performance was found to be

10    substandard and were terminated on that basis?  Can the Court,

11    just from the bald facts, conclude that that's just implausible?

12         MR. HAMILTON:  No, Your Honor.  To start, we don't

13    have facts about the number of employees at issue, which were

14    involved with the agencies that our defendants.  Plaintiffs are

15    generally relying on newspaper articles and things like that for

16    their assertions about the quantity of the employees at issue.

17         And instead, the documents that are in the record for

18    actual Federal Government employees who were terminated, shows

19    that there was ant RIF and that these agencies made judgments

20    that the probationers were not fit for Federal Government

21    service.

22         And the notice requirement that the OPM regulations state

23    is -- is it doesn't require much.  I mean, it says that the

24    employees have to be notified that they were terminated.  And

25    that there has to be a statement as to the conclusion of the

 1  termination.

 2          THE COURT:  Related to their performance.

 3          MR. HAMILTON:  Right.  It has to be.

 4          THE COURT:  So what do I make of statements like this?

 5  The purpose of this notice is to notify you of the decision to

 6  terminate your employment with the U.S. Department of Housing

 7  and Urban Development, HUD, during your trial period in order to

 8  promote the efficiency of the federal service in accordance with

 9  the priorities of the administration.

10      It doesn't sound like that has anything to do with this

11  employee's performance.

12          MR. HAMILTON:  Well, there's a note about efficiency

13  there and that -- not sure about this specific employee, but

14  that could reference the employee's efficiency.  But I would

15  also note that the government's vision for a particular role is

16  necessarily a part of any sort of fitness determination that an

17  employee in the agency is going to make about a probationer.

18  It's not possible to determine the fitness of an employee

19  without asking fit for what, which would be the role, and

20  whatever the federal government's expectations are for the role

21  in question.

22          THE COURT:  Well, wouldn't the most logical approach

23  to all of this be that if there is a broad determination like

24  that, which is that a whole category of employees are no longer

25  valuable to the government because of new objectives, new

1   directions, a new course, et cetera, then the most logical

2   interpretation of that situation is that we are terminating

3   employees as a group in order to achieve a broader objective?

4   Isn't that what the RIF process is obviously designed to

5   address?  And that really what we're trying to do is cram a

6   square peg into a round hole in trying to convince this court

7   that oh, no, all of these people were reviewed for their

8   specific capacities and their personal performance in their

9   jobs, and on the basis of their less than satisfactory or fully

10  successful performance, they were terminated.

11          MR. HAMILTON:  Well, Your Honor, two important

12  distinctions about the termination of probationary employees

13  from RIF.  One, the RIF is not going to involve a judgment about

14  an individual's performance on the job.

15          THE COURT:  Exactly.  And isn't that exactly what the

16  agencies have done in this case?  They've decided that they're

17  going to go in a different direction.  There was an election.

18  There's a new administration.  There's a whole new perspective

19  at the top of the Executive Branch of Government in terms of how

20  government should operate, how many people should work for the

21  government, the work that the government should do across the

22  board.

23      And accordingly, in alignment with that realignment, they

24  decided to shift thousands of persons out of federal employment.

25  Which may well be their prerogative, that's not an issue that's

 1    before the court.  This case isn't about whether or not the
 2    government can terminate people, it's about if they decide to
 3    terminate people how they must do it.

 4         Move fast and break things.  Move fast, fine.  Break
 5    things?  If that involves breaking the law, then that becomes
 6    problematic.  Isn't that really at the heart of what's going on
 7    here?

 8              MR. HAMILTON:  I don't think so, Your Honor.  The
 9    guidance document that OPM put out noted the Agency's authority.
10    Well, really their obligation to be constantly assessing
11    individuals who were in their probationary period for their
12    fitness for Federal Government service.  And that is what the
13    documents that plaintiffs have submitted show that the agencies
14    did here.

15         The President signed an executive order directing some
16    agencies to start making plans for a reduction in force, but
17    that -- you know, the timeline for that doesn't match up with
18    what happened here, where OPM put out a guidance document on the
19    first day of the new administration.  And the reductions in
20    force were slated to happen later in time.

21         Another important distinction between a reduction in force
22    and the termination of a probationary employee is that with a
23    reduction in force a role is eliminated, but with the
24    termination of a probationer, it remains a possibility that that
25    role can be filled.  And there is a hiring freeze right now, but

1    there are exceptions to the hiring freeze.  And so agencies that

2    are not covered by the hiring freeze may be in a position to

3    fill roles from individuals who were separated as probationers.

4    And right now that hiring freeze is slated to end next month.

5    So there may be well be additional agencies that are able to

6    fill roles that were vacated by terminated probationers.  That

7    isn't something that would happen if there were a RIF.

8          Another RIF authority I want to cite is 5 CFR 351.204,

9    which says that RIF procedures take effect when the agency

10   determines that a reduction in force is necessary.  That hasn't

11   happened here.  The documents that the plaintiffs have submitted

12   instead are termination documents of probationary employees

13   during their probationary terms, consistent with the significant

14   discretion that Congress has allowed Federal Government

15   departments and agencies to exercise during this probationary

16   term of Federal Government employees.

17         Finally, Your Honor, I just note that plaintiffs have not

18   made the required showing on the remaining elements of a

19   temporary restraining order, which are irreparable harm,

20   especially true for the you nope the financial injuries that

21   they are alleging.  Really our arguments here are really similar

22   to our standing arguments.

23         And a very important consideration in weighing the balance

24   of the equities and the public interest is the enormous

25   destruction that would happen for the Federal Government if a

 1 | temporary restraining order of the sort that plaintiffs request

 2 | was issued.

 3 |        Plaintiffs are claiming that --

 4 |        THE COURT:  Hold on.  What's the disruption?  Is the

 5 | disruption the continuation of the people in their jobs; jobs

 6 | they were in as recently as a few weeks ago?  Or is the

 7 | disruption their sudden terminations from those jobs?  I mean,

 8 | the job of the court in the context of the TRO is if found -- if

 9 | the other bases are satisfied, is to restore the status quo.

10 | What's the -- isn't the status quo the way things were before

11 | the action that arguably was unlawful was taken?  You following

12 | me?

13 |        MR. HAMILTON:  I think so, Your Honor.  But also it is

14 | a temporary restraining order, not a preliminary injunction.

15 | And so to the extent plaintiffs are trying to restore people

16 | into Federal Government service, that isn't a restraint on any

17 | of the defendants, instead that looks much more like a mandatory

18 | injunction and not -- not a restraint.

19 |        On the balance of the equities though, and the public

20 | interest, the effect on the government is relevant.  The effect

21 | on the government is so much more substantial than the effect on

22 | the plaintiffs.  The defendants would presumably be required to

23 | pay salaries out to these employees, which would far exceed

24 | whatever injuries the plaintiffs can identify.  And the Federal

25 | Government, it seems would also be required to employ people who

1    it has determine ready not fit for Federal Government service.

2           THE COURT:  But if the Court were to find as a matter

3    of fact that what actually happened here was nothing about their

4    performance and their fitness but was a RIF, it's just that you

5    didn't execute the RIF properly, according to law, isn't the

6    status quo to have the federal employees remain in employment

7    until you redo the RIF, which seems to be your client's

8    inclination, and, you know, execute properly; give all the

9    notices, allow the states to get ready to face the burden of

10   discharged employees, et cetera.

11          MR. HAMILTON:  I'm not so sure that the status quo is

12   measured all the way back to January 20th, or it wouldn't be at

13   the time that the Court is entering its order.

14          THE COURT:  But if the Court finds that the Government

15   attempted a RIF, but was unsuccessful in doing so; you never

16   actually properly executed the RIF.  People effectively haven't

17   been lawfully terminated, at least on a temporary basis, that's

18   the conclusion.

19       Why isn't the imperative to, you know, restore the order

20   and the state of things that existed before the Government's

21   attempted mass discharge that was apparently unlawful?  Why

22   would we allow the new circumstance, not the status quo, to

23   persist until ultimate resolution of the case?

24          MR. HAMILTON:  Because this is just for the purpose of

25   at most preserving the status quo, as it stands today.  This is

1   a 14-day remedy on short briefing, short time.  And it wouldn't

2   be consistent with the restraint order in the temporary

3   restraining order for there to be this extraordinary remedy of

4   compelling the defendants to take back into federal service a

5   substantial number of individuals who it has determined are not

6   fit for government service.

7        You know, looking forward --

8             THE COURT:  But if this was an was an attempt at a

9   RIF, but the RIF was not successfully accomplished, were the

10  people actually ever discharged from federal service?

11            MR. HAMILTON:  They were.  I mean plaintiffs have

12  submitted evidence of 19 individuals who received statements

13  that they were being terminated.  Some of them, I would note,

14  allowed a period of time during which those individuals would

15  continue to draw down salaries after receiving their termination

16  notice.  One allowed three weeks or something like that.

17       So, again, I think if --

18            THE COURT:  You're saying treat those discharge

19  letters as operable, even if they were unlawful.

20            MR. HAMILTON:  Well, my arguments -- I mean, if we're

21  just talking about these elements, you know, of well, I suppose

22  really what is the status quo.  I took Your Honor's question to

23  be about where is the status quo.

24            THE COURT:  That is the -- that is the question.

25            MR. HAMILTON:  So if we're talking about kind of where

 1  the status quo is, it's where we are right now.  And ordering

 2  defendants to take back into the Federal Government tens of

 3  thousands of employees is not preserving the status quo, it's

 4  going back to the status quo that existed at a time that

 5  plaintiffs have chosen, which is January 20th of 2025.  And you

 6  know, also a significant time ago a number of documents that

 7  plaintiffs have submitted don't even involve very recent

 8  terminations.  They're terminations about a month ago.

 9          THE COURT:  You keep saying take back.  You may have

10  removed them from their offices, you may have stopped paying

11  them, you may have sent them a letter that at least under this

12  hypothetical was inoperable because it was unlawful.  I mean, it

13  starts to get sort of metaphysical.  But what is their status?

14  If that's where the court concludes things likely are, legally,

15  then they're still federal employees.

16          MR. HAMILTON:  That isn't -- that isn't how I

17  understand the Federal Government to be treating them though.  I

18  mean, I'm only going off of what the plaintiffs have put in the

19  record which is these 19 letters, and those say that individuals

20  are being separated from the Federal Government.  And so to

21  order them to -- or rather order defendants to treat them as

22  though those letters had not happened would be changing not

23  preserving the status quo right now.

24          THE COURT:  Well, it's all how you look at it.

25      Go ahead.  What else you got.

 1              MR. HAMILTON:  If Your Honor has no further questions,

 2    we ask the Court would deny plaintiff's motion for a temporary

 3    restraining order.

 4              THE COURT:  Thank you, Mr. Hamilton.

 5              MR. HAMILTON:  Thank you, Your Honor.

 6              THE COURT:  I appreciate your advocacy.

 7         Ms. Williamson, any rebuttal from movant?

 8              MS. WILLIAMSON:  Yes, Your Honor.  I have just four

 9    points and I'll try to be quick.

10         Point number one, Your Honor, is that my friends on the

11    other side seem to be taking issue with the fact that the

12    plaintiff states have very little information at the moment.

13    They've criticized the presentation to say that we haven't

14    provided enough declarations from defendant agencies.  The

15    states are at an information disadvantage as a result of the

16    defendant's failure to notice.

17         In this case, we relied not only on those individual

18    declarations, which are illustrative not exclusive, but public

19    reporting, the OPM memo, the Executive Order, a variety of other

20    indicators that RIFs occurred here.

21         Your Honor made the point about the terms under which a

22    probationary employee can be fired.  That's -- Your Honor is

23    correct, that there are only three routes.  And I just wanted to

24    also point out that the law requires an honest assessment after

25    a fair trial.  So this isn't just that someone -- someone in the

 1   government can claim to have fired someone just because they
 2   want to.  It has to be an honest assessment after fair trial.
 3        My third point, Your Honor, is on what the issue of status
 4   quo is.  We cited this in our filing and I would point the Court
 5   to League of Women Voters of North Carolina verse North
 6   Carolina, a Fourth Circuit decision from 2014.  And it says that
 7   the status quo to be preserved by injunctive relief is the
 8   quote, "Last uncontested status between the parties which
 9   proceeded the controversy."
10        So in this case, that would be before the unlawful RIFs
11   that the defendants conducted.
12        Finally, Your Honor, I just want to very briefly touch on
13   Thunder Basin.  There isn't a route for relief if this Court is
14   not that route.  There is no administrative body that could hear
15   the claims of the states here.  Thunder Basin largely focuses,
16   though not exclusively, on the idea of there being a forum to
17   hear a complaint.  And if defendants' arguments are accepted,
18   the states have no route to even seek any form of relief for the
19   injuries they've suffered here.
20        Your Honor, we would ask if the Court has no more questions
21   that the Court enter a temporary restraining order here.
22        Thank you.
23             THE COURT:  Thank you, counsel.  I appreciate the
24   submissions.
25        The Court's not going to rule from the bench.  The matter

1   is complex and there are a number of issues, some quite subtle,

2   that need to be addressed, and a written ruling, a written

3   memorandum and order is the more appropriate vehicle by which

4   the Court will address the matters that are before it.  That

5   said, the Court expects to rule promptly.

6        Counsel are excused.  Court's in recess.

7            (The proceedings concluded at 10:56 a.m.)

8

9

10

11

12

13

14            CERTIFICATE OF OFFICIAL REPORTER

15        I, Kassandra L. McPherson, Registered Professional
    Reporter, in and for the United States District Court for the
16  District of Maryland, do hereby certify, pursuant to 28 U.S.C. §
    753, that the foregoing is a true and correct transcript of the
17  stenographically-reported proceedings held in the above-entitled
    matter and that the transcript page format is in conformance
18  with the regulations of the Judicial Conference of the United
    States.
19
            Dated this 13th day of March 2025.
20
            -S-
21            _____
            KASSANDRA L. MCPHERSON, RPR
22            FEDERAL OFFICIAL COURT REPORTER

23

24

25

# 1

**1** [1] - 3:10
**10:56** [1] - 49:7
**12** [2] - 1:7, 14:12
**13th** [2] - 6:25, 49:19
**14-day** [1] - 45:1
**14th** [1] - 6:25
**18** [1] - 14:12
**19** [7] - 3:6, 20:19, 28:24, 36:18, 38:1, 45:12, 46:19
**1A** [1] - 1:8

# 2

**20,000** [1] - 7:13
**200** [1] - 11:18
**2014** [2] - 13:13, 48:6
**2025** [4] - 1:7, 12:18, 46:5, 49:19
**20th** [2] - 44:12, 46:5
**21** [2] - 6:16, 29:23
**21,000** [1] - 6:5
**21st** [1] - 11:17
**23,000** [1] - 6:5
**24,000** [1] - 6:5
**28** [1] - 49:16

# 3

**3502** [2] - 5:23, 9:7
**351.204** [1] - 42:8

# 4

**41** [3] - 3:7, 20:24, 28:21

# 5

**5** [4] - 5:22, 9:7, 36:9, 42:8
**50** [4] - 21:6, 21:8, 37:20, 37:21

# 6

**60** [4] - 12:15, 13:22, 28:3, 34:9

# 7

**753** [1] - 49:16

# 8

**813** [1] - 11:15

# 9

**9:37** [1] - 2:1

# A,

**a.m.** [2] - 2:1, 49:7
**AA** [1] - 29:3
**abilities** [1] - 35:5
**ability** [5] - 14:20, 16:24, 16:25, 19:18
**able** [4] - 21:18, 23:5, 36:4, 42:5
**above-entitled** [1] - 49:17
**absence** [1] - 26:5
**absent** [1] - 10:7
**absolutely** [1] - 8:22
**accepted** [3] - 4:12, 35:1, 48:17
**accomplished** [1] - 45:9
**accordance** [1] - 39:8
**according** [3] - 13:18, 33:8, 44:5
**accordingly** [2] - 35:25, 40:23
**account** [1] - 14:8
**accumulated** [1] - 4:15
**achieve** [1] - 40:3
**act** [1] - 15:18
**Act** [6] - 3:13, 13:11, 13:12, 13:13, 30:2
**acted** [1] - 13:10
**action** [8] - 3:16, 3:17, 15:1, 16:8, 28:9, 28:10, 29:11, 43:11
**actions** [3] - 3:19, 29:13, 29:18
**activities** [1] - 23:6
**activity** [2] - 17:15
**acts** [1] - 29:18

**actual** [4] - 7:25, 8:17, 32:19, 38:18
**add** [1] - 27:22
**additional** [5] - 11:3, 15:17, 27:11, 36:8, 42:5
**address** [7] - 1:14, 3:23, 20:4, 26:24, 27:19, 40:5, 49:4
**Address** [1] - 1:17
**addressed** [2] - 14:19, 49:2
**adequately** [1] - 6:8
**adjudication** [1] - 29:25
**administration** [3] - 39:9, 40:18, 41:19
**administrative** [4] - 17:1, 24:24, 25:1, 48:14
**Administrative** [1] - 3:13
**admit** [1] - 29:9
**admitted** [1] - 29:4
**adversarial** [1] - 4:6
**advocacy** [1] - 47:6
**affects** [2] - 17:14, 33:7
**affidavit** [1] - 26:7
**affidavits** [1] - 5:2
**affirmed** [1] - 19:5
**agencies** [23] - 3:8, 3:9, 5:24, 6:16, 10:1, 12:11, 12:13, 19:23, 28:21, 29:2, 29:7, 29:23, 36:19, 38:14, 38:19, 40:16, 41:13, 41:16, 42:1, 42:5, 42:15, 47:14
**agency** [15] - 9:10, 11:2, 14:2, 14:7, 28:21, 29:11, 29:13, 29:18, 29:21, 36:2, 37:4, 37:18, 38:3, 39:17, 42:9
**Agency's** [1] -

41:9
**ago** [4] - 37:8, 43:6, 46:6, 46:8
**agree** [1] - 34:23
**Agriculture** [1] - 2:5
**ahead** [4] - 22:9, 22:15, 29:20, 46:25
**aided** [1] - 1:25
**al** [3] - 1:3, 1:5, 2:4
**alignment** [1] - 40:23
**allegations** [2] - 19:20, 19:22
**allege** [2] - 3:12, 3:18
**alleging** [1] - 42:21
**allow** [6] - 17:20, 23:9, 24:2, 36:9, 44:9, 44:22
**allowed** [4] - 19:3, 42:14, 45:14, 45:16
**allows** [1] - 28:1
**alright** [1] - 20:16
**amended** [2] - 13:12, 29:21
**analogous** [1] - 18:22
**announces** [1] - 29:21
**announcing** [1] - 26:17
**anonymize** [1] - 5:8
**answer** [3] - 7:19, 7:20, 30:18
**ant** [1] - 38:19
**Anthony** [1] - 2:13
**anticipation** [1] - 4:13
**application** [1] - 37:12
**applications** [1] - 11:21
**applied** [1] - 11:15
**apply** [4] - 15:2, 19:3, 31:5, 32:8
**applying** [1] - 17:11
**appraisal** [1] - 37:8
**appreciate** [2] - 47:6, 48:23
**approach** [1] - 39:22

**appropriate** [2] - 3:25, 49:3
**areas** [2] - 13:25, 14:8
**arguably** [1] - 43:11
**arguing** [1] - 20:15
**argument** [7] - 4:23, 9:13, 15:4, 31:1, 32:23, 32:24, 33:17
**arguments** [8] - 6:14, 16:13, 27:3, 34:15, 42:21, 42:22, 45:20, 48:17
**Article** [2] - 32:25, 33:8
**articles** [1] - 38:15
**ascertain** [1] - 5:6
**assert** [2] - 8:13, 8:14
**assertions** [1] - 38:16
**assessing** [2] - 23:15, 41:10
**assessment** [2] - 47:24, 48:2
**Assistant** [1] - 2:25
**assisting** [1] - 24:2
**associated** [1] - 15:11
**assume** [1] - 27:1
**assumes** [1] - 27:23
**assumption** [1] - 16:5
**attempt** [1] - 45:8
**attempted** [2] - 44:15, 44:21
**attention** [1] - 7:11
**attested** [4] - 7:8, 7:9, 10:21, 14:12
**Attorney** [2] - 2:12, 2:25
**authority** [3] - 35:24, 41:9, 42:8
**authorized** [1] - 35:6
**avenue** [2] - 35:10, 35:15
**avoid** [1] - 13:15

# B

**balance** [2] - 42:23, 43:19
**bald** [1] - 38:11
**Baltimore** [1] - 1:8
**barred** [1] - 32:12
**based** [2] - 8:15, 14:3
**bases** [1] - 43:9
**Basin** [8] - 30:22, 31:2, 31:4, 32:5, 32:8, 32:22, 48:13, 48:15
**basis** [7] - 10:10, 12:23, 32:11, 35:13, 38:10, 40:9, 44:17
**bear** [1] - 19:4
**bears** [1] - 36:25
**becomes** [1] - 41:5
**befall** [1] - 10:6
**BEFORE** [1] - 1:10
**begin** [1] - 9:19
**Behalf** [2] - 1:12, 1:15
**behalf** [1] - 2:11
**behavior** [1] - 7:8
**behind** [1] - 13:13
**bench** [1] - 48:25
**benefits** [4] - 10:5, 11:16, 14:21, 15:3
**better** [2] - 4:6, 34:9
**between** [2] - 41:21, 48:8
**beyond** [1] - 3:20
**Biden** [1] - 18:9
**bit** [1] - 7:11
**board** [1] - 40:22
**Board** [4] - 24:12, 30:5, 30:7, 33:5
**bodies** [1] - 32:7
**body** [1] - 48:14
**bond** [2] - 20:4, 20:6
**bonds** [2] - 20:7, 20:8
**bottom** [1] - 23:12
**bottom-line** [1] - 23:12
**bound** [2] - 32:10, 34:8
**Branch** [3] - 3:1, 3:4, 40:19
**branch** [1] - 33:11

**breadth** [1] - 28:24
**break** [2] - 41:4
**breaking** [1] - 41:5
**BREDAR** [1] - 1:10
**brief** [5] - 4:13, 4:14, 8:1, 12:2, 32:12
**briefing** [2] - 20:4, 45:1
**briefly** [3] - 16:13, 20:3, 48:12
**bring** [3] - 25:20, 32:24, 33:7
**broad** [1] - 39:23
**broader** [1] - 40:3
**broadly** [1] - 35:19
**brought** [1] - 15:5
**Brown** [2] - 2:13, 2:15
**burden** [7] - 21:1, 24:24, 25:1, 28:4, 33:25, 36:25, 44:9
**burdens** [1] - 25:7

**C**

**cabinet** [1] - 3:8
**California** [1] - 29:15
**cannot** [1] - 32:24
**capacities** [1] - 40:8
**capacity** [2] - 15:23, 26:1
**care** [1] - 5:12
**carefully** [2] - 4:14, 5:6
**Carolina** [2] - 48:5, 48:6
**Case** [1] - 2:5
**CASE** [1] - 1:4
**case** [44] - 2:3, 2:6, 3:25, 5:18, 5:22, 9:20, 10:11, 10:14, 10:19, 12:17, 12:22, 17:7, 17:9, 17:10, 17:11, 17:12, 17:22, 17:24, 18:18, 18:23, 19:13, 19:15, 19:21, 20:2, 20:25, 22:12, 23:14, 28:12,

28:18, 28:19, 29:20, 32:2, 32:17, 33:18, 33:22, 34:1, 36:10, 40:16, 41:1, 44:23, 47:17, 48:10
**cases** [1] - 18:8
**categories** [1] - 14:19
**category** [2] - 36:6, 39:24
**Centers** [1] - 12:9
**central** [2] - 9:20, 10:8
**certain** [10] - 4:5, 5:2, 9:21, 9:24, 13:23, 14:3, 18:13, 19:4, 27:13, 32:11
**certainly** [1] - 14:13
**CERTIFICATE** [1] - 49:14
**certify** [1] - 49:16
**cetera** [4] - 10:16, 26:14, 40:1, 44:10
**CFR** [1] - 42:8
**challenge** [3] - 3:11, 3:15, 24:5
**changing** [1] - 46:22
**channeled** [1] - 32:6
**chaotic** [1] - 28:2
**CHARLES** [1] - 1:14
**Charles** [1] - 2:20
**checkered** [1] - 12:22
**chiefly** [1] - 17:5
**child** [2] - 17:18, 17:19
**choosing** [1] - 26:22
**chosen** [1] - 46:5
**Christopher** [1] - 3:3
**CHRISTOPHER** [1] - 1:17
**Circuit** [2] - 18:24, 48:6
**circuit** [1] - 32:3
**circumstance** [1] - 44:22
**circumstances** [3] - 4:5, 8:9, 10:13
**cite** [1] - 42:8

**cited** [1] - 48:4
**cites** [1] - 17:5
**citizens** [1] - 26:2
**CIVIL** [1] - 1:4
**Civil** [1] - 30:2
**civil** [2] - 32:7, 35:1
**claim** [1] - 48:1
**claiming** [1] - 43:3
**claims** [4] - 15:5, 32:6, 32:9, 48:15
**clarify** [1] - 3:15
**clear** [6] - 6:7, 7:22, 9:8, 10:12, 19:22, 24:18
**clearly** [1] - 26:12
**clerk** [1] - 2:3
**CLERK** [2] - 2:4, 2:23
**client** [1] - 20:21
**client's** [1] - 44:7
**clients** [2] - 20:22, 20:24
**close** [1] - 23:17
**CNS** [1] - 7:8
**cognizable** [4] - 12:23, 17:16, 18:1, 30:17
**Columbia** [4] - 2:18, 2:21, 3:7, 20:19
**coming** [1] - 7:9
**comments** [2] - 26:24, 28:18
**Commerce** [1] - 29:8
**common** [2] - 20:7, 23:18
**compelling** [3] - 33:10, 45:4
**compete** [1] - 14:9
**competing** [1] - 14:8
**competitive** [1] - 13:24
**complaint** [7] - 3:10, 3:20, 24:8, 24:9, 29:9, 35:15, 48:17
**complaints** [1] - 29:21
**completely** [2] - 28:2, 31:23
**complex** [1] - 49:1
**complied** [1] - 25:20

**comply** [1] - 5:19
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**concede** [3] - 22:17, 27:2, 31:1
**conceded** [1] - 37:21
**conceivably** [1] - 29:11
**conceptualized** [1] - 29:16
**concerned** [1] - 25:19
**concerns** [1] - 5:18
**conclude** [2] - 22:16, 38:11
**concluded** [1] - 49:7
**concludes** [1] - 46:14
**conclusion** [3] - 5:5, 38:25, 44:18
**concrete** [2] - 9:18, 10:13
**concreteness** [1] - 23:16
**conduct** [9] - 6:4, 8:10, 10:23, 11:1, 11:2, 14:2, 14:18, 26:21, 27:21
**conducted** [2] - 13:18, 48:11
**conducting** [1] - 5:21
**confer** [1] - 23:13
**Conference** [1] - 49:18
**conformance** [1] - 49:17
**Congress** [9] - 5:19, 9:24, 13:7, 13:9, 23:2, 25:5, 33:2, 33:12, 42:14
**connection** [2] - 24:6, 28:9
**consequence** [1] - 31:18
**consequences** [4] - 23:7, 23:10, 24:14, 25:7
**consider** [2] - 4:11, 12:17
**consideration** [2]

- 7:10, 42:23
**considered** [1] - 22:14
**consistent** [3] - 36:22, 42:13, 45:2
**constantly** [1] - 41:10
**construed** [1] - 31:13
**consume** [1] - 13:24
**contain** [1] - 36:19
**contemplates** [1] - 26:20
**contend** [2] - 6:4, 13:6
**contends** [1] - 36:10
**content** [1] - 5:2
**contention** [1] - 33:21
**contest** [1] - 18:18
**context** [7] - 17:7, 17:12, 17:13, 17:23, 17:24, 28:11, 43:8
**continuation** [1] - 43:5
**continue** [5] - 9:5, 13:4, 14:14, 16:10, 45:15
**continued** [1] - 8:12
**contract** [3] - 18:13, 18:15
**Control** [1] - 12:9
**controversy** [1] - 48:9
**conveyed** [1] - 26:12
**convince** [1] - 40:6
**core** [1] - 33:21
**correct** [2] - 47:23, 49:16
**correction** [1] - 35:20
**correctly** [2] - 27:16, 27:18
**cost** [1] - 19:5
**couched** [1] - 33:17
**count** [1] - 3:7
**counties** [1] -

26:14
**country** [1] - 10:1
**couple** [2] - 12:20, 37:8
**course** [8] - 4:1, 5:9, 6:16, 7:17, 11:19, 30:10, 35:20, 40:1
**COURT** [98] - 1:1, 2:3, 2:14, 2:19, 2:22, 3:2, 3:5, 4:20, 4:22, 5:14, 6:2, 6:10, 7:11, 7:19, 7:21, 8:20, 9:5, 9:15, 10:10, 11:6, 12:14, 12:22, 13:6, 13:17, 14:14, 15:4, 15:11, 15:21, 16:1, 16:3, 16:10, 16:17, 20:7, 20:10, 20:14, 20:18, 21:3, 21:6, 21:8, 21:11, 21:13, 21:15, 21:17, 21:20, 21:22, 21:25, 22:4, 22:6, 22:8, 22:15, 22:21, 23:2, 23:7, 23:22, 24:8, 25:4, 25:24, 26:7, 27:1, 27:14, 27:23, 28:13, 28:16, 30:6, 30:10, 30:14, 30:17, 30:24, 31:11, 31:16, 31:22, 32:2, 32:8, 33:15, 33:17, 34:6, 34:16, 34:23, 36:10, 37:7, 37:19, 38:6, 39:2, 39:4, 39:22, 40:15, 43:4, 44:2, 44:14, 45:8, 45:18, 45:24, 46:9, 46:24, 47:4, 47:6, 48:23, 49:22
**court** [22] - 3:21, 15:1, 15:23, 16:15, 18:16, 19:14, 19:15, 19:16, 19:18, 19:25, 20:5,

22:16, 30:1, 30:22, 30:24, 31:23, 32:19, 40:6, 41:1, 43:8, 46:14
**Court** [36] - 4:11, 4:14, 5:11, 14:25, 16:17, 16:20, 17:11, 17:20, 17:22, 18:7, 18:10, 18:23, 18:24, 19:5, 19:12, 22:14, 27:7, 28:19, 29:15, 30:19, 31:20, 32:25, 33:8, 38:6, 38:10, 44:2, 44:13, 44:14, 47:2, 48:4, 48:13, 48:20, 48:21, 49:4, 49:5, 49:15
**court's** [1] - 49:6
**Court's** [3] - 4:12, 4:25, 48:25
**Courtroom** [1] - 1:8
**courts** [3] - 24:11, 30:1, 33:13
**covered** [1] - 42:2
**crafting** [1] - 22:22
**cram** [1] - 40:5
**created** [2] - 30:2, 33:2
**creating** [1] - 13:14
**credulity** [1] - 9:2
**criminal** [2] - 17:12, 17:13
**crisply** [1] - 26:12
**criteria** [2] - 8:17, 31:5
**critical** [1] - 24:16
**criticized** [1] - 47:13
**crystal** [1] - 6:7

### D

**Dated** [1] - 49:19
**days** [8] - 3:22, 3:25, 9:1, 12:15, 14:13, 28:3, 34:9, 34:24
**deceptive** [2] - 35:16, 37:11
**decide** [1] - 41:2

**decided** [7] - 17:23, 18:7, 18:8, 35:18, 35:23, 40:16, 40:24
**decision** [11] - 17:10, 17:11, 18:8, 18:9, 18:24, 19:5, 19:11, 24:5, 35:7, 39:5, 48:6
**decisions** [2] - 18:20, 19:7
**declaration** [6] - 7:7, 10:20, 10:24, 11:14, 15:16, 29:4
**declarations** [7] - 7:2, 8:23, 10:18, 28:24, 29:1, 47:14, 47:18
**dedicate** [1] - 11:3
**defendant** [6] - 2:23, 5:24, 19:17, 19:20, 19:23, 47:14
**Defendant's** [1] - 14:18
**defendant's** [2] - 5:19, 47:16
**Defendants** [2] - 1:6, 1:15
**defendants** [22] - 3:1, 3:4, 3:7, 4:12, 9:10, 10:3, 14:16, 19:13, 19:14, 27:8, 28:20, 28:21, 29:12, 29:23, 38:14, 43:17, 43:22, 45:4, 46:2, 46:21, 48:11
**defendants'** [1] - 48:17
**Defense** [2] - 29:9, 29:12
**deficient** [2] - 6:6, 8:21
**demonstrate** [2] - 8:11, 18:17
**deny** [1] - 47:2
**Department** [6] - 2:5, 3:1, 7:3, 29:9, 29:11, 39:6
**department** [2] - 10:21, 35:21
**departments** [1] -

42:15
**deploy** [1] - 26:15
**deploying** [1] - 26:11
**Deputy** [1] - 2:25
**derived** [1] - 19:1
**described** [1] - 19:19
**designed** [2] - 29:25, 40:4
**desire** [1] - 6:20
**destruction** [1] - 42:25
**detail** [1] - 4:24
**detailed** [1] - 3:9
**determination** [5] - 28:11, 38:3, 38:6, 39:16, 39:23
**determinations** [1] - 7:6
**determine** [5] - 8:18, 32:5, 37:4, 39:18, 44:1
**determined** [1] - 45:5
**determines** [1] - 42:10
**Development** [1] - 39:7
**development** [1] - 11:4
**devote** [1] - 17:2
**devoted** [1] - 15:15
**DHS** [1] - 29:8
**difference** [1] - 12:16
**different** [10] - 14:9, 25:9, 31:24, 35:18, 35:22, 35:25, 36:19, 36:21, 37:5, 40:17
**DiMartini** [1] - 7:3
**diminish** [3] - 35:20, 36:1
**direct** [1] - 18:4
**directed** [1] - 29:16
**directing** [1] - 41:15
**direction** [3] - 35:19, 35:25, 40:17
**directions** [1] - 40:1
**directly** [1] - 26:12
**disadvantage** [1]

- 47:15
**disagree** [1] - 32:24
**discharge** [2] - 44:21, 45:18
**discharged** [4] - 6:8, 8:20, 44:10, 45:10
**discovered** [1] - 37:11
**discretion** [2] - 34:22, 42:14
**discussed** [3] - 9:8, 12:2, 14:17
**discussion** [1] - 16:6
**Disease** [1] - 12:9
**dismissed** [1] - 36:14
**dispute** [1] - 29:25
**disputes** [1] - 30:3
**disputing** [1] - 24:1
**disqualifier** [1] - 35:5
**disruption** [3] - 43:4, 43:5, 43:7
**distinction** [1] - 41:21
**distinctions** [1] - 40:12
**distinguishable** [2] - 19:12, 31:15
**District** [8] - 2:17, 2:20, 3:6, 20:19, 29:15, 30:19, 49:15, 49:16
**DISTRICT** [2] - 1:1, 1:1
**diverting** [1] - 26:8
**DIVISION** [1] - 1:2
**docket** [1] - 5:11
**docketed** [1] - 3:10
**Doctrine** [1] - 32:5
**document** [3] - 5:10, 41:9, 41:18
**documents** [10] - 5:9, 36:18, 36:20, 38:1, 38:2, 38:17, 41:13, 42:11, 42:12, 46:6
**DOD** [1] - 29:8

- 47:15
**done** [6] - 5:14, 8:14, 13:18, 31:17, 40:16
**DOPA** [1] - 18:22
**doubt** [2] - 5:23, 28:8
**down** [3] - 4:25, 15:20, 45:15
**downstream** [7] - 22:12, 23:20, 24:4, 27:5, 28:6, 28:9, 28:10
**dozens** [1] - 28:20
**draw** [1] - 45:15
**driver's** [1] - 19:2
**during** [7] - 4:18, 8:10, 37:10, 39:7, 42:13, 42:15, 45:14
**duty** [1] - 37:4

### E

**early** [4] - 3:24, 13:15, 20:25, 24:17
**earners** [1] - 13:4
**earning** [1] - 13:5
**ECF** [1] - 3:10
**effect** [6] - 24:4, 27:9, 42:9, 43:20, 43:21
**effective** [1] - 10:23
**effectively** [6] - 6:20, 7:1, 7:9, 8:7, 12:5, 44:16
**effects** [4] - 22:13, 23:21, 27:5, 28:7
**efficiency** [3] - 39:8, 39:12, 39:14
**effort** [1] - 11:8
**elaborate** [1] - 10:11
**election** [2] - 35:22, 40:17
**element** [1] - 28:13
**elements** [3] - 25:12, 42:18, 45:21
**eliminated** [1] - 41:23
**emergency** [3] - 5:4, 32:11, 34:7
**employ** [2] - 33:11, 43:25
**employee** [22] -

6:7, 7:8, 8:9, 8:20, 22:13, 27:6, 28:7, 29:10, 29:17, 33:3, 35:10, 35:13, 36:25, 37:5, 37:7, 37:17, 37:18, 39:13, 39:17, 39:18, 41:22, 47:22
**Employee** [1] - 38:3
**employee's** [4] - 8:10, 30:3, 39:11, 39:14
**employees** [66] - 3:12, 3:16, 6:1, 6:5, 6:24, 7:1, 7:6, 7:10, 7:13, 8:8, 8:23, 8:24, 9:3, 10:2, 11:15, 12:15, 12:18, 20:20, 20:21, 22:2, 23:10, 24:3, 24:6, 24:7, 24:10, 25:1, 27:10, 27:13, 29:1, 29:2, 29:22, 30:25, 31:4, 31:9, 31:18, 31:19, 32:10, 32:18, 32:24, 33:9, 33:20, 34:20, 34:22, 36:5, 36:9, 36:12, 36:14, 36:18, 36:20, 38:2, 38:8, 38:13, 38:16, 38:18, 38:24, 39:24, 40:3, 40:12, 42:12, 42:16, 43:23, 44:6, 44:10, 46:3, 46:15
**employer** [2] - 33:24, 35:4
**employers** [1] - 34:21
**employment** [13] - 8:12, 11:25, 13:3, 31:14, 33:3, 33:6, 33:7, 34:7, 37:2, 38:5, 39:6, 40:24, 44:6
**enacted** [1] - 33:13

**end** [10] - 5:14, 23:13, 23:19, 24:4, 27:20, 27:21, 28:6, 34:11, 37:2, 42:4
**ended** [1] - 16:4
**enforcement** [6] - 17:13, 17:14, 17:15, 17:19, 17:23, 17:24
**engage** [1] - 36:2
**engaged** [1] - 22:16
**engaging** [2] - 25:17, 27:21
**enormous** [1] - 42:24
**enroll** [1] - 24:20
**enrolling** [1] - 25:2
**enter** [2] - 32:19, 48:21
**entered** [2] - 4:7, 29:15
**entering** [2] - 15:6, 44:13
**entertain** [1] - 4:23
**entitled** [5] - 5:4, 11:7, 21:1, 31:16, 49:17
**equities** [2] - 42:24, 43:19
**eric** [1] - 2:24
**ERIC** [1] - 1:16
**erroneous** [1] - 35:8
**especially** [3] - 12:22, 15:20, 42:20
**ESQUIRE** [5] - 1:13, 1:13, 1:14, 1:16, 1:17
**essentially** [7] - 4:22, 8:16, 10:5, 11:3, 17:19, 35:7
**establishing** [1] - 36:25
**estimate** [2] - 21:3, 21:7
**et** [7] - 1:3, 1:5, 2:4, 10:16, 26:14, 40:1, 44:10
**evaluated** [6] - 6:5, 37:20, 37:23, 38:9
**evaluation** [4] -

8:14, 8:18, 37:16, 37:17
**evaluator's** [1] - 37:16
**events** [1] - 15:17
**evidence** [5] - 4:18, 6:17, 11:9, 36:12, 45:12
**ex** [1] - 4:3
**exact** [1] - 21:4
**exactly** [4] - 11:11, 16:9, 40:15
**example** [6] - 11:15, 12:9, 14:4, 15:15, 18:9, 18:21
**exceed** [1] - 43:23
**except** [1] - 13:1
**exceptions** [1] - 42:1
**exclusive** [1] - 47:18
**exclusively** [3] - 22:12, 32:6, 48:16
**excuse** [5] - 16:19, 16:20, 20:1, 28:10, 29:24
**excused** [1] - 49:6
**execute** [4] - 27:18, 27:24, 44:5, 44:8
**executed** [3] - 24:15, 27:16, 44:16
**executive** [2] - 33:11, 41:15
**Executive** [3] - 6:19, 40:19, 47:19
**exemplary** [1] - 37:8
**exercise** [1] - 42:15
**exhausted** [1] - 34:16
**Exhibit** [1] - 29:6
**exhibits** [1] - 5:6
**Exhibits** [1] - 29:3
**existed** [2] - 44:20, 46:4
**exists** [1] - 32:5
**expectations** [1] - 39:20
**expects** [1] - 49:5
**expend** [1] - 11:8
**expenses** [1] - 17:1

**experts** [2] - 13:17, 14:12
**explicit** [1] - 25:10
**explicitly** [1] - 33:18
**expressed** [1] - 25:10
**extend** [1] - 37:1
**extensive** [1] - 11:1
**extent** [4] - 5:8, 20:5, 30:23, 43:15
**extraordinarily** [1] - 28:23
**extraordinary** [1] - 3:24, 21:2, 45:3

## F

**face** [1] - 44:9
**fact** [16] - 4:12, 8:22, 9:3, 9:23, 18:6, 18:17, 18:19, 19:18, 23:15, 23:16, 25:11, 25:21, 26:3, 38:7, 44:3, 47:11
**facts** [2] - 38:11, 38:13
**factual** [1] - 7:12
**failed** [2] - 19:23, 23:23
**failing** [1] - 23:19
**fails** [1] - 8:11
**failure** [3] - 5:19, 9:14, 47:16
**fair** [3] - 24:12, 47:25, 48:2
**fall** [1] - 8:17
**falls** [2] - 28:4, 33:25
**far** [2] - 29:23, 43:23
**fast** [2] - 41:4
**faulty** [1] - 35:9
**favor** [1] - 15:6
**February** [3] - 6:24, 6:25
**Federal** [30] - 2:25, 3:3, 3:15, 6:21, 24:6, 24:23, 25:19, 27:10, 27:12, 28:20, 30:3, 32:16, 33:10, 33:24, 34:4, 34:12, 34:21,

37:1, 38:18, 38:20, 41:12, 42:14, 42:16, 42:25, 43:16, 43:24, 44:1, 46:2, 46:17, 46:20
**FEDERAL** [1] - 49:22
**federal** [29] - 3:8, 3:12, 3:16, 6:6, 11:15, 12:8, 12:18, 14:6, 19:3, 28:21, 29:23, 30:1, 30:3, 30:22, 30:25, 31:14, 32:3, 32:10, 33:3, 33:4, 33:7, 39:8, 39:20, 40:24, 44:6, 45:4, 45:10, 46:15
**few** [8] - 6:16, 7:18, 13:1, 14:13, 34:24, 37:15, 43:6
**fifth** [1] - 36:6
**Fifth** [1] - 18:24
**fight** [1] - 11:3
**figure** [1] - 19:19
**filed** [4] - 3:7, 4:1, 10:15, 11:14
**files** [2] - 7:5, 7:17
**filing** [2] - 29:21, 48:4
**fill** [2] - 42:3, 42:6
**filled** [1] - 41:25
**finally** [2] - 42:17, 48:12
**finances** [4] - 12:3, 13:1, 14:21, 16:25
**financial** [2] - 18:18, 42:20
**fine** [1] - 41:4
**fire** [6] - 7:1, 7:6, 7:9, 8:8, 26:13
**fired** [8] - 9:3, 11:23, 12:4, 12:12, 26:19, 35:9, 47:22, 48:1
**firing** [3] - 8:7, 9:1, 9:4
**first** [9] - 3:25, 5:17, 6:3, 6:10, 11:6, 16:14, 26:23, 35:8,

41:19
**fit** [5] - 38:4, 38:20, 39:19, 44:1, 45:6
**fitness** [6] - 8:11, 37:4, 39:16, 39:18, 41:12, 44:4
**five** [1] - 29:7
**flow** [1] - 14:18
**focus** [1] - 10:20
**focuses** [1] - 48:15
**focusing** [1] - 32:18
**follow** [3] - 17:10, 17:14, 36:21
**follow-on** [2] - 17:10, 17:14
**followed** [1] - 22:23
**following** [2] - 17:10, 43:11
**footnote** [3] - 18:2, 18:3
**FOR** [1] - 1:1
**force** [12] - 5:21, 6:15, 9:9, 10:25, 36:3, 36:11, 41:16, 41:20, 41:21, 41:23, 42:10
**forced** [1] - 10:22
**foregoing** [1] - 49:16
**forestall** [1] - 10:6
**forestalling** [1] - 11:22
**forgave** [1] - 18:13
**forget** [1] - 4:24
**forgiven** [1] - 18:15
**form** [4] - 18:12, 25:11, 30:18, 48:18
**format** [1] - 49:17
**former** [2] - 7:7, 11:15
**forth** [5] - 4:9, 5:9, 13:25, 35:6, 35:18
**forum** [1] - 48:16
**forward** [2] - 36:18, 45:7
**four** [2] - 32:12, 47:8
**Fourth** [1] - 48:6
**fourth** [1] - 36:6
**framed** [2] -

19:16, 20:20
**framing** [1] - 29:13
**freeze** [4] - 41:25, 42:1, 42:2, 42:4
**friend** [5] - 6:13, 9:12, 16:14, 17:5, 25:15
**friend's** [3] - 20:4, 26:24, 28:17
**friends** [4] - 18:2, 19:8, 19:10, 47:10
**full** [1] - 5:9
**fully** [4] - 35:11, 37:13, 37:25, 40:9
**functionally** [1] - 33:19
**functions** [2] - 9:24
**fundamental** [1] - 6:3
**future** [1] - 12:19

## G

**Gellerson** [1] - 2:17
**GELLERSON** [2] - 1:13, 2:17
**General** [3] - 2:12, 2:14, 2:25
**generally** [1] - 38:15
**given** [6] - 4:8, 11:5, 13:22, 23:3, 23:23, 34:9
**government** [21] - 8:13, 18:17, 20:15, 29:19, 34:1, 35:6, 35:18, 35:21, 35:23, 35:25, 36:5, 36:10, 39:25, 40:20, 40:21, 41:2, 43:20, 43:21, 45:6, 48:1
**Government** [36] - 5:1, 6:21, 8:18, 16:8, 22:6, 22:9, 24:6, 24:23, 25:19, 27:11, 27:12, 28:20, 30:4, 32:16, 33:10, 33:21, 33:24, 34:1, 34:5,

34:12, 34:21, 37:1, 38:18, 38:20, 40:19, 41:12, 42:14, 42:16, 42:25, 43:16, 43:25, 44:1, 44:14, 46:2, 46:17, 46:20
**government's** [2] - 39:15, 39:20
**Government's** [6] - 3:11, 3:15, 3:19, 7:25, 21:22, 44:20
**grant** [1] - 7:7
**grateful** [1] - 4:10
**group** [1] - 40:3
**guess** [1] - 33:19
**guidance** [4] - 6:22, 6:23, 41:9, 41:18
**guidances** [2] - 6:24, 6:25

## H

**HALL** [2] - 1:17, 3:3
**Hall** [1] - 3:3
**HAMILTON** [64] - 1:16, 2:24, 4:21, 20:16, 20:23, 21:5, 21:7, 21:9, 21:12, 21:14, 21:16, 21:18, 21:21, 21:23, 22:1, 22:5, 22:7, 22:10, 22:19, 22:24, 23:4, 23:9, 24:1, 24:19, 25:14, 26:3, 26:21, 27:4, 27:19, 28:6, 28:15, 28:17, 30:9, 30:12, 30:16, 30:20, 31:6, 31:13, 31:21, 31:25, 32:3, 32:15, 33:16, 34:3, 34:11, 34:19, 36:7, 36:17, 37:15, 38:1, 38:12, 39:3, 39:12, 40:11, 41:8, 43:13, 44:11, 44:24, 45:11, 45:20, 45:25,

46:16, 47:1, 47:5
**Hamilton** [4] - 2:25, 4:20, 20:14, 47:4
**harm** [10] - 9:14, 10:17, 11:22, 12:23, 15:1, 17:16, 23:16, 23:17, 31:24, 42:19
**harmed** [2] - 9:17, 18:12
**harms** [8] - 10:6, 14:24, 16:7, 16:11, 19:24, 25:13, 32:9, 33:23
**head** [1] - 28:21
**heads** [1] - 3:9
**health** [1] - 12:10
**hear** [4] - 4:11, 5:17, 48:14, 48:17
**heard** [1] - 4:9
**HEARING** [1] - 1:9
**hearing** [5] - 2:6, 3:22, 4:13, 4:18, 5:5
**hearings** [1] - 4:3
**heart** [1] - 41:6
**held** [4] - 3:22, 17:12, 18:25, 49:17
**helping** [2] - 23:10, 24:3
**hereby** [1] - 49:16
**hire** [1] - 35:8
**hired** [1] - 35:12
**hiring** [5] - 10:5, 41:25, 42:1, 42:2, 42:4
**hold** [3] - 26:16, 32:14, 43:4
**holds** [1] - 23:14
**hole** [1] - 40:6
**honest** [2] - 47:24, 48:2
**Honor** [64] - 2:10, 2:24, 4:19, 4:21, 5:13, 5:18, 6:9, 6:14, 6:18, 7:2, 7:16, 7:20, 8:6, 8:22, 9:2, 9:6, 9:7, 9:9, 9:19, 10:17, 11:11, 12:2, 12:7, 12:25, 13:9, 14:1, 14:11,

14:15, 15:10, 15:13, 15:25, 16:9, 16:11, 18:20, 20:3, 20:9, 20:16, 20:24, 21:16, 21:18, 22:1, 22:7, 22:10, 22:19, 28:15, 28:22, 32:22, 33:12, 34:19, 37:15, 38:12, 40:11, 41:8, 42:17, 43:13, 47:1, 47:5, 47:8, 47:10, 47:21, 47:22, 48:3, 48:12, 48:20
**Honor's** [1] - 45:22
**HONORABLE** [1] - 1:10
**host** [5] - 15:17, 16:16, 16:22, 16:25, 18:20
**Housing** [1] - 39:6
**HUD** [1] - 39:7
**huge** [3] - 28:8, 28:24
**hundred** [3] - 21:11, 21:13, 21:14
**hundreds** [1] - 29:22
**hypothetical** [2] - 37:19, 46:12

## I

**idea** [1] - 48:16
**ideal** [1] - 4:6
**identify** [3] - 33:6, 36:4, 43:24
**identifying** [1] - 29:7
**Ill** [2] - 32:25, 33:8
**illegal** [1] - 16:8
**illegally** [1] - 31:17
**illustrative** [1] - 47:18
**imbedded** [2] - 12:8, 12:10
**immediate** [1] - 15:22
**immigration** [1] - 17:24
**impact** [3] - 3:16, 3:18, 24:9
**impacting** [1] -

10:15
**impacts** [1] - 24:14
**impairs** [1] - 25:25
**imperative** [2] - 10:16, 44:19
**implausible** [1] - 38:11
**implemented** [1] - 13:21
**implicit** [1] - 35:24
**implicitly** [1] - 33:18
**important** [6] - 3:14, 4:25, 5:3, 40:11, 41:21, 42:23
**importantly** [1] - 3:14
**IN** [1] - 1:1
**incidental** [3] - 22:13, 23:20, 33:6
**inclination** [1] - 44:8
**include** [5] - 3:6, 3:8, 5:25, 12:3, 16:23
**includes** [1] - 8:9
**including** [4] - 5:25, 9:24, 15:8, 24:18
**increase** [1] - 11:18
**indefinite** [1] - 12:19
**independent** [1] - 29:18
**indicating** [2] - 6:17, 6:20
**indicators** [1] - 47:20
**individual** [5] - 8:23, 32:24, 36:23, 37:17, 47:17
**individual's** [1] - 40:14
**individualized** [3] - 7:5, 7:10, 7:14
**individuals** [9] - 24:2, 28:25, 31:14, 41:11, 42:3, 45:5, 45:12, 45:14, 46:19
**inefficient** [1] - 37:24

**inevitable** [1] - 25:12
**inflicted** [2] - 16:7, 25:7
**information** [14] - 5:1, 9:22, 9:23, 10:2, 10:4, 10:5, 10:10, 11:5, 11:9, 23:25, 26:11, 47:12, 47:15
**informational** [5] - 9:21, 10:8, 10:14, 14:20, 23:12
**initial** [1] - 6:23
**initiated** [1] - 3:23
**injunction** [5] - 14:25, 19:25, 20:1, 43:14, 43:18
**injunctive** [1] - 48:7
**injured** [1] - 25:24
**injuries** [26] - 12:2, 12:3, 13:1, 14:17, 14:18, 16:16, 16:22, 16:23, 17:25, 18:1, 18:4, 18:5, 18:6, 18:16, 18:25, 22:14, 24:20, 30:12, 30:14, 30:16, 30:17, 42:20, 43:24, 48:19
**injurious** [1] - 9:20
**injury** [25] - 9:20, 9:21, 10:8, 10:9, 10:10, 14:19, 14:20, 14:21, 14:22, 16:24, 16:25, 18:18, 18:19, 23:13, 23:14, 23:15, 23:16, 25:18, 25:21, 26:3, 26:5, 27:20
**Innovation** [1] - 13:12
**inoperable** [1] - 46:12
**instance** [1] - 11:6
**instant** [1] - 12:5
**instead** [7] - 13:23, 26:15, 30:1, 33:1, 38:17, 42:12,

43:17
**instructed** [1] - 7:4
**instrumentality** [1] - 18:11
**insurance** [4] - 11:16, 24:21, 24:22, 25:2
**intends** [1] - 4:17
**intent** [1] - 25:5
**intentionally** [1] - 13:10
**interest** [3] - 20:8, 42:24, 43:20
**interested** [2] - 25:4, 25:5
**interests** [2] - 30:8, 33:23
**interns** [1] - 26:15
**interpretation** [1] - 40:2
**interrupted** [1] - 9:5
**intervene** [4] - 13:3, 13:15, 17:14, 17:21
**intervention** [2] - 10:7, 13:14
**introduce** [1] - 2:8
**investigations** [1] - 10:23
**Investment** [1] - 13:11
**invitation** [1] - 4:13
**invite** [1] - 20:12
**involve** [2] - 40:13, 46:7
**involved** [2] - 19:13, 38:14
**involves** [1] - 41:5
**irreparable** [4] - 9:13, 14:24, 16:12, 42:19
**irreparably** [1] - 9:18
**issuance** [1] - 3:21
**issue** [23] - 4:11, 5:22, 7:22, 10:12, 10:14, 11:20, 15:12, 16:14, 19:10, 19:13, 19:14, 19:15, 20:11, 24:12, 25:14, 29:13, 30:21, 34:2, 38:13, 38:16, 40:25, 47:11, 48:3

issued [1] - 43:2
issues [2] - 24:13, 49:1
itself [5] - 3:20, 8:15, 8:16, 9:21, 19:19

## J

JAMES [1] - 1:10
January [3] - 11:17, 44:12, 46:5
JKB-23-748 [1] - 2:6
JKB-25-748 [1] - 1:4
job [5] - 10:4, 35:12, 37:14, 40:14, 43:8
jobs [6] - 25:8, 25:13, 40:9, 43:5, 43:7
Judge [2] - 1:10, 33:19
judgment [1] - 40:13
judgments [1] - 38:19
Judicial [1] - 49:18
judicially [1] - 18:1
jump [1] - 22:15
June [1] - 16:3
jurisdiction [3] - 16:21, 30:1, 30:22
jurisdictional [1] - 16:13
justice [1] - 4:6
Justice [1] - 3:1

## K

KASSANDRA [1] - 49:21
Kassandra [1] - 49:15
keep [1] - 46:9
kicks [1] - 15:20
kind [4] - 23:17, 29:24, 33:19, 45:25
knot [1] - 19:16
knows [2] - 20:24, 22:9

## L

Labor [1] - 10:21
lack [2] - 10:25, 17:15
lacks [1] - 30:1
laid [2] - 10:3, 28:5
large [2] - 28:23, 33:23
largely [1] - 48:15
last [2] - 10:15, 34:24
Last [1] - 48:8
law [17] - 6:6, 10:11, 12:23, 14:2, 14:4, 14:23, 15:21, 17:4, 23:14, 23:18, 32:2, 32:10, 34:24, 41:5, 44:5, 47:24
lawful [1] - 27:25
lawfully [1] - 44:17
lawsuit [4] - 3:22, 25:20, 29:24, 33:8
lay [1] - 10:3
lay-off [1] - 10:3
layoffs [1] - 13:16
lays [1] - 33:24
leadership [1] - 35:23
leading [2] - 9:1, 13:3
League [1] - 48:5
least [9] - 17:9, 27:24, 30:23, 31:1, 31:13, 32:17, 37:19, 44:17, 46:11
leaves [3] - 5:23, 25:25, 26:18
leaving [2] - 5:9, 29:10
left [2] - 20:17, 26:15
legal [2] - 4:23, 26:1
legally [1] - 46:14
lens [1] - 25:15
less [7] - 21:8, 21:13, 21:14, 21:17, 25:4, 37:21, 40:9
lesser [1] - 31:11
letter [2] - 8:2, 46:11

letters [3] - 45:19, 46:19, 46:22
level [1] - 13:15
levels [1] - 34:1
licenses [2] - 19:2, 19:4
light [2] - 12:22, 35:3
likely [2] - 29:20, 46:14
limitations [1] - 8:7
limits [1] - 8:8
Linda [2] - 17:12, 17:17
line [2] - 15:20, 23:12
link [1] - 34:3
list [1] - 6:23
litigate [2] - 22:11, 30:7
litigated [1] - 30:4
litigation [6] - 16:4, 18:22, 20:8, 20:25, 21:24, 24:10
live [2] - 26:14, 29:5
lives [1] - 29:6
loans [2] - 18:14, 18:15
local [1] - 12:10
logical [2] - 39:22, 40:1
look [3] - 4:25, 5:6, 46:24
looking [2] - 29:20, 45:7
looks [1] - 43:17
lose [2] - 13:4, 25:8
losing [1] - 25:13
loss [6] - 12:3, 12:5, 12:23, 13:15, 24:20
lost [1] - 15:24

## M

ma'am [1] - 2:16
major [1] - 35:19
manage [1] - 28:24
managed [1] - 13:8
Management [1] - 6:23
mandate [1] - 5:19
mandatory [1] -

43:17
manifest [1] - 10:18
manner [2] - 9:4, 27:25
March [2] - 16:7, 49:19
MARCH [1] - 1:7
MARYLAND [2] - 1:1, 1:3
Maryland [6] - 1:8, 2:4, 2:11, 2:12, 11:16, 49:16
mass [2] - 10:3, 44:21
massive [1] - 13:16
match [1] - 41:17
materials [1] - 4:15
matter [3] - 44:2, 48:25, 49:17
matters [1] - 49:4
MCPHERSON [1] - 49:21
McPherson [1] - 49:15
mean [10] - 8:19, 23:19, 24:19, 32:3, 38:23, 43:7, 45:11, 45:20, 46:12, 46:18
meant [1] - 12:5
measure [1] - 37:6
measured [1] - 44:12
meeting [1] - 7:4
meetings [1] - 6:25
memo [1] - 47:19
memorandum [1] - 49:3
memos [1] - 29:14
Merit [4] - 24:11, 30:4, 30:7, 33:4
merits [1] - 34:15
met [1] - 4:2
metaphysical [1] - 46:13
might [6] - 4:7, 15:4, 21:8, 26:18, 26:19, 37:17
minute [1] - 6:2
mislead [1] - 35:17

missing [2] - 34:3, 36:6
Missouri [1] - 18:10
mitigate [5] - 15:1, 16:7, 23:7, 23:10, 25:12
moment [2] - 22:15, 47:12
Monday [1] - 4:14
money [3] - 14:25, 26:4, 27:21
moneys [1] - 18:12
month [2] - 42:4, 46:8
months [3] - 12:20, 13:1, 14:12
morning [10] - 2:10, 2:14, 2:19, 2:22, 2:24, 3:2, 3:5, 4:10, 20:14
most [5] - 12:15, 12:19, 39:22, 40:1, 44:25
motion [3] - 2:6, 3:23, 47:2
mounting [1] - 15:2
mouth [1] - 10:23
movant [1] - 47:7
move [5] - 7:23, 34:15, 35:18, 41:4
MSPB [3] - 31:19, 31:22, 32:6
MSPB's [1] - 32:4
multiple [2] - 6:15, 22:17
Murthy [6] - 19:11, 19:12, 19:23, 28:12, 28:18, 28:19
must [4] - 4:1, 5:25, 22:22, 41:3

## N

NAME [1] - 1:19
NARA [1] - 29:8
narrow [1] - 29:15
nearly [1] - 22:12
Nebraska [1] - 18:9
necessarily [4] - 13:24, 23:15, 26:10, 39:16

necessary [1] - 42:10
need [5] - 7:21, 10:1, 17:2, 34:7, 49:2
needs [1] - 17:18
never [3] - 4:5, 26:23, 44:15
new [13] - 15:17, 17:3, 19:2, 24:4, 29:21, 35:23, 39:25, 40:1, 40:18, 41:19, 44:22
newly [1] - 11:13
newspaper [1] - 38:15
newspapers [1] - 26:16
next [5] - 16:3, 16:4, 26:18, 27:25, 42:4
NO [1] - 1:4
NOAA [1] - 29:3
nominal [1] - 20:8
none [1] - 9:9
nonetheless [1] - 37:9
normally [2] - 11:1, 11:4
North [2] - 48:5
NORTHERN [1] - 1:2
notable [1] - 32:15
note [9] - 18:21, 24:21, 28:22, 30:1, 33:13, 39:12, 39:15, 42:17, 45:13
noted [1] - 41:9
notes [1] - 1:25
nothing [2] - 8:19, 44:3
notice [32] - 4:8, 5:20, 5:24, 5:25, 9:8, 9:10, 9:14, 10:25, 11:24, 12:4, 12:12, 12:15, 13:2, 13:10, 13:22, 14:16, 22:25, 23:3, 23:5, 23:19, 23:23, 23:24, 27:8, 32:16, 32:21, 34:11, 37:9, 38:22, 39:5, 45:16, 47:16
notices [1] - 44:9

notifications [1] - 26:20
notified [2] - 25:11, 38:24
notify [1] - 39:5
notion [2] - 33:18, 38:8
nullity [1] - 8:8
number [13] - 6:1, 10:2, 11:17, 17:10, 19:14, 21:4, 22:2, 37:5, 38:13, 45:5, 46:6, 47:10, 49:1
Number [2] - 2:5, 3:10
nutshell [1] - 11:6

**O**

objective [1] - 40:3
objectives [1] - 39:25
obligation [1] - 41:10
obligations [1] - 25:21
obviously [2] - 9:15, 40:4
occur [3] - 4:3, 13:22, 28:4
occurred [1] - 47:20
occurring [1] - 11:10
October [1] - 16:4
OF [2] - 1:1, 49:14
offer [1] - 37:2
Office [2] - 6:22
offices [1] - 46:10
OFFICIAL [2] - 49:14, 49:22
once [2] - 20:14, 34:6
one [13] - 4:24, 11:14, 13:21, 17:10, 24:24, 28:14, 32:22, 37:15, 37:16, 40:13, 45:16, 47:10
ones [2] - 5:16, 10:3
operable [1] - 45:19
operate [1] - 40:20
operating [1] -

33:22
opinion [3] - 18:3, 19:6, 19:19
OPM [16] - 6:22, 7:4, 7:9, 8:7, 8:8, 29:13, 29:16, 34:20, 36:22, 37:3, 38:4, 38:22, 41:9, 41:18, 47:19
OPM's [2] - 8:19, 9:11
opponents [2] - 6:4, 6:11
Opportunity [1] - 13:13
opportunity [1] - 4:8
opposed [1] - 26:19
option [1] - 36:15
Order [2] - 6:19, 47:19
order [35] - 2:7, 3:21, 3:24, 4:3, 4:7, 10:4, 14:2, 19:25, 20:1, 21:2, 24:25, 25:22, 27:7, 27:9, 27:12, 31:8, 31:11, 31:20, 31:23, 32:19, 39:7, 40:3, 41:15, 42:19, 43:1, 43:14, 44:13, 44:19, 45:2, 45:3, 46:21, 47:3, 48:21, 49:3
ordered [1] - 15:23
ordering [1] - 46:1
orderly [2] - 26:19, 28:2
orders [2] - 20:5, 31:12
organization [1] - 14:5
organize [1] - 14:3
otherwise [2] - 26:9, 34:8
outlines [1] - 15:16
outreach [2] - 10:23, 11:1
outset [1] - 3:14

own [7] - 17:2, 24:13, 24:14, 33:23, 34:2
owns [1] - 31:22

**P**

page [1] - 49:17
part [7] - 9:12, 13:6, 13:11, 18:7, 34:17, 36:2, 39:16
parte [1] - 4:4
participate [1] - 23:9, 24:2
particular [6] - 5:25, 23:23, 31:3, 35:16, 36:2, 39:15
parties [5] - 3:17, 18:1, 24:10, 31:4, 48:8
party [7] - 4:4, 4:7, 17:13, 17:21, 25:25, 33:5
passage [1] - 28:3
passed [2] - 7:13, 13:7
pathway [1] - 37:12
pay [4] - 7:11, 24:22, 33:11, 43:23
paying [1] - 46:10
payment [1] - 15:8
payments [2] - 17:18, 17:19
peg [1] - 40:6
people [26] - 11:13, 11:23, 11:25, 12:4, 13:3, 15:2, 15:18, 19:2, 24:20, 25:8, 25:13, 26:13, 28:5, 33:25, 34:6, 37:20, 37:21, 40:7, 40:20, 41:2, 41:3, 43:5, 43:15, 43:25, 44:16, 45:10
perform [1] - 9:23, 16:24, 26:1
performance [19] - 6:6, 7:14, 8:1, 8:4, 8:10, 8:15,

8:21, 8:25, 9:4, 37:8, 37:13, 37:24, 38:9, 39:2, 39:11, 40:8, 40:10, 40:14, 44:4
performance-based [1] - 8:15
performed [2] - 9:3
performing [3] - 6:7, 35:10, 35:12
perhaps [4] - 5:8, 20:12, 35:22, 36:13
period [8] - 8:10, 35:3, 35:11, 36:24, 37:10, 39:7, 41:11, 45:14
permit [1] - 4:5
persist [1] - 44:23
person [3] - 11:18, 14:6, 37:1
personal [1] - 40:8
Personnel [1] - 6:23
personnel [6] - 7:5, 12:8, 12:11, 12:12, 14:3, 14:9
persons [1] - 40:24
perspective [1] - 40:18
petition [1] - 3:23
phase [1] - 20:25
place [3] - 9:9, 26:23, 35:8
plainly [1] - 19:12
plaintiff [5] - 5:20, 10:15, 10:19, 17:17, 20:6, 29:5, 37:22, 47:12
plaintiff's [2] - 32:23, 47:2
Plaintiffs [2] - 1:3, 1:12
plaintiffs [29] - 3:6, 5:16, 20:21, 21:19, 22:11, 22:12, 23:6, 23:20, 24:5, 28:23, 29:13, 29:20, 29:23, 33:9,

36:18, 38:14, 41:13, 42:11, 42:17, 43:1, 43:3, 43:15, 43:22, 43:24, 45:11, 46:5, 46:7, 46:18
plaintiffs' [3] - 2:8, 16:15, 21:1
plan [1] - 25:10
planning [1] - 28:1
plans [1] - 41:16
plausible [1] - 7:13
plenty [1] - 6:17
podium [1] - 20:17
point [20] - 7:2, 7:7, 8:19, 10:8, 11:12, 12:7, 15:21, 17:8, 17:9, 19:9, 19:10, 19:23, 23:12, 32:22, 37:16, 47:10, 47:21, 47:24, 48:3, 48:4
points [2] - 37:15, 47:9
policies [1] - 35:22
policy [1] - 27:24
position [4] - 21:22, 21:23, 22:1, 42:2
positions [1] - 14:10
positive [1] - 8:25
possibility [1] - 41:24
possible [1] - 39:18
possibly [1] - 32:13
precedent [1] - 32:4
precisely [3] - 11:21, 14:1, 15:25
predicting [1] - 11:20
preempts [1] - 30:22
preferences [4] - 14:3, 14:4, 14:5, 14:7
preliminary [2] - 19:25, 43:14
premise [1] - 35:9

preparations [1] - 28:1
preparatory [1] - 13:23
prepared [2] - 25:6, 34:9
prerogative [1] - 40:25
present [3] - 4:4, 4:8, 4:17
Present [1] - 1:18
presentation [1] - 47:13
preserved [1] - 48:7
preserving [3] - 44:25, 46:3, 46:23
President [2] - 6:19, 41:15
presumably [2] - 15:6, 27:25, 43:22
pretty [3] - 24:18, 35:14, 37:3
prevail [2] - 15:7, 16:5
prevailed [1] - 16:4
prevent [1] - 27:12
primarily [2] - 18:2, 19:11
primary [1] - 5:22
principles [2] - 18:5, 18:6
priorities [1] - 39:9
privacy [1] - 5:7
probation [2] - 35:7, 35:13
probationaries [1] - 23:21
Probationary [1] - 38:3
probationary [42] - 3:12, 6:7, 6:24, 7:6, 7:10, 8:7, 8:9, 8:19, 20:20, 20:21, 22:2, 22:13, 24:7, 27:6, 27:13, 28:25, 29:10, 29:17, 29:22, 31:9, 32:25, 34:20, 34:22, 35:1, 35:3, 35:11, 36:5, 36:14, 36:17, 36:20,

36:23, 36:25, 37:2, 37:10, 38:8, 40:12, 41:11, 41:22, 42:12, 42:13, 42:15, 47:22

**probationer** [3] - 28:11, 39:17, 41:24

**probationers** [3] - 38:20, 42:3, 42:6

**problem** [1] - 30:20

**problematic** [1] - 41:6

**procedure** [1] - 24:14

**procedures** [3] - 22:22, 25:16, 42:9

**Procedures** [1] - 3:13

**proceed** [1] - 5:17

**proceeded** [1] - 48:9

**proceedings** [2] - 49:7, 49:17

**process** [3] - 8:24, 35:24, 40:4

**produce** [1] - 19:2

**Professional** [1] - 49:15

**professionals** [1] - 12:10

**program** [1] - 12:9

**programmatic** [1] - 14:22

**programming** [1] - 14:23

**programs** [3] - 13:14, 14:22, 19:3

**Programs** [2] - 3:1, 3:3

**promote** [1] - 39:8

**promoted** [1] - 8:24

**promptly** [1] - 49:5

**proper** [1] - 17:7

**properly** [4] - 24:15, 44:5, 44:8, 44:16

**proposition** [3] - 18:4, 32:2, 34:23

**protect** [1] - 5:7

**Protection** [4] - 24:12, 30:4, 30:7, 33:4

**provide** [12] - 5:20, 5:24, 9:14, 10:4, 11:5, 14:20, 17:3, 17:4, 27:8, 32:11, 34:8, 34:10

**provided** [4] - 9:10, 9:22, 14:16, 47:14

**provides** [1] - 15:21

**providing** [2] - 11:3, 19:25

**provision** [1] - 13:11

**provisions** [1] - 36:8

**public** [8] - 5:8, 5:11, 10:22, 12:10, 20:8, 42:24, 43:19, 47:18

**purpose** [7] - 13:7, 13:13, 23:24, 24:1, 39:5, 44:24

**purposes** [1] - 16:6

**pursuant** [2] - 35:24, 49:16

**pursue** [2] - 31:3, 35:21

**put** [7] - 10:22, 15:17, 36:18, 38:4, 41:9, 41:18, 46:18

## Q

**qualification** [1] - 8:11

**qualifications** [2] - 35:5, 35:17

**quantity** [1] - 38:16

**questions** [4] - 20:3, 33:2, 47:1, 48:20

**quick** [1] - 47:9

**quite** [6] - 5:3, 7:17, 18:21, 19:22, 28:18, 49:1

**quo** [15] - 27:16, 43:9, 43:10, 44:6, 44:11,

44:22, 44:25, 45:22, 45:23, 46:1, 46:3, 46:4, 46:23, 48:4, 48:7

**quote** [1] - 48:8

## R

**raised** [1] - 16:14

**rank** [1] - 14:3

**rapid** [13] - 10:1, 10:9, 13:2, 14:23, 15:19, 15:22, 16:24, 23:5, 25:11, 25:17, 25:21, 32:11, 34:7

**rapidly** [2] - 15:24, 17:2

**rather** [2] - 8:16, 46:21

**re** [15] - 15:14, 37:20, 37:23, 38:9

**re-evaluated** [4] - 37:20, 37:23, 38:9

**re-shuttle** [1] - 15:14

**read** [5] - 7:25, 24:8, 26:18, 27:14, 28:7

**ready** [5] - 25:6, 25:12, 28:4, 44:1, 44:9

**real** [3] - 9:13, 10:13, 12:23

**realignment** [1] - 40:23

**really** [13] - 12:16, 16:17, 21:9, 21:12, 28:18, 35:4, 37:12, 40:5, 41:6, 41:10, 42:21, 45:22

**rebuttal** [2] - 20:12, 47:7

**receive** [3] - 14:25, 18:13, 37:9

**received** [3] - 7:14, 8:25, 45:12

**receiving** [1] - 45:15

**recent** [1] - 46:7

**recently** [1] - 43:6

**recess** [1] - 49:6

**recission** [1] - 31:12

**recognized** [2] - 18:16, 23:17

**recognizing** [2] - 32:4, 33:2

**reconsider** [1] - 35:7

**record** [9] - 4:16, 5:1, 5:10, 6:17, 7:2, 36:13, 38:2, 38:17, 46:19

**redact** [1] - 5:7

**redacted** [1] - 5:11

**redo** [1] - 44:7

**redress** [1] - 30:18

**redressable** [2] - 24:24, 25:22

**reduce** [1] - 6:20

**reduction** [8] - 6:15, 9:9, 36:3, 36:11, 41:16, 41:21, 41:23, 42:10

**reductions** [4] - 5:21, 6:15, 10:25, 41:19

**reference** [1] - 39:14

**Reform** [1] - 30:2

**Registered** [1] - 49:15

**regroup** [1] - 17:2

**regular** [1] - 35:2

**regulation** [2] - 8:16, 37:3

**Regulations** [1] - 38:4

**regulations** [6] - 8:19, 9:11, 34:20, 36:22, 38:22, 49:18

**reimburses** [1] - 24:23

**reinstated** [1] - 12:12

**reinstatement** [1] - 32:13

**reinstating** [5] - 12:17, 25:1, 31:8, 31:18, 32:18

**rejust** [1] - 19:24

**related** [1] - 39:2

**relationship** [2] - 23:17, 33:6

**relevant** [1] - 43:20

**reliance** [1] - 12:8

**relied** [1] - 47:17

**relief** [8] - 3:24, 5:4, 5:17, 20:5, 24:9, 48:7, 48:13, 48:18

**relocating** [1] - 24:3

**rely** [6] - 10:22, 17:17, 18:2, 19:8, 19:11, 22:12

**relying** [2] - 23:20, 38:15

**remain** [2] - 14:9, 44:6

**remaining** [1] - 42:18

**remains** [1] - 41:24

**remedy** [10] - 15:22, 21:2, 31:3, 31:7, 31:22, 32:9, 32:13, 34:5, 45:1, 45:3

**remedying** [1] - 31:23

**removed** [1] - 46:10

**render** [1] - 8:7

**reported** [1] - 49:17

**REPORTER** [2] - 49:14, 49:22

**Reporter** [1] - 49:15

**reporting** [2] - 10:22, 47:19

**representation** [1] - 20:23

**representations** [1] - 22:2

**request** [3] - 20:4, 38:7, 43:1

**require** [4] - 9:23, 11:2, 23:2, 38:23

**required** [13] - 5:24, 8:18, 9:8, 9:10, 9:11, 14:23, 17:4, 24:22, 26:22, 42:18, 43:22, 43:25

**requirement** [6] - 8:3, 8:4, 15:19, 19:1, 32:20, 38:22

**requires** [6] -

5:20, 8:2, 9:21, 9:24, 34:12, 47:24

**requiring** [3] - 7:9, 12:13, 13:10

**rescinded** [2] - 27:15, 33:1

**rescission** [1] - 31:17

**residents** [1] - 11:13

**resolution** [1] - 44:23

**resolve** [2] - 30:2, 32:13

**resolved** [1] - 27:3

**resources** [11] - 10:4, 11:3, 11:8, 11:23, 12:1, 15:14, 15:15, 17:3, 26:8, 26:11

**respect** [1] - 22:23

**respond** [2] - 15:23, 28:17

**responding** [1] - 33:21

**response** [12] - 10:1, 10:9, 13:2, 14:23, 15:19, 15:22, 16:3, 16:25, 23:5, 25:12, 25:17, 25:21

**responsibilities** [2] - 26:1, 26:2

**rest** [2] - 12:18, 24:18

**restoration** [2] - 27:15, 33:9

**restore** [3] - 43:9, 43:15, 44:19

**restored** [2] - 16:1, 33:3

**restoring** [3] - 27:10, 31:14, 34:4

**restraining** [17] - 2:7, 3:21, 3:24, 4:3, 20:1, 21:2, 24:25, 25:22, 27:9, 27:12, 31:8, 42:19, 43:1, 43:14, 45:3, 47:3, 48:21

**restraint** [4] - 4:4,

43:16, 43:18, 45:2

**result** [5] - 9:14, 14:17, 17:2, 31:13, 47:15

**revenue** [5] - 12:3, 12:5, 12:23, 13:5, 24:20

**revenues** [1] - 12:17

**review** [3] - 7:17, 7:25, 8:3

**reviewed** [3] - 4:15, 8:1, 40:7

**reviewing** [2] - 7:5, 7:24

**reviews** [2] - 7:14, 8:25

**revised** [2] - 29:14

**RIF** [42] - 5:24, 6:4, 6:5, 9:9, 13:18, 13:20, 14:2, 22:16, 22:24, 23:8, 24:14, 24:17, 25:16, 26:23, 27:1, 27:2, 27:8, 27:14, 27:16, 27:18, 31:12, 31:17, 32:20, 34:13, 34:14, 34:17, 36:15, 38:19, 40:4, 40:13, 42:7, 42:8, 42:9, 44:4, 44:5, 44:7, 44:15, 44:16, 45:9

**RIFs** [6] - 13:7, 14:12, 22:17, 22:23, 47:20, 48:10

**rights** [1] - 30:25

**road** [1] - 4:25

**role** [6] - 24:4, 39:15, 39:19, 39:20, 41:23, 41:25

**roles** [2] - 42:3, 42:6

**round** [1] - 40:6

**route** [3] - 48:13, 48:14, 48:18

**routes** [1] - 47:23

**RPR** [1] - 49:21

**RS** [2] - 17:12, 17:17

**rule** [2] - 48:25, 49:5

**rules** [1] - 4:5

**ruling** [1] - 49:2

**RX** [1] - 17:17

## S

**salaries** [3] - 33:11, 43:23, 45:15

**satisfactory** [2] - 37:13, 40:9

**satisfied** [1] - 43:9

**scheme** [2] - 30:2, 33:2

**scope** [1] - 20:20

**scour** [1] - 26:16

**scramble** [1] - 12:13

**scrambling** [1] - 26:9

**seal** [1] - 36:19

**sealed** [2] - 5:2, 5:10

**search** [2] - 11:9, 26:11

**searching** [1] - 26:10

**Second** [1] - 35:10

**second** [1] - 37:12

**secretaries** [1] - 3:8

**Secretary** [4] - 10:20, 10:21, 11:14, 15:15

**section** [1] - 5:23

**see** [3] - 26:17, 31:14, 34:23

**seek** [4] - 30:18, 31:19, 33:8, 48:18

**seeking** [9] - 3:21, 4:4, 5:16, 6:23, 25:23, 27:8, 31:7, 32:12, 32:16

**seem** [6] - 5:3, 12:19, 27:19, 31:5, 32:23, 47:11

**seldom** [1] - 13:21

**Senior** [1] - 1:10

**sense** [3] - 33:12, 33:15, 33:16

**sent** [1] - 46:11

**separate** [3] - 24:7, 30:21,

36:20

**separated** [2] - 42:3, 46:20

**separating** [1] - 34:22

**separation** [1] - 36:23

**serious** [1] - 20:11

**servant** [1] - 35:1

**service** [7] - 14:6, 14:7, 18:14, 18:15, 32:7, 33:4, 33:10, 35:1, 35:2, 38:21, 39:8, 41:12, 43:16, 44:1, 45:4, 45:6, 45:10

**Service** [5] - 30:2, 30:4, 33:4

**services** [9] - 10:9, 11:4, 11:12, 13:3, 15:19, 17:3, 25:7, 32:11, 34:7

**set** [3] - 10:18, 10:24, 14:11

**setting** [1] - 26:9

**shift** [1] - 40:24

**short** [2] - 45:1

**shoulder** [1] - 28:4

**show** [5] - 8:23, 10:13, 18:11, 21:1, 41:13

**showing** [1] - 42:18

**shown** [1] - 22:11

**shows** [2] - 26:17, 38:18

**Shutkin** [1] - 33:20

**shuttle** [1] - 15:14

**side** [8] - 4:17, 16:14, 17:5, 18:2, 19:8, 19:11, 25:15, 47:11

**side's** [2] - 6:14, 9:12

**signed** [1] - 41:15

**significance** [1] - 23:22

**significant** [4] - 9:16, 42:13, 46:6

**similar** [3] -

28:18, 28:21, 42:21

**simple** [2] - 7:12, 37:3

**simply** [3] - 8:13, 17:22, 31:11

**simultaneously** [1] - 6:16

**single** [2] - 15:2, 36:21

**Sinks** [1] - 2:20

**SINKS** [2] - 1:14, 2:20

**situation** [4] - 11:25, 18:21, 19:24, 40:2

**situations** [1] - 27:13

**size** [3] - 6:20, 35:21, 36:1

**slated** [2] - 41:20, 42:4

**social** [1] - 25:6

**someone** [6] - 25:2, 29:4, 37:18, 47:25, 48:1

**sometimes** [2] - 3:25, 4:3

**sorry** [1] - 16:19

**sort** [21] - 8:14, 9:20, 10:7, 11:24, 13:14, 13:16, 13:21, 14:5, 14:9, 17:7, 17:14, 18:22, 19:15, 24:3, 29:25, 30:13, 32:6, 32:19, 39:16, 43:1, 46:13

**sorted** [1] - 15:7

**sought** [1] - 17:17

**sound** [1] - 39:10

**space** [5] - 17:20, 17:24, 30:22, 32:5, 33:22

**speaking** [1] - 35:19

**specific** [2] - 39:13, 40:8

**specifically** [1] - 22:21

**spend** [2] - 7:21, 7:24

**spending** [2] - 26:4, 27:20

**spent** [1] - 14:6

**sprawling** [1] - 28:19

**square** [1] - 40:6

**staff** [1] - 11:2

**stage** [3] - 21:24, 24:17, 32:17

**stand** [1] - 18:3

**standard** [1] - 37:3

**standards** [1] - 4:1

**standing** [29] - 9:17, 12:24, 16:15, 16:18, 16:20, 16:21, 16:22, 17:7, 18:8, 18:11, 18:17, 18:19, 18:25, 19:7, 22:10, 22:11, 22:18, 22:20, 23:13, 24:18, 25:15, 26:24, 27:2, 30:6, 30:21, 42:22

**stands** [1] - 44:25

**start** [6] - 6:19, 22:10, 27:17, 28:4, 38:12, 41:16

**starts** [1] - 46:13

**State** [9] - 2:4, 2:11, 2:12, 3:20, 5:5, 11:16, 12:6, 18:25, 34:1

**state** [41] - 10:1, 10:6, 10:7, 11:13, 11:20, 12:1, 12:3, 12:10, 12:13, 12:16, 13:1, 13:5, 13:15, 14:21, 14:22, 14:23, 15:3, 15:23, 16:25, 17:13, 18:4, 18:8, 18:10, 18:11, 18:13, 18:14, 18:17, 19:4, 23:1, 23:7, 25:2, 28:2, 28:9, 32:10, 33:5, 34:8, 34:12, 38:22, 44:20

**state's** [2] - 19:24, 32:9

**State's** [1] - 11:15

**statement** [2] - 8:5, 38:25

**statements** [2] - 39:4, 45:12

**STATES** [1] - 1:1

**States** [18] - 2:5, 3:11, 3:12, 3:15, 3:18, 5:2, 9:17, 16:19, 16:20, 16:21, 17:6, 18:23, 25:9, 28:8, 30:19, 49:15, 49:18

**states** [56] - 3:6, 3:18, 5:20, 9:13, 9:22, 10:15, 10:19, 11:24, 12:8, 13:2, 13:10, 14:16, 14:17, 14:24, 15:14, 15:15, 15:16, 15:17, 16:15, 16:21, 16:22, 17:1, 17:6, 19:7, 20:6, 20:19, 22:17, 22:22, 22:25, 23:3, 23:5, 23:9, 24:2, 24:3, 24:9, 24:13, 25:6, 25:10, 25:11, 25:24, 29:5, 30:6, 30:9, 30:11, 32:10, 32:21, 33:18, 33:22, 34:13, 44:9, 47:12, 47:15, 48:15, 48:18

**States'** [1] - 5:3

**status** [17] - 27:15, 43:9, 43:10, 44:6, 44:11, 44:22, 44:25, 45:22, 45:23, 46:1, 46:3, 46:4, 46:13, 46:23, 48:3, 48:7, 48:8

**statute** [16] - 5:22, 5:23, 8:2, 8:15, 9:7, 9:11, 9:21, 13:7, 13:19, 22:21, 22:25, 25:10, 26:20, 32:19, 33:12, 34:12

**statutes** [1] - 34:21

**stenographically** [1] - 49:17

**stenographically-reported** [1] - 49:17

**stenotype** [1] -

1:25
**steps** [1] - 13:23
**still** [7] - 10:12, 27:4, 27:20, 35:7, 35:13, 36:23, 46:15
**stopped** [1] - 46:10
**strains** [1] - 9:2
**stringent** [1] - 4:1
**strong** [2] - 15:5, 31:1
**struggling** [1] - 28:23
**student** [1] - 18:14
**studying** [1] - 34:24
**submissions** [2] - 21:19, 48:24
**submit** [2] - 4:13, 5:10
**submitted** [8] - 4:14, 13:20, 28:24, 29:4, 41:13, 42:11, 45:12, 46:7
**substance** [1] - 9:16
**substandard** [2] - 37:24, 38:10
**substantial** [3] - 34:21, 43:21, 45:5
**substantially** [2] - 35:20, 36:1
**subtle** [2] - 7:23, 49:1
**successful** [4] - 35:12, 37:14, 37:25, 40:10
**successfully** [1] - 45:9
**sudden** [1] - 43:7
**suddenly** [4] - 13:21, 15:18, 25:13, 33:24
**sued** [3] - 28:20, 29:2, 29:7
**suffer** [1] - 19:1
**suffered** [4] - 16:16, 16:22, 17:15, 48:19
**suffering** [4] - 9:13, 11:22, 14:17, 17:1
**sufficient** [3] - 18:16, 18:19, 23:13
**suggest** [1] - 9:10

**suggesting** [3] - 17:6, 31:2, 36:13
**suggestion** [1] - 37:22
**suit** [3] - 3:7, 28:20, 28:22
**summarily** [2] - 6:8, 35:14
**supervisors** [1] - 8:25
**supplement** [1] - 36:7
**supplied** [1] - 10:19
**support** [3] - 17:18, 17:19, 38:7
**supports** [1] - 32:2
**suppose** [1] - 45:21
**supposed** [1] - 13:8
**Supreme** [10] - 17:11, 17:22, 18:7, 18:10, 18:22, 18:24, 19:5, 19:12, 22:14, 28:19
**surrogates** [1] - 33:20
**suspect** [3] - 21:9, 21:14, 23:4
**SVA** [1] - 29:8
**system** [2] - 4:6, 25:3
**System** [2] - 24:11, 30:7
**SYSTRA** [1] - 30:21

**T**

**tact** [1] - 10:16
**tangle** [1] - 19:16
**tax** [7] - 12:3, 12:5, 12:16, 12:18, 12:23, 13:5, 24:20
**taxes** [1] - 15:9
**tea** [1] - 26:18
**technical** [1] - 4:24
**television** [1] - 26:17
**template** [1] - 36:21
**temporary** [18] -

2:7, 3:21, 3:24, 4:3, 20:1, 21:2, 24:25, 25:22, 27:9, 27:11, 31:7, 42:19, 43:1, 43:14, 44:17, 45:2, 47:2, 48:21
**tens** [9] - 27:10, 29:17, 31:8, 33:9, 34:4, 36:14, 37:22, 38:8, 46:2
**term** [3] - 18:7, 37:2, 42:16
**terminate** [5] - 34:25, 36:5, 39:6, 41:2, 41:3
**terminated** [16] - 20:22, 22:3, 28:25, 29:8, 29:10, 35:14, 36:12, 37:25, 38:10, 38:18, 38:24, 40:10, 42:6, 44:17, 45:13
**terminating** [3] - 27:13, 37:9, 40:2
**termination** [19] - 3:11, 7:15, 23:11, 23:21, 27:5, 28:7, 28:10, 29:22, 30:3, 32:25, 33:7, 36:9, 36:17, 39:1, 40:12, 41:22, 41:24, 42:12, 45:15
**terminations** [9] - 13:22, 22:13, 28:3, 29:17, 34:19, 36:19, 43:7, 46:8
**terms** [7] - 12:16, 13:7, 15:4, 35:5, 40:19, 42:13, 47:21
**TESSA** [1] - 1:13
**Tessa** [1] - 2:17
**test** [1] - 30:22
**Texas** [8] - 17:6, 17:22, 17:24, 18:8, 18:24, 18:25, 25:9, 28:8
**THE** [101] - 1:1, 1:1, 1:10, 2:3,

2:4, 2:14, 2:19, 2:22, 2:23, 3:2, 3:5, 4:20, 4:22, 5:14, 6:2, 6:10, 7:11, 7:19, 7:21, 8:20, 9:5, 9:15, 10:10, 11:6, 12:14, 12:22, 13:6, 13:17, 14:14, 15:4, 15:11, 15:21, 16:1, 16:3, 16:10, 16:17, 20:7, 20:10, 20:14, 20:18, 21:3, 21:6, 21:8, 21:11, 21:13, 21:15, 21:17, 21:20, 21:22, 21:25, 22:4, 22:6, 22:8, 22:15, 22:21, 23:2, 23:7, 23:22, 24:8, 25:4, 25:24, 26:7, 27:1, 27:14, 27:23, 28:13, 28:16, 30:6, 30:10, 30:14, 30:17, 30:24, 31:11, 31:16, 31:22, 32:2, 32:8, 33:15, 33:17, 34:6, 34:16, 34:23, 36:10, 37:7, 37:19, 38:6, 39:2, 39:4, 39:22, 40:15, 43:4, 44:2, 44:14, 45:8, 45:18, 45:24, 46:9, 46:24, 47:4, 47:6, 48:23
**themselves** [5] - 2:8, 3:17, 13:24, 24:13, 31:19
**theory** [2] - 5:3, 6:12
**thereof** [1] - 36:2
**they've** [5] - 11:8, 24:10, 40:16, 47:13, 48:19
**third** [8] - 17:13, 17:20, 18:1, 25:25, 33:5, 35:15, 36:15, 48:3
**thousand** [3] -

11:18, 21:15, 21:17
**thousands** [14] - 25:8, 27:10, 28:5, 29:17, 31:9, 33:9, 33:25, 34:4, 36:13, 36:14, 37:22, 38:8, 40:24, 46:3
**three** [5] - 18:3, 34:25, 36:4, 45:16, 47:23
**throw** [1] - 28:8
**thrust** [1] - 32:23
**Thunder** [8] - 30:21, 31:2, 31:4, 32:5, 32:8, 32:22, 48:13, 48:15
**timeline** [1] - 41:17
**Title** [1] - 36:9
**today** [6] - 9:18, 10:16, 11:17, 31:7, 31:10, 44:25
**today's** [1] - 3:22
**took** [4] - 9:9, 16:8, 19:15, 45:22
**top** [1] - 40:19
**touch** [2] - 16:13, 48:12
**touches** [1] - 32:20
**traceability** [1] - 19:10
**traditionally** [1] - 23:17
**Trans** [1] - 23:14
**transcript** [2] - 49:16, 49:17
**transcription** [1] - 1:25
**Treasury** [1] - 7:3
**treat** [2] - 45:18, 46:21
**treating** [1] - 46:17
**treatment** [1] - 4:25
**trial** [3] - 39:7, 47:25, 48:2
**TRO** [9] - 1:9, 3:22, 4:11, 15:6, 15:7, 27:15, 29:15, 38:7, 43:8
**true** [5] - 8:5,

12:25, 23:8, 42:20, 49:16
**truth** [1] - 11:9
**try** [4] - 5:14, 11:24, 26:18, 47:9
**trying** [9] - 17:3, 24:5, 24:9, 27:6, 30:24, 32:9, 40:5, 40:6, 43:15
**two** [5] - 16:13, 17:9, 29:1, 33:13, 40:11
**type** [1] - 17:23
**typically** [1] - 14:11

**U**

**U.S** [3] - 3:1, 22:14, 39:6
**U.S.C** [3] - 5:23, 9:7, 49:16
**ultimate** [2] - 15:5, 44:23
**ultimately** [1] - 10:12
**ultra** [2] - 3:19, 29:18
**unclear** [1] - 19:17
**uncommon** [1] - 20:9
**uncontested** [1] - 48:8
**under** [14] - 4:5, 14:2, 17:4, 18:5, 18:13, 19:3, 27:15, 30:21, 33:1, 36:18, 37:19, 38:3, 46:11, 47:21
**undermine** [1] - 19:8
**undertake** [1] - 26:22
**undertaking** [1] - 7:17
**unemployed** [2] - 11:13, 15:18
**unemployment** [6] - 10:5, 11:16, 14:21, 24:21, 24:22, 25:2
**Union** [1] - 23:14
**unions** [1] - 33:19
**unique** [1] - 32:9
**UNITED** [1] - 1:1
**United** [8] - 2:5,

17:5, 18:23, 25:9, 28:7, 30:19, 49:15, 49:18
**unlawful** [5] - 43:11, 44:21, 45:19, 46:12, 48:10
**unredacted** [1] - 5:10
**unsuccessful** [1] - 44:15
**untangling** [1] - 19:19
**up** [8] - 9:1, 10:4, 15:17, 20:12, 26:9, 27:16, 27:20, 41:17
**upheld** [2] - 18:23, 18:24
**upholding** [1] - 18:8
**Urban** [1] - 39:7
**urgency** [2] - 15:11, 15:13
**USDA** [1] - 1:5

**V**

**vacated** [1] - 42:6
**valuable** [1] - 39:25
**variety** [1] - 47:19
**vary** [1] - 36:20
**vehicle** [1] - 49:3
**verse** [3] - 17:6, 18:23, 48:5
**version** [3] - 5:8, 5:11, 13:12
**versus** [3] - 2:5, 18:9, 25:9
**veteran** [1] - 14:7
**veterans** [1] - 14:4
**viability** [1] - 28:8
**view** [2] - 33:1, 36:15
**viewing** [1] - 25:14
**vindicate** [1] - 30:25
**violations** [1] - 3:12
**vires** [2] - 3:19, 29:18
**VIRGINIA** [1] - 1:13
**Virginia** [2] - 2:11, 29:6
**vision** [1] - 39:15

**Voters** [1] - 48:5
**vs** [1] - 1:4

**W**

**wages** [1] - 15:8
**warranted** [2] - 9:4, 20:6
**watch** [1] - 26:16
**ways** [4] - 34:25, 36:4, 36:21, 37:5
**websites** [2] - 15:17, 26:9
**WEDNESDAY** [1] - 1:7
**week** [2] - 10:15, 11:19
**weekend** [1] - 34:7
**weeks** [6] - 6:17, 7:18, 14:13, 37:8, 43:6, 45:16
**weighing** [1] - 42:23
**welcome** [2] - 2:12, 20:18
**whole** [3] - 13:13, 39:24, 40:18
**Williamson** [4] - 2:11, 4:18, 5:12, 47:7
**WILLIAMSON** [30] - 1:13, 2:10, 4:19, 5:13, 5:18, 6:9, 6:13, 7:16, 7:20, 8:6, 8:22, 9:6, 9:19, 10:17, 11:11, 12:21, 12:25, 13:9, 14:1, 14:15, 15:10, 15:13, 15:25, 16:2, 16:9, 16:11, 16:19, 20:9, 20:13, 47:8
**Women** [1] - 48:5
**wonder** [1] - 29:10
**word** [1] - 10:22
**words** [2] - 8:4, 23:24
**workers** [3] - 10:24, 26:15, 34:4
**Workforce** [2] - 13:11, 13:12
**workforce** [1] - 11:4

**written** [2] - 49:2
**Wu** [2] - 10:21, 11:14
**Wu's** [1] - 15:15

**Y**

**year** [2] - 11:17, 12:18

**§**

**§** [1] - 49:16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STATE OF MARYLAND,** *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **CIVIL NO. JKB-25-0748** |
| **UNITED STATES DEPARTMENT OF AGRICULTURE,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

## TABLE OF CONTENTS

I.     SUMMARY ................................................................................................................. 1

II.    INTRODUCTION .................................................................................................... 2

III.   BACKGROUND ....................................................................................................... 2

  A.   Requirements for Terminating Probationary Employees ...................................... 2

  B.   The Government's Alleged Actions ...................................................................... 6

  C.   The States' Alleged Harms ................................................................................... 7

IV.    REVIEWABILITY ................................................................................................. 12

  A.   Justiciability ....................................................................................................... 12

    1.   Injury in Fact ................................................................................................ 13

    2.   Causation ...................................................................................................... 19

    3.   Redressability ............................................................................................... 20

  B.   Jurisdiction ......................................................................................................... 21

    1.   Final Agency Action .................................................................................... 21

    2.   Claim Channeling ........................................................................................ 23

V.     TEMPORARY RESTRAINING ORDER ........................................................... 30

  A.   Likelihood of Success on the Merits ................................................................. 30

    1.   Zone of Interests .......................................................................................... 31

    2.   The Agencies Conducted RIFs .................................................................... 32

    3.   The Agencies' Actions Were Contrary to Statutory RIF Requirements ........ 39

  B.   Irreparable Harm ................................................................................................ 41

  C.   Balance of the Equities & the Public Interest .................................................... 42

VI.    SCOPE OF RELIEF .............................................................................................. 44

  A.   TRO Purpose & Limitations .............................................................................. 44

  B.   Geographic Scope .............................................................................................. 47

  C.   Content of the Injunction ................................................................................... 49

  D.   Agencies Restrained .......................................................................................... 52

VII.   SECURITY/BOND REQUIREMENT ................................................................. 52

VIII.  STAY PENDING APPEAL ................................................................................... 53

IX.    CONCLUSION ....................................................................................................... 54

ii

## I.    SUMMARY

When the federal government terminates large numbers of its employees, including those still on probation because they were recently hired or promoted, it must follow certain rules. Some of those rules are intended to help states manage the consequences of sudden, mass layoffs. Workers who unexpectedly lose their jobs often need immediate assistance—in applying for unemployment, in searching for new jobs, and in obtaining essential social services—and Congress and the government itself recognized as much when they crafted rules meant to give states advance notice of big layoffs. Without advance notice and the opportunity to plan, organize, and reprogram necessary resources, states are harmed.

In this case, the government conducted massive layoffs, but it gave no advance notice. It claims it wasn't required to because, it says, it dismissed each one of these thousands of probationary employees for "performance" or other individualized reasons. On the record before the Court, this isn't true. There were no individualized assessments of employees. They were all just fired. Collectively. Accordingly, in the language of relevant laws, these big government layoffs were actually "Reductions in Force," or "RIFs." And, because these were "RIFs," they had to be preceded by notice to the states that would be impacted.

Lacking the notice to which they were entitled, the States weren't ready for the impact of so many unemployed people. They are still scrambling to catch up. They remain impaired in their capacities to meet their legal obligations to their citizens.

Because the federal government's recent discharge of thousands of probationary employees was not executed in compliance with rules intended to ensure that states are ready to bear the load cast upon them when mass layoffs occur, and because the Plaintiff States are not yet

1

in fact so prepared, and this because of the violations, the recent directives of various federal agencies terminating probationary employees must be stayed.

In the accompanying Temporary Restraining Order, the illegal RIFs *are* stayed for fourteen days, during which the Court will likely consider an application for a preliminary or longer-term injunction. The Temporary Restraining Order restores the status quo. Employees purportedly terminated under the RIFs are returned to the Government's employ, *i.e.*, they resume the status they enjoyed before the Government acted.

*     *     *

## II.    INTRODUCTION

Plaintiffs, which include nineteen states and the District of Columbia ("the States"), have filed suit against forty-one Defendants, which include cabinet agencies and their secretaries, and other federal agencies and their heads ("the Government"). (*See generally* ECF No. 1.) The States challenge the Government's termination of probationary federal employees. Plaintiffs have filed a Motion for Temporary Restraining Order ("TRO"). (ECF No. 4.) The parties have filed briefing and evidence in relation to the Motion. (ECF Nos. 4, 5, 19, 20, 33.) The Court held a Hearing on the Motion on March 12, 2025. The Motion will be granted, and a TRO will issue.

## III.   BACKGROUND

### A.    Requirements for Terminating Probationary Employees

In the federal civil service, most employees are considered to be under probationary status in the first year or two of their employment. *See* 5 U.S.C. §§ 3321(a), 7511(a)(1)(A)(ii), 7511(a)(1)(C)(ii); 5 C.F.R. § 315.801. A probationary employee may be terminated "because his

2

work performance or conduct during this period fails to demonstrate his fitness or his qualifications

for continued employment," 5 C.F.R. § 315.804, or "for reasons based in whole or in part on

conditions arising before his appointment," 5 C.F.R. § 315.805. If a probationary employee is

terminated because his performance or conduct fails to demonstrate that he is fit for continued

employment, the agency "shall terminate his services by notifying him in writing as to why he is

being separated and the effective date of the action. The information in the notice as to why the

employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the

inadequacies of his performance or conduct." 5 C.F.R. § 315.804. Otherwise, a probationary

employee may be terminated as part of a reduction in force ("RIF"). The parties have not identified

any other method by which a probationary employee may be terminated.

With respect to a RIF, federal statutes and regulations set forth detailed procedures that

federal agencies must follow. *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351. The relevant regulations

provide that "[e]ach agency shall follow this part when it releases a competing employee from his

or her competitive level by . . . separation . . . , when the release is required because of lack of

work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of

reemployment rights or restoration rights; or reclassification of an employee's position die [*sic*] to

erosion of duties when such action will take effect after an agency has formally announced a

reduction in force in the employee's competitive area and when the reduction in force will take

effect within 180 days." 5 C.F.R. § 351.201(a)(2).

When conducting a RIF, an agency must follow certain retention preferences, as laid out

in the statute and regulations. *See* 5 U.S.C. § 3502(a) (directing the Office of Personnel

Management ("OPM") to "prescribe regulations for the release of competing employees in a

reduction in force which give due effect to (1) tenure of employment; (2) military preference . . . ;

(3) length of service; and (4) efficiency or performance ratings."); 5 C.F.R. § 351.501 (providing that "[c]ompeting employees shall be classified on a retention register on the basis of their tenure of employment, veteran preference, length of service, and performance" based upon group designations). Probationary employees are included in "group II" and may only be released after the release of "group III" employees, which includes certain temporary and term employees. 5 C.F.R. § 351.501(a), (b).

In addition, when conducting a RIF, a federal agency must:

establish "competitive areas[1] in which employees compete for retention"; designate the "competitive areas" of which employees are to compete for retention at least 90 days before the effective date of the RIF; designate any "competitive levels" of positions included in the RIFs that would permit the agency to reassign retained employees without causing undue interruption; and rank employees for retention based on factors including their tenure group, time in service (including military service), veteran preference, length of service, and performance.

(ECF No. 1 ¶ 92 (citing 5 U.S.C. § 3502(a); 5 C.F.R. §§ 351.402–351.404, 351.504).)

Further, federal agencies are required to provide at least 60 days written notice before they may release a federal employee. If the RIF is caused by unforeseeable circumstances, "the Director of OPM, at the request of an agency head or designee, may approve a notice period of less than 60 days." 5 C.F.R. § 351.801(b). "The shortened notice period must cover at least 30 full days before the effective date of release." *Id.*

That notice must be provided to (1) the employee; (2) the employee's collective bargaining representative; and—if the RIF involves at least 50 employees within a "competitive area"—(3) the state in which the employee's duty station was located. 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803.

---

[1] "A competitive area must be defined solely in terms of the agency's organizational unit(s) and geographical location and . . . it must include all employees within the competitive area so defined. A competitive area may consist of all or part of an agency. The minimum competitive area is a subdivision of the agency under separate administration within the local commuting area." 5 C.F.R. § 351.402(b).

4

The notice must be provided to "[t]he State or the entity designated by the State to carry out rapid response activities under Title I of the Workforce Investment Act of 1998." 5 C.F.R. § 351.803. That notice must include: "(1) The number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM); (2) The effective date of the separations; and (3) Any other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services." *Id.*

When an agency fails to provide the requisite notice to the State, the "employee may not be released, due to a reduction in force[.]" 5 U.S.C. § 3502(d)(1).

The States, in turn, are required to carry out "rapid response activities" pursuant to the Workforce Innovation and Opportunity Act of 2014.[2] *See* 20 C.F.R. § 682.302 ("Rapid response must be delivered when" there is, *inter alia*, "[a]nnouncement or notification of a mass layoff as defined in § 682.305."); *see also* 20 C.F.R. § 682.305 (defining "mass layoff" as one that "meets the State's definition of mass layoff, as long as the definition does not exceed a minimum threshold of 50 affected workers" or, "[w]here a State has not defined a minimum threshold for mass layoff meeting the requirements of paragraph (a) of this section, layoffs affecting 50 or more workers").

"Rapid response activity" is defined as the activities provided by the state in response to a mass layoff "in order to assist dislocated workers in obtaining reemployment as soon as possible, with services including" "the establishment of onsite contact with employers and employee representatives"; "the provision of information on and access to available employment and training activities"; "the provision of emergency assistance"; and "assistance to the local community in

---

[2] The Workforce Innovation and Opportunity Act of 2014 succeeded the Workforce Investment Act of 1998. *See* 29 U.S.C. § 3361(a) ("Except as otherwise specified, a reference in a Federal law to a provision of the Workforce Investment Act of 1998 (29 U.S.C. 2801 et seq.) shall be deemed to refer to the corresponding provision of [the Workforce Innovation and Opportunity Act of 2014].").

5

developing a coordinated response and in obtaining access to State economic development." 29 U.S.C. § 3102(51). These rapid-response services are designed to cushion the blow of sudden mass unemployment. *See, e.g.*, 20 C.F.R. § 682.100 (providing that the Workplace Innovation and Opportunity Act ("WIOA") designates "both required and allowable activities"); *id.* § 682.200 (identifying "[r]equired statewide . . . activities," including "rapid response activities"); *id.* § 682.300(a) (defining "rapid response" as "encompass[ing] the strategies and activities necessary to," among other things, "[d]eliver services to enable dislocated workers to transition to new employment as quickly as possible"). These federal duties stand alongside the States' own, jurisdiction-specific requirements related to mass unemployment events. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11–303 to –04 (setting out Maryland's "quick response program," whose duties include "monitor[ing] layoff and employment patterns and payments of unemployment compensation contributions to identify employers that are likely to experience large losses in employment or a reduction in operations"); N.J. Stat. Ann. § 34:21-5 (setting out New Jersey's "response team," whose duties include, among others, "[s]eek[ing] to facilitate cooperation between [management and employees] to most effectively utilize available public programs which may make it possible to delay or prevent the transfer or termination of operations"); (*see generally* ECF No. 4-1 at 16–17). Finally, the States also hold background obligations to provide unemployment and similar benefits. *See generally, e.g.*, Md. Code Ann., Lab. & Empl. §§ 8–101 to –1608; N.J. Stat. Ann. §§ 43:21–1 to –71.

## B.   The Government's Alleged Actions

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." It set out as its purpose, "[b]y eliminating waste, bloat, and insularity, my Administration will empower

6

**JA482**

American families, workers, taxpayers, and our system of Government itself." It provides, *inter alia*, that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs."

On February 11 and 12, various agencies terminated large numbers of probationary employees. (ECF No. 1 ¶¶ 107–109.)

The States allege that, on February 13, "OPM officials met with agency officials throughout the federal government and ordered agencies to lay off nearly all of the federal government's approximately 220,000 probationary employees." (*Id.* ¶ 110.) And, in a February 14 email, Plaintiffs allege that OPM explained to agencies that "[w]e have asked that you separate probationary employees that you have not identified as mission critical no later than the end of the day Monday, 2/27. We have attached a template letter. The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs)." (*Id.* ¶ 112.)

This was followed by several more agencies terminating large numbers of probationary employees on February 13 through March 3. (*Id.* ¶¶ 115–137.)

All told, the States allege that the Government has terminated at least 24,000 probationary employees. (*Id.* ¶ 139.) The States were not provided any notice of such terminations from the relevant agencies. (*Id.* ¶ 148.)

## C. The States' Alleged Harms

The States allege several injuries resulting from the Government's failure to follow the RIF procedures. They situate these injuries within five distinct categories of harm: (1) harms to the States' rapid-response protocols, which both federal and state law require the States to develop, (*see* ECF No. 4-1 at 21–22, 33–34; ECF No. 19 at 2–3); (2) harms to the States' administration of

7

unemployment benefits, (*see* ECF No. 4-1 at 21–22, 34–35; ECF No. 19 at 2–3); (3) harms to State programs that rely on embedded federal workers, (*see* ECF No. 4-1 at 36–37; ECF No. 19 at 3); (4) harms to the States' finances, namely, the States' tax bases and various social-services programs, including public health insurance, (*see* ECF No. 4-1 at 23, 37–38; ECF No. 19 at 4–5); and (5) an informational harm that attends the fact of not having received the statutorily required notice, (*see* ECF No. 4-1 at 23, 24; ECF No. 19 at 5–6).

First, the States allege harms to their rapid-response efforts by virtue of having to "divert[] or . . . prepar[e] to divert staff from critical state-funded matters." (ECF No. 19 at 2.) They also allege harms in the form of "administrative burdens [flowing from] the need to affirmatively contact federal agencies, monitor public reporting, and conduct mass outreach to identify impacted workers," (*id.* at 2–3 (citations omitted)), as well as to "determine if additional firings will occur" and "attempt to provide services to those employees," (ECF No. 4-1 at 22 (collecting affidavits from State labor officials)). For example, the State of Maryland "created a new website, requiring significant time and expense," in order to provide resources to recently terminated federal employees. (ECF No. 4-5 ¶ 29.) In the States' telling, these recent costs exceed those they would have incurred with proper notice under the RIF statute. (*See, e.g.*, ECF No. 4-5 ¶¶ 21–22 (Maryland Secretary of Labor asserting that "[r]eacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law," and that "[b]ecause the [State] has received no notice of federal RIFs, despite extensive outreach, [it is] dedicating significantly more staff, resources, and expenditures to fulfill [its] statutory obligation").)

Second, the States allege harms to their unemployment-benefits systems as a direct result of a surge in the number of claims brought by former federal employees. (*See* ECF No. 4-1 at 21–22; 32–38.) The States offer the following numbers, among others:

8

- Between January 21 and March 3, 2025, Maryland received claims from 813 former federal employees, up 330 percent from the 189 such claims it received during the same period the prior year. (*See* ECF No. 4-5 ¶¶ 50, 52.) In "the last few weeks," the State has received 30 to 60 new claims per day. (*Id.* ¶ 18.)
- Between February 1 and March 4, 2025, California received claims from 1,621 former federal employees, up 149 percent from the 650 such claims it received during the same period the prior year. (*See* ECF No. 4-7 ¶ 30.)
- Between January 19 and March 1, 2025, Illinois received claims from 446 former federal employees, just seven fewer than the 453 such claims it received during the entire 2024 calendar year. (*See* ECF 4-8 ¶¶ 15–16.)
- Between January 21 and February 26, 2025, New Jersey received claims from 388 former federal employees, up 273 percent from the 104 such claims it received during the same period the prior year. (*See* ECF No. 4-11 ¶¶ 14–15.)
- Between January 21 and February 27, 2025, New York received claims from 550 former federal employees, a "significant increase" from prior numbers. (*See* ECF No. 4-13 ¶ 4.)
- In February 2025, Massachusetts received claims from 251 former federal employees, with a "significant uptick" in the latter weeks of that period, including 32 claims on February 24 alone. (ECF No. 4-9 ¶¶ 16–17.)

Because of these increases in claims, the States say they "are experiencing administrative burdens and costs," including costs related to the processing of numerous additional claims. (ECF No. 19 at 3 (citing ECF No. 4-5 ¶¶ 37–38, 73–74 (describing how, in Maryland, state money makes up for any federal shortfalls in unemployment-related funding)); *see also* ECF No. 4-5 ¶¶ 59, 70 (identifying Maryland's added costs not only in processing claims, but in *verifying* them, especially given scant information about the firings).) And the States fear "[t]his surge is only beginning," given that "the effective dates for some terminations have not yet passed" and "there will [also] be a delay between when individuals are fired and when they likely apply for benefits." (*See* ECF No. 4-1 at 21.)

Beyond the increased burdens on unemployment-benefits services and the ability to fulfill their rapid-response duties, the States separately "anticipate increased costs to the agencies that enroll new participants in Medicaid and other health-benefits programs." (ECF No. 4-1 at 36.) In that context, the expected harms stem from circumstances substantially similar to those described

9

above: a bevy of new and otherwise avoidable administrative tasks, including "[f]ielding questions from terminated employees, processing an unexpected influx of applications, and providing other health-benefits services." (*See id.*)

Third, "[s]ome Plaintiff States have also lost the benefit of services provided by federal employees embedded within state agencies, without any time to prepare." (ECF No. 1 ¶ 6.) In New Jersey and Rhode Island, for example, federal employees working in the Centers for Disease Control and Prevention ("CDC")'s Public Health Associate Program ("PHAP") are embedded in state health agencies. (*See* ECF No. 4-12 ¶ 5; ECF No. 4-15 ¶ 7.) In New Jersey, three PHAP associates, all of whom working on infectious disease tracing, were terminated. (ECF No. 4-12 ¶ 11.) CDC later reinstated the associates, but one of the three elected not to return. (*Id.*) New Jersey was "unable to prepare for the sudden loss of labor it was relying on to perform crucial public health services," and, because the associates' caseloads had to be transferred without any notice to staffers who already had full caseloads, there were "administrative inefficiencies, duplicative work, and most importantly, delayed notifications to persons exposed to syphilis, HIV, and TB, which in turn increased the risk of spreading disease in New Jersey." (*Id.* ¶ 13.) Plaintiffs provide similar evidence for Rhode Island, where two PHAP associates were terminated but then reinstated. (*See generally* ECF No. 4-15.)

Fourth, the States allege that the Government's actions "will continue to cause irreparable harm to Plaintiff States' tax base." (ECF No. 4-1 at 37.) According to the Comptroller of Maryland, for example, "[a]lthough unemployed individuals receiving unemployment benefits generally pay income tax on their benefits, the benefits paid are less than the amount the individuals earned when they were fully employed, and therefore the taxes paid are generally less than the taxes paid during their employment." (ECF No. 4-38 ¶ 5.) She further attests that

10

"hundreds" of Maryland federal employees have been recently terminated and applied for unemployment benefits, which will ultimately result in "significant decreases in Maryland's income tax revenues." (*Id.* ¶¶ 7–8.) Plaintiffs also rely on the analysis of Terry Clower, a public policy professor at George Mason University. (ECF No. 4-35.) Dr. Clower estimates that "the termination of 1,000 federal workers in the District [of Columbia] would, over a period of 60 days, reduce the District's income tax revenues by $320,914 and sales tax revenues by $57,942." (*Id.* ¶ 9.) If the number of terminated employees was 50,000, then the reductions in income and sales tax revenues would be approximately $16 million and just under $3 million, respectively. (*Id.*) Moreover, Dr. Clower estimates that, if fired workers are given the opportunity to find alternative employment, the tax losses to the District would be significantly lower, (*id.* ¶ 12); the States contend that this analysis shows that "[h]ad the District received the notice required by law, these losses would likely have been mitigated, including because some employees would have been able to obtain alternative employment prior to their termination." (ECF No. 4-1 at 37–38.)

Fifth, the States allege a "textbook informational injury" because of the Government's failure to provide information about RIFs as required by law. (ECF No. 19 at 5.) The States assert—and the Government does not deny—that the Government did not provide any advance notice that it was conducting RIFs, nor did it provide "information as to the location and circumstances of future RIFs" as required under federal law. (*Id.* (citing 5 U.S.C. § 3502(d)(3)(A)(i); 5 C.F.R. § 351.803(b)(1).)

## IV.  REVIEWABILITY

The Court first examines whether it may review the actions at issue. It concludes that the States—or at least some subset of them—have standing, that there were reviewable final agency actions, and that *Thunder Basin* does not preclude review.

### A.  Justiciability

Article III of the Constitution limits the judicial power of the federal courts to the resolution of "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1. The law has long understood this language to limit the judiciary to settling "genuine, live dispute[s] between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (quoting *Carney v. Adams*, 592 U.S. 53, 58 (2020)). When a dispute does not fit that description, it is considered nonjusticiable, *see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979), and the federal courts lack subject-matter jurisdiction to decide it. *See Hamilton v. Pallozzi*, 848 F.3d 614, 620–21 (4th Cir. 2017) (citation omitted).

An "essential and unchanging part" of the case-or-controversy limitation is the requirement of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry is often cast as asking "whether the plaintiff is the proper party to bring th[e] suit." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). By ensuring, among other things, that plaintiffs seek relief from only those acts that affect them in a definite and distinct way, the standing doctrine "ensures that federal courts decide only 'the rights of individuals,'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Marbury v. Madison*, 5 U.S. 137, 170 (1803)), and therefore exercise only "their proper function in a limited and separated government," *id.* (citation omitted). "Such scrutiny is necessary to filter the truly afflicted from the abstractly distressed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000).

12

To establish standing, a plaintiff must show (1) a "concrete, particularized, and actual or imminent" injury in fact; (2) that the injury "was likely caused by the defendant"; and (3) that the injury "would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423 (citing *Lujan*, 504 U.S. at 560–61). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (internal quotation marks omitted) (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

Here, the States have demonstrated each of the fundamental elements of standing, such that they are entitled to invoke federal jurisdiction over their claims. The Court addresses each element in turn.

### 1.   Injury in Fact

The States assert five categories of injury: (1) increased administrative costs associated with the hasty rollout of rapid-response protocols, (2) increased administrative costs related to the burden the dismissals have placed on their unemployment-benefits programs, (3) the loss of the services of embedded federal employees, (4) financial harms by way of decreased tax revenue and increased public health insurance payouts, and (5) informational harms in the form of not receiving notice they had a strong interest in receiving (an argument supported by the foregoing, allegedly avoidable harms). *See supra* Section I.C.

As an initial matter, for analytical purposes, the Court views these injuries differently than the States do. As the States themselves observed at the TRO hearing, the "central injury" in this case is fundamentally informational: the States were not given statutorily required notice of the Government's RIFs. For that reason, the other four categories of harm are most naturally understood not as standalone injuries, but as harms flowing from the lack of notice. After all, had

13

**JA489**

notice been provided, those other injuries—at least as the States describe them—would not have materialized. Accordingly, the Court considers the States to assert just *one* injury, not five.

That does not mean, however, that the other categories of injury are irrelevant—far from it. This is because of what is required to establish an informational injury under Article III.

Informational injury has long been recognized as a valid injury in fact. *See, e.g.*, *Laufer, LLC*, 60 F.4th at 163 (collecting cases). And while courts have, from time to time, enforced limits on the justiciability of claims arising from informational harms—often in the context of whether such harms were sufficiently "concrete," *see, e.g.*, *TransUnion*, 594 U.S. at 441–42; *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 300 (4th Cir. 2024)—they have always been open to plaintiffs who (1) did not receive information they were legally entitled to receive and, as a result, (2) experienced "a 'real' harm with an adverse effect." *See Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)); *see also TransUnion*, 594 U.S. at 442 (observing that there must be "'downstream consequences' from failing to receive . . . required information" (citation omitted)).

The States' asserted informational injury satisfies these requirements. First, the plain text of the relevant statutes and regulations makes clear that the States were legally entitled to notice of an imminent RIF. *See* 5 U.S.C. § 3502(d)(3)(A); 5 C.F.R. § 351.803(b). Not only that, but the notice had to contain certain information. *See* 5 U.S.C. § 3502(d)(3)(B); 5 C.F.R. § 351.803(c). Nowhere does the Government dispute the States' interest on this score—not in its briefing, nor during the TRO hearing.

Second, the States have incurred substantial follow-on harms as a result of the Government's failure to provide the required RIF notice. Chief among these are the increased burdens associated with the States' flat-footed rollout of rapid-response and unemployment-

14

benefits programs. (*See, e.g.*, ECF No. 4-5 ¶¶ 27, 58 (describing costs and delays associated with diverting Maryland personnel); ECF No. 4-8 ¶ 24 (similar, but for Illinois).) To fulfill their legal obligation to provide these services, the States have had to divert money and human resources from existing purposes to new ones—and, because of the lack of notice, have done so less efficiently than they would otherwise have. That is enough for standing. After all, even on their own, monetary losses are "obvious" concrete harms, *see, e.g.*, *TransUnion*, 594 U.S. 413 at 425, such that they are also undeniably "real" for purposes of informational injury. The same must be true of the diversion and/or loss of various employees' services, whether this stems from internal employees being reassigned or embedded ones disappearing; the Court presumes employees are hired for and placed according to the value they provide—and, accordingly, that departure or placement into another role, even temporarily, constitutes (at least) a financial loss.

The Court reaches the same conclusion, albeit on somewhat shakier ground, with respect to the increased costs associated with a surge in payouts of unemployment claims and other various public benefits. The question for *these* harms is not, of course, whether they are "concrete"; they are, for the same reasons as the financial and labor harms inflicted upon the States' capacity to run their rapid-response and unemployment-benefits programs. The question, rather, is whether they are sufficiently "actual or imminent."

On balance, the Court believes they are. Future harm is enough for standing when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). And here, the analysis is straightforward: mass layoffs lead to large numbers of unemployed people, and large numbers of unemployed people lead to an increase in the number of unemployment claims. At this early stage, that is enough, even in view of the fact

15

**JA491**

that not *every* terminated employee will file for unemployment, and that not every employee who does so will be successful. After all, the States have already shown an increase in the number of benefits claims coming from former federal employees. And the courts have repeatedly endorsed similar theories of future injury. *See, e.g.*, *Dep't of Com.*, 588 U.S. at 766–67 (approving standing theory based on "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" due to expected nonresponses to modified census); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (holding a State to have standing to challenge a federal immigration law based on the costs of issuing a greater number of driver's licenses), *aff'd by an equally divided court*, 579 U.S. 547 (2016); *State v. Biden*, 10 F.4th 538, 547 (5th Cir. 2021) (holding a State to have standing because it "incurs a cost every time it *inquires* into whether [someone] satisfies the requirements for a license" (emphasis in original)). Even so, the Court notes the infirmity inherent in all theories of future injury, particularly those that rely on the anticipated behavior of third parties. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").

The only injury the States assert that does *not* readily present an "actual or imminent" downstream harm is the loss of tax revenue. The question of when a state or municipality has standing to sue on the grounds that a challenged federal action will reduce its tax revenue is a somewhat unsettled one. On the one hand, it has long been held that a State cannot establish standing by positing a chain of events flowing from the Government's actions that could eventually lead to decreased tax revenue flowing into the general treasury. *See Florida v. Mellon*, 273 U.S. 12, 17–18 (1927) (rejecting as "purely speculative, and, at most, only remote and indirect" the claim that a challenged act "will have the result of inducing potential taxpayers to withdraw

16

property from the state, thereby diminishing the subjects upon which the state power of taxation may operate"). On the other, a State may be able to establish standing when a challenged action will cause a "direct injury in the form of a loss of specific tax revenues." *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). The Courts of Appeals are split as to how broadly *Wyoming* should be read, *compare Sierra Club v. Trump*, 977 F.3d 853, 870–71 (9th Cir. 2020), *judgment vacated on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 56 (2021), *with El Paso County v. Trump*, 982 F.3d 332, 339–41 (5th Cir. 2020), and it does not appear that the Fourth Circuit has opined on the matter.

Here, reasonable minds could differ as to whether the States' position places it closer to the plaintiff in *Florida* or in *Wyoming*. The States' fears of a general "significant decline in tax receipts" as a result of economic pressures engendered by the terminations is likely too diffuse of an injury to be cognizable. (ECF No. 19 at 4–5.) The States come closer to the mark, however, in presenting evidence that the State of Maryland will likely suffer significant lost income tax revenue as a result of the Government's terminations, because individuals receiving unemployment benefits pay lower income taxes than those who are fully employed. (ECF No. 4-38 (Declaration of the Comptroller of Maryland).) But whether this loss is sufficiently directly tied to the RIFs is unclear.

Weaknesses in certain theories aside, the Court is satisfied that the States have shown an injury in fact based on informational harm. The States have already incurred appreciable financial and labor costs as a direct result of not receiving notice they were owed, and they will certainly incur additional costs in the future related to the increased payout of public benefits. And the Court is unpersuaded by the Government's argument, reiterated throughout the TRO hearing, that each of these costs is "downstream" and therefore not cognizable under Article III. As the Supreme

17

Court has made clear, a "real," downstream harm is a critical *component* of an informational injury—hardly a circumstance that destroys one. *See, e.g., TransUnion*, 594 U.S. at 442; *see also Dreher*, 856 F.3d at 345 (citing *Spokeo*, 578 U.S. at 340). For that reason, particularly in this expedited posture, the Court need not say definitively which theories of injury ought not survive for the duration of the litigation; at least one valid theory is enough.[3]

The Court is also unmoved by the Government's appeal to what it calls "the extraordinary breadth of the States' suit," an argument the Government appears to raise in support of its view that the States have not identified a particularized injury. (*See* ECF No. 20 at 13–14.)

To buttress this argument, the Government likens this action to *Murthy v. Missouri*, in which several plaintiff states—all of which had sought a preliminary injunction barring federal officials from pressuring social media platforms to suppress free speech—were held to lack standing. 603 U.S. 43 (2024). True, this case, like *Murthy*, is a "sprawling" suit in which "dozens of Executive Branch officials and agencies" have been sued. *Id.* at 49, 61. But while massive and unusual suits may legitimately invite closer judicial scrutiny than more run-of-the-mill ones, there is of course no *per se* rule that such actions are impermissible.

And besides, the scale of the two suits is where the similarities between this case and *Murthy* end. In *Murthy*, the crux of the standing problem was twofold: First, the plaintiffs could not establish that any harm—suppression of free speech protected by the First Amendment—was fairly traceable to the governmental defendants, rather than to the (nonparty) social media platforms who actually made the decision to restrict their speech. 603 U.S. at 62–68. Second, in

---

[3] For similar reasons, and in light of the fact that the Court would order nationwide relief even if just a single State had standing to press these claims, *see infra* Section IV.B, the Court need not determine which States, if any, do *not* have standing to go the distance in this action. For the limited purposes of this TRO, it is enough for one State to be able to invoke the jurisdiction of this Court. The Court is satisfied that at least some subset of the States—namely, Maryland—has done so.

*Murthy* the plaintiffs sought prospective relief against future alleged suppression campaigns, but there was no evidence that the government was continuing its alleged pressure campaign or was likely to do so in the future. *Id.* at 68–72. This case is completely different. First, unlike in *Murthy*, where only prospective relief was sought and it was doubtful that plaintiffs would suffer any future injuries, here the harm is happening right now, and can only be remedied by immediate injunctive relief. More fundamentally, unlike in *Murthy*, the alleged chain of causation does not depend upon the actions of third parties not before the Court. Instead, the allegations are simply that the Government failed to provide the States information to which they are statutorily entitled, and that because of this failure States have been forced to expend resources that they would not otherwise have had to expend. This distinction also goes to redressability. In *Murthy*, it was not clear how a favorable court order would redress the injuries claimed, as nothing in the order would prevent the nonparty social media platforms from continuing to suppress the plaintiffs' speech. *Id.* at 73–74 ("[T]he platforms remain free to enforce, or not to enforce, those policies—even those tainted by initial governmental coercion. The platforms are not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." (cleaned up)). Such concerns are simply not at issue here.

2. Causation

To start, it is plain that at least *some* of the harms the States have experienced—namely, the increase in the cost of administering certain state programs, irrespective of what those programs will be required to pay out—are direct and foreseeable results of the agencies' failures to provide RIF notices. The Government does not argue otherwise. (*See* ECF No. 20 at 12–17.) Accordingly, on that basis alone, the Court is confident there is no causation defect that would wholly defeat the States' standing.

19

As for the harms based on the expected increase in public benefits awards and future lost tax revenues, the Government argued during the TRO hearing that these harms were self-inflicted. The Court disagrees. Costs that States incur in the satisfaction of a mandatory legal duty, even one arising under state law, are not self-inflicted. *See, e.g.*, *Texas*, 809 F.3d at 155. And here, legal duties arise under *both* federal and state law. *See, e.g.*, 20 C.F.R. §§ 682.100–.300 (providing certain duties under the Workplace Innovation and Opportunity Act); Md. Code Ann., Lab. & Empl. §§ 11–303 to –04 (setting out Maryland's "quick response program" with respect to mass unemployment events); N.J. Stat. Ann. § 34:21-5 (similar, but for New Jersey).

Causation is also not defeated by certain theories' reliance on the anticipated behavior of third parties. This element is satisfied when "third parties will likely react in predictable ways to the" conduct at issue. *See Dep't of Com.*, 588 U.S. at 768. For much the same reason the States' appeal to future increased benefits payouts was "actual or imminent" for purposes of injury in fact, that harm is traceable to the Government's terminations: mass layoffs mean more unemployed people, more unemployed people means more unemployment claims. That is textbook predictability.

3. Redressability

Finally, the States have shown their harms to be redressable by the relief sought. To satisfy this element, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

As established above, the States' injuries were caused by the lack of RIF notice. That circumstance, standing alone, might lead one to conclude that the appropriate remedy—and, for that matter, the only one the States would have standing to seek—is *notice*, albeit overdue.

20

**JA496**

But this ignores the nature of the States injuries. While the *initial* harm was caused by a lack of notice, the States' informational harm includes at least some of the serious downstream harms the States assert. Thus, those downstream injuries must be considered in the redressability analysis.

The remedy the States seek is to set aside the Government's allegedly unlawful RIFs—a remedy which, in effect, would require the reinstatement of the terminated employees. (*See* ECF No. 1 ¶¶ 242–43.) The Government appears to agree. (*See, e.g.*, ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by their *reinstatement*." (emphasis in original).) So, too, does the Court. After all, the States' injuries are the result of the increasing pressure on States' rapid-response, unemployment, and other public programs. Were the terminated employees to be reinstated, that pressure would abate. That is enough for redressability.

### B.    Jurisdiction

#### 1.    Final Agency Action

The Court begins by clarifying the conduct at issue in this case, at least for purposes of the pending TRO request. The States challenge two distinct federal actions: first, the OPM directives that allegedly directed other federal agencies to dismiss probationary employees *en masse*; and second, the actual, agency-level dismissals of those employees without notice. (ECF No. 4-1 at 24–25.) But the nub of this lawsuit is the lack of notice the States received with respect to the RIF provisions. (*See, e.g.*, ECF No. 19 at 3 ("The strain on Plaintiffs' rapid response systems is directly traceable to Defendants' unlawful RIFs, conducted without the required advanced notice.")). And the agency actions that are most proximate to that harm are the dismissals without notice, not the OPM directives, for one simple reason: under the RIF regulations, notice must come from the dismissing agencies, not from OPM, except as it concerns OPM's dismissals of its *own*

21

employees. *See* 5 C.F.R. § 351.803(b). For that reason, this Memorandum focuses on the unnoticed dismissals, though the Court makes no final determination at present as to which actions are appropriately reviewed in this litigation.

"Judicial review under the [Administrative Procedure Act ("APA")] is limited to review of 'final agency action.'" *NAACP v. Bureau of the Census*, 945 F.3d 183, 189 (4th Cir. 2019) (quoting 5 U.S.C. § 704). But, as explained below, the unnoticed dismissals fall squarely within that category. Accordingly, the APA poses no jurisdictional obstacle to this Court's review of the States' claims.[4]

To start, "agency action" is a capacious term, "cover[ing] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001) (citation omitted). And while the Government refers to the acts at issue as "alleged final agency actions," (ECF No. 20 at 14, 23), it does not otherwise dispute that the dismissals are "agency actions" within the meaning of the APA's review provision. Nor could it. *See, e.g.*, *Burdue v. FAA*, 774 F.3d 1076, 1080 (6th Cir. 2014) ("[An agency employee's] termination is . . . agency action for purposes of the [APA].").

As for "finality," an action is "final" whenever two conditions are satisfied: (1) the action is the "consummation of the agency's decisionmaking process," and (2) the action is one "by which rights or obligations have been determined or from which legal consequences will flow." *NAACP*, 945 F.3d at 189 (ultimately quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The firings without notice undeniably meet this standard, as any agency's decision to dismiss an employee

---

[4] Notably, the requirement of "final agency action" applies only to the States's two APA claims, not their *ultra vires* claim. This is because the right of action for an *ultra vires* claim flows from the federal courts' equity jurisdiction, not from the APA. *See, e.g.*, *PFLAG, Inc. v. Trump*, Civ. No. BAH-25-337, 2025 WL 685124, at *9 & n.26 (D. Md. Mar. 4, 2025) (citing *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006)). That said, for purposes of the pending TRO request, the Court addresses the merits only of the States' APA claims, not their more unusual *ultra vires* claim, despite jurisdiction to consider each. *See infra* Section III.A.

22

effects self-evident legal consequences for both parties and plainly marks the end of the agency's decisionmaking with respect to the employee involved. *See, e.g.*, *Burdue*, 774 F.3d at 1080; *cf. Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, Civ. No. WHA-25-1780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) ("OPM's direction to the other agencies [to dismiss probationary employees] constituted a final agency action for the purposes of the APA.").

The Court therefore has jurisdiction to review each of the States' claims, at least insofar as they concern dismissals without notice.

### 2.    Claim Channeling

The Government argues that the Court has no jurisdiction to hear the States' claims because of an alternative administrative review structure set up by Congress.

In *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Supreme Court articulated a two-step analytical framework to assess whether Congress impliedly divested the district courts of jurisdiction to hear challenges to an agency action.

First, a reviewing court asks whether some statute, either explicitly or implicitly, channels certain claims about agency action away from the courts and into an administrative agency. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016). This inquiry "involves examining the statute's text, structure, and purpose." *Bennett*, 844 F.3d at 181 (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)).

Second, if the reviewing court determines that a statute *does* channel certain claims away from the courts, it then considers whether the specific claims at issue fall within that category. *See Axon*, 598 U.S. at 185–86; *see also id.* at 186 ("The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question."). In essence, the court's task is "to decide if a claim is 'of the type'

23

Congress thought belonged within a statutory scheme." *Id.* at 188–89 (quoting *Thunder Basin*, 510 U.S. at 212). Only in "limited circumstances" is a claim *not* "of th[at] type," *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 500 (D.C. Cir. 2018), given that procedures "designed to permit agency expertise to be brought to bear on particular problems" ought ordinarily to be understood as exclusive. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965)).

To assess whether such "limited circumstances" are present in an individual case, courts apply the three so-called *Thunder Basin* factors: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claims, (2) whether the claims are "wholly collateral to [the] statute's review provisions," and (3) whether the claims are "outside the agency's expertise." *Axon*, 598 U.S. at 186 (alteration in original) (quoting *Thunder Basin*, 510 U.S. at 212–13). "When the answer to all three questions is yes, '[the court] presume[s] that Congress does not intend to limit jurisdiction,'" *id.* (quoting *Free Enter. Fund*, 561 U.S. at 489), though a claim may be judicially reviewable even if the factors "point in different directions," *id.*

As both the States and the Government observe, Congress has provided for the exclusive administrative review of most employment claims brought by federal employees, thus satisfying the first step of the two-step framework. Two statutory review schemes are relevant here. The first is set out in the Federal Service Labor-Management Relations Statute ("FSMLRS"), itself set out in Title VII of the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191–216 (1978) (codified at 5 U.S.C. §§ 7101–35). As the District of D.C. recently explained in a similar context, the FSMLRS

> governs labor relations between the executive branch and its employees. It "grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The

24

**JA500**

[FSMLRS] further "establishes a scheme of administrative and judicial review." *Id.* Under that scheme, the Federal Labor Relations Authority ("FLRA"), a three-member agency charged with adjudicating federal labor disputes, reviews matters including "negotiability" and "unfair labor practice" disputes. *See* 5 U.S.C. § 7105(a). When reviewing unfair labor practice complaints, "the FLRA resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118).

Direct review of the FLRA's decisions is available in the courts of appeals. 5 U.S.C. § 7123(a). The D.C. Circuit has repeatedly held that this scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims." *Trump*, 929 F.3d at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013)).

*Nat'l Treasury Emps. Union v. Trump*, Civ. No. CRC-25-420, 2025 WL 561080, at *4 (D.D.C.

Feb. 20, 2025).

The second statutory review scheme is set out elsewhere in the CSRA, which separately

"established a comprehensive system for reviewing personnel action taken against federal

employees." *See Elgin*, 567 U.S. at 5 (citation omitted). Under *those* provisions,

[i]f an agency takes a final adverse action against an employee—removal, suspension for more than [fourteen] days, reduction in grade or pay, or furlough for [thirty] days or less, 5 U.S.C. § 7512—the employee may appeal to the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Probationary employees, however, generally do not enjoy a right to appeal to the MSPB. *Id.* § 7511(a)(1). Employees may appeal final MSPB decisions to the Federal Circuit, which has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.

*Nat'l Treasury Emps. Union*, 2025 WL 561080, at *5.

Notwithstanding the existence of two exclusive statutory review schemes, the Court

concludes that, under the three *Thunder Basin* factors, those schemes do not foreclose district-

court jurisdiction over the States' claims in this case.

25

On the first factor, foreclosure of meaningful judicial review, it is clear the States prevail. The Government argues that "any affected party" may challenge the RIF dismissals "within the administrative scheme" Congress has provided. (ECF No. 20 at 19.) But that argument is defeated by the plain text of the statutory scheme the Government cites, which forecloses any possibility of the States bringing their claims before an administrative agency. In relevant part, the FLRA has the authority to "conduct hearings and resolve complaints of unfair labor practices," 5 U.S.C. § 7105(a)(2)(G), charges of which may be brought "by any *person*," *id.* § 7118(a)(1); *see also id.* § 7121(g)(3)–(4) (referring to the ability of "a person" to appeal to the MSPB, among other remedies). Yet the labor-management relations chapter of the CSRA defines a "person" as "an individual, labor organization, or agency"—not a State. 5 U.S.C. § 7103(a)(1). Similarly, the MSPB may hear appeals from "[a]n *employee*, or *applicant for employment*," *id.* § 7701; *see also id.* § 7513(d) (permitting appeals by "*employee*[*s*]")—again, categories that could not plausibly include States. *Cf. id.* § 7103(a)(2) (defining "employee," for purposes of the labor-management chapter, as either an individual "employed in an agency" or an individual whose employment "has ceased because of any unfair labor practice," as described elsewhere in the statute).

Beyond being unable to seek review *by* any agencies, the States are also foreclosed from seeking judicial review *of* agency decisions. While the Government is correct that the Federal Circuit has exclusive jurisdiction over challenges to the final decisions of the MSPB, (*see* ECF No. 20 at 19 (citing 28 U.S.C. § 1295(a)(9))), the MSPB's own statute shows that judicial review is available only for "*employee*[*s*] or *applicant*[*s*] *for employment* affected or aggrieved" by the MSPB's decisions, 5 U.S.C. § 7703(a)(1) (emphasis added). Likewise, although the Courts of

26

Appeals have exclusive jurisdiction over review of most final orders of the FLRA, such review is, again, available only for "[a]ny *person* aggrieved" by such orders. *Id.* § 7123(a).

In short, the Government supplies no authority for the proposition that a *State* would be able to seek review in any relevant setting—and, indeed, conceded during the TRO hearing that none could.[5] This shortcoming alone is arguably fatal to the Government's position, given that "meaningful judicial review is the most important factor in the *Thunder Basin* analysis." *Bennett*, 844 F.3d at 183 n.7 (collecting cases). If the Government were correct, then Congress would have created a statutory entitlement for States to be provided notice under 5 U.S.C. § 3502(d)(3)(A)(i), but provided no judicial review to vindicate that entitlement, a conclusion contrary to the "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).

The second factor, claims' collaterality to the statutory review provisions, likewise favors the States. For its part, the Government argues the States seek to "interject themselves into the employment relationship between the United States and government workers." (ECF No. 20 at 3.) But that ignores that the States have suffered unique harms, peculiar to their status *as* states, irrespective of those harms' connection with the agency-employee relationship. *See* 5 U.S.C. § 3502(d); 5 C.F.R. § 351.803; *see also supra* Sections I.A, .C. For that reason, the Government's reference to parallel proceedings before the MSPB and Office of Special Counsel ("OSC"), (*see*

---

[5] Likewise, the Government supplies no authority for the related (but equally dubious) proposition that the CSRA wholly divests the district courts of jurisdiction to offer reinstatement as a remedy, (*see, e.g.*, ECF No. 20 at 14), rather than the more limited view that the CSRA divests the courts of jurisdiction to offer that remedy to specific parties. This latter view is the better interpretation of the CSRA's preclusive scope. *See, e.g.*, *Elgin*, 567 U.S. at 13 (explaining that the CSRA's review is exclusive as it concerns federal employees, without any indication that it is exclusive as to reinstatement); (*see also* ECF No. 20 at 14 n.6 (conceding that the district courts *do* have jurisdiction over Title VII claims, which may lead to reinstatement)). Perhaps that is why, when making hay of the fact that two other courts recognized a lack of jurisdiction to entertain certain claims for reinstatement, (*see* ECF No. 20 at 3 (first citing *Nat'l Treasury Emps. Union*, 2025 WL 561080; and then citing *Am. Fed'n of Gov't Emps.*, 2025 WL 660053)), the Government completely elides the fact that those claims were brought by fundamentally different parties—namely, employees and their unions.

ECF No. 20 at 10), is unavailing. As the Supreme Court has explained, "decid[ing] when a particular claim is 'of the type' to fall outside a statutory review scheme . . . requires considering the *nature* of the claim, not the status (pending or not) of an agency proceeding." *Axon*, 598 U.S. at 194 (emphasis added) (quoting *Thunder Basin*, 510 U.S. at 212). Indeed, *Thunder Basin* "contemplates . . . that even when a proceeding is pending, an occasional claim may get immediate review—in part because it involves something discrete." *Id.* What's more, *Axon* permitted judicial review of claims directed at ongoing proceedings involving *the very parties seeking judicial review, see id.* at 193–94—in other words, claims much closer (and therefore less collateral) to an administrative proceeding than are the States' claims in this case, particularly given that the States have no administrative remedy available to them.

The third and final factor, the agencies' expertise, is a closer call, but likely also breaks for the States. Again, there is no mechanism for the States to obtain administrative review before the MSPB, the FLRA, or the OSC. There is thus little reason to think those agencies hold special expertise over the States' claims. On the contrary, the States' claims "raise 'standard questions of administrative' . . . law, detached from 'considerations of agency policy.'" *Axon*, 598 at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). And while the MSPB, FLRA, and OSC "know[] a good deal about" unlawful dismissal of federal employees, they know "nothing special about" the central problem the *States* have asserted: a failure to provide proper notice under the RIF statute. *Cf. id.* And as the Court has by now made clear, that the States' problem *connects* with unlawful dismissals hardly means those dismissals are the subject of this suit.

The Government argues, unpersuasively, that the fact *someone* can seek review of similar claims is enough to disclaim jurisdiction over the States' action. (*See* ECF No. 20 at 21 ("[T]he CSRA and FSL-MRS schemes provide for meaningful judicial review over the very claims

28

asserted by the States, even if the States themselves are not the proper parties to assert them.").)

There are multiple problems with this theory. First, as explained above, while certain facts are common to the States' action and any administrative actions that might be brought by terminated employees, the States' interests remain substantially different from the employees', as evinced by the presence of harms that only states *qua* states can experience. Second, it is hard to swallow that the States, to redress their harms, must simply hope and wait for scores of terminated federal employees to pursue administrative relief. For one, the States are suffering precisely the sort of "here-and-now injury" that favors prompt judicial review. *See Axon*, 598 U.S. at 191 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020)). For another, it is highly doubtful that solo employees or their unions would or could adequately represent the States' peculiar interests in an administrative setting. For the States' harms to be fully redressed in that manner, it would seem to require every employee who was dismissed without notice to pursue (and win) administrative relief, either individually or collectively, such that the pressure on state unemployment programs would eventually, and in piecemeal fashion, be alleviated. The Court is not prepared to accept that theory as reality.

In sum, the CSRA does not preclude this Court's jurisdiction over the States' claims. Time and again, the courts have been firm: "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186 (citing *Bowen*, 476 U.S. at 670); *accord Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967) (collecting cases, and observing that "judicial review of a final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress"); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof."). Here, remarkably, the Government argues that not only is there no judicial review for the States, there is no review of *any* kind. That

29

**JA505**

is a startling state of affairs indeed—and one that basic principles of administrative law require this Court to reject.

## V.    TEMPORARY RESTRAINING ORDER

Having determined that the Court has jurisdiction to hear this case, the Court turns to the factors necessary for issuance of a TRO.

"The standard for a temporary restraining order is the same as a preliminary injunction." *Maages Auditorium v. Prince George's County*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 F. App'x 256 (4th Cir. 2017). The party seeking a temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although Plaintiffs "need not establish a 'certainty of success,'" they must "make a clear showing that [they are] likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The Court concludes that the States have established all four factors, and that a TRO is warranted.

### A.    Likelihood of Success on the Merits

The States are very likely to succeed on the merits of (at least) their APA contrary-to-law claim. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). For purposes of a contrary-to-law claim, the legal standards against which the federal government's conduct is assessed are supplied not by the APA itself, but by a separate statute—in

30

this case, the RIF statute, 5 U.S.C. § 3502. The Court concludes that the States are highly likely to show that they are within the zone of interests of the RIF statute, that the Government conducted RIFs, and that, when doing so, it wholly failed to comply with the statutory and regulatory demand that notice be provided to the States.

           1.     Zone of Interests

In general, statutory protections "extend[] only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked,'" whether or not a statute is invoked under the APA. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Nevertheless, "in the APA context, that . . . test is not 'especially demanding.'" *Id.* at 130 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). All it requires is that a plaintiff's interest be "*arguably* within the zone of interests to be protected or regulated" by the underlying statute. *Match–E–Be–Nash–She–Wish Band*, 567 U.S. at 224 (emphasis added) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 357 U.S. 150, 153 (1970)). Indeed, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 497 U.S. 388, 399 (1987)).

Far beyond merely coming within the legal "zone of interests," the States' interests in this case strike at the very heart of the RIF provisions.

For one, the statute expressly identifies States and the notice they are due. *See* 5 U.S.C. § 3502(d)(3)(A)(i) ("Notice . . . shall be given to . . . the State or entity designated by the State to carry out rapid response activities under . . . the [Workplace Innovation and Opportunity Act ("WIOA")]."); *see also* 5 C.F.R. § 351.803(b) (similar). It also describes precisely *what* must be

31

shared with the States. *See* 5 U.S.C. § 3502(d)(3)(B) (requiring notice of "the number of employees to be separated from service" due to a RIF, "broken down by geographic area or on such other basis as may be required by" other regulations; "when those separations will occur"; and "any other matter which might facilitate the delivery of rapid response assistance or other services under . . . the [WIOA]"); *see also* 5 C.F.R. § 351.803(c) (similar). Based on the text of the statute alone, Congress clearly envisioned for the States an important role in the RIF process.

Beyond occupying a place of prominence in the RIF statutory text, the States also hold legal duties under the WIOA and its implementing regulations to offer rapid-response services to alleviate the societal stresses brought on by sudden mass unemployment. As the Court has discussed above, *see supra* Section I.A, the States are required by federal law to respond to assist workers in finding new employment. 20 C.F.R. § 682.200. The States have their own binding requirements regarding rapid-response activities. *See, e.g.*, Md. Code Ann., Lab. & Empl. §§ 11– 303 to –04. And the States provide unemployment and similar benefits to their own citizens. *See generally, e.g.*, Md. Code Ann., Lab. & Empl. §§ 8–101 to –1608; N.J. Stat. Ann. §§ 43:21–1 to – 71.

All of this underscores the general proposition that the States have important—indeed, mandatory—uses for RIF notice from the Government, and therefore strong interests in such notice being provided on time and in full. It would defy common sense to say these are not among those interests "arguably" protected by the RIF provisions. *See Match–E–Be–Nash–She–Wish Band*, 567 U.S. at 224.

### 2. The Agencies Conducted RIFs

Having determined that the States may bring this action under the APA, the Court turns to the substantive core of this case—whether the States are likely to succeed in showing that the

32

Government's mass terminations, without providing notice to the States, were unlawful. The Government makes essentially two arguments in support of its contention that it has not acted contrary to law. (*See* ECF No. 20 at 23–25.) First, it argues that it had the discretion to terminate the probationary employees in the manner that it did. (*See id.* at 23 ("The States fundamentally misunderstand Defendants' discretion to terminate probationers.").) Second, it argues that it did not conduct a RIF. (*See id.* at 24–25 ("[T]he States ignore fundamental differences between a RIF and the termination of a probationer. The actions they challenge here are the latter, not the former.").) These arguments are unavailing.

Agencies are, of course, permitted to terminate probationary employees. That is not what this case is about. Indeed, agencies are directed to "utilize the probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 C.F.R. § 315.803(a). However, agencies are permitted to terminate probationary employees under only three circumstances: (1) due to conditions arising prior to their employment, 5 C.F.R. § 315.805; (2) due to unsatisfactory performance or conduct, 5 C.F.R. § 315.804(a); and (3) pursuant to a RIF. Neither the Court nor the parties has identified any other permissible reason to terminate a probationary employee. Indeed, the Government was invited at the TRO hearing to identify any other permissible ways to terminate probationary employees, and it could not do so.

Here, the terminated probationary employees were plainly not terminated for cause. The sheer number of employees that were terminated in a matter of days belies any argument that these terminations were due to the employees' individual unsatisfactory performance or conduct. As

33

Plaintiffs allege, the Government has terminated at least 24,000 probationary employees.[6] (ECF No. 1 ¶ 139 ("Defendants have not published official counts and locations of the employees they have terminated, but based on publicly reported numbers and firsthand accounts from affected employees, it appears that Defendants have terminated at least 24,000 probationary employees as of the date of this Complaint.").) It is simply not conceivable that the Government could have conducted individualized assessments of the relevant employees in the relevant timeframe. (*See, e.g.,* ECF No. 4-37 ¶ 14 ("Practically speaking, it would take weeks or months to evaluate the job performance of 6,700 probationary employees.").)

The States also provided affidavits from individuals who worked at certain Defendant Agencies, reflecting that the termination decisions were not based upon individualized assessments of the relevant employees. (ECF No. 4-36 ¶¶ 4, 19 (former "Deputy Director for Operations in the Center for Consumer Information and Insurance Oversight (CCIIO) within the Centers for Medicare & Medicaid Services (CMS)" explaining that "[t]he mass terminations of probationary employees at CCIIO were not based on any individualized assessment of the probationary employees. The CMS [chief human resources officer] did not review the positions for suitability, never read a single person's resume, never spoke with any of the terminated probationary employees, and had no personal knowledge of their individual performance."); ECF No. 4-37 ¶ 14 (former "Human Capital Officer for the Internal Revenue Service ('IRS')" explaining that "Treasury did not review or consider the actual job performance or conduct of any IRS probationary employee when issuing the termination notices. I know this because this fact was discussed openly in meetings.").)

---

[6] At the TRO hearing, the Government was unable to supply the Court with the number of probationary employees who, to date, have been terminated from the relevant agencies. The Government likewise provided the Court with no evidence to suggest that the States' estimate was inaccurate.

34

The Government offers no contrary evidence, yet it insists that these were for-cause terminations and that the notices provided to individual employees were not defective because "[a] statement that a probationer has been terminated because of his or her performance during the probationary period is sufficient." (ECF No. 20 at 24.)

The Court does not render any conclusions regarding what precise language a termination for cause must contain; however, the law is clear that when dismissing an employee due to unsatisfactory performance, "[t]he employer . . . must *honestly* be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *McGuffin v. Soc. Sec. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019) (emphasis added) (citation and internal quotation marks omitted). The affidavits filed by terminated probationary employees reflect that they received boilerplate termination notices explaining that their performance was inadequate, but that they had all received either formal or informal positive feedback from their supervisors. (*E.g.*, ECF No. 33-1 (affidavit and termination letter from former U.S. Department of Transportation probationary employee); ECF No. 33-2 (affidavit and termination letter from former U.S. Department of Health and Human Services probationary employee); ECF No. 33-5 (affidavit and termination letter from former U.S. Department of the Interior probationary employee); ECF No. 33-10 (affidavit and termination letter from former Internal Revenue Service[7] probationary employee); ECF No. 33-11 (affidavit and termination letter from former Federal Emergency Management Agency[8] probationary employee); ECF No. 33-14 (affidavit and termination letter from former Consumer Financial Protection Bureau probationary employee); ECF No. 33-15 (affidavit and termination letter from former National Oceanic and Atmospheric

---

[7] Although the IRS is not named as a Defendant, it sits within the Department of the Treasury, which is named.

[8] Although the Federal Emergency Management Agency is not named as a Defendant, it sits within the Department of Homeland Security, which is named.

35

Administration probationary[9] employee); ECF No. 33-16 (affidavit and termination letter from former U.S. Department of Agriculture probationary employee); ECF No. 33-17 (affidavit and termination letter from former Environmental Protection Agency probationary employee); ECF No. 33-18 (affidavit and termination letter from former Small Business Administration probationary employee); ECF No. 33-19 (affidavit and termination letter from former U.S. Department of Veterans Affairs probationary employee).)

Further underscoring the Court's conclusion that these terminations were not based upon qualifications or performance is that many notices to employees did not even cursorily identify any issues with the individual's performance, but rather explained that their terminations were in the public interest or due to the priorities of the current administration, or else provided no reason at all. (*E.g.*, ECF No. 33-3 at 7 (U.S. Agency for International Development termination letter indicating that "I am terminating you on the basis that it is in the best interest of the U.S. Government"); ECF No. 33-4 at 7 (U.S. Department of Housing and Urban Development termination letter indicating that "this notice is to notify you of the decision to terminate your employment . . . in order to promote the efficiency of the federal service in accordance with the priorities of the Administration"); ECF No. 33-6 at 7 (U.S. Department of Labor termination letter indicating that "[t]he Agency finds your further employment would not be in the public interest"); ECF No. 33-7 at 8 (General Services Administration termination letter indicating "I do not consider it in the best interest of the government to retain you in the Federal service and have decided to terminate your appointment during your probationary period."); ECF No. 33-8 at 7 (U.S. Department of Education termination letter indicating that "I regrettably inform you that I am removing you from your position of [redacted] with the agency and the federal civil service

---

[9] Although the National Oceanic and Atmospheric Administration is not named as a Defendant, it sits within the U.S. Department of Commerce, which is named.

36

effective today, February 12, 2025."); ECF No. 33-9 at 7 (U.S. Department of the Treasury termination letter stating that "[b]ased on [OPM] guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public interest"); ECF No. 33-12 at 7 (U.S. Department of Energy termination letter stating "[p]er OPM instructions, DOE finds that your further employment would not be in the public interest"); ECF No. 33-13 at 8 (Federal Deposit Insurance Corporation termination letter stating that "the FDIC finds that you have not demonstrated that your further employment at the FDIC would be in the public interest").)

In short, the record reflects that these probationary employees were not terminated for cause. *Cf. Roe v. Dep't of Defense*, 947 F.3d 207, 222 (4th Cir. 2020) (holding that the Air Force did not perform "individualized determination[s]" when the "the Air Force discharge memoranda contain identical language briefly stating that each servicemember's HIV-positive status 'renders him ineligible for deployment'"). The Government's contention to the contrary borders on the frivolous. Moreover, to the extent that the Government counsel tries to justify these terminations as for cause after the fact, such an attempt must fail, as "the *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981). And, as the Government conceded at the hearing, probationary employees may only be terminated for cause (either due to qualifications and performance, or for issues arising prior to employment) or through a RIF.

The actions of the Government reflect that these terminations were RIFs. The relevant regulations provide that "[e]ach agency shall follow this part when it releases a competing employee from his or her competitive level by . . . separation . . . , when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position

37

**JA513**

[due] to erosion of duties when such action will take effect after an agency has formally announced a reduction in force in the employee's competitive area and when the reduction in force will take effect within 180 days." 5 C.F.R. § 351.201(a)(2); *see also* U.S. Off. of Pers. Mgmt., *Workforce Reshaping Operations Handbook*, 25–26 (2017) (explaining that "[a] personnel action must be effected under RIF procedures when both the action to be taken and the reason for the action are covered by the RIF regulations"; including, under "actions to be taken," an employee's separation; and including, under "reason for the action," a "lack of work," "shortage of funds," "insufficient personnel ceiling," and/or "reorganization"). The wholesale dismissal of employees due to their status as probationary employees appears to be some form of reorganization, even if the Government does not refer to it as such.

That these terminations were RIFs is evident from the sheer number of employees fired in such a short timespan. Further, the Secretary of Labor for the Maryland Department of Labor reported that, in response to queries from her office, federal agencies have reported, as reasons for the terminations, a "permanent lack of work due to a change in Presidential administration," and have also noted that the employees were "laid off due to a reduction in force." (ECF No. 4-5 ¶¶ 61–62.) On this point, the Court again observes that several employee termination notices evince that the terminations were plainly not due to any individual employee's performance, but rather reflected a reorganization within the relevant federal agencies. For instance, a termination letter issued by the Department of the Treasury states the following: "In its January 20, 2025, memorandum entitled *Guidance on Probationary Periods, Administrative Leave and Details*, OPM advised that '[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.' Based on that guidance and in light of current mission needs, the Agency finds that your continued employment at the Agency is not in the public

38

interest." (ECF No. 33-9 at 7 (alterations in original).) On top of that, the terminations came on the heels of an Executive Order directing agency heads to conduct RIFs.

The States have not carried their burden, however, of showing a likelihood of success on the merits with respect to three Defendant Agencies—the Department of Defense ("Defense"), the National Archives and Records Administration ("Archives"), and OPM. With respect to these three named agencies only, the States have not provided any affidavits from, for example, former employees attesting to their terminations, or to the presence of widespread terminations of probationary employees. (*See generally* ECF No. 33 (affidavits attesting to terminations at all Defendant Agencies except for Defense, Archives, and OPM).) While the Court does not rely solely on these affidavits and termination letters in reaching its above conclusion, those records provide an important link between the individual Defendant Agencies and the broader allegations about the number of employees terminated and the general statements, discussed above, that these actions constituted RIFs. So, although it is a close call, at this early stage, and given that a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22 (citation omitted), there is insufficient basis in the record for the Court to conclude that RIFs likely occurred at these three agencies. This conclusion is without prejudice to the presentation of additional evidence with respect to these three agencies.

### 3.     The Agencies' Actions Were Contrary to Statutory RIF Requirements

Thus, the Court turns to whether the Government followed requisite RIF procedures. If employees are terminated as part of a RIF, there are legal requirements the agencies must follow. *See generally* 5 U.S.C. § 3502; 5 C.F.R. Part 351. And it is undisputed—and indisputable—that these requirements apply to probationary employees. *See* 5 C.F.R. § 351.501(a)–(b). One such

39

requirement is that, whenever a RIF involves at least fifty employees within a competitive area,[10] the agency must provide notice to "[t]he State or the entity designated by the State to carry out rapid response activities under [the WIOA]." 5 C.F.R. § 351.803(a). That notice must include (1) "[t]he number of employees to be separated from the agency by reduction in force (broken down by geographic area or other basis specified by OPM)"; (2) "[t]he effective date of the separations"; and (3) "[a]ny other information specified by OPM, including information needs identified from consultation between OPM and the Department of Labor to facilitate delivery of placement and related services." *Id.* § 351.803(c).

The Government did not follow the requisite notice procedures, and it does not attempt to argue that it did. Indeed, the Government's substantive arguments are aimed only at its view that it did not conduct RIFs. And the consequence of the Government's failure to follow the requisite notice procedures is clear: if an agency fails to provide notice, an employee "may not be released[] due to a reduction in force." 5 U.S.C. § 3502(d).

Because the States have shown that the Government's actions were highly likely "not in accordance with law," 5 U.S.C. § 706, they are likely to prevail on the merits of their APA claims.[11]

---

[10] Although the Court is focused on the lack of requisite notice, there is no evidence that the Government followed *any* of the requisite RIF procedures, including defining the competitive area. But "[a] competitive area may consist of all or part of an agency," 5 C.F.R. § 351.402, and given the sheer number of terminated employees, it is implausible that the fifty-person threshold necessary to trigger this requirement has not been met. (*See, e.g.*, ECF No. 4-5 ¶ 17 (declaration by the Maryland Secretary of Labor explaining that "the Maryland Department of Labor has already received at least 813 claims by ex-federal employees for unemployment benefits" and that it "is also aware of public announcement of significant layoffs at Maryland and D.C.-located federal agencies"); ECF No. 4-7 ¶ 30 (Declaration by the Director of the California Employment Development Department explaining that her office has received "1,621 claims by former federal employees for unemployment benefits since February 1, 2025"); ECF No. 4-8 ¶ 15 (Declaration by the Deputy Director, Service Delivery of the Illinois Department of Employment Security, explaining that her office has received 446 claims for unemployment insurance by former federal employees); ECF No. 4-13 ¶ 4 ("From January 21 – February 20, [the New York Department of Labor] received 178 new unemployment claims from federal employees. From February 21 – February 27, the most recently available data set, [that office] logged an additional 372 new unemployment claims from federal employees.").)

In any event, the Government cannot be permitted to skirt RIF notice requirements by simply not defining the competitive area as required, then claiming the preconditions for RIF notice have not been met.

[11] Having resolved the matter on the basis of the APA, the Court makes no findings as to the States' likelihood of success on their *ultra vires* claim.

40

## B. Irreparable Harm

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Further, "the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Although the harms the States face are largely economic, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citation omitted). Here, the harm is irreparable because money damages are likely not available. *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019) ("The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief '*other than money damages*.'" (quoting 5 U.S.C. § 702) (emphasis added)); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 115–16 (D.D.C. 2022) (explaining that the unavailability of money damages for APA claims counsels in favor of a finding of irreparable harm).

Further, even if damages were available, where economic damages are "difficult to ascertain," there may be irreparable harm. *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)). The damages incurred by the States are difficult to ascertain, and an injunction is necessary to mitigate the chaos caused by the Government.

41

The States' diversion of resources as a result of the lack of notice also constitutes an irreparable harm. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (recognizing the "diversion of resources away from . . . core missions" as irreparable); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 42 (D.D.C. 2020) (explaining that "the forced diversion of resources" has been "recognized as irreparable harm in other suits" (collecting cases).)

In addition, the notice provision contemplates providing notice sixty days before a RIF. The information to be provided is therefore time sensitive, and the harm itself is temporal and immediate. This likewise weighs in favor of finding that the harm is irreparable. *Cf. Heritage Found. v. U.S. Dep't of State*, Civ. No. TJK-24-2862, 2024 WL 4607501, at \*10 (D.D.C. Oct. 29, 2024).

## C.    Balance of the Equities & the Public Interest

The final two factors—balance of the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court is mindful that it may not collapse this inquiry with the first *Winter* factor. *See USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at \*4 (4th Cir. Feb. 24, 2025) (explaining that it is "circular reasoning" to argue that a government "program is against the public interest because it is unlawful" and that such argument "is nothing more than a restatement of their likelihood of success argument").

In cases such as this, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe*, 947 F.3d at 230–31 (internal quotation marks and citation omitted). But the public interest goes beyond that. As discussed above, these mass terminations conducted without appropriate notice have placed enormous strain on the States. And the public has a great interest in the States not unnecessarily diverting resources from other functions. (*See,*

42

*e.g.*, ECF No. 4-5 ¶ 27 (Declaration from the Maryland Secretary of Labor that Maryland Department of Labor personnel "have been diverted from state-funded workforce development projects, including the Employment Advancement Right Now ('EARN') program, which is a . . . workforce development grant initiative serving over 5,000 constituents annually"); *id.* ¶ 26 (explaining that state matters that have been affected by the diversion of resources includes "occupational and professional licensing oversight, financial regulation, [and] state workforce development programs"); *id.* ¶ 58 (explaining that the diversion will also "impede the timely processing of regular [unemployment claims], creating significant backlogs and delays"); ECF No. 4-8 ¶ 24 (declaration from the Deputy Director, Service Delivery of the Illinois Department of Employment Security providing that "the diversion of personnel to handle [Unemployment Compensation for Federal Employees] claims will impede the timely processing of regular unemployment insurance claims, creating backlogs and delays").) It is in the public interest to provide immediate relief to the States so as to alleviate the extreme burdens placed upon them by the Government. The Court also recognizes that there exists an interest in a presidential administration carrying out its priorities, which may take the form of mass terminations. However, the Court concludes that the public's interest in governmental institutions following the law, and in reducing burdens on the States is greater. These harms to the States—and to the public—will be further exacerbated if emergency relief is not granted.

The Government argues that a TRO would "impose significant and unrecoverable costs on Defendants." (ECF No. 20 at 27.) The Court does not discount this reality. However, by the Government's own admission, reinstatement of the probationary employees is the *only relief* that will provide redress to the States. (*See* ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by [the employees'] *reinstatement*."); *id.* at 17 ("To prevent or stem

43

the diversion of state assistance resources, the Court again would have to order reinstatement of the removed probationers into their former agency jobs.").) The Court recognizes the breadth of the relief it will grant, but the Court cannot allow the Government to benefit from chaos of its own making.

For instance, in *HIAS*, 985 F.3d, the Fourth Circuit upheld the district court's entry of a preliminary injunction barring the Government from enforcing an Executive Order concerning refugee resettlement that was found to be likely violative of the federal Refugee Act, 8 U.S.C. § 1522. As the Fourth Circuit explained, "[t]he resettlement agencies face enormous burdens to comply with the Order and Notice, as well as the likelihood of affiliates closing entirely in jurisdictions that refuse consent. In contrast, under the district court's injunction, the government must continue to implement the refugee resettlement program according to the Act's well-established processes refined over several decades." *Id.* at 326. So too here, the States are faced with enormous burdens in the face of the Government's failure to provide notice, and under an order reinstating employees and enjoining the Government from further illegal action, the Government must simply act according to well-established law.

On balance, the Court finds that the public interest and the equities weigh in favor of granting a TRO.

## VI.    SCOPE OF RELIEF

### A.    TRO Purpose & Limitations

Before turning to the specific relief that will be ordered in this case, it is necessary to review fundamental principles about the nature of a TRO and the kinds of relief that are available at the TRO stage.

The purpose of a preliminary injunction is to preserve the status quo until there is a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The purpose of a TRO is to preserve the status quo until the Court is able to hold a preliminary injunction hearing. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). Each "aim[s] to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted).

The Government argues that an order reinstating fired workers would not be a proper invocation of the Court's authority to "restrain[]", but would rather be an impermissible "mandatory injunction." (ECF No. 20 at 25 n.9.) The Government is mistaken. A mandatory injunction, which is "disfavored" and issued in only the "most extraordinary circumstances," is one that changes the status quo. *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). A prohibitory injunction, by contrast, is one that maintains the status quo. *League of Women Voters*, 769 F.3d at 236. Critically, the "status quo," for purposes of injunctive relief, "is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (citation and internal quotation marks omitted). As the Fourth Circuit has recognized, "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters*, 769 F.3d at 236 (cleaned up) (quoting *Aggarao*, 675 F.3d at 378). As the Second Circuit has explained:

> The "status quo" in preliminary-injunction parlance is really a "status quo ante." *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the *status quo ante*"); *accord O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has recently disturbed the status quo to reverse its actions . . . restores, rather than disturbs, the status quo ante,

45

**JA521**

and is thus not an exception" to the ordinary standard for preliminary injunctions). This special "ante" formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current "status quo" precipitated by their wrongdoing.

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018).

It is in the context of the broader conceptual distinction between a prohibitory and mandatory injunction that Rule 65's use of the word "restraining" must be understood. *See Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir. 1989) (stating that a TRO, "by the very word 'restraining[,'] should issue only for the purpose of preserving the status quo and preventing irreparable harm and for just so long as is necessary to hold a hearing"). This is not a case in which the Court is asked, at the TRO stage, to order a defendant to take on new burdens or obligations that it had previously not shouldered. *Cf., e.g., Sosa v. Lantz*, 660 F. Supp. 2d 283, 290 (D. Conn. 2009) (declining to issue a TRO that would have required a state prison to move an inmate to a larger cell, on the grounds that such an order "would provide [the inmate] with affirmative relief *changing* the status quo" (emphasis in original)). Instead, the Court is asked to order the Government to preserve the situation that existed before it embarked on the likely illegal mass terminations without providing requisite notice to the States. Although such an order will inevitably require the Government to take affirmative steps to comply, it nevertheless fits comfortably within the scope of the Court's TRO authority. *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2951 (3d ed. 2024) ("[A]lthough they are rare, temporary restraining orders can be framed to require affirmative action on the part of the 'restrained' party.").[12]

---

[12] Alternatively, as discussed in more detail below, the Court has statutory authority to order appropriate preliminary relief under the APA. 5 U.S.C. § 705.

46

**JA522**

**B.      Geographic Scope**

The Court must determine the appropriate scope of any injunctive relief. This task "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (citations omitted). As the Fourth Circuit has explained:

> District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that "a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citations and internal quotation marks omitted). A district court may issue a nationwide injunction so long as the court "mold[s] its decree to meet the exigencies of the particular case." *Id.* (quoting *Trump v. Int'l Refugee Assistance Project*, [582 U.S. 571, 580] (2017)). And a nationwide injunction may be appropriate when the government relies on a "categorical policy," and when the facts would not require different relief for others similarly situated to the plaintiffs. *Id.* at 232–33.

*HIAS*, 985 F.3d at 326 (first alteration in original).

In *HIAS*, the Fourth Circuit upheld the district court's entry of a preliminary injunction barring the Government from enforcing an Executive Order concerning refugee resettlement that was found to be likely violative of the federal Refugee Act, 8 U.S.C. § 1522. 985 F.3d at 316–18. The Court held that the district court did not abuse its discretion in enjoining the application of the executive order nationwide, rather than limiting the relief to the three plaintiff resettlement agencies. As the panel explained:

> The refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country. Enjoining the Order and Notice only as to the plaintiff resettlement agencies would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect.

*Id.* at 326–27.

Much like how the program challenged in *HIAS* "impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country," here, the challenged

47

dismissals without notice apply to federal workers spread throughout the United States. When, as is likely the case here, the Government's policy is violative of the law across the board, it is appropriate for injunctive relief to be nationwide in scope, rather than limited to specific plaintiffs. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he the scope of injunctive relief is dictated by the extent of the violation established . . . ."); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 178 (D.D.C. 2021) (affirming "the propriety of nationwide injunctions in APA cases where the challenged policy is found to be arbitrary and capricious or otherwise facially unlawful" (citation omitted)); *cf. Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 733 (5th Cir. 1977) ("[A] nationwide or companywide injunction is appropriate only when the facts indicate a company policy or practice in violation of the statute."). To limit the scope of the injunction only to Plaintiff States would mean that an individual federal employee's job status would depend on the fortuity of their physical location, a result that would be inequitable and "undermine . . . national consistency" in the federal workforce and application of federal civil service law. *HIAS*, 985 F.3d at 326. Moreover, any attempt to disaggregate federal government–wide employment policy on a state-by-state-level is bound to be unworkable, as it would functionally create two separate, drastically different regimes with respect to probationary employees in each affected agency. In these circumstances, a nationwide injunction—rather than one tied only to these specific States—is warranted. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (upholding the district court's grant of a nationwide preliminary injunction when "the facts would not require different relief for others similarly situated" (cleaned up) (quoting *HIAS*, 985 F.3d at 326–27)).

48

**JA524**

### C.    Content of the Injunction

Under the APA, to prevent irreparable injury, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) (quoting *District of Columbia v. Dep't of Agric.*, 444 F. Supp. at 16), *order dissolved*, Civ. No. PX-20-2118, 2023 WL 3547497 (D. Md. May 18, 2023). Furthermore, it is well established that the Court "may craft declaratory and injunctive relief designed to preclude a federal agency from acting in contravention of its statutory and regulatory authority," and that it "may require an agency to modify its current or future practices in order to account for past violations of its statutes or regulations." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004) (citations omitted).

The ordinary remedy for unlawful agency actions is vacatur. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law' . . . ." (quoting 5 U.S.C. § 706(2)(A))); *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (similar); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (cleaned up)). Although some courts have occasionally endorsed a practice of remanding an agency action to the agency for further consideration without vacatur, *see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), the Fourth Circuit "has never formally embraced the *Allied-Signal* remand-without-vacatur approach." *Sierra Club v. U.S. Army Corps of Eng'rs*,

49

909 F.3d 635, 655 (4th Cir. 2018). Even assuming that remand without vacatur may be appropriate in some instances, such a remedy is warranted only when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Id.* (quoting *Allied-Signal*, 988 F.2d at 150–51 (alteration in original)). Here, however, it is likely that the Government's actions were plainly contrary to law, and there is no plausible scenario in which the Government's procedures for terminating probationary employees could be adequately justified on remand to the agencies. In such instances, the likely final remedy is that the Government's actions must be vacated in their entirety. *See id.* (holding that vacatur was required when the challenged actions were "legally deficient" such that there was no realistic possibility of the actions being justified upon agency reconsideration).

Here, the Court finds that—just as vacatur would likely be the appropriate remedy at the final judgment stage under the APA, 5 U.S.C. § 706—the proper provisional remedy under Rule 65 and § 705 is a stay of the Government's efforts to terminate probationary employees *en masse* and without notice to the States. *Cf. Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("[W]e conclude that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action."), *cert. granted in part*, ___ S. Ct. ___, 2025 WL 65914 (Mem.) (Jan. 10, 2025); *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020) ("Nationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated."); *see generally Gomez v. Trump*, 485 F. Supp. 3d 145, 202–04 (D.D.C. 2020) (explaining the relationship between vacatur under § 706 and enjoining a likely unlawful agency action under § 705).

50

Only an order staying the Government's likely unlawful RIF process can prevent the States from suffering irreparable injury in the form of the disruption and costs imposed by the mass terminations. Indeed, the Government admits as much. (ECF No. 20 at 14 ("[T]he States' asserted injuries could only be conceivably redressed by their reinstatement." (emphasis omitted).)  Were the Court to withhold from granting such interim relief, it would likely be impossible adequately to remedy the States' injuries at the final judgment stage, which may be many months if not years away.  Given the complexity and unprecedented nature of the terminations, it would be difficult, if not impossible, to retrospectively assign a dollar amount to the burdens incurred by the States from the Government's likely unlawful terminations—and in any event, money damages are likely categorically unavailable in a suit of this type, as discussed above, *see supra* Section III.B.

As a practical matter, a stay of the Government's terminations of probationary employees means that the Government must reinstate all affected employees working for the Defendant Agencies.  Then, if the Government wishes to continue pursuing its RIF agenda, the Government must start from square one, acting in compliance with federal law.  Only by following the procedures set forth in federal law can the Court ensure that the States receive the notice to which they are statutorily entitled.  The Court is not blind to the practical reality that the relief being ordered today will have far-reaching impacts on the federal workforce and will require the Government to expend considerable resources in an effort to undo the RIFs that have been put into place.  But, as explained above, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano*, 442 U.S. at 702.  When, as is likely the case here, the Government has engaged in an illegal scheme spanning broad swaths of the federal workforce, it is inevitable that the remediation of that scheme will itself be a significant task.

51

## D.    Agencies Restrained

The final issue pertaining to the scope of the TRO is which specific Defendants are to be restrained. As discussed above, there are three agencies named as Defendants in this action—namely, Defense, OPM, and Archives—with respect to which Plaintiffs have provided insufficient evidence that RIFs have occurred.[13]  It is of course axiomatic that a movant is not entitled to a TRO against a defendant when the movant has not shown that it is likely to prevail on the merits as to that defendant.  Accordingly, Defense, OPM, and Archives will be excluded from the TRO. This exclusion is without prejudice to the States' right, at the preliminary injunction stage, to produce evidence showing that RIFs occurred at these agencies and to seek appropriate relief.

## VII.    SECURITY/BOND REQUIREMENT

Under Federal Rule of Civil Procedure 65(c), a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  District courts have discretion to set the required security at a nominal amount, *see Hoechst Diafoil Co.*, 174 F.3d at 421 n.3, and this approach has long been followed in public-interest litigation cases, *Alabama ex rel. Baxley v. Corps of Eng'rs of U.S. Army*, 411 F. Supp. 1261, 1275–76 (N. D. Ala. 1976) (collecting cases); *South Carolina v. United States*, 329 F. Supp. 3d 214, 238 n.35 (D.S.C. 2018) (same), *vacated on other grounds*, 912 F.3d 720 (4th Cir. 2019); *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, Civ. No. ABA-25-0333, 2025 WL 573764, at \*30 (D. Md. Feb. 21, 2025); *see also* Wright & Miller, *supra*, § 2954.

---

[13] A related issue is the contention urged by counsel for the Government at the TRO hearing—namely, that certain affidavits refer to agencies that are not Defendants in this action.  In particular, the Government cited to affidavits from an employee from the Federal Emergency Management Agency ("FEMA") and the National Oceanic and Atmospheric Administration ("NOAA").  (*See* ECF No. 5-11, 5-15 (affidavits attesting to terminations of probationary employees at FEMA and NOAA, respectively).)  But FEMA and NOAA are housed within the Departments of Homeland Security and Commerce, respectively, which *are* expressly named as Defendants.  (*See* ECF No. 1 at 3–4.)

Here, the Court concludes that a nominal bond is appropriate. Although the risk of harm to the Government is not remote, the potential cost of an improvidently granted TRO on the federal government is too complex to calculate in this expedited proceeding. And even if a dollar amount could be put on the Government's actions, it would be prohibitive to require plaintiffs to bear up front the total cost of the alleged governmental wrongdoing. Accordingly, the Court will require each Plaintiff State to pay a bond of $100.

## VIII.  STAY PENDING APPEAL

The Government requests that any order issuing injunctive relief be stayed pending appeal. (ECF No. 20 at 28.) In deciding whether to issue a stay pending appeal, the Court considers:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (citation omitted). These factors "substantial[ly] overlap" with the *Winter* factors. *Id.*

It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites. *See, e.g.*, *PFLAG, Inc. v. Trump*, Civ. No. 25-337-BAH, 2025 WL 685124, at *32 (D. Md. Mar. 4, 2025) (granting a request for a preliminary injunction, then denying a request for a stay pending appeal "[f]or all the [same] reasons"). Here, the stay applicant (*i.e.,* the Government) has *not* made a strong showing of likelihood of success on the merits; indeed, the Court concluded that the Government will likely *lose* on the merits. Accordingly, for the reasons stated above in the discussion of the *Winter* factors, the Government's request for a stay pending appeal will be denied.

53

## IX.   CONCLUSION

For the reasons stated herein, a TRO will issue.

Dated this ___13___ day of March, 2025.

BY THE COURT:

_James K. Bredar_

James K. Bredar
United States District Judge

54

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STATE OF MARYLAND, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | **CIVIL NO. JKB-25-0748** |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

### TEMPORARY RESTRAINING ORDER

For the reasons stated in the foregoing Memorandum, it is ORDERED as follows:

1. Plaintiffs' Motion for Temporary Restraining Order (ECF No. 4) is GRANTED with respect to the Restrained Defendants (as defined below). The Restrained Defendants are RESTRAINED pursuant to the terms of this Order throughout the United States.

2. All purported terminations of Affected Probationary Employees (as defined below) on or after January 20, 2025, by the Restrained Defendants and/or any parties working, directly or indirectly, in concert with the Restrained Defendants, are STAYED throughout the United States.

3. To alleviate the burdens on the States conducting their mandated rapid-response activities, the Restrained Defendants SHALL REINSTATE all Affected Probationary Employees throughout the United States FORTHWITH, and in any event before March 17, 2025, at 1:00 p.m. EDT.

4. The Restrained Defendants SHALL NOT, throughout the United States, conduct any future Reductions in Force ("RIFs")—whether formally labeled as such or not—except in

**JA531**

compliance with the notice requirements set forth in 5 U.S.C. § 3502, relevant regulations set forth in Title 5, Chapter I of the Code of Federal Regulations, and all other applicable law, in order to ensure that Plaintiff States receive adequate notice, as required by law, in order to conduct their mandated rapid-response activities.[1]

5. On or before Monday, March 17, 2025, at 1:00 p.m. EDT, the Restrained Defendants SHALL FILE on the Court's electronic docket a Status Report documenting the actions that they have taken to comply with this Order. Such Status Report shall set forth the number of Affected Probationary Employees reinstated at each Defendant agency, broken down by subagency, department, and/or other subdivision, to the greatest degree of granularity practicable.

6. The Court anticipates requiring further Status Reports, which may require the Restrained Defendants to provide further detail as to their compliance activities. The Court may also enter further orders as necessary to ensure compliance with this Order.

7. Any motion for extension of this Order is due on or before Friday, March 21, 2025, at 4:00 p.m. EDT, and any hearing on a motion for a Preliminary Injunction will occur on Wednesday, March 26, 2025, at 9:30 a.m. EDT in Courtroom 5A, United States Courthouse, 101 W. Lombard St., Baltimore, Maryland.

8. Pursuant to Rule 65(c), each individual Plaintiff State and the District of Columbia SHALL POST A BOND of $100, for a total of $2,000, with the Clerk of the Court FORTHWITH.

9. Unless the Court orders otherwise, this Order SHALL EXPIRE on Thursday, March 27, 2025, at 8:00 p.m. EDT.

---

[1] Nothing in this Order prohibits the Government from conducting lawful terminations of probationary federal employees—whether pursuant to a proper RIF or else for cause, on the basis of good-faith, individualized determinations, under the standards for making such determinations set forth in the foregoing Memorandum, and not as part of a mass termination.

2

10. For the purposes of this Order, the following definitions apply:

    a.  Reinstatement means restoration to employment, whether actually on duty or on leave, including administrative leave.

    b.  Restrained Defendants means the following agencies, and the respective agency heads sued in their official capacities:[2]

        i.  United States Department of Agriculture;

        ii.  United States Department of Commerce;

        iii.  United States Department of Education;

        iv.  United States Department of Energy;

        v.  United States Department of Health and Human Services;

        vi.  United States Department of Homeland Security;

        vii.  United States Department of Housing and Urban Development;

        viii.  United States Department of Interior;

        ix.  United States Department of Labor;

        x.  United States Department of Transportation;

        xi.  United States Department of Treasury;

        xii.  United States Department of Veterans Affairs;

        xiii.  Consumer Financial Protection Bureau;

        xiv.  Environmental Protection Agency;

        xv.  Federal Deposit Insurance Corporation;

        xvi.  General Services Administration;

---

[2] This definition includes all Defendants named in the Complaint, with the exception of: (1) the National Archives and Records Administration and Marco Rubio in his official capacity as Archivist; (2) the Office of Personnel Management and Charles Ezell in his official capacity as its Acting Director; and (3) the Department of Defense and Pete Hegseth in his official capacity as Secretary of the Department of Defense.

   xvii. Small Business Administration; and

   xviii. United States Agency for International Development.

  c. Affected Probationary Employees means all federal probationary employees who were previously employed by any of the Restrained Defendant agencies, or any department or other subdivision therein, and who were purportedly terminated on or after January 20, 2025. The definition excludes any such employees who (1) were actually terminated on the basis of a good-faith, individualized determination of cause, under the standards for making such a determination set forth in the foregoing Memorandum, and who (2) were not otherwise terminated as part of a mass termination.

DATED this _13_ day of March, 2025, at ___8:15 P.M___.

           BY THE COURT:

           _James K. Bredar_

           James K. Bredar
           United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, | |
| et al., | |
| Defendants. | |

**DEFENDANTS' NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the Fourth Circuit from the Court's Temporary Restraining Order and Opinion issued on March 13, 2025, ECF Nos. 43 and 44.

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

*/s/ Christopher R. Hall*
Christopher R. Hall
Assistant Director, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-4778
Email: Christopher.hall@usdoj.gov

1

**JA535**

Kelly O. Hayes
United States Attorney

*/s/ Beatrice C. Thomas*
Beatrice C. Thomas (Bar No. 21969)
Assistant United States Attorney
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, MD 21202
beatrice.thomas@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on this 14th day of March 2025, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel.

_____*/s/*_____
Beatrice C. Thomas

**JA536**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, *et al*., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al*., | |
| Defendants. | |

**RESTRAINED DEFENDANTS' COMPLIANCE STATUS REPORT**

Defendants, through undersigned counsel, hereby file a Status Report documenting the actions they have taken to comply with the Court's Temporary Restraining Order ("TRO") of March 13, 2025 (ECF No. 43). The Court's order applies to 21 federal agencies (ECF 44 at 2-3) (hereinafter "Restrained Defendants").[1] Plaintiffs filed a motion for a temporary restraining order on March 9, 2025; Defendants filed an opposition on March 10, 2025; and the Court heard argument on March 12, 2025. On March 13, 2025, at approximately 8:30 PM, the Court issued the TRO, which stayed the "purported terminations" of "Affected Probationary Employees" and ordered the reinstatement of those same employees, in addition to an order directing Restrained Defendants to conduct any future Reductions in Force ("RIFs") consistent with statutory and

---

[1]  The Restrained Defendants include United States Department of Agriculture; United States Department of Commerce; United States Department of Education; United States Department of Energy; United States Department of Health and Human Services; United States Department of Homeland Security; United States Department of Housing and Urban Development; United States Department of Interior; United States Department of Labor; United States Department of Transportation; United States Department of Treasury; United States Department of Veterans Affairs; Consumer Financial Protection Bureau; Environmental Protection Agency; Federal Deposit Insurance Corporation; General Services Administration; Small Business Administration; and the U.S. Agency for International Development, along with their corresponding agency personnel.

1

regulatory requirements.  The Court's Order also required the filing of a Compliance Report, as

per this term:

> On or before Monday, March 17, 2025, at 1:00 p.m. EDT, the Restrained
> Defendants SHALL FILE on the Court's electronic docket a Status Report
> documenting the actions that they have taken to comply with this Order. Such Status
> Report shall set forth the number of Affected Probationary Employees reinstated at
> each Defendant agency, broken down by subagency, department, and/or other
> subdivision, to the greatest degree of granularity practicable.

ECF 44 at 3.  Consistent with the Court's order, Restrained Defendants submit this compliance

status report.  In support of this Compliance Report, Restrained Defendants submit the attached

Declarations, *see* Exhibit 1, which demonstrate their compliance with the TRO.  Defendants will

continue all reasonable efforts to summarize the progress of all remaining Restrained Defendants

and submit any further reports as needed.

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

*/s/ Christopher R. Hall*
Christopher R. Hall
Assistant Director, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-4778
Email: Christopher.hall@usdoj.gov

2

**JA538**

KELLY O. HAYES
United States Attorney

*/s/ Beatrice C. Thomas*
Beatrice C. Thomas
Assistant United States Attorney
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, MD 21202
Email: beatrice.thomas@usdoj.gov

*Attorneys for Defendants*

3

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 17th day of March 2025, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF System, which will send notice of such filing to all counsel.


*<u>/s/ Beatrice C. Thomas</u>*
Beatrice C. Thomas
Assistant United States Attorney

4

**JA540**

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

## DECLARATION OF KRYSTI J. WELLS

Pursuant to 28 U.S.C. § 1746, I, Krysti J. Wells declare as follows:

1.    I am the Director of the Office of Human Capital Operations, Office of Mission Support, at the U.S. Environmental Protection Agency ("EPA") headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the EPA, or on information provided to me by EPA employees.

2.    I have served in this position since October 22, 2023.  In my role at the EPA, I am responsible for operational personnel management. I have the responsibility for overseeing the recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.    Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.    The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended

tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, EPA received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      EPA terminated approximately 419 probationary employees between February 14, 2025 and February 21, 2025.

7.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring EPA to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on EPA, cause significant confusion, and cause turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.    Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave, leave without pay, or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.    Nonetheless, EPA has immediately begun reinstating Affected Probationary Employees on a leave status, as permitted by the TRO.  On March 16, 2025 between 5-6 P.M. ET, EPA sent emails to the personal email addresses of all the Affected Probationary Employees notifying them that their terminations were rescinded, as required by the TRO.

11.    Most of these employees were returned in a paid administrative leave status. Some, who were in an unpaid leave status prior to their termination (including students on leave for the school year), were returned to a leave without pay status.

12.    EPA uses the Department of Interior's HR processing system, Federal Personnel and Payroll System ("FPPS"). FPPS was offline starting at 5 P.M. ET on March 15, 2025. It remained unexpectedly offline until approximately 12 P.M. ET on March 17, 2025. As a result, EPA has not yet processed all of the cancellations for the relevant termination actions in FPPS. However, all of the timecards were updated to change the Affected Probationary Employees' statuses and, as noted above, Affected Probationary Employees all received a notice that their termination was rescinded on March 16, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/  KRYSTI WELLS   Digitally signed by KRYSTI WELLS Date: 2025.03.17 17:31:01 -04'00'

Krysti J. Wells

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| Maryland, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>United States Department of Agriculture,<br><br>et al.,<br><br>     Defendants. | Case No. 1:25-cv-00748-JKB |

**DECLARATION OF REESHA TRZNADEL**

Pursuant to 28 U.S.C. § 1746, I, Reesha Trznadel declare as follows:

1.      I am the Acting Chief Human Capital Officer at the United States Department of Energy ("DOE") headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of DOE, or on information provided to me by DOE employees.

2.      I have served in this position since February 28, 2025.  In my Acting role at DOE, I oversee those responsible for personnel management. I oversee those responsible for personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are generally employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.     The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." An employee's appointment is not final until they have completed their probationary period.

5.     On January 20, 2025, although I was not serving in this position at that time, it is my understanding that DOE received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.     On or around February 13 and February 14, 2025, DOE terminated approximately 555 probationary employees.

7.     I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring various Defendants including DOE to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.     Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status could impose burdens on DOE and cause significant confusion and turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status are being onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions,

2

**JA546**

receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, DOE has immediately begun cancelling the termination actions for all of its 555 Affected Probationary Employees. By 1:00 p.m. on March 17, 2025, DOE had cancelled the termination notices for approximately 319 of its 555 Affected Probationary Employees and placed them in a retroactive Administrative Leave status from the date of removal. DOE completed this process for the remaining Affected Probationary Employees by 1:35 p.m. on March 17, 2025. If any of these 555 employees ultimately choose not to return to employment with the Department, but instead choose to resign, their official records (eOPF) will reflect the date of resignation specific to the date it was communicated to leadership.

11.     All Affected Probationary Employees have been placed in a retroactive Administrative Leave status that will continue until their badging and IT access are restored, at which time they will be converted to an Active Duty status.

12.     DOE continues working to reinstate employees by working with Agency leadership to arrange for an orderly return to the office (onboarding) while the employees are in an administrative leave status. Additionally, DOE is working to restore benefit entitlements for all the employees and ensure all personnel records are corrected and accurate.

**JA547**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/ Reesha Trznadel

REESHA TRZNADEL
ACTING CHIEF HUMAN CAPITAL OFFICER
US DEPARTMENT OF ENERGY

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| |
|---|
| Maryland, et al., |
| Plaintiffs, |
| v. |
| United States Department of Agriculture, et al., |
| Defendants. |

Case No. 1:25-cv-00748-JKB

**DECLARATION OF JESSICA S. PALATKA**

Pursuant to 28 U.S.C. § 1746, I, Jessica S. Palatka declare as follows:

1.      I am the Chief Human Capital Officer for the U.S. Department of Commerce (Commerce) headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of the Department of Commerce, or on information provided to me by Commerce employees.

2.      I have served in this position since September 2021.  In my role at Commerce, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, Commerce received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring Commerce to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

7.      Between January 20, 2025, and March 3, 2025, Commerce terminated 791 probationary employees out of approximately 9,000 total probationary and trial period employees.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on Commerce, cause significant confusion, and cause turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and other

2

**JA550**

requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.   Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.   Nonetheless, Commerce immediately began reinstating Affected Probationary Employees. Twenty-seven of the 791 employees had been reinstated within days of their terminations for various operational reasons. As to the remaining 764 Affected Probationary Employees, Commerce has issued notification of their reinstatement pursuant to the TRO. By 1:00 pm EDT today, March 17, 2025, Commerce had notified 736 of the Affected Probationary Employees of their reinstatement. For the remaining 28 Affected Probationary Employees, as of 1:00 pm EDT today, March 17, 2025, Commerce had not yet been able to locate personal contact information for those Affected Probationary Employees; however, as of 4:15pm on March 17, Commerce had notified all 764 Affected Probationary Employees of their reinstatement.

11.   Commerce will maintain all Affected Probationary Employees reinstated pursuant to the TRO in administrative leave status, retroactive to the date of termination.

12.   While it was not feasible for Commerce to process all administrative actions to complete the reinstatements by the time of filing, Commerce is working diligently to finalize them within seven days; all reinstatements will nonetheless be retroactive to the date of termination.

3

**JA551**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/   JESSICA PALATKA

Digitally signed by JESSICA PALATKA
Date: 2025.03.17 18:40:04 -04'00'

Jessica S. Palatka

4

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

Maryland, et al.,

      Plaintiffs,

      v.

United States Department of Agriculture,

et al.,

      Defendants.

Case No. 1:25-cv-00748-JKB

### DECLARATION OF ROLAND EDWARDS

### DEPARTMENT OF HOMELAND SECURITY

Pursuant to 28 U.S.C. § 1746, I, Roland Edwards, declare as follows:

1.      I am the Chief Human Capital Officer of the Department of Homeland Security (DHS) headquartered in Washington, D.C.  I oversee the human capital functions of the DHS and its Components, including the Federal Emergency Management Agency (FEMA), the Cybersecurity and Infrastructure Security Agency (CISA), and United States Customs and Immigration Services (USCIS).  I make this Declaration based on my own personal knowledge, on information contained in the records of the DHS, or on information provided to me by DHS employees.

2.      I have served in this position since March 13, 2022.  In my role at the DHS, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and the tracking and recording of personnel actions, including terminations. I assist in

ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have less than one year of current continuous service under other than a temporary appointment.  In the excepted service, the trial period may require up to two years of current continuous service in the same or similar positions.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, the DHS received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      The DHS terminated approximately 313 probationary employees between January 20, 2025 and March 14, 2025.  This number excludes probationary employees who were terminated in individualized actions based on their performance or conduct, and therefore excludes individuals who do not meet the definition of "Affected Probationary Employees" in paragraph 10(c) of the Temporary Restraining Order (TRO) entered in this case on March 13, 2025.

7.      I have been provided and have reviewed the TRO issued in this case on March 13, 2025, requiring the DHS to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

2

**JA554**

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on the DHS, cause significant confusion, and cause turmoil for the terminated employees. Specifically, to the extent that employees are offered reinstatement into full duty status (as opposed to administrative leave), they would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions.

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, the DHS has immediately begun reinstating Affected Probationary Employees.  The DHS personnel system is linked to its payroll system, and personnel actions are processed with each payroll cycle.  Thus, complete reinstatement is a multi-stage process that requires preparing personnel actions for processing with the next payroll cycle.  By 1:00 PM on March 17, 2025, the DHS took steps to place Affected Probationary Employees into administrative leave and, has prepared more than 310 personnel actions for processing.  Of the 313 Affected Probationary Employees, the DHS identified 1 employee who declined reinstatement, 1 employee who is currently employed by the DHS in another Component, and another employee who was already returning to service in order to participate in the Deferred Resignation Program.  In addition to preparing personnel actions for processing, the DHS has sent notice of reinstatement to affected probationary employees.  The DHS is working diligently to take all other necessary

3

**JA555**

actions to reinstate medical benefits and assess premiums, process within-grade increases and other secondary personnel actions, correct leave balances, and carry out other administrative tasks.  For Affected Probationary Employees who do not want to be reinstated (*e.g.,* probationary employees who obtained alternative employment and do not want to come back), DHS is offering the option of voluntary resignation.

11.    Employees reinstated pursuant to the TRO have been placed into administrative leave with full pay and benefits.

12.    DHS continues working to ensure that all Affected Employees are reinstated as quickly as possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

BENJAMIN R EDWARDS
Digitally signed by BENJAMIN R EDWARDS
Date: 2025.03.17 18:48:48 -04'00'

Roland Edwards

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

### DECLARATION OF ANNE BYRD

Pursuant to 28 U.S.C. § 1746, I, Anne Byrd, declare as follows:

1.      I am the Assistant Secretary for Administration for the United States Department of Transportation, which is headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the United States Department of Transportation, or on information provided to me by United States Department of Transportation employees.

2.      I have served in this position since February 25, 2025.  In my role at the United States Department of Transportation, I serve as the Department's Chief Human Capital Officer pursuant to Secretarial delegation. 49 C.F.R. § 1.38.  I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.  Prior to my appointment, I served as a Senior Advisor to the Secretary of Transportation since February 3, 2025.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, the United States Department of Transportation received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring the United States Department of Transportation to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

7.      The United States Department of Transportation terminated approximately 788 probationary employees between February 14 and 24, 2025. Of these employees, 775 are Affected Probationary Employees.[1]

8.      Whether required by operation of the TRO or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on the United States Department of Transportation, cause significant confusion, and cause turmoil for the

---

[1] Of the remaining 13 terminated employees, two were terminated based on individualized performance-based determinations, eight had their terminations rescinded before issuance of the TRO, two resigned, and one accepted the Deferred Resignation Program.

2

**JA558**

terminated employees. Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, the United States Department of Transportation has immediately begun reinstating Affected Probationary Employees. On Monday, March 17, 2025, the United States Department of Transportation informed 775 Affected Probationary Employees that it is rescinding the termination of their probationary/trial period termination and that they are being reinstated. Approximately 757 of these employees were informed of their reinstatement by 1:00 p.m. EDT. The remaining employees were informed no later than 1:10 p.m. EDT. The Department has notified all Affected Probationary Employees that they have been reinstated, and it is working diligently to complete additional administrative processes related to the reinstatement of these employees.

11.     All terminated probationary employees will be reinstated with pay and benefits to their previous position with the Department of Transportation and the federal service. They will receive their regular compensation for the period from February 15, 2025, to their return to duty. The record of the termination will be removed from their Official Personnel Folder.

3

12.    In order to effectuate an orderly return to the Department of Transportation, the terminated probationary employees will be placed on paid administrative leave through Wednesday, March 19, 2025. The Department of Transportation will coordinate the specifics of their return, including the restoration of their government equipment and Personal Identity Verification (PIV) card. Employees who decline to return will be directed to submit a formal written resignation from their position of record no later than Wednesday, March 19, 2025. Each employee who does not submit a resignation will be placed on active duty beginning Thursday, March 20, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

*Anne Byrd*

Anne Byrd

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Maryland, et al.,

     Plaintiffs,

     v.

United States Department of Agriculture,

et al.,

     Defendants.

Case No. 1:25-cv-00748-JKB

## DECLARATION OF JACQUELINE CLAY

Pursuant to 28 U.S.C. § 1746, I, Jacqueline Clay, declare as follows:

1.     I am the Chief Human Capital Officer for the U.S. Department of Education, headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the Department of Education, or on information provided to me by the Department of Education employees.

2.     I have served in this position since June 19, 2022.  In my role at the Department of Education, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.     Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, the Department of Education received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      The Department of Education terminated 65 probationary employees out of approximately 108 probationary employees between February and March, 2025.

7.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring the Department of Education to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on the Department of Education, cause significant confusion, and cause turmoil for the terminated employees.  Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and

**JA562**

other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, the Department of Education processed reinstatements for the 65 Affected Probationary Employees prior to 1:00pm Monday, March 17, 2025. To the extent that the Department must complete additional administrative processes related to the reinstatement of these employees, the Department is acting diligently to complete such processes.

11.     All Affected Probationary Employees will be placed on paid administrative leave.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/ JACQUELINE CLAY
Digitally signed by JACQUELINE CLAY
Date: 2025.03.17 18:11:57 -04'00'

Jacqueline Clay

3

JA563

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

**DECLARATION OF LORI A. MICHALSKI**

Pursuant to 28 U.S.C. § 1746, I, Lori A. Michalski declare as follows:

1.      I am the Chief Human Capital Officer, Department of Housing and Urban Development, headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of the U.S. Department of Housing and Urban Development (HUD), or on information provided to me by HUD employees.

2.      I have served in this position since February 2021.  In my role at the Department of Housing and Urban Development, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and the tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

**JA564**

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, HUD received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      HUD terminated approximately 312 probationary employees out of approximately 549 probationary employees on February 14, 2025.

7.      I have been provided with and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring HUD to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on HUD, cause significant confusion, and cause turmoil for the terminated employees. Specifically, employees offered reinstatement into full duty status will be required to obtain new security badges, reinstitute applicable security clearance actions, receive government furnished equipment, and require other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

2

**JA565**

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or before or after they have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.      Nonetheless, HUD has immediately begun reinstating Affected Probationary Employees. As of this time, HUD has fully reinstated 13 employees, and by 1 pm on March 17, 2025 initiated reinstatement actions for 299 probationary employees.

11.      Eleven employees were reinstated effective March 10, 2025, and two were reinstated effective March 12, 2025. Two hundred ninety-nine Affected Probationary Employees are being placed on administrative leave temporarily effective March 17, 2025.

12.      HUD has initiated the action to reinstate the 299 Affected Probationary Employees by the 1:00 p.m. deadline given by the TRO. Email notifications are being sent to the affected employees beginning March 17, 2025, with information regarding their reinstatement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/    LORI MICHALSKI

Lori A. Michalski

3

**JA566**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Maryland, et al.,

     Plaintiffs,

     v.

United States Department of Agriculture,

et al.,

     Defendants.

Case No. 1:25-cv-00748-JKB

## DECLARATION OF MARK D. GREEN

Pursuant to 28 U.S.C. § 1746, I, Mark D. Green, declare as follows:

1.     I am the Deputy Assistant Secretary for Human Capital, Learning, and Safety at the U.S. Department of the Interior ("Department"), headquartered in Washington, D.C. I have served in this position since September 2022. I make this Declaration based on my own personal knowledge, on information contained in the records of the Department, or on information provided to me by Department employees.

2.     In my role at the Department, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary and trial period appointees.

3.     Probationary appointees in the competitive service are individuals who have been working in their respective positions for less than one year. In the excepted service, the trial period is generally two years.

**JA567**

4.      Probationary and trial periods are part of the hiring process, and probationary and trial period appointees have extremely limited protections against termination compared to individuals who satisfy the definition of "employee," and accordingly enjoy greater due process protections. Probationary and trial periods are essentially extended tryouts for finalized appointments. Supervisors evaluate probationary and trial period appointees to determine whether the individuals would be a good fit for long-term employment. While working throughout probationary or trial periods, individuals receive no assurance of final appointments or of becoming permanent employees.

5.      On or about January 20, 2025, I reviewed a guidance memorandum issued by the Office of Personnel Management ("OPM"), which requested that the Department and other agencies review all probationary and trial period appointees and identify which individuals should be retained and which should be terminated. Consistent with the OPM guidance, the Department reviewed all probationary and trial period appointees' performances to determine which individuals to keep and which to terminate.  The Department continued this review process even after OPM clarified its earlier guidance on February 14 and 24, 2025.

6.      On or after February 14, 2025, the Department retained, and did <u>not</u> terminate, the competitive service appointments of 1968 individuals during their respective probationary periods and did <u>not</u> terminate the excepted service appointments of 422 individuals during their respective trial periods. However, on or after February 14, 2025, the Department did terminate the competitive service appointments of 1303 individuals during their respective probationary periods and did terminate the excepted service appointments of 409 individuals during their respective trial periods, for a total of 1712 termination actions taken by the Department. Although OPM offered language for potential use in developing termination notices, the Department did not adopt OPM's

2

**JA568**

suggestions, and instead, independently developed language used in the termination notices that informed affected individuals of these personnel decisions.

7.    I have been provided and have reviewed the temporary restraining order (TRO) issued in this litigation on March 13, 2025, requiring the Department to reinstate all Affected Probationary [and Trial Period Appointees], as such individuals are defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.    Whether required by operation of the TRO here or another court or administrative order, the reinstatement of all probationary and trial period appointees whom the Department terminated on or after February 14, 2025, imposes substantial burdens on the Department, causes significant confusion, and will potentially subject terminated individuals to the receipt of conflicting or contradictory information.  Specifically, reinstating terminated appointees imposes significant administrative burdens on the Department. Among other things, all reinstated individuals must be onboarded again, which includes the labor-intensive processes of coordinating human resources efforts and paperwork, issuing new security badges and government-furnished equipment, reinstituting applicable security clearance actions, arranging for any necessary and applicable training, re-enrolling affected individuals in benefits programs, assessing the appropriateness of granting reinstated appointees administrative leave, and calculating and processing the amount of any financial obligation that the Department may owe as a result of the reinstatements and the amounts, if any, that reinstated individuals request to have withheld for various work-related benefits. The Department must also take other requisite administrative actions, such as evaluating the off-duty actions of reinstated appointees during the period of separation, and auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.     Additionally, reinstating terminated appointees causes confusion for the Department and reinstated individuals, more than four hundred forty (440) of whom have appeals currently pending before Administrative Judges assigned to U.S. Merit Systems Protection Board (MSPB) Regional and Field Offices. Persons who were terminated just weeks ago have now been reinstated, and the effect of these reinstatements will impact pending or potential MSPB appeals and will compel preservation, at least temporarily, of the now-rescinded termination actions. Yet, an appellate ruling could reverse the district court's order shortly after terminated individuals have been reinstated through extended grants of administrative leave, complete restoration to full-duty status, or otherwise. The Department could reverse reinstatements in that circumstance and correspondingly impact pending or potential or dismissed MSPB appeals. And even though the terminated individuals have now been reinstated prior to any reversal of the district court's order, the reinstated individuals remain probationary or trial period appointees and can again be subject to termination actions, which would again inform affected individuals of their rights associated with filing MSPB appeals, filing complaints pursuant to processes established by the U.S. Equal Employment Opportunity Commission, and filing complaints pursuant to processes established by the U.S. Office of Special Counsel.  In short, reinstated individuals will be subjected to multiple changes in their employment status in a matter of weeks and will be forced to untangle the maze of their potential appeal rights.

10.     The tremendous uncertainty associated with this confusion and these administrative burdens impede supervisors from appropriately managing their workforce. Work schedules and assignments are effectively being tied to hearing and briefing schedules set by the courts. It will be extremely difficult to assign new work to reinstated individuals in light of the uncertainty over their future status.

4

11.    Finally, reinstating terminated appointees interferes with the effective functioning of the Department. On and after February 14, 2025, the Department has made meaningful changes to address the challenged terminations, including reassigning the duties performed by the terminated individuals, many of whom will have no duties to perform upon reinstatement.

12.    Nonetheless, the Department has complied with the TRO by reinstating affected probationary period and trial period appointees.  As of 1 p.m. EDT on this date, the Department had (a) reinstated, by cancelling termination actions (a very time and labor intensive process) for, approximately forty-five percent (45%) of the 1301 individuals whose competitive service appointments the Department had terminated during their respective probationary periods and had (b) reinstated, by cancelling termination actions for, approximately twenty-five percent (25%) of the 409 individuals whose excepted service appointments the Department had terminated during their respective trial periods.  As of the time and date of this declaration, the Department had (c) reinstated, by cancelling termination actions for, approximately ninety-five percent (95%) of the 1301 individuals whose competitive service appointments the Department had terminated during their respective probationary periods and had (d) reinstated, by cancelling termination actions for, approximately seventy-five percent (75%) of the 409 individuals whose excepted service appointments the Department had terminated during their respective trial periods. Accordingly, as of the time and date of this declaration, the Department had reinstated, by cancelling termination actions for, approximately ninety percent (90%) of the 1710 individuals whom the Department had terminated during their respective probationary or trial periods on or after February 14, 2025. Throughout the remainder of this date, the Department will continue the reinstatement process, by cancelling termination actions, for the remaining ten percent (10%) of the 1710 individuals whom the Department terminated during their respective probationary or trial periods on or after February

5

14, 2025. The Department does not intend to reinstate two (2) individuals, both of whom qualify for exclusions from the TRO in accordance with 10(c).

13.    The Department has notified or attempted to notify, telephonically and electronically (via personal email addresses where and when known to the Department), all affected individuals of these reinstatement actions and the cancellations of the termination decisions, but to the extent that the Department needs to complete additional administrative processes related to these reinstatement/cancellation efforts, the Department continues to work diligently to complete such processes.

14.    The Department will continue to analyze all data and information relevant to termination actions, taken on or after February 14, 2025, that have affected or will affect individuals during their respective probationary or trial periods.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

Digitally signed by
MARK GREEN
Date: 2025.03.17
18:27:03 -04'00'

MARK D. GREEN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Maryland, et al.,

      Plaintiffs,

      v.

United States Department of Agriculture,

et al.,

      Defendants.

Case No. 1:25-cv-00748-JKB

## DECLARATION OF SYDNEY ROSE

Pursuant to 28 U.S.C. § 1746, I, Sydney Rose, declare as follows:

1.    I am the Chief Human Capital Officer within the U.S. Department of Labor ("DOL"), Office of the Assistant Secretary for Administration and Management, Office of Human Resources, headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of DOL, or on information provided to me by DOL employees.

2.    I have served in this position since March 24, 2013. In my role at DOL, I am responsible for personnel management. I have the responsibility for overseeing the human resources enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with Federal law, including those related to probationary employees.

3.    Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

**JA573**

4.    The probationary period is part of the hiring and selection process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.    On January 20, 2025, DOL received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.    I have been provided and have reviewed the temporary restraining order ("TRO") issued in this case on March 13, 2025, requiring DOL to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

7.    With respect to DOL employees who meet the definition of "Affected Probationary Employees" set forth in the TRO, DOL notes that it issued probationary termination notices to approximately 170 probationary employees out of approximately 620 probationary and trial period employees. For approximately 167 of the 170 Affected Probationary Employees, their termination date was effective March 7, 2025; for the remaining three (3) Affected Probationary Employees, two had termination dates effective on February 20, 2025, and the third on February 21, 2025.

8.    Effective March 7, 2025, DOL rescinded the approximately 167 probationary termination notices of Affected Probationary Employees whose effective termination date was March 7, 2025. For the remaining three (3) probationary employees whose effective termination dates were prior to March 7, 2025, DOL rescinded their terminations and reinstated their

employment with no loss of pay prior to March 7, 2025. Accordingly, as of this time, DOL has no Affected Probationary Employees who have not either returned to work or voluntarily separated from DOL.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

*Sydney P. Rose*

/s/

Sydney Rose

Chief Human Capital Officer

U.S. Department of Labor

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

## DECLARATION OF ADAM MARTINEZ

Pursuant to 28 U.S.C. § 1746, I, Adam Martinez declare as follows:

1.      I am the Acting Chief Human Capital Officer of the Consumer Financial Protection Bureau ("Bureau") headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the CFPB, or on information provided to me by CFPB employees.

2.      I have served in this position since approximately, Monday, October 21, 2024.  In my role at the CFPB, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.    The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.    On January 20, 2025, the CFPB received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.    The CFPB terminated 117 probationary employees between February 11, 2025, and February 13, 2025.

7.    I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring the Consumer Financial Protection Bureau to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025,

8.    Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status will impose substantial burdens on the CFPB, cause significant confusion, and cause turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status will have to be onboarded again, including the possibility of completing any applicable training, filling out human resources paperwork, obtaining new security badges, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as

2

**JA577**

auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.    Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.    Nonetheless, the CFPB has immediately begun reinstating Affected Probationary Employees.  By 3:30 pm on March 16, 2025, the CFPB reinstated 117 Affected Probationary Employees.  While CFPB has notified all Affected Probationary Employees that they have been reinstated, to the extent CFPB needs to complete additional administrative processes related to the reinstatement of these employees, CFPB is acting diligently to complete such processes.

11.    All reinstated employees will be immediately placed on administrative leave status while the CFPB continues to act to comply with the TRO and/or employees are to be assigned work by management/supervisors.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

ADAM MARTINEZ
Digitally signed by ADAM MARTINEZ
Date: 2025.03.17 17:17:22 -04'00'

Adam Martinez

3

**JA578**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Maryland, et al., | |
|      Plaintiffs, | Case No. 1:25-cv-00748-JKB |
|      v. | |
| United States Department of Agriculture, et al., | |
|      Defendants. | |

**DECLARATION OF BEATRICE (JULIE) BRILL**

Pursuant to 28 U.S.C. § 1746, I, Beatrice Julie Brill declare as follows:

1. I am the Acting Chief Human Capital Officer of the Small Business Administration (SBA), Office of Human Resources Solutions, (OHRS) headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of the SBA, or on information provided to me by SBA employees.

2. I have served in this position since February 12, 2025. In my role at the SBA, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3. Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.     The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.     On January 20, 2025, SBA received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.     The Agency terminated 304 probationary employees out of approximately 700 probationary employees between February 11, 2025, and February 25, 2025. On February 18, 2025, SBA rehired 6 of those probationary employees. As of March 17, 2025, five remain employed with SBA and one voluntarily resigned, and thus were unaffected by the Court's recent order.

7.     I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring SBA to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025,

8.     Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on Interior, cause significant confusion, and cause turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork,

2

**JA580**

obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.    Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subject to multiple changes in their employment status in a matter of weeks.

10.    Nonetheless, SBA has immediately begun reinstating Affected Probationary Employees.  By 12:40 pm on March 17, 2025, SBA had sent notification to all 298 Affected Probationary Employees that they are reinstated. Seven notifications of the 298 were undeliverable, and the OHRS Office will conduct additional outreach to obtain updated employee contact information.

11.    127 of these employees were reinstated into administrative leave and will be provided backpay since the date of their release.  164 employees were previously on intermittent work schedules (non-pay status) at the time of their release and are being reinstated and returned into intermittent non-pay status (not on administrative leave).  Because these employees were on an intermittent work schedule, the Agency does not owe them any backpay.

12.    SBA continues working to reinstate all Affected Probationary Employees.  Further, while SBA has notified Affected Probationary Employees that they have been reinstated, to the extent SBA needs to complete additional administrative processes related to the reinstatement of these employees, SBA is acting diligently to complete such processes.

3

**JA581**

4

13.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated: March 17, 2025

BEATRICE
BRILL

Digitally signed by
BEATRICE BRILL
Date: 2025.03.17
16:41:53 -04'00'

Beatrice (Julie) Brill

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Maryland, et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>United States Department of Agriculture,<br>et al.,<br><br>      Defendants. | Case No. 1:25-cv-00748-JKB |

## DECLARATION OF DANIEL H. BENDLER

Pursuant to 28 U.S.C. § 1746, I, Daniel H. Bendler, declare as follows:

1.      I am the Deputy to the Acting Chairman and Chief Operating Officer of the Federal Deposit Insurance Corporation ("FDIC") headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of the FDIC, or on information provided to me by FDIC employees.

2.      I have served in this position since February 2022.  In my role at the FDIC, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and the tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, the FDIC received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      The FDIC terminated approximately 156 probationary employees out of approximately 261 eligible probationary employees between February 18 and 19, 2025.  There were five probationary employees terminated as a part of the group that would have otherwise been terminated for individualized reasons based on performance/conduct.

7.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring the FDIC to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees would impose substantial burdens on the FDIC, cause significant confusion, and cause turmoil for the terminated employees.  Specifically, employees' missed contributions to health benefits, flexible spending accounts, and thrift savings plan contributions will have to be calculated and recovered; employees' time cards must be individually restored, to include certifying the time lost during the termination; each employee would have to

2

**JA584**

pay back the lump sum payment already received for unused annual leave or set up a debt process to remit the payment back; and the FDIC security office would need to reinstate initial or bridge investigations for each employee.

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated via administrative leave or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, the FDIC reinstated all Affected Probationary Employees as of 11:59 am today.  As of this time, the FDIC has rescinded the terminations of 151 Affected Probationary Employees.

11.     As of today, the reinstated Affected Probationary Employees have been placed into paid administrative leave status at the FDIC.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

DANIEL BENDLER

Digitally signed by DANIEL BENDLER
Date: 2025.03.17
18:07:21 -04'00'

/s/

Daniel H. Bendler

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| |
|---|
| Maryland, et al., |
|       Plaintiffs, |
|       v. |
| United States Department of Agriculture, et al., |
|       Defendants. |

Case No. 1:25-cv-00748-JKB

## DECLARATION OF SEPIDEH KEYVANSHAD

Pursuant to 28 U.S.C. § 1746, I, Sepideh Keyvanshad declare as follows:

1.     I am the Senior Deputy Assistant Administrator for the Office of Human Capital and Talent Management (HCTM) at the United States Agency for International Development (USAID) headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in USAID records, or on information provided to me by USAID employees.

2.     I have served in this position since approximately April 2024. In my role at USAID, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.     Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, USAID received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      USAID terminated, at the direction of USAID leadership, 270 probationary employees out of 295, effective March 7, 2025.

7.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring USAID to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025,

8.      Upon receiving notice of the TRO, USAID immediately began reinstating Affected Probationary Employees through the following process. A cancellation of the termination action will be processed during Pay Period 5 with an effective date of March 7, 2025. The SF-50 documenting this cancellation will be available in eOPF on or about March 31, 2025. HCTM will email the SF-50 to all personal email addresses it has on file during the week of March 31, 2025.

9.      Additionally, by 1:00 pm EDT today, March 17, 2025, USAID sent a letter via email to all Affected Probationary Employees informing them of the above actions.

10.    Upon reinstatement, all reinstated probationary employees will be placed on paid administrative leave until further notice.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/ *Sepideh Keyvanshad*

Sepideh Keyvanshad

**JA588**

Docusign Envelope ID: 6657264D-FC72-4675-9E00-8654B30D8B4D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Maryland, et al., | |
|     Plaintiffs, | Case No. 1:25-cv-00748-JKB |
|     v. | |
| United States Department of Agriculture, et al., | |
|     Defendants. | |

## DECLARATION OF JEREMY TAYLOR

Pursuant to 28 U.S.C. § 1746, I, Jeremy Taylor declare as follows:

1.       I am the Deputy Chief Human Capital Officer, Office of Human Resources Management, at the General Services Administration headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the General Services Administration, or on information provided to me by General Services Administration, Office of Human Resources employees.

2.       I have served in this position since July 2024.  In my role at the General Services Administration, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and the tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

Docusign Envelope ID: 6657264D-FC72-4675-9E00-8654B30D8B4D

3.      Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, General Services Administration received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      The General Services Administration terminated approximately 366 probationary employees out of approximately 812 probationary and trial period employees between February 13, 2025 and March 7, 2025.

7.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring the General Services Administration to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on the General Services Administration, cause significant confusion, and cause turmoil for the terminated employees.  Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out

2

**JA590**

human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.      Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated via administrative leave or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, the General Services Administration has immediately begun reinstating Affected Probationary Employees. By 9:00am on March 17, 2025, The General Services Administration reinstated all its 366 Affected Probationary Employees.  Subsequently, 2 of these employees declined to be reinstated. There are 0 decisions pending.

11.     While General Services Administration has notified all Affected Probationary Employees that they have been reinstated, to the extent General Services Administration needs to complete additional administrative processes related to the reinstatement of these employees, the General Services Administration is acting diligently to complete such processes.

12.     As of 1:00pm today, the General Services Administration has placed the 364 reinstated probationary employees on paid administrative leave.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

Signed by:

*Jeremy Taylor*
646749BC69944EC...
Jeremy Taylor

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

### DECLARATION OF TREVOR NORRIS

Pursuant to 28 U.S.C. § 1746, I, Trevor Norris, declare, as follows:

1. I am Deputy Assistant Secretary (DAS) for Human Resources (HR) for the United States Department of the Treasury, headquartered in Washington, D.C. I have served in this position since October 2017. As DAS for HR, I oversee all human capital programs for the Department of the Treasury and its bureaus (collectively, "Treasury"). I have the responsibility for tracking and recording personnel actions, including terminations.

2. Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

3. The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an

agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

4. On January 20, 2025, Treasury received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

5. Between February 19 and March 7, 2025, Treasury terminated approximately 7,605 out of approximately 16,663 probationary employees.

6. I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring Treasury to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

7. Whether required by operation of the TRO here or another court or administrative order, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, reinstituting applicable security clearances, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

8. Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

2

9.      Nonetheless, Treasury has immediately begun reinstating Affected Probationary Employees.  Specifically, I worked with my colleagues within the office of the DAS for HR over the weekend of March 15-16 to develop an implementation plan for reinstating Affected Probationary Employees.  At 10:30 A.M. on March 17, my office convened a meeting with the Human Resources Officers of Treasury's bureaus, and directed them to provide notice (via personal emails or other available means) to Affected Probationary Employees by 1:00 P.M.  Bureaus were provided with a template notice informing employees that they were being reinstated immediately.

      a.    The Bureau of Engraving and Printing provided email notice of reinstatement to all of its 48 Affected Probationary Employees at 11:31 A.M. on March 17, 2025.

      b.   The Bureau of the Fiscal Service provided email notice to 168 of its 169 Affected Probationary Employees prior to 1:00 P.M. on March 17, 2025.  The final remaining employee received notice at 1:07 PM after an invalid email address was corrected.

      c.   The United States Mint experienced delays in retrieving personal email addresses for its 8 Affected Probationary Employees, but managed to provide email notices to all 8 persons by 1:30 P.M., March 17, 2025.

      d.    Due to difficulty in compiling personal email addresses, the Internal Revenue Service (IRS) was not able to fully comply with the 1:00 deadline.  It sent email notices to 6,387 of its 7,315 Affected Probationary Employees by 3:00 P.M. on March 17, 2025.  The IRS has arranged for certified mail

3

notifications to be sent to all of its Affected Probationary Employees on March 18, 2025.

    e.  The Office of the Comptroller of the Currency (OCC) had not yet formally processed the terminations of its 73 Affected Probationary Employees (which was effective March 8), and as a result was able to formally place these employees in an administrative leave status on March 16.  OCC also sent email notices to its affected employees, at 3:54 P.M. on March 17.

All Treasury bureaus are working expeditiously to complete administrative processing of the reinstatements in their Human Resources systems, including issuance of SF-50 Notice of Personnel Action Forms.

10.    Upon reinstatement, Treasury will place each affected employee in an Administrative Leave status.

11.    Treasury continues working to reinstate the 7,613 employees affected by the termination actions taken between February 19 and March 7, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

TREVOR NORRIS

4

**JA595**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| Maryland, et al., <br><br>      Plaintiffs, <br><br>      v. <br><br> United States Department of Agriculture, et al., <br><br>      Defendants. | Case No. 1:25-cv-00748-JKB |

## DECLARATION OF MARY PLETCHER RICE

Pursuant to 28 U.S.C. § 1746, I, Mary Pletcher Rice declare as follows:

1. I am the Acting Principal Deputy Assistant Secretary for Administration within Departmental Administration at the United States Department of Agriculture ("USDA" or "Department") headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of USDA, or on information provided to me by USDA employees.  I have served in this position since January 31, 2025, and I have been employed at USDA since 2018.

2. In my role at USDA, I currently oversee the Department's Office of Human Resources Management and I have purview over USDA subagencies' Chief Operating Officers and Human Resources Offices.

3. Approximately 5,714 probationary employees were terminated from USDA beginning February 13, 2025, and concluding on or around February 17, 2025. I have been provided, and have reviewed, the temporary restraining order ("TRO") issued in the above-

captioned case on March 13, 2025, requiring USDA to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

4.    USDA is already reinstating the terminated probationary employees, pursuant to a 45-day March 5, 2025, Stay Order issued by the Merit Systems Protection Board ("MSPB"), which was requested by the Office of Special Counsel.

5.    On March 12, 2025, USDA reinstated all 5,714 Affected Probationary Employees by restoring them to the status they were in prior to their terminations and provided each with back pay from the date of their respective termination. As part of a phased plan for return-to-duty, upon returning to pay status, the Affected Probationary Employee will initially be placed on paid administrative leave. USDA began the notification process on Friday March 14th to all Affected Probationary Employees confirming their reinstatement. USDA is diligently working on providing this notice to all Affected Probationary Employees.

6.    A group of 1,070 seasonal Forest Service Affected Probationary Employees who were not in pay status at the time of their terminations (due to the off-season) have been reinstated to their prior unpaid status. Additionally, there are six Affected Probationary Employees in the Foreign Agricultural Service who were administratively furloughed prior to their terminations, and who have been reinstated to their prior administrative furlough status.

7.    USDA is acting diligently to complete the administrative steps related to notifying the Affected Probationary Employees of their reinstatement, processing the reinstatements for purposes of all relevant USDA record systems, and returning the reinstated employees to duty status.

8.      Whether required by operation of the March 5, 2025, MSPB Stay Order and/or this Court's March 13, 2025, Temporary Restraining Order, reinstating the terminated probationary employees is complex and places the following logistical burdens on USDA and its approximately 29 subordinate Mission Areas, Agencies, and Staff Offices, including USDA's multiple human resources offices: (1) initiating the process of placing all removed probationary employees, who received February 2025 termination letters, into pay status, and providing backpay, from the date of the termination notice through the present, which involves several systems and applies across multiple pay periods; (2) ascertaining whether some of the probationary employees choose to resign, due to having secured other employment or not wanting to return to duty at USDA; (3) reinstituting and ensuring operational status of secured LincPasses, office space, and equipment (including laptops in most instances) for those individuals whose mission criticality requires on-site work; and (4) addressing, as appropriate, any identified or substantiated threats to the physical safety of USDA's existing 111,000 person workforce and security of USDA's physical plants and assets across the nation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

MARY RICE

/s/

Digitally signed by MARY RICE
Date: 2025.03.17
18:20:46 -04'00'

MARY PLETCHER RICE

3

JA598

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| Maryland, et al., | |
| Plaintiffs, | Case No. 1:25-cv-00748-JKB |
| v. | |
| United States Department of Agriculture, et al., | |
| Defendants. | |

**DECLARATION OF MARK ENGELBAUM**

Pursuant to 28 U.S.C. § 1746, I, Mark Engelbaum declare as follows:

1.       I am the Assistant Secretary for Human Resources and Administration/Operations, Security, and Preparedness at the Department of Veterans Affairs (VA), headquartered in Washington, D.C.  I make this Declaration based on my own personal knowledge, on information contained in the records of the VA, or on information provided to me by VA employees.

2.       I have served in this position since February 13, 2025.  In my role at the VA, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.       Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.      The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.      On January 20, 2025, the VA received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.      VA initially terminated approximately 1,900 probationary employees between February 13, 2025, and February 24, 2025, out of approximately 46,000 probationary employees on board at VA at that time. Following administrative review, 1,683 remained terminated as of March 17, 2025.

7.      I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring VA to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025.

8.      Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on VA, cause significant confusion, and cause turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, re-enrolling in benefits programs and payroll, reinstituting applicable security

2

**JA600**

clearance actions, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.    Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated (via administrative leave or otherwise) or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.    Nonetheless, VA has immediately begun rescinding the notice of termination and reinstating the employment of the Affected Probationary Employees. While notification efforts are still underway, the VA, by 1:00 pm EDT today, Monday, March 17, 2025, has for all intents and purposes, reinstated all Affected Probationary Employees, placing them in an initial administrative leave status with full pay and benefits, effective March 17, 2025. Affected Probationary Employees will also receive back pay from the date of termination to the date of reinstatement.

11.    Individual personal contact information is not immediately available for every individual employee at the Agency level. Accordingly, as of the signing of this declaration, the VA has begun sending rescission notices to those employees for whom contact information is available as well as to the servicing Human Resources offices of all 1,683 affected Probationary Employees. The Human Resources offices are notifying the supervisors of these employees, who have been instructed to expeditiously notify the Affected Probationary Employees that they are reinstated and in a pay status.  The Agency will follow up on a daily basis, starting on close of business Monday, March 17, 2025 until it has received verification that all impacted employees have been notified. VA has started the process to cancel the Standard Form (SF) 50s that

terminated the employment of the Affected Probationary Employees and expects this process to be completed no later than Tuesday, March 18, 2025.

12.    VA continues working to reinstate to all Affected Probationary Employees. VA is engaging the Affected Probationary Employees' supervisor to ensure employees receive the notice, are aware of their employment status, and are advised to maintain contact with their supervisor while on administrative leave. The VA is acting diligently to complete additional administrative processes related to the reinstatement of these employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 17, 2025

/s/Mark Engelbaum 7:05 p.m.

Mark Engelbaum

4

**JA602**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| Maryland, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>United States Department of Agriculture,<br>et al.,<br><br>    Defendants. | Case No. 1:25-cv-00748-JKB |

**DECLARATION OF JOHNATHAN J. GARDNER**

Pursuant to 28 U.S.C. § 1746, I, Johnathan J. Gardner declare as follows:

1.     I am the Acting Associate Deputy Assistant Secretary for Human Capital, Department of Health and Human Services headquartered in Washington, D.C. I make this Declaration based on my own personal knowledge, on information contained in the records of the United States Department of Health and Human Services ("HHS"), or on information provided to me by the Department's Human Resources Directors.

2.     I have served in this position since August 12, 2024. In my role at HHS, I am responsible for personnel management. I have the responsibility for overseeing the personnel enterprise and tracking and recording of personnel actions, including terminations. I assist in ensuring that all personnel actions comply with federal law, including those related to probationary employees.

3.     Probationary employees in the competitive service are employees who have been employed for less than one year. In the excepted service, the trial period may be up to two years.

4.    The probationary period is part of the hiring process, and probationary employees have limited protections against termination. The probationary period is essentially an extended tryout to determine the fitness of the employee and, according to regulation, an agency "shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment."

5.    On January 20, 2025, HHS received a guidance memorandum from the Office of Personnel Management ("OPM"), which stated that "agencies should identify all employees on probationary periods" and "should promptly determine whether those employees should be retained at the agency."

6.    Between February 14 and March 13, 2025, HHS issued termination notices to 3,248 probationary and trial period employees out of approximately 8,466 employees serving a probationary or trial period under HHS policy.[1]   HHS placed 2,537 probationary and trial period employees on administrative leave through March 14, 2025; HHS also placed 711 remaining probationary and trial period employees within the Centers for Disease Control and Prevention (CDC) on administrative leave with no set end date. However, between February 15 and March 13, 2025, 88 of these 3,248 probationary and trial period employees were subsequently taken off administrative leave and terminated before the end of their probationary period.

7.    I have been provided and have reviewed the temporary restraining order (TRO) issued in this case on March 13, 2025, requiring HHS to reinstate all Affected Probationary Employees, as defined in paragraph 10(c) of the TRO, who were terminated on or after January 20, 2025,

---

[1]  HHS Policy requires all employees to serve a probationary or trial period.  However, some of these employees may be entitled to due process if they meet the definition of an employee under 5 U.S.C. § 7511(a)(1).

8.     Whether required by operation of the TRO here or another court or administrative order, reinstatement of removed employees to full duty status would impose substantial burdens on HHS, cause significant confusion, and cause turmoil for the terminated employees. Specifically, all employees offered reinstatement into full duty status would have to be onboarded again, including going through any applicable training, filling out human resources paperwork, obtaining new security badges, restoring to benefits programs and payroll, receiving government furnished equipment, and other requisite administrative actions, such as auditing personnel requests to ensure any actions that would have otherwise been taken during their period of separation are completed.

9.     Additionally, an appellate ruling could reverse the district court's order shortly after terminated employees have been reinstated or have returned to full duty status. In short, employees could be subjected to multiple changes in their employment status in a matter of weeks.

10.     Nonetheless, HHS has reinstated the Affected Probationary Employees.  As of this time, HHS has reinstated the 88 Affected Probationary Employees who were terminated before the end of their probationary period, between February 15 and March 13, 2025, as described in paragraph 6, *supra*.  HHS sent notification to all Affected Probationary Employees of their reinstatement by email or letter on March 17, 2025.

11.     Further, HHS has placed all reinstated probationary and trial period employees on administrative leave. In this regard, HHS has extended the administrative leave status of the 2,855 probationary and trial period employees who were scheduled to be terminated after March 14, 2025 following the completion of the previously scheduled administrative leave period, as described in paragraph 6, *supra*.  HHS notes that there is a difference between the number of Affected Probationary Employees issued termination notices and the number of Affected

Probationary Employees who were reinstated or had their administrative leave status extended. Some of this difference reflects the fact that, prior to March 13, 2025, HHS granted exceptions to allow some Affected Probationary Employees to return to duty. The remainder of this difference reflects the fact that, prior to March 13, 2025, HHS made a determination that some Affected Probationary Employees met the definition of an employee under 5 U.S.C. § 7511(a)(1) and thus were not probationary employees under § 7511(a)(1), and accordingly, HHS reinstated those Affected Probationary Employees prior to March 13, 2025.  HHS sent notification to all Affected Probationary Employees of the extension of their administrative leave period, if applicable, by email or letter on March 17, 2025.

12.     By 1:00 pm EDT today, Monday, March 17, 2025, HHS reinstated, or extended the administrative leave period for all of the Affected Probationary Employees within HHS, with two small sets of exceptions.

a.     The first set of Affected Probationary Employees are those who were employed at NIH. HHS reinstated or extended the administration leave period for 90% of the NIH Affected Probationary Employees by 1:00 pm EDT today. However, during the course of this process, NIH experienced technical issues with the relevant personnel systems, which resulted in delays completing the reinstatement or extension process.  NIH completed reinstating or extending the administrative leave period for the remaining 10% of Affected Probationary Employees by 1:30 p.m. EDT today.

b.     The second set of Affected Probationary Employees are those CDC employees who were already on administrative leave as of March 13, 2025. Consistent with paragraph 6, *supra*, HHS is maintaining these Affected Probationary Employees on administrative leave, with no set end date, in compliance with the TRO.

13.     While HHS has notified all Affected Probationary Employees that they have been

reinstated or that their administrative leave status has been extended as applicable, to the extent

HHS needs to complete additional administrative processes related to the reinstatement of these

employees, HHS is acting diligently to complete such processes.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated: March 17, 2025

JOHNATHAN J.
GARDNER -S
Johnathan J. Gardner

Digitally signed by JOHNATHAN
J. GARDNER -S
Date: 2025.03.17 18:29:31 -04'00'

5

Exhibit A

**From:** CHCO Council
**Sent:** Friday, February 14, 2025 12:48 PM
**Subject:** Follow up: CHCO Council Special Session

CHCOs and Deputy CHCOs,

Thank you for your time today.

This message clarifies immediate next steps for probationary employees.

Over the past several days, agencies have worked to review, clean up, and finalize their lists of probationary employees they wish to keep, and wish to terminate, and begin taking action.

We have asked that you separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/17. We have attached a template letter.  The separation date should be as soon as possible that is consistent with applicable agency policies (including those in CBAs).

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."  A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service.   "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual." Thus, the probationary period is part of the federal hiring process; there is currently a hiring freeze; and a probationer has no right to continued employment in the federal government.

An employee's performance must be measured in light of the existing needs and interests of government. OPM has emphasized that individual employee performance measurement should be "aligned with and support organizational goals" and "focus[] employee efforts on achieving organizational and group goals." An employee's performance must be viewed through the current needs and best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Through the exemptions process, agencies have identified the highest-performing probationers in mission critical areas. Regulations on probationary periods state: "The agency shall utilize the

probationary period as fully as possible to determine the fitness of the employee and shall terminate his or her services during this period if the employee fails to demonstrate fully his or her qualifications for continued employment." 5 CFR 315.803.  OPM believes "qualifications for continued employment" in the current context means that only the highest-performing probationers in mission-critical areas should be retained.

After actioning, please update the previous probationary employee spreadsheet you've sent us to include the information below. **Please resend the updated version to tracking@opm.gov with Amanda Scales and Jamie Sullivan on cc by 8:00pm EST Monday**. This tracker should include:

- Which probationary employees have been terminated and which you plan to keep. For those you plan to keep, provide an explanation of why.
- For each probationary employee, indicate if they have opted into the deferred resignation program or not. This can be done by cross-checking the latest submissions sent to you via tracking@opm.gov. Please also indicate whether you have signed a written deferred resignation agreement with them or not.
- Probation end date.

**Please continue providing these reports daily through at least the end of next week.**

We have also attached a template Probationary tracker for your reports today.

Thank you,
OPM

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:                    [NAME]
                         [TITLE]

SUBJECT:                 Notification of Termination During Probationary Period

REFERENCES:              5 U.S.C. § 7511
                         [5 U.S.C. § 3321(a)]
                         [5 C.F.R. §§ 315.803 and 804]
                         [5 C.F.R. § 316.304]
                         [INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE] and federal service during your probationary/trial period consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. [The agency also informed you of this requirement in the job opportunity announcement for the position.]

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3] Furthermore, OPM has emphasized that individual employee performance measurement should be aligned with and support organizational goals and focus employee efforts on achieving organizational and group goals. In addition, OPM has instructed Agencies to consider whether an employee's performance is in the best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Based on the OPM guidance referenced above, the Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this notice or 30 days after the date of your receipt of this notice, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact [CONTACT].

[INSERT NAME OF AGENCY OFFICIAL]
[INSERT TITLE OF AGENCY OFFICIAL]

Exhibit B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv-00748-JKB |

**DECLARATION OF LILIANA CAETANO BACHELDER**

I, Liliana Caetano Bachelder, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the president of the Foreign Agricultural Service Employees, Local 3976, District Council 20, American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 3976").  AFSCME Local 3976 is affiliated with AFSCME District Council 20. District Council 20, through its constituent local unions like Local 3976, represents federal civilian employees in agencies and departments across the federal government.  I have served as president of Local 3976 since January 2021.

3.      Before becoming the local union president, I have been employed as an International Trade Specialist for the U.S. Department of Agriculture's ("USDA") Foreign Agricultural Service in the Foreign Affairs Program.  The Foreign Agricultural Service ("FAS") is the foreign affairs arm of the USDA.  Its primary mission is to open trade in other countries

and assist farmers and producers in the United States to export their agricultural products abroad. In other words, our agency helps farmers and producers in the U.S. grow and thrive by opening foreign markets to American agricultural products. I have been employed with the Foreign Agricultural Service for 31 years.

4.      AFSCME Local 3976 represents a bargaining unit of approximately 400 civil servants who work for the Foreign Agricultural Service in the Washington, D.C. metropolitan area. These employees include International Economists, International Trade Specialists, Nutritionists, Trade Policy Analysts, International Science Advisors, Technical Assistance Specialists, International Market Specialists, and others.

5.      AFSCME Local 3976 represents the interests of the USDA's Foreign Agricultural Service nonsupervisory civil servants. Our core functions include providing support, guidance, and resources to bargaining unit employees as their officially recognized exclusive representative.

6.      As the exclusive representative for the nonsupervisory Foreign Agricultural Service civil servants, AFSCME Local 3976 enters into collective bargaining negotiations with the USDA on a wide variety of terms and conditions of employment and represents bargaining unit members through the negotiated grievance process.

7.      AFSCME Local 3976 and the USDA, Foreign Agricultural Service are parties to a collective bargaining agreement that memorializes negotiated terms and conditions of employment, benefits, rules, a grievance procedure and other procedures of the workplace.

8.      Early on Friday, February 14, 2025, bargaining unit members who are probationary employees began notifying the union by phone, email and text messages that the USDA sent these employees emails containing, as an attachment or within the body of the email,

a letter to each employee terminating their employment, effective February 13, 2025, at 7:00

p.m. eastern time.  The emails to affected employees were sent to employees late at night on

February 13 between approximately 8:00 p.m. and approximately 2:00 a.m. on February 14. A

true and correct copy of an exemplar of one of these notices is attached hereto as Exhibit 1.

9.      The letter to employees titled "Notification of Termination During Probationary

Period" explained to the affected probationary employees that they were being removed from

their position during the "probationary/trial period." The letter further states that the USDA finds

that "based on your performance, further employment at the Agency would be in the public

interest."  The letter is signed by USDA Chief Human Capital Officer, Myrna Matherly. I have

seen several employees' termination notices from our bargaining unit, and they were all identical.

10.     To date, twenty-two (22) Foreign Agricultural Service probationary employees

and AFSCME Local 3976 bargaining-unit members were terminated. However, AFSCME Local

3976 does not currently know the scope of the terminations of probationary employees within its

bargaining unit as the USDA did not provide the union advance notice of the terminations or

provided the union with a list of all affected probationary employees. The USDA has yet to

respond to a formal information request from the Union for the list of affected probationary

employees in the local's bargaining unit.

11.     Since the termination letters were sent to affected employees, the union has been

flooded with emails, texts, and phone calls from affected employees and other bargaining unit

members who are devastated and are concerned about their livelihoods and the mission of their

agency.  Affected employees have contacted the union to seek information, guidance,

explanations of their rights, and legal advice.

12.     Affected probationary employees were blindsided by the termination letter and are desperately trying to figure out how they will pay for their basic needs such as health insurance, housing, and childcare. Some of the probationary employees who were terminated had barely started their federal careers and are among the lowest paid USDA members in entry level positions.  These bargaining unit members moved to Washington, D.C., one of the most expensive cities in the country, to work in the public service and are now left with financial obligations that they cannot afford due to the job loss.

13.     Affected employees are devastated and stressed by the negative impact of terminations on their lives and the lives of their families.  Affected employees are looking to their union to protect them and to provide information on their benefits, such as the process to continue healthcare coverage or how to apply to unemployment insurance, and their legal rights. Some of this information should have been provided by the agency, but it has failed to provide clear guidance on the employee's loss of benefits and what to do next concerning their separation from federal service.  The union has had to research information that in normal circumstances would have been provided by the agency concerning the continuation or loss of benefits to provide to members and has been forced to seek legal advice and resources from District Council 20 and AFSCME International Union on member's legal rights.

14.     The Union continues to respond to a deluge of calls, texts, and email from bargaining unit members. Members are asking about information on continuation of health benefits; how to obtain their personnel documents and forms that are needed to apply for unemployment insurance and other benefits; the effect of the termination for "performance" on their eligibility for unemployment insurance or future job prospects; why they are not receiving information and guidance from the agency.  The Union is providing almost daily updates by

emails to the entire bargaining unit about what we know and can share about potential legal actions to challenge the mass terminations and to provide any information and guidance that is relevant to their termination or loss of benefits. The Union is also hosting town hall meetings with the members to discuss their concerns and share information.

15.     Since the USDA terminated probationary employees, the Union has had to divert virtually all of its time and resources to engage with the membership on this issue and address their concerns. Since the terminations of probationary employees at the Foreign Agricultural Service, I have been spending at least 9 hours per day addressing the termination of probationary employees and responding to and assisting affected employees and other bargaining unit members who are concerned about the future of their employment. I have also had to work on my days off and on the weekends to talk to affected employees, address their concerns, and coordinate with the local's executive board on the strategy to protect our members. The local's vice president and chief steward currently work full-time jobs for the Foreign Agricultural Service. These local officers must use the Union's limited union "official time" bank to work on this issue during the workday if their workload permits or work on these issues during their time off. They have worked several hours each day either on union official time or after hours help our affected members. This representational work for the Union is only increasing because of the chaos caused by the mass terminations for all employees in the bargaining unit. Even non-probationary employees in the bargaining unit are now terrified of opening their emails to find they are immediately terminated and are reaching out to the Union for assurances or guidance which we cannot provide given the agency's lack of transparency on employee terminations.

16.     The substantial increase in emails, phone calls, text messages, and requests for counseling concerning the termination of probationary employees has diverted resources and

time that the union dedicates to its mission of advocating and negotiating for improved

workplace conditions, organizing new members, representing employees, and the administrative

tasks to maintain the union.  For example, the entire union executive board and stewards have

had to drop their non-urgent representational work to research the impact of the terminations and

to counsel employees.

17.    Affected employees are particularly worried about how the termination letter,

which states they were terminated for "performance" reasons, will impact their future job

prospects.  Many affected employees have told the Union that they believe that the terminations

were not based on inadequate performance because they have received excellent performance

evaluations, awards, or commendations and their performance had never before been questioned.

One probationary employee who corresponded with the signatory of the termination letter,

Myrna Matherly, questioned the letter's representation that their termination was based on

performance and challenged the agency manager to produce any negative performance

evaluation.  In this correspondence the employee asked if their good performance evaluations

were a factor in their termination. Ms. Matherly responded that they were not, and that the

language used in the termination letter was provided by OPM for all terminations of probationary

employees across the federal government.

18.    Affected bargaining unit members are living in fear of how they will be able to

financially provide for their families and this is affecting their mental and physical health. None

of the affected employees have received their SF-50 form that documents the termination and

allows employees to seek benefits such as unemployment insurance. The USDA has told some

affected employees that they must wait weeks to get the form because they were hired in the

middle of a pay period and must wait for the current pay period to end before processing the forms.

19.    The termination of probationary employees has affected very talented and committed public sector workers and veterans. The USDA could not possibly justify their termination based on inadequate "performance."

20.    One such employee was an International Economist with the Foreign Agricultural Service, hired under the prestigious and highly competitive Presidential Management Fellows ("PMF") program.  The PMF Program is a leadership development program that recruits and trains future government leaders that transition to the federal service after a two-year probationary period.  This affected employee is also a veteran, having served for five years as a Navy corpsman assigned to the Marine Corps to provide medic services during two deployments in Iraq and Southeast Asia.  As an International Economist for the Foreign Agricultural Service, this employee did analytical work concerning the imposition on tariffs placed on U.S. agricultural products or work engaged in trade facilitation when U.S. agricultural products are impeded from entering a market abroad for various reasons, including retaliatory tariffs. His role was to facilitate the trade of U.S. agricultural products in foreign markets that benefited U.S. farmers and agricultural product producers.  On the morning of February 14, 2025, this employee received the probationary employee email termination notice notifying his that his termination was effective the day prior. He was subsequently locked out of all USDA systems and lost access to his personnel documents, such as past performance evaluations and other personnel documents.  This news was devastating to the employee, who had to immediately figure out how he would financially provide for his family, including his young son.  He thought he was protected as a veteran, by his status as a PMF fellow, and by his outstanding performance. He

feels betrayed by the government because he went to bat for this country as a soldier serving two overseas deployments, but the government did not go to bat for him. He stated that if the agency had actually done an individualized review of his performance, it would have concluded that his performance was exemplary.  He is currently having trouble filing for unemployment insurance because he has not received the SF-8 or SF-50 forms from his employer required to file for unemployment.  He must move from his apartment to find more affordable housing and is thinking of using credit or his retirement savings to cover living expenses while he searches for another job.  This affected employee is concerned with the mission of the agency to open and develop trade in other countries and assist farmers and producers in the Unites States to export their agricultural products abroad because so many smart and talented people, including other PMF fellows, who do critical work for the agency were terminated without cause. Without the dozens of employees who have been terminated that provide very specialized expertise to the mission of the agency, the Foreign Agricultural Service will have a harder time keeping up with trade barriers, leading to missed market opportunities and unchallenged restrictions that put U.S. farmers and exporters at a disadvantage.  Fewer staff also means weaker relationships between U.S. farmers and international buyers, slowing export growth and cutting into U.S. farmer incomes.

21.    Another probationary employee was terminated with only 23 days left in her probationary period.  Prior to joining the USDA, this employee worked with small-scale farmers and policy makers for over 30 years helping to balance natural resources management with economic and social objectives. This employee served as a technical expert to hundreds of small American farms and previously worked for the USDA as a contractor for more than a decade. This employee is highly qualified and holds a BSFS in Economics of Development from

Georgetown University, and an MS in Agroecology from University of Florida. In this final phase of her career, she decided to rejoin the USDA as a federal employee and bring her extensive experience to the Foreign Agricultural Service. In her role as Agricultural Science Advisor she addressed trade barriers so that U.S. farmers and product makers have access to overseas markets, and to assist if shipments were stuck at foreign ports.  When terminated, she was helping a U.S. BBQ sauce maker get an ~$250,000 shipment into the European Union; since the EU changed in regulations in November, U.S. exporters have been unable to meet the new EU requirements. During this time, this employee was also working vigorously to prevent significant trade losses to American farmers resulting from impending regulations in a country that is one of our top 10 recipients of agricultural exports.  The EU has announced its intent to alter how shipments are inspected and documented, and if U.S. producers aren't prepared, the trade losses to U.S. dairy, meats/poultry/pork, soybeans, grains, and processed vegetables sectors could reach ~$3 billion.  When fired, this employee was collaborating with the US Trade Representative and the U.S. Embassy (in-country), analyzing which sectors would be affected first, which would be affected worst, and how to navigate the situation. When this employee received the termination email on February 14, 2025, she immediately called her supervisor, who was unaware of the mass terminations of probationary employees.  The email stated that the employee was being fired for performance despite having a fully successful performance review. This employee must now take her highly specialized experience and education that has benefited U.S. farmers and the public elsewhere.

22.     The terminations at our agency have been completely haphazard, even affecting employees who are not actually probationary. For example, one of our members, who is not a probationary employee, notified the Union that the USDA terminated her as a probationary

employee.  This termination has negatively impacted her in many ways, including significant stress on her physical and mental health, as well as financial hardship. As a single mom, losing her sole source of income has been devastating.  On Friday, February 13th at 8:47pm, she received an email from HR with an attached notice titled "Termination during Probationary Period."  The termination notice stated that "[t]he attached notice of termination is based on your probationary status."  The letter incorrectly stated that she was still within her probationary period and falsely stated that her termination was based on "performance."  In fact, this employee's probationary period had ended nearly a year ago, on March 13, 2024.  Moreover, in the last two years this employee has received two cash awards for her excellent performance. Additionally, in 2023, she received an award for "expanding U.S. agriculture exports through trade supporting initiatives."  The affected employee immediately contacted the USDA's Human Resources Department ("HR") and the Union about this egregious mistake.  The last message she received from HR was: "We have reviewed the job announcement and final job offer and found that it had been erroneously announced and you were appointed to a competitive service term appointment instead of the Schedule B, excepted service appointment, as intended. As such, you will not be terminated as a probationary employee as required by the new Administration guidance.  However, this notices you that you will be receiving a letter that your term appointment will not be extended."  As of today, this employee is still unsure of her employment status and living under constant stress and anguish.  She has had to nearly deplete her savings so she can pay her rent 3 months in advance while she looks for another job, and she must consider leaving the DC area so she can secure employment before she run out of resources to support herself and her daughter.

23.     Members of the USDA FAS bargaining unit pay voluntary membership dues to the union, which is the union's overwhelming source of operational funding. The union's budget will be negatively impacted because of the loss of dues due to the terminations of probationary employees, and its bargaining power will be diminished because of the loss of members.

24.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on March 19, 2025, in Arlington, VA.


_____*/s/ Liliana Caetano Bachelder*_____
Liliana Caetano Bachelder*

*A copy of the signature page bearing an
original signature is attached hereto.

23.    Members of the USDA FAS bargaining unit pay voluntary membership dues to the union, which is the union's overwhelming source of operational funding. The union's budget will be negatively impacted because of the loss of dues due to the terminations of probationary employees, and its bargaining power will be diminished because of the loss of members.

24.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on March 19, 2025, in Arlington, VA.


Liliana Caetano Bachelder

11

Exhibit 1



**United States Department of Agriculture**

**Farm and Foreign Agricultural Services**

**Foreign Agricultural Service**

**Human Capital Management Division Washington, DC 20250**

March 14, 2024

**MEMORANDUM FOR:** ████████████████████████

**FROM**            M. LYNN MATHERLY
                     CHIEF HUMAN CAPITAL OFFICER

**SUBJECT"**         **NOTIFICATION OF TERMINATION DURING PROBATIONARY PERIOD**

**REFERENCES:**       5 U.S.C. § 7511
                     5 U.S.C. § 3321(a)
                     5 U.S.C. §2102
                     5 CFR §212.101
                     5 C.F.R. §§ 315.803, 315.804, and 315.806
                     Departmental Regulation 4020-250-1

This is to provide notification that the Agency is removing you from your position of ██████ ████████████ and federal service consistent with the above references.

On 9/22/2024, the Agency appointed you to the position of ████████████████████. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

USDA

you that the Agency is removing you from your position of ██████████████████ with the Agency and the federal civil service effective February 13, 2025, at 7:00 PM Eastern Time.

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at:  Washington DC Regional Office, 1901 S. Bell Street, Suite 950, Arlington, Virginia 22202 or washingtonregionaloffice@mspb.gov.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact TFAA-FAS-CHCO@usda.gov.

M. Lynn Matherly
CHIEF HUMAN CAPITAL OFFICER

Exhibit C

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO;  et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 3:25-cv-01780-WHA <br><br> **DECLARATION OF DR. ANDREW FRASSETTO** |

**DECLARATION OF DR. ANDREW FRASSETTO**

I, Dr. Andrew Frassetto, hereby declare as follows:

1.      I am a member of AGFE Local 3403, and, until February 18, 2025, I was an employee of the National Science Foundation (NSF). I make this statement based on personal knowledge, information, and belief and if called as a witness could and would testify competently thereto.

2.      I received a Ph.D. in Geosciences from the University of Arizona in 2009, with a dissertation on "Teleseismic Studies of the North American Cordillera: Evaluating the Changing Structure, Composition, and Fabric after Subduction." I subsequently conducted two years of postdoctoral research at the University of Copenhagen, and then worked for thirteen years at the Incorporated Research Institutions for Seismology (IRIS), which became the EarthScope Consortium, overseeing projects within the NSF Geodetic Facility for the Advancement of Geoscience (GAGE) and NSF Seismological Facility for the Advancement of Geoscience (SAGE).

3.      I began working at NSF on September 9, 2024, as a permanent-track Program Director and group lead for the Division of Earth Sciences Instrumentation and Facilities (EAR-IF) program.

4.      The opportunity to join NSF and give back to the science community and the next generation of US-based scientists was an honor and a privilege for me. I participated in several NSF research projects as a student, and my Ph.D. work was largely supported by a NSF Graduate Research Fellowship. Through those experiences I was able to witness NSF's unique role in advancing research and education in science, technology, engineering, and mathematics, and I strongly believe in its mission.

5.      The EAR-IF program that I worked in provides funding for around 100 projects that use specialized, modern scientific instrumentation at teaching and research institutions across the United States. These instruments range from laboratory microscopes to radar surface mappers to deployable underground sensors, and are used for projects that advance research across the earth sciences. These projects include identifying critical minerals in mine waste, understanding how grassland soils respond to wildland fires, or characterizing what the Earth's atmosphere and climate were like millions of years ago to provide perspective on our planet and others. The instruments funded by the EAR-IF program are often also made available to other scientists at the same

1    institution or as national open-access research facilities to support research beyond the specific

2    projects awarded funding.

3          6.        The EAR-IF program makes and oversees more than $20 million a year of awards to

4    outside institutions, and my NSF team worked creatively to maximize the return on this investment

5    and the advancement of critical science.

6          7.        The EAR-IF program currently has active awards to institutions in California that total

7    more than $13 million over multi-year commitments.

8          8.        On February 13, 2025, I had a progress review meeting with my supervisor, Dena

9    Smith-Nufio, the Division Director of Earth Sciences. At that meeting, I was told that my

10    performance was at a very high level and given a written progress review, which included statements

11    that:

12          • "His primary roles include oversight of the EAR Instrumentation and Facilities

13            Program and several of the division's mid-scale community facilities, which makes his

14            role mission critical."

15          • "He has already demonstrated an outstanding ability to balance the various aspects of

16            his job responsibilities and is highly effective at organizing and completing all his

17            work in an accurate and timely manner."

18          • "He has been an outstanding contributor to the division, directorate and the agency."

19    A true and correct copy of the Progress Review I received on February 13, 2025 is attached hereto as

20    **Exhibit A.**

21          9.        Five days later, my employment was terminated "based on your performance."

22          10.       At 9:01 am on the morning of February 18, many of my colleagues and I received an

23    email directing us to attend a meeting at 10 am, signed by Star Anderson, Acting Division

24    Director/Deputy CHCO Division of Human Resource Management.

25          11.       I was present for the meeting in person at the NSF headquarters in Alexandria,

26    Virginia, but the meeting was in a hybrid format, with many employees joining by Zoom.

27          12.       Hybrid meetings are very common at NSF, as employees work in many different

28    locations. To facilitate accessibility and disability accommodations, NSF meetings held over Zoom

Declaration of Dr. Andrew Frassetto, No. 3:25-cv-01780-WHA                    2

1    have automated closed captions and transcriptions provided by default. I have participated in many

2    hybrid meetings at NSF that incorporate those transcription tools.

3         13.    The transcript attached hereto as **Exhibit B** is consistent with my recollection of the

4    February 18, 2025 meeting and the tools we regularly use to transcribe meetings. I have reviewed the

5    transcript and it accurately records what transpired at the meeting, with redactions to omit the names

6    of terminated employees.

7         14.    Five members of NSF management presented at the meeting: Micah Cheatham, Chief

8    Management Officer; Karen Marrongelle, Chief Science Officer; Sarita Marshall, Chief, Payroll and

9    Benefits Branch, Division of Human Resources; Angel Williams, General Counsel; and Wonzie

10   Gardner, Chief Human Capital Officer.

11        15.    All statements made by NSF management and by the employees who attended the

12   meeting in person appear in the transcript in Exhibit B as coming from "E3410 x8539 Conf Room."

13        16.    During the meeting, Micah Cheatham told all the terminated employees that NSF did

14   not make the decision to terminate the employment of probationary employees. Instead, he stated that

15   NSF had previously chosen to retain probationary employees, but late Friday night, NSF received

16   direction to terminate our employment from the Office of Personnel Management (OPM).  Those

17   statements appear from roughly 10:20:37–10:21:09 on the transcript in Exhibit B.

18        17.    Micah Cheatham further informed us that the cause that would be listed in our

19   termination letters was "boilerplate" that came directly from OPM. He told us NSF was only

20   provided the options to terminate probationary employees based on performance or conduct and that

21   terminations based on conduct would not have allowed any of us to apply for unemployment benefits.

22   Those statements appear from roughly 10:26:10–10:26:22 on the transcript in Exhibit B.

23        18.    Micah Cheatham was also the speaker in the conference room during, but not limited

24   to, the times recorded on the transcript as 10:02:27–10:04:47; 10:06:35–10:06:55; 10:08:20–

25   10:09:18; 10:22:14–10:22:33; 10:23:02–10:23:33; and 10:31:19–10:31:27.  The statement that

26   appears on the transcript at 10:15:28 reading "[t]his is not a decision the agency made. This is a

27   direction we received, first of all," was made by Micah Cheatham.

28

19.     The speaker in the conference room during, but not limited to, the times recorded on the transcript from 10:04:56–10:06:21 and 10:09:23–10:10:23 was Sarita Marshall.

20.     Wonzie Gardner was the speaker in the conference room during, but not limited to, the times recorded on the transcript from 10:18:52–10:19:31, including for the statements reading that "we have no choice," that NSF was "following what we're getting from OPM" and that "We are following orders."

21.     No one at the meeting stated that my performance or the performance of any of the fired probationary employees was deficient.

22.     Following the meeting, on February 18, I was officially terminated from my position and given a letter stating that the reason was "[t]he Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest." A true and correct copy of the letter is attached hereto as **Exhibit C**.

23.     Nearly 170 of my colleagues were likewise terminated, and to the best of my knowledge, all terminated probationary employees were provided with the same letter.

24.     These firings are certain to have a severe negative impact on NSF's work. NSF employs roughly 1,500 people, of whom more than 10 percent have been terminated. These staff cuts will be extremely damaging to all of the programs at NSF and to the projects that NSF funds. For example, the review of proposals submitted for awards in the EAR-IF program will be immediately disrupted by my termination. To the extent that the program is able to continue, the work will be shouldered by a much smaller team, and crucial support for scientific projects across the country will likely be significantly delayed.

25.     Being terminated also severely affects my life and my family. In choosing to work for NSF, I was attracted to the stability and benefits provided by the position. Having a federal job with access to healthcare benefits meant that my wife, who is a dedicated and talented early childhood educator who teaches at a local pre-kindergarten, could keep working at her job. The flexible hours also meant that I could schedule around extracurricular activities for our 7-year-old daughter, and I could serve as the President of her Title 1 school's Parent-Teacher Organization.

1    26.    Based on the information I was given at the February 18, 2025, meeting, our family

2    will lose access to health care benefits on March 25, 2025.

3

4    I declare under penalty of perjury under the laws of the United States that the foregoing is true

5    and correct. Executed this 22nd day of February 2025 in Alexandria, Virginia.

6

7

8                                                        Dr. Andrew Frassetto

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

SMITH, DENA M.2/13/2025 11:59:13 AMProgress ReviewReleased

Dr. Andrew Frassetto currently serves as a program director in the Division of Earth Sciences (EAR) within the Directorate for Geosciences (GEO). His primary roles include oversight of the EAR Instrumentation and Facilities Program and several of the division's mid-scale community facilities, which makes his role mission critical. Dr. Frassetto has been an outstanding program director, and he has taken the lead role in overseeing this important and complicated portfolio for the division.  Dr. Frassetto came to NSF with a unique skill set in interdisciplinary scientific research, experience in the oversight of large, complex projects and coordination of field-based logistics. Since joining NSF, he has taken on projects based on his own initiative and further expanded his skill set and completed trainings that have focused on NSF's new Project Management and Research Infrastructure competencies. He has already demonstrated an outstanding ability to balance the various aspects of his job responsibilities and is highly effective at organizing and completing all his work in an accurate and timely manner.

Dr. Frassetto also has excellent oral and written communication skills. He has participated in multiple in-person and virtual engagements with the scientific community to help them navigate the merit review and awards management processes. These engagements have included one-on-one interactions, presentations at meetings, and webinars and he always creates a favorable impression of NSF with the scientific community. In addition, he has started to develop partnerships with other federal agencies and has led several successful virtual meetings aimed at facilitating stronger relationships with our partners. Finally, he has served on cross-division and cross-directorate working groups and has been a key member of the division's communications team.

EAR has a large and diverse portfolio of research resource support, that includes everything from smaller instruments to mid-scale facilities to major research infrastructure projects. Dr. Frassetto's work on this portfolio has been outstanding and he has brought important experience to the role and has demonstrated highly competent project management and oversight.  He is a program director who has needed minimal supervision and eagerly seeks special assignments at higher levels of difficulty. He has been an outstanding contributor to the division, directorate and the agency.

# EXHIBIT B

[E3410 x8539 Conf Room] 09:58:35

I haven't know. So you find a job.


[E3410 x8539 Conf Room] 09:58:46

I would like a conference.


[E3410 x8539 Conf Room] 09:59:00

Yeah, that is fair.


[E3410 x8539 Conf Room] 09:59:06

Hi.


[E3410 x8539 Conf Room] 09:59:42

We're working now.


[E3410 x8539 Conf Room] 10:01:13

Really?


[E3410 x8539 Conf Room] 10:01:22

They're uncomfortable. I know this is important.


[E3410 x8539 Conf Room] 10:02:21

Are we ready? Yes.


[E3410 x8539 Conf Room] 10:02:27

You've been invited here today because you were either a probationary employee or you are an expert on intermittent appointment.


[E3410 x8539 Conf Room] 10:02:36

We've asked you here today to tell you face to face that we will be terminating your employment at the end of the day today.


[E3410 x8539 Conf Room] 10:02:44

It's an exceptionally difficult decision. We've been directed by the administration to remove all term probationary employees. We have identified an extremely small number that we identified as mission critical we were not given any real significant discretion in that area.


[E3410 x8539 Conf Room] 10:03:05

Today at 11 o'clock, each of you will receive a termination letter by email.


[E3410 x8539 Conf Room] 10:03:11

At 1 p.m, you will lose access to the network And at the end of the day today, you'll be terminated.


[E3410 x8539 Conf Room] 10:03:19

Your letter provides a summary of actions that we need you to take today.


[E3410 x8539 Conf Room] 10:03:23

It also describes your rights to appeal. At a high level, you have the ability to appeal this termination.


[E3410 x8539 Conf Room] 10:03:32

If you are a probationer, you have the ability to appeal your termination to the merit systems protection board the Office of Special Counsel or the Equal Employment Opportunity Commission.


[E3410 x8539 Conf Room] 10:03:43

You can choose one. The first one that you apply to will be the one that you choose. You cannot do all three.


[E3410 x8539 Conf Room] 10:03:50

If you're an expert, you do not have an opportunity to appeal.

[E3410 x8539 Conf Room] 10:03:55

At the end of this meeting, you should coordinate with your supervisor to transfer files.


[E3410 x8539 Conf Room] 10:04:03

Close out your active work. Pack your personal belongings if you're in the building.


[E3410 x8539 Conf Room] 10:04:08

You will lose access at one to the system. You do not have to leave until the end of the day.


[E3410 x8539 Conf Room] 10:04:14

Once you've completed your assigned tasks. You will be released. You can leave at will.


[E3410 x8539 Conf Room] 10:04:20

You will be paid for the full day, no matter what time you leave.


[E3410 x8539 Conf Room] 10:04:28

You ready? You have one more thing. You have the option to resign in lieu of termination.


[E3410 x8539 Conf Room] 10:04:34

That may be beneficial to you. If you choose to resign, you will not be eligible for unemployment.


[E3410 x8539 Conf Room] 10:04:40

However, if asked when you apply for future positions, you will be able to say that you were not terminated.


[E3410 x8539 Conf Room] 10:04:47

From a previous position.

[E3410 x8539 Conf Room] 10:04:56

So for those of you that have federal benefits. Sorry. Okay. For those of you that have federal benefits, your health insurance will be terminated at the end of the pay period.

[E3410 x8539 Conf Room] 10:05:07

You will have a free 31-day extension of coverage. We will send you all communications for those that are online. I have someone from my benefits team that will drop a link to a separations booklet.

[E3410 x8539 Conf Room] 10:05:18

We will have a link set up. Where you can drop us information. So if you want to sign up for TCC, which is similar to COBRA, You will be able to do that after today.

[E3410 x8539 Conf Room] 10:05:29

That email requesting to resign that Micah alluded to, that needs to go to benefits at nsf.gov by 1159 p.m. Today.

[E3410 x8539 Conf Room] 10:05:37

The plan is for us to also mail you your letters.

[E3410 x8539 Conf Room] 10:05:40

You will also get a copy of your OPF. With your last SF 50, you will get a printed benefits booklet that has information on how you reach out to us after you have separated.

[E3410 x8539 Conf Room] 10:05:51

My team was always available for questions at benefitsatnsf.gov. After this, the biggest thing I think right now is the health insurance piece of it, which you will again have a 31 day extension of coverage.

[E3410 x8539 Conf Room] 10:06:03

Life insurance, you will have an opportunity to convert to a non-group policy. Most employees do not do that because it's just term insurance.

[E3410 x8539 Conf Room] 10:06:11

Your federal dental and vision insurance plan, they will terminate at the end of the pay period. There is no extension for coverage under FedVIP.

[E3410 x8539 Conf Room] 10:06:21

If you have FSA with us, you will be able to claim expenses all the way through next year, but the expenses will have to stop effective today. So any claims after today will be denied.

[E3410 x8539 Conf Room] 10:06:35

If you are online and you are not able to return to the building.

[E3410 x8539 Conf Room] 10:06:39

If you're online and you are able to return to the building by 1 p.m, you may return to retrieve your personal belongings and turn in your computer.

[E3410 x8539 Conf Room] 10:06:49

And badge if you are not. If you're not in the building and you're not able to return by 1 p.m.

[E3410 x8539 Conf Room] 10:06:55

We will send you a prepaid box so that you can return your government equipment and we will pack your belongings and send them to your home of record.

[E3410 x8539 Conf Room] 10:07:04

For those that are in the building. If your IT specialist is not on site, you can drop your laptop down to the help desk.

[E3410 x8539 Conf Room] 10:07:10

We ask that you put your badge. You can leave it with the badging office, which is right next to the help desk. Again, for those online, work with your IT specialist. As long as your supervisor is informed, they can coordinate getting you the prepaid package.

[E3410 x8539 Conf Room] 10:07:29

We greatly appreciate your service and your contributions to NSF. This is a difficult decision for everyone. We thank you for your service.

[E3410 x8539 Conf Room] 10:07:38

If you would like to answer questions, we'll hear from the union president And then if you'd like to ask questions after that.

████████ 10:07:49

Micah, a lot of people joined a little bit late. So can you repeat?

████████ 10:07:54

Just the general advice.

[E3410 x8539 Conf Room] 10:07:54

Exactly. We're about to ask that some folks are still joining the mic on?

[E3410 x8539 Conf Room] 10:08:01

It's on, well, we can't hear the people online either. So can you boost the volume a little bit?

[E3410 x8539 Conf Room] 10:08:07

Please. Can you hear me? Can you hear me? Many folks are joining.

[E3410 x8539 Conf Room] 10:08:15

They're in the waiting room. Yeah, they're a bit late, but would it be possible for you to repeat?

[E3410 x8539 Conf Room] 10:08:20

This information. Yes. We've invited Most probationary employees and all experts today to announce that your employment will be terminated at the end of the day today.

[E3410 x8539 Conf Room] 10:08:31

We were able to This is in executing.


[E3410 x8539 Conf Room] 10:08:36

Government-wide guidance from the administration. I'm sure you've read in the news that all agencies are terminating probationary employees.


[E3410 x8539 Conf Room] 10:08:44

We're at the same time terminating expert employees who are basically at will intermittent employees.


[E3410 x8539 Conf Room] 10:08:50

This is an extremely difficult decision. But we have limited discretion.


[E3410 x8539 Conf Room] 10:08:56

We will cut off you at 11 o'clock. You will receive an email with a termination letter that will include your rights to appeal, as well as instructions for the remainder of the day.


[E3410 x8539 Conf Room] 10:09:06

We'll cut off IT access at one o'clock, but you're not required to leave at one.


[E3410 x8539 Conf Room] 10:09:11

Will be released once you provide for the transfer of your files and active work.


[E3410 x8539 Conf Room] 10:09:16

And you will have the rest of the day to day.


[E3410 x8539 Conf Room] 10:09:18

Say your goodbyes, pack your personal belongings if you're in the building.

[E3410 x8539 Conf Room] 10:09:23

That is all. Sarita, would you mind explaining the benefits yes thank you so for those that have health insurance, your health insurance Excuse me, your health insurance will terminate at the end of the pay period. That is this Saturday. You will have a free 31 day extension of coverage, at which point you will be eligible to apply for what we call TCC, which is similar to COBRA.


[E3410 x8539 Conf Room] 10:09:47

That COBRA coverage, you're eligible to maintain that for 18 months.


[E3410 x8539 Conf Room] 10:09:52

And information will be provided to everyone. Everyone will get something mailed to their address on file that has a printed booklet of information on everything, lump sum payments for annual leave.


[E3410 x8539 Conf Room] 10:10:03

Everything. Dental and vision insurance, that does separate, that terminates at the end of this pay period. So that's this Saturday. There is no extension under the law for FedVIP coverage.


[E3410 x8539 Conf Room] 10:10:13

Everything will be provided. We will also be providing you a copy of your OPF.


[E3410 x8539 Conf Room] 10:10:17

We do know that you don't have much time to get everything. So we will be providing copies of OPFs.


[E3410 x8539 Conf Room] 10:10:23

Along with your last benefits form that shows the termination of coverage.


[E3410 x8539 Conf Room] 10:10:31

You indicated that employees can resign. Yes. So you have that. Yes, absolutely. What is the difference in terms of benefits or anything? There's no difference in benefits as far as resignation versus this removal action. So some employees prefer to resign. If you send us an email saying you prefer to resign, that email has to be received.

[E3410 x8539 Conf Room] 10:10:53

By 11.59 p.m. Tonight at the benefits at nsf.gov email alias.


[E3410 x8539 Conf Room] 10:10:59

The personnel action will not show a removal. It will instead show resignation in lieu of involuntary action.


[E3410 x8539 Conf Room] 10:11:07

With that, you cannot file unemployment benefits.


[E3410 x8539 Conf Room] 10:11:19

You guys have a question online. Hey, ███.


███████████ 10:11:24

Yes, I'll start calling on people. ███ do you want to ask your question?


███████████ 10:11:31

Yeah, so my SF50 states that I am a permanent Fed.


███████████ 10:11:38

My letter of offer, remember you guys recruited me to come back here to NSF.


███████████ 10:11:44

My letter of offer clearly stated a 12-month probationary period. I before this new rule received a backdated tenure to 2023.


███████████ 10:11:58

So by all of the legal documents here, I am not probationary I don't understand how this is illegal.

██████████ 10:12:06

I have asked both my division directors And my directorate, but nobody has responded to any of my emails.

██████████ 10:12:13

I think you do owe it to us to explain how this is legal how is this possibly legal to change your work status unilaterally in a legal contract, which is my letter of offer.

██████████ 10:12:27

Which I left my university to come here. You recruited me to come here.

██████████ 10:12:33

How is that legal? You do owe it to us to explain how that is legal. What is the legal underpinning of that determination?

[E3410 x8539 Conf Room] 10:12:41

Exactly the same situation for me and many others. It has been NSF's longstanding practice to allow employees on an accepted service appointment Well, to communicate to employees on accepted service appointment that their probation ends after 12 months.

[E3410 x8539 Conf Room] 10:12:59

That is not supported by law or regulation. I would encourage you i would encourage you When you receive…

██████████ 10:13:06

It is written in the contract and in my SF 50.

[██████████ 10:13:11

Are you saying that what NSF says in writing is not We can change it at any time.

██████████ 10:13:19

**JA648**

And you don't care about us.


[E3410 x8539 Conf Room] 10:13:23

No, nobody said that I don't care about you. I care very much. This is... You seem to be taking an extra split at people who have SF50s that say they're probate that they're off probation and tenure.


[E3410 x8539 Conf Room] 10:13:35

Why are you sleeping at those employees don't have to do that. We have documentation in our files.


[E3410 x8539 Conf Room] 10:13:41

The documentation is incorrect. The practice is not consistent with law and regulation.


[██████████] 10:13:47

Name the law.


[E3410 x8539 Conf Room] 10:13:47

When you receive your termination letter, it will include options for you to appeal this termination, I would encourage you to make that argument there.


[E3410 x8539 Conf Room] 10:14:00

You made that argument on our behalf. There's no one to make the argument to. It is not consistent with law and regulation.


[██████████] 10:14:10

Which law?


[E3410 x8539 Conf Room] 10:14:11

Also, follow legal orders.


[E3410 x8539 Conf Room] 10:14:19

The union has a question. Ipas, who are also our colleagues and we care about them Most of them have jobs back in the universities.


[E3410 x8539 Conf Room] 10:14:32

███ You've NSF is being asked to reduce the headcount of the agency.


[E3410 x8539 Conf Room] 10:14:40

Why did you decide to Who would those of us who are most vulnerable and who have no jobs to go to?


[E3410 x8539 Conf Room] 10:14:48

At risk while IPAs who have jobs, most of them to go back to are being spared. I just wanted to state that IPAs aren't federal employees.


[E3410 x8539 Conf Room] 10:14:58

So they're not subject to the same actions as federal employees. They're paid through grants.


[E3410 x8539 Conf Room] 10:15:05

They're not paid out of appropriated dollars in the same respect.


[E3410 x8539 Conf Room] 10:15:09

So that's what I would just say with that. They're not similarly situated. They look similarly situated and I can appreciate that because I'm sure we're working alongside them and I understand that. The same argument can be made for contractors and other things.


[E3410 x8539 Conf Room] 10:15:21

But IPAs are not federal employees so they can't be probationers because they're not feds.


[E3410 x8539 Conf Room] 10:15:28

So there was no limited discretion. This is not a decision the agency made. This is a direction we received, first of all. Second of all, this is the first of many forthcoming workforce reductions.


**JA650**

[E3410 x8539 Conf Room] 10:15:42

So we do have some hands on one.


███████████ 10:15:52

████, you would like to ask your question?


[███████████] 10:15:56

I'm going to follow up with what ████ said and with what many of my colleagues have been asking all of you.


███████████ 10:16:03

Which is, you can tell us, Micah, that it's the law and regulation But all of you sitting up there who gave us the offer letters that brought us to NSF, we trusted you.


███████████ 10:16:15

That the word you're putting in our offer letters, that the word that you're putting in our SF50s is what brought us to NSF.


███████████ 10:16:23

We did our one-year trial periods. I have two outstanding evaluations.


███████████ 10:16:29

In my time here at NSF. We did what you put on our offer letters, all of you sitting up there who run this agency, who are supposed to follow laws and regulations, but haven't. But who's getting terminated? We are getting terminated.


███████████ 10:16:45

I knew of this issue one month ago. I have been begging HRM. I have been begging all of you to give us answers. Why did you make this decision?

██████████ 10:16:56

You know what happened? Radio silence. No one put anything on paper. No one put anything on an email. No one even bothered to reach out to staff and say, hey.

██████████ 10:17:06

You are in this situation. Your job is at risk. This is the first time anyone in leadership is engaging with staff whose terms of employment have been changed at the last minute.

██████████ 10:17:20

You are presenting us as trophies in front of OPM. I don't want to hear anything about how you are sad.

██████████ 10:17:26

How you feel bad for everyone who's losing their job today.

██████████ 10:17:30

Many of us left our research careers because we wanted to come serve the mission of this agency.

██████████ 10:17:35

We have been screwed by the incompetence of the people who put one year trial periods on our dates, didn't bother communicating that a policy change has taken place. And now we are completely out of jobs as of one o'clock today.

██████████ 10:17:48

If you can go to sleep at night. Knowing that this is what you all did, you screwed people, hardworking people who trusted the word of this agency left their careers wherever they came from That's on all of you. Take some accountability. Don't tell us it's the law and regulation.

██████████ 10:18:06

You put those things in writing for all of us.

[E3410 x8539 Conf Room] 10:18:12

**JA652**

Okay. Go ahead. Question in the room.

[E3410 x8539 Conf Room] 10:18:19

We're trying to move on. Off the session and have leadership for that.

[E3410 x8539 Conf Room] 10:18:27

Yes. Can you speak to the rumors of Wozny resigning so he would not be party to this?

[E3410 x8539 Conf Room] 10:18:34

What? Yeah, Wazi, the rumor is he took the fork in the road so he wouldn't have to be part of this The show. Oh, did you take the fork? Yes, I did. Let me tell you the reason why I did, okay? I was scheduled to retire on February 28th. That's never been changed.

[E3410 x8539 Conf Room] 10:18:52

I sent a letter to my folks one January. Okay, let me tell you also, the reason I'm in this room is because I care about each and every one of you.

[E3410 x8539 Conf Room] 10:19:00

A statement was made a minute ago the NSF doesn't care. Everyone on this table cares about this. We've been wrestling this for a long time.

[E3410 x8539 Conf Room] 10:19:08

When Micah says law, when angel says law, we have no choice for following what we're getting from OPM.

[E3410 x8539 Conf Room] 10:19:12

Let me tell you one thing. There's nobody up here nobody has been working very hard this time we can last three months to try to do this. We knew something was coming.

[E3410 x8539 Conf Room] 10:19:23

**JA653**

We are following orders. We are part of the executive branch. We follow that. I apologize for people that have made life-changing career moves.

[E3410 x8539 Conf Room] 10:19:31

I get that. We understand that. We really, really understand that this is not easy.

███████████████ 10:19:38

Onesie, what account? One second.

[E3410 x8539 Conf Room] 10:19:38

This is not easy at all. Let me tell you this. Excuse me. This is not easy at all.

[E3410 x8539 Conf Room] 10:19:42

Excuse me?

[███████████████ 10:19:43

I hear you. One, help me understand this. What accountability is anyone in leadership taking for lying to people who came to NSF being told that you're on board.

[E3410 x8539 Conf Room] 10:19:52

███████████ let me correct you, ██████ █████ It wasn't a lie when we told you what we did. It wasn't a lie.

[E3410 x8539 Conf Room] 10:19:59

I'm learning this just like you are. Okay, it's not a lie, ██████.

[E3410 x8539 Conf Room] 10:20:03

Yeah, I would just say, I think, I mean, um. I think people that made those decisions thought it was accurate at the time.

**JA654**

[E3410 x8539 Conf Room] 10:20:12

And they were either misinformed or they just didn't get it right. I mean, to be honest with you. So I don't think they misled people. I don't think they intentionally wanted to harm people. They had a policy, but it was not based on

[E3410 x8539 Conf Room] 10:20:26

The law. Yeah, I think they're uh they became informed very recently.

[E3410 x8539 Conf Room] 10:20:37

We did. In the last two weeks. Up until Friday. Yes. We were told by OPM it was the agency's discretion whether to remove probations or not.

[E3410 x8539 Conf Room] 10:20:49

We chose to retain them all. Last Friday night.

[E3410 x8539 Conf Room] 10:20:54

They gave direction to there was some direction that was given to cabinet level agencies. And so you saw those actions taking place at the end of last week.

[E3410 x8539 Conf Room] 10:21:04

But the directions we received were it was our discretion. And late, late Friday night.

[E3410 x8539 Conf Room] 10:21:09

They told us that they directed us to remove probationers. That is why we did not address it, because at the time it did not need to be addressed. So are you saying we are being fired on decisions by OPM and not by the agency? Opm has no authority to fire us. They are communicating the direction of the administration. And I want to go back.

[E3410 x8539 Conf Room] 10:21:33

Wansie Gardner has served 43 years in the military and civilian service.

[E3410 x8539 Conf Room] 10:21:39

He's not sneaking out early to avoid difficult decisions. He is honorably served.

[E3410 x8539 Conf Room] 10:21:46

For longer than some of us have been alive. So just remember that.

[E3410 x8539 Conf Room] 10:21:52

I just heard that.

[█████████] 10:21:52

I'm not sure if you can hear me, but all the remote people were only able to join about four minutes ago so we are just we don't even know the context of what's happening yet because no link was sent until four minutes ago.

[█████████] 10:22:04

Could you please explain to us

[E3410 x8539 Conf Room] 10:22:08

Yeah, Micah can repeat it. Again.

[E3410 x8539 Conf Room] 10:22:14

Yes, we have asked all most probationers and all experts to join this meeting today to announce that you will be terminated.

[E3410 x8539 Conf Room] 10:22:22

We were directed last to effective today. We were directed last Friday by OPM to terminate all probationers except for a minimal number of mission critical probationers.

[E3410 x8539 Conf Room] 10:22:33

We're taking the opportunity to also terminate experts who are intermittent at-will employees.

[███████████] 10:22:42

[████] quick question for you. When it comes to being identified as mission critical. What level of discretion was given there being someone that knows that they were designated as mission critical but still being terminated what sort of what sort of

[███████████] 10:22:59

Insight can you offer?

[E3410 x8539 Conf Room] 10:23:02

Mission critical determination, first of all, it is exceptionally small number that we're permitted to have. Second of all, we looked at three things. We asked who was mission critical and more than half of people were identified as mission critical and that was too many. So we looked at three things.

[E3410 x8539 Conf Room] 10:23:18

Whether you determine mission critical how long a federal service you had, understanding that a large number of probationers had a lot of temporary federal service that does not count towards the probation, but nevertheless.

[E3410 x8539 Conf Room] 10:23:33

Honorable service in the federal government. And the third thing we looked at was how close people were to the end of their probationary period. There's a combination of those factors were used to determine.

[E3410 x8539 Conf Room] 10:23:43

You just said that you were taking

[██████████████] 10:23:43

Thank you.

[███████████] 10:23:53

The conference room is muted. We can't hear online.

██████████ 10:24:03

I have a question that has been asked a few times, and this is for this group.

[E3410 x8539 Conf Room] 10:24:07

Excuse me.

██████████ 10:24:08

Can you explain what the timeline for the final paycheck is and if there will be any severance?

[E3410 x8539 Conf Room] 10:24:14

Okay, so... I'm pulling up my account. Sorry. Fulling up my calendar now.

[E3410 x8539 Conf Room] 10:24:19

There is no severance with this. Because of the years of service and it's a probationary trial period termination. So there is no service package with this.

[E3410 x8539 Conf Room] 10:24:28

You're going to get your last paycheck on time. So that would be for most people next Friday. And then two pay periods from that.

[E3410 x8539 Conf Room] 10:24:36

You will get your annual leave lump sum payment. So if you have credit hours.

[E3410 x8539 Conf Room] 10:24:40

Comp time. Annual leave, you will get another check with that lump sum payment in it and you will get an LES that has that payment amount on there as well.

[E3410 x8539 Conf Room] 10:24:50

And again, we're going to mail everything out so that you can communicate with us.

[E3410 x8539 Conf Room] 10:24:53

After you're gone. I just heard that.


[E3410 x8539 Conf Room] 10:25:00

They wanted to close this session soon. I asked management to please answer the questions of my colleagues, I think they deserve that their service and their sacrifice. And I would also ask my colleagues that as uh as bad as you feel, ask any question you have to ask, but please


[E3410 x8539 Conf Room] 10:25:22

Be polite. I don't find another word to say it.


[E3410 x8539 Conf Room] 10:25:28

If you have a question, you can go to the mic.


[E3410 x8539 Conf Room] 10:25:35

Good here? So I just want to make sure that i understand The letter that we'll be receiving in a couple minutes is does it are we all getting the same cause for termination is that individual for each person? I just want to better understand


[E3410 x8539 Conf Room] 10:25:56

I understand, obviously. Broader thing is that it's being directed by OPM, but the technicality in the letter, what's the reason? Just as we contemplate resignation versus resignation versus the letter.


[E3410 x8539 Conf Room] 10:26:10

The cause comes from boilerplate we received from OPM. The cause says that the agency finds based on your performance that you have not demonstrated that your further employment at the agency would be in the public interest.


[E3410 x8539 Conf Room] 10:26:22

That is the only thing it says. The options were performance or conduct. If we made it for conduct, you would not be able to apply for unemployment.

[E3410 x8539 Conf Room] 10:26:33

No. Quickly, can you clarify the BSE situation? Bse rotators. They're not included in this.

[E3410 x8539 Conf Room] 10:26:44

Okay. Unless you were in a trial period or you would have gotten an email. So VSEEs in general are not included. Yeah, so if many of us are handling stuff literally tens of millions of dollars that are in the next week or two we have to hand off to and need to know

[E3410 x8539 Conf Room] 10:27:02

As we hand that off, if part of our teams are still going to be here as we hand off. I mean, literally a panel next week on the point of contact.

[E3410 x8539 Conf Room] 10:27:11

Outside agreements, MOUs with the Paul G. Allen Foundation, the Kavli Foundation, tens of millions of dollars. I am the person who is the person The rest of the team are rotators.

[E3410 x8539 Conf Room] 10:27:21

There's a lot of money at stake. So please, please work with your division leadership in identifying who, but as of right now, I understand that situation and I think we're going to find that in other places as well.

[E3410 x8539 Conf Room] 10:27:36

So please make sure that you're looping in your divisional leadership.

[E3410 x8539 Conf Room] 10:27:41

And I have 80 panelists who are signed up on the inside. In person, in the next three weeks. I know.

[E3410 x8539 Conf Room] 10:27:50

I know, I understand. And my email is going to go dead at one o'clock and they're going to say, where's that guy?

[E3410 x8539 Conf Room] 10:27:55

And also they need some help on how to communicate with these people about this, right? Because I won't, I won't go in, won't go and do anything crazy, but do I say to them Hey, things have changed. I know in this that the division leadership should do that, but I have two hours to handle all this stuff.

[E3410 x8539 Conf Room] 10:28:14

I appreciate your dedication, the mission. I genuinely do. Please coordinate with your supervisor.

[E3410 x8539 Conf Room] 10:28:23

Hi, could you answer my question about experts? And I'll just repeat it for the benefit of folks who are online and apparently the room was muted.

[E3410 x8539 Conf Room] 10:28:32

So the question is, you suggested or you said that you were taking this opportunity to terminate experts, which suggests that it was not a requirement to do so.

[E3410 x8539 Conf Room] 10:28:44

So I'd like your explanation about the rationale behind that. Thank you. That is correct.

[E3410 x8539 Conf Room] 10:28:51

That the removal of experts was completely at the agency's discretion.

[E3410 x8539 Conf Room] 10:28:56

Because if we're asked to remove probationers, then we also need to remove at-will employees.

[E3410 x8539 Conf Room] 10:29:03

So it's an issue of fairness in your mind. It's not just an issue of fairness but yes

█████████████ 0:29:15

All right, ██████, we have an online question █████ If you'd like to ask a question.

JA661

[███████] 10:29:25

Yeah, what is the process? So you said health insurance ends at the end of this pay period on Saturday.

[E3410 x8539 Conf Room] 10:29:39

I think you went mute on the rest of your question.

███████ 10:29:44

I don't have any control over the muting. So I'm going to say for the record that i have received no negative feedback about my performance have identified no issues with my performance. For that, I'm saving for the record.

███████ 10:29:59

But my question is, health insurance you said, ends at the end of the week.

███████ 10:30:04

You can extend to 31 days. Is that 31 days from the end of the week? And what is the process for applying for the extension?

[E3410 x8539 Conf Room] 10:30:12

So the extension is automatic and yes, it begins at the end of the week. So from Saturday, you will have a free automatic 31 day extension of health insurance coverage.

[E3410 x8539 Conf Room] 10:30:21

You're welcome.

███████ 10:30:21

Thank you. Also, I do want to say that you'll see a lot of [███████] in this meeting. That's because I shared my link and then it got shared more widely. That's the only way most of the people in this meeting were able to join in here.

**JA662**

████████████ 10:30:33

I am the real ███████████

[E3410 x8539 Conf Room] 10:30:39

████████ online, can you drop the link to the booklet for those that join late and may not have received it at first, please?

[E3410 x8539 Conf Room] 10:30:48

May I go? Yes. Can you explain why you haven't negotiated with the administration to eliminate the more expensive rotator program so that you could protect those of us that have given up our academic jobs These people have jobs. You could reduce our force.

[E3410 x8539 Conf Room] 10:31:06

By unemploying no one. So have you negotiated that with the administration? Have you tried to save those of us that have given up our academic by dismissing those that have not.

[E3410 x8539 Conf Room] 10:31:19

There's no negotiation, first of all. And second of all, the administration has already announced its intention to significantly reduce the workforce.

[E3410 x8539 Conf Room] 10:31:27

It is only a matter of time. It is not today is not the only workforce reduction that we will do.

[E3410 x8539 Conf Room] 10:31:37

Before you ask your question, we do have someone monitoring Q&As and the Q&A online for you, ████████ So if you drop your question in there, she can read that for you out loud. Just wanted to make that announcement for those of you online.

[E3410 x8539 Conf Room] 10:31:59

Again, with the sort of more mechanical our timesheets, time cards.

[E3410 x8539 Conf Room] 10:32:04

We need to get those in by 1. Correct. As long as your supervisor knows your hours for last week.


[E3410 x8539 Conf Room] 10:32:12

We will take your time cards. Okay.


[E3410 x8539 Conf Room] 10:32:18

I'm going to ask a mechanical question. I'm going to ask a little bit of a personal one. It's not really even a question.


[E3410 x8539 Conf Room] 10:32:25

But I know no other business that I've ever been associated with where somebody has walked in unexpectedly and just been fired in a matter of hours.


[E3410 x8539 Conf Room] 10:32:35

Not in a professional setting at all. You look around this room, these are people who have dedicated their lives either to their profession Similar to ones that you mentioned or you mentioned, excellent. Someone's dedicated 40 years to that Many of the people in this room have done that. They've dedicated their lives not only to their academic careers.


[E3410 x8539 Conf Room] 10:32:56

But also decided that what they wanted to do was better their country. They wanted to work for their country. And this was the most impactful way for them to do that.


[E3410 x8539 Conf Room] 10:33:04

So they made some sacrifices and they left. And to simply be said.


[E3410 x8539 Conf Room] 10:33:09

In a matter of minutes. Your service no longer matters regardless of what you may say. It matters not And we said that you were going to have this opportunity, but we're taking that away from you because of an administrative

[E3410 x8539 Conf Room] 10:33:25

Type of mandate. And I would still argue there's ways to There is ways to address that mandate and still have a more humanistic and a practical way of doing this.

[E3410 x8539 Conf Room] 10:33:37

There is no reason. I have many colleagues at federal agencies across the federal government And there's ways of doing this that gives people at least an understanding to digest this.

[E3410 x8539 Conf Room] 10:33:49

Before they go home, and I want you guys all to listen to this, when they go home to their families and say.

[E3410 x8539 Conf Room] 10:33:54

I've lost my job. My credibility with my peers for no reason.

[E3410 x8539 Conf Room] 10:34:03

For a mandate. And I didn't feel like the people that were here to support me In whatever reasons, my direct my divisional director, my associate director, all those people actually supported me i'm here Because I'm looking at waste, fraud, and abuse in some ways, not abuse or anything.

[E3410 x8539 Conf Room] 10:34:23

But to help optimize programs. That's my whole gig. I'm meeting a requirement of the federal government to look at

# EXHIBIT C

 U.S. National Science Foundation

DATE:                        February 18, 2025

TO:                          Andrew M. Frassetto, Program Director
                             Directorate for Geosciences

FROM:                        Starlisha Anderson, Acting Director
                             Division of Human Resource Management

SUBECT:                      Termination of Excepted Service Appointment

On September 8, 2024, you were hired on an Excepted Service appointment as an Program Director, in Directorate for Geosciences, at the U.S. National Science Foundation (NSF).

The purpose of this memorandum is to notify you that your employment will be terminated effective at the end of the business day on February 18, 2025. The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest.

<u>You may choose to resign in lieu of being terminated.</u> This decision may impact your rights and benefits. If you wish to resign in lieu of being terminated, please notify <u>benefits@nsf.gov</u> before 11:59 pm EST today, February 18, 2025.

<u>NSF Property Turn-In</u>: You are required to turn in your PIV badge, laptop, and all other government property in your possession.  If you are onsite today, you must turn in your government property to your directorate or office point of contact. If you are not onsite, a prepaid box will be mailed to your address of record which you are required to use to immediately return such property. Until this has been done, any indebtedness that you have to the government will be offset by your salary check and/or retirement funds. If you have personal property onsite, and you are not able to retrieve it today, a representative of your directorate or office will pack and mail it to your address of record.

If you disagree with this decision, you may contest it in accordance with one of the following procedures.  You may only choose one of these options, outlined below; and, whichever filing occurs first, will be considered your choice.

    a. <u>Option</u> – Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal,



U.S. National Science Foundation

respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: https://www.mspb.gov/about/contact.htm.

b.  <u>Option</u> – Equal Employment Opportunity Program (EEO), Office of Civil Rights (OCR): If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, and/or reprisal for prior EEO activity, you may file a discrimination complaint within forty-five (45) days of the effective date of this action. Questions concerning the EEO process may be referred to:

> National Science Foundation
> Office of Civil Rights
> 2415 Eisenhower Ave
> Alexandria, VA 22314
> Phone: (703) 292-8020
> Email: eeo@nsf.gov

c.  <u>Option</u> – Office of Special Counsel (OSC): If you believe this action is in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx. As an alternative, you may communicate in writing to the following address:

> Complaints Examining Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505

We appreciate your service to the Agency and wish you the greatest success in your future endeavors. If you have any procedural questions regarding this action, you may contact the Workforce Relations Branch at workforcerelations@nsf.gov.


Starlisha Anderson
Acting Director, Division of Human Resource Management
Office of Information and Resource Management

Exhibit D

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN 203827)
Eileen B. Goldsmith (SBN 218029)
Danielle E. Leonard (SBN 218201)
Robin S. Tholin (SBN 344845)
James Baltzer  (SBN 332232)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
egoldsmith@altber.com
dleonard@altber.com
rtholin@altber.com
jbaltzer@altber.com

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO;  et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, et al., <br><br> Defendants. | Case No. 3:25-cv-01780-WHA <br><br> **DECLARATION OF DR. THOMAS EVANS** |

**DECLARATION OF DR. THOMAS EVANS**

I, Dr. Thomas Evans, hereby declare as follows:

1.    I am a member of AGFE Local 3403, and, until February 18, 2025, I was an employee of the National Science Foundation (NSF). I make this statement based on personal knowledge, information, and belief, and if called as a witness could and would testify competently thereto.

2.    I received a Ph.D. in Geography from the University of North Carolina at Chapel Hill in 1998, after which I spent 26 years working in academia. I began as a post-doctoral fellow at Indiana University, where I advanced through the ranks to become a full Professor with tenure. In 2018, I moved to the University of Arizona, where I was a Professor at the School of Geography, Development & Environment.

3.    My research focus was investigating how environmental processes affect people and how human decision-making impacts environmental systems, including research in areas such as environmental decision-making, institutions, governance and natural resource management, food and water security and food systems governance. My work involved complex geographic data analysis, including GPS navigation systems, satellite imagery, and land management systems.

4.    As a Professor, I led collaborative, multi-institutional research teams involving faculty, graduate students, and postdocs and served on more than 25 federal review panels, evaluating hundreds of proposals for NSF and other agencies.

5.    In 2021, I took a two-year leave from my university to serve as a rotator Program Director at NSF through the Visiting Scientist, Engineer and Educator (VSEE) program. Rotators in the VSEE program are employed at NSF for a limited term before returning to their universities.

6.    After that experience, I decided to apply for a full-time position at NSF, and was hired as a permanent-track Program Director at the National Science Foundation on July 30, 2023.

7.    The transition to working at NSF was a major decision for me. I wound down my research lab, which required ensuring that students and post-doctoral researchers found other positions. I also relocated my family to Washington, D.C.

8.    The commitment letter I received from NSF stated that my employment was subject to a one-year probationary period.

Declaration of Dr. Thomas Evans, No. 3:25-cv-01780-WHA                    1

9.     The Standard Form 50 (SF 50) Notification of Personnel Action form I received at the beginning of my employment listed my tenure status as "Conditional," which I understood at the time to mean that I was a probationary employee.

10.     I completed my one-year probationary period on July 30, 2024.

11.     On July 30, 2024, a subsequent SF-50 was issued to my electronic official personnel folder (eOPF) reflecting the change in my status from "Conditional" to "Permanent" in box 24 ("Tenure") of the form. I therefore understood that I was no longer a probationary employee and that I had full civil service protections in my job.

12.     On or about February 5, 2025, I became aware that my name was included on a list of probationary employees that had been sent by NSF to the Office of Personnel Management (OPM). I reached out to NSF human resources to try to understand why that was the case. Human resources then informed me for the first time that I was considered a probationary employee for two years, despite the documentation I had previously received. No NSF-wide was sent announcing this change to all employees or even to all employees who had likewise been given offer letters stating that they were probationary for only one year.

13.     As of February 18, 2025, no SF-50 had been uploaded to my eOPF indicating any change in my tenure status from "Permanent."

14.     Throughout my total service of 3 years and 6 months at NSF between my term as a rotator and permanent employment, I consistently received performance evaluations of "Outstanding." Attached hereto as Exhibit A is a true and correct copy of my performance evaluation conducted in April 2024, in which I was rated Outstanding, the highest of five possible levels, in all three performance elements for my position: Program Planning and Management, Programmatic and Scientific Communication, Professional Development. The names of other NSF employees have been redacted.

15.     In the narrative sections of my April 2024 performance review, my supervisor wrote that:

- "Tom completes the basic responsibilities of program management, recruiting panelists and ad-hoc reviewers, managing review panels, program budgeting, processing proposals, and

1    coordinating with the other HEGS POs and program support staff on program actions,

2    exceptionally well."

3    • "Tom excelled in his first year as a permanent PO in BCS, having served as a VSEE rotator

4    previously."

5    • "We look forward to Tom's continued growth as a permanent member of the scientific staff at

6    NSF."

7    16.    As of February 2025, I was serving as a Program Director for NSF programs

8    including: Confronting Hazards, Impacts and Risks for a Resilient Planet; Sustainable Regional

9    Systems Research Networks; Human-Environment and Geographical Sciences Program; and

10   Strengthening American Infrastructure.

11   17.    The Confronting Hazards, Impacts and Risks for a Resilient Planet (CHIRRP)

12   Program funds projects designed to advance understanding, forecasting and/or prediction of future

13   Earth system hazards and risks, engage communities in development of research questions and

14   approaches, and produce actionable, science-based solution pathways for adaptation methodologies,

15   products, and services. The CHIRRP program is designed to address hazards compounded by

16   changing climates, rising populations, expanding demands for resources, aging infrastructure, and

17   increasing reliance on technology that are putting the country's economy, well-being, and national

18   security at risk.

19   18.    The Strengthening American Infrastructure (SAI) Program focuses on how

20   fundamental knowledge about human reasoning and decision-making, governance, and social and

21   cultural processes enables the building and maintenance of effective infrastructure that improves lives

22   and society and builds on advances in technology and engineering. SAI funds pathbreaking

23   fundamental research applied to strengthening a specific focal infrastructure.

24   19.    I was also one of four Program Directors assigned to a working group at NSF

25   developing funding opportunities to advance interdisciplinary research on the future risks associated

26   with wildland fire. This group included ecologists, atmospheric scientists, and computer scientists,

27   among other fields. I was the only social scientist in the group, and my position was therefore

28

1   particularly important for ensuring that the team considered the critical role human behavior plays in

2   the vulnerabilities and risks associated with wildland fire.

3        20.    On the morning of February 18, 2025, I received an email instructing me to attend a

4   meeting with representatives of NSF human resources at 10:00 AM. I attended the hybrid meeting by

5   Zoom.

6        21.    At that meeting, representatives of NSF management announced the termination of

7   nearly 170 employees.

8        22.    There were numerous technical difficulties with the call. I was able to join at or

9   around 10:06 a.m., but others were continuing to join later. The presenters therefore repeated the

10  termination announcement multiple times over the course of the meeting to inform newly arriving

11  employees what was happening.

12       23.    At this February 18, 2025 meeting, NSF confirmed that they considered my

13  employment to be in fact subject to a two-year probation period, contrary to the terms outlined in my

14  offer letter and personnel records.

15       24.    For many other employees in a similar situation, this was the first time they became

16  aware that they were not permanent employees. Multiple people asked questions about their SF-

17  50s—which like mine also showed "permanent" tenure status—during the meeting. We were

18  informed that regardless of the statements made by NSF when we were hired, and our personnel files,

19  we were probationary employees under OPM's orders and interpretation of the law and regulations.

20       25.    I received my official termination notice from NSF human resources via email at 2:56

21  PM, effective at the end of the business day.

22       26.    My termination letter stated: "The Agency finds, based on your performance, that you

23  have not demonstrated that your further employment at the Agency would be in the public interest."

24  A true and correct copy of my termination letter is attached hereto as Exhibit B.

25       27.    Based on the statements made by NSF at the 10 AM meeting and discussions with

26  fellow employees, it is my understanding that all terminated probationary employees at NSF were

27  given the same boilerplate language about the cause of our terminations. At the meeting, Micah

28  Cheatham told us that NSF was given the option by OPM of terminating us due to performance or

Declaration of Dr. Thomas Evans, No. 3:25-cv-01780-WHA                                    4

1    due to conduct, and that NSF chose performance, not because it was true, but because it would allow

2    us to claim unemployment.

3       28.     In total, nearly 170 employees were terminated out of roughly 1,500 at NSF.

4       29.     On information and belief, at least one NSF employee who worked at an NSF research

5    station in Antarctica joined the Zoom meeting and learned that she was one of the employees being

6    terminated.

7       30.     It is my understanding that at least 20 of the terminated employees had, like me, been

8    given prior documentation showing that they were no longer considered probationary employees.

9    Although the terminations were extremely abrupt for all of those of us who were fired on February

10    18, 2025, those of us who thought we had been permanently employed did not believe that our jobs

11    could be put at risk like this at all.

12       31.     I knew that I would have one year of probationary employee status when I joined NSF,

13    but when I successfully completed that period with outstanding ratings, I believed that I had job

14    security as a permanent federal employee.

15       32.     Many NSF employees are former professors who gave up tenured positions to work

16    for the public interest and the advancement of critical research across the country.

17       33.     The suddenness and scope of these terminations make it extremely difficult for my

18    colleagues and me to find new jobs. Academic hiring is seasonal, and the fact that these unexpected

19    terminations occurred in the middle of that cycle means that immediate job opportunities are very

20    rare. Moreover, many of us are entering the job market at once due to these blanket terminations, and

21    are therefore competing for a limited number of jobs in our fields. Even where there are openings,

22    most are at the Assistant Professor level, further limiting the opportunities for senior scholars.

23       34.     The termination of nearly 170 employees, including myself, also significantly reduces

24    NSF's capacity to fulfill its core mission of advancing U.S. science and security.

25       35.     The fact that the abrupt terminations were made with less than one day's notice means

26    that the terminated employees had mere hours to provide crucial transition information before being

27    locked out of NSF systems. I was only provided a few hours between being notified of my

28    termination and being locked out of all the NSF IT systems in which to ensure that I had access to

Declaration of Dr. Thomas Evans, No. 3:25-cv-01780-WHA           5

1  necessary information about my benefits, while also trying to adequately transition my workload to

2  colleagues who were remaining at the agency.

3      36.    Program Directors at NSF were already managing substantial responsibilities before

4  more than 10% of NSF employees were terminated at once with minimal notice. Program Directors

5  manage hundreds of ongoing awards, including communicating with principal investigators that have

6  awards and reviewing annual reports. Those who remain will need to take on additional workloads,

7  including just to determine what work was being done by those who were terminated, undermining

8  NSF's ability to provide effective and timely support for vital scientific research.

9      37.    NSF also partners with other federal agencies and non-governmental organizations to

10  provide significant funding to its projects. On information and belief, some of the terminated

11  employees worked on these partnerships. The loss of employees who built those relationships and

12  concerns that outside funders have about NSF's stability going forward will threaten those sources of

13  funding for the agency. This will ultimately reduce the support available for scientists, researchers,

14  and students working in critical programs.

15      38.    The blanket approach to these terminations also had disproportionate negative impacts

16  on specific programs that happened to rely on a higher proportion of more recent, probationary

17  employees. For example, at least two other Program Directors who were involved in the wildland fire

18  working group at NSF were terminated along with me. The loss of so many program directors will

19  delay any funding through that program that would have gone to scientists across the country and

20  across disciplines working to address the future risks associated with wildland fire, and could threaten

21  that project as a whole.

22

23      I declare under penalty of perjury under the laws of the United States that the foregoing is true

24  and correct. Executed this 22nd day of February 2025 in Richmond, Virginia.

25

26

27                                                    Dr. Thomas Evans

28

Declaration of Dr. Thomas Evans, No. 3:25-cv-01780-WHA                               6

**JA676**

# EXHIBIT A

### National Science Foundation
### General Workforce (GWF) Performance Plan and Appraisal

**Part 1. Employee Input** *I have reviewed this plan and have been involved in its development.*

| | |
|---|---|
| Employee Name (Last, First, Middle): Evans, Tom | Appraisal Pd. 4/1/2023  -  3/31/2024 |
| Title: Program Director | Series/Plan/Grade: 0101  -  AD  -  04 |
| Organization: Division of Behavioral and Cognitive Sciences | |
| Plan Purpose: Annual | PD Number: |
| Reviewing Official's Signature: Electronically signed by ▮▮▮▮▮ (Reviewing Official)<br><br>**Originally signed by ▮▮▮▮▮ on 4/23/2023** | Date: 4/23/2023 |
| Rating Official's Signature: Electronically signed by ▮▮▮▮▮ (Rating Official)<br><br>**Originally signed by ▮▮▮▮▮ on 4/24/2023** | Date: 4/24/2023 |
| Employee's Signature: Electronically signed by EVANS, THOMAS P.<br><br>**Originally signed by THOMAS P. EVANS on 4/24/2023** | Date: 4/24/2023 |

**Part 2. Progress Review**

| | |
|---|---|
| Rating Official's Signature: 🔍 Electronically signed by ▮▮▮▮▮ (Rating Official) | Date: 📅 10/26/2023 |
| Employee's Signature: 🔍 Electronically signed by EVANS, THOMAS P. | Date: 📅 10/26/2023 |

**Part 3. Rating**

| Summary Rating Levels: | ☐ Unacceptable | ☐ Marginally Successful | ☐ Fully Successful | ☐ Exceeds Fully Successful | ☑ Outstanding |
|---|---|---|---|---|---|

Fully Successful:  Refer to NSF Generic Performance Standards (GPS)

**Part 4. Derivation Formula and Calculation of Annual Summary Rating**

| Performance Element/Performance Element Group | Rating Level | Rating Value |
|---|---|---|
| Program Planning and Management * | Outstanding (O) | 5 |
| Programmatic and Scientific Communication * | Outstanding (O) | 5 |
| Professional Development * | Outstanding (O) | 5 |

✳ Denotes Critical Element
^ Denotes Overridden Rating
✖ Denotes PE not included in Rating Calculations

**Part 5. Rating Signatures**

| | |
|---|---|
| Reviewing Official's Signature: 🔍 Electronically signed by ▮▮▮▮▮ (Reviewing Official) | Date: 📅 4/26/2024 |
| Rating Official's Signature: 🔍 Electronically signed by ▮▮▮▮▮ (Rating Official) | Date: 📅 4/26/2024 |
| Employee's Signature: 🔍 Electronically signed by EVANS, THOMAS P. | Date: 📅 4/29/2024 |
| Employee's Comments: | |
| Performance Appraisal Certifier Signature: 🔍 Electronically signed by ▮▮▮▮▮ (Performance Appraisal Certifier) | Date: 📅 5/1/2024 |

**Part 6. Instructions**

Instructions are available in the "Resources" section.

**JA678**

**Part 7. Performance Elements**

## Program Planning and Management                              ☑ **Critical**

**Strategic Alignment:**

Annual objectives related to this element will be set by the supervisor and communicated to the employee as work is assigned throughout the year. The employee's performance rating for this element will be based on the (a) degree to which he or she accomplishes these objectives and the (b) manner in which he or she goes about accomplishing these objectives. Descriptions of expectations at each level of performance are provided in the NSF Generic Performance Standards. • Maintain the integrity and quality of the peer merit review process.• Plan allocation of resources to maintain a healthy balance of support to meet program needs.• Take action on all proposals in a timely manner.• Prepare review analyses that are well-reasoned and well-documented to justify recommendation.• Consider both merit review criteria in funding recommendations.• Maintain an effective and efficient post-award evaluation process.• Pursue goals of increasing diversity and broadening participation in selection of reviewers, panelists, and PIs.• Ensure proposals comply with NSF policy and division practice, including consideration of plans for mentorship and data management and access.• Work effectively and collaboratively with administrative staff in processing work and meeting deadlines.• Secure co-review when the scope of a proposal requires broader engagement.• Assess trends and opportunities in the field with assistance of advisory panel, scientific community, professional societies, committees of visitors, etc., and incorporate these, as appropriate, into program planning and development.• Keep senior management informed of operations in the program.• Promote and support excellence in science ethics.• Perform other duties as assigned.

**Fully Successful (FS):**

Refer to NSF Generic Performance Standards (GPS)

**Employee Element Self-Accomplishment Narrative:**

OPM FORM 5018 10/2018
PERF: NF00 OM00 USAPerformance

**Rating Official Element Narrative:**

Tom's core programmatic work is as permanent lead of a well-coordinated team (with co-POs ███████████ running the Human-Environment and Geographical Sciences (HEGS) Program. Tom completes the basic responsibilities of program management, recruiting panelists and ad-hoc reviewers, managing review panels, program budgeting, processing proposals, and coordinating with the other HEGS POs and program support staff on program actions, exceptionally well. Of note is that Tom has led the effort to deliver consistent pre-panel orientation for the program group sessions and well as 1-on-1 sessions as needed. He also continues to adopt the power of technology such as PanelSolver and RoboRA to ease the workflow burden of HEGS. Notable this past year is his effort to spearhead HEGS's volunteering to run a panel using the new Proposal Evaluation System (PES) that is to be the replacement for Fastlane. Tom led coordination with the PES team including orientation sessions, platform testing, and panelist training. The PES experience was quite positive with only minor obstacles – the HEGS team is looking forward to the full PES rollout and was pleased to be one (and the only SBE) program that contributed to the PES gamma test phase. It is very important to participate in the testing of new technologies at NSF and we are grateful that Tom volunteered and participated with HEGS to do so; feedback will be incorporated into the final version.

Tom continues to coordinate the effort to re-envision the HEGS senior and DDRI programs by reworking the solicitations to (1) clarify to the research community the types of scholarship that fall within the scope of the HEGS program; (2) encourage submissions to HEGS that are currently underrepresented (such as proposals from GIScientists); and (3) identify mechanisms to re-invent the DDRI program to better serve the community and to diversify the topical representation in submissions and awards. The need for HEGS program revisions has increased with the ending of the highly successful cross-directorate DISES program given the interest of those PIs to submit to HEGS via the newly imagined "SHINE" track.

As the lead of the program that links the social sciences with the physical sciences and engineering in SBE, Tom has become instrumental in providing SBE leadership and representation in environmentally oriented cross directorate programs. This work includes co-chairing the SBE-led CRISES program. Tom was instrumental in running the initial competition (planning and conference proposals) for this program together with co-chair ███████████ from SES under extreme time pressure. The development of the DCL and FAQs was done quickly, with the response impressive for such a new program. Over 150 concept outlines were submitted which had to be internally reviewed and managed by a volunteer Working Group, and 15 award recommendations processed during an already busy close-out season. It is due to Tom's leadership that the initial launch of CRISES was a success. Tom has continued to work with ████ to lead CRISES.v2, now enlarged with representation from other directorates.

Tom is also involved in other activities, widespread in their coordination with other directorates, where he is usually the sole SBE PO on many working groups. Through his thoughtful contributions and leadership, SBE perspectives are integrated in these efforts.

1. Tom joined ███████████████ as co-chair of Sustainable Regional Systems Research Networks (SRS RNs) in early 2024. While ████ handles most of the day-to-day work, Tom has been engaged with key decision-making and outreach. In 23-24, the SRS work involved clearance of the program solicitation, FAQ and webinar; work will ramp up during the next reporting period.

1. Tom has long been involved as the SBE rep on the Wildland Fire working group, based in BIO. HEGS was primary or co-funder on about of the awards and SBE sciences have become a critical partner in the Wildland Fire program. Tom continues to work with the Wildland Fire working group towards a vision of a possible solicitation in FY25.

1. Tom served as one of several POs on the cross-directorate Dynamics of Integrated Socio-Environmental Systems (DISES) – supporting lead ███████ in the administration of DISES in 2023 when SBE lead in the program's management.

1. Tom also serves on the Strengthening American Infrastructure (SAI) program working group.

1. He is also on the cross-directorate Clean Energy Technology working group and representing SBE.

1. He served on the directorate-less Advisory Committee on Environmental Research and Education (AC-ERE) work group ensuring the highlighting of SBE matters.

Along with ███████ Tom filled in on the Graduate Research Fellowship Program including running a GRFP panel for geography/sociology in January 2024 on short notice for a SES PO who was unable to participate. This program, along with HEGS's DDRIG program, is critical in the support of graduate students. A crucial new development toward the end of the reporting period is Tom's 50% detail to GEO-RISE to serve as founding co-chair of the new program, Confronting Hazards, Impacts and Risks for a Resilient Planet program (CHIRRP). This service is invaluable to SBE in its engagement with GEO on the development of this new program after the elimination of DISES and as SBE seeks to be involved in the Building a Resilient Planet budget roadmap.

| Program Planning and Management Rating Levels: | ☐ Unacceptable (U)   ☐ Minimally Successful (MS)   ☐ Fully Successful (FS)   ☐ Very Good (VG)   ☑ Outstanding (O) |
|---|---|

OPM FORM 5018 10/2018
PERF: NF00 OM00 USAPerformance

## Programmatic and Scientific Communication                    ☑ Critical

**Strategic Alignment:**

Annual objectives related to this element will be set by the supervisor and communicated to the employee as work is assigned throughout the year. The employee's performance rating for this element will be based on the (a) degree to which he or she accomplishes these objectives and the (b) manner in which he or she goes about accomplishing these objectives. Descriptions of expectations at each level of performance are provided in the NSF Generic Performance Standards. • Respond to requests for information from Division Director and senior management in a timely fashion.• Keep senior management informed of significant achievements in the field, as well as new trends and developments.• Participate in outreach activities designed to encourage research, broaden participation, foster interdisciplinary collaborations, and enhance public engagement in science, as time and funds permit.• Compose accurate and compelling highlights and work proactively to identify and help generate other media communications, so as to showcase supported research.• Demonstrate and document links between supported research and broader impacts to society, including working with the scientific community to promote effective and appropriate linkages.• Maintain accessibility for members of the community and ensure professional and effective interactions with them.• Maintain effective communication with scientific community, potential PIs, and awardees via all appropriate means.• Keep community informed about new funding opportunities, new policy and requirements, and new employment opportunities at NSF.• Foster the involvement of BCS and other scientific communities in interdisciplinary research.• Perform other duties as assigned

**Fully Successful (FS):**

Refer to NSF Generic Performance Standards (GPS)

**Employee Element Self-Accomplishment Narrative:**

**Rating Official Element Narrative:**

Tom was very active in programmatic and scientific communication this past year. He conducted numerous outreach events for most of the many programs he represents – these include webinars, presentations at conferences/workshops, e.g., AAG, AGU (where he stepped in when the SBE rep was not able to attend at relatively short notice), Google Next, and meetings with graduate student classes at various institutions (virtually). As the Permanent lead in HEGS, Tom is frequently the coordinator of responses, and he initiated an innovative tracking process (pinned spreadsheet in Teams) to ensure timely replies to all PI inquiries and to fellow POs and staff about co-review and invitations to participate in lead agency and other initiatives to foster cross-directorate and international science.

**Programmatic and Scientific Communication Rating Levels:**  ☐ Unacceptable (U)  ☐ Minimally Successful (MS)  ☐ Fully Successful (FS)  ☐ Very Good (VG)  ☑ Outstanding (O)

OPM FORM 5018 10/2018
PERF: NF00 OM00 USAPerformance

## Professional Development                                    ☑ Critical

**Strategic Alignment:**

Annual objectives related to this element will be set by the supervisor and communicated to the employee as work is assigned throughout the year. The employee's performance rating for this element will be based on the (a) degree to which he or she accomplishes these objectives and the (b) manner in which he or she goes about accomplishing these objectives. Descriptions of expectations at each level of performance are provided in the NSF Generic Performance Standards. • Establish contacts and maintain active involvement in area of scientific expertise by participating in meetings, conferences, and undertaking other relevant activities.• Actively keep colleagues at NSF aware of research and other professional activities.• Keep abreast of current discoveries and innovations in field of scientific expertise.• As funding and workload permit:o Pursue personal research and disseminate results.o Foster research expertise and professionalism in field of expertise through engagement and collaboration with colleagues and students.o Undertake management development activities, including training courses as appropriate.o Engage in other professional or scholarly activity pertinent to personal growth and organizational goals, particularly as the activity links program area and expertise to others within an interdisciplinary context.

**Fully Successful (FS):**

Refer to NSF Generic Performance Standards (GPS)

**Employee Element Self-Accomplishment Narrative:**

**Rating Official Element Narrative:**

As Tom transitioned from VSEE rotator to perm PO, he wound down his lab group at the University of Arizona, although he retains a courtesy appt. However, he has a very active IR/D plan as he collaborates with a cross-institutional team of scholars with whom he has worked for the past 10+ years on climate adaptation research in Sub-Saharan Africa. A highlight is serving as Co-PI on a new $2M award from the Department of Defense Minerva program (PI ▓▓▓▓▓ at U California Santa Barbara) that extends the group's work on climate adaptation in Zambia and Kenya to drivers and impacts of inter-personal conflict. The first phase of this project runs from 2023-2026 with a second phase contingent upon adequate performance in phase I. Tom was co-author on 4 peer reviewed manuscripts published in 2023 (see list below). Tom's active research is incredibly relevant and informs the cross-directorate work he does at NSF.

Giroux, S., Kaminski, P., Waldman, K., Blekking, J., Evans, T., & Caylor, K. K. 2023. Smallholder social networks: Advice seeking and adaptation in rural Kenya. Agricultural Systems, 205, 103574.

Joshi, N., Gerlak, A. K., Hannah, C., Lopus, S., Krell, N., & Evans, T. 2023. Water insecurity, housing tenure, and the role of informal water services in Nairobi's slum settlements. World Development, 164, 106165.

Gatti, N., Cecil, M., Baylis, K., Estes, L., Blekking, J., Heckelei, T., Vergopolan, N. and Evans, T., 2023. Is closing the agricultural yield gap a "risky" endeavor? Agricultural Systems, 208, p.103657.

Cecil, M., Chilenga, A., Chisanga, C., Gatti, N., Krell, N., Vergopolan, N., Baylis, K., Caylor, K., Evans, T., Konar, M. and Sheffield, J., 2023. How much control do smallholder maize farmers have over yield? Field Crops Research, 301, p.109014.

Tom attended the American Association of Geographers meeting in Spring 2023 for outreach and IRD, and the Google Next conference in December 2023. The latter conference was an outreach trip but had unexpected professional development relevance in part because the community attending Google Next and associated culture was entirely different than that of a typical academic conference. The industry-focus of this event was an interesting perspective in the context of recent NSF efforts to promote use-inspired outcomes and intersections between basic science research and industry partnerships (SBE-TIP collaborations).

**Professional Development Rating Levels:**    ☐ Unacceptable (U)  ☐ Minimally Successful (MS)  ☐ Fully Successful (FS)  ☐ Very Good (VG)  ☑ Outstanding (O)

OPM FORM 5018 10/2018
PERF: NF00 OM00 USAPerformance

## Part 8. Summary Rating Narrative

Tom excelled in his first year as a permanent PO in BCS, having served as a VSEE rotator previously. He is solid in managing the HEGS program collaboratively, and his work in extra-programmatic assignment has increased significantly as he settles into being a key SBE PO on environmental cross-directorate activities, especially his leadership on the SBE led CRISES program. Tom's network of relationships across NSF is deepening, with his current detail in GEO solidifying connections there. Tom is a true team player, willing to participate in efforts large and small, and willing to step up where there is a need. He has done this while continuing substantial scholarly work, and this benefits SBE as he remains very well versed in current trends in human-environmental and environmental research. We look forward to Tom's continued growth as a permanent member of the scientific staff at NSF.

## Part 9. Employee Self-Accomplishment Narrative

### Program Planning and Management

Tom serves as one of 2.5 Program Officers assigned to the Human-Environment and Geographical Sciences (HEGS) Program. Responsibilities with HEGS have included recruiting panelists, conducting review panels, program budgeting, developing review analyses, and coordinating with the other HEGS POs on program actions (e.g. co-review requests). A particular role has involved the conduct of pre-panel orientations (approximately 20 sessions counting group sessions and also numerous 1-on-1 sessions for panelists who have conflict with group slots). The three HEGS POs work well together and we find a way to keep HEGS on track one (or more) of us are tugged away for other priorities.

Tom continued to encourage evaluation and adoption of new NSF workflows in the past performance period. This included continued adoption of PanelSolver and RoboRA for HEGS program workflows.

More recently the HEGS program volunteered to run a panel using the new Proposal Evaluation System (PES) that is to be a replacement for Fastlane. Tom led the coordination with the PES team including orientation sessions, platform testing and panelist training. The PES experience was quite positive with only minor obstacles – the HEGS team is looking forward to the full PES rollout and was pleased to be one of the programs that contributed to the PES gamma test phase.

Tom has worked with ████████████████████████████████████████ in re-envisioning the HEGS senior and DDRI programs. The HEGS team is currently revising our program solicitations with the following specific aims in mind: 1) clarifying to the research community the types of scholarship that fall within the scope of the HEGS program, 2) encouraging submissions to HEGS that are currently underrepresented (e.g. GISci) and 3) identifying mechanisms to re-invent the DDRI program and diversity of topics represented in submissions and awards. This process has involved careful consideration of the program scope and mechanics. The HEGS team looks forward to submitting revised program solicitations for review in FY24. ████ and ████ have been highly vested in this solicitation revision/strategic direction process and hopefully we can find a period in 2024 when we have enough bandwidth to proceed carefully with this process. If done too hastily there can be blowback from the PI community but we have had enough meetings at this point to proceed - in part this path is clearer now that the public announcement on the ending of DISES is soon to be released.

### Programmatic and Scientific Communication

Tom has conducted numerous outreach events in the form of HEGS webinars, meetings with graduate student classes at various institutions (4 in 2023-2024 period) and presentations at conferences/workshops (AAG and Google Next in 2023-2024 period). Tom frequently is the HEGS program officer coordinating email responses to PIs but this is very much a team effort.

Tom promoted adoption of a tracking process (pinned spreadsheet in Teams) to ensure timely replies to PIs. Collaborative decisions include PI inquiries of fit for HEGS, deciding if HEGS should participate in different programmatic inquiries at SBE, and consideration of EOIs from programs like UKRI and IUCRC. The HEGS program officers have a fairly consistent take on most inquiries at this point – as the HEGS program officers have been working together for 1.5 years now it is common for the first PO who gets to a PI inquiry to respond without requiring input from the other 2 POs. But about 20% of our inquiries are less clear judgement calls (e.g. UKRI or IUCRC consideration, PI inquiries on topics at the edge of HEGS scope) in which case we use a tracking system to record positions from each of us. The tracking spreadsheet pinned in Teams has worked relatively well to solicit this input versus email where messages can slip down in inboxes.

### Representation and Coordination

OPM FORM 5018 10/2018
PERF: NF00 OM00 USAPerformance

Tom's representation within SBE and outside SBE has ticked up considerably in the 2023-2024 period. Tom continued to participate as a member of several cross-directorate working groups. These include the Wildland Fire working group that saw the awarding of 16 planning proposals in 2023 – Tom was the managing PO for SBE on these awards and HEGS was primary or co-funder of 7 of the 16 awards. BIO supported 10 awards and GEO 7 awards. In other words, SBE was a critical partner in the Wildland Fire 2023 portfolio, particularly when considering the relative budgets of SBE vs. BIO & GEO. Tom continues to work with the Wildland Fire working group towards a vision of a possible solicitation in FY25. A less time consuming working group was the Clean Energy Technology working group and representing SBE at the NSF working group for the Advisory Committee on Environmental Research and Education (now handed off to ▓▓▓▓▓▓▓▓▓▓▓▓ as of Feb 2024).

Tom serves as a program director with the Dynamics of Integrated Socio-Environmental Systems (DISES) and Strengthening American Infrastructure (SAI) programs. These programs did not involve an inordinate amount of leadership time as it is the PO lead that shoulders most of the burden ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ respectively). But Tom supported ▓▓▓▓▓▓▓ in administration of DISES in the 2023 cycle and handled a portion of the award/decline decisions. Along with ▓▓▓▓▓▓, Tom filled in on the Graduate Research Fellowship Program including running a GRFP panel for geography/sociology in January 2024 on short notice for a SES PO who was unable to participate.

A more significant allocation of time in the 2023-2024 performance period involved co-chairing the SBE Centers for Research and Innovation in Science, the Environment and Society (CRISES) with ▓▓▓▓▓▓▓▓▓▓▓▓ (SES) and ▓▓▓ ▓▓▓▓▓▓ This involved managing the rollout of the CRISES DCL (planning and conference proposals), community outreach/webinars, coordination of the 12 member working group, management of concept outline review (150), review of full proposals (120) and processing awards (15). This was a big effort given the accelerated timetable for CRISES but the working group succeeded in getting all award and decline recommendations submitted before July closeout. The working group members really stepped up to make this timeline possible. Tom continues to work with ▓▓▓▓ to stand up a 2nd round of CRISES DCL coordinating revision of the DCL with WG members and SBE leadership.

Tom joined ▓▓▓▓▓▓▓▓▓▓▓▓ as co-chair of Sustainable Regional Systems Research Networks (SRS RNs) in early 2024. ▓▓▓▓ handles a significant amount of the co-chair workload but Tom has been engaged at a higher level than anticipated in decision making and outreach (multiple meetings/week + email traffic). So far the SRS work has involved clearance of the program solicitation, FAQ and webinar – coordination with the larger working group will ramp up in April and review process of the $15M proposals will start soon after the May 15 2024 deadline.

In March 2024 Tom started a detail with GEO to co-chair the GEO Confronting Hazards, Impacts and Risks for a Resilient Planet program (CHIRRP). This detail technically started March 10 2024 but the workload starting ticking up in February 2024.

Overall this cross-directorate work has been an increasingly significant time commitment but has been rewarding as it leverages Tom's research experience leading and collaborating with interdisciplinary teams. Tom's network of relationships at NSF is developing and growing stronger due to the engagement on the working groups noted above. This has involved learning how to strategically step in when there are opportunities to leverage SBE science in different cross-directorate initiatives constructively and collaboratively.

**Professional Development**

Tom wound down his lab group at the University of Arizona with his transition from VSEE to permanent program officer role in 2023. He continues to actively collaborate with a cross-institutional team of scholars with whom he has worked for the past 10+ years on climate adaptation research in Sub-Saharan Africa.

A highlight is serving as Co-PI on a new $2M award from the Department of Defense Minerva program (PI ▓▓▓▓▓▓▓ at U California Santa Barbara) that extends the group's work on climate adaptation in Zambia and Kenya to drivers and impacts of inter-personal conflict. The first phase of this project runs from 2023-2026 with a second phase contingent upon adequate performance in phase I. Tom was co-author on 4 peer reviewed manuscripts published in 2023.

Tom attended the American Association of Geographers meeting in Spring 2023 and the Google Next conference in December 2023. The latter conference was an outreach trip but had unexpected professional development relevance in part because the community attending Google Next and associated culture was entirely different than that of a typical academic conference. The industry-focus of this event was an interesting perspective in the context of recent NSF efforts to promote use-inspired outcomes and intersections between basic science research and industry partnerships.

**JA684**

**Part 10. For Agency Use**

**JA685**

# EXHIBIT B

 **U.S. National Science Foundation**

DATE:                        February 18, 2025

TO:                          Thomas P. Evans, Program Director
                             Directorate for Social, Behavioral & Economic Sciences

FROM:                        Starlisha Anderson, Acting Director
                             Division of Human Resource Management

SUBECT:                      Termination of Excepted Service Appointment

On July 30, 2023, you were hired on an Excepted Service appointment as an Program Director, in Directorate for Social, Behavioral & Economic Sciences, at the U.S. National Science Foundation (NSF).

The purpose of this memorandum is to notify you that your employment will be terminated effective at the end of the business day on February 18, 2025. The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest.

<u>You may choose to resign in lieu of being terminated</u>. This decision may impact your rights and benefits. If you wish to resign in lieu of being terminated, please notify <u>benefits@nsf.gov</u> before 11:59 pm EST today, February 18, 2025.

<u>NSF Property Turn-In</u>: You are required to turn in your PIV badge, laptop, and all other government property in your possession. If you are onsite today, you must turn in your government property to your directorate or office point of contact. If you are not onsite, a prepaid box will be mailed to your address of record which you are required to use to immediately return such property. Until this has been done, any indebtedness that you have to the government will be offset by your salary check and/or retirement funds. If you have personal property onsite, and you are not able to retrieve it today, a representative of your directorate or office will pack and mail it to your address of record.

If you disagree with this decision, you may contest it in accordance with one of the following procedures. You may only choose one of these options, outlined below; and, whichever filing occurs first, will be considered your choice.

    a. <u>Option</u> – Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal,

 U.S. National Science Foundation

respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: https://www.mspb.gov/about/contact.htm.

b. Option – Equal Employment Opportunity Program (EEO), Office of Civil Rights (OCR): If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, and/or reprisal for prior EEO activity, you may file a discrimination complaint within forty-five (45) days of the effective date of this action. Questions concerning the EEO process may be referred to:

> National Science Foundation
> Office of Civil Rights
> 2415 Eisenhower Ave
> Alexandria, VA 22314
> Phone: (703) 292-8020
> Email: eeo@nsf.gov

c. Option – Office of Special Counsel (OSC): If you believe this action is in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx. As an alternative, you may communicate in writing to the following address:

> Complaints Examining Unit
> U.S. Office of Special Counsel
> 1730 M Street, N.W., Suite 218
> Washington, DC 20036-4505

We appreciate your service to the Agency and wish you the greatest success in your future endeavors. If you have any procedural questions regarding this action, you may contact the Workforce Relations Branch at workforcerelations@nsf.gov.

Starlisha Anderson
Acting Director, Division of Human Resource Management
Office of Information and Resource Management

Exhibit E

## March 17 Status Report Summary Chart

| Agency | Affected Probationary Employees | Citation |
|---|---|---|
| EPA | 419 | ECF 52-1 at 3 ¶ 6 |
| Energy | 555 | ECF 52-1 at 6 ¶ 6 |
| Commerce | 791 | ECF 52-1 at 10 ¶ 7 |
| DHS | 313 | ECF 52-1 at 14 ¶ 6 |
| DOT | 788 | ECF 52-1 at 18 ¶ 7 |
| Education | 65 | ECF 52-1 at 22 ¶ 6 |
| HUD | 312 | ECF 52-1 at 25 ¶ 6 |
| Interior | 1,712 | ECF 52-1 at 28 ¶ 6 |
| DOL | 170 | ECF 52-1 at 34 ¶ 7 |
| CFPB | 117 | ECF 52-1 at 37 ¶ 6 |
| SBA | 304 | ECF 52-1 at 40 ¶ 6 |
| FDIC | 156 | ECF 52-1 at 44 ¶ 6 |
| USAID | 270 | ECF 52-1 at 47 ¶ 6 |
| GSA | 366 | ECF 52-1 at 50 ¶ 6 |
| Treasury | 7,605 | ECF 52-1 at 53 ¶ 5 |
| USDA | 5,714 | ECF 52-1 at 57 ¶ 5 |
| VA | 1,900 | ECF 52-1 at 60 ¶ 6 |
| HHS | 3,248 | ECF 52-2 at 2 ¶ 6 |
| **TOTAL** | **24,805** | |

Exhibit F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv-00748-JKB |

**DECLARATION OF KATHERINE ARCHULETA**

I, Katherine Archuleta, hereby declare as follows:

1.      I am the former Director of the United States Office of Personnel Management (OPM).  I make this statement based on personal knowledge and if called as a witness could and would testify competently thereto.

2.      I was appointed to the position of OPM Director by the President of the United States on November 4, 2013, and I held that position until July of 2015.

3.      Prior to my appointment as OPM Director, I worked for approximately 20 years in local and federal government positions.  I started my career as an elementary schoolteacher in Denver, Colorado, and then worked in local Denver government.  I later served as the Deputy Chief of Staff and Chief of Staff for the U.S. Department of Transportation, as Senior Advisor at the U.S Department of Energy, and as Chief of Staff to the U.S. Secretary of Labor.

4.      Subsequent to my years of service in the federal government, I have remained active in public service and civic affairs, including in my current position as the Co-Founder of the Latina Initiative.  The mission of the Latina Initiative is to encourage Colorado's Latina voters to use their voices and their votes to influence elected leaders and policy makers throughout the state.   I served as a Trustee of the University of Denver from 2016 to 2021.  I

currently serve as a member of the Board of Trustees of the Rose Community Foundation, Commissioner of the Denver Urban Renewal Board, and Conservation Colorado.  In 2020, I was inducted into the Colorado Women's Hall of Fame for my lifelong commitment to public service.

5.      In my role as OPM Director, I was responsible for overseeing the office that serves as the Human Resources office for the entire federal government, and as a result, I am familiar with the civil service laws and regulations that govern recruiting, hiring, development and support for federal workers.

6.       From my time working at three federal agencies (Transportation, Energy, and Labor) and as the OPM Director, I am very familiar with the respective roles that federal executive agencies and OPM play with respect to hiring and termination of federal employees, including those employees considered to be probationary under the civil service system.

7.      Probationary employees are generally those who have worked for the federal government in their positions for less than two years.  These individuals can be quite experienced in their fields, and they often bring private sector, academic, and other government experience and talent that the federal government needs.  This category of newer hires also includes the future of the federal workforce.

8.      During my time as OPM Director, the office worked to ensure that federal agencies were supported in their efforts to recruit and retain talent to serve our country.

9.      The probationary period plays a critical role in the evaluation and integration of new employees.  Prior to hiring, probationary employees undergo extensive screening and interviews to assess their qualifications for the position.  Once hired, the probationary period itself is designed to allow both the employee and employer to further assess the fit and suitability for the role.  During this time, evaluations, reviews, and mentoring are integral to the process. Employers have a responsibility to conduct periodic assessments of the probationary employee's performance, ensuring a fair evaluation of their capabilities as potential permanent staff.  This collaborative effort serves to confirm that only the most qualified individuals transition into the permanent workforce at the conclusion of the probationary period.  All of these decisions are

made at the agency or office level, where each entity assesses whether the individual probationary employee is prepared for transition into a permanent position.

10.     I have become aware of the incoming Presidential Administration's actions with respect to probationary workers throughout the country from reports in the press regarding mass terminations throughout the federal agencies.  These reports are concerning and disturbing.  It is inconceivable to me that the federal government would endeavor to eliminate the category of probationary workers.  This is not remotely in the public interest and, in my experience, these terminations appear to ignore the civil service laws and regulations that I implemented and enforced.

11.     In particular, to the extent that OPM was involved in directing federal agencies to terminate workers, I am not aware of any legal authority for OPM to issue such an order.  The federal agencies are authorized by Congress to make hiring and firing decisions, within the confines of the federal civil service protections.  Our role at OPM was to support those agencies in those decisions, not to make those decisions for them.

12.     The speed and extent of the terminations by agencies of large numbers of probationary workers, in my experience, could only have occurred as a result of a central mandate.  It is simply not possible, in my experience, for so many federal agencies to have independently and simultaneously decided to terminate large numbers of their workers.  That would be unprecedented, and logistically impossible.

13.     In my experience, and under the laws and regulations that apply to federal employment with which I am familiar, any agency that wished to release an individual, including a probationary individual from employment, would conduct an individualized assessment of performance.  If the news reports are correct about the volume of the terminations, it is not possible for these agencies to have done proper assessments of all of these employees.  Nor is it plausible that all these employees have performance issues.

14.     In my experience, and under the laws and regulations that apply to federal employment with which I am familiar, agencies determine whether to propose a reduction in force. OPM does not propose reductions in force at agencies.  And, any agency that wishes to conduct such a reduction would need to comply with the regulations governing reductions in force, including by providing sufficient advance notice to employees, their representatives, and state and local governments that may be affected.  This is not an undertaking to be taken lightly and without planning.  Agencies engage in significant advance planning before conducting a reduction in force, and they must respect the protections given to workers who are permitted to compete for other federal jobs rather than lose their seniority, benefits, and compensation.

15.     I am disheartened to learn that the office that I led with pride, with a mission and dedication to supporting federal agencies and their employees, has been involved in what appears to me to be the wholesale mistreatment of federal workers.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: _____                         ____/s/_Katherine Archuleta_____
                                                                Katherine Archuleta*

                                                                *A copy of the signature page
                                                                bearing an original signature is
                                                                attached hereto.

14.    In my experience, and under the laws and regulations that apply to federal employment with which I am familiar, agencies determine whether to propose a reduction in force. OPM does not propose reductions in force at agencies. And, any agency that wishes to conduct such a reduction would need to comply with the regulations governing reductions in force, including by providing sufficient advance notice to employees, their representatives, and state and local governments that may be affected. This is not an undertaking to be taken lightly and without planning. Agencies engage in significant advance planning before conducting a reduction in force, and they must respect the protections given to workers who are permitted to compete for other federal jobs rather than lose their seniority, benefits, and compensation.

15.    I am disheartened to learn that the office that I led with pride, with a mission and dedication to supporting federal agencies and their employees, has been involved in what appears to me to be the wholesale mistreatment of federal workers.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: _March 18, 2025_

Katherine Archuleta

Exhibit G

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv-00748-JKB |

## DECLARATION OF PACE SCHWARZ

I, Pace Schwarz, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am a Research Assistant in the Office of the General Counsel for the American Federation of Government Employees, AFL-CIO ("AFGE").

3.      In my role as a Research Assistant, I conduct research for AFGE's attorneys and assist with certification and delegation matters. I have been assigned several special projects, including a project to catalog letters related to AFGE affiliates delegation of authority.

4.      Since February 18, 2025, however, I have spent most of my time reviewing notices and letters sent to AFGE related to actions taken by the current Presidential administration, including reviewing probationary termination notices that have been sent to AFGE.

5.      Due to the work related to probationary terminations, I have been unable to complete other important work I have been assigned.

6.      Over the last two weeks I have catalogued over 100 letters AFGE's national office has received from employees who were terminated during their probationary period. Many of the letters were unsolicited. I understand that there have been thousands more probationary terminations of employees AFGE represents.

7.      One such termination letter, which I have attached as Exhibit A, was distributed to a probationary employee at the Department of Veterans' Affairs ("VA") at 7:09pm on February 13, 2025. The employee's identifying information has been redacted.

8.      Exhibit A indicates that the probationary employee was being removed "based on [their] performance." The letter fails to reference the employee's actual performance records, the specific relationship of the employee's duties or alleged failing to the public interest, or the position of the employee to whom it was addressed.

9.      A copy of Exhibit A was displayed by Rep. Mark Takano, Ranking Member of the House Committee on Veterans' Affairs, in his questioning of Ms. Tracey Therit, VA's Chief Human Capital Officer, on February 25, 2025, about the termination of these probationary employees.

10.     A similar termination letter sent to probationary employees at the Department of Energy ("DOE"), which I have included as Exhibit B and is similarly redacted, also references an employee's performance as a basis for termination and states that the DOE's findings were "per OPM instructions."

11.     I was also asked to review an email that I am attaching as Exhibit C, that was sent from the Defense Civilian Personnel Advisory Service to all Civilian Personnel Council Policy Members, on February 26, 2025. In the email, all Department of Defense (DoD) components are directed, in "accordance with direction from OPM," that they "must terminate the employment of

individuals who are currently serving a probationary or trial period" beginning February 28, 2025. The letter further states that a template termination notice should be used and that the template was "provided by OPM."

12.    I have reviewed the OPM template attached to the email marked as Exhibit C and have attached it as Exhibit D. The template letter is nearly identical to the probationary termination letters used at other agencies and, like those, cites performance reasons as the basis for termination.

13.    With many of the termination letters sent to AFGE, employees provided additional information including, in some cases, copies of their performance evaluations.

14.    In forty-three instances, employees sent us copies of their performance evaluations with their termination letters.  Even though these employees' termination letters cited performance issues as the reason for their termination, the evaluations indicated satisfactory or above-average performance. Indeed, most of the evaluations indicated performance at the highest level possible. Additionally, many other employees provided statements from their supervisors affirming their positive performance, despite their termination letters claiming otherwise. Many of these supervisor statements indicated that the employee terminated was the highest-performing individual in their respective office or work area. Several employees also noted—or provided evidence—that their supervisors opposed their terminations. I am not providing copies of individual termination letters here that I have reviewed because of concerns about retaliation.

15.    Recently, I was also asked to catalog termination letters and reduction-in-force letters involving USAID. The USAID letters are not included in those I previously catalogued.

16.    USAID issued reduction-in-force (RIF) letters to employees on February 23, 2025. USAID also issued termination letters to probationary employees on February 24, 2025.

17.    One USAID employee whose letters I reviewed received a RIF letter on February 23, 2025, which noted that the employee had less than a year of service. The letter also explained that the RIF was being taken applicable to "civil service RIF regulations," and noted the employee may have rights pursuant to those regulations, including the right to placement assistance. The RIF letter also stated that the employee would not be separated until April 23, 2025.

18.    On February 24, 2025, the same employee received a termination letter indicating she was being immediately terminated as a probationary employee.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 19th day of March 2025 in Washington, D.C.

Pace Schwarz

**Andrew Huddleston**

| | |
|---|---|
| **From:** | Therit, Tracey |
| **Sent:** | Thursday, February 13, 2025 7:09 PM |
| **To:** | Mitchell, Jillian Y. |
| **Subject:** | Termination During Probation Notice |

February 13, 2025

MEMORANDUM FOR Jillian Y Mitchell

FROM:              Tracey Therit
                       Chief Human Capital Officer

SUBJECT:        Notification of Termination During Probationary Period

REFERENCES:   5 U.S.C. § 7511
                       5 U.S.C. § 3321(a)
                       5 C.F.R. §§ 315.803 and 804

This is to provide notification that the Agency is removing you from federal service consistent with the above references.

On 4/21/2024, the Agency appointed you to your position. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." [2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the  civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position with the Agency and the federal civil service effective February 13, 2025.

You may seek review of this action.  Such reviews include:

   a. appealing this action to the Merit Systems Protection Board (MSPB) if you allege you were discriminated against due to marital status or partisan political reasons or your removal was not effected in accordance with the procedural requirements of 5 C.F.R. 315.805; or
   b. requesting corrective action before the Office of Special Counsel (OSC) for prohibited personnel practices; or
   c. pursuing a discrimination complaint with the Office of Resolution Management (ORM).

Please see below for details on your ability to file some of these claims concurrently. If you are not a supervisor, you shall be deemed to have exercised your option to appeal this action at such time as you

timely initiate action to appeal to MSPB. If you believe this action constitutes a prohibited personnel practice, other than discrimination, under 5 U.S.C. § 2302(b), including retaliation for protected whistleblowing, you may elect to file either an appeal to MSPB, or request corrective action from OSC, and your election is based on which election you file first. If you are not a supervisor, your election of one of these options precludes the other. If you are a supervisor, the election of remedies does not apply to you, and you may pursue all three options. If you believe that this action was taken against you for discriminatory reasons, other than marital status or political affiliation, refer to the paragraph immediately below.

Equal Employment Opportunity Commission (EEOC): If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, pregnancy, age or disability, you may file a complaint of discrimination. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-566-3982. Such a complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

If this action is also appealable to MSPB, such a discrimination complaint may be a "mixed case complaint," or if you raise the issue of discrimination in any appeal to MSPB, it may be a "mixed case appeal." You may not initially file both a mixed case complaint and a mixed case appeal on the same matter, unless you are a supervisor. If you are not a supervisor, whichever you file first, the MSPB appeal or the complaint of discrimination, will be considered an election to proceed in that forum and will determine the procedures that will be followed. If you are a supervisor, you may elect both MSPB and EEOC.

Merit Systems Protection Board (MSPB): If you appeal to the MSPB, your appeal may be submitted by mail, facsimile, by commercial overnight delivery, by electronic filing the MSPB Appeal Form (https://e-appeal.mspb.gov), or in person at any time after you receive this letter, but not later than 30 calendar days after the separation has been effected, or 30 calendar days after the date of the your receipt of this decision, whichever is later. The address to mail your appeal can be found here: U.S. Merit Systems Protection Board | Contacts and Locations (https://www.mspb.gov/about/contact.htm). You must submit an original and one copy of both your appeal and all attachments. If you do not submit an appeal within the time set by statute, regulation, or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown. The judge will provide you an opportunity to show why the appeal should not be dismissed as untimely. A copy of the form is available by request if you are unable to access it at the MSPB website. Please refer to the MSPB website (www.mspb.gov) for information regarding the appeals process and procedures that must be followed. You may be represented by an attorney or other representative of your choice. If you believe this action was taken against you for discriminatory reasons, refer to the paragraph on EEOC. If you decide to file an appeal with MSPB, you should notify the Board that the agency's point of contact for this appeal is Ochcofrontoffice@va.gov

Office of Special Counsel (OSC): If you elect to request corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 U.S.C. § 2302(b) (prohibited personnel practices). This can include, but is not limited to, claims of reprisal for whistleblowing and/or engaging in protected activity. If you are not a supervisor and you elect to request corrective action with OSC, you will have waived your right to file an appeal with MSPB (if eligible), regarding the same matter, except as follows. If you are making a covered claim of retaliation for engaging in certain protected activities, or for making protected disclosures and OSC terminates its investigation and/or has not timely notified you it will seek corrective action, you may have the right to file an individual right of action (IRA) appeal to the MSPB. Such an appeal will be limited to an adjudication of whether you proved that your protected activity or disclosure was a contributing factor in the effected action (5 U.S.C. § 1214; 5 U.S.C. § 1221). If you are a supervisor, you may pursue remedies from MSPB and OSC concurrently.

If you are not a supervisor, whichever option you may choose to pursue regarding this action (an appeal to the MSPB, a request for corrective action to OSC, or a discrimination complaint), shall be considered an election by you to proceed under that appeal process.  However, if you are not a supervisor, you may still concurrently file a corrective action to OSC and a discrimination complaint. If you are a supervisor, you may elect all three remedies concurrently.

Separating VA employees are required to return their PIV card to their PIV issuing office and their government furnished IT equipment and peripherals to the Office of Information Technology (OIT) for redeployment or disposition.

GFE Equipment
You will immediately take your equipment to the closest VA medical center or 810 Vermont Avenue to turn in your IT equipment. The local OIT staff will collect all assigned government furnished equipment (GFE), including peripherals such as monitors, docking stations, printers, etc.

Regardless of the original issuing site, all local IT teams will accept returned GFE and will adhere to local procedures for equipment accountability.

A return receipt for the equipment will be issued to the employee by local IT staff to acknowledge receipt of the employee's GFE and peripherals.
OIT Facility Requirements
Return any non-IT equipment, office and/or card keys, and PIV card to local facility.
If there is lost equipment a report of survey needs to be completed before you separate.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions concerning this matter or the rights described above, or if you need assistance or additional information, please contact Ochcofrontoffice@va.gov .

/s/
Tracey Therit

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id*.

*DOE F 1325.8e   Electronic Form Approved by Forms Mgmt. 04/26/2012*
*(08-89)*

**United States Government**                                         **Department of Energy**

# memorandum
                                                **Bonneville Power Administration**

DATE:   February 13th, 2025

FROM:   ███████████████   Bonneville Power Administration

SUBJECT:   Termination During Probationary Period

TO:   ███████████████   Environmental Support Assistant

This is to provide notification that the Agency is removing you from your position of Environmental Support Assistant and federal service consistent with the references at the bottom of this memorandum.

Your appointment to this position was subject to the satisfactory completion of an initial probationary/trial period ending on ███████

Guidance from the Office of Personnel Management (OPM) states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees." "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service." "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."

Per OPM instructions, DOE finds that your further employment would not be in the public interest. For this reason, you are being removed from your position with DOE and the federal civil service effective today.

You may have the right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at:

MSPB Western Regional Office
1301 Clay Street, Suite 1380N
Oakland, CA 94612-5217
Fax: (510) 273-713

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.

█

████████████████ Termination During Probationary Period

[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

If you decide to file an appeal with MSPB, you should notify the MSPB that the agency contact official for the purposes of your appeal is:

General Counsel, L-7
Bonneville Power Administration
P.O. Box 3621
Portland, OR 97232
Phone: 503-230-3000
Fax: 503-230-7405
Email: dcfelton@bpa.gov

As part of your appeal to the MSPB, you may allege whistleblower retaliation and/or EEO discrimination as affirmative defenses. However, once you timely file a notice of appeal with the MSPB, you may not subsequently file an OSC complaint, or an EEO complaint on the same matter.

Alternatively, you may seek corrective action under subchapters II and III of 5 U.S.C. chapter 12, by filing a complaint with the Office of Special Counsel (OSC), www.osc.gov. If you seek corrective action with OSC by making an allegation of whistleblower retaliation, you may not subsequently file an appeal to MSPB on the same matter. However, an OSC complaint may be followed by an Individual Right of Action (IRA) appeal to the MSPB under 5 U.S.C. § 1221. IRA appeals are limited to the issue of whether the agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures. As a result, you will be forgoing the right to challenge this action on other grounds.

Alternatively, you have the right to file a complaint with the U.S. Equal Employment Opportunity Commission (EEOC) consistent with the provisions of 5 U.S.C. § 7121(d) and 29 C.F.R. § 1614.301 and 1614.302. If you believe this action is based in whole or in part on prohibited discrimination (i.e. on the basis of your race, color, religion, sex (pregnancy, sexual orientation, sexual harassment), age (40 or older), national origin, genetic information, disability (mental or physical) or reprisal for prior EEO activity), you must contact a BPA or DOE EEO counselor within 45 calendar days of the date you received this decision. You have the right to file an EEO complaint after counseling. If you file an EEO complaint, you may not subsequently file an appeal with the MSPB on the same matter. Your EEO complaint will be deemed a "mixed case complaint" and upon acceptance by the agency you will be advised of the mixed case complaint processing procedures and appeal options.

The Department of Energy provides employees and their family members with a comprehensive Employee Assistance Plan (EAP). The EAP offers an array of services and resources aimed at supporting and enhancing personal well-being and work-life balance. Services are free and confidential, within the bounds of the law. You may contact FOH EAP and Work-Life program or to make a confidential appointment with a licensed counselor by calling 1-800-222-0364 (or 888-262-7848 if you are hearing-impaired). When contacting the FOH EAP, please use Department of



3



Termination During Probationary Period

Energy/DOE to identify the agency. To access EAP information and resources, self-help assessments, webinars, podcasts, and more, please visit: FOH4You.


We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact HR Help at 503-230-3230 or email: HRHelp@bpa.gov.


cc: Employee Relations File – HE-1

References:

> [5 U.S.C. § 7511]
> [5 U.S.C. § 3321(a)]
> [5 C.F.R. §§ 315.803 and 804]
> [5 C.F.R. § 316.304]
> [DOE O 333.1]

You are subscribed to DCPAS Messages.

**DCPAS Message 2025045**

1.

2.

3.

<u>**NOT**</u>

1.
2.
3.
4.
5.
6.

1. [Ref 3 - DCPAS Reference Guide - Determining Appeal Rights of an Individual Serving a Probationary Period - February 2025_FINAL.docx](#)
2. [Ref 2 - Termination of Probationary Employee Template - DoD.docx](#)

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your [Subscriber Preferences Page](#). You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit [subscriberhelp.govdelivery.com](#).

This service is provided to you at no charge by the [Defense Civilian Personnel Advisory Service](#).

[DATE], 2025

MEMORANDUM FOR [EMPLOYEE], [TITLE], [ORGANIZATION]

FROM:                    [NAME]
                         [TITLE]

SUBJECT:                 Notification of Termination During Probationary Period

REFERENCES:              5 U.S.C. § 7511
                         [5 U.S.C. § 3321(a)]
                         [5 C.F.R. §§ 315.803 and 804]
                         [5 C.F.R. § 316.304]
                         [INSERT AGENCY POLICY]

This is to provide notification that the Agency is removing you from your position of [TITLE] and federal service during your probationary/trial period consistent with the above references.

On [INSERT DATE OF APPOINTMENT], the Agency appointed you to the position of [TITLE]. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. [The agency also informed you of this requirement in the job opportunity announcement for the position.]

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3] Furthermore, OPM has emphasized that individual employee performance measurement should be aligned with and support organizational goals and focus employee efforts on achieving organizational and group goals. In addition, OPM has instructed Agencies to consider whether an employee's performance is in the best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce.

Based on the OPM guidance referenced above, the Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of [TITLE] with the Agency and the federal civil service effective [insert date and time, if necessary].

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id*.

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this notice or 30 days after the date of your receipt of this notice, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at: [INSERT MSPB REGIONAL OR FIELD OFFICE CONTACT INFORMATION].

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any questions, please contact [CONTACT].

[INSERT NAME OF AGENCY OFFICIAL]
[INSERT TITLE OF AGENCY OFFICIAL]

Exhibit H

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | | | | 2. Social Security Number | | 3. Date of Birth | | 4. Effective Date |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 02-13-2025 |

| **FIRST ACTION** | | | | | **SECOND ACTION** | | | |
|---|---|---|---|---|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | | | | 6-A. Code | 6-B. Nature of Action | | |
| 357 | Termination | | | | | | | |
| 5-C. Code | 5-D. Legal Authority | | | | 6-C. Code | 6-D. Legal Authority | | |
| ZLM | 5 USC 3321(a)(1) | | | | | | | |
| 5-E. Code | 5-F. Legal Authority | | | | 6-E. Code | 6-F. Legal Authority | | |

| 7. FROM: Position Title and Number | | | | | | 15. TO: Position Title and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| 8.Pay Plan | 9.Occ. CD | 10.Grd/Lvl | 11.Step/Rate | 12.Tot. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. CD | 18.Grd/Lvl | 19.Step/Rate | 20.Tot. Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | | | | | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | $0 | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Department of Energy | |

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 1-None | 3-10 Point/Disability | 5-10 Point/Other | 0-None | 2-Conditional | | |
| 1  2-5 Point | 4-10 Point/Compensable | 6-10 Point/Compensable/30% | 2  1-Permanent | 3-Indefinite | | YES   X   NO |

| 27. FEGLI | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| B0 | Waived | 9     Not Applicable | 0     Regular Rate |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KF  FERS(FRAE) & FICA(01/14) | | F     Full Time | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1-Competitive Service  3-SES General | | E-Exempt | | |
| 1  2-Excepted Service  4-SES Career Reserved | E  N-Nonexempt | | | 2472 |

| 38. Duty Station Code | 39. Duty Station   (City-County-State or Overseas Location) |
|---|---|
| 110010001 | Washington  Dist Columbia  DC  USA |

| 40. Agency Data | 41. Emplid | 42. FROM: Dept ID | 43. TO: Dept ID | 44. PAR Number |
|---|---|---|---|---|
| | | 2M01000000 | | |

45. Remarks

- Health benefits coverage is extended for 31 days during which you are eligible to convert to an individual policy (nongroup contract). You are also eligible for temporary continuation of your FEHB coverage for up to 18 months.

- Lump-sum payment to be made for any unused annual leave.
- OPF retained by NARA, National Personnel Center.
- Reason(s) for termination: In the public interest
- SF8 issued (Notice to Federal Employee About Unemployment Insurance).

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| Department of Energy | |
| 47. Agency Code   48. Personnel Office ID   49. Approval Date | Renee Johnson |
| 02-13-2025 | Supervisory Human Resources Specialist |

TURN OVER FOR IMPORTANT INFORMATION

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6236

1 – Employee Copy – Keep for Future Reference

**JA714**

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| ▮▮▮▮▮ | | ▮▮▮▮▮ | ▮▮▮▮ | 02-11-2025 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5-A. Code 385 | 5-B. Nature of Action TERM DURING PROB/TRIAL PERIOD | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code L4M | 5-D. Legal Authority REG 315.804 EQ | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ▮▮▮▮ | |

| 8. Pay Plan CN | 9. Occ. Code ▮▮ | 10. Grade or Level | 11. Step or Rate | 12. Total Salary ▮▮▮ | 13. Pay Basis PA | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary .00 | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12A. Basic Pay | | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay .00 | | 20A. Basic Pay .00 | 20B. Locality Adj. .00 | 20C. Adj. Basic Pay .00 | 20D. Other Pay .00 | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| CONSUMER FINANCIAL PROTECT BUREAU ▮▮▮▮▮▮ | FR FT5070000000000000    PP 03 2025 |

| **EMPLOYEE DATA** | | | | | |
|---|---|---|---|---|---|
| 23. Veterans Preference 1<br>1 - None    3 - 10 Point/Disability    5 - 10 Point/Other<br>2 - 5 Point    4 - 10 Point/Compensable    6 - 10 Point/Compensable/30% | | 24. Tenure 2<br>0 - None    2 - Conditional<br>1 - Permanent 3 - Indefinite | 25. Agency Use | 26. Veterans Preference for RIF<br>YES    X    NO | |
| 27. FEGLI B0    WAIVED | | 28. Annuitant Indicator 9    NOT APPLICABLE | | 29. Pay Rate Determinant 0 | |
| 30. Retirement Plan 5    OTHER | 31. Service Comp. Date (Leave) ▮▮▮▮ | 32. Work Schedule F    FULL TIME | | 33. Part-Time Hours Per Biweekly Pay Period | |

| **POSITION DATA** | | | |
|---|---|---|---|
| 34. Position Occupied 2<br>1 - Competitive Service 3 - SES General<br>2 - Excepted Service    4 - SES Career Reserved | 35. FLSA Category N<br>E - Exempt<br>N - Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status 5899 |
| 38. Duty Station Code 11-0010-001 | 39. Duty Station    (City-County-State or Overseas Location) WASHINGTON   DIST OF COLUMBIA   DC | | |
| 40. Agency Data | 41. | 42. | 43.    44. |

45. Remarks
E.O. 14210 AND THE STOP WORK EMAIL FROM RUSS VOUGHT ENTITLED ADDITIONAL
DIRECTIVES ON BUREAU ACTIVITIES DTD 2/10/2025.
HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE
ELIGIBLE TO CONVERT TO INDIVIDUAL POLICY (NONGROUP CONTRACT). YOU ARE
ALSO ELIGIBLE FOR TEMP CONTINUATION OF YOUR FEHB COVERAGE FOR UP TO
18 MTHS
▮▮▮▮▮▮▮▮

LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.

| 46. Employing Department or Agency CONSUMER FINANCIAL PROTECTION BUR | 50. Signature/Authentication and Title of Approving Official ELECTRONICALLY SIGNED BY: |
|---|---|
| 47. Agency Code ▮▮▮ | 48. Personnel Office ID ▮▮▮ | 49. Approval Date 02-13-2025 | ADAM MARTINEZ ACTING CHIEF HUMAN CAPITAL OFFICER |

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6236

**1 - Employee Copy - Keep for Future Reference**

# JA715

## NOTICE TO EMPLOYEE

**This is your copy of the official notice of a personnel action. Keep it with your records because it could be used to make  employment, pay, and qualifications decisions about you in the future.**

**The Action**
- Blocks 5-B and 6-B describe the personnel action(s) that occurred.
- Blocks 15-22 show the position and organization to which you are assigned.

**Pay**
- When the personnel action is an award or bonus, block 20 shows the amount of that one-time cash payment. When the action is not an award or bonus, block 12 shows your former total annual salary, and block 20 shows your new total annual salary (block 20C plus 20D). The amounts in blocks 12 and 20 do not include any one-time cash payments (such as performance awards and recruitment or relocation bonuses) or payments that may vary from one pay period to the next (such as overtime pay), or other forms of premium pay.
- Block 20A is the scheduled amount for your grade and step, including any special salary rate you receive. It does not include any locality-based pay. This rate of pay serves as the basis for determining your rate of pay upon promotion, change to a lower grade, or reassignment, and is used for pay retention purposes.
- Block 20B is the annual dollar amount of your Interim Geographic Adjust-ment or, beginning in 1994, your locality-based comparability payment.
- Block 20C is your Adjusted Basic Pay, the total of blocks 20A and 20B. It servers as the basis for computing your retirement benefits, life insurance, premium pay, and severance pay.
- Block 20D is the total dollar amount of any Retention Allowances, Super-visory Differentials, and Staffing Differentials that are listed in the remarks block. These payments are made in the same manner as basic pay, but are not a part of basic pay for any purposes.

**Block 24 - Tenure**
- Identifies the nature of your appointment and is used to determine your rights during a reduction in force (RIF). Tenure groups are explained in more detail in subchapter 26 of FPM Supplement 296-33 and RIF is explained in FPM Supplement 351-1; both should be available for review in your personnel office.

**Block 26 - Veterans Preference for RIF**
- Indicates whether you have preference for reduction-in-force purposes.

**Block 30 - Retirement Plan**

| | |
|---|---|
| - FICA | -Social Security System |
| - CS | -Civil Service Retirement System |
| - CS-Spec | -Civil Service Retirement System for law enforcement and firefighter personnel |
| - FS | -Foreign Service Retirement and Disability System |
| -FERS | -Federal Employees' Retirement System |
| -FERS Reserve Tech | -Federal Employees' Retirement System for National Guard Reserve Technicians |
| -FERS ATC | -Federal Employees' Retirement System for Air Traffic Controllers |
| -FERS Spec | -Federal Employees' Retirement System for law enforcement and firefighter personnel |
| -FSPS | -Foreign Service Pension System |

- If your appointment entitles you to elect health benefits or life insurance, and you have not been provided materials explaining the programs available and the enrollment forms, contact your personnel specialist.
-Your personnel specialist will also tell you if your position is covered by an agreement between an employee organization (union) and agency. If you are eligible to and elect to join an employee organization, you can elect to have

**Block 31 - Service Computation Date (Leave)**
- Shows when your Federal service began unless you have prior creditable service. If so, this date is constructed to include your total years, months and days of prior creditable civilian and military service.
- Full-time employees with fewer than 3 years of service earn 4 hours of annual leave each pay period; those with 3 or more years but less than 15 years earn 6 hours each pay period; and those with 15 or more years earn 8 hours each pay period
- Your earnings and leave statement or your time and attendance card will show the rate at which you earn leave and your current unused leave balance.

**Block 32 - Work Schedule**
- Your work schedule is established by your supervisor.
- A full-time employee works on a prearranged scheduled tour of duty that is usually 40 hours per week. A part-time employee has a prearranged scheduled tour of duty that is usually between 16 and 32 hours per week. An intermittent employee has no prearranged scheduled tour of duty and works when needed.
- Full-time and part-time employees whose appointments are for 90 days or more are usually eligible to earn annual leave; intermittent employees are not.
- Seasonal employees work on an annually recurring basis for periods of less than 12 months each year; they may have a full-time, a part-time, or an intermittent schedule during their work season.
- On-call employees work during periods of heavy workload and are in pay status for a t least 6 months of each year; they may have either a full-time or a part-time schedule when they are in pay status.

**Block 33 - Part-time Hours Per Biweekly Pay Period**
- Indicates the number of hours a part-time employees is scheduled to work during a two-week pay period.

**Block 34 - Position Occupied**
- Identifies the employment system under which you are serving - the Competitive Service, the Excepted service, or the Senior Executive Service (SES).
- The employment system determines your eligibility to move to other jobs in the Federal service, your rights in disciplinary and adverse actions, and your eligibility for reemployment if you leave Federal service.

**Block 35 - FLSA Category**
- Exempt employees are not covered by the minimum wage and overtime law (the Fair Labor Standards Act); nonexempt employees **are** covered.

**Block 37 - Bargaining Unit Status**
- Identifies a bargaining unit to which you belong; whether or not you are actually a member of a labor organization. Code "7777" indicates you are eligible but not in a bargaining unit; code "8888" indicates you are ineligible for inclusion in a bargaining unit.

**Blocks 38 and 39 - Duty Station**
- Identifies the city, county and state or the overseas location, where you actually work.

## OTHER INFORMATION

your dues withheld from your salary.
- If you have questions or need more information about your rights and benefits, ask your supervisor or your personnel office.
- Definitions for any coded data in Blocks 1-24, 27-39 and 45-50 may be found in Federal Personnel Manual Supplement 292-1.

**It is your responsibility to read all the information on the front of this notice and tell your personnel office immediately if there is an error in it.**

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| | | | | 02/18/2025 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5–A. Code | 5–B. Nature of Action | 6–A. Code | 6–B. Nature of Action |
| 357 | TERMINATION | | |
| 5–C. Code | 5–D. Legal Authority | 6–C. Code | 6–D. Legal Authority |
| A3M | CS RULE V | | |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | | | | | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | .00 | | .00 | | .00 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| FEDERAL EMERGENCY MGMT AGENCY | |
| | 1B |
| | HS CB6103000502030000   PP 03 2025 |

## EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|
| 6 | 1 – None   3 – 10–Point/Disability   5 – 10–Point/Other<br>2 – 5–Point   4 – 10–Point/Compensable   6 – 10–Point/Compensable/30% | | 2 | 0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | | X   YES          NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   BASIC | 9   NOT APPLICABLE | 0   NOT APPLICABLE |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KF   FERS (FRAE) | | F   FULL TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2   1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | E   E – Exempt<br>N – Nonexempt | | 1059 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON  DIST OF COLUMBIA  DC |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

**45. Remarks**

SEPARATED BY ORDER OF OFFICE OF PERSONNEL MANAGEMENT DATED          FOR
2/17/2025 VIOLATION OF CS V
NOT ENTITLED TO SEVERANCE PAY.
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
SF-2819 WAS PROVIDED. LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS
DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NON-
GROUP CONTRACT).
HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE
ELIGIBLE TO CONVERT TO INDIVIDUAL POLICY (NONGROUP CONTRACT). YOU ARE
ALSO ELIGIBLE FOR TEMP CONTINUATION OF YOUR FEHB COVERAGE FOR UP TO
18 MTHS

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| HOMELAND SECURITY | ELECTRONICALLY SIGNED BY: |
| | JULIE WOZNIAK |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|
| | | 02/18/2025 | DIRECTOR, TITLE V STAFFING DIVISION |

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| ██████████ | | ██████████ | ██████████ | 02/13/2025 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5–A. Code<br>385 | 5–B. Nature of Action<br>TERMINATION DURING PROB / TRIAL PERIOD | 6–A. Code | 6–B. Nature of Action |
| 5–C. Code<br>L2M | 5–D. Legal Authority<br>REG 315.804. | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| ██████████ | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | ██ | ██ | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| ██ | ██ | ██ | ██ | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| OPM<br>██████████<br>██████████<br>██████████ | |

### EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 – None    3 – 10–Point/Disability    5 – 10–Point/Other<br>2 – 5–Point    4 – 10–Point/Compensable    6 – 10–Point/Compensable/30% | 2 | 0 – None    2 – Conditional<br>1 – Permanent    3 – Indefinite | TG | YES    X    NO |

| 27. FEGLI<br>C0 | BASIC ONLY | 28. Annuitant Indicator<br>9 | NOT APPLICABLE | 29. Pay Rate Determinant<br>0 |
|---|---|---|---|---|

| 30. Retirement Plan<br>KF    FERS FRAE AND FICA (FULL) | 31. Service Comp. Date (Leave)<br>██████████ | 32. Work Schedule<br>F    FULL TIME | 33. Part–Time Hours Per<br>Biweekly<br>Pay Period |
|---|---|---|---|

### POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 | 1 – Competitive Service    3 – SES General<br>2 – Excepted Service    4 – SES Career Reserved | N | E – Exempt<br>N – Nonexempt | 05MA0 | 2286 |

| 38. Duty Station Code<br>11-0010-001 | 39. Duty Station (City – County – State or Overseas Location)<br>WASHINGTON  DISTRICT OF COLUMBIA  DC |
|---|---|

| 40. Agency Data | 41. | 42.<br>0000 | 43.<br>33.94 | 44.<br>HIGH RISK (HR) |
|---|---|---|---|---|

| 45. Remarks |
|---|
| SF 2819 WAS PROVIDED.  LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT).<br>HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT). YOU ARE ALSO ELIGIBLE FOR TEMPORARY CONTINUATION OF YOUR FEHB COVERAGE FOR UP TO 18 MONTHS. ██████████<br>NOT ENTITLED TO SEVERANCE PAY.<br>LUMP–SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE. |

| 46. Employing Department or Agency<br>OPM | 50. Signature/Authentication and Title of Approving Official<br>ELECTRONICALLY SIGNED BY:<br>CARMEN GARCIA-WHITESIDE<br>CHIEF HUMAN CAPITAL OFFICER AND DIRECTOR OF OPM HR |
|---|---|
| 47. Agency Code<br>██ | 48. Personnel Office ID<br>██ | 49. Approval Date<br>02/21/2025 | |

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

JA718

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| ▮▮▮▮▮▮▮▮ | | ▮▮▮▮▮▮ | ▮▮▮▮▮ | 02/14/2025 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| **5-A. Code** 357 | **5-B. Nature of Action** TERMINATION | **6-A. Code** | **6-B. Nature of Action** |
| **5-C. Code** ZLM | **5-D. Legal Authority** 5 CFR PART 315 | **6-C. Code** | **6-D. Legal Authority** |
| **5-E. Code** | **5-F. Legal Authority** | **6-E. Code** | **6-F. Legal Authority** |

| 7. FROM: Position Title and Number | | | | | 15. TO: Position Title and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮▮ | | | | | | | | | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮ | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| ▮▮▮▮▮▮▮▮ | |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 = None  3 = 10-Point/Disability  5 = 10-Point/Other  2 = 5-Point  4 = 10-Point/Compensable  6 = 10-Point/Compensable/30% | 2 — 0 = None  2 = Conditional  1 = Permanent  3 = Indefinite | | YES  X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0  BASIC ONLY | 9  NOT APPLICABLE | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KR  FERS-RAE & FICA | ▮▮▮▮ | F  FULL-TIME | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 — 1 = Competitive Service  3 = SES General  2 = Excepted Service  4 = SES Career Reserved | E — E = Exempt  N = Nonexempt | | 8888 |

| 38. Duty Station Code | 39. Duty Station (City — County — State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON,DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. ▮▮▮▮ | 42. EDUC LVL 17 | 43. SUPV STAT 8 | 44. POSITION SENSITIVITY MODERATE RISK |
|---|---|---|---|---|

**45. Remarks**

FORWARDING ADDRESS: ▮▮▮▮▮▮▮▮▮▮
SF 2819 WAS PROVIDED.  LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO
  CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT).
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
REASON(S) FOR TERMINATION: PER OPM 01/20/25
SICK LEAVE WILL BE RECREDITED TO AN EMPLOYEE'S ACCOUNT IF REEMPLOYED FOLLOWING A BREAK IN SERVICE.
SF-8 (NOTICE TO FEDERAL EMPLOYEE ABOUT UNEMPLOYMENT INSURANCE) ISSUED.

| 46. Employing Department or Agency  IN - INDIAN AFFAIRS | 50. Signature/Authentication and Title of Approving Official  250711879 / ELECTRONICALLY SIGNED BY: |
|---|---|
| **47. Agency Code** ▮▮▮ | **48. Personnel Office ID** ▮▮▮ | **49. Approval Date** 02/25/2025 | RHONDA HOGSTAD  HR SPECIALIST |

| 5-Part 50-316 | 2 - OPF Copy - Long-Term Record - DO NOT DESTROY | Editions Prior to 7/91 Are Not Usable After 6/30/93  NSN 7540-01-333-6238 |
|---|---|---|

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

**NOTIFICATION OF PERSONNEL ACTION**

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| | | | | 03/07/2025 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 385 | TERMINATION DURING PROB / TRIAL PERIOD | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| L2M | REG 315.804. | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | |

| 8. Pay Plan | 9.Occ. Code | 10.Grade or Level | 11.Step or Rate | 12. Total Salary | 13.Pay Basis | 16. Pay Plan | 17. Occ. Code | 18.Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | PA | | | | | | |
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj Basic Pay | 12D. Other Pay | | | 20A. Basic Pay | | 20B. Locality Adj. | | 20C. Adj. Basic Pay | 20D. Other Pay |
| | | | $0 | | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| PUBLIC BUILDINGS SERVICE | |

**EMPLOYEE DATA**

| 23. Veterans Preference | | | | 24. Tenure | | | 25. Agency Use | 26. Veterans Pref for RIF |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | | | 2 | 0 - None  2 - Conditional  1 - Permanent  3 - Indefinite | | JC | YES  X NO |
| 2 - 5-Point | | | | | | | | |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
|---|---|---|---|---|
| E1 | BASIC + OPTION C (1X) | 9 | NOT APPLICABLE | 0 |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|
| KF | FERS FRAE AND FICA (FULL) | | F | FULL TIME | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1 | 1 - Competitive Service  3 - SES General  2 - Excepted Service  4 - SES Career | E - Exempt  E  N - Nonexempt | 192.P1121202.60.11.000.. | 1217 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 11-0010-001 | WASHINGTON DISTRICT OF COLUMBIA DC |

| 40. | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | 0000 | 33.94 | MODERATE RISK (MR). |

45. Remarks

SF 2819 WAS PROVIDED. LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT).

HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT). YOU ARE ALSO ELIGIBLE FOR TEMPORARY CONTINUATION OF YOUR FEHB COVERAGE FOR UP TO 18 MONTHS.

NOT ENTITLED TO SEVERANCE PAY.

LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.

OPF RETAINED BY WWW.ARCHIVES.GOV

REASON(S) FOR TERMINATION: PER THE OFFICE OF PERSONNEL MANAGEMENT (OPM), GUIDANCE ON PROBATIONARY PERIODS, ADMINISTRATIVE LEAVE AND DETAILS. JANUARY 20, 2025.

SF-8 ISSUED TO EMPLOYEE.

| 46. Employing Department or Agency | | | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|---|
| PUBLIC BUILDINGS SERVICE | | | ELECTRONICALLY SIGNED BY: |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | JOSETTE I. COLYNE |
| | | 03/07/2025 | SUPERVISORY HUMAN RESOURCES SPECIALIST |

5-Part        2 - OPF Copy - Long-Term Record -- DO NOT DESTROY        Editions Prior to 7/91 Are Not Usable After 6/30/9

**JA720**

# NOTICE TO EMPLOYEE

### This is your copy of the official notice of a personnel action. Keep it with your records because it could be used to make employment, pay, and qualifications decisions about you in the future.

## The Action

- Blocks 5-B and 6-B describe the personnel action(s) that occurred.
- Blocks 15-22 show the position and organization to which you are assigned.

## Pay

- When the personnel action is an award or bonus, block 20 shows the amount of that one-time cash payment. When the action is not an award or bonus, block 12 shows your former total annual salary, and block 20 shows your new total annual salary (block 20C plus 20D). The amounts in blocks 12 and 20 do not include any one-time cash payments (such as performance awards and recruitment or relocation bonuses) or payments that may vary from one pay period to the next (such as overtime pay), or other forms of premium pay.
- Block 20A is the scheduled amount for your grade and step, including any special salary rate you receive. It does not include any locality-based pay. This rate of pay serves as the basis for determining your rate of pay upon promotion, change to a lower grade, or reassignment, and is used for pay retention purposes.
- Block 20B is the annual dollar amount of your interim Geographic Adjustment or, beginning in 1994, your locality-based comparability payment.
- Block 20C is your Adjusted Basic Pay, the total of blocks 20A and 20B. It serves as the basis for computing your retirement benefits, life insurance, premium pay, and severance pay.
- Block 20D is the total dollar amount of any Retention Allowances, Supervisory Differentials, and Staffing Differentials that are listed in the remarks block. These payments are made in the same manner as basic pay, but are not a part of basic pay for any purpose.

## Block 24 - Tenure

- Identifies the nature of your appointment and is used to determine your rights during a reduction in force (RIF). Tenure groups are explained in more detail in subchapter 26 of FPM Supplement 296-33 and RIF is explained in FPM Supplement 351-1; both should be available for review in your personnel office.

## Block 26 - Veterans Preference to RIF

- Indicates whether you have preference for reduction-in-force purposes.

## Block 30 - Retirement Plan

- **FICA** - Social Security System
- **CS** - Civil Service Retirement System
- **CS-Spec** - Civil Service Retirement System for law enforcement and firefighter personnel
- **FS** - Foreign Service Retirement and Disability System
- **FERS** - Federal Employees' Retirement System
- **FERS-Reserve Tech** - Federal Employees' Retirement System for National Guard Reserve Technicians
- **FERS-ATC** - Federal Employees' Retirement System for Air Traffic Controllers
- **FERS-Spec** - Federal Employees' Retirement System for law enforcement and firefighter personnel
- **FSPS** - Foreign Service Pension System

## Block 31 - Service computation Date (Leave)

- Shows when your Federal service began unless you have prior creditable service. If so, this date is constructed to include your total years, months and days of prior creditable civilian and military service.
- Full-time employees with fewer than 3 years of service earn 4 hours of annual leave each pay period; those with 3 or more years but less than 15 years earn 6 hours each pay period; and those with 15 or more years earn 8 hours each pay period.
- Your earnings and leave statement or your time and attendance card will

## Block 32 - Work Schedule

- Your work schedule is established by your supervisor.
- A full-time employee works on a prearranged scheduled tour of duty that is usually 40 hours per week. A part-time employee has a prearranged scheduled tour of duty that is usually between 16 and 32 hours per week. An intermittent employee has no prearranged scheduled tour of duty and works when needed.

Full-Time and part-time employees whose appointments are for 90 days or more are usually eligible to earn annual leave; intermittent employees are not. Seasonal employees work on an annually recurring bases for periods of less than 12 months each year; they may have a full-time, a part-time, or an intermittent schedule during their work season.

On-call employees work during periods of heavy workload and are in pay status for at least 6 months of each year; they may have either a full-time or a part-time schedule when they are in pay status.

## Block 33 - Part-time Hours Per Biweekly Pay Period

Indicates the number of hours a part-time employee is scheduled to work during a two-week pay period.

## Block 34 - Position Occupied

Identifies the employment system under which you are serving -- the Competitive Service, the Excepted Service, or the Senior Executive Service (SES).

The employment system determines your eligibility to move to other jobs in the Federal service, your rights in disciplinary and adverse actions, and your eligibility for reemployment if you have Federal service.

## Block 35 - FLSA Category

Exempt employees are not covered by the minimum wage and overtime law (the Fair Labor Standards Act); nonexempt employees are covered.

## Block 37 - Bargaining Unit Status

Identifies a bargaining unit to which you belong, whether or not your are actually a member of a labor organization. Code "7777" indicates you are eligible but not in a bargaining unit; code "8888" indicates you are ineligible for inclusion in a bargaining unit.

## Block 38 and 39 - Duty Station

Identifies the city, county, and state or the overseas location, where you actually work.

# OTHER INFORMATION

- If your appointment entitles you to elect health benefits or life insurance, and you have not been provided materials explaining the programs available and the enrollment forms, contact your personnel specialist.

- Your personnel specialist will also tell you if your position is covered by an agreement between an employee organization (union) and your agency. If you are eligible to and elect to join an employee organization, you can elect to have your dues withheld from your salary.

- If you have questions or need more information about your rights and benefits, ask your supervisor or your personnel office.

- Definitions for any coded data in Blocks 1-24, 27-39 and 45-50 may be found in Federal Personnel Manual Supplement 292-1.

### It is your responsibility to read all the information on the front of this notice and tell your personnel office immediately if there is an error in it.

## JA721

Exhibit I

**From:** ███████████████ on behalf of CPC eOPF
**To:** ███████████████
**Subject:** Important: Separation Packet Regarding Your Departure from GSA
**Date:** Thursday, March 13, 2025 7:01:28 PM
**Attachments:** ███████████

Dear ███████████,

Please find attached a separation packet outlining details regarding your departure from General Services Administration, effective 03/07/2025. This packet includes information about your benefits continuation, and necessary paperwork to complete the separation process.

If you have any questions regarding the information provided, please contact the designated email address as stated in the separation letter. A separate email will follow with the password to open the attachment.

Please do not reply to this email. For any further correspondence, please direct your inquiries to rif@gsa.gov.

Best regards,
General Services Administration
Processing and Personnel Records Center

GSA eOPF/OPF Team
Processing and Personnel Management Center (PPRM)
2300 Main Street 2NW
Kansas City, Missouri 64108

Exhibit J

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv-00748-JKB |

---

**DECLARATION OF ▮▮▮▮▮▮▮▮▮**

I, ▮▮▮▮▮▮▮ swear under penalty of perjury,

1.  My name is ▮▮▮▮▮▮ and I am an adult resident of ▮▮▮▮▮▮ Minnesota.

2.  I was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a team in the Center for Leadership Development within the Human Resources Solutions subagency at the Office of Personnel Management (OPM). My start date was September 9, 2024., and my duty station was ▮▮▮▮▮ Minnesota.

3.  OPM classified me as a probationary employee. My probationary period was one year, or until approximately September 9, 2025.

4.  I was hired to join the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████

███████████████████████████████████████████

5.     On February 13, 2025, I was terminated along with eight other probation colleagues ███████████ and nearly 100 employees across OPM. We were first informed of our termination via a Microsoft Teams video broadcast where an unnamed individual informed us that we would be receiving a termination notice via email shortly, and it would include the reason for termination. Shortly after the video call ended, I received a letter via email informing me of my termination and the reason. A true and correct copy of the letter is attached to this declaration as Exhibit 1. The letter stated that "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that effective at the **close of business today (February 13, 2025)**, you are being terminated from your position with the Agency and the federal civil service during your probationary period."

6.     My supervisor and leadership within the ███ were never informed that we were being terminated; our supervisors only found out from me and my fellow terminated colleagues directly when we messaged them via our team's Slack during the short window we had before being locked out. In fact, on the morning of my termination, the leadership team assigned me to new project work, which I do not believe they would have done if I was being let go for poor performance.

7.     I am now unemployed. I have applied for unemployment insurance benefits with the State of Minnesota. I have also lost my health benefits and have applied for medical assistance with Hennepin County to get medical coverage.

8.      Prior to my termination, I received a positive performance review from both my supervisor and the ███ managing director on February 7, 2025, stating that I was performing at or above the Fully Successful level at that time (and had performed at or above Fully Successful for their entire time as an employee of OPM).  The review also noted that neither my Rating Official nor my Reviewing Official had any evidence of poor/sub-standard performance by me, and thus neither my Rating Official nor my Reviewing Official provided any such evidence through any forum or channel at any time.

9.      Although I only served since September, I loved my job and was honored to be a civil servant. I took a 25% pay cut from my last job for this role but was willing to do so in order to serve my country. In addition to mourning the loss of opportunities to serve the American public, I am devastated by the impact that this will have on my career path and earning potential in the long run; I am currently seeking employment for positions that are mostly another pay cut from my Federal government salary.

Dated: __3-17-25__                         Signed ████████████

Exhibit 1

MEMORANDUM FOR: ██████████████████

FROM:            CHARLES EZELL
                 Acting Director
                 Office of Personnel Management

DATE:            February 13, 2025

SUBJECT:         Termination During Probationary Period

REFERENCES:      5 U.S.C. § 7511
                 5 C.F.R. §§ 315.803 and 315.804

On September 09, 2024, you were hired on a competitive service appointment as ██████████ ███████████████████████████████████████ at the U.S. Office of Personnel Management (OPM) with a one-year probationary period beginning September 09, 2024.

An appointment is not final until the probationary period is over, and the probationary period is part of the hiring process for employees.[37] A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service.[38] Until the probationary period has been completed, a probationer has the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual.[39]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that effective at the **close of business today (February 13, 2025)**, you are being terminated from your position with the Agency and the federal civil service during your probationary period.

If you believe your termination was based on your partisan political affiliation or marital status, you may appeal your termination with the Merit Systems Protection Board (MSPB). Should you elect to appeal to the MSPB, your appeal must be in writing and must be submitted no later than

---

[37] OPM, *Practical Tips for Supervisors of Probationers*.
[38] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005).
[39] *Id*.

████████████████████

30 calendar days after the effective date of this termination, or 30 days after the date of your receipt of this decision, whichever is later. If you do not submit your appeal within this time limit, it will be dismissed as untimely filed unless a good reason for the delay is shown. An appeal form and copy of the MSPB's procedures and rules may be found at https://www.mspb.gov/appeals/forms.htm. The mailing address to which an appeal should be sent is:

Merit Systems Protection Board
Central Regional Office
230 South Dearborn Street, 31st Floor
Chicago, IL 60604-1669

Alternatively, an electronic appeal may be filed at https://e-appeal.mspb.gov/. See "How to File an Appeal" at http://www.mspb.gov/appeals/appeals.htm.

If you believe this termination is being taken in whole or in part because of discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, and/or reprisal for prior EEO activity, you may file a discrimination complaint with the OPM Center for Equal Employment Opportunity by contacting an EEO Counselor within forty-five (45) days of the effective date of your termination. This office can be reached at (202) 606-0359 or via email at EEO@opm.gov.

If you believe this action is in retaliation for your making protected whistleblowing disclosures, you may also seek corrective action from the U.S. Office of Special Counsel (OSC). If you do so, your appeal may be limited to whether the Agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures, and you will not be able to challenge the decision on other bases in that action. To seek corrective action from the OSC, you may submit your complaint online. More information on or about filing a complaint with the OSC may be found at https://osc.gov/Pages/File-Complaint.aspx. As an alternative, you may communicate in writing to the following address:

Complaints Examining Unit
U.S. Office of Special Counsel
1730 M Street, N.W., Suite 218
Washington, DC 20036-4505

Please note that you must return your Personal Identity Verification (PIV) badge and any other government issued equipment in your possession. Your organization will reach out with further information regarding your offboarding.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact OPMHumanResources@opm.gov.

Exhibit K

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

---

| | |
|---|---|
| STATE OF MARYLAND, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., <br><br> Defendants. | Case No.: 1:25-cv-00748-JKB |

---

### DECLARATION OF ███████████

I, ███████████, swear under penalty of perjury,

    1.    My name is ███████████ and I am an adult resident of ███████ Maryland.

    2.    I began working for the National Archives and Records Administrator ("NARA")

as an ███████████████████████████ on approximately July 2, 2023. My duty

station was Washington, D.C.

    3.    From the date of my hire, NARA classified me as a probationary employee. My

probationary period was two years, or until approximately July 1, 2025.

    4.    On February 18, 2025, I received a video call via Teams from ███████████

███████████████ my supervisor, ███████████ ███████████

███ and a union representative. On the call, they stated that, an hour prior, they had received

a call instructing them to terminate all probationary employees at OFR. ███████████

and the HR representative made clear that it was not their decision to terminate my employment

and that they were following instructions. ███████████████ both stressed that my job

performance was excellent and that NARA was not terminating me based on my job performance.

     5.     Later that day, I received a Notification of Termination During Probationary Period by email from NARA. The notice stated that "[i]n accordance with the direction to agencies to reduce budgets, implement a hiring freeze, reorganize and reprioritize our work and prepare for a reduction in force, we have come to the conclusion that we cannot continue with the current staffing levels." It then stated I was being terminated on this basis. The email did not identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

     6.     The February 18, 2025 Teams meeting was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

     7.     On March 19, 2025, I received a notice by email from ███████████████████ that I was being reinstated to my position effective this coming Monday, March 24, 2025. The notice gives no reason why I am being reinstated.

     8.     Between February 18, 2025 and my reinstatement on March 25, 2025, I have been unemployed. I applied for and received unemployment insurance benefits with the D.C. government.

     9.     During my period of unemployment, and likely for several weeks more, I have not been able to afford to support the local economy in the same way. Unemployment insurance benefits barely covers my mortgage and utility bills, not to mention food. I have stopped all other non-essential spending. Even though NARA is reinstating me, it will take me some time to get back on my feet.

10.     As a resident of Maryland, I pay income taxes to the state of Maryland. Each pay period, NARA withheld and paid income taxes from my paycheck to the state of Maryland.

11.     I was a ███████ and earned a salary of approximately ███████ per year.

12.     Before I was terminated, my job duties as ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

13.     In the year and a half I worked at NARA, I received two performance reviews.  In both, I received a rating of Highly Successful.  I never received any feedback that there were issues with my job performance.

Dated: 3/20/25                    Signed: ███████████

Exhibit 1



**Fwd:** ███████████████████ **- Notification of Termination During Probationary Period**

███████████████████                                    Tue, Feb 18, 2025 at 3:10 PM

Begin forwarded message:

**From:** labor.relations@nara.gov
**Date:** February 18, 2025 at 3:08:57 PM EST
**To:** ████████████
**Cc:** ████████████
**Subject:** ████████████ **- Notification of Termination During Probationary Period**
**Reply-To:** labor.relations@nara.gov

February 18, 2025

MEMORANDUM FOR ████████████████████████████

FROM:            ████████

                 ████████████████████

SUBJECT:         Notification of Termination During Probationary Period

REFERENCES:      5 U.S.C. § 7511

5 U.S.C. § 3321(a)

5 C.F.R. §§ 315.803 and 804

5 C.F.R. § 316.304

NARA 307

This is to provide notification that the Agency is terminating you from your position of TECHNICAL WRITER-EDITOR and federal service consistent with the above references.

**JA736**

Case 1:25-cv-00748-JKB          Document 78-14          Filed 03/20/25          Page 7 of 8

On June 30, 2024, the Agency appointed you to the position of ████████████████. As documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position. This probationary period is the final step of the examination process. An employee serving a probationary period may be terminated during the one-year probationary period for any legitimate reason, e.g., performance, conduct, budget, etc. You were made aware of and voluntarily accepted all these terms when you entered your position on June 30, 2024.

In its January 20, 2025, memorandum entitled Guidance on Probationary Periods, Administrative Leave and Details, OPM advised that "[p]robationary periods are an essential tool for agencies to assess employee performance and manage staffing levels." In accordance with the direction to agencies to reduce budgets, implement a hiring freeze, reorganize and reprioritize our work and prepare for a reduction in force, we have come to the conclusion that we cannot continue with the current staffing levels.

For these reasons, I regret to inform you that I am terminating you from your position of ████████████████████ with the agency and the federal civil service effective today.

Upon receipt of this termination notice, you are obligated to return all NARA issued property and your NARA identification card, in proper working condition, to me. You may be held personally liable for the value of any NARA issued property not returned.

If you believe your probationary designation was erroneous, please contact labor.relations@nara.gov.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors. If you have any questions, please contact labor.relations@nara.gov.

You may appeal this decision to the Merit Systems Protection Board (MSPB) if you allege that this action was based on partisan political reasons or marital status.

If you elect to appeal to the MSPB, your appeal must be filed no later than 30 days after the effective date of this action, or 30 days after the date you receive this letter, whichever is later. If you do not submit an appeal within the time set by statute, regulation, or order of the judge, your appeal will be dismissed as untimely unless a good reason for the delay is shown. MSPB's regulations may be found at www.mspb.gov. An appeal may be prepared and filed electronically at http://e-appeal.mspb.gov. The MSPB strongly encourages electronic filing to reduce delays caused by their increased telework posture.

Alternatively, while it is not recommended, you may choose to submit your MSPB appeal using the attached MSPB Form 185. Mail the hard copy to the appropriate MSPB office based on your location, which can be found at the following website:

Merit Systems Protection Board

https://www.mspb.gov/about/contact.htm

If you have prior military service and believe this action was based on discrimination for that service, you may file a complaint with the Department of Labor or file an appeal directly with the MSPB. If you first file an appeal with the Department of Labor, you may not file an appeal with the MSPB until the Department of Labor notifies you that it was unable to resolve the complaint.

If you allege the action taken against you was based in whole or in part on discrimination because of race, color, religion, sex, age (over 40), national origin, or disability, you may appeal the discrimination allegation with the Equal Employment Opportunity Commission (EEOC). To begin this process, you must contact a counselor at (301) 837-0939 in NARA's Office of Equal Employment Opportunity (NEEO) within 45 calendar days of the effective date of this action. Failure to contact an EEO counselor within the 45-calendar day timeframe may result in the dismissal of your appeal.

You may seek corrective action by the Office of Special Counsel (OSC) at www.osc.gov. Your appeal will be limited to a determination as to whether the agency took one or more covered personnel actions against you in retaliation for making one or more protected whistleblowing disclosures, which constitutes a prohibited personnel practice in accordance with Title 5 United States Code (USC) 2302(b). If OSC dismisses your claim, you may file

**JA737**

an individual right of action (IRA) appeal to MSPB, but MSPB will only adjudicate whether you proved that your protected disclosure was a contributing factor in the effected action.

Whichever is filed first, an appeal to the MSPB, or a discrimination complaint, shall be considered an election by you to proceed under that appeal process. Once you elect a forum, you will not be able to challenge the action in a different forum.

Should you appeal this action in any forum, you are expected to notify the forum that the following individual should receive a copy of your appeal:

National Archives and Records Administration

Stephani Abramson

Counsel for Procurement and Employment Law

Office of General Counsel

8601 Adelphi Road, Room 311

College Park, MD 20740

(301) 837-1888

Fax: (301) 837-0293

Stephani.Abramson@nara.gov

A Standard Form 50 effecting your termination will be forwarded to you when available. If you have any questions concerning this letter, please contact Labor.Relations@nara.gov with the subject line Probationary Separation.

Please acknowledge receipt using the form link below and keep a copy of this letter for your records.

Acknowledgement of Termination During Probationary Period

Attachment: MSPB Form 185, Merit Systems Protection Board Appeal Form

**JA738**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL., | |
| Plaintiffs, | |
| v. | Case No.: 1:25-cv-00748-J   B |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., | |
| Defendants. | |

**DECLARATION OF** ███████████

I, ██████████, swear under penalty of perjury:

    1.     My name is ████████, and I am an adult resident of Bethesda, Maryland.

    2.     I began working for the Department of Defense (Defense) as a ███████ at the ████████████████████████████████████ which is overseen by the Defense ealth Agency, on February 10, 2025.  My duty station was Bethesda, Maryland.

    3.     From the date of my hire, Defense classified me as a probationary employee.  My probationary period was one year, or until appro  imately February 10, 2026.

    4.     On March 5, 2025, I received by email a notice signed by Stephen L. Ferrara that Defense was terminating my employment effective March 26, 2025.     E  hibit 1.

    5.     The notice cites guidance from the Office of Personnel Management (OPM), including that "OPM has instructed Agencies to consider whether an employee's performance is in the best interest of the government, in light of the President's directive to dramatically reduce the size of the federal workforce."

1

6.     The March 5, 2025, termination notice I received also states, "Based on the OPM guidance referenced above, ███ finds, based on your performance, that you have not demonstrated that your further employment with ███ would be in the public interest. For this reason, ███ informs you that ███ is removing you from your position of ███ with ███ and the federal civil service effective March 26, 2025."

7.     The March 5, 2025, termination notice from Stephen L. Ferrara was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

8.     I know of at least one other probationary employee at ███ who received this same letter signed by Stephen L. Ferrara. I believe, based on news reports and conversations with former colleagues, that Defense has terminated dozens of probationary employees since March 3, 2025.

9.     Less than an hour after I received the March 5, 2025, termination notice, my supervisors, ███ and ███, met with me in my office. ███ is the ███, and ███ at ███ and my direct supervisor. ███ and ███ are my sole supervisors at ███. Both ███ and ███ offered to draft letters of recommendation to support me in finding new employment.

10.    ███ sent her recommendation letter to me by email on March 6, 2025. *See* Exhibit 2. It states that ███ offers her "strongest recommendation for ███." ███ writes, ███ was only permitted to work for the ███ for a few weeks before the Defense Health Agency decided to dismiss her from Federal service citing her status as a probationary employee. This classification solely indicates that ███ was in her first year of service with our ███ and in no way reflects the quality or impact of her performance.

2

**JA740**

Although D  A cited that ████████ did not  demonstrate that [her] further employment with

████ would be in the public interest' my e  perience as the ████████ was precisely counter

to D  A's findings. ████████ consistently demonstrated initiative, a strong work ethic, and a

commitment to e  cellence which would benefit our ████, ████████  and the Department

of Defense.    er achievements are quite remarkable, particularly in light of her short time with

the ███ ."

      11.    Also on March 6, 2025, ██ emailed me a letter of recommendation.    E  hibit

3. ███ wrote, "My assessment is that ████████ demonstrated fully successful performance

in all elements of the job.  Neither I nor ████████ initiated the termination of ████████

employment. The decision to terminate ████████ employment was not based on any

assessment conducted by myself nor by ████████ ."

      12.    I am now on administrative leave and will be unemployed effective March 26,

2025.  I am actively searching for new employment.  If I am unable to find new employment, I

will consider applying for unemployment insurance benefits with the Maryland government, if I

am eligible.

      13.    I can no longer afford to support the local economy in the same way.  I have cut

my spending to the bare minimum.  For e  ample, I can no longer afford to dine at restaurants or

to shop at local businesses.

      14.    I pay income ta  es to the government of Maryland.  Each pay period, Defense

withheld and paid income ta  es from my paycheck to the Maryland government.

      15.    Before I was terminated, my job duties as a ████████ included ████████

████████████████████████████████████████████

████████████ .

3

16.    I was a ███████, step █, and earned a salary of approximately $██████ per year.

17.    I had not yet received formal performance evaluations during my tenure as a

███████.  However, both of my supervisors consistently gave me positive, informal feedback

about my performance.


Dated: <u>March 18, 2025</u>                              Signed: ████████████
                                                                   ████████████

                                                  *A copy of the signature page
                                                  bearing an original signature is
                                                  attached hereto.

4

**JA742**

16. I was a ▮▮▮▮, step ▮, and earned a salary of approximately ▮▮▮▮ per year.

17. I had not yet received formal performance evaluations during my tenure as a ▮▮▮▮ However, both of my supervisors consistently gave me positive, informal feedback about my performance.

Dated: 03/18/25 _____

Signed ▮▮▮▮▮▮▮▮▮▮ _____

*A copy of the signature page bearing an original signature is attached hereto.

4

**JA743**

# EXHIBIT 1



THE ASSISTANT SECRETARY OF DEFENSE

1200 DEFENSE PENTAGON
WASHINGTON, DC 20301-1200

**HEALTH AFFAIRS**

MAR 0 5 2025

MEMORANDUM FOR██████████  ██████████  ██████████████

FROM: STEPHEN L. FERRARA, ACTING ASSISTANT SECRETARY OF DEFENSE FOR
       HEALTH AFFAIRS

SUBJECT: Notification of Termination During Probationary Period

REFERENCES:    5 U.S.C. § 7511
               5 U.S.C. § 3321(a)
               5 C.F.R. §§ 315.803 and 804
               5 C.F.R. § 316.304

   This is to provide notification that the ████████████████████
████████ is removing you from your position of ████████ and federal service during your
probationary/trial period consistent with the above references.

   On February 10, 2025, ████ appointed you to the position of ████████ As documented
on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial
period. ████ also informed you of this requirement in the job opportunity announcement for the
position.

   Guidance from the Office of Personnel Management ("OPM") states, "An appointment is
not final until the probationary period is over," and the probationary period is part of "the hiring
process for employees."[1] "A probationer is still an applicant for a finalized appointment to a
particular position as well as to the Federal service."[2] "Until the probationary period has been
completed," a probationer has "the burden to demonstrate why it is in the public interest for the
Government to finalize an appointment to the  civil service for this particular individual."[3]
Furthermore, OPM has emphasized that individual employee performance measurement should be
aligned with and support organizational goals and focus employee efforts on achieving
organizational and group goals. In addition, OPM has instructed Agencies to consider whether an
employee's performance is in the best interest of the government, in light of the President's
directive to dramatically reduce the size of the federal workforce.

   Based on the OPM guidance referenced above, ████ finds, based on your performance,
that you have not demonstrated that your further employment with ████ would be in the public

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] See U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

**JA745**

▮▮▮▮▮ ▮▮▮ ▮▮▮▮ reason, ▮▮▮ ▮▮▮▮▮ you that ▮▮ ▮ ▮ removing you from your position of ▮▮▮▮▮▮ with ▮▮▮ ▮▮▮ the federal civil service effective March 26, 2025.

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this notice or 30 days after the date of your receipt of this notice, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office at (202) 653-7200.

We appreciate your service to the ▮▮▮ and wish you the greatest of success in your future endeavors. If you have any questions, please contact ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Stephen L. Ferrara, M.D.
Acting

**JA746**

# EXHIBIT 2

6 March, 2025

To Whom It May Concern,

I offer my strongest recommendation for ████████ for a position in your organization based on her exceptional performance and contributions during her time at ████████ ████████████████ at the ████████████████ from Feb 10, 2025 - March 5, 2025.

████████████ was only permitted to work for the ████ for a few weeks before the Defense Health Agency decided to dismiss her from Federal service citing her status as a probationary employee. This classification solely indicates that ████████████ was in her first year of service with our ██████ and in no way reflects the quality or impact of her performance. Although DHA cited that ████████████ did not "demonstrate that [her] further employment with ████ would be in the public interest" ; my experience as the ████████████ was precisely counter to DHA's findings. ████████████ consistently demonstrated initiative, a strong work ethic, and a commitment to excellence which would benefit our ████████████████, and the Department of Defense. Her achievements are quite remarkable, particularly in light of her short time with the ████. In the little time she was permitted to support the ████, ████████████:

- ████████████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████████
- ████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ██████████████████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████████
  ████████
- ████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████



These accomplishments demonstrate ▮▮▮▮▮▮▮ dedication to improving ▮▮▮▮▮▮▮, supporting military personnel, and contributing to national defense. Her ability to learn quickly, take initiative, and work independently make her a valuable asset to any organization.

I am confident that ▮▮▮▮▮▮ will continue to excel in her future endeavors. Please do not hesitate to contact me if you have any further questions.

Sincerely,

# EXHIBIT 3



March 6, 2025

To Whom It May Concern,

███████      held the position of ████████  at the ██████████████████████ from February 10, 2025 to March 26, 2025. This is a federal civilian position in the competitive service in the ███████████████████████████████████

I served as ████████████  direct supervisor. My supervisor is ██████████████, the ███████. My assessment is that ████████████ demonstrated fully successful performance in all elements of the job. Neither I nor ████████████ initiated the termination of ████████████ employment. The decision to terminate ████████████ employment was not based on any assessment conducted by myself nor by ████████████.

As a new member of our team, ████████████ quickly demonstrated an eagerness to take on challenging projects and to learn new software and processes. She was poised to make important contributions to the ████ and, by extension, ████████████████████.

**JA751**



Should this ▅▅▅▅▅▅ position become available again in the future, I highly recommend ▅▅▅▅▅▅▅▅▅▅ reinstatement to the position. I also highly recommend ▅▅▅▅▅▅▅ for employment in any other entry level professional ▅▅▅▅▅ position. Prospective employers would do well to consider ▅▅▅▅▅▅ for her strong job performance, technical acumen, and dedication to her work.

If you have any questions, please feel free to contact me ▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅

Sincerely,

Exhibit M



**OFFICE OF THE UNDER SECRETARY OF DEFENSE**
**4000 DEFENSE PENTAGON**
**WASHINGTON, D.C. 20301-4000**

MAR – 3 2025

PERSONNEL AND
READINESS

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
　　　　　　　　COMMANDERS OF THE COMBATANT COMMANDS
　　　　　　　　DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Independent Department of Defense Determination to Terminate Probationary
　　　　　Employees

　　　　Consistent with Executive Order 13217, "Commencing the Reduction of the Federal
Bureaucracy," February 19, 2025; Executive Order 14210, "Implementing the President's
'Department of Government Efficiency' Workforce Optimization Initiative," February 11, 2025;
and the Secretary of Defense's clear direction to streamline operations and prioritize critical
missions in order to re-direct scarce and limited resources towards enhancing the lethality and
war fighting capacity of the Department of Defense, the Department is taking independent steps
to reduce the size of the civilian workforce.

　　　　Pursuant to my statutory duties and authorities regarding total force management and
civilian personnel requirements of the Department of Defense established in 10 U.S.C. § 136 and
Department of Defense Directive 5124.02, "Under Secretary of Defense for Personnel and
Readiness (USD(P&R))," June 23, 2008, as amended, I determined it necessary to reduce the
size of the Department's civilian workforce. In conjunction with Secretary of Defense
Memorandum, "Immediate Civilian Hiring Freeze for Alignment with National Defense
Priorities," February 28, 2025, this action is part of the Department's broader effort to
appropriately align its personnel resources with its critical war-fighting functions. The first step
in doing this will be terminating those probationary employees whose continued employment at
the Department would not be in the public interest. These terminations will commence on
Monday, March 3, 2025.

　　　　The Department will continue taking steps to implement President Trump's direction to
restore accountability to the American public, reduce the size of the Federal Government's
workforce through efficiency improvements and attrition, and faithfully and responsibly manage
taxpayer dollars.

　　　　　　　　　　　　　　　　　　Darin S. Selnick
　　　　　　　　　　　　　　　　　　Performing the Duties of the Under Secretary of
　　　　　　　　　　　　　　　　　　　Defense for Personnel and Readiness

**JA754**

Exhibit N

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| STATE OF MARYLAND, *et al.*, |
| Plaintiffs, |
| v. |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, |
| Defendants. |

C.A. No.

## <u>DECLARATION OF KIMBERLY BREITMEYER</u>

I, Kimberly Breitmeyer, declare as follows:

1.     I am a resident of the State of Michigan. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am currently employed by the Michigan Unemployment Insurance Agency (MUIA) as Legal Advisor and Legal & Compliance Bureau Administrator.

3.     The MUIA is responsible for providing unemployment benefits to Michigan workers who have lost their job through no fault of their own.

4.     As Legal Advisor and Legal & Compliance Bureau Administrator, I have access to reports and claimant records that detail the federal employees with workstations in Michigan who have filed a claim for unemployment benefits.  I also oversee the implementation and

1

compliance of federally funded programs within the MUIA, ensuring certain expenditures align with federal guidelines and regulations.

5.    The ongoing mass termination of federal workers is irreparably harming Michigan in several ways.

6.    To the best of my knowledge, the federal departments involved in the reduction of workforce have not provided the MUIA with any notice concerning the mass terminations. Historically, the federal employer provides its employees with a Standard Form 8 (SF 8 - Unemployment compensation for Federal Employees (UCFE) Program Notice to Federal Employee About Unemployment Insurance). The SF 8 provides pertinent information that the MUIA needs to timely process the employee's claim for benefits and avoid unintended errors. For example, the SF 8 provides the precise name of the employer, including its Federal Identification Code (FIC) which is used to request wages. The MUIA shall request but shall not require an employee who is applying for benefits to submit their base period employer's unemployment account number or federal employer identification number. Mich. Comp. Laws § 421.28(8). Without the FIC, the employee is left to select what they think is the name of the employer; often the employee is incorrect, which results in the wage request being sent to the incorrect federal department. This results in a delay in processing the claim for benefits and a delay in remitting payment of the benefits by anywhere from two to four weeks. Further, the lack of a SF 8, a claim for benefits may be monetarily denied due to misidentification of the employer type and name, resulting in claimant having to use the protest process. In short, claimants could be denied benefits simply because they are unaware of the proper FIC maintained by the employer and necessary to file an allowed monetary claim.

2

7.      Additionally, to the best of my knowledge, the federal departments that are terminating staff have also not provided those employees with the Standard Form 50 (SF 50 - Notice of Personnel Action), which provides the reason for separation.  This information is used by the MUIA to determine eligibility for unemployment benefits.  If the claimant provides the separation reason and that reason is wrong, this leads to creation of unnecessary issues to address separation and thereafter could lead to the employer filing a protest and thus a delay in providing a claimant with necessary benefits.

8.      As detailed more below, the MUIA is seeing an increase in claims for unemployment benefits filed by ex-federal workers, who had workstations located in Michigan.  As of last week, the MUIA has allowed 130 claims for benefits and has 171 benefit claims pending wage information from the federal employers.  Again, without the FIC, the MUIA must rely on the employee's information or conduct its own investigation where the employee does not have the proper federal department.  This is resulting in time delays with a few hundred claims.   These delays will only increase with the increase in number of benefit claims filed in the weeks and months to come.

9.      Generally, the Michigan Employment Security (MES) Act (Mich. Comp. Laws § 421.1, *et seq.*), enacted in 1936, provides insurance benefits, over an extended period of time, to persons who become unemployed through no fault of their own.

10.     As a general matter, the federal Government is required to reimburse Michigan for unemployment benefits provided to former federal employees.  Specifically, Michigan is party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees (UCFE) under 5 U.S.C. § 8502(a).

3

**JA758**

11.     Under 5 U.S.C. § 8502(b), Michigan is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under Michigan Unemployment Compensation Law.

12.     In addition, the MUIA administers its federal-state cooperative unemployment insurance program financed in large part by grants from the federal government pursuant to the Social Security Act. 42 U.S.C. §§ 501—503.

13.     The Michigan Unemployment Insurance Compensation Program, certified by the U.S. Secretary of Labor under 42 U.S.C. § 502(a), provides for payment of insurance benefits for up to twenty (20) weeks to persons who find themselves unemployed through no fault of their own.  Mich. Comp. Laws § 421.27(d).  [This statute was recently amended to allow for the payment of benefits for up to twenty-six (26) weeks, effective April 2, 2025.]

14.     Pursuant to Mich. Comp. Laws § 421.32(a), an individual in Michigan who wishes to collect unemployment insurance benefits must file a claim in accordance with promulgated administrative rules and procedures adopted by the MUIA.

15.     Claimants file claims online using the MUIA's claimant system to assert a claim initially and to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for the separation, work experience, and other relevant information.  Mich. Comp. Laws § 421.28(1)(a); § 421.32(a); Mich. Admin. Code, R. 421.205(1) and 421.208(1).

16.     The reason for separation, along with other pertinent information alleged by the claimant, is then transmitted to the claimant's employer(s) for notification of the filing (i.e., a monetary determination). Mich. Comp. Laws § 421.32(b); Mich. Admin. Code, R. 421.205(1). The employer may dispute the contents of the monetary determination, including but not limited

4

**JA759**

to, the reason for the separation, the reported wages earned, etc. Mich. Comp. Laws § 421.32(b); Mich. Admin. Code, R. 421.205(2).

17.     Michigan law disqualifies some claimants from benefits depending on the circumstances of their separation from employment. *See* Mich. Comp. Laws § 421.29–29a. Disqualifying circumstances include termination for misconduct, aggravated misconduct, and gross misconduct. *Id.*

18.     A claims examiner at the MUIA is charged with making an initial determination on the claim. Mich. Comp. Laws § 421.32(a).

19.     If a claimant is determined to be monetarily eligible, if the claimant's most recent base period or benefit year separation was for a reason other than "lack of work," the agency shall issue a determination regarding non-monetary eligibility. Mich. Comp. Laws § 421.32(c).

20.     If a determination involves the resolution of a dispute of material fact, the claims examiner must investigate by issuing a request for information to the employee and her employer(s). Mich. Comp. Laws § 421.32(d).  Once that disputed issue is resolved, a determination must be delivered to the claimant and the employer "promptly."  Mich. Comp. Laws § MCL 421.32(a). If the determination is favorable to the claimant, payments must begin "promptly."

21.     A claimant or employer may file an administrative appeal within 30 days.  Mich. Comp. Laws § 421.32a(1).  If no appeal is filed, the MUIA may redetermine the eligibility, benefit amount, maximum benefits payable, and the decision to recover an overpayment on its own motion. Mich. Comp. Laws § 421.32a(2).  If a redetermination is made, the MUIA must send notice of the redetermination to the claimant and an employer entitled to notice. Mich. Comp. Laws § 421.32a(2).  A redetermination is final unless an appeal is filed, and such appeals

5

**JA760**

may proceed through administrative and then judicial review. Mich. Comp. Laws § 421.32a(3); § 421.33(1); § 421.34(2); § 421.38(1), (4).

22.    The UIA's latest data indicates that approximately 300 former federal employees have applied for unemployment benefits since January 21, 2025.

23.    When an employer provides the initial report of separation to the MUIA, the employer must indicate the reason for the separation, including whether the employee was fired for cause, such as misconduct. If the Agency does not receive the appropriate notice with the separation reason, it relies on the claimant's reason for separation. Later, when the federal department provides the separation information on the Agency's Form 931, the issue may need to be reconsidered resulting in a delay in processing the claim. For example, some claimants are claiming their separation as "fired." While not required to apply for unemployment benefits, some individuals have attached in their application their letter of employment termination from the federal government. Such letters indicate that these individuals were probationary employees purportedly terminated for cause. Some of these claimants chose "fired" for the separation; but the UIA Form 931 (asking for the reason for separation) from the federal department indicates: "PERMANENT LACK OF WORK DUE TO CHANGE IN PRESIDENTIAL ADMINISTRATION RECENT EXECUTIVE ORDERS REQUIRED THE AGENCY TO TERMINATE THE EMPLOYEE." This separation reason now requires the MUIA to reconsider its original decision based on "fired" and issue a nonmonetary redetermination with the corrected information.

24.    When there is a dispute of material fact between the employer and the claimant, such as whether a termination was done for cause, the claims examiner must send a written notice to the claimant and the employer notifying them of a fact-finding process in which the

6

**JA761**

parties can offer evidence for the MUIA to rely on in making its decision. Mich. Comp. Laws § 421.32(a), (d).

25.     Thereafter, the claims examiner must issue a written decision on the issue and deliver it to the parties. Mich. Comp. Laws § 421.32(a).  From that point, either party may initiate the administrative appeals process, which consumes a great deal of time and the administrative resources of an administrative law judge and Appeals Commission members who must conduct contested case hearings, deliberate over arguments, and draft decisions.

26.     This diversion of personnel will undoubtedly impede the timely processing of regular UI claims, creating significant backlogs and delays. The consequences will be far-reaching, affecting countless individuals who depend on swift resolutions to sustain their livelihoods. By diverting resources, we compromise the efficiency and responsiveness of our claims processing system, ultimately undermining public trust and exacerbating economic hardship.

27.     While the MUIA is only beginning to process these claims, our staff has already begun the process of contacting relevant federal departments to request information concerning separation.

28.     I anticipate, however, that given the inconsistent position between the termination letters and USDA's report, and the consistency of the termination letters across agencies, at least some federal agencies will maintain their position that the terminated probationary employees were fired for cause, and are accordingly ineligible, at least in part, for unemployment benefits under Michigan law.

29.     As soon as we receive such an assertion, the MUIA will be required to follow our intensive and mandatory investigative process.  And while designed to ensure fairness, the

7

procedures impose a significant strain on the MUIA's financial and temporal resources. Each case demanding a fact-finding proceeding necessitates staff hours for sending the fact-finding document to the claimant and employer, reviewing the response and evidence, and drafting detailed decisions. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

30.    The cumulative effect of these investigations translates to substantial expenditures on personnel, administrative overhead, and the technological infrastructure required to manage the burgeoning caseload, ultimately depleting the MUIA's budget and hindering its ability to address other critical labor-related issues.

31.    Recent statements of the President and other federal officials have indicated that the overwhelming majority of recent federal terminations were not for-cause firings, based on individualized assessments of performance, but instead constitute a Government-wide effort to shrink the size of the federal workforce, an effective reduction in force.

32.    As a result, it is likely that the overwhelming majority of recently terminated federal employees will in fact be eligible for state unemployment benefits, because they were not terminated for cause.

33.    However, the federal Government's pretextual claim that such terminations are for-cause will necessitate extensive and irreparable investigatory costs and resource expenditures by the Michigan Department of Labor and Economic Opportunity.

34.    Finally, Michigan will also bear increased costs in the form of unemployment benefits of ex-federal employees.  While the Federal government is generally required to reimburse Michigan for UCFE benefits, Michigan must pay such benefits in the first instance, depleting the statewide trust fund that is supported by private employers in the state.

8

35.    Moreover, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program.  42 U.S.C. § 502(a).  While Michigan has been and continues to expend additional resources necessary to address the uptick in federal unemployment claims, it is thus entirely speculative whether MUIA's costs will be fully reimbursed.

Executed on March 19, 2025, at Lansing, Michigan.

Kimberly Breitmeyer
Legal Advisor and Legal & Compliance
Bureau Administrator
Michigan Unemployment Insurance Agency

9

**JA764**

Exhibit O

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND; et al., | |
| Plaintiffs, | |
| v. | C.A. No. |
| DONALD TRUMP, in his official capacity as President of the United States; et al., | |
| Defendants. | |

**<u>DECLARATION OF SARITA NAIR</u>**

I, Sarita Nair, declare as follows:

1.      I am a resident of the State of New Mexico. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the New Mexico Department of Workforce Solutions as the Cabinet Secretary. I have been in this position since August 15, 2022.

3.      As Cabinet Secretary, I am the chief executive of the Department of Workforce Solutions, and ultimately oversee all divisions, including federal contracts, federal-state programs, and federal funding.

4.      The Department administers a wide range of federally funded workforce and training programs, including but not limited to those authorized by the Workforce Innovation and

**JA766**

Opportunity Act (WIOA), that are vital to New Mexico's economic stability and workforce development.

5.      The Department of Workforce Solutions also is responsible for the Unemployment Insurance program, employment services, and labor market information.

6.      As Cabinet Secretary, I have access to comprehensive reports and financial records that detail the state of New Mexico's labor market, including claims for unemployment benefits, and the allocation and distribution of federal funding received by the Department of Workforce Solutions.

7.      The ongoing mass layoff of federal workers is irreparably harming New Mexico in several ways.

**Employment Services Expenditures**

8.      The Department of Workforce Solutions oversees Rapid Response, a coordinated, multiple-partner strategy to provide immediate assistance to New Mexicans subject to mass layoffs.  Rapid Response is the state entity responsible for conducting outreach and providing unemployment services required by the federal Workforce Investment Act of 1998, as amended by the federal Workforce Innovation and Opportunity Act of 2014.  Specifically, a state rapid response program is required by both the federal Workforce Innovation and Opportunity Act 29 U.S.C. § 3174(A)(2)(i).

9.      The Department of Workforce Solutions also oversees WIOA Title III (Wagner-Peyser) and the Reemployment Services and Eligibility Assessments (RESEA), both of which focus on career counseling and job placement.

10.     The Department works in close partnership with other stakeholders, such as the 25 America's Job Centers across New Mexico, which provide localized assistance to both

employers and employees across the state in both employment services and unemployment insurance claims.

11.    The purpose of Rapid Response, Title III, and RESEA is to reduce reliance on public benefit systems such as unemployment insurance; to promote economic recovery and vitality by developing an ongoing, comprehensive approach to identify, plan for, and respond to layoffs and dislocations; and to prevent or minimize the impact of mass layoffs on workers, businesses, and communities.

12.    When notified of a forthcoming mass layoff, the Rapid Response team will quickly provide informational resources and reemployment services for workers, including but not limited to: information and support for filing Unemployment Insurance (UI) claims, information on the impacts of layoffs on health coverage or other benefits, information on and referral to career services, reemployment-focused workshops and services, and occupational training.

13.    In addition, the Rapid Response team will contact affected businesses to collect, verify, and distribute information regarding Rapid Response activities, it will coordinate with state staff and local workforce area staff at the America's Job Centers in the affected area to provide support for the affected workers. The Division of Unemployment Insurance will mobilize to streamline and expedite the processing of unemployment claims, Title III will initiate job fairs and rapid hiring protocols, and the RESEA program will identify claimants at risk of exhausting their unemployment benefits for additional services.

14.    The Rapid Response, Title III and RESEA teams also facilitate connections to partner agencies and organizations to ensure their ability to provide assistance to terminated workers and their families, such as home heating assistance, food resources, and child care.

15.    Pursuant to 5 U.S.C. § 3502(d)(3)(A)(i), the federal Government is required to notify New Mexico, or "the State or entity designated by the State to carry out rapid response activities under section 134(a)(2)(A) of the Workforce Investment Act of 1998" of a plan for a reduction-in-force (RIF) of federal employees, generally at least 60 days in advance of any proposed RIF.

16.    The notices required by 5 U.S.C. § 3502(d)(3)(A) are intended to trigger Rapid Response activities since it is explicitly to be given to the state entity required to carry out Rapid Response activities.

17.    Upon information and belief, neither the New Mexico Department of Workforce Solutions nor any other entity in the New Mexico State Government have received notice of a federal reduction in force at any federal agency.

18.    Yet, as detailed more below, the Department of Workforce Solutions has already received 195 claims by ex-federal employees for unemployment benefits since February 2, 2025.

19.    Because our Rapid Response team received no notice of federal reductions in force, the Department has been required to dedicate more staff, resources, and expenditures to fulfill our statutory mission.

20.    Because the Department has not received advance notice of which agencies are planning to conduct mass layoffs, we have been forced to rely on public reporting and word-of-mouth to conduct after-the-fact outreach to potentially affected workers.  Reacting after a layoff is far more resource-intensive than the advance planning and assistance process required by law.

21.    Moreover, the Department of Workforce Solutions has had to devote significant additional staff time from communications and policy staff to conduct broad-based outreach to try and identify recently terminated employees, and provide relevant resources and services.

22.     Under normal circumstances, such personnel are engaged in general media strategy around connecting New Mexicans to jobs, providing round-the-clock support for New Mexico's 60-day legislative session, growing apprenticeship programs, and other affirmative efforts to help grow and support New Mexico's job market.

23.     Such staff have instead been dedicated to reacting to the latest layoff news, trying to identify affected federal agency and ex-employees, provide information, and otherwise adjust procedures and resources to assist confused and unemployed New Mexicans in a complicated and rapidly evolving environment.

24.     The New Mexico Department of Workforce Solutions has expended over $23,000 in personnel and operational costs between February 2, 2025, and March 10, 2025, to address these extraordinary circumstances. In addition, the New Mexico Department of Tourism expended $25,000 to assist in outreach to displaced federal workers.

25.     In sum, my office and the State are devoting significant time, resources and expense, simply to identify workers subject to federal mass layoffs, conduct mass outreach, and otherwise make resources available to potentially affected individuals in new ways, all because federal agencies have failed to provide the legally required notice of mass layoffs.

**Unemployment Assistance Process**

26.     The Department of Workforce Solutions manages claims for unemployment benefits in New Mexico.

27.     New Mexico Unemployment Compensation benefits, created under the Social Security Act of 1935, provide for unemployment benefits for up to 26 weeks to individuals who find themselves unemployed through no fault of their own. § 51-1-3, NMSA 1978.

28.     As a general matter, the federal Government is required to reimburse New Mexico for unemployment benefits provided to former federal employees. Specifically, New Mexico is party to an agreement with the United States Secretary of Labor, wherein the Secretary shall pay, as an agent of the United States, Unemployment Compensation for Federal Employees ("UCFE") pursuant to 5 U.S.C. § 8502(a).

29.     Pursuant to 5 U.S.C. § 8502(b), New Mexico is reimbursed for UCFE payments to federal employees in the same amount, on the same terms, and subject to the same conditions which would be payable to them under New Mexico Unemployment Compensation Law.

30.     The New Mexico Department of Workforce Solutions administers its federal-state cooperative unemployment insurance program, financed in large part by grants from the federal government pursuant to the Social Security Act. 42 U.S.C. §§ 501-503.

31.     Pursuant to § 51-1-8, NMSA 1978, an individual in New Mexico who wishes to collect unemployment insurance benefits must file a claim in accordance with regulations adopted by the New Mexico Department of Workforce Solutions.

32.     Claimants file initial claims online using the Department's system, via telephone, or in person, to provide information to indicate the basis of the claim, the name of the claimant's previous employer, the reason for their separation, and other relevant information.  § 51-1-5, NMSA 1978; NMAC 11.3.300.301 and 11.3.300.308.

33.     After an individual has filed an initial claim, DWS sends a fact-finding questionnaire to the employer to verify the information provided and allow opportunity for response to the information provided in the claim.  Employers have 10 days to respond.  If an employer does not submit a timely response, DWS makes a determination based on the information available at the time.  NMAC 11.3.300.308 NMAC.

34.     Eligibility for unemployment benefits is determined based on criteria such the circumstances of the separation from employment, whether sufficient wages have been earned in the base period, and whether the claimant is able to work, available for work and actively seeking work.  §§ 51-1-4 through 51-1-8, NMSA 1978.

35.      After a claim is filed, DWS reviews the information provided by the claimant and the employer through the fact-finding process and issues an eligibility determination.  A non-monetary determination is made as to whether a claimant is qualified to receive benefits based on their separation from employment. If the claimant is eligible for benefits, a monetary determination is made, based on the wages earned in the base period, to ascertain the weekly benefit amount the claimant will be eligible to receive.  § 51-1-8, NMSA 1978.

36.     An interested party may file an appeal of any determination issued by the Department by submitting a written request via mail, email, or their online unemployment account.  Unless an appeal is filed within 15 days of the determination, the original decision is deemed to be the final decision of the department.  If an appeal is timely filed, a telephonic appeal hearing is scheduled before an Administrative Law Judge, at which the parties can present evidence, witnesses, and testimony for a review.  § 51-1-8, NMSA 1978, and NMAC 11.3.500.

**Unemployment Benefits Recent Experience and Investigatory Process**

37.     The Department's latest data indicates that 195 former federal employees have applied for unemployment benefits since February 2, 2025.

38.     The primary geographic locations of unemployment claims from federal employees are Albuquerque, Rio Rancho, Carlsbad, Santa Fe, and Las Cruces.

39.     The federal agencies that claimants have reported most frequently as their employer are the US Department of Agriculture, the US Department of Interior – National Park

Service, and the US Department of Interior – Bureau of Indian Affairs. In total, claimants have filed claims naming 17 federal agencies as their employer.

40.     As stated above, when an employer provides the initial report of separation to the Department, the employer must indicate the reason for the separation.

41.     Upon information and belief, federal workers' termination notices have included statements suggesting that they were fired for poor performance.

42.     The Department of Workforce Solution's procedures require that the claims adjudicator must investigate the reason for discharge.

43.     Under § 51-1-7(A)(2), NMSA 1978, the standard for disqualification of a claimant is not whether they were fired "for cause" or for poor performance, but rather, whether "the individual has been discharged for misconduct connected with the individual's employment." "To be disqualifying, misconduct must evince a willful or wanton disregard for the employer's interests and must significantly infringe upon legitimate employer expectations." *Otero v. New Mexico Emp't Sec. Div.*, 1990-NMSC-007, 109 N.M. 412, 785 P.2d 1031. Employees must receive adequate warnings prior to discharge. *Chavez v. Employment Sec. Comm'n,* 1982-NMSC-077, 98 N.M. 462, 649 P.2d 1375.

44.     On February 11, 2025, President Trump issued Executive Order 14222, stating, "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)." In addition, numerous other statements of the President and other federal officials suggest that the majority of recent federal terminations were not due to employee misconduct, but instead constitute a government-wide effort to shrink the size of the federal workforce.

45.     Upon information and belief, the Department of Workforce Solutions anticipates that given the consistency of the termination letters across agencies, at least some federal

agencies will assert that the terminated probationary employees were fired for cause and are accordingly ineligible for unemployment benefits.

46.     To the extent that the Department determines that recently terminated federal employees were not terminated for misconduct, they will be eligible for state unemployment benefits. In any appeal of unemployment benefits, pursuant to the New Mexico Unemployment Insurance Employer Handbook, the employer carries the burden of proof in establishing the separation was for reasons other than a layoff due to lack of work and in establishing the separation was for misconduct.

47.     To the extent the federal government files timely appeals of federal workers' claims, the Department of Workforce Solutions is required to and will follow an intensive investigative process.  Because they are designed to ensure fairness, the procedures impose a significant strain on the Department's financial and temporal resources. Each case demanding a fact-finding proceeding necessitates extensive staff hours for scheduling, conducting interviews, reviewing evidence, and drafting detailed decisions. The need to send notices, accommodate witness testimony, and facilitate cross-examination further escalates the time commitment. Moreover, the potential for subsequent appeals triggers a cascade of additional hearings and reviews, diverting resources from other essential departmental functions.

48.     Upon information and belief, the federal Government's pretextual claim that such terminations are not reductions in force is likely to necessitate extensive and irreparable costs and resource expenditures by the Department of Workforce Solutions.

**Increased Unemployment Benefits**

49.     Finally, New Mexico will also bear increased costs in the form of unemployment benefits of displaced federal employees.  While the federal government is generally required to

reimburse New Mexico for UCFE benefits, New Mexico must pay such benefits in the first instance, depleting the statewide trust fund that is supported by private employers in the state.

50.    Moreover, the U.S. Secretary of Labor has discretion to reimburse states for administrative costs required to conduct the state unemployment compensation program.  42 U.S.C. § 502(a).  While New Mexico has been and continues to expend additional resources necessary to address the uptick in federal unemployment claims, it is thus entirely speculative whether the Department's costs will be fully reimbursed.

51.    To the extent that the federal government refuses to reimburse the New Mexico Unemployment Insurance Trust Fund for adjudicated claims, the Department of Workforce Solutions will be required to expend considerable resources in collection processes. In addition, the Department may be required to seek funding to protect the UI Trust Fund from the state legislature.

Executed on March 10, 2025, at Santa Fe, New Mexico

_____

Sarita Nair, Cabinet Secretary

Exhibit P

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STATE OF MARYLAND, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE, ET AL.,<br><br>Defendants. | Case No.: 1:25-cv- |

**DECLARATION OF** ▮▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮▮▮, swear under penalty of perjury,

1.      My name is ▮▮▮▮▮▮▮▮ and I am an adult resident of Washington, D.C.

2.      I began working for the U.S. Department of Agriculture ("USDA"), in the U.S. Forest Service, under ▮▮▮▮▮▮▮▮, as a ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ on approximately January 12, 2025.  My duty station was Washington, D.C.

3.      From the date of my hire, the Forest Service classified me as a probationary employee.  My probationary period was one year, or until approximately January 11, 2026.

4.      On February 14, 2025, I received by email a notice signed by ▮▮▮▮▮▮▮, ▮ ▮▮▮▮▮▮▮▮▮▮▮, that the Forest Service was terminating my employment, effective immediately.  The letter stated, "The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest."  *See* Exhibit 1.  The notice did not identify any issue with my

1

performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

5.      I was not aware of my termination prior to February 14.  If I had more warning, I would have had more time to look for a new position.

6.      I am now unemployed.  I plan to apply for unemployment insurance benefits with the D.C. government as soon as I am eligible.

7.      Unfortunately, I can no longer afford to support the local economy in the same way.  For example, I canceled my contract with my personal trainer and will need reduce my expenses significantly.  If I do not find a new job in the next few months, I will need to relocate out of the District.

8.      Prior to my termination, my job duties as a ███████████████

███████████████████████████████████████

██████████████████  ████████████████████

██████████████████████████████████████

████████████████████

9.      I was a ██████ ██████ and earned a salary of approximately ████████ per year.

10.     As a resident of the District of Columbia, I pay income taxes to the District.  Each pay period, USDA withheld and paid income taxes from my paycheck to the District government.

11.     In the five weeks I worked at the Forest Service, no supervisor had raised any issue with my performance or conduct.  In fact, I received positive verbal feedback from my supervisor on multiple occasions and my supervisor even assigned me job duties above my job title by making me the ████████████████  Prior to my federal service, I had worked with many

2

of my current colleagues, including my supervisor, ███████████, as a contract employee, and the feedback I received about my job performance was always outstanding.

Dated: <u>March 5, 2025</u>                    Signed: ████████████████
                                                         ███████████████

*A copy of the signature page bearing an original signature is attached hereto.

3

**JA779**

of my current colleagues, including my supervisor, ████████████, as a contract employee, and

the feedback I received about my job performance was always outstanding.

Dated: 3/5/2025                              Signed: ████████████████████████

*A copy of the signature page bearing an
original signature is attached hereto.

Exhibit 1



February 13, 2025

MEMORANDUM FOR: ████████████, ████████████, GS-0301-14

FROM:               ████████████
                    Director, Human Resource Management

SUBJECT:            Notification of Termination During Probationary Period

REFERENCES:         5 U.S.C. § 7511
                    5 U.S.C. § 3321(a)
                    5 U.S.C. §2102
                    5 CFR §212.101
                    5 C.F.R. §§ 315.803, 315.804, and 315.806
                    Departmental Regulation 4020-250-1


This is to provide notification that the Agency is removing you from your position of ████████████ and federal service consistent with the above references.

On 1/12/2025, the Agency appointed you to the position of ████████████ as documented on your appointment Standard Form 50 (SF-50), your appointment is subject to a probationary/trial period. The agency also informed you of this requirement in the job opportunity announcement for the position.

Guidance from the Office of Personnel Management ("OPM") states, "An appointment is not final until the probationary period is over," and the probationary period is part of "the hiring process for employees."[1] "A probationer is still an applicant for a finalized appointment to a particular position as well as to the Federal service."[2] "Until the probationary period has been completed," a probationer has "the burden to demonstrate why it is in the public interest for the Government to finalize an appointment to the civil service for this particular individual."[3]

The Agency finds, based on your performance, that you have not demonstrated that your further employment at the Agency would be in the public interest. For this reason, the Agency informs you that the Agency is removing you from your position of ████████████ with the Agency and the federal civil service effective immediately.

---

[1] OPM, *Practical Tips for Supervisors of Probationers*.
[2] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005)
[3] *Id.*

Page **1** of **2**

You may have a right to file an appeal with the Merit Systems Protection Board (MSPB) on the limited grounds set forth in 5 C.F.R. § 315.806. Any such appeal must be filed within 30 days of the effective date of this decision or 30 days after the date of your receipt of this decision, whichever is later. You should review MSPB regulations at 5 C.F.R. §§ 1201.14 and 1201.24 for instructions on how to file an electronic appeal and content requirements of the appeal, respectively. For more information, please visit www.mspb.gov or contact your local MSPB regional or field office.

We appreciate your service to the Agency and wish you the greatest of success in your future endeavors.  If you have any off-boarding questions, please contact your Supervisor; or Human Resources Management Contact Center at 877-372-7248, Opt. 2 for questions regarding your benefits.  For any other questions, please contact sm.fs.hrm_elr@usda.gov.



Exhibit Q

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STATE OF MARYLAND, ET AL.,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, ET AL.,

    Defendants.

Case No.: 1:25-cv-00748-JKB

### DECLARATION OF ▮▮▮▮▮

I, ▮▮▮▮, swear under penalty of perjury,

1.  My name is ▮▮▮▮ and I am an adult resident of ▮▮▮▮ MD.

2.  I began working for the Department of Commerce ("Commerce") as a ▮▮▮▮

▮▮▮▮ on approximately November 8,

2024. My duty station was Silver Spring, MD.

3.  From the date of my hire, Commerce classified me as a probationary employee.
My probationary period was one year, or until approximately November 7, 2025.

4.  On February 27, 2025, around 4:00pm, I received an email containing a Notice of
Termination, effective at 5:00pm that same day. The notice stated that in light of OPM's
guidance regarding probationary employees, Commerce stated that it was terminating me.
Specifically, it found that I "was not fit for continued employment because [my] ability,
knowledge and/or skills do not fit the Agency's current needs." Exhibit 1. The email did not

identify any issue with my performance or conduct, nor did it identify any conditions arising before my appointment to justify my termination.

5.    The February 27, 2025 termination notice was the first I had learned of my termination. If I had more warning, I would have started looking for a new position immediately.

6.    On March 17, 2025, I received a notice of reinstatement from Commerce.

7.    During the period between February 27, 2025 and March 17, 2025, I was unemployed. I applied for unemployment insurance benefits with the state of Maryland. While I had not received the benefits, I submitted the weekly information required to show eligibility. Because my household suddenly lost 80% of its income, my family had to get food from a community food pantry, and I was planning on applying for WIC benefits. We could not spend any money beyond the barest essentials, and I did not know how I was going to make rent.

8.    As a resident of Maryland, I pay income taxes to the state of Maryland. Each pay period, Commerce withheld and paid income taxes from my paycheck to the Maryland government.

9.    I was a ███████ equivalent and earned a salary of approximately ███████ per year.

10.    Before I was terminated, my job duties as a ███████████ were to manage

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

11.     In the few months I worked at Commerce, I did not receive a formal performance evaluation but my supervisor gave me written positive feedback regarding my job performance. At no point did anyone raise issues with my job performance.

Dated: 3/20/2025                    Signed:

Exhibit 1

 Gmail

███████████████████████████

# Fwd: Notification of Termination During Probationary Period

████████████████████████

Thu, Feb 27, 2025 at 3:57 PM

To: ████████████████████████████

Sent from my iPhone

Begin forwarded message:

> **From:** ███████████████████████
> **Date:** February 27, 2025 at 3:50:56 PM EST
> **To:** ████████████████
> **Subject: Notification of Termination During Probationary Period**

February 27, 2025

MEMORANDUM FOR ████████████████████████████
Federal Employee, ████████████
FROM: ████████████████████████

SUBJECT: Notification of Termination During Probationary Period
REFERENCES: 5 U.S.C. § 3321(a)
DAO 202-315

This is to provide notification that I am terminating you from the position of
and federal service consistent with the above references.

On November 18, 2024, the agency appointed you to the

position of ████████████████. As documented on your
appointment Standard Form 50 (SF-50), your
appointment is subject to the completion of a probationary/trial
period. The agency also
informed you of this requirement in the job opportunity
announcement for the position.

Guidance from the Office of Personnel Management ("OPM")
states, "An
appointment is not final until the probationary period is over," and
the probationary period
is part of "the hiring process for employees." (1) "A probationer is
still an applicant for a
finalized appointment to a particular position as well as to the
Federal service" (2) "Until the
probationary period has been completed," a probationer has "the
burden to demonstrate
why it is in the public interest for the Government to finalize an
appointment to the civil
service for this particular individual." (3)

OPM has advised that "[p]robationary periods are an essential
tool for agencies to
assess employee performance and manage staffing levels." (4)
In light of that guidance, the
Agency finds that you are not fit for continued employment
because your ability,
knowledge and/or skills do not fit the Agency's current needs.

For these reasons, I am terminating you from the position █
████████████████ with the
agency and the federal civil service effective February 27, 2025
at 5 p.m. EST.

If you believe this action is the result of discrimination based on
partisan political
reasons or marital status, you have the right to file an appeal
with the Merit Systems
Protection Board (MSPB) under 5 C.F.R. § 315.806. You must
file an appeal within 30
days of the effective date of this decision or 30 days after the
date of your receipt of this
decision, whichever is later. You should review MSPB

**JA790**

regulations at 5 C.F.R. §§ 1201.14
and 1201.24 for instructions on how to file an electronic appeal
and content requirements
of the appeal, respectively. For more information, please visit
www.mspb.gov or contact
your local MSPB regional or field office
at: https://www.mspb.gov/about/contact.htm


If you believe that your termination is the result of discrimination,
you have the
right to file a complaint pursuant to 29 C.F.R. Part 1614.  Any
allegation of discrimination
based on race, color, religion, sex, national origin, physical or
mental disability, and/or age,
must be brought to the attention of an Agency Equal
Employment Opportunity (EEO)
Counselor within forty-five (45) days of the effective date of this
action. https://www.noaa.gov/civil-rights/eeo-counseling-
complaints


If you elect to seek corrective action by the Office of Special
Counsel's (OSC)
Complaints Examining Unit, your appeal will be limited to a
determination as to whether
the Agency took one or more covered personnel actions against
you in retaliation for
making one or more protected whistleblowing disclosures, which
constitutes a prohibited
personnel practice in accordance with 5 U.S.C. § 2302(b). If
OSC dismisses your claim,
you may file an individual right of action appeal to the MSPB, but
the MSPB will only
adjudicate whether you proved that your protected disclosure
was a contributing factor in
the effected action. For more information, you may visit the
OSC's website at:
https://osc.gov/pages/file-complaint.aspx


If you have any questions regarding this notice, please contact

███████████ █ ███████████████████              ████████
                          at

**JA791**

(1)  OPM, Practical Tips for Supervisors of Probationers.
(2)  *See* U.S. Merit Systems Protection Board Report to the President and Congress, The Probationary Period: A Critical Assessment Opportunity (August 2005)
(3)  Id.
(4)  OPM, *Guidance on Probationary Periods, Administrative Leave and Details*

**JA792**