No. 25-1248 (L)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

STATE OF MARYLAND, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

## REPLY BRIEF OF APPELLANTS

YAAKOV M. ROTH
*Acting Assistant Attorney
General*

SARAH WELCH
*Counsel to the Assistant
Attorney General*

KELLY O. HAYES
*United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
STEVEN A. MYERS
*Attorneys, Appellate Staff
Civil Division*

*U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-3180*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................... 1

ARGUMENT.............................................................................. 2

I.  The District Court Lacked Jurisdiction................................ 2

    A.  The States Failed To Establish Article III Standing. ................. 2

    B.  Federal Personnel Statutes Divest District Courts Of Subject-Matter Jurisdiction To Consider Claims Concerning The Termination Of Federal Employees. .............. 10

II.  The Government Did Not Conduct A Reduction In Force. ................ 16

III.  The States Failed To Establish The Other Preliminary-Injunction Factors............................................................. 19

CONCLUSION........................................................................ 22

# TABLE OF AUTHORITIES

**Cases:**                                                                    <u>Page(s)</u>

*Abbott v. Pastides,*
    900 F.3d 160 (4th Cir. 2018) ................................................................. 8

*AFGE v. Secretary of the Air Force,*
    716 F.3d 633 (D.C. Cir. 2013) ............................................................... 15

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ................................................................. 6

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ..................................................................... 14, 15

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ............................................................................ 4

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984) ......................................................................... 11

*Bureau of Alcohol, Tobacco & Firearms v.*
    *Federal Labor Relations Auth.,*
    464 U.S. 89 (1983) .......................................................................... 15

*Department of Commerce v. New York,*
    588 U.S. 752 (2019) ........................................................................... 4

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) ...................................................................... 20

*Dreher v. Experian Info. Sols., Inc.,*
    856 F.3d 337 (4th Cir. 2017) ................................................................ 4

*Elgin v. Department of the Treasury,*
    567 U.S. 1 (2012) ................................................................. 10, 13, 15

*Federal Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ............................................................................ 9

*Federal Law Enf't Officers Ass'n v. Ahuja,*
    62 F.4th 551 (D.C. Cir. 2023) ................................................................. 13

*Filebark v. U.S. Dep't of Transp.,*
    555 F.3d 1009 (D.C. Cir. 2009) .............................................................. 11

*Florida v. Mellon,*
    273 U.S. 12 (1927) ...................................................................................... 5

*Grae v. Corrections Corp. of Am.,*
    57 F.4th 567 (6th Cir. 2023) ................................................................. 5, 6

*Iowa ex rel. Miller v. Block,*
    771 F.2d 347 (8th Cir. 1985) ..................................................................... 6

*James v. Von Zemenszky,*
    284 F.3d 1310 (Fed. Cir. 2002) .......................................................... 1, 16

*Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ...................................................................................... 8

*Louisiana v. Department of Homeland Sec.,*
    726 F. Supp. 3d 653 (E.D. La. 2024) ...................................................... 7

*Mahmoud v. McKnight,*
    102 F.4th 191 (4th Cir. 2024) ................................................................ 14

*National Treasury Emps. Union v. Federal Labor Relations Auth.,*
    737 F.3d 273 (4th Cir. 2013) .................................................................. 14

*New York v. Yellen,*
    15 F.4th 569 (2d Cir. 2021) ....................................................................... 6

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 21

*OPM v. AFGE,*
    No. 24A904, 2025 WL 1035208 (U.S. Apr. 8, 2025) ............................ 20

*Pennsylvania ex rel. Shapp v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) .................................................................. 6

*Piney Run Pres. Ass'n v. County Comm'rs,*
    523 F.3d 453 (4th Cir. 2008) .................................................................. 14

*Rydholm v. Equifax Info. Servs. LLC,*
    44 F.4th 1105 (8th Cir. 2022) ................................................................. 5

*Sackett v. EPA,*
    566 U.S. 120 (2012) ................................................................................15

*Sampson v. Murray,*
    415 U.S. 61 (1974) ................................................................................. 20

