**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1248

STATE OF MARYLAND; STATE OF MINNESOTA; DISTRICT OF
COLUMBIA; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF
COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE
OF HAWAII; STATE OF ILLINOIS; STATE OF MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE
ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

          Plaintiffs – Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in
her Official Capacity as Secretary of Agriculture; UNITED STATES
DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his Official Capacity
as Secretary of Commerce; UNITED STATES DEPARTMENT OF DEFENSE;
PETER HEGSETH, In his Official Capacity as Secretary of Defense; UNITED
STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her Official
Capacity as Secretary of Education; UNITED STATES DEPARTMENT OF
ENERGY; CHRISTOPHER WRIGHT, in his Official Capacity as Secretary of
Energy; UNITED STATES DEPARTMENT OF HEALTH & HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in his Official Capacity as Secretary of
Health and Human Services; UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her Official Capacity as Secretary of Homeland
Security; UNITED STATES DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT; SCOTT TURNER, in his Official Capacity as Secretary of
Housing and Urban Development; UNITED STATES DEPARTMENT OF THE
INTERIOR; DOUGLAS BURGUM, in his Official Capacity as Secretary of the
Interior; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-
DEREMER, in her Official Capacity as Secretary of Labor; UNITED STATES
DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in his Official
Capacity as Secretary of Transportation; UNITED STATES DEPARTMENT OF
THE TREASURY; SCOTT BESSENT, in his Official Capacity as Secretary of the
Treasury; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS;

DOUGLAS A. COLLINS, in his Official Capacity as Secretary of Veterans Affairs; CONSUMER FINANCIAL PROTECTION BUREAU; RUSSELL VOUGHT, in his Official Capacity as Acting Director of the Consumer Financial Protection Bureau; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his Official Capacity as Administrator of the Environmental Protection Agency; FEDERAL DEPOSIT INSURANCE CORPORATION; TRAVIS HILL, in his Official Capacity as Acting Chairman of the Federal Deposit Insurance Corporation; GENERAL SERVICES ADMINISTRATION; MICHAEL J. RIGAS, in his Official Capacity as Acting Administrator of the General Services Administration; NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; OFFICE OF PERSONNEL MANAGEMENT; SCOTT KUPOR, in his Official Capacity as Director of the Office of Personnel Management; SMALL BUSINESS ADMINISTRATION; KELLY LOEFLER, in her Official Capacity as Administrator of the Small Business Administration; UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT; MARCO RUBIO, in his Official Capacity as Acting Administrator of the United States Agency for International Development and Archivist for the National Archives and Records Administration,

                    Defendants – Appellants.

------------------------------

THE OVERSIGHT PROJECT; DAN HUFF,

            Amici Supporting Appellant.

DONALD B. AYER; BARBARA COMSTOCK; JOHN FARMER, JR.; PETER D. KEISLER; PHILIP ALLEN LACOVARA; J. MICHAEL LUTTIG; JOHN MCKAY; TREVOR POTTER; ALAN CHARLES RAUL; PAUL SAMUEL ROSENZWEIG; CLAUDINE SCHNEIDER; ROBERT SHANKS; WILLIAM WELD; CHRISTINE TODD WHITMAN,

            Amici Supporting Appellee.

———————————

**No. 25-1338**

———————————

STATE OF MARYLAND; STATE OF MINNESOTA; DISTRICT OF COLUMBIA; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MASSACHUSETTS; STATE OF

MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF RHODE
ISLAND; STATE OF VERMONT; STATE OF WISCONSIN,

       Plaintiffs – Appellees,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in
her Official Capacity as Secretary of Agriculture; UNITED STATES
DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his Official Capacity
as Secretary of Commerce; UNITED STATES DEPARTMENT OF DEFENSE;
PETE HEGSETH, In his Official Capacity as Secretary of Defense; UNITED
STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her Official
Capacity as Secretary of Education; UNITED STATES DEPARTMENT OF
ENERGY; CHRISTOPHER A. WRIGHT, in his Official Capacity as Secretary of
Energy; UNITED STATES DEPARTMENT OF HEALTH & HUMAN
SERVICES; ROBERT F. KENNEDY, JR., in his Official Capacity as Secretary of
Health and Human Services; UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her Official Capacity as Secretary of Homeland
Security; UNITED STATES DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT; SCOTT TURNER, in his Official Capacity as Secretary of
Housing and Urban Development; UNITED STATES DEPARTMENT OF THE
INTERIOR; DOUGLAS BURGUM, in his Official Capacity as Secretary of the
Interior; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-
DEREMER, in her Official Capacity as Secretary of Labor; UNITED STATES
DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in his Official
Capacity as Secretary of Transportation; UNITED STATES DEPARTMENT OF
THE TREASURY; SCOTT BESSENT, in his Official Capacity as Secretary of the
Treasury; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS;
DOUGLAS A. COLLINS, in his Official Capacity as Secretary of Veterans Affairs;
CONSUMER FINANCIAL PROTECTION BUREAU; RUSSELL VOUGHT, in
his Official Capacity as Acting Director of the Consumer Financial Protection
Bureau; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE
M. ZELDIN, in his Official Capacity as Administrator of the Environmental
Protection Agency; FEDERAL DEPOSIT INSURANCE CORPORATION;
TRAVIS HILL, in his Official Capacity as Acting Chairman of the Federal Deposit
Insurance Corporation; GENERAL SERVICES ADMINISTRATION; MICHAEL
J. RIGAS, in his Official Capacity as Acting Administrator of the General Services
Administration; NATIONAL ARCHIVES AND RECORDS ADMINISTRATION;
OFFICE OF PERSONNEL MANAGEMENT; SCOTT KUPOR, in his Official
Capacity as Director of the Office of Personnel Management; SMALL BUSINESS
ADMINISTRATION; KELLY LOEFLER, in her Official Capacity as Administrator

of the Small Business Administration; UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT; MARCO RUBIO, in his Official Capacity
as Acting Administrator of the United States Agency for International Development
and Archivist for the National Archives and Records Administration,

           Defendants – Appellants.

------------------------------

THE OVERSIGHT PROJECT; DANIEL HUFF,

           Amici Supporting Appellant.

DONALD B. AYER; BARBARA COMSTOCK; JOHN FARMER, JR.; PETER D.
KEISLER; PHILIP ALLEN LACOVARA; J. MICHAEL LUTTIG; JOHN
MCKAY; TREVOR POTTER; ALAN CHARLES RAUL; PAUL SAMUEL
ROSENZWEIG; CLAUDINE SCHNEIDER; ROBERT SHANKS; WILLIAM
WELD; CHRISTINE TODD WHITMAN,

           Amici Supporting Appellee.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore.
James K. Bredar, Senior District Judge.  (1:25−cv−00748−JKB)

---

Argued:  May 6, 2025                                   Decided:  September 8, 2025

---

Before WILKINSON, RUSHING, and BENJAMIN, Circuit Judges.

---

Vacated with directions to dismiss by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Rushing joined. Judge Benjamin wrote a dissenting opinion.