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................ 4, 5, 7

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ......................................................................... 13, 14

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .............................................................................. 5, 7

*United States v. Fausto,*
    484 U.S. 439 (1988) ...................................................................... 11, 13, 14

*United States v. Texas,*
    599 U.S. 670 (2023) .......................................................................... 3, 4, 5

*Watt v. Energy Action Educ. Found.,*
    454 U.S. 151 (1981) ............................................................................... 4, 5

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ............................................................................... 4

*Wyoming v. U.S. Dep't of Interior,*
    674 F.3d 1220 (10th Cir. 2012) ............................................................. 6

*XY Planning Network, LLC v. SEC,*
    963 F.3d 244 (2d Cir. 2020) ................................................................. 6

**Statutes:**

29 U.S.C. § 2104 ................................................................ 12

29 U.S.C. § 2864 .................................................................. 8

29 U.S.C. § 3174 .................................................................. 8

**Regulations:**

5 C.F.R. § 351.201 ............................................................ 18

20 C.F.R. § 682.330 ............................................................. 8

**Rule:**

Fed. R. Civ. P. 65 ........................................................... 19

**INTRODUCTION**

In this challenge by states to the federal government's termination of probationary employees, the states offer no basis to depart from the motions panel's conclusion that "[t]he Government is likely to succeed in showing the district court lacked jurisdiction." Order 4-5, Apr. 9, 2025 (Stay Order). The states' contrary arguments rest on an unworkable theory of informational-injury standing and a cramped view of the exclusive review scheme Congress created for challenges to federal employment matters. The states lack standing to challenge this federal personnel action, and any challenge belongs in the administrative review scheme, not the district court.

On the underlying merits, the states' arguments fail to rehabilitate the district court's mistaken conclusion that if the agencies lacked cause for terminating the probationary employees, the employees must actually have been released in a reduction in force (RIF). A RIF is not simply a defective for-cause termination—it is "an administrative procedure by which agencies" "abolish[] positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). Like the district court, the states fail to identify any evidence that the agencies eliminated the terminated employees' positions.

Nor do the states' arguments on the equitable factors justify the district court's sweeping reinstatement order. Contrary to the states' assertions, the district court's reinstatement order plainly intrudes on the Executive Branch's internal affairs, and the states cannot defend the district court's extraordinary injunction by insisting that it is narrower than the court's initial, even more unjustifiably broad temporary restraining order.

## ARGUMENT

## I. The District Court Lacked Jurisdiction.

The states' arguments on the two threshold jurisdictional defects fail to justify departing from the motions panel's conclusion that the states are unlikely to succeed on the merits because the district court likely lacked jurisdiction. Stay Order 5. The states lack a cognizable injury to support their standing, and their claims reduce to a challenge to federal personnel actions that must proceed, if at all, only through the comprehensive process of administrative and judicial review Congress created.

### A. The States Failed To Establish Article III Standing.

The states assert the federal government's termination of probationary employees will cause downstream harm to their state budgets and resources. But as our opening brief established, those indirect harms

are not a cognizable Article III injury, and the states cannot overcome that by repackaging the harms as an "informational injury-in-fact." Resp. Br. 21.

**1.** The states do not argue that their supposed injuries are sufficient on their own to establish standing. *See* Resp. Br. 21-28 (pressing only an informational-injury theory); *see also* JA916 (acknowledging that states' standing theory is "fundamentally informational"). The states say the federal government's personnel actions have caused harm to their budgets and resources. They insist, for example, that the terminations have resulted in "surges in unemployment claims," "increased reliance on state social service programs," and "financial harms from decreased tax revenue." Resp. Br. 24-25. As our opening brief established, however, those harms do not suffice for standing. *See* Opening Br. 23-24. In *United States v. Texas*, 599 U.S. 670 (2023), the Supreme Court recognized that "federal policies frequently generate indirect effects on state revenues or state spending," and that when a state's standing theory rests on such harms, the claim for standing can become too "attenuated." *Id.* at 680 n.3. The states sensibly do not argue that these alleged harms are enough, on their own, for standing.