---

**ARGUED:** Sarah Elizabeth Welch, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Appellants.  Caroline S. Van Zile, OFFICE OF THE ATTORNEY
GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C., for Appellees.
**ON BRIEF:**  Yaakov Roth, Acting Assistant Attorney General, Mark R. Freeman,
Courtney L. Dixon, Steven A. Myers, Civil Division, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C.; Kelly O. Hayes, United States Attorney, OFFICE OF

THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellants. Brian L. Schwalb, Attorney General, Ashwin P. Phatak, Principal Deputy Solicitor General, Anne Deng, Assistant Attorney General, Tessa Gellerson, Assistant Attorney General, Chris Edward Mendez, Assistant Attorney General, Mark A. Rucci, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C.; Anthony G. Brown, Attorney General, Julia Doyle, Solicitor General, Joshua M. Segal, Principal Deputy Solicitor General, Adam Kirschner, Assistant Attorney General, Michael Drezner, Assistant Attorney General, Virginia A. Williamson, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Keith Ellison, Attorney General, Liz Kramer, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota; Kristin K. Mayes, Attorney General, Hayleigh S. Crawford, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona; Rob Bonta, Attorney General, Satoshi Yanai, Senior Assistant Attorney General, Miranda Mason, Supervising Deputy Attorney General, Demian Camacho, Deputy Attorney General, CALIFORNIA DEPARTMENT OF JUSTICE, San Diego, California; Phil Weiser, Attorney General, David Moskowitz, Deputy Solicitor General OFFICE OF THE COLORADO ATTORNEY GENERAL, Denver, Colorado; William Tong, Attorney General, Michael Skold, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut; Kathleen Jennings, Attorney General, Ian R. Liston, Director of Impact Litigation, Vanessa L. Kassab, Deputy Attorney General, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; Anne E. Lopez, Attorney General, Kalikoʻonālani D. Fernandes, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF HAWAII, Honolulu, Hawaii; Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, OFFICE OF THE ILLINOIS ATTORNEY GENERAL, Chicago, Illinois; Andrea Joy Campbell, Attorney General, Katherine Dirks, Chief State Trial Counsel, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts; Dana Nessel, Attorney General, Bryan Davis, Jr., Assistant Attorney General, Debbie Taylor, Assistant Attorney General, Labor Division, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Detroit, Michigan; Aaron D. Ford, Attorney General, Heidi Parry Stern, Solicitor General, OFFICE OF THE NEVADA ATTORNEY GENERAL, Las Vegas, Nevada; Matthew J. Platkin, Attorney General, Nathaniel Levy, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey; Raúl Torrez, Attorney General, Anjana Samant, Deputy Counsel for Impact Litigation, NEW MEXICO DEPARTMENT OF JUSTICE, Santa Fe, New Mexico; Letitia James, Attorney General, Mark S. Grube, Senior Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York; Dan Rayfield, Attorney General, Stacy M. Chaffin, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon; Peter F. Neronha, Attorney General, Sarah W. Rice, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island; Charity R. Clark, Attorney General, Jonathan T. Rose, Solicitor General, OFFICE OF THE ATTORNEY GENERAL

OF VERMONT, Montpelier, Vermont; Joshua L. Kaul, Attorney General, Brian P. Keenan, Assistant Attorney General, WISCONSIN DEPARTMENT OF JUSTICE, Madison, Wisconsin, for Appellees.  Samuel Everett Dewey, CHAMBERS OF SAMUEL EVERETT DEWEY, LLC, Arlington, Virginia, for Amici The Oversight Project and Dan Huff.  Kristy Parker, Ori Lev, Washington, D.C., Conor Gaffney, New Orleans, Louisiana, Julia L. Torti, PROTECT DEMOCRACY PROJECT, New York, New York, for Amici Former Government Officials.

_____

WILKINSON, Circuit Judge:

Shortly after the 2025 Presidential Inauguration, the federal government began to lay off thousands of probationary employees across multiple federal agencies. Many people regard these sudden terminations as a harsh and dislocating action that works significant hardship on many civil servants—individuals who committed their considerable energy and talents to serving the nation. Others regard these terminations as part of a long-overdue effort to downsize the federal government and trim unnecessary expenses. Complaints about the bloat of the federal bureaucracy and concerns about preserving the public fisc have long been facets of our political discourse.

This clash of views must ultimately be resolved by the voters. For our part, we deal with a narrow constitutional question: whether a group of states has Article III standing to challenge the composition of the federal workforce. Standing doctrine requires us to ensure that the proper party is seeking the proper relief. Here that is not the case. Although it was the employees who suffered the brunt of the harm, they are nowhere to be found in this case. We conclude that the plaintiff States lacked standing here and return this case to the district court with directions to dismiss it.

I.

A.

The federal government can hire employees subject to a one- or two-year probationary period depending on the nature of the particular job. These probationary employees are not at-will employees, but their employment is far from guaranteed. A federal agency may terminate probationary employees (1) for conditions arising prior to

their appointment; (2) for cause; or (3) as part of a reduction in force ("RIF"). *See* 5 C.F.R. §§ 315.803(a), 315.805; 5 U.S.C. § 3502. For-cause termination requires an individualized determination that the employee's "work performance or conduct during [the probationary] period fails to demonstrate his fitness or his qualifications for continued employment" after being given a fair shake in the role. 5 C.F.R. § 315.804(a); *see McGuffin v. Soc. Sec. Admin.*, 942 F.3d 1099, 1102 (Fed. Cir. 2019); *Younies v. Merit Sys. Prot. Bd.*, 662 F.3d 1215, 1219 (Fed. Cir. 2011).

RIFs—administrative procedures to effectuate departmental reorganizations and/or respond to the lack of available work—likewise provide certain procedural guardrails for terminated federal employees. These requirements are numerous, spanning an entire Part of the Code of Federal Regulations. *See* 5 C.F.R. §§ 351.201–351.902. Therefore, properly preparing for and implementing a RIF can often take well over a year. *See* J.A. 235.

Out of all the RIF requirements, only one—a notice provision—has state governments specifically in mind; the rest serve to vindicate the interests of the federal employees alone. The notice provision mandates that the federal government provide both released employees and state governments of the impacted jurisdictions 60 days' notice before termination. 5 U.S.C. § 3502(d). In emergency situations, the President may shorten this notice period to no less than 30 days "if necessary because of circumstances not reasonably foreseeable." *Id.* § 3502(e)(1). The notice serves in part to help states "carry out rapid response activities [required] under section 134(a)(2)(A) of the Workforce Investment Act of 1998." *Id.* § 3502(d)(3)(A)(i). These rapid response activities are meant to "assist dislocated workers" in "obtaining reemployment as soon as possible" through,

8

for example, "the provision of information on and access to available employment and training activities." 29 U.S.C. § 3102(51). Congress set forth the information that the notice must contain to help states prepare for and conduct these activities: (1) the number of terminated employees in specific geographic areas, (2) when the terminations will occur, and (3) "any other matter" that would aid in facilitating the states' rapid response activities. 5 U.S.C. § 3502(d)(3)(B).