**2.** Instead, echoing the district court, the states seek to repackage their alleged harms as an "informational injury-in-fact." Resp. Br. 21. But the states' arguments do not rehabilitate their lack of standing. The states

do not dispute that informational injury suffices only when it causes "real" harms that are "of the type that have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340, 341 (2016)). And as already explained, courts have not "traditionally entertained lawsuits of this kind" brought by states alleging downstream harms to their budgets and resources as a result of the federal government's employment decisions. *Texas*, 599 U.S. at 678.

The states say that taking *Texas* at face value would "upend[] decades of standing precedent," Resp. Br. 29, but the cases they cite involved direct injuries that differ markedly from the states' asserted harms here. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 489-90 (2023) (standing to challenge action that "directly injure[d]" state's instrumentality by closing accounts it serviced); *Department of Commerce v. New York*, 588 U.S. 752, 767 (2019) (standing to challenge reduction in federal funding paid directly to state); *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (standing to challenge law requiring purchase of coal from sources other than Wyoming, which had previously supplied virtually 100% of coal, reducing coal tax revenue by quantified, undisputed amounts); *Watt v. Energy Action Educ. Found.*, 454

U.S. 151, 161 (1981) (standing to defend entitlement to share of oil and gas revenues). Those cases do not support the boundless theory that a state attains standing—informational or otherwise—whenever a federal action would impose indirect burdens on its tax base or benefits programs. The Supreme Court has long rejected that proposition. *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (finding state lacked standing to challenge federal inheritance tax that would cause, at most, only "indirect" harm to the state's tax base). *Texas* reiterated and reaffirmed those principles. *See* 599 U.S. at 680 n.3.

The states also cite various lower-court cases, but none supports their theory. Nearly all predate the Supreme Court's substantial clarification of informational-injury standing in *TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021), and *Spokeo*, 578 U.S. 330. The three post-*TransUnion* cases the states identify in this portion of their brief do not help them. In *Rydholm v. Equifax Information Services LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022), the plaintiff had standing to challenge incorrect information in his credit report that caused him to receive unfavorable lending rates and denials of credit. That holding, involving direct, tangible harms to an individual, casts little light on the states' arguments that their asserted peripheral harms suffice. Next, in *Grae v. Corrections Corp. of America*, 57 F.4th 567, 571 (6th Cir.

2023), the court held that the plaintiff *lacked* standing because he admitted he "had not suffered any adverse effects." And in *New York v. Yellen*, 15 F.4th 569, 576-77 (2d Cir. 2021), the court concluded that the states had standing because they could identify "specific tax revenues," quantified by experts, that they would lose under the challenged tax policy—an approach the states have not attempted here.

By contrast, the states omit substantial lower-court authority, both recent and longstanding, rejecting state standing based on just the sort of supposed harms they invoke. *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.) ("Are we really going to say that any federal regulation … that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court?"); *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 252-53 (2d Cir. 2020) (no standing based on prospect of decreased tax revenue, as tax revenue "is driven by countless variables"); *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1231 (10th Cir. 2012) (no standing based on "economic losses and adverse displacement effects"); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (no standing to challenge policy that would "forc[e] unemployment up and state tax revenues down"); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable

economic repercussions of virtually all federal policies ... suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing."); *Louisiana v. Department of Homeland Sec.*, 726 F. Supp. 3d 653, 675 (E.D. La. 2024) ("[The] Plaintiffs' claimed economic injuries in the form of a reduction in their ad valorem tax collections are, at most, a remote and indirect consequence" of the challenged action).

The states cannot avoid this conclusion by pointing to a statutory notice provision. Even assuming that notice provision is applicable here, *but see infra* pp. 16-19, the states' articulation of a statutory basis for their claims cannot solve their problem under Article III, which "requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341; *see also TransUnion*, 594 U.S. at 426 ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III ... .").