Federal employees may contest the validity of their terminations under the Civil Service Reform Act ("CSRA") in an administrative tribunal known as the Merit Systems Protection Board ("MSPB"). Probationary employees may only challenge terminations for "improper procedure" or discrimination based on "partisan political reasons or marital status." 5 C.F.R. § 315.806. They may appeal an adverse decision of the MSPB to the United States Court of Appeals for the Federal Circuit, which generally has exclusive jurisdiction. 5 U.S.C. § 7703(b).

### B.

It is no secret that the current Administration aims to reduce the workforce of many federal agencies. This mission began in earnest on day one, when the Office of Personnel Management ("OPM") distributed a guidance memorandum directing executive agencies to "identify all employees on probationary periods" and "promptly determine whether those employees should be retained." J.A. 45. On February 11, 2025, the President issued an Executive Order aiming to "eliminat[e] waste, bloat, and insularity" in the Executive Branch and ordering agency heads to investigate ways of reducing the federal workforce, including through RIFs. J.A. 482. On February 13, news media reported that OPM had

9

directed multiple federal agencies to begin terminating the majority of the federal government's probationary employees en masse. J.A. 47. The next day, OPM followed up over email with the human resources officials of each federal agency, asking them to "separate probationary employees that you have not identified as mission-critical no later than end of the day Monday, 2/27" in accordance with "the President's directive to dramatically reduce the size of the federal workforce." J.A. 609–10.

Shortly thereafter, on February 26, OPM and the Office of Management and Budget ("OMB") issued another guidance memorandum in compliance with the February 11 Executive Order. RUSSELL T. VOUGHT & CHARLES EZELL, GUIDANCE ON AGENCY RIF AND REORGANIZATION PLANS (Feb. 26, 2025). This document provided that "[a]gencies should [] seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; [and] seek reductions in components and positions that are non-critical." *Id.* at 2. OPM and OMB instructed agencies to continue "evaluat[ing] probationary employees" for the purposes of removal and created a plan for future "large-scale reductions in force." *Id.* at 3.

By February 13, 2025, various federal agencies had begun terminating large swaths of probationary employees. For example, the USDA terminated approximately 3,400 employees in the Forest Service, the Treasury Department terminated approximately 6,000 employees, the VA terminated approximately 2,400 employees, and HHS terminated approximately 1,300 employees. By early March, the federal government had terminated at least 24,000 probationary employees. *See* J.A. 45–51.

The government did not provide 60- or 30-days' advance notice of the terminations. The plaintiff States in this case allege that in the weeks after the terminations began, affected jurisdictions began experiencing sharp increases in unemployment claims as compared to the same period last year—including a 330% increase in Maryland and a 149% increase in California. J.A. 485. Plaintiffs further allege that they had to expend substantial resources in response to the sudden and unnoticed terminations in order to initiate the rapid response activities required under the Workforce Investment Act. For instance, some created new websites and phone lines specifically intended to assist these probationary employees. Finally, the States allege a diversion of significant financial and personnel resources from other government programs to their rapid response programs. *See, e.g.*, J.A. 82–85, 104, 117–18, 125–26, 142–43.

C.

On March 6, 2025, 19 states and the District of Columbia (the "States") sued 21 federal agencies in the United States District Court for Maryland, alleging that the terminations of probationary employees were unlawful.[1] Plaintiffs argued that the mass terminations were unlawful because (1) the terminations were not a result of individualized, for-cause determinations, (2) they therefore constituted a RIF, and (3) the federal government did not comply with the statutory RIF requirements, which included giving the States 60 days' notice. J.A. 51–54, 71.

---

[1] The 19 states are Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Wisconsin. J.A. 22–23.

11

Plaintiffs requested both "immediate temporary relief" and "preliminary and permanent injunctive relief." J.A. 71–72. Specifically, the States requested "immediate temporary relief restraining Defendants from terminating any probationary employees without making specific, individualized determinations regarding the inadequacy of the employee's conduct or performance and reinstating probationary employees who were terminated on or after January 20, 2025, as part of mass terminations that did not comply with RIF procedures and were not based on individualized determinations of the inadequacy of the employee's conduct or performance." J.A. 71. Next, plaintiffs sought "preliminary and permanent injunctive relief enjoining any further terminations that do not follow the RIF requirements or requirements for separating probationary employees for performance." J.A. 72.

On March 13, the district court granted plaintiffs' motion for a temporary restraining order ("TRO"). It ordered the government to "REINSTATE all Affected Probationary Employees throughout the United States FORTHWITH, and in any event before March 17, 2025." J.A 531. The district court further ordered that the defendants "SHALL NOT, throughout the United States, conduct any future Reductions in Force ('RIFs')—whether formally labeled as such or not—except in compliance with the notice requirements set forth in 5 U.S.C. § 3502, relevant regulations set forth in Title 5, Chapter I of the Code of Federal Regulations, and all other applicable law." J.A. 531–32. In a footnote, the district court added, "Nothing in this Order prohibits the Government from conducting lawful terminations of probationary federal employees—whether pursuant to a proper RIF or else for cause, on the basis of good-faith, individualized determinations, under the standards for

12

making such determinations set forth in the foregoing Memorandum, and not as part of a mass termination." J.A. 532. The court stated that it planned to hold a preliminary injunction hearing on March 26, 2025. *Id.*

The government appealed the TRO and requested an administrative stay or a stay pending appeal. In the meantime, it began to reinstate the terminated probationary employees in compliance with the district court's order. *See* J.A. 537–607. On March 21, this court denied the government's motion, noting "the district court's stated intention to hold a hearing on March 26, 2025, and to promptly grant or deny preliminary injunctive relief thereafter." Order at 2, *Maryland v. USDA*, No. 25-1248 (4th Cir. Mar. 21, 2025). In a concurrence, Judge Rushing recognized "the growing concerns over district courts issuing nationwide injunctions to order redress for those who have not sought it." *Id.* at 4 (Rushing, J., concurring).

After extending the TRO and holding a hearing, the district court granted plaintiffs' request for a preliminary injunction on April 1, 2025. J.A. 990–94. The preliminary injunction was similar to the TRO, except that it was limited to reinstating and restraining the government's ability to terminate only those probationary employees "[w]hose duty station (prior to any purported termination) and/or residence" was in one of the 20 plaintiff jurisdictions. J.A. 993–94. The court ordered the government to "TAKE all steps necessary to undo the purported terminations of such Affected Probationary Employees" to the extent that was not completed pursuant to the TRO. J.A. 990. And it further ordered that the government "SHALL NOT conduct any future Reductions in Force ('RIFs')—whether formally labeled as such or not—with respect to Affected Probationary Employees, except

13

in compliance with the notice requirements set forth in 5 U.S.C. § 3502, relevant regulations set forth in Title 5, Chapter I of the Code of Federal Regulations, *and all other applicable law*." J.A. 990–91 (emphasis added). The court included the same footnote as in the TRO, which indicated that the government was permitted to terminate federal employees "(1) pursuant to a proper RIF conducted in compliance with all applicable laws, or else (2) for cause, on the basis of good-faith, individualized determinations, under the standards for making such determinations set forth in the TRO Memorandum." J.A. 991.