The error of the states' informational-injury theory is underscored by the fact that they have not established that their downstream harms flow from a lack of information. *See TransUnion*, 594 U.S. at 440 (no standing for claim where plaintiffs lacked "evidence of harm caused by" incorrect

format of disclosures). The states assert, for example, that the termination of probationary employees will cause an uptick in unemployment-benefit applications and cause a loss of state tax revenues, but the states only speculate that such downstream harms would have been averted had they received the notice they demand. *See* Resp. Br. 32. And while the states insist that their "rollout" of state resources was "hasty" because they did not timely receive the notice to which they claim they were entitled, Resp. Br. 24, it is far from clear that the states would not have incurred the same costs regardless: After all, the obligations they identify are called *rapid* response activities and direct the states to take "[i]mmediate" action upon receiving notice. 20 C.F.R. § 682.330(b); *see also* 29 U.S.C. §§ 2864(a)(2)(A), 3174(a)(2)(A). In any event, those particular asserted harms are in the past, not continuing or prospective, so they cannot support the prospective relief the district court ordered. *See Los Angeles v. Lyons*, 461 U.S. 95, 106 (1983); *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

Regardless, as our opening brief explained, the district court's reinstatement remedy does not redress any "informational" injury to the states. Opening Br. 25-27. As the states' cited cases demonstrate, a plaintiff seeking injunctive relief on a theory of informational injury asserts that a

judicial order would lead him to obtain information he lacks. Resp. Br. 27 (citing, *e.g.*, *Federal Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998)). And the states understandably do not dispute that such a case typically ends when the plaintiff has received the information it seeks. *See* Opening Br. 25-26. Here, the district court recognized that the states are "obviously" now "aware" of the terminations of which they complain. JA934. The district court nonetheless reasoned that reinstatement is necessary because the "downstream harms stem from the increased pressure on state programs," and "an adequate remedy is one that relieves that pressure." JA934. As before, the states cite no precedent supporting that remarkable conclusion. *See* Opening Br. 26-27.

The states instead defend the district court's remedy by insisting that they *still* have not received notice, Resp. Br. 23-24, even though they are suing the government for terminating probationary employees and claim to be certain they face irreparable harm. The states assert that they still lack details about terminated employees "broken down by geographic area" and unspecified "other information," *id.*, but the record contains numerous declarations compiled by the states detailing specific agencies and specific terminated employees. *See* JA77-406; JA608-784. Nor do the states persuasively explain, in any event, why having that additional information

in particular would redress any losses to the states' tax base, reduce the number of state unemployment claims, or avoid the need to expend funds to provide rapid-response resources. *See* Resp. Br. 23-24, 30. At most, even accepting the states' theory, any such lack of information could have been redressed by an order requiring the federal government to provide the additional information. Or the district court could have issued declaratory relief directed to the states' federal-law rapid-response obligations. Any "informational injury" to the states does not support the extraordinary remedy of directing the reinstatement of thousands of third-party employees across multiple federal agencies.

### B. Federal Personnel Statutes Divest District Courts Of Subject-Matter Jurisdiction To Consider Claims Concerning The Termination Of Federal Employees.

Even if the states had standing, the district court still lacked jurisdiction over their case because the Civil Service Reform Act (CSRA) and Federal Service Labor-Management Relations Statute establish the "exclusive means" for reviewing challenges to federal agencies' employment decisions. *Elgin v. Department of the Treasury*, 567 U.S. 1, 8 (2012). That comprehensive statutory scheme requires complaints to be directed first to an administrative process, then to the courts of appeals. It leaves no role for

the district court to adjudicate the states' challenge to the probationary employees' terminations and reinstate the employees.

The states' primary argument is that Congress did not provide states an opportunity to challenge federal employees' terminations. Resp. Br. 37. But that is exactly the point: in authorizing challenges to employment decisions only by unions, employees, and applicants for employment, Congress deliberately denied review to anyone else. *See Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984); *United States v. Fausto*, 484 U.S. 439 (1988); *see also Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1013 (D.C. Cir. 2009) (recognizing that the "exclusion" of a particular class of plaintiffs or claims from the CSRA scheme reflects a "manifestation of a considered congressional judgment" that there is no statutory entitlement to review (quoting *Fausto*, 484 U.S. at 448)).