The government promptly appealed the preliminary injunction and requested a stay pending appeal. J.A. 995. On April 9, this court granted the government's motion and stayed the preliminary injunction pending appeal. The panel majority concluded that the government was "likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." Order at 5, *Maryland v. USDA*, No. 25-1248 (4th Cir. Apr. 9, 2025). Judge Benjamin dissented on this point. *Id.* at 6. The States moved for an administrative stay, which the panel majority denied. The panel then requested full briefing and held oral argument.

## II.

Article III requires that federal courts adjudicate only cases and controversies. *Murthy v. Missouri*, 603 U.S. 43, 56 (2024). Justiciability turns on the threshold question of standing: whether the party bringing suit is "a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). This is no "troublesome hurdle" to be cleared with the most whimsical of attempts on the way to the merits. *United States v. Texas*, 599 U.S.

14

670, 675 (2023) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 476 (1982)). Rather, Article III standing is an integral component of our nation's system of checks and balances and a key mechanism of judicial restraint. Therefore, our exercise of jurisdiction is appropriate only when a plaintiff has affirmatively established "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020). To fail this three-part test is to put a period on the case.

We hold that the States failed to allege a cognizable and redressable injury and look no further into the merits of the preliminary injunction.

A.

Plaintiffs' failure to receive notice sounds like a quintessential informational injury—the federal government withheld information that the States had a statutory right to receive. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). But Congress cannot create an injury-in-fact through legislative fiat alone. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). And the Supreme Court has specifically expressed skepticism about informational injuries insofar as they do not result in "'downstream consequences' from failing to receive the required information." *Id.* at 442 (citation omitted). Thus, to transform an informational injury-in-law into an injury-in-fact, plaintiffs must allege "a 'real' harm with an adverse effect" resulting from the failure to receive the

information. *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)).

The States advance two related theories of informational injury: first, that the injury was the failure to obtain the specific *information* mandated by the notice requirement, and second, that the injury was the preparatory *time* lost as a result of the failure to provide notice. The alleged downstream harms caused by both alleged injuries converge into three rough categories: (1) rapid-response-related expenses incurred prior to filing the present lawsuit (*e.g.*, the costs of creating the new websites and phone lines and any costs associated with diverting resources to implementing the programs); (2) forward-looking rapid-response-related expenses; and (3) various indirect impacts to state budgets (*e.g.*, the costs of processing heightened volumes of applications for state-subsidized health insurance and the income tax losses for the period the probationary employees would have worked had there been a 60-day notice period). *See* Response Br. at 14–15.

None of these categories provides a sufficient basis to find a cognizable injury-in-fact. As an initial matter, the States cannot point to previously incurred expenses as a harm for purposes of standing in a request for a preliminary injunction. "Past exposure to illegal conduct does not in itself show a present case or controversy" for purposes of equitable relief. *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). Prospective relief must instead be justified by prospective injury. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (requiring that plaintiffs seeking injunctive relief show "sufficient likelihood of future injury"); *Murthy*, 603 U.S. at 58. Even if directly attributable to the

lack of notice, such expenses are in the past, so they can only support an action for damages, not injunctive relief.

Thus, with regard to the rapid response programs, we focus only on the allegedly ongoing and forward-looking expenses at the time the States filed their complaint. In doing so, we look at whether these harms have a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (internal quotation marks omitted) (quoting *Spokeo*, 578 U.S. at 341).

While monetary harms generally qualify as injuries-in-fact, we cannot view the injuries of states at this high level of abstraction. We must instead consider the context in which the alleged injuries arose. In *United States v. Texas*, no judicially cognizable injury existed, despite the plaintiff states' significant monetary harms, because the states were contesting the "Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Texas*, 599 U.S. at 684. The Supreme Court further noted that it was "mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer" in light of "our system of dual federal and state sovereignty." *Id.* at 680 n.3.

The federal government is required in all kinds of ways to respect the basic sovereignty of the states. But the reverse is also true. It is hard to imagine a more traditionally federal function than the management of the federal workforce. The federal workforce performs federal functions. How it performs them is a matter of federal concern. *See* U.S. CONST. art. I, § 8 (enumerated Congressional powers); art. II, § 3 (duty of the Executive to "take Care that the Laws be faithfully executed"). Indeed, the federal

government "has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs'" including when it comes to the composition of its workforce. *Sampson v. Murray*, 415 U.S. 61, 83 (1974) (internal citation omitted); *see also Arnett v. Kennedy*, 416 U.S. 134, 168 (1974) (Powell, J., concurring in part) ("[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs."). Because the interest here is a traditionally federal one, the States have no judicially cognizable injury under *Texas*.

A contrary result would upend our federalist system by ceding federal sovereignty to the states. Innumerable federal actions impact state budgets and programs. Under plaintiffs' theory, every modification in federal funding levels would authorize states to sue in federal court. This is all too open-ended. *See Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing."). If we recognized a cognizable injury here, there would be no end to the suits that states could bring to contest any federal action.

Finally, the alleged declines in tax revenue and increased social services expenses float ever further downstream. If states could claim these "peripheral costs" for purposes of standing, there would effectively be no barrier to suit. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). Such a result would "would make a mockery . . . of the constitutional requirement of case or controversy." *Id.* (quoting Alexander Bickel, *The Voting Rights*

18

*Cases*, 1966 SUP. CT. REV. 79, 89–90 (1966)). For example, any allegation of improper termination by any federal employer could allow a state to swoop in and claim a tax loss for standing purposes. The only limit would be states' willingness to sue. The Court has long been wary of taxpayer standing for similar reasons, *see, e.g.*, *United States v. Richardson*, 418 U.S. 166, 175 (1974), and we see no reason to view tax-recipient standing with any less skepticism. Such harms are often too generally applicable and too attenuated from the legal violation to serve as cognizable injuries-in-fact. This is especially true given the sweeping injunctive relief plaintiffs seek. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2558 (2025) ("[T]he broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." (quoting Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 NOTRE DAME L. REV. 1763, 1797 (2022))).

In holding that the States did not allege a cognizable injury, we recognize that they are not the proper parties to bring this suit. The real and direct harms were suffered not by the States, but by the terminated probationary employees, none of whom are even parties to this suit. And while the States may have valid practical reasons to be concerned about their citizens' employment statuses, they may not masquerade their efforts to serve as *parens patriae*. *See Murthy*, 603 U.S. at 76 ("States do not have 'standing as *parens patriae* to bring an action against the Federal Government.'" (quoting *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023))). "An uninjured plaintiff" may not bypass the standing requirement "to ensure a defendant's 'compliance with regulatory law.'" *TransUnion*, 594 U.S. at 427 (quoting *Spokeo*, 578 U.S. at 345 (Thomas, J., concurring)).

B.