The states' attempt to distinguish those cases fails. The states observe that the statutory scheme in *Block* did not permit "participation by consumers," Resp. Br. 41 (quoting *Block*, 467 U.S. at 347), but the same is true of states here: no provision of the CSRA creates an "express provision for participation" by states, *see Block*, 467 U.S. at 347. While federal law requires *notice* to states of certain RIFs, it nowhere provides that states may *enforce* this obligation in an administrative or judicial proceeding.

The states only confirm the point in citing a separate statute addressing reductions-in-force by private employers. Resp. Br. 37-38 (citing 29 U.S.C. § 2104). The states claim that that statute grants states and localities a right to sue in district court for violations of the notice requirement. *Id.* But the fact that Congress elsewhere expressly *granted* the states a right to sue private employers underscores that Congress's silence on the matter in the federal employment context was deliberate. The states omit, moreover, that Congress barred them, in those private suits, from seeking the precise reinstatement remedy they seek here. 29 U.S.C. § 2104(b) ("[A] Federal court shall not have authority to enjoin a plant closing or mass layoff."). The states' suggestion that Congress intended to give them greater recourse to superintend the *federal government's* employment actions than private businesses' employment actions gets the inference exactly backwards.

Nor can the states dismiss *Fausto* and similar cases by attempting to distance their claim from a "garden-variety employment claim[]." Resp. Br. 41. The states' merits arguments confirm that they squarely challenge the federal government's termination of probationary employees: the states assert that the terminations "were not undertaken for cause" and that the agencies' stated reasons for the terminations were "pretextual." Resp. Br.

45; *see also* JA945-959 (district court analyzing this issue). The states'
claim turns on those allegations, and it cannot succeed without them. *See*
Resp. Br. 42. The states likewise ignore that they sought—and obtained—
reinstatement of the terminated employees. Those are core employment
questions and remedies within the heartland of the CSRA scheme, and the
states' claim, "at bottom," rests on the same theory as a challenge to the
same actions the affected employees are endeavoring to bring, seeking the
same remedy. *See Federal Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551,
563 (D.C. Cir. 2023) (quotation marks omitted); *see also* Opening Br. 34.

The states' reliance on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200
(1994), does not further their argument. *Contra* Resp. Br. 34-40. The
Supreme Court has already spoken to the CSRA's effects on district court
jurisdiction—twice over. Opening Br. 33; *see Elgin*, 567 U.S. at 10 (citing
*Fausto* and *Thunder Basin*); *Fausto*, 484 U.S. at 444. Those decisions make
clear that the CSRA's comprehensive scheme—providing for specified
claimants, claims, processes, and remedies—is the sort of scheme that
forecloses judicial review outside its contours. For the reasons explained,
the states' challenge to "personnel action taken against federal employees,"
*Fausto*, 484 U.S. at 455, is "of the type Congress intended to be reviewed
within" the CSRA's statutory structure, *see Axon Enter., Inc. v. FTC*, 598

U.S. 175, 186 (2023) (quoting *Thunder Basin*, 510 U.S. at 212)—subject to the specific limitations that Congress provided.[1] The states' arguments would turn the CSRA's exclusive-review scheme on its head, permitting states to challenge the federal government's termination of probationary employees in district court—and obtain reinstatement of affected employees—"free" from any of the restrictions that would apply to claims by the real parties in interest. *See Fausto*, 484 U.S. at 449-50; *see also National Treasury Emps. Union v. Federal Labor Relations Auth.*, 737 F.3d 273, 276-77 (4th Cir. 2013) (discussing these restrictions).