19

We now turn to redressability, the other component of Article III standing that looms in the plaintiffs' path. The government contends that there is a "mismatch between the states' informational injury theory" and the remedy of indefinite reinstatement of probationary employees. Opening Br. at 27. It argues that any remedy here should have been tailored to the States' specific injury, namely an injunction that gave the States the *information* they were missing due to lack of notice or at most a temporary reinstatement of 60 days to provide the States with the *time* they allegedly lost. *See id.*; Oral Arg. at 12:00. Instead the district court, for the duration of the case, prohibited the federal agencies from terminating the probationary employees unless they did so in compliance with "all applicable laws." This required the government not only to provide notice to the plaintiffs but also to comply with all the laws and regulations that protect the employees themselves—who, again, are *not* parties to this case. As the government put it, "neither federal personnel law nor the U.S. Constitution contemplates that the legality of any employee's termination—whether the terminations at issue here, or any future RIF that an agency might execute—will be subject to the continuing jurisdiction of a federal district court *at the behest of state governments*." Reply Br. in Support of Mot. for a Stay Pending Appeal at 9 n.1 (emphasis added).

The States counter that any mismatch between injury and remedy is not related to standing but would instead be an error on the merits as to the "scope of relief" granted by the district court. *See* Response Br. at 32; Oral Arg. at 18:50.

We think, however, that the broad remedy here presents a redressability problem—not because that is what the district court ordered, but because that was the relief that

plaintiffs requested in their complaint. As we discuss below, the plaintiffs' requested equitable remedy primarily served to vindicate the interests and rights of the non-party probationary employees. This creates a fatal disconnect between the plaintiffs' alleged injury and the sweeping relief they requested.

1.

Under black-letter standing doctrine, a plaintiff must demonstrate "that [its] injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 602 U.S. at 380. The Supreme Court has emphasized that "standing is not dispensed in gross" and "a plaintiff must demonstrate standing . . . 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). And even though the government does not contest causation, "[r]edressability can still pose an independent bar" even where "the defendant has directly injured the plaintiff." *All. for Hippocratic Med.*, 602 U.S. at 381 n.1; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 n.7 (1998).

To assess redressability, we look to the relief that was requested by the plaintiff in its complaint. *See Steel Co.*, 523 U.S. at 105–06; *Murthy*, 603 U.S. at 73. Our scrutiny of the requested relief under Article III standing doctrine, especially where plaintiffs are seeking an equitable remedy, ensures that the "proper parties" are seeking the "proper relief" to redress their injuries. William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 158–61 (2023) (collecting "cases about equitable remedies" in which the Supreme Court "emphasizes the standing-remedy connection"). That is why

sometimes "standing and remedies intersect." *Texas*, 599 U.S. at 690 (Gorsuch, J., concurring); *see also O'Shea*, 414 U.S. at 499 ("[Article III standing] considerations obviously shade into those determining whether the complaint states a sound basis for equitable relief.").

This close evaluation of the requested relief in the standing analysis is important for at least three reasons, all of which are relevant to this case. First, a plaintiff may not normally seek relief in federal court to vindicate "the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In other words, "standing doctrine strongly disfavors so-called 'third party standing'" cases, where "even though the plaintiff *does* have an injury in fact and it *can* be redressed by her suit, she is denied standing nonetheless, because she is vindicating rights that more properly belong to somebody else." Baude & Bray, *supra*, at 157 (citing *Warth*, 422 U.S. at 499).

Second, and relatedly, we must closely examine the "connection between the alleged injury and the judicial relief requested" to guard against cases "in which the relief requested goes well beyond the violation of law alleged." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated on other grounds by*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). This approach serves "the general rule" that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also CASA*, 145 S. Ct. at 2557. The "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Cuno*, 547 U.S. at 353 (quoting *Lewis*, 518

U.S. at 357) (noting that plaintiffs' proposed theory of standing "would contravene this principle"). "The actual-injury requirement would hardly serve the purpose . . . of preventing courts from undertaking tasks assigned to the political branches [] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration." *Lewis*, 518 U.S. at 357.

And third, probing the requested relief in the standing analysis helps us determine whether a federal court is even capable of providing the remedy the plaintiff seeks. For example, "the case may not be of the kind 'traditionally redressable in federal court.'" *All. for Hippocratic Med.*, 602 U.S. at 381 n.1 (quoting *Texas*, 599 U.S. at 676). Or the relief requested by the plaintiff is simply "not available" because of a law passed by Congress, such that the plaintiff "fail[s] to show that the District Court could order effective relief." *Texas*, 599 U.S. at 690 (Gorsuch, J., concurring); *id.* at 704 (Barrett, J., concurring). Or perhaps the plaintiff's requested relief would otherwise have the federal court act beyond its proper role in a system of separated powers and dual sovereignty with the states. *See, e.g.*, *Lewis*, 518 U.S. at 385 (Thomas, J., concurring) ("Principles of federalism and separation of powers impose stringent limitations on the equitable power of federal courts."); Richard H. Fallon, Jr., *The Fragmentation of Standing*, 93 TEX. L. REV. 1061, 1110–11 (2015) ("In actions for equitable remedies . . . the concerns bearing on standing merge along a spectrum with concerns about whether the relief sought would overreach the bounds of judicial competence or enmesh the issuing court in functions more properly reserved to democratically accountable institutions.").

2.

As discussed, the States alleged an informational injury from the lack of advance notice. They argued, and the district court agreed, that they were deprived of two discrete things: (1) information and (2) 60 days of time to prepare in advance of the terminations.

Keeping these alleged injuries in mind, and assuming they are cognizable, we turn to the relief requested in the plaintiffs' complaint. In addition to requests for "immediate temporary relief" to reinstate the terminated probationary employees, the plaintiffs ultimately sued for "preliminary and permanent injunctive relief." J.A. 71–72. The plaintiffs sought a court order "enjoining any further terminations that do not follow the RIF requirements or requirements for separating probationary employees for performance and enjoining Defendants from separating any employees pursuant to a RIF prior to the reinstatement of the probationary employees described above." J.A. 72.

The word "notice" does not appear once in the prayer for relief. Nor does "60 days" or any discrete time period. Instead, plaintiffs requested an order that would indefinitely require the government to comply with "the RIF requirements" or the "requirements for separating probationary employees for performance." Because other parts of the complaint listed the "RIF Requirements" separately from the "RIF Notice Requirements" to include the myriad other steps the government must take before conducting a RIF pursuant to 5 U.S.C. § 3502, we can only conclude that the States' use of the broader "RIF requirements" in their prayer for relief was intentional. *See* J.A. 42–43. And when stating their claims, the States likewise argued that the government violated the law by not "following the required RIF procedures, *see* 5 U.S.C. § 3502; 5 C.F.R. Part 351, *including* providing 60 days'

24

notice to states." J.A. 68 (emphasis added). Plaintiffs reiterate on appeal that the agencies "fire[d] employees en masse based on shifting justifications and with no process, despite clear statutory and regulatory commands to the contrary." Response Br. at 49. According to the plaintiffs themselves, the injunction they requested—because it requires the federal government to follow "the proper RIF procedures"—would remedy the harms to "24,000 public servants" and vindicate their "interests." *Id.*

Given all this, we are unable to construe the States' requested relief and ultimate goal in this case as anything other than an attempt to invoke a federal court's jurisdiction to restrain the federal government from terminating its probationary employees unless it *fully* complies with all applicable employment statutes and regulations.[2] That is a far cry from a narrow order that the agencies comply with the 60-day notice provision applicable to the plaintiffs before us.