The states' specific arguments under *Thunder Basin* are unpersuasive in any event. The states argue first that the CSRA regime will not provide for meaningful judicial review if they cannot sue immediately in the district court. Resp. Br. 37-39. But courts readily reject just that sort of argument. *See Sackett v. EPA*, 566 U.S. 120, 130 (2012) ("Where a statute provides

---

[1] The states make much of the absence of precedent holding specifically that states are unable to proceed directly to district court on claims like these. Resp. Br. 34, 41. But the states cite no precedent holding that states *can* challenge federal employment actions directly in district court. If anything, the novelty of the states' claims and procedural approach cuts against their position. As plaintiffs, the states bear the burden of establishing jurisdiction, *see Piney Run Pres. Ass'n v. County Comm'rs*, 523 F.3d 453, 459 (4th Cir. 2008), and the preliminary injunction context reinforces that burden, *see Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024).

that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not *subject* to the administrative process, is strong."); *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 638-39 (D.C. Cir. 2013) ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts."). Second, the states say their claims of lack of notice "have nothing to do" with claims subject to the CSRA process, Resp. Br. 39-40 (quoting *Axon*, 598 U.S. at 193), but—again—the states challenge a federal personnel action, and their argument turns on establishing the nature of that action. *See supra* pp. 12-13; *Axon*, 598 U.S. at 189 (challenge was genuinely collateral to merits when it did not contest "any specific substantive decision," such as "firing an employee"). The states' last argument, that their claims fall outside agency adjudicators' expertise, fails to persuade for the same reason. *See, e.g.*, *Elgin*, 567 U.S. at 23 (MSPB "regularly construes" labor statutes); *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 97 (1983) (The Federal Labor Relations Authority has "specialized expertise in its field of labor relations").

## II.   The Government Did Not Conduct A Reduction In Force.

If the Court were to reach the merits, it should still reverse. The states claim they offered "overwhelming" evidence that the terminated probationary employees were subject to a RIF, Resp. Br. 43, but *none* of the evidence goes to the determinative question. That question is whether the challenged actions "eliminate[d] jobs"—that is, whether they "abolished" the "positions" themselves. *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). That is the essence of a RIF, and the feature that distinguishes it from other types of federal employment actions. *See id.*; Resp. Br. 7 (agreeing that a RIF "is directed solely at a position within an agency" (quoting *James*, 284 F.3d at 1314)). But the states identify no evidence, and no findings by the district court, addressing that question.[2]

Instead, the states argue that the government must have conducted a RIF because it lacked sufficient cause to terminate the probationary employees, and the government is, as a general matter, seeking to reduce the size of the federal workforce. But if the government lacked cause to terminate a probationary employee it tried to terminate for cause, that

---

[2] The states incorrectly assert that the government "do[es] not dispute" that there are only three reasons a federal agency may terminate a probationary employee. Resp. Br. 42. The government has disputed that claim and continues to do so. *See* JA946.

would be a defective for-cause termination. The lack of cause could not turn the termination into a RIF.

The thin evidence the states rely on does not support their position. The states attempt to invoke "[t]ermination letters that expressly stated that firings were pursuant to applicable 'civil service RIF regulations.'" Resp. Br. 43 (quoting JA701). But that does not accurately represent the record. The cited declaration identifies a single "letter" that allegedly referenced RIF regulations, received by "[o]ne USAID employee." JA701. That letter was dated February 23, 2025, and "stated that the employee would not be separated until April 23, 2025." JA701. That was not the letter that terminated the employee. Instead, the employee received a separate "termination letter" the next day "indicating that she was being immediately terminated as a probationary employee," JA701, and the declaration does not claim that the termination letter referenced a RIF.

The states are thus left to rely on a separation packet from GSA that instructed a terminated employee to "direct your inquiries to rif@gsa.gov." JA723; *see* Resp. Br. 43. The name of an email address chosen by the agency to collect employee inquiries sheds no light on the nature of any particular personnel action taken by the agency. Like the rest of plaintiffs'

evidence, that email address says nothing about whether the agency eliminated the positions of the probationary employees it terminated.

More broadly, the states argue that because the administration has announced the goal of reducing the size of the federal workforce, and agencies terminated large number of employees, the "purpose" of the terminations made them RIFs. Resp. Br. 42. The states appear to draw this motivation-based reasoning from a regulation, 5 C.F.R. § 351.201(a)(2), but that regulation does not establish that a government-wide policy goal transforms any employee termination into a RIF. Instead, the regulation provides that an agency must follow the RIF regulations when the "release" of an employee "is required because of lack of work," "shortage of funds," "reorganization," or the like, "when such action will take effect after [the] agency has formally announced a reduction in force in the employee's competitive area." *Id.* The regulation, in other words, specifies only that an agency must follow RIF regulations when releasing an employee for covered reasons during a RIF.