Plaintiffs' requested relief was ultimately aimed at vindicating the rights of the non-party employees. The 60-day notice requirement applicable to the States is just one provision amid a sea of provisions in the RIF statute that otherwise seek to protect the rights and interests of federal *employees. See generally* 5 U.S.C. § 3502; 5 C.F.R. §§ 351.201–351.902. Just to *prepare* for a RIF, "an agency spends approximately 12 to 18

---

[2] We note that the district court granted plaintiffs' requested injunction accordingly. It restrained the government from conducting RIFs unless they were "proper" and "in compliance with all applicable laws." J.A. 991. The court noted in its memorandum opinion that there "must" be "no more terminations until *all* legally mandated procedures, *including* [the notice period], have been satisfied." J.A. 934 (emphasis added). And it stated that the injunction "will extend *indefinitely* until final judgment." J.A. 974 (emphasis added).

months" to comply with all of these employee-centric provisions. J.A. 235. And the States' alternative demand for individualized employee-by-employee determinations would similarly vindicate *employees'* rights. The proper parties to vindicate the rights of employees under federal employment law are the employees themselves, not state governments on their behalf.

For similar reasons, the sweeping relief requested by the States was overly broad and disconnected from both their asserted injury and the relevant statutory violation, going far beyond the "inadequacy that produced [plaintiffs'] injury in fact." *Cuno*, 547 U.S. at 353. The indefinite reinstatement of federal employees is simply too much to request to remedy a lack of notice.

These two related problems with the requested relief reflect the concerns that the Supreme Court articulated in *Warth v. Seldin*, *Allen v. Wright*, and other decisions. The strictures of Article III that constrain plaintiffs from seeking expansive relief on behalf of third parties not before the court "tend[] to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982); *see also TransUnion*, 594 U.S. at 423–24 ("Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities."). A challenge to the legality of the underlying federal employment actions here belongs to the employees.

26

In sum, the States impermissibly sought to use the narrow violation of one provision in this large statutory scheme to have a federal district court oversee the Executive's compliance with broader employment law. *See* Baude & Bray, *supra*, at 160 ("Equity had to be conscious about whether the plaintiff's grievance was commensurate with the remedy sought, because otherwise a trifle of grievance could be the basis for a remedy that imposed massive costs on the defendant."). Federal courts lack jurisdiction to entertain such lopsided suits.

We need not decide what relief the plaintiffs here could have permissibly sought, but the parties offer two ideas. The government acknowledges that an appropriate remedy for plaintiffs' informational injury would be an injunction requiring the government to produce the required information. *See* Opening Br. at 25–26 (citing *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989); *Akins*, 524 U.S. at 21). And as for plaintiffs' "temporal" injury, the government concedes and plaintiffs acknowledge that the States could have requested a narrow injunction requiring the government to give notice of the terminations and restraining the government from effectuating the terminations for the 60-day notice period. *See* Oral Arg. at 12:00, 34:38. That relief would be tailored to the narrow statutory violation at issue. It would not invoke, at the behest of state governments, the jurisdiction of the federal courts to monitor and enforce the federal government's compliance with a plethora of legal provisions that are unrelated to the States and instead protect individual employees.

3.

Quite simply, the federal court in this case lacked the affirmative power to manage the federal government's workforce at the behest of state governments. The Civil Service Reform Act's reticulated scheme further supports our conclusion on redressability. In the CSRA, Congress "established a comprehensive system for reviewing personnel action taken against federal employees," entitling employees to a hearing before the MSPB and judicial review in the Federal Circuit. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5–6 (2012) (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)). The Supreme Court has concluded that Congress intended this scheme to be "exclusive" and has twice rejected employees' attempts to litigate their claims in other forums. *Id.* at 5, 9–11, 23 (citing *Fausto*, 484 U.S. at 452). Indeed, the CSRA scheme explains why not a single individual employee is herself a plaintiff in this case. *See* J.A. 941. Given this comprehensive review system, which excludes the federal district courts and where terminated employees are directed to challenge their terminations and seek reinstatement, we are skeptical that the broad relief that the States sought in this case is available to them in a federal district court. *See Texas*, 599 U.S. at 690 (Gorsuch, J., concurring) (observing "a lack of redressability" where the requested "form of relief is not available").

### III.

We acknowledge that the abrupt and indiscriminate dismissal of the probationary employees here exacted all-too-human costs upon those affected. But this real impact on the employees, who are not parties here, cannot govern our review. Instead, we are required to answer a narrower question concerning the plaintiffs in this case: whether a group of states may invoke the jurisdiction of a federal district court to oversee the federal

28

government's compliance with federal employment laws governing the termination of federal employees. The relief requested here is wholly out of proportion to the injury alleged. To hold that standing exists would upset, indeed revolutionize, the balance inherent in dual sovereignty, one in which reciprocal respect must be accorded by one sovereign to the paramount interests of another. We must hold, as the Supreme Court's decisions plainly dictate, that these plaintiffs lacked standing to seek the relief that they did. We therefore vacate the judgment below and remand with directions to the district court to dismiss the action.

*VACATED WITH DIRECTIONS TO DISMISS*

DEANDREA GIST BENJAMIN, Circuit Judge, dissenting:

The majority votes to dissolve the district court's well-reasoned decision granting a preliminary injunction. For the reasons below and those explained in thorough detail by the district court, I would leave the preliminary injunction intact. Therefore, I respectfully dissent.

I.

A.

Immediately upon assuming office, President Donald J. Trump appointed Charles Ezell to serve as acting director of the Office of Personnel Management ("OPM"). J.A. 45.[1] The same day, Ezell distributed a memo to the directors and acting directors of departments and agencies, directing the heads to " 'identify all employees on probationary periods . . . and send a report to OPM listing all such employees' no later than January 24, 2025" and to "promptly determine whether those employees should be retained by the agency." *Id.* (internal quotation marks omitted in second quote). "Also on January 20, 2025, President Trump signed an executive order entitled 'Hiring Freeze,' " instructing "the Director of the Office of Management and Budget—in consultation with OPM and the United States Department of Government Efficiency Service ('DOGE')—to 'submit a

---

[1] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers for citations to the J.A. utilize the "JA#" numbering at the bottom of the page on each document.

plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition.' " *Id.* at 45–46.

"On February 11, 2025, President Trump issued Executive Order 14210, entitled 'Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative,' " which "directed agency heads to 'promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs.' " *Id.* at 46.