As discussed above, the states' merits arguments make indisputably clear that their claim reduces to a challenge to the government's termination of probationary employees. They make the same arguments many terminated probationary employees are themselves endeavoring to

make: that the government lacked cause to fire them, and that they were instead illegally terminated in unannounced RIFs. The states rely on employees' previous performance evaluations. *See* Resp. Br. 44. And they seek the same remedy: reinstatement. Those arguments, evidence, and remedies belong in the administrative process Congress created. And the terminated probationary employees, not the states, are the proper parties to press those arguments.

## III. The States Failed To Establish The Other Preliminary-Injunction Factors.

Last, the remaining equitable factors weigh sharply against the states. *See* Stay Order 4-5. The harms to the government from the injunction are straightforward: being forced to continue employing individuals whose services it no longer requires and to pay those individuals' salaries and compensation—funds the government will be unable to recover. *See* Opening Br. 38-39. The states present no argument in defense of the district court's refusal to limit the government's losses by imposing a bond, as Federal Rule of Civil Procedure 65(c) requires. *See* Opening Br. 39. Instead, the states claim that this costly and intrusive requirement does not substantially interfere with the government's internal affairs because agencies might still be able to use *other* means to re-terminate the employees. Resp. Br. 52. That argument ignores both precedent and

common sense. *See Sampson v. Murray*, 415 U.S. 61, 83-84 (1974) (acknowledging the "obviously disruptive effect" of "preliminary injunctive relief" in "Government personnel cases").

The states also appear to suggest that the expenditures required by the preliminary injunction should not count in the analysis of the equitable factors because, in their view, the government is wrong on the merits (Resp. Br. 50) and would be illegally impounding appropriated funds if it does not pay the terminated employees (*id*. at 51-52). But as established, the states are not likely to succeed on the merits. And their late-breaking, undeveloped, and speculative impoundment argument cannot eclipse the government's straightforward harm: It must continue to employ and pay workers whose services it no longer requires and whom it has lawfully terminated. *See Department of Educ. v. California*, 145 S. Ct. 966, 969 (2025) (per curiam) (staying a preliminary injunction based on a similar showing, when district court declined to impose bond); *see also OPM v. AFGE*, No. 24A904, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025) (staying a preliminary injunction in a similar case); Stay Order 5 (relying on these stays).

On the other side of the ledger, the states' forecasted downstream harms from reduced tax revenues, a forecasted uptick in unemployment

benefits and associated costs, and past disruption and costs associated with rapidly executing their rapid response activities, are insufficient for Article III standing. A fortiori, those injuries do not establish irreparable harm warranting the extraordinary remedy of reinstatement. The states' contrary arguments about the balance of the harms and the public interest likewise provide no reason to second-guess the motions panel, which balanced the states' asserted harms against the government's harms and the public interest and determined that a stay was warranted. Stay Order 4-5 (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)). The states also try to defend the preliminary injunction on the ground that it is "narrower than the TRO" the district court first issued. Resp. Br. 52-53. But an earlier overreach cannot insulate a later one, even if the later overreach has a narrower scope.

In view of the equities' sharp tilt toward the government, as well as the government's likelihood of success on the merits and the states' lack of irreparable harm, the district court abused its discretion in ordering reinstatement of thousands of probationary employees at the states' request.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney*
*General, Civil Division*

<u>s/ Sarah Welch</u>
SARAH WELCH
*Counsel to the Assistant Attorney*
*General, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
(202) 514-3180

KELLY O. HAYES
*United States Attorney*

MARK R. FREEMAN
COURTNEY L. DIXON
STEVEN A. MYERS
*Attorneys, Appellate Staff*
*Civil Division*

April 28, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,547 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*s/ Sarah Welch*
Sarah Welch

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

*s/ Sarah Welch*
Sarah Welch