Shortly thereafter, various agencies began mass terminations, firing more than twelve thousand employees within a month of the executive order: the Consumer Financial Protection Bureau terminated 143–173 employees; "the Department of Education terminated 60 probationary employees"; "the General Services Administration notified approximately 100 probationary employees that they would be terminated"; "the Department of Energy terminated nearly 2,000 probationary employees" and "terminated around 130 probationary employees in the Bonneville Power Administration" (380 reinstated later); the Department of Veterans Affairs terminated approximately 2,400 probationary employees; "OPM fired 250 probationary employees"; "the Small Business Administration terminated around 720 probationary employees"; "the Department of Agriculture terminated approximately 3,400 probationary employees"; "the Environmental Protection Agency fired approximately 388 probationary employees"; "the Interior Department fired approximately 2,400 probationary employees"; and "the Department of Homeland Security terminated 605 probationary employees"; etc. *Id.* at 46–48.

B.

On March 6, 2025, the States[2] filed a complaint, arguing the Government's mass firings were in violation of law, arbitrary and capricious, and ultra vires. *Id.* at 68–70. The States allege that the Government "ha[s] not abided by the statutory and regulatory requirements for RIFs, including the requirement to provide 60 days' notice to the Plaintiff States." *Id.* at 45. Specifically, the States allege that the Government failed to "designate the 'competitive areas' in which employees would compete for retention," "designate any 'competitive levels' of positions included in the RIFs," "establish a retention register of employees in each competitive level," "rank employees for retention," or "provide required notices 60 days in advance of the effective date of termination to affected employees, their collective bargaining representatives, or to Plaintiff States." *Id.* at 51–52.

On March 7, 2025, the States filed a motion for temporary restraining order (TRO). The district court granted the TRO, and this panel affirmed. Subsequently, the States moved for a preliminary injunction, the district court granted the motion, and this panel granted a stay of the preliminary injunction pending this appeal.

II.

---

[2] Plaintiff States are a consortium of nineteen states (Maryland, Minnesota, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Wisconsin) and the District of Columbia.

32

The majority finds that the States do not have standing.  It ignored the real harms asserted by the States, relies on a misreading of *United States v. Texas*, 599 U.S. 670 (2023), and adopts the Government's willful ignorance of the States' actual claims.

As the district court's order ably set-out, the States clearly have standing to challenge *the process by which* the Government has engaged in mass firings.[3]

### A.

To establish standing, "the plaintiff must have a ' "personal stake" ' in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).  To prove a personal stake, "plaintiffs must be able to sufficiently answer the question: " 'What's it to you?' " *Id.* (quoting Antonin Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983)) (internal quotation marks omitted).  A satisfactory answer to this question requires a plaintiff to show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

### B.

---

[3] The majority and the Government repeatedly mischaracterize the basis of the States' claims, asserting that the States are attempting to sue on behalf of their respective citizens for alleged unlawful firings.  This mischaracterization not only misses the point but—more seriously—distracts from the States' *actual* alleged harm.  The States were entitled to proper notice, which the Government did not give.  *That* is the basis for the instant suit.

For injury-in-fact, the Supreme Court has recognized that certain intangible injuries, including an "informational injury," can support standing. *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24–25 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989). "[A] statutory violation *alone*," however, "does not create a concrete informational injury sufficient to support standing." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016)). Instead, a "constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled *and* that the denial of that information creates a 'real' harm with an adverse effect." *Id.* (quoting *Spokeo*, 578 U.S. at 339–40).

By this standard, the States' informational injury cannot be a "dead end," as the Government claims. *See* Appellants' Br. (ECF No. 58) at 8 (hereinafter "Opening Br.").[4] First, pursuant to 5 U.S.C. § 3502(d), the Government was *legally required* to inform the States at least 60 days before any RIF. *See also* 5 C.F.R. § 351.803(b). The Government failed to do so, thereby depriving the States of information to which they were legally entitled and satisfying the first requirement of a constitutionally cognizable informational injury. *See Dreher*, 856 F.3d at 345.

---

[4] Page numbers for citations to ECF documents utilize the page numbers in the red or blue headers on each document.

Next, as discussed in depth by the district court, the denial of this notice has, and will continue to, cause real harm with significant adverse effects. *See Maryland v. United States Dep't of Agric.*, 777 F. Supp. 3d 432, 449–53 (D. Md. 2025). Such adverse effects include, but are not limited to, an increase in unemployment benefits applications, an increase in the resources required to investigate this influx in unemployment benefits applications, additional financial and labor costs associated with the sudden strain placed on rapid response programs without advance notice, unanticipated loss of tax revenue, and the loss of support from federal employees who were working with various state agencies.[5] *See id.* These harms, among others, plainly satisfy the concreteness requirement and thus provide the necessary grounds for Article III standing. *See Dreher*, 856 F.3d at 345.

The majority summarily dismisses the harms alleged by the States. I agree with the majority that "the [probationary] employees . . . suffered the brunt of the harm" from the RIFs, Maj. Op. at 7., but the States alleged the deprivation of *statutory and regulatory* notice that the federal government owed them, resulting in harms foreseen by the statute.

---

[5] The Government's argument regarding the harms suffered by the States as a result of the lack of statutory notice is concerning. *See* Opening Br. at 28–29 (arguing that allowing standing "based on downstream harms to state budgets and operations from the termination of probationary employees. . . would permit states to access the federal courts to supervise nearly any federal government action, and it is irreconcilable with Supreme Court precedent"); *see also* Maj. Op. at 18 ("Innumerable federal actions impact state budgets and programs. Under [the States'] theory, every modification in federal funding levels would authorize states to sue in federal court. . . . If we recognized a cognizable injury here, there would be no end to the suits that states could bring to contest any federal action."). All that is required is for the *federal* government to adhere to statutory notice requirements as set forth by *federal* law. The Government had the opportunity to conduct the RIF according to statutory procedure and chose not to do so.

35

*See* 5 U.S.C. § 3502(d)(3)(A)(i) ("Notice . . . shall be given to the State or entity designated by the State to carry out rapid response activities."); *see also Maryland*, 777 F. Supp. 3d. at 454–55 (district court detailing "concrete" harms to the States). Far from "ceding federal sovereignty to the states," Maj. Op. at 18, the States ask only that the federal government do what is required under law. The statute and regulations require the Government to give 60 days' notice before a RIF. The Government refused, and it is their disregard for the law that prompted this lawsuit.

Further, the district court correctly distinguished this case from *Texas*. Asking the Government "to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions" is a far cry from requiring the Government to adhere to a statutory notice requirement. *See United States v. Texas*, 599 U.S. 670, 677 (2023). The former "run[s] up against the Executive's Article II authority to enforce federal law" and seeks to mandate something of the Government that was not already required. *Id.* at 678. The latter merely asks the Government to comply with legally-mandated procedure.

Additionally, unlike in *Texas*, the Government inaction here was not discretionary. In *Texas*, the states sought damages for the costs associated with incarceration and social services based on the Government's *failure to exercise its discretion*—i.e., its discretionary inaction. *Id.* at 674, 684–85. Here, the alleged harms, namely, the unexpected increased financial burden placed on rapid response programs, are a result of the Government's *failure to adhere to statutory notice requirements*—i.e., its actions contrary to law. One is tangentially related to actions that the Government was not required to take, while the other

36

is *directly related* to an action the Government was required to and failed to take. For these reasons, and those aptly explained by the district court, *Texas* is inapplicable here.

C.

Moving to redressability, the majority's understanding of that standing requirement relies on a misread of the complaint, ignoring the interconnectedness of the RIF procedures and blessing the Government's attempt to read-in claims under the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 7101–35.

1.

a.

It is important to understand the RIF notice procedures when reading the complaint.

5 U.S.C. § 3502(d)(1)(B) directs, as relevant here, "an employee may not be released, due to a reduction in force, unless . . . the requirements of paragraph (3) are met at least 60 days before an employee is so released. *Id.* Subsection (d)(3) states "[n]otice under paragraph (1)(B) shall be given to the State or entity designated by the State to carry out rapid response activities." *Id.* § 3502(d)(3)(A)(i).

The regulations implementing the statutory RIF notice requirements are contained in 5 C.F.R. § 351 Reduction in Force. Section 351 is an exhaustive and detailed framework for RIFs, largely focused on proper identification of employees who may be subject to RIFs. Subsection 803(b)(1) contains the notice due to states: "When 50 or more employees in a competitive area receive separation notices . . . the agency must provide written notification . . . to [t]he State or the entity designated by the State to carry out rapid response activities." 5 C.F.R. § 351.803(b)(1).

37

The additional detail in the regulation as compared to the statute is important.  Not only is notice required but § 351.803(b)(1) presumes that separated employees are "in a competitive area."  *Id.*  Subsection 402 requires competitive areas to be defined by each agency.  *See id.* § 351.402.  Even a cursory search through the regulation indicates why agencies must do so.  A RIF cannot be effectuated—the employees subject to a RIF cannot be identified—without knowing which competitive area an employee is in.

This includes the regulation's notice provision.  A state receives notice only if "50 or more employees in a competitive area" are subject to a RIF.  *Id.* § 351.803(b)(1).  And a competitive area is only established when "employees compete for retention" during a RIF process.  *Id.* § 351.402(a).  So, the notice provision is not unmoored from the larger statutory and regulatory framework of RIFs but an essential part of the RIF requirements.

b.

Throughout the complaint the States refer alternately to "RIF requirements" and "RIF notice requirements."  Looking to the prayer for relief, the States request that the Government be made to follow "RIF requirements."  J.A. 71–72.  In noting the States use of "RIF requirements" over "RIF notice requirements" in the prayer for relief, the majority believes it has routed the States on redressability.  If the States went through the trouble of using two terms and then settling on one, then the use of only one of those terms operates to the exclusion of the other.  *See* Maj. Op. at 24 ("Because other parts of the complaint listed the 'RIF Requirements' separately from the 'RIF Notice Requirements' to include the myriad other steps the government must take before conducting a RIF pursuant to 5 U.S.C. § 3502, we can only conclude that the States' use of the broader 'RIF requirements'

38

in their prayer for relief was intentional.") (citation omitted).  So, by choosing "RIF requirements" the States are asking for relief broad enough to encompass not just their lack of notice but also the probationary employees' claims.

While creative, this seemingly simple "close evaluation of the requested relief," Maj. Op. at 22, can only be achieved by ignoring context.  As discussed above, the RIF notice requirements contained in the statute and the regulations are not divorced from the broader RIF requirements.  It is impossible to determine if a state receives notice under § 351.803(b)(1) without dozens of other decisions being made by OPM and the individual agencies.  *See Maryland*, 777 F. Supp. 3d. at 446 ("[A]gencies must, among other requirements: identify 'competitive areas' . . . [and] rank employees based on various criteria.").

Though the majority attempts to distinguish between "RIF requirements" and "RIF notice requirements," any reasonable read of the complaint must be in the context of the RIF statutes and regulations.  Far from "an attempt to invoke a federal court's jurisdiction to restrain the federal government from terminating its probationary employees unless it fully complies with all applicable employment statutes and regulations," Maj. Op. at 25 (emphasis removed), the States can *only* receive relief for the harms inflicted on them with "adequate notice followed by forbearance—no more terminations until all legally mandated procedures, including passage of the requisite period of time, have been satisfied." *Maryland*, 777 F. Supp. 3d. at 460 .  Nowhere do the States ask for more than

they need.  Any suggestion "that the mere provision of notice would do the trick toggles between naïve and disingenuous."  *Id.* (internal citation omitted).[6]

2.

The majority further aligns with the Government by converting their arguments on the CSRA into an additional redressability bar.  *See* Maj. Op. at 27 ("The Civil Service Reform Act's reticulated scheme further supports our conclusion on redressability.").

The CSRA "provides for the original and exclusive administrative review of certain labor- and employment-related claims brought by federal employees and/or their unions." *Maryland*, 777 F. Supp. 3d. at 462.  The Government argues the CSRA precludes the States' claims because "the exclusion of states from the CSRA's review scheme reflects Congress's considered judgment limiting who may challenge a personnel decision and on what grounds—rather than providing carte blanche for states to sue outside the CSRA's comprehensive scheme."  Opening Br. at 39.

The States do not dispute that they cannot receive relief under the CSRA—instead, they have consistently argued that their harm arises from an independent "statutory right[] to notice."  Appellees' Br. (ECF No. 63) at 85; Mem. in support of motion for prelim. inj.

---

[6] I note also that nowhere in its opinion does the majority address the Government's case-long assertion that they "Did Not Conduct A Reduction In Force."  Opening Br. at 43. No matter the relief the Government argues would have been appropriate to ask for, *see* Maj. Op. at 19–20 (discussing Government's redressability argument), it is reasonable to question whether the Government's redressability argument was designed to avoid the RIF statute and regulations altogether.

(D. ECF No. 78-1) at 15.  As discussed previously, § 351.803(b)(1) requires the States receive notice—not employees.  I, like the district court, am not prepared to accept "the faulty premise that the States [are] simply trying to vindicate the interests of the terminated workers (as opposed to their own and separate harms as 'state *qua* states')."  *Maryland*, 777 F. Supp. 3d. at 463.

*      *      *

Accordingly, the States have successfully answered the question: " 'What's it to you?'"  *See TransUnion LLC*, 594 U.S. at 423 (internal quotation marks omitted). Standing based on the alleged informational injury is thus appropriate here.

III.

I adopt the district court's thorough and well-reasoned analysis of both standing and the merits of the preliminary injunction.  Instead of focusing on the case and claims before us, the majority impermissibly broadens the scope to "whether a group of states has Article III standing to challenge the composition of the federal workforce."  Maj. Op. at 7.  As explained above and in great detail by the district court, nowhere have the States asked to micromanage the Government.  They ask merely for what they are due—notice under the statutes and regulations.

Because I will not endorse the Government's attempt to circumvent our Nation's laws, I respectfully dissent